**Nos. 23-2309, 23-2467**

IN THE

# United States Court of Appeals

## FOR THE SEVENTH CIRCUIT

————————

BAD RIVER BAND OF THE LAKE SUPERIOR TRIBE OF
CHIPPEWA INDIANS OF THE BAD RIVER RESERVATION,
Plaintiff-Appellee, Cross-Appellant,

v.

ENBRIDGE ENERGY COMPANY, INC., and ENBRIDGE ENERGY, L.P.,
Defendants-Appellants, Cross-Appellees.

————————

ENBRIDGE ENERGY COMPANY, INC., and ENBRIDGE ENERGY, L.P.,
Counter-Plaintiffs, Appellants/Cross-Appellees,

v.

BAD RIVER BAND OF THE LAKE SUPERIOR TRIBE OF
CHIPPEWA INDIANS OF THE BAD RIVER RESERVATION, and NAOMI TILLISON,
Counter-Defendants, Appellees/Cross-Appellants.

————————

Appeal from the U.S. District Court for the Western District of Wisconsin,
No. 3:19-cv-602-wmc, Judge William M. Conley

————————

**OPENING BRIEF AND REQUIRED SHORT APPENDIX FOR
ENBRIDGE ENERGY COMPANY, INC. AND ENBRIDGE ENERGY, L.P.**

————————

ALICE E. LOUGHRAN
DAVID H. COBURN
MARK C. SAVIGNAC
STEPTOE & JOHNSON LLP
1330 Connecticut Ave. NW
Washington, DC 20036
(202) 429-6202
aloughran@steptoe.com

JOSEPH S. DIEDRICH
ERIC M. MCLEOD
HUSCH BLACKWELL LLP
33 E. Main St., Suite 300
Madison, WI 53703
(608) 255-4440
joseph.diedrich@huschblackwell.com

MICHAEL C. DAVIS
DAVID L. FEINBERG
JUSTIN B. NEMEROFF
VENABLE LLP
600 Massachusetts Ave. NW
Washington, DC 20001
mcdavis@venable.com

*Counsel to Appellants / Cross-Appellees*

# CIRCUIT RULE 26.1 DISCLOSURE STATEMENT
## (Eric M. McLeod)

Appellate Court No.: 23-2309, 23-2467

Short Caption:   Bad River Band of the Lake Superior Tribe of Chippewa Indians v. Enbridge Energy Co., Inc.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statement be filed immediately following docketing; but the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

(1)  The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

   Enbridge Energy Company, Inc.; Enbridge Energy, Limited Partnership

(2)  The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

   Venable LLP; Husch Blackwell LLP; Steptoe & Johnson LLP

(3)  If the party or amicus is a corporation:

   i)  Identify all its parent corporations, if any; and

   Enbridge Energy Company, Inc. and Enbridge Energy, Limited Partnership are both indirect subsidiaries of Enbridge Inc., a publicly traded company.

   ii)  list any publicly held company that owns 10% or more of the party's or amicus' stock:

   Enbridge Energy Company, Inc. and Enbridge Energy, Limited Partnership are both indirect subsidiaries of Enbridge Inc., a publicly traded company.

Attorney's Signature: /s/ Eric M. McLeod            Date:   9/11/2023
Attorney's Printed Name:    Eric M. McLeod

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). Yes ____ No  X

Address:  Husch Blackwell LLP
         33 East Main Street, Suite 300
         P.O. Box 1379
         Madison, WI 53701-1379

Phone Number:    (608) 255-4440    Fax Number:      (608) 258-7138

E-Mail Address: Eric.McLeod@huschblackwell.com

# CIRCUIT RULE 26.1 DISCLOSURE STATEMENT
## (Joseph S. Diedrich)

Appellate Court No.: 23-2309, 23-2467

Short Caption: ___Bad River Band of the Lake Superior Tribe of Chippewa Indians v. Enbridge Energy Co., Inc.___

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statement be filed immediately following docketing; but the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

(1)  The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. App. P 26.1 by completing item #3):

  ___Enbridge Energy Company, Inc.; Enbridge Energy, Limited Partnership___

(2)  The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

  ___Venable LLP; Husch Blackwell LLP; Steptoe & Johnson LLP___

(3)  If the party or amicus is a corporation:

  i)  Identify all its parent corporations, if any; and

  ___Enbridge Energy Company, Inc. and Enbridge Energy, Limited Partnership are both indirect subsidiaries of Enbridge Inc., a publicly traded company.___

  ii)  list any publicly held company that owns 10% or more of the party's or amicus' stock:

  ___Enbridge Energy Company, Inc. and Enbridge Energy, Limited Partnership are both indirect subsidiaries of Enbridge Inc., a publicly traded company.___

Attorney's Signature: _/s/ Joseph S. Diedrich_____  Date: ___9/11/2023___
Attorney's Printed Name: ___Joseph S. Diedrich___

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). Yes _X_ No ___

Address: Husch Blackwell LLP
  33 East Main Street, Suite 300
  P.O. Box 1379
  Madison, WI 53701-1379

Phone Number: ___(608) 258-7380___  Fax Number: ___(608) 258-7138___

E-Mail Address: Joseph.Diedrich@huschblackwell.com

# CIRCUIT RULE 26.1 DISCLOSURE STATEMENT
## (Alice E. Loughran)

Appellate Court No.: 23-2309, 23-2467

Short Caption:    Bad River Band of the Lake Superior Tribe of Chippewa Indians v. Enbridge Energy Co., Inc.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statement be filed immediately following docketing; but the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

   Enbridge Energy Company, Inc.; Enbridge Energy, Limited Partnership

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

   Venable LLP; Husch Blackwell LLP; Steptoe & Johnson LLP

(3) If the party or amicus is a corporation:

   i)   Identify all its parent corporations, if any; and

        Enbridge Energy Company, Inc. and Enbridge Energy, Limited Partnership are both indirect subsidiaries of Enbridge Inc., a publicly traded company.

   ii)  list any publicly held company that owns 10% or more of the party's or amicus' stock:

        Enbridge Energy Company, Inc. and Enbridge Energy, Limited Partnership are both indirect subsidiaries of Enbridge Inc., a publicly traded company.

Attorney's Signature: /s/ Alice E. Loughran          Date:   9/11/2023
Attorney's Printed Name:    Alice E. Loughran

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). Yes ____ No  X

Address:  Steptoe & Johnson LLP
          1330 Connecticut Ave. NW
          Washington, DC 20036

Phone Number:    (202) 429-6202     Fax Number:      N/A

E-Mail Address: aloughran@steptoe.com

## CIRCUIT RULE 26.1 DISCLOSURE STATEMENT
### (David H. Coburn)

Appellate Court No.: 23-2309, 23-2467

Short Caption:  Bad River Band of the Lake Superior Tribe of Chippewa Indians v. Enbridge Energy Co., Inc.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statement be filed immediately following docketing; but the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

(1)  The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

     Enbridge Energy Company, Inc.; Enbridge Energy, Limited Partnership

(2)  The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

     Venable LLP; Husch Blackwell LLP; Steptoe & Johnson LLP

(3)  If the party or amicus is a corporation:

  i)  Identify all its parent corporations, if any; and

     Enbridge Energy Company, Inc. and Enbridge Energy, Limited Partnership are both indirect subsidiaries of Enbridge Inc., a publicly traded company.

  ii)  list any publicly held company that owns 10% or more of the party's or amicus' stock:

     Enbridge Energy Company, Inc. and Enbridge Energy, Limited Partnership are both indirect subsidiaries of Enbridge Inc., a publicly traded company.

Attorney's Signature: /s/ David H. Coburn                    Date:  9/11/2023
Attorney's Printed Name:    David H. Coburn

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). Yes ____ No  X

Address: Steptoe & Johnson LLP
         1330 Connecticut Ave. NW
         Washington, DC 20036

Phone Number:    (202) 429-3000    Fax Number:       N/A

E-Mail Address: dcoburn@steptoe.com

## CIRCUIT RULE 26.1 DISCLOSURE STATEMENT
### (Mark C. Savignac)

Appellate Court No.: 23-2309, 23-2467

Short Caption:  __Bad River Band of the Lake Superior Tribe of Chippewa Indians v. Enbridge Energy Co., Inc.__

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statement be filed immediately following docketing; but the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

(1)  The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

   __Enbridge Energy Company, Inc.; Enbridge Energy, Limited Partnership__

(2)  The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

   __Venable LLP; Husch Blackwell LLP; Steptoe & Johnson LLP__

(3)  If the party or amicus is a corporation:

   i)   Identify all its parent corporations, if any; and

   __Enbridge Energy Company, Inc. and Enbridge Energy, Limited Partnership are both indirect subsidiaries of Enbridge Inc., a publicly traded company.__

   ii)  list any publicly held company that owns 10% or more of the party's or amicus' stock:

   __Enbridge Energy Company, Inc. and Enbridge Energy, Limited Partnership are both indirect subsidiaries of Enbridge Inc., a publicly traded company.__

---

Attorney's Signature: __/s/ Mark C. Savignac__   Date:  __9/11/2023__
Attorney's Printed Name:  __Mark C. Savignac__

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). Yes ____ No __X__

Address:  Steptoe & Johnson LLP
          1330 Connecticut Ave. NW
          Washington, DC 20036

Phone Number:  __(202) 429-3000__   Fax Number:  __N/A__

E-Mail Address: __msavignac@steptoe.com__

# CIRCUIT RULE 26.1 DISCLOSURE STATEMENT
## (Michael C. Davis)

Appellate Court No.: 23-2309, 23-2467

Short Caption:    Bad River Band of the Lake Superior Tribe of Chippewa Indians v. Enbridge Energy Co., Inc.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statement be filed immediately following docketing; but the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

    Enbridge Energy Company, Inc.; Enbridge Energy, Limited Partnership

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

    Venable LLP; Husch Blackwell LLP; Steptoe & Johnson LLP

(3) If the party or amicus is a corporation:

    i)   Identify all its parent corporations, if any; and

    Enbridge Energy Company, Inc. and Enbridge Energy, Limited Partnership are both indirect subsidiaries of Enbridge Inc., a publicly traded company.

    ii)  list any publicly held company that owns 10% or more of the party's or amicus' stock:

    Enbridge Energy Company, Inc. and Enbridge Energy, Limited Partnership are both indirect subsidiaries of Enbridge Inc., a publicly traded company.

Attorney's Signature: /s/ Michael C. Davis                Date:  9/11/2023
Attorney's Printed Name:    Michael C. Davis

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). Yes ____ No  X

Address:  Venable LLP
          600 Massachusetts Ave. NW
          Washington, DC 20001

Phone Number:    (202) 344-4000    Fax Number:    (202) 344-8300

E-Mail Address: mcdavis@venable.com

# CIRCUIT RULE 26.1 DISCLOSURE STATEMENT
## (David L. Feinberg)

Appellate Court No.: 23-2309, 23-2467

Short Caption: __Bad River Band of the Lake Superior Tribe of Chippewa Indians v. Enbridge Energy Co., Inc.__

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statement be filed immediately following docketing; but the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

   __Enbridge Energy Company, Inc.; Enbridge Energy, Limited Partnership__

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

   __Venable LLP; Husch Blackwell LLP; Steptoe & Johnson LLP__

(3) If the party or amicus is a corporation:

   i)   Identify all its parent corporations, if any; and

      __Enbridge Energy Company, Inc. and Enbridge Energy, Limited Partnership are both indirect subsidiaries of Enbridge Inc., a publicly traded company.__

   ii)  list any publicly held company that owns 10% or more of the party's or amicus' stock:

      __Enbridge Energy Company, Inc. and Enbridge Energy, Limited Partnership are both indirect subsidiaries of Enbridge Inc., a publicly traded company.__

Attorney's Signature: __/s/ David L. Feinberg__     Date: __9/11/2023__
Attorney's Printed Name: __David L. Feinberg__

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). Yes ____ No __X__

Address:  Venable LLP
          600 Massachusetts Ave. NW
          Washington, DC 20001

Phone Number: __(202) 344-4000__    Fax Number: __(202) 344-8300__

E-Mail Address: __dlfeinberg@venable.com__

# CIRCUIT RULE 26.1 DISCLOSURE STATEMENT
## (Justin B. Nemeroff)

Appellate Court No.: 23-2309, 23-2467

Short Caption:    Bad River Band of the Lake Superior Tribe of Chippewa Indians v. Enbridge Energy Co., Inc.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statement be filed immediately following docketing; but the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

(1)  The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

     Enbridge Energy Company, Inc.; Enbridge Energy, Limited Partnership

(2)  The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

     Venable LLP; Husch Blackwell LLP; Steptoe & Johnson LLP

(3)  If the party or amicus is a corporation:

   i)   Identify all its parent corporations, if any; and

        Enbridge Energy Company, Inc. and Enbridge Energy, Limited Partnership are both indirect subsidiaries of Enbridge Inc., a publicly traded company.

   ii)  list any publicly held company that owns 10% or more of the party's or amicus' stock:

        Enbridge Energy Company, Inc. and Enbridge Energy, Limited Partnership are both indirect subsidiaries of Enbridge Inc., a publicly traded company.

---

Attorney's Signature: /s/ Justin B. Nemeroff              Date:   9/11/2023
Attorney's Printed Name:     Justin B. Nemeroff

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). Yes ____ No  X

Address:  Venable LLP
          600 Massachusetts Ave. NW
          Washington, DC 20001

Phone Number:     (202) 344-4000     Fax Number:      (202) 344-8300

E-Mail Address: jbnemeroff@venable.com

# TABLE OF CONTENTS

Table of Contents ...................................................................... i

Table of Authorities ................................................................ iii

Jurisdictional Statement ........................................................... 1

Statement of the Issues ............................................................ 1

Introduction ............................................................................. 2

Statement of the Case ............................................................... 4

    A.    Line 5's construction and critical role in serving energy markets in the United States and Canada .................................. 4

    B.    The Band consents to Line 5's construction and operations in successive agreements .............................................. 5

    C.    The Band repudiates the 1992 Agreement and seeks to eject Line 5 from the entire Reservation ........................ 9

    D.    The Band sues Enbridge for trespass and anticipatory nuisance .................................................................. 10

    E.    The district court's rulings ............................................ 11

Summary of Argument ........................................................... 14

Standard of Review ................................................................ 17

Argument ............................................................................. 17

I.    Enbridge is not trespassing or unjustly enriched because it has a legal right to operate Line 5 across the Band's property ................... 17

    A.    The implied duty of good faith and fair dealing .......................... 17

    B.    The Band's express commitment to do whatever it can reasonably do to ensure Enbridge's objectives are achieved ............................................................... 19

    C.    The Band breached the express and implied duties by refusing consent for the Allotted Parcels ..................... 20

D.    The Band's trespass claim fails because Enbridge's BIA-approved easements remain in effect by operation of law .......... 29

II.    The district court's injunction conflicts with the foreign policy of the United States and its treaty with Canada ...................... 32

A.    The shutdown order violates the Transit Treaty with Canada ........................................................................... 32

B.    The injunction also violates the foreign affairs doctrine ............ 37

III.    The district court erred by ruling that an injunction must follow a finding of trespass liability .................................................. 40

A.    The district court applied the wrong test ..................................... 40

B.    The district court ignored significant harm to innocent third parties caused by a shutdown of Line 5 ............................. 43

C.    The district court ignored the Band's wrongful conduct ............. 46

IV.    The Court should reverse the district court's injunction based on federal common law nuisance ........................................... 48

A.    The PSA displaces federal common law's cause of action for nuisance in the context of interstate pipeline safety ............. 48

B.    The district court erred in rejecting Enbridge's displacement argument ...................................................... 52

C.    The Band's nuisance claim fails as a matter of law for additional reasons .......................................................... 59

Conclusion ........................................................................................ 61

Certificate of Compliance with Rule 32(a) ...................................... 63

Certificate of Compliance With Circuit Rule 30(d) ......................... 64

Statutory Addendum

Required Short Appendix

Certificate of Service

TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Abbott Labs. v. Mead Johnson & Co.*,
  971 F.2d 6 (7th Cir. 1992) ............................................................ 44

*Am. Elec. Power Co. v. Conn.*,
  564 U.S. 410 (2011) .......................................................... *passim*

*American Insurance Ass'n v. Garamendi*,
  539 U.S. 396 (2003) .......................................................... *passim*

*Asakura v. City of Seattle*,
  265 U.S. 332 (1924) ................................................................ 33

*Betco Corp. v. Peacock*,
  876 F.3d 306 (7th Cir. 2017) ................................................ 14, 18, 25

*Centex Corp. v. United States*,
  49 Fed. Cl. 691 (2001) .............................................................. 27

*In re Chayka's Estate*,
  176 N.W.2d 561 (Wis. 1970) ....................................................... 21

*City of Milwaukee v. Illinois*,
  451 U.S. 304 (1981) .............................................................. 51, 2

*Davilla v. Enable Midstream Partners L.P.*,
  913 F.3d 959 (10th Cir. 2019) ................................................... 40, 41

*eBay Inc. v. MercExchange, L.L.C.*,
  547 U.S. 388 (2006) ........................................................... 40, 43, 44

*Geier v. Am. Honda Motor Co., Inc.*,
  529 U.S. 861 (2000) ................................................................ 59

*Kimberly Assoc. v. United States*,
  261 F.3d 864 (9th Cir. 2001) ...................................................... 28

*Liebhart v. SPX Corp.*,
  998 F.3d 772 (7th Cir. 2021) ...................................................... 51

*Lynch v. United States,*
   292 U.S. 571 (1934) ................................................................. 27

*MacDonald v. Chicago Park Dist.,*
   132 F.3d 355 (7th Cir. 1997) .................................................. 17

*Market St. Assoc. LP v. Frey,*
   941 F.2d 588 (7th Cir. 1991) .................................................. 18

*Marvin M. Brandt Revocable Tr. v. United States,*
   572 U.S. 93 (2014) ................................................................. 47

*Michigan v. Enbridge Energy, LP,*
   571 F. Supp. 3d 851 (W.D. Mich. 2021) ................................ 51

*Michigan v. U.S. Army Corps of Engineers,*
   667 F.3d 765 (7th Cir. 2011) ............................................ 55, 56

*N.J. by Jacob v. Sonnabend,*
   37 F.4th 412 (7th Cir. 2022) .................................................. 17

*Harrell ex rel. NLRB v. Am. Red Cross,*
   714 F.3d 553 (7th Cir. 2013) .................................................. 17

*NRDC v. U.S. EPA,*
   859 F.2d 156 (D.C. Cir. 1988) ................................................ 30

*Oneida County, N.Y. v. Oneida Indian Nation of N.Y. State,*
   470 U.S. 226 ........................................................................... 42

*Packers Trading Co. v. CFTC,*
   972 F.2d 144 (7th Cir. 1992) .................................................. 47

*People of State of Illinois v. Outboard Marine,*
   680 F.2d 473 (7th Cir. 1982) ................................................... 5

*Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.,*
   324 U.S. 806 (1945) ....................................................... 46-47, 61

*Precision Pine & Timber, Inc. v. United States,*
   596 F.3d 817 (Fed. Cir. 2010) ................................................ 18

*Shondel v. McDermott,*
   775 F.2d 859 (7th Cir. 1985) ........................................ 46, 47, 61

*Sprietsma v. Mercury Marine,*
537 U.S. 51 (2002) ........................................................... 51, 58, 59

*Swinomish Indian Tribal Cmty. v. BNSF Ry. Co.,*
2023 WL 2646470 (W.D. Wash. Mar. 27, 2023) ......................... 43

*Union Home Mortg. Corp. v. Cromer,*
31 F.4th 356 (6th Cir. 2022) ................................................ 47

*United States v. Locke,*
529 U.S. 89 (2000) ............................................................ 57

*United States v. Pend Oreille Cnty. Pub. Util. Dist. No. 1 (Kalispel
III),* 135 F.3d 602 (9th Cir. 1998) ........................................ 41, 42

*United States v. Pend Oreille Pub. Util. Dist. No. 1 (Kalispel II),*
28 F.3d 1544 (9th Cir. 1994) ............................................... 41, 42

*United States v. Santa Fe Pac. R.R. Co.,*
314 U.S. 339 (1941) .......................................................... 42, 43

*United States v. Winstar,*
518 U.S. 839 (1996) .......................................................... 27, 28

*Winter v. NRDC,*
555 U.S. 7 (2008) ............................................................. 44

*Zenith Ins. Co. v. Employers Ins. of Wausau,*
141 F.3d 300 (7th Cir. 1998) ............................................... 19

**U.S. Constitution**

U.S. Const. Art. I § 8 ............................................................ 37, 38

U.S. Const. Art. II § 2 ........................................................... 38

U.S. Const. Art. II § 3 ........................................................... 38

**Statutes**

5 U.S.C. § 558(c) ................................................................ 15, 29, 32

25 U.S.C. § 323 ....................................................................7

25 U.S.C. § 324 .................................................................. 26

25 U.S.C. § 2218 ............................................................................... 26

46 U.S.C. § 4311(g) .......................................................................... 58

49 U.S.C. §§ 60101(a)(18)-(19).................................................. 49, 56

49 U.S.C. § 60102(a)(1) .............................................................. 49, 56

49 U.S.C. § 60102(a)(2) .................................................................... 49

49 U.S.C. § 60104(c) ......................................................................... 50

49 U.S.C. § 60117(p) ................................................................... 50, 54

49 U.S.C. § 60120(c) ......................................................................... 58

**Federal Treaties**

*Agreement Between the Government of the United States and the Government of Canada Concerning Transit Pipelines*, Jan. 28, 1977, 28 U.S.T. 7449, 1977 WL 181731 ...................................................................*passim*

1854 Treaty between the United States and the Chippewa .................... 35, 36

**Regulations**

25 C.F.R. § 2.6 .................................................................................. 26

25 C.F.R. § 169.3 (2013).............................................................. 30, 31

25 C.F.R. § 169.10 ............................................................................ 28

25 C.F.R. § 169.14 (2013)................................................................. 30

25 C.F.R. § 169.19 (2013)................................................................. 31

25 C.F.R. § 169.107 .......................................................................... 27

25 C.F.R. § 169.108(a)....................................................................... 27

43 C.F.R. § 4.314(a)........................................................................... 29

49 C.F.R. § 1.96 ................................................................................ 49

49 C.F.R. § 190.233(a)....................................................................... 50

49 C.F.R. § 190.239 ...................................................................... 50

49 C.F.R. § 195.450 ...................................................................... 49

49 C.F.R. § 195.452 ...................................................................... 49

**OTHER AUTHORITIES**

123 Cong. Rec. 26,291 (1977) ..................................................... 33

Restatement (Second) of Contracts § 205 ..................................... 18

Restatement (Second) of Torts §§ 936, 940 .................................. 61

Restatement (Second) of Torts §§ 940, 950 .................................. 61

Senate Committee on Foreign Relations, Report on Agreement
    with Canada Concerning Transit Pipelines, S. Exec. Rep. No.
    95-9 ............................................................................... 32, 33

23 Williston on Contracts § 63:22 (4th ed.) ................................... 18

**GLOSSARY**

| Short Form | Description |
| --- | --- |
| A. | Appendix under Circuit Rule 30(a) |
| Allotted Parcels | Parcels of reservation land originally conveyed to individual Indians known as allottees. (A7) |
| Band | Plaintiff Bad River Band of the Lake Superior Tribe of Chippewa Indians of the Bad River Reservation |
| BIA | Bureau of Indian Affairs |
| Enbridge | Defendants Enbridge Energy Company, Inc. and Enbridge Energy, L.P. Throughout this brief, "Enbridge" includes the predecessor company, Lakehead Pipeline Company. |
| IBIA | Interior Board of Indian Appeals |
| FERC | Federal Energy Regulatory Commission |
| Meander | Line 5 runs underground near a specific meander or bend in the Bad River. (A6) |
| PHMSA | Pipeline and Hazardous Materials Safety Administration |
| PSA | Pipeline Safety Act |
| R. | Record number in the district court (PACER) |
| Reservation | Bad River Reservation |
| SA | Separate Appendix under Circuit Rule 30(b) |

| Short Form | Description |
|---|---|
| Tribal Parcels | Parcels of reservation land wholly owned by the Band and held in trust by the United States. (R.360:7.) |
| Transit Treaty | *Agreement Between the Government of the United States and the Government of Canada Concerning Transit Pipelines*, Jan. 28, 1977, 28 U.S.T. 7449, 1977 WL 181731 |

## JURISDICTIONAL STATEMENT

The district court had subject matter jurisdiction over the operative complaint under 28 U.S.C. §§ 1331 and 1362 because plaintiff (the "Band") is a federally-recognized Indian tribe pursuing federal common law claims. The district court also had jurisdiction under § 1331 over Counts I-III of Defendants' counterclaims based on rights memorialized in federal right-of-way easements. (R.146:52, 67–71.) The district court entered a final judgment on June 29, 2023. (A128-129.) Defendants ("Enbridge") timely appealed on June 30, 2023 (R.680), and the Band cross-appealed (R.695). This Court has jurisdiction under 28 U.S.C. § 1291. This appeal is from a final judgment that disposes of all parties' claims.

## STATEMENT OF THE ISSUES

**1.** Whether Enbridge is trespassing where the Band consented to fifty years of Line 5's operations over its land but then acquired interests in additional parcels traversed by the pipeline and refused to provide consent for renewed easements on them, thwarting the parties' agreement.

**2.** Whether the district court's injunctive remedy, including a permanent shutdown of Line 5's operations by June 2026, is precluded by the 1977 U.S.-Canada Transit Treaty and the foreign affairs doctrine.

**3.**     Whether the district court erred in concluding that it lacked equitable power to permit Enbridge to continue operating on the Reservation beyond June 2026 and until the Line 5 reroute is complete.

**4.**     Whether the Pipeline Safety Act displaces the Band's claim for anticipatory public nuisance and shutdown remedy under federal common law.

## INTRODUCTION

This appeal challenges the district court's decision to shut down an international pipeline that provides energy to millions in the Midwest and central Canada. This pipeline—known as Line 5—has served this vital function for almost seventy years. Line 5 extends over 645 miles, traversing Wisconsin and Michigan before crossing into Ontario, Canada. (A1, A3, A110.) The pipeline is protected by a treaty between the United States and Canada guaranteeing the uninterrupted flow of hydrocarbons between the two countries. (A41.) As the Government of Canada explained, "Line 5 is vital to Canada's energy security and economic prosperity …." (R.210-47:17.)

Just twelve miles of Line 5 traverse the Band's Reservation. (A3.) Seventy years ago, the Band consented to Line 5's operations on a pipeline right-of-way on the Reservation. (A3.) More recently in 1992, the Band agreed to another fifty years (until 2043) of pipeline operations on its land and to do whatever it could reasonably do to ensure Enbridge's objectives of

2

operating Line 5 on the existing right-of-way are achieved. (A4–5.) But, after accepting substantial compensation for these promises, the Band acquired a few additional parcels along the Reservation right-of-way—constituting less than a half percent (.436%) of the pipeline's length—and is now using *those* parcels to shut down the entire pipeline, frustrating the whole purpose of the parties' agreement. (A6–8.) As the district court observed, "[t]he use of trespass for a few parcels to drive the effective closure of all Line 5 has always been about a tail wagging a much larger dog." (A111.)

The Band sued Enbridge for trespass and also alleged that Line 5's operations posed an anticipatory public nuisance at a specific location known as the Meander. (R.123.) The district court found Enbridge liable for trespass as a matter of law. It ordered disgorgement of profits and injunctive relief, directing Enbridge to stop operating Line 5 in three years—which the court itself stated was an impossibly short time to accomplish a reroute of the pipeline off the Reservation, given the need to obtain permits and the Band's paradoxical opposition to that reroute. (A123, A129.) The court imposed a separate injunction on the nuisance claim, requiring Enbridge to implement a more restrictive shutdown and purge plan, even though Congress vested a federal agency with power to shut down a pipeline when local conditions pose a safety risk. (A108–10, A129.)

## STATEMENT OF THE CASE

**A.    Line 5's construction and critical role in serving energy markets in the United States and Canada**

Enbridge owns and operates Line 5. (A1.) In 1953, Enbridge's predecessor built Line 5 to drastically reduce the amount of petroleum products traveling by tankers on the Great Lakes. The route from Superior, Wisconsin to Sarnia, Ontario—shown in the map below—has not changed since its construction in 1953.



Exhibit II-2: Line 5 Pipeline with Terminals and Facilities[19]

(R.416:15.) Line 5 is part of a network of connecting pipelines that originate in Western Canada and transport petroleum products to refineries in the Midwest, Ontario, and Quebec. (R.380:22–27.)

Line 5 has been a vital piece of a massive network on which Americans and Canadians depend to satisfy their energy needs. The pipeline transports up to twenty-three million gallons per day of light crude oil and natural gas liquids. (A3.) It supplies about 38% percent of all crude oil in Michigan, northern Ohio, western Pennsylvania, Ontario, and Quebec. (R.262:55.) And it supplies virtually all propane in Ontario and most of Michigan. (R.204:3; R.495:18-19; R.495:19; SA100-01.)

Line 5 serves ten oil refineries in the United States and Canada. (R.262:53.) Most of the output is transportation fuels—gasoline, jet fuel, and diesel. (R.210-47:5.) Line 5's natural gas liquids product consists primarily of propane and butanes. (R.262:15.) Propane is mostly consumed by the residential (home heating) and agricultural sectors (R.262:15; SA100), while a type of butane is used primarily for gasoline production. (R.204:3; R.495:15; R.262:15.) Line 5 and its associated facilities provide thousands of workers in the United States and Canada with middle-class wages and benefits. (R.214:8-12; R.497:21.)

## B. The Band consents to Line 5's construction and operations in successive agreements

Twelve miles of Line 5 run underground through the Band's Reservation in northern Wisconsin. (A3, A76.) The 60-feet wide pipeline

corridor was selected in 1952 as a relatively straight path across northern Wisconsin that avoids populated areas, lakes, and highways. (R.218-20:4.)

With the Band's consent, the BIA granted successive easements that gave Enbridge the right to build and operate Line 5 through Reservation lands. (R.260:3-8.) The original easement included "all the parcels on the Reservation owned either by the Band or by individual Indians" that Line 5 crossed. (A3.) Some parcels in the easement right-of-way are wholly owned by the Band and held in trust by the United States (Tribal Parcels). (A3, A7.) The right-of-way also includes fifteen parcels originally conveyed to individual Indians known as allottees (Allotted Parcels). (A7.) As reflected in the map below, the Allotted Parcels are interspersed in the twelve-mile pipeline corridor across the Reservation.



(R.218-51:2.)

In 1973, the BIA renewed the existing easement over both the Tribal Parcels and Allotted Parcels. (R.170-7; 170-26:3.) That easement was set to expire in 1993. (A4; R.218-7.) Both Enbridge and the Band wanted a fifty-year renewal of the existing easement, but the BIA advised that it would not issue renewals longer than twenty years on the Allotted Parcels. (A4–5; SA16; 25 U.S.C. § 323; 25 C.F.R. Part 169.)

In 1992, Enbridge and the Band executed an agreement under which the Band consented to Line 5's operation through 2043 on its lands and

agreed to "do whatever [it] can reasonably do" to ensure that Enbridge's objective of maintaining and operating Line 5 for fifty years on the existing right-of-way is achieved, "even if it means that [the Band] must do something which is not expressly described herein." (SA2, SA4–5; R.218-1:4–5.) Enbridge paid the Band $800,000, which the Band advised the BIA was "an extremely good price for the right of way …." (SA61.) Enbridge then negotiated consents from the individual owners of the Allotted Parcels. (A6; R.218-11.) The BIA issued an easement through 2043 over the Tribal Parcels and easements through June 3, 2013, over the Allotted Parcels. (SA18–22; R.170-14; R.170-15.)

While Enbridge's right-of-way has not changed since its original construction in 1953, ownership in the Allotted Parcels has. (A3, A6-7.) At the time of the 1992 Agreement, the Band held fractional interests in three of the Allotted Parcels. (A4.) By June 2013, the Band owned or co-owned eleven Allotted Parcels on the easement right-of-way and acquired an interest in a twelfth in 2016. (A7.)[1]

In March 2013, before the terms of the easements on the Allotted Parcels ended, Enbridge submitted timely applications to renew rights-of-way across them. (R.170-26:3; A7.) Enbridge and the Band then began a

---

[1] The Band made these acquisitions pursuant to the 1982 Indian Consolidation Act, 25 U.S.C. §§ 2202-2221. (A6-7.)

multi-year effort to negotiate consents for renewal. (A7–9; R.170-27; R.170-32.)

### C.     The Band repudiates the 1992 Agreement and seeks to eject Line 5 from the entire Reservation

Despite consenting to fifty years of Line 5 operations on its lands, the Band subsequently changed its mind. It then sought to use its fractional interests in the Allotted Parcels to shut down all of Line 5 in breach of the 1992 Agreement. (A3, A7–8; R.380:39.)

In 2017 and 2019, the Band's governing body passed resolutions "resolv[ing] that it shall not renew its interests in the rights of way across lands within the Reservation." (SA40–41, SA63–64; R.170-33; R.218-21; A8.) Those resolutions directed the Band's staff to "take all action permitted under the law for Line 5 removal within the waters of the Reservation and [Bad River] Watershed." (R.218-21; R.170-33; SA63–64, SA40–41.)

The Band also claimed that Line 5 was at risk of becoming uncovered and releasing product into the environment, but blocked Enbridge's numerous efforts to undertake erosion mitigation measures. (A3, A7–8, A17.) As Line 5 crosses the Reservation, it runs under the Bad River near a meander in the river ("Meander"). (A60.) As a result of the Bad River's natural process of migration, the right bank of the river at the Meander has moved to within eleven feet (at the closest point) of where the Line 5 pipeline

is buried. (A77–79.) Enbridge has proposed over a dozen projects to minimize and prevent erosion at the Meander—including temporary sandbags and rock riprap. (A79; A63–66; SA66–70; SA120–123, SA80–82; R.636:6–7; R.640:2; R.642:5.) Enbridge applied to the Band, which exercises delegated Clean Water Act authority, to approve such work. (A91.) The Band has not approved a single Enbridge proposal. (A91–93; SA66, SA120.)

### D. The Band sues Enbridge for trespass and anticipatory nuisance

In 2019, the Band filed this lawsuit, raising two principal grievances. (R.123.) First, it accused Enbridge of trespassing on the Allotted Parcels in which the Band held an ownership interest. (R.123:56.) The Band asserted a related unjust enrichment claim. (R.123:59.) Enbridge counterclaimed, alleging that the Band had breached the express terms of the 1992 Agreement—including the express covenant to take reasonable measures to ensure Enbridge's existing right-of-way—and the covenant of good faith and fair dealing. (R.146:67–70.) Second, the Band asserted an anticipatory nuisance claim under federal common law, claiming that Line 5 posed an imminent risk of release due to erosion at the Meander—a risk the Band itself was exacerbating by blocking all of Enbridge's proposals to combat erosion. (R.123:54.)

As relations with the Band strained, Enbridge initiated plans to relocate the 12-mile section of Line 5 outside the Reservation. As of 2020, Enbridge had secured all land and easement rights necessary to lay the 41-mile pipeline segment, a construction team had been assembled, and materials were purchased. (R.611:6–7.) Enbridge is prepared to start construction immediately upon obtaining state and federal permits. (R.611:10.) Despite insisting that Line 5 be removed from the Reservation, the Band is actively opposing Enbridge's reroute permits. (A123; R.611:5–10, 64–72.)

After the Band moved for an immediate ejectment of Line 5, the Government of Canada expressed its urgent concern about any shutdown of Line 5 and formally initiated bilateral dispute resolution with the United States, pursuant to the Transit Treaty governing cross-border hydrocarbon pipelines like Line 5. (A42; R.357-2.) Because "the energy security of both Canada and the United States would be directly impacted by a Line 5 closure," the Government of Canada is "extremely concerned by the efforts of the [Band] to immediately and permanently shut down" Line 5. (R.357-2.)

## E.    The district court's rulings

At summary judgment, the district court ruled that Enbridge was liable for trespass and unjust enrichment. (R.360:35.) It reasoned that Enbridge did not, as a matter of law, have the Band's consent (express or implied) to

continue operating over twelve of the Allotted Parcels. (A2, A23.) The court dismissed Enbridge's breach of contract counterclaims. (A2, A26.) It was "inclined" to order that Enbridge "complete the reroute" outside the Reservation "within five years" and pay double fees if the reroute took longer; however, the court withheld issuing the injunction pending further input from the parties. (A43.) The district court also ruled that the Band's federal common-law nuisance claim would proceed to trial. (A3, A54.)

In fall 2022, the district court held a bench trial on the remaining issues, including nuisance liability and remedies for trespass and nuisance. (A73–74; A54; A57–58.) At trial, Enbridge established that Line 5's operations on the Reservation complied with governing federal pipeline safety regulations. (R.198; SA75–76.) The court observed during the hearing: "I have not formally decided, but I certainly made clear that I don't see myself stopping the pipeline …." (R.607:187.)

On May 9, 2023, the Band filed an emergency motion urging the court to immediately enjoin Line 5's operation. (R.628.) The Band claimed that further erosion had occurred at the Meander following seasonal flooding. (R.629:1) The district court held an evidentiary hearing, where it expressed frustration that the Band had "refus[ed] to take any steps to prevent a catastrophic failure at the meander" (R.679:9), instead "[choosing] a strategy that has contributed to further erosion," (R.679:20.) The court observed that

12

the Band was playing "Russian roulette" by refusing to agree to reasonable remediation measures. (R.607:177.) "I am begging the Band to just act. Do something. Show me that you are acting in good faith …." (R.670:25–26.) The court denied the Band's emergency motion. The court added: "I don't see a remedy for trespass that includes an injunction … I think that there are monetary remedies for that." (R.679:231.)

On June 16, 2023, the district court entered an order resolving the remaining issues. (A73–124; *see also* A125–27.) The court ordered Enbridge to disgorge profits of $5,151,668 for past trespass on the twelve Allotted Parcels and to continue disgorging profits quarterly while Line 5 operates on the Reservation. (A112–22; A129.) As a further trespass remedy, the district court ordered Enbridge to "cease operation of Line 5 on any parcel within the Band's tribal territory on which defendants lack a valid right of way on or before June 16, 2026." (A129; A122–24; A127.) The court refused to consider the Transit Treaty, stating that "it is an international dispute that will have to be resolved elsewhere" and it is not "even a thumb on my balance." (R.605:46–47.) Finally, the court found that Line 5 constitutes a public nuisance at the Meander. (A102–05.) As a remedy, the court found that Enbridge's shutdown and purge plan—while designed to be consistent with governing federal safety regulations—was not "sufficiently conservative." (A105, A110; SA75–76.) The court ordered Enbridge to modify the plan by

adopting more stringent shutdown criteria that the court itself devised. (A129; A106–10; A127.)

## SUMMARY OF ARGUMENT

This Court should reverse the district court's ruling that Enbridge is in trespass, its injunction requiring Enbridge to cease operation on the Reservation by June 2026, and its injunction imposing judge-made pipeline safety regulations under federal common law.

*First*, Enbridge is not in trespass for operating on the twelve Allotted Parcels. In 1992, the Band agreed to fifty years of Line 5's operations on its land and further agreed to do "whatever [it] can reasonably do" to ensure that Enbridge's objectives—including maintaining and operating Line 5 for 50 years on the existing right-of-way—are not impeded. (SA4–5.) The Band breached this commitment when it refused consent for after-acquired parcels and thwarted the 1992 Agreement's entire purpose. As the district court noted, "Enbridge's 50-year easement over Band-owned tribal land is of little import unless Enbridge has permission to operate its pipeline across the entire Reservation …." (A19–20.) The Band's conduct also violated the implied duty of good faith and fair dealing, which requires that "each party to a contract will not do something which will have the effect of injuring or destroying the ability of the other party to receive the benefits of the contract." *Betco Corp. v. Peacock*, 876 F.3d 306, 310 (7th Cir. 2017) (cleaned

up). Enbridge is entitled to the Band's consent and the benefit of the bargain—just as the parties agreed.

Enbridge is not in trespass for another reason. Section 558(c) of the Administrative Procedure Act provides that, where an applicant "has made timely and sufficient application" to extend the term of an existing right-of-way, such right-of-way "does not expire until the application has been finally determined by the agency." 5 U.S.C. § 558(c). Here, Enbridge submitted timely and sufficient applications to renew rights-of-way across the Allotted Parcels, and those applications remain active pending the outcome of the administrative appeal before the Interior Board of Indian Appeals (IBIA).

*Second*, the district court's injunction orders violate the Transit Treaty, which has the force of federal legislation under the Supremacy Clause. Article II of the Transit Treaty bars public authorities from permanently shutting down cross-border pipelines such as Line 5. The injunction also violates the doctrine of *American Insurance Ass'n v. Garamendi*, which precludes "interference with the foreign policy [that our international] agreements embody." 539 U.S. 396, 416-17 (2003). Under *Garamendi*, the Court need only find that the shutdown order creates a likelihood of "something more than incidental effect in conflict with express foreign policy." *Id*. at 420. That standard is met here, given that the Government of

15

Canada formally invoked the Transit Treaty's dispute resolution process in direct response to the Band's shutdown efforts. (R.357-2.)

*Third*, the district court erred by finding that public interest and other equitable concerns could not displace any tribal sovereignty over the twelve Allotted Parcels absent extraordinary situations. (A122–23.) The district court did not weigh the equitable factors, including catastrophic effects on the public from the forced shutdown of crucial energy infrastructure as well as the Band's own conduct in breaching the 1992 Agreement and refusing to allow erosion mitigation. Even if a showing of extraordinary circumstances is required, such a showing has been clearly made in this case.

*Fourth*, the federal Pipeline Safety Act (PSA) displaces the district court's application of federal common law to hold that Line 5 constitutes an anticipatory public nuisance and impose its own shutdown and purge plan. Because "it is primarily the office of Congress, not the federal courts, to prescribe national policy," an Act of Congress displaces judge-made federal common law if it "speaks directly to the question at issue." *Am. Elec. Power Co. v. Conn.*, 564 U.S. 410, 423-24 (2011). The PSA's delegation of authority over pipeline safety—including the power to shut down pipelines if local conditions pose a safety risk—to an expert agency easily clears that bar. In addition, the district court's injunction order on the nuisance claim— requiring a more stringent shutdown and purge plan—violates Article IV of

the Treaty. That provision permits the appropriate regulatory authorities—and only the appropriate regulatory authorities—to temporarily stop or reduce the flow of cross-border flow hydrocarbons.

## STANDARD OF REVIEW

This Court reviews the district court's summary judgment ruling de novo. *N.J. by Jacob v. Sonnabend,* 37 F.4th 412, 420 (7th Cir. 2022). The Court reviews a district court's injunction ruling for abuse of discretion. *Harrell ex rel. NLRB v. Am. Red Cross*, 714 F.3d 553, 556 (7th Cir. 2013). A district court "necessarily abuse[s] its discretion by making an error of law." *MacDonald v. Chicago Park Dist.*, 132 F.3d 355, 357 (7th Cir. 1997).

## ARGUMENT

## I. Enbridge is not trespassing or unjustly enriched because it has a legal right to operate Line 5 across the Band's property

The district court held at summary judgment that Enbridge was trespassing on parcels in which the Band holds fractional ownership interests. (A9–23.) This was error, for the Band cannot prove a vital element of its trespass claim: that "Enbridge lacked a legal right—express or implied—to enter or remain." (A10.) The 1992 Agreement and the Administrative Procedure Act give Enbridge that right.

### A.   The implied duty of good faith and fair dealing

Enbridge's breach of contract claim is based on two separate theories: the Band breached its express commitments in the 1992 Agreement and also

17

breached an implied duty of good faith and fair dealing. (A11, A18.)[2] The district court recognized that a key provision in the 1992 agreement—Section 3—"is akin to the contract's implied duty of good faith recognized by Wisconsin common law." (A16.) Because the case law establishes the contours of the implied duty, Enbridge starts there.

Every contract contains an implied "duty of good faith and fair dealing." Restatement (Second) of Contracts § 205; *see also Market St. Assoc. LP v. Frey*, 941 F.2d 588, 595 (7th Cir. 1991) (Wisconsin law); *Precision Pine & Timber, Inc. v. United States*, 596 F.3d 817, 828-29 (Fed. Cir. 2010) (federal law). The implied duty binds each party to refrain from "do[ing] anything to injure or destroy" the counterparty's "benefits of the agreement." 23 Williston on Contracts § 63:22 (4th ed.). It prohibits "evasion of the spirit of the bargain" regardless of whether "the actor believes his conduct to be justified." Restatement § 205 cmt. (d). By definition, the implied duty imposes obligations not explicit in the contract's text: It "accompanies not just what the contract says but also what the parties expected to occur." *Betco Corp.*, 876 F.3d at 310.

---

[2] All agree that the contract claim is governed by general common law principles, looking to Wisconsin case law, federal common law, and the Restatement (Second) of Contracts. (A10 n.3.)

The test for breach of the implied duty is whether the non-breaching party received "the benefits that it expected when it entered into the contract," or its counterparty "destroyed [the party's] ability to receive the benefits." *Id.* at 311-12; *accord Zenith Ins. Co. v. Employers Ins. of Wausau*, 141 F.3d 300, 308 (7th Cir. 1998) (Wisconsin law).

## B. The Band's express commitment to do whatever it can reasonably do to ensure Enbridge's objectives are achieved

In the 1992 Agreement, the parties made this implied covenant express and greatly expanded it. (SA1–6.) The 1992 Agreement makes clear that Enbridge's primary objective in executing the contract is the grant of "a right of way for the construction, operation and maintenance of a pipeline for fifty (50) years within the Existing Right of Way." (SA2; *see also* SA25-25.) Section 3 then requires the Band to do whatever it can reasonably do—even actions not required within the Agreement's four corners—to ensure that Enbridge's objectives are met:

> The Tribe and the Company will do whatever they can reasonably do to ensure that all of the objectives of the Tribe and the Company, as those objectives are expressed in this Agreement, are achieved, *even if it means that one or both of the parties must do something which is not expressly described herein.*

SA4–5 (emphases added).

The second sentence of Section 3 sets forth another Enbridge objective: "to obtain from the Tribe all consents and authorizations it is possible for the

19

Company to obtain, whether necessary or not to obtain a fifty (50) year easement for Right of Way for a pipeline over the Company's existing pipeline Right of Way in which the Tribe has an interest." (SA5.) The Band waived sovereign immunity with respect to any disagreement or enforcement of the Agreement, though waiver for enforcement of aggregate monetary amounts is limited to $800,000. (SA2–3.)[3]

## C.   The Band breached the express and implied duties by refusing consent for the Allotted Parcels

The Band breached these express and implied duties when it destroyed the rights and benefits Enbridge received from that Agreement by blocking renewal of Enbridge's twenty-year easements on the Allotted Parcels. The district court acknowledged as much: "Enbridge's 50-year easement over the Band-owned tribal land is of little import unless Enbridge has permission to operate its pipeline across the entire Reservation, and without the Band's consent to easements on the 12 Band-owned allotment parcels, Enbridge cannot obtain the permission that it needs." (A19–20.)

---

[3]   Section 3 is nothing like a "further assurances" clause requiring the completion of ministerial tasks necessary to consummate the contract. A16-17, citing *Boyd Group (U.S.) Inc. v. D'Orazio*, No. 14 CV 7751, 2015 WL 3463625, at *5 (N.D. Ill. May 29, 2015). Neither district court nor the Band cited any case interpreting a provision like Section 3 that *expressly* requires the parties to reasonably ensure that the party's contractual objectives are achieved, even if it means doing "something which is not expressly described" in the contract. (SA4–5.)

Enbridge's objective in the 1992 Agreement was, at a minimum, to be able to operate Line 5 across the parcels then owned by the Band until 2043—and that objective is defeated by the Band's refusal to consent to easement renewals on the twelve Allotted Parcels. The Band's course of conduct violates both the duty of good faith and the Band's express contractual promise to do whatever it "can reasonably do to ensure that all of the objectives of … the Company … are achieved, even if it means that [the Band] must do something which is not expressly described" in the 1992 Agreement. (SA4–5.)

This case is analogous to the following illustration from the Restatement's section on the implied duty of good faith:

> A, owner of a shopping center, leases part of it to B, giving B the exclusive right to construct a supermarket, the rent to be a percentage of B's gross receipts. During the term of the lease A acquires adjoining land, expands the shopping center, and leases part of the adjoining land to C for a competing supermarket. Unless such action was contemplated or is otherwise justified, there is a breach of contract by A.

Restatement § 205 illustration 2. Both in this case and the illustration, a landowner violated the implied duty of good faith by acquiring additional land and using it to destroy the counterparty's contractual benefit. *See also In re Chayka's Estate*, 176 N.W.2d 561, 563-65 (Wis. 1970). Only here, the Band also breached its express promise to do everything reasonably necessary to ensure that Enbridge's objectives were achieved. (SA4–5.) The Band's own

21

statements make clear that it sought removal of Line 5 from the entire Reservation. (R.218-21; R.170–33.)

The district court rejected Enbridge's position, citing five reasons—all erroneous. (A20–23.)

*First*, the district court said that the 1992 Agreement's objective had not been frustrated because its only "purpose or objective" was "to grant Enbridge an easement to operate across *the then* Band-owned parcels for 50 years. … [T]he agreed upon purpose was not, as Enbridge now asserts, to permit it to operate across the entire Reservation for 50 years." (A20) (emphasis added). This is factually incorrect and legally erroneous.

Factually, Enbridge's prime objective was to obtain the Band's consent to Line 5's uninterrupted operation on the Reservation as a whole—not just the parcels then owned by the Band. The Agreement expressly states Enbridge's overall objective to obtain "the construction, operation and maintenance of a pipeline for fifty (50) years within the Existing Right of Way." (SA2.) And the Tribe agreed to do whatever reasonably necessary to ensure that contractual objective was achieved, "even if it means that [the Band] must do something which is not expressly described herein." (SA5.) The Band breached this provision by doing the exact opposite: taking every possible action to thwart Enbridge's maintenance and operation of Line 5

across the Reservation. In so doing, the Band deprived Enbridge of the 1992 Agreement's benefits.

Furthermore, the Agreement expressly states that "[o]ne of the Company's objectives under this Agreement is to obtain from the Tribe *all* consents and authorizations it is possible for the Company to obtain, *whether necessary or not* to obtain a fifty (50) year easement for Right of Way for a pipeline over the Company's existing pipeline Right of Way in which the Tribe has an interest." (SA5, emphases added). Thus, the agreement explicitly went beyond consents for the parcels in which the Band held an interest in 1992 and reached "all" Band "consents and authorizations it is possible for the Company to obtain." The district court's contrary conclusion was erroneous.

Everyone involved in 1992 understood that Enbridge's goal was to obtain the Band's consent—in return for substantial monetary consideration—for Line 5 to operate across the entirety of the Reservation for a fifty-year period. It goes without saying that a linear asset like a pipeline has value only if it can operate across its entire length. Remove a single segment, and the entire pipeline is rendered worthless. There was no basis for the district court to conclude—at the summary judgment stage, no less— that Enbridge's objective was limited to the parcels then owned by the Band

and that the Band was entitled to use other acquired parcels to shut down the pipeline.

Even if Enbridge's objective was merely to obtain "an easement to operate across the *then Band-owned parcels* for 50 years" (A20) (emphasis added), the Band's course of conduct plainly thwarts that objective by depriving Enbridge of the ability to operate the pipeline for the remaining decades within the fifty-year easement. The district court's analysis should have concluded with its acknowledgement that the fifty-year easement "is of little import unless Enbridge has permission to operate its pipeline across the entire Reservation." (A20.)

*Second*, the district court insisted that courts cannot "expand[] the four corners of the contract itself" or "read language into a contract which is not there." (A17–18.) But an implied duty of good faith and fair dealing is read into every contract, is not (by definition) explicit in the contract's language, and may necessarily require a party to do something not expressly required by the contract. Where, as here, the test for the implied duty is satisfied, it is no answer to say that contracts impose only those obligations made explicit in the text—which would negate the implied duty. In any event, as the district court acknowledged, the parties *did* include express language in Section 3 that parallels the implied duty.

*Third*, the district court reasoned that "Enbridge knew full well at the time it signed the 1992 Agreement that there was a substantial risk its easements on the allotment parcels would expire after 20 years" because the easements were limited to twenty years and the individual landowners might choose not to renew. (A17.) But it is always true that third parties might take actions that threaten a party's benefits from a contract—like building a competing supermarket across the street. That hardly gives *the contract counterparty* (who, unlike third parties, is bound by the contract) the right to take actions that thwart the contract's entire purpose and benefits. *See Betco*, 876 F.3d at 310.

*Fourth*, the district court said that reading the Agreement to prohibit the Band from withholding consent "would be effectively renewing these easements without BIA approval." (A23.) Not so. Enbridge acknowledges that BIA approval is necessary. But there is no evidence that anything stands in the way of BIA approval other than the Band's unlawful refusal to consent.[4] And while the BIA's policy is twenty-year easements on allotted lands, that does not prohibit a landowner from consenting for longer. It certainly does not insulate the Band's course of conduct in acquiring new land and then using that land to thwart Enbridge's benefits under the 1992 Agreement.

---

[4] Enbridge has obtained consents for renewed 20-year easements from seventy individual landowners of the Allotted Parcels. (R.259-5:13.)

*Finally*, the district court reasoned that the implied duty of good faith is inapplicable because a tribal entity may only surrender sovereign authority by a clear statement, not by implication. (A20–22.) That reasoning ignores the Band's *express* undertaking in Section 3 of the Agreement to take reasonable steps—even if not expressly stated in the Agreement—to ensure all of Enbridge's express objectives were achieved. Moreover, it broadly waived sovereign immunity "with respect to any dispute regarding this Agreement and with respect to enforcement of this Agreement …." (SA2–3.)

In any event, the so-called "unmistakability" doctrine has no application because this case does not concern any surrender of sovereign authority. The only "power" at issue is to grant or deny consent to a BIA easement over the twelve Allotted Parcels—a power that is not inherent in the Band's sovereign authority. In this case, the power to give or deny consent to an easement is conferred by statute and regulations not only upon the Band, but upon individual Indian landowners as well. *See* 25 U.S.C. §§ 324, 2218 and 25 C.F.R. §§ 169.107, 169.108(a). The Band's consent is not required for easements over allotted lands that the Band does not own. *See* 25 U.S.C. §§ 324, 2218; 25 C.F.R. §§ 169.107, 169.108(a). In short, the "power" that the Band seeks to exercise here is that of a private landowner to exclude from the land it owns, not the power of a sovereign to exclude from its sovereign territory.

The Band did not merely refuse consent. The course of conduct at issue here is the one-two punch of first acquiring land in which the Band held no interest in 1992 and then refusing to provide consent that Enbridge would not have required but for that acquisition. Acquiring land elsewhere in the right-of-way and then refusing to renew an existing easement to thwart a contract for which the Band was compensated is hardly a sovereign act.

In signing and performing under the 1992 Agreement, the Band is acting in its proprietary capacity, not its governmental or sovereign capacity. The case law demonstrates that the sovereign power does not apply to such contracts. Even as to the Federal Government, it is settled that "[w]hen the United States enters into contract relations, its rights and duties therein are governed generally by the law applicable to contracts between private individuals." *Lynch v. United States*, 292 U.S. 571, 579 (1934). "[T]he sovereign acts doctrine was meant to serve this principle, not undermine it." *United States v. Winstar*, 518 U.S. 839, 895 (1996) (plurality opinion). "In a government contract, the implied covenant of good faith and fair dealing requires that the Government not use its unique position as sovereign to target the legitimate expectations of its contracting partners." *Centex Corp. v. United States*, 49 Fed. Cl. 691, 708 (2001). And "when the government is acting as a private contracting party, then the [unmistakability] doctrine does not apply, and the government's rights and duties are governed by law

27

applicable to private parties unaltered by the government's sovereign status."
*Kimberly Assoc. v. United States*, 261 F.3d 864, 869 (9th Cir. 2001). "[W]hat
the Supreme Court … had in mind when [it] referred to sovereign power was
that power exercised by government for 'public and general' purposes, as
opposed to releasing government from its contractual obligations." *Id.*

A right-of-way is a non-possessory interest and, as a matter of federal
law, the grant of such an interest does not diminish a tribe's sovereign
authority "to any extent." 25 C.F.R. § 169.10. "Injecting the opportunity for
unmistakability litigation into every common contract action
would … produce the untoward result of compromising the Government's
practical capacity to make contracts, which [the Supreme Court has] held to
be 'of the essence of sovereignty' itself." *Winstar*, 518 U.S. at 884.

\*          \*          \*

Both the express terms of Section 3 and the implied duty of good faith
and fair dealing compel the Band's consent to easement renewals on the
Allotted Parcels to avoid destruction of Enbridge's benefit from the 1992
Agreement. Those duties require the Band's consent so that Enbridge can
obtain the benefit of its bargain—exactly as the parties intended. Further,
Enbridge's counterclaims sought the Band's consent through specific
performance. (R.146:69–70.) Thus, even if the contract by its own terms does
not amount to consent, Enbridge asserted a claim for specific performance

that should have been presented at trial and, if successful, would mean Enbridge is entitled to consent. The district court erred in granting summary judgment for the Band on its trespass claim and dismissing Enbridge's counterclaims. This Court should reverse.

### D. The Band's trespass claim fails because Enbridge's BIA-approved easements remain in effect by operation of law

Under the Administrative Procedure Act, "[w]hen [a] licensee has made *timely and sufficient application* for a renewal or a new license in accordance with agency rules, a license with reference to an activity of a continuing nature *does not expire* until the application has been finally determined by the agency." 5 U.S.C. § 558(c) (emphasis added). Here, Enbridge submitted timely and sufficient applications to renew rights-of-way across the Allotted Parcels before the end of their terms in June 2013. (A24.) The BIA Regional Director denied Enbridge's applications in July 2021, but the denial has been stayed pending a final, judicially reviewable determination by the IBIA. (R.207:82-3; A24; 25 C.F.R. § 2.6; 43 C.F.R. § 4.314(a)). The existing easements therefore remain in force, so there is no trespass.

The only ground that the district court gave for holding otherwise was that "Enbridge's renewal applications did not comply with the BIA's rules" because the applications did not include landowner consents. *Id*. This was legal error. In requiring compliance with agency rules, Section 558(c) is

"referring only to procedural standards set by the agency," the question of substantive adequacy being the ultimate question for the agency to answer. *See NRDC v. U.S. EPA*, 859 F.2d 156, 215 (D.C. Cir. 1988). The governing BIA rules do not require that an application to renew a right-of-way include landowner consents.

The district court invoked 25 C.F.R. § 169.14 (2013), which requires a deposit of consideration for the right-of-way and thus, the district court reasoned, requires that an agreement have been reached on the amount of consideration to be paid. (A24–25.) (The 2013 rules undisputedly govern.) But § 169.14 applies only to an application for a brand-*new* right-of-way, which is why it requires a deposit to cover "damages caused during the survey, and estimate damages to result from construction" of the pipeline. Here, Enbridge sought to renew *existing* rights-of-way for an existing pipeline. Renewals of existing rights-of-way are governed by 25 C.F.R. § 169.19 (2013), which does not require consent (or any payment) as part of the application.

> On or before the expiration date of any right-of-way heretofore or hereafter granted for a limited term of years, an application may be submitted for a renewal of the grant. If the renewal involves no change in the location or status of the original right-of-way grant, the applicant may file with his application a certificate under oath setting out this fact, and the Secretary, *with the consent required by § 169.3*, may thereupon extend the grant for a like term of years, upon the payment of consideration as set forth in § 169.12.

25 C.F.R. § 169.19 (2013) (emphasis added). Notably, the regulation treats the consent as separate from the application. It only requires consent as a prerequisite to the BIA's ultimate issuance of the renewed easement. *See id.; accord* 25 C.F.R. § 169.3 (2013) ("No right-of-way shall be *granted* ... without the prior written consent of the tribe" (emphasis added)).

The district court also cited the BIA right-of-way handbook ("Handbook") for processing applications for *new* rights-of-way to conclude that landowner consent is a required item "to be submitted with the renewal application." (A24–25 (citing the Handbook at 14–19)). The relevant section for renewal applications is located elsewhere in the Handbook and captioned, "Process a request for Grant of Easement for ROW extension." (Handbook at 70.) Nothing in this portion of the Handbook requires that consents for renewals be submitted with the application.

The district court stated that the BIA Acting Regional Director denied Enbridge's renewal applications in November 2020 on the ground that Enbridge had not submitted the consents "with its right-of-way applications." (A24.) To the contrary, the Acting Regional Director did not state that Enbridge's applications were incomplete for lack of consents or any other reason. Instead, she confirmed that, under the governing regulations, "[t]he submission of landowner consents is a requirement ... that must be met prior to the *granting* of a right of way." (R.170-26:7; SA32) (emphasis added).

31

Enbridge's existing easements "do[] not expire until the [renewal] application[s] ha[ve] been finally determined by the agency." 5 U.S.C. § 558(c). Line 5 remains on the Allotted Parcels pursuant to the existing easements. There is no trespass.

## II. The district court's injunction conflicts with the foreign policy of the United States and its treaty with Canada

The district court ordered Enbridge to shut down Line 5's operations on the Reservation—and, thus, its operations across the whole of its length—in June 2026. (A129.) It also directed Enbridge to adopt a materially more restrictive shutdown and purge plan. (A107–110; A127; A33.) These rulings violate the Transit Treaty and the foreign affairs doctrine.

### A. The shutdown order violates the Transit Treaty with Canada

In the mid-1970s—when this country was facing an oil crisis—the United States began negotiating with Canadian officials for an agreement to ensure the unimpeded movement of Alaska petroleum across Canada to the lower forty-eight states.[5] Canada expressed a reciprocal interest in the uninterrupted flow of hydrocarbons across the United States en route from

---

[5] Senate Committee on Foreign Relations, Report on Agreement with Canada Concerning Transit Pipelines, S. Exec. Rep. No. 95-9, at 2-3 (1977) (hereinafter "Senate Report").

one part of Canada to another.[6] Those cross-border talks resulted in the Transit Treaty between the United States and Canada. 28 U.S.T. 7449. This Treaty was ratified by President Carter with the advice and consent of the Senate pursuant to Article II of the Constitution.[7] The Treaty thus "stands on the same footing of supremacy as do the provisions of the Constitution and laws of the United States." *Asakura v. City of Seattle*, 265 U.S. 332, 341 (1924).

Article I declares that the Treaty expressly governs the "pipeline or any part thereof" and "all real … property … connected therewith."[8] Article II is its central substantive provision. It ensures that "[n]o public authority in the territory of either Party shall institute any measures, other than those provided for in Article V, which are intended to, or which would have the effect of, impeding, diverting, redirecting or interfering with in any way the transmission of hydrocarbons in transit." The Treaty does not define the term "public authority," but that phrase's plain meaning encompasses the Band's

---

[6] *See id*. at 2, 36-37.

[7] *See* 123 Cong. Rec. 26,291 (1977). When submitting the signed transit pipelines agreement to the Senate, the Executive Branch observed that the "agreement is self-executing upon its entry into force, and U.S. implementing legislation accordingly will not be required." Senate Report, *supra* at note 5*, at 83.

[8] The Transit Treaty is reproduced in its entirety in the Statutory Addendum to this brief.

Tribal Council, the district court, and the federal government as a whole, all of which are "public authorit[ies] in the territory" of the United States.[9] There is no dispute that Line 5 is protected by the Treaty. (R.360:41.)

The district court's injunction requires Enbridge to cease operations on the Reservation and shut down Line 5 in its entirety unless Enbridge can complete a reroute within three years. (A124, A129.) The district court said that timeline is implausible: "absent extraordinary efforts by Enbridge and federal officials, even [a *five-year* timeline] appears to be optimistic given the organized opposition to it, including by the Band." (A123). The injunction plainly "would have the effect of[] impeding … or interfering with in any way the transmission of hydrocarbons in transit" and therefore violates Article II.

Article V reinforces Article II's plain meaning. To avoid interruptions to the flow of hydrocarbons along transit pipelines, Article V provides that the flow of hydrocarbons may be stopped only "temporarily," only in certain exigent circumstances such as a natural disaster or operating emergency, and only "with the approval of the appropriate regulatory authorities …." Treaty

---

[9] Under international law, the obligations of each country extend to the "conduct of any state organ … whether the organ exercises legislative, executive, judicial … function …." U.N. International Law Commission, Articles on Responsibility of States for Internationally Wrongful Acts, U.N. General Assembly Res. 56/83, annex, Art. 4(1) (Dec. 12, 2001), https://legal.un.org/ilc/texts/instruments/english/draft_articles/9_6_2001.pdf.

Art. V.1[10] In the United States, the "appropriate regulatory authorit[y]" is the federal Pipeline and Hazardous Materials Safety Administration (PHMSA). *See* Section IV, *infra*. Article V further provides that there must be an "expeditious restoration" of "normal operations" after that temporary operating condition has passed. *See* Treaty Art. V.3 ("The Party shall not unnecessarily delay or cause delay in the expeditious restoration of normal pipeline operations."). This provision also precludes the district court's injunction requiring a modified shutdown plan since the court is not "the appropriate regularly authority"—PHMSA is. As these provisions demonstrate, the Transit Treaty prohibits public authorities from permanently shutting down transit pipelines.

The district court erred by simply disregarding the Transit Treaty. It stated that "there is no indication the Band will be involved in any arbitration between the United States and Canada; and the Band's property rights are themselves recognized in a federal treaty—the 1854 Treaty between the United States and the Chippewa; and again, a court cannot find

---

[10] "In the event of an actual or threatened natural disaster, an operating emergency, or other demonstrable need temporarily to reduce or stop for safety or technical reasons the normal operation of a Transit Pipeline, the flow of hydrocarbons through such Transit Pipeline may be temporarily reduced or stopped in the interest of sound pipeline management and operational efficiency by or with the approval of the appropriate regulatory authorities of the Party in whose territory such disaster, emergency or other demonstrable need occurs …." Treaty Art. V.1.

that Congress abrogated Indian treaty rights absent unambiguous language to that effect." (A42.)

The first point is a non-sequitur. The Federal Government has plenary authority over both Indian tribes and international relations; it is no more required to "involve" the Band in relations with Canada than it would be required to involve any other landowner.

As for the 1854 Treaty, there is no conflict between that treaty and the Transit Treaty that would entail any "abrogation" of Indian treaty rights. (A42–43.) Under the 1854 Treaty, the United States agreed "to set apart and withhold from sale, for use of the Chippewas of Lake Superior, the following-described tracts of land …." 1854 Treaty, Art. 2. Nothing in that treaty forecloses application of generally applicable federal laws regulating interstate and international commerce. *See* U.S. Const. Art. I, § 8, cl. 3. Nothing in the 1854 Treaty requires federal courts to make available an injunction remedy under federal common law. Furthermore, the Band specifically agreed that Enbridge may operate Line 5 through 2043 over its tribal lands as provided in the 1992 Agreement. (SA1–6.) In that Agreement, the Band voluntarily gave up any sovereign right to exclude Line 5's operations through 2043 in exchange for substantial consideration. (SA1–6.) *See also* Section I.C, *supra* (explaining that this case does not concern any surrender of sovereign authority).

In short, the district court's injunction order should be reversed as violating the Transit Treaty. None of this suggests the Band has no remedy. If Enbridge were found in trespass on the disputed parcels, then the district court could award appropriate damages but refrain from forcing a permanent shutdown.

## B.     The injunction also violates the foreign affairs doctrine

The district court's application of federal common law to order the shutdown of a transit pipeline subject to the Treaty is also barred for an independent reason: the doctrine of foreign affairs preemption (or, in this case, foreign affairs displacement of federal common law).

To ensure that the United States speaks with one voice in all matters of international relations, the Constitution commits those matters to the political branches of the Federal Government. *Garamendi*, 539 U.S. at 401. Federal power over external affairs is not shared with tribes or courts but is vested in the President and Congress exclusively. *See id.*; U.S. Const. Art. I § 8, Art. II § 2, Art. II § 3.

In *Garamendi*, the Supreme Court considered a California law addressing the complicity of certain insurance companies in Nazi Germany's "theft of Jewish assets, including the value of insurance policies." 539 U.S. at 401-02; *id.* at 408-13. California sought to force European insurance companies to acknowledge and pay unpaid claims under Nazi-era insurance

policies, and it used heavy-handed means in pursuit of that goal. *See id.* At the same time, the U.S. Government was negotiating with Germany, culminating in the German Foundation Agreement, which established a process for presenting unpaid claims but lacked the draconian penalties of the California law. *See id.* at 405-08. As the Court explained: "California seeks to use an iron fist where the President has consistently chosen kid gloves." *Id.* at 427.

The Supreme Court held that the California law was preempted because it "interfere[d] with foreign policy of the Executive Branch, as expressed principally in the executive agreements with Germany, Austria, and France." *Id.* at 413. The relevant agreements "include[d] no preemption clause." *Id.* at 417. Applying conflict preemption, the Court found that the evidence was "more than sufficient to demonstrate that the state Act stands in the way of the President's diplomatic objectives." *Id.* at 427 (cleaned up). The Court reached this conclusion even though the Executive Agreements at issue were not treaties and did not carry the force of law under the Supremacy Clause.

As in *Garamendi*, the district court's injunction here violates the foreign affairs doctrine because it would "interfere[] with the National Government's [*i.e.*, the President's and Congress's] conduct of foreign relations." 539 U.S. at 401. The Transit Treaty prescribes a specific process

for resolving disputes arising under it. Transit Treaty, Art. IX (disputes regarding the interpretation, application, or operation of the agreement shall be settled by the parties through negotiation and, if necessary, international arbitration). The United States and Canada are now actively engaged in the Treaty's bilateral dispute resolution process to determine whether the shutdown order violates the commitments of the United States made in the 1977 Treaty. The district court brushed this process aside, stating that "it is an international dispute that will have to be resolved elsewhere." (R.605:46–47.) It is true that the Treaty issues should ultimately be resolved by the international dispute resolution process. But that does not mean that a federal court—a "public authority" whose actions are limited by the Treaty—can simply disregard it, effectively usurping the international dispute resolution process by acting as if Canada's Treaty claim were invalid.

Under *Garamendi*, the Court need only recognize that the shutdown order creates a likelihood of "something more than incidental effect in conflict with express foreign policy." 539 U.S. at 420. That standard was met here: the Government of Canada formally invoked the Transit Treaty's dispute resolution process, in direct response to the Band's efforts to shut down Line 5. (R.357-2.) Breaking this country's commitments in the Transit Treaty would harm the public interest by undermining the foreign policy of the United States, U.S.-Canada relations, and the credibility of American

diplomatic commitments throughout the world. As in *Garamendi*, "the express federal policy and the clear conflict raised by [the district court's injunction] are alone enough to require" federal common law "to yield." 539 U.S. at 425.

## III. The district court erred by ruling that an injunction must follow a finding of trespass liability

The district court erred by finding that public interest and other equitable concerns could not displace any tribal sovereignty absent extraordinary situations. (A122-23.) This ruling ignores governing precedent: even if there is a finding of liability, a plaintiff "must satisfy a four-factor test before a court may grant [injunctive] relief." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). This is true even in cases involving trespasses on Indian lands. *Davilla v. Enable Midstream Partners L.P.*, 913 F.3d 959, 973 (10th Cir. 2019) (vacating an injunction in a case involving individual Indian lands when the district court failed to consider all injunction factors). In any event, this case presents extraordinary circumstances.

### A.     The district court applied the wrong test

The district court recognized that the Band was using twelve parcels on the Reservation to shut down a 645-mile pipeline, causing significant harm to energy consumers in the Midwest and Canada and to international relations

between the United States and Canada, as well as job losses for thousands of workers. (A111.) The district court, nevertheless, held that "equitable concerns" could not displace "tribal sovereignty" unless "extraordinary circumstances" were present. (A122–23.) The court thus wrongly replaced the equitable balancing test required by governing precedent with an inquiry into whether "extraordinary circumstances" were present to displace "tribal sovereignty." *Davilla*, 913 F.3d at 973.

As explained above, tribal sovereignty is not at issue here. *See* Section I.C, *supra*. But even where there is an intentional trespass on tribal lands, the district court retains equitable authority to decline the issuance of an injunction. *See United States v. Pend Oreille Cnty. Pub. Util. Dist. No. 1* ("*Kalispel III*"), 135 F.3d 602, 614 (9th Cir. 1998). In *Kalispel*, the utility operated a dam that flooded part of the tribe's reservation, causing those lands "to remain underwater all year." *Id.* at 606. The utility was found to be in intentional trespass dating back several decades. *Id.* The Ninth Circuit directed the district court to "consider whether to issue an injunction" and specifically suggested "fashion[ing] a remedy to minimize the harm such an injunction could cause," such as "enjoin[ing] the Utility from occupying Reservation land but stay[ing] the order to permit the Utility to seek an amendment to its license." *United States v. Pend Oreille Pub. Util. Dist. No. 1 (Kalispel II),* 28 F.3d 1544, 1551-52 (9th Cir. 1994). The district court then

granted the injunction but stayed it "for that amount of time which is necessary for FERC to act upon [the utility's] application" for an amendment to its license, provided that the utility pay a fee to the plaintiff to compensate for the continued trespass. *Kalispel III*, 135 F.3d 602, 614 (9th Cir. 1998).

The district court distinguished *Kalispel* and similar cases as limited to "temporary" trespass or where the tribe had suffered "no injury." (A126.) But the courts in *Kalispel* permitted the utility to remain on the tribal lands for an unspecified period while pursuing the necessary licenses, even though they did not know if or when FERC would render a decision on the licenses. Also, the tribe in *Kalispel* was undeniably injured because land that was otherwise usable for part of the year was permanently underwater—and had been for decades. *Kalispel III*, 135 F.3d at 606. Here, by contrast, the Band contractually agreed with Enbridge to permit Enbridge to maintain and operate Line 5 on the existing right-of-way for fifty years. Even assuming Enbridge is in trespass, the trespass is limited to twelve Allotted Parcels. (A1, A37, A110-11.) Further, Line 5 is underground and thus does not impact or impair the Band's use and enjoyment of those parcels. (A76.)

In addition, it is long established that a district court may award money damages for a trespass on tribal lands without issuing injunctive relief. *See, e.g., Oneida County, N.Y. v. Oneida Indian Nation of N.Y. State*, 470 U.S. 226, 229, 244 n.16, 253 n.27 (1985); *United States v. Santa Fe Pac.*

*R.R. Co.*, 314 U.S. 339, 343-44, 359-60 (1941); *Swinomish Indian Tribal Cmty. v. BNSF Ry. Co.*, 2023 WL 2646470, at *5-6 (W.D. Wash. Mar. 27, 2023).

Accordingly, the district court erred by asking whether "equitable circumstances" were present to "displace tribal sovereignty" instead of asking whether the Band had satisfied its burden of showing entitlement to equitable relief. *See eBay Inc.*, 547 U.S. at 391. Moreover, the difference between three years and until Enbridge completes its earnest effort to reroute Line 5 off the Reservation lacks the legal significance the district court attributed to it. To treat it as such was an error of law, perforce an abuse of discretion.

## B.    The district court ignored significant harm to innocent third parties caused by a shutdown of Line 5

Further, the district court did not resolve significant issues in the consideration of the equitable injunction factors. As the court recognized, "both sides' experts [at the trial] acknowledge[d] that the loss of Line 5, even with time for planning its closing, will have near-term economic impacts on consumers, particularly with respect to the delivery of propane during heating season … in Michigan and Ontario." (A94–95.) The court also criticized the "Band's assurances of an easy [market] adjustment" if Line 5 is shut down. (A96–97.) Yet, the court concluded its final order with a

43

perfunctory statement that "three years will at least give the public and other affected market players time to adjust to a permanent closure of Line 5." (A123.) This statement was not based on any evidentiary support or analysis. In fact, both the Band's and Enbridge's experts agree that infrastructure is not currently in place to accommodate the throughput from Line 5. (R.603:92-93; R.604:65-66; R.611:88, 97–98; R.610:116, 118.) Enbridge's expert specifically testified that, if the Court ordered a Line 5 shutdown in three years but the reroute was still pending, the market would not take long term or permanent steps to replace Line 5. (R.610:114–16; *see also, e.g.,* SA101, SA103.)

The Supreme Court has emphasized the importance of the public interest prong of the *eBay* test, explaining that "courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter v. NRDC,* 555 U.S. 7, 24 (2008). And courts weigh the public interest precisely by evaluating "the consequences … to nonparties" from "granting or denying the injunction." *Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 11 (7th Cir. 1992). Here, the district court ignored the overwhelming public interests against a permanent shutdown of Line 5. Those public interests far outweigh the Band's claims of trespass based on the twelve Allotted Parcels—particularly given the Band's agreement to permit Line 5's operations through 2043.

Harm to the public from shutting down Line 5 is undisputed. Millions in Canada and the Midwest depend on the propane derived from the natural gas liquids transported on Line 5 for heating, and any shutdown would cause disruption and long-term uncertainty on a massive scale. (A41–43, A67, A94–99, A111.) Propane shortages in parts of the U.S. and Canada will leave consumers with a "heat-or-eat" dilemma. (R.493:3, 23-42; R.495:15-22, 43-47; A94–95; SA101.) And crude oil shortages in the same markets may result in the closure of refineries in Pennsylvania, Wisconsin, Michigan, Ohio, Quebec, and Ontario. (R.495:8–12, 55–68; SA97–98; SA84, SA87–88.) For example, John Wagner of the United Refinery testified that if Line 5 closed for more than even three or four weeks, the refinery would be forced to stop operating. (R.679:79; SA103.) These closures would result in lost jobs for thousands. (R.652; SA103–04; SA87–88.) Prices will increase, straining local economies. (R.495:46–47; SA84, SA101; SA97–98.) The ramifications of a shutdown will be wide-ranging, long-lasting, and devastating to consumers. (R.497:6–21; R.495:9–12; R.610:68; R.604:137; SA100–01.)

As the district court found, the evidence at trial "suggests increased economic volatility in the markets for light crude, [natural gas liquids] and propane/butane in the Upper Midwest and Eastern Canada." (A99.) The Band merely tried to "minimize[] any long-term impact" of a shutdown of Line 5 and its "assurances of any easy [market] adjustment" were "much less

credible." (A97, 99.) But without Line 5, there are insufficient means to transport hydrocarbons to the region. (A94–99.) Current rail, truck, and waterborne infrastructure is insufficient to replace the supply of both crude oil and propane to the markets served by Line 5. (A94–99; SA101, SA103, SA91, SA84.) Only if there is certainty the reroute will not occur will third parties even consider sizable investments in new infrastructure. (R.610:111–14, 125; R.394:17, 19-20; R.604:88-89, 92, 99; R.500:13–16.)

Such significant public harms, including the Nation's interest in maintaining amicable relations with Canada, should have been thoroughly considered before any entry of an injunction shutting down all of Line 5.

### C.     The district court ignored the Band's wrongful conduct

As Enbridge has explained, the Band breached its contractual promises and also undermined Enbridge's right to maintain and operate Line 5 for fifty years on the existing right-of-way. *See* Section I.C, *supra*. The district court failed to consider the Band's wrongful conduct in granting equitable relief.

"[I]n equity as in law the plaintiff's fault, like the defendant's, is relevant to the question of what if any remedy the plaintiff is entitled to." *Shondel v. McDermott,* 775 F.2d 859, 868 (7th Cir. 1985). Indeed, courts "close[ ] [their] doors" to a plaintiff "tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant." *Precision Instrument Mfg. Co. v. Auto.*

46

*Maint. Mach. Co.*, 324 U.S. 806, 814 (1945); *see Packers Trading Co. v. CFTC*, 972 F.2d 144, 149 (7th Cir. 1992). Here, at no point in its injunction analysis did the district court consider the Band's breach of contract or its direct interference with Enbridge's ability to use its undisputed 50-year easement. (A122–24; *see* A37–43.) As a result, the injunction "aid[s] in" and "rewards" that "unlawful activity." *Shondel*, 775 F.2d at 868.

In addition, "[a]n injunction is overly broad when there is a risk that it *restrains* legal conduct…." *Union Home Mortg. Corp. v. Cromer*, 31 F.4th 356, 364 (6th Cir. 2022) (emphasis added). The injunction requires Enbridge to cease operating Line 5 on the twelve *Allotted Parcels* by June 26, 2026. (A129.) Yet, the injunction necessarily means Enbridge must also cease operating on the *Tribal Parcels* and the remaining 633 miles of pipeline. (A111.) On the Tribal Parcels, however, Enbridge has contractual expectations and an undisputedly valid easement through 2043. (R.170-14:2–3.) Enbridge's 50-year easement gives it a right "to enter and use" the Tribal Parcels and "obligates the [Band] not to interfere with [Enbridge's] use[.]" *Marvin M. Brandt Revocable Tr. v. United States*, 572 U.S. 93, 105 (2014). By shutting down Line 5's operations on the twelve Allotted Parcels, the court's order restrains Enbridge's lawful use of the entire pipeline. The district court took none of this into account.

## IV. The Court should reverse the district court's injunction based on federal common law nuisance

The Band alleged that continuing erosion at the Meander will eventually threaten Line 5's integrity and lead to a release on the Reservation, constituting an anticipatory public nuisance. The district court agreed and directed Enbridge to adopt a more stringent shutdown and purge plan than required by federal pipeline safety regulations. (A105, A110.) This ruling, if replicated by courts in other districts where the "nation's 2.6-million mile pipeline transportation network"[11] operates, would displace the uniform regulatory system for pipeline safety adopted by Congress and substitute a patchwork of judicially-imposed regulatory regimes.

### A. The PSA displaces federal common law's cause of action for nuisance in the context of interstate pipeline safety

On nuisance liability, the district court erred by using the common-lawmaking power to displace the comprehensive regulatory regime established in the Pipeline Safety Act, 49 U.S.C. §§ 60101, *et seq.* (R.231:10–13; R.323:15–20.) "Legislative displacement of federal common law does not require the 'same sort of evidence of a clear and manifest [congressional] purpose' demanded for preemption of state law." *AEP*, 564 U.S. at 423-24.

---

[11] *See* PHMSA's information page, https://www.transportation.gov/briefing-room/safetyfirst/pipeline-and-hazardous-materials-safety-administration (last visited Sept. 8, 2023).

The inquiry is "simply whether a [federal] statute 'speaks directly to [the] question' at issue." *Id*.

Here, the PSA speaks directly to the question of how to protect the environment from the risk of interstate pipeline releases, and thus displaces judicial regulation of the same through a federal common-law nuisance action. Enacted in 1994, the PSA aims to "provide adequate protection against risks to life and property posed by pipeline transportation ...." 49 U.S.C. § 60102(a)(1). To achieve that goal, the PSA gives the Secretary of Transportation broad authority to "protect[] the environment" by promulgating federal "safety standards" for interstate pipeline transportation. *Id*. §§ 60102(a)(2), 60101(a)(18)–(19). The Secretary of Transportation has delegated authority to implement the PSA to an expert federal agency—PHMSA. *See* 49 C.F.R. § 1.96. PHMSA, in turn, has promulgated an extensive body of federal safety rules that pervasively regulate the design, construction, and operation of interstate pipelines like Line 5. *See* 49 C.F.R. § 195 *et seq*.[12] As further confirmation of its intent to

---

[12] These rules include a set of requirements imposed on pipeline operators with respect to ensuring safety at so-called "high consequence areas," which include river and other waterbody crossings (such as the Meander). *See* 49 C.F.R. § 195.452; *id*. § 195.450 (defining "high consequence areas."); PHMSA Notice, Pipeline Safety: Potential for Damage to Pipeline Facilities Caused by Earth Movement and Other Geological Hazards, 84 Fed. Reg. 18,919 (May 2,

occupy the field to the exclusion of other regulators, Congress expressly provided that a "State authority may not adopt or continue in force safety standards for interstate pipeline facilities or interstate pipeline transportation." 49 U.S.C. § 60104(c).[13]

Congress also vested the Secretary of Transportation with authority to issue emergency orders imposing "restrictions, prohibitions, or safety conditions" on pipeline operators "[i]f the Secretary determines that an unsafe condition or practice … constitutes or is causing an imminent hazard …." 49 U.S.C. §§ 60117(p)(1), (p)(8); 49 C.F.R. §§ 190.233(a), 190.239. Congress directed the Secretary to consider the impact on the national economy and national security as well as customers, and to consult with appropriate federal and state agencies. 49 U.S.C. § 60117(p)(2); *see also Michigan v. Enbridge Energy, LP*, 571 F. Supp. 3d 851, 860 (W.D. Mich. 2021) (holding that PHMSA has "exclusive jurisdiction" to close pipelines based on unsafe conditions or practices).

Courts are not free to apply "indeterminate nuisance concepts and maxims of equity jurisprudence" where, as here, "Congress has … occupied

---

2019); *see also* SA75–76, SA43–49 (declarations detailing compliance with PHMSA's safety regulations).

[13] "Congress' inclusion of an express pre-emption clause 'does *not* bar the ordinary working of conflict pre-emption principles'" such as obstacle and field preemption. *Sprietsma v. Mercury Marine*, 537 U.S. 51, 65 (2002).

the field through the establishment of a comprehensive regulatory program supervised by an expert administrative agency." *City of Milwaukee v. Illinois*, 451 U.S. 304, 317 (1981) ("*Milwaukee II*").

The district court acknowledged that PHMSA is fully "aware of the current conditions at the meander." (A106; A110.) Despite being informed on the meander conditions and conducting an on-site visit (R.638:1, R.673:4–5: R.680:4), PHMSA officials have not imposed additional requirements on Line 5's operations on the Reservation. (R.673:4–5; R.680:4.) Courts cannot micromanage shutdown and purge plans for interstate pipelines. *See Liebhart v. SPX Corp.*, 998 F.3d 772, 779 (7th Cir. 2021). "It is altogether fitting that Congress designated an expert agency … as best suited to serve as primary regulator" given that "[f]ederal judges lack the scientific, economic, and technological resources an agency can utilize in coping with issues of this order." *AEP*, 564 U.S. at 428. "The expert agency is surely better equipped to do the job than individual district judges issuing ad hoc, case-by-case injunctions." *Id.* While the district judge here was dissatisfied with Congress's chosen solution to the problem, or with the federal agency's discharge of its delegated authority, none of that justified its use of common-lawmaking power to usurp PHMSA's regulatory authority. (A69, A110.)

**B.    The district court erred in rejecting Enbridge's displacement argument**

### 1.    Supreme Court displacement cases are directly on point

As the district court acknowledged, the Supreme Court has applied the displacement doctrine to other statutes—including the Clean Air Act and the Clean Water Act. *See AEP*, 564 U.S. at 423-24 (2011); *Milwaukee II*, 451 U.S. at 317. In both cases, the Court found that the federal common law claim of nuisance was preempted.

In *Milwaukee II*, the city pursued "a claim for abatement of a nuisance caused by interstate water pollution" allegedly emanating from Illinois and Michigan. 451 U.S. at 307. While the case was pending, "Congress enacted the Federal Water Pollution Control Act Amendments of 1972." *Id.* "The 'major purpose' of the Amendments was 'to establish a *comprehensive* long-range policy for the elimination of water pollution.'" *Id.* at 318 (quoting S. Rep. No. 92-414, at 95)). "The establishment of such a self-consciously comprehensive program by Congress … strongly suggests that there is no room for courts to attempt to improve on that program with federal common law." *Id.* at 319. The Court held that the 1972 amendments displaced the city's common-law cause of action. *Id.* at 317.

Similarly, *AEP* held that "the Clean Air Act and the EPA actions it authorizes displace any federal common-law right to seek abatement of

carbon-dioxide emissions from fossil-fuel fired powerplants." 564 U.S. at 424. The Court rejected the plaintiff's argument that the Clean Air Act did not displace federal common law because the EPA had not actually exercised that authority. *See id.* at 425-26. "*The critical point is that Congress delegated to EPA the decision whether and how to regulate carbon-dioxide emissions from powerplants; the delegation is what displaces federal common law.*" *Id.* at 426 (emphasis added). Even if the EPA declined to impose limits on those emissions, "the federal courts would have no warrant to employ the federal common law of nuisance to upset the Agency's expert determination." *Id.*

The district court spuriously distinguished these Supreme Court precedents on the ground that "the Band is not seeking an injunction that would impose safety regulations addressed already by the Pipeline Safety Act or federal regulation." (A50.) The PSA gives PHMSA broad authority to impose regulatory requirements to address the risk of a release and order a shutdown to protect the environment. The dispute here arises, not from any failure by Congress to speak directly to the issue, but rather from the district court's belief that the Enbridge plan is not "sufficiently conservative" based on its own understanding of the (highly technical) facts and weighing of the interests affected. (A33.) The whole point of the displacement doctrine is that federal courts' common-lawmaking power disappears where Congress has

imposed its chosen regulatory regime, *even if a particular court would prefer a different one.*

The district court faulted Enbridge for failing to point to a "provision of the Act that provides a legislative solution to ['the threat posed by the alleged imminent exposure of the pipeline at the Bad River meander'], such as how close a river can come to exposing a pipeline or what to do when a pipeline faces an imminent threat of exposure to a river." (A50.) But any scenario can be described at a level of specificity that the statute does not explicitly address. The PSA charges PHMSA with protecting the environment from all potential pipeline releases, whether the risk comes from "exposure to a river" or any other source. As in *AEP*, "[t]he critical point is that Congress delegated to [the agency] the decision whether and how to regulate [pipeline safety at waterways]; the delegation is what displaces federal common law." 564 U.S. at 426. And Congress has delegated to agency authority the specific power to shut down the pipeline if local conditions pose an unreasonable risk of rupture. 49 U.S.C. § 60117(p). "[T]he delegation is what displaces federal common law." *AEP*, 564 U.S. at 426.

The district court also invoked this Court's statement, soon after the Supreme Court decided *AEP*, that displacement turns on "whether Congress has provided a sufficient legislative solution to the particular interstate nuisance here to warrant a conclusion that this legislation has occupied the

field to the exclusion of federal common law." *Michigan v. U.S. Army Corps of Engineers*, 667 F.3d 765, 777 (7th Cir. 2011) ("*Asian Carp I*"). But this Court was not purporting to supplant the Supreme Court's holding that "[t]he test … is simply whether the statute speaks to the question at issue." *AEP*, 564 U.S. at 424 (brackets and quotation marks omitted). Nor did this Court suggest that the displacement analysis turns on whether a particular judge considers the regulatory solution to be "sufficient." The PSA *is* Congress's chosen solution to the problem that a pipeline release could cause environmental harm, leaving no room for federal judges to substitute their own preferred solutions.

Indeed, this Court has expressly *rejected* a displacement analysis that would ask whether "the solution Congress chose is not adequate": "This we cannot do. … [O]ur fundamental commitment to the separation of powers precludes the courts from scrutinizing the sufficiency of the congressional solution." *People of State of Illinois v. Outboard Marine,* 680 F.2d 473, 478 (7th Cir. 1982). *Asian Carp I* did not overrule *Outboard Marine*. It simply used the phrase "sufficient legislative solution" as shorthand for the analysis mandated by the Supreme Court: whether Congress has spoken directly to the question at issue. If it has done so, *Outboard Marine* and *AEP* hold that federal common law is displaced.

55

In *Asian Carp I*, this Court held that congressional action on invasive carp did not "reach the level of detail one sees in the air or water pollution schemes." *Id.* at 778-79. With minor exceptions, "neither the Corps nor any other [federal] agency has been empowered actively to regulate the problem of invasive carp, and Congress has not required any agency to establish a single standard to deal with the problem or to take any other action." *Id.* at 780. Congress had made only a "narrow delegation" of authority which "bears little resemblance to the regulatory power that the EPA wields under the Clean Air Act." *Id.*

This case is entirely different: The PSA represents a "level of congressional action" far in excess of that at issue in *Asian Carp I* and comparable to that found sufficient to displace federal common law in *AEP*. The Band is complaining about, and the district court focused on, the risk of a release of oil from an interstate pipeline. Congress has addressed precisely this issue. *See* 49 U.S.C. § 60102(a)(1). The statute empowers an expert federal agency to regulate interstate pipeline safety, with prevention of accidental releases as the central statutory objective. *See id.* §§ 60102(a)(2), (b)(1). This is not a "narrow delegation"; it gives PHMSA ample regulatory authority over pipeline safety comparable to what the EPA has over emissions sources.

### 2. The PSA's saving clause does not preserve the federal nuisance claims for injunctive relief

Finally, the district court erroneously invoked the PSA's saving clause, which states that the PSA "does not affect the tort liability of any person." 49 U.S.C. § 60120(c). The saving clause's reference to the "tort liability of any person" is best understood as referring to a pecuniary obligation to pay compensation for damages arising from a tort. *See Sprietsma*, 537 U.S. at 64. The district court adopted a broader reading of the clause as also saving nonpecuniary *remedies* like regulation-style injunctions. (A51–52.)

The Supreme Court addressed similar issues in *United States v. Locke*, 529 U.S. 89, 105-06 (2000), and *Sprietsma*, 537 U.S. at 51. At issue in *Locke* were two savings clauses in the Oil Pollution Act of 1990. 529 U.S. at 103-07. The clauses broadly stated that "[n]othing in this Act … shall … affect, or be construed or interpreted as pre-empting, the authority of any State … from imposing any additional liability or requirements with respect to … the discharge of oil" or "the authority of … any State … to impose additional liability or additional requirements … relating to the discharge, or substantial threat of a discharge, of oil." *Id.* at 104-05. Yet the Court concluded that these clauses did not authorize broad state regulation of oil tanker safety; rather, they merely preserved state authority to impose damages liability to compensate for the effects of oil releases: "The evident

purpose of the saving clauses is to preserve state laws which, rather than imposing substantive regulation of a vessel's primary conduct, establish liability rules and financial requirements relating to oil spills." *Id*. at 105. The Court declined "to give broad effect to savings clauses where doing so would upset the careful regulatory regime established by federal law." *Id*. at 106.

In *Sprietsma*, the plaintiff's wife died after falling from a boat and being hit by its motor. 537 U.S. at 54. The husband sued the motor's manufacturer, claiming that the motor was unreasonably dangerous. *Id*. at 55. A federal statute, the Federal Boat Safety Act of 1971, contained a preemption clause but also a saving clause broader than the one at issue here: "Compliance with this chapter … does not relieve a person from liability at common law." 46 U.S.C. § 4311(g). The Court reasoned that "*compensation is the manifest object of the saving clause, which focused not on state authority to regulate, but on preserving 'liability at common law or under State law.' In context, this phrase surely refers to private damages remedies*." *Sprietsma*, 537 U.S. at 64 (quoting 46 U.S.C. § 4311(g)) (emphases added).

The same is true here. The PSA's operative term is "liability"—the same term that the Court in *Sprietsma* held "surely refers to private damages remedies." In both statutes, "compensation is the manifest object of the saving clause …." *Id*. The Band's broader reading, according to which the

clause also preserves other remedies such as detailed, regulation-style injunctions, would allow the saving clause to decimate the PSA's goal of bringing uniformity to interstate pipeline safety regulation. "[T]his Court has repeatedly declined to give broad effect to savings clauses where doing so would upset the careful regulatory scheme established by federal law." *Geier v. Am. Honda Motor Co., Inc.*, 529 U.S. 861, 870 (2000). Courts should reject interpretations of savings clauses that permit the federal law to "defeat its own objectives" or "destroy itself." *Geier*, 529 U.S.at 872 (cleaned up).

The district court erred in using federal common law to displace the comprehensive regulatory scheme for pipeline safety established by Congress.

## C.  The Band's nuisance claim fails as a matter of law for additional reasons

At the emergency hearing in May 2023, the district court acknowledged that the Band was not taking reasonable steps to prevent erosion at the Meander: "You're in court telling me that you need an emergency motion to shut down [Line 5]…, and yet you haven't even allowed simple steps that would have prevented some of this erosion, and we now know it would have prevented some of this erosion…[T]his is a situation now that the Band is complicit in." (R.670:14.) "I am begging the Band to just act. Do something. Show me that you are acting in good faith…" (R.670:25–26.) In fact, the record established that the Band did "[d]o something," but it did

exactly the wrong thing: it thwarted Enbridge's every effort to abate erosion at the Meander. (A89–90; SA120–23.)

Article V of the Transit Treaty provides that, in the event that there are safety issues with operating the transit pipeline, the Parties have a duty to minimize the length of any shutdown to avoid disruptions in the continued flow of hydrocarbons and "shall not unnecessarily delay or cause delay in the expeditious restoration of normal pipeline operations." Art. V.1–3. Here, the Band has done the exact opposite: its actions at the Meander are deliberately designed to cause a shutdown of Line 5 by refusing to allow remediation efforts. (A66, A75.) As Chairman Wiggins stated during a tribal meeting in February 2019, the Meander would be "the foundation of the litigation" to eject the pipeline, and the Band "would not allow" Enbridge "to engineer [its] way out …." DX724 at 2 (admitted and discussed at R.599:55-56).

The record here shows that the Meander can be mitigated in any number of reasonable means, such as rock riprap and sandbags. (SA80–82; SA67–70.) These means are routinely used in similar situations. (SA80–82.) Rock riprap has even been used elsewhere along the Bad River, including by the Band itself. (A66; SA80–82.) At minimum, the district court should have—but did not—consider the Band's more-than-adequate opportunity to abate, or enable the abatement of, the alleged nuisance itself. *See*

60

Restatement (Second) of Torts §§ 940, 950. Because it did not, the nuisance injunction must be vacated.

Further, the Band's failure to permit Enbridge to remediate erosion at the Meander—and its corresponding responsibility for the nuisance—should have weighed against any injunctive relief. "[I]n equity as in law the plaintiff's fault, like the defendant's, is relevant to the question of what if any remedy the plaintiff is entitled to." *Shondel*, 775 F.2d at868; *see* Restatement (Second) of Torts §§ 936, 940. Indeed, courts "close[] [their] doors" to a plaintiff "tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant." *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814 (1945). The Band's actions at the Meander should have precluded any injunctive relief here on the nuisance claim.

## CONCLUSION

The Court should reverse the district court's judgment.

Dated: September 11, 2023

| | |
|---|---|
| /s/  Alice E. Loughran | /s/ Joseph S. Diedrich |
| Alice E. Loughran | Joseph S. Diedrich |
| David H. Coburn | Eric M. McLeod |
| Mark C. Savignac | HUSCH BLACKWELL LLP |
| STEPTOE & JOHNSON LLP | 33 E. Main St., Suite 300 |
| 1330 Connecticut Ave. NW | Madison, WI 53703 |
| Washington, DC 20036 | (608) 255-4440 |
| (202) 429-6202 | joseph.diedrich@huschblackwell.com |
| aloughran@steptoe.com | |

/s/ Michael C. Davis

Michael C. Davis
David L. Feinberg
Justin B. Nemeroff
VENABLE LLP
600 Massachusetts Ave. NW
Washington, DC 20001
(202)344-4545
mcdavis@venable.com

*Counsel to Appellants/Cross-Appellees*

## CERTIFICATE OF COMPLIANCE WITH RULE 32(A)

I certify that this corrected brief complies with the word limit imposed by Circuit Rule 32(c) because it contains 13,821 words, including the glossary but excluding material exempted by Federal Rule of Appellate Procedure 32(f).

I further certify that the brief complies with the typeface and type-style requirements of Federal Rule of Civil Procedure 32(a)(5) and (6) because it has been prepared in proportionally spaced, 13-point Century Schoolbook typeface using Microsoft Word.

Dated: September 11, 2023

/s/  Alice E. Loughran
Alice E. Loughran
STEPTOE & JOHNSON LLP
(202)429-6202

## CERTIFICATE OF COMPLIANCE WITH CIRCUIT RULE 30(D)

The Rule 30(a) appendix bound with this brief and the separate Rule 30(b) appendix submitted with this brief contain all the materials required by parts (a) and (b) of Circuit Rule 30.

Dated: September 11, 2023

/s/  Alice E. Loughran
Alice E. Loughran
STEPTOE & JOHNSON LLP
(202)429-6202

64

# Statutory Addendum

## Table of Contents

### *Transit Treaty*

*Agreement Between the Government of the United States and the Government of Canada Concerning Transit Pipelines,* Jan. 28, 1977, 28 U.S.T. 7449, 1977 WL 181731 ...........................1

### *Sections of the U.S. Code*

5 U.S.C. § 558 ..........................................................9

25 U.S.C. § 324 ......................................................10

49 U.S.C. § 60102(a)-(b) .........................................11

49 U.S.C. § 60117(p) ..............................................17

49 U.S.C. § 60120...................................................22

### *Sections of the Code of Federal Regulations*

25 C.F.R. § 2.6 (2023) ...........................................24

25 C.F.R. § 169.3 (2013) ........................................25

25 C.F.R. § 169.14 (2013) .......................................27

25 C.F.R. § 169.19 (2013) .......................................28

# AGREEMENT BETWEEN THE GOVERNMENT OF THE UNITED STATES OF AMERICA AND THE GOVERNMENT OF CANADA CONCERNING TRANSIT PIPELINES

The Government of the United States of America and the Government of Canada,

Believing that pipelines can be an efficient, economical and safe means of transporting hydrocarbons from producing areas to consumers, in both the United States and Canada;

Noting the number of hydrocarbon pipelines which now connect the United States and Canada and the important service which they render in transporting hydrocarbons to consumers in both countries; and

Convinced that measures to ensure the uninterrupted transmission by pipeline through the territory of one Party of hydrocarbons not originating in the territory of that Party, for delivery to the territory of the other Party, are the proper subject of an agreement between the two Governments;

Have agreed as follows:

## ARTICLE I

For the purpose of this Agreement:

(a) "Transit Pipeline" means a pipeline or any part thereof, including pipe, valves and other appurtenances attached to pipe, compressor or pumping units, metering stations, regulator stations, delivery stations, loading and unloading facilities, storage facilities, tanks, fabricated assemblies, reservoirs, racks, and all real and personal property and works connected therewith,

1

used for the transmission of hydrocarbons in transit. "Transit Pipeline" shall not include any portion of a pipeline system not used for the transmission of hydrocarbons in transit.

(b) "Hydrocarbons" means any chemical compounds composed primarily of carbon and hydrogen which are recovered from a natural reservoir in a solid, semi-solid, liquid or gaseous state, including crude oil, natural gas, natural gas liquids and bitumen, and their derivative products resulting from their production, processing or refining. In addition, "hydrocarbons" includes coal and feedstocks derived from crude oil, natural gas, natural gas liquids or coal used for the production of petro-chemicals.

(c) "Hydrocarbons in transit" means hydrocarbons transmitted in a "Transit Pipeline" located within the territory of one Party, which hydrocarbons do not originate in the territory of that Party, for delivery to, or for storage before delivery to, the territory of the other Party.

## **ARTICLE II**

1. No public authority in the territory of either Party shall institute any measures, other than those provided for in Article V, which are intended to, or which would have the effect of, impeding, diverting, redirecting or interfering with in any way the transmission of hydrocarbons in transit.

2. The provisions of paragraph 1 of this Article apply:

(a) In the case of Transit Pipelines carrying exclusively hydrocarbons in transit, to such volumes as may be transmitted to the Party of destination in the Transit Pipeline;

2

(b) In the case of Transit Pipelines in operation at the time of entry into force of this Agreement not carrying exclusively hydrocarbons in transit, to the average daily volume of hydrocarbons in transit transmitted to the Party of destination during the 12 month period immediately prior to the imposition of any measures described in paragraph 1;

(c) In the case of Transit Pipelines which come into operation subsequent to the entry into force of this Agreement not carrying exclusively hydrocarbons in transit, to such volumes of hydrocarbons in transit as may be authorized by the appropriate regulatory bodies; or

(d) To such other volumes of hydrocarbons in transit as may be agreed upon subsequently by the Parties.

3. Each Party undertakes to facilitate the expeditious issuance of such permits, licenses, or other authorizations as may be required from time to time for the import into, or export from, its territory through a Transit Pipeline of hydrocarbons in transit.

## ARTICLE III

1. No public authority in the territory of either Party shall impose any fee, duty, tax or other monetary charge, either directly or indirectly, on or for the use of any Transit Pipeline unless such fee, duty, tax or other monetary charge would also be applicable to or for the use of similar pipelines located within the jurisdiction of that public authority.

2. No public authority in the territory of either Party shall impose upon hydrocarbons in transit any import, export or transit fee, duty, tax or other monetary charge. This paragraph shall not preclude the inclusion of

hydrocarbon throughput as a factor in the calculation of taxes referred to in paragraph 1.

## **ARTICLE IV**

1. Notwithstanding the provisions of Article II and paragraph 2 of Article III, a Transit Pipeline and the transmission of hydrocarbons through a Transit Pipeline shall be subject to regulations by the appropriate governmental authorities having jurisdiction over such Transit Pipeline in the same manner as for any other pipelines or the transmission of hydrocarbons by pipeline subject to the authority of such governmental authorities with respect to such matters as the following:

> a. Pipeline safety and technical pipeline construction and operation standards;

> b. environmental protection;

> c. rates, tolls, tariffs and financial regulations relating to pipelines;

> d. reporting requirements, statistical and financial information concerning pipeline operations and information concerning valuation of pipeline properties.

2. All regulations, requirements, terms and conditions imposed under paragraph 1 shall be just and reasonable, and shall always, under substantially similar circumstances with respect to all hydrocarbons transmitted in similar pipelines, other than intra-provincial and intra-state pipelines, be applied equally to all persons and in the same manner.

# **ARTICLE V**

1. In the event of an actual or threatened natural disaster, an operating emergency, or other demonstrable need temporarily to reduce or stop for safety or technical reasons the normal operation of a Transit Pipeline, the flow of hydrocarbons through such Transit Pipeline may be temporarily reduced or stopped in the interest of sound pipeline management and operational efficiency by or with the approval of the appropriate regulatory authorities of the Party in whose territory such disaster, emergency or other demonstrable need occurs.

2. Whenever a temporary reduction of the flow of hydrocarbons through a Transit Pipeline occurs as provided in paragraph 1:

> (a) In the case of a Transit Pipeline carrying exclusively hydrocarbons in transit, the Party for whose territory such hydrocarbons are intended shall be entitled to receive the total amount of the reduced flow of hydrocarbons,

> (b) In the case of a Transit Pipeline not carrying exclusively hydrocarbons in transit, each Party shall be entitled to receive downstream of the point of interruption a proportion of the reduced flow of hydrocarbons equal to the proportion of its net inputs to the total inputs to the Transit Pipeline made upstream of the point of interruption. If the two Parties are able collectively to make inputs to the Transit Pipeline upstream of the point of interruption, for delivery downstream of the point of interruption, of a volume of hydrocarbons which exceeds the temporarily reduced capacity of such Transit Pipeline, each Party shall be entitled to transmit through such Transit Pipeline a proportion of the total reduced capacity equal to its authorized share of the flow of hydrocarbons through such

Transit Pipeline prior to the reduction. If no share has been authorized, specified or agreed upon pursuant to Article II, paragraph 2, the share of the Parties in the reduced flow of hydrocarbons shall be in proportion to the share of each Party's net inputs to the total flow of hydrocarbons through such Transit Pipeline during the 30 day period immediately preceding the reduction.

3. The Party in whose territory the disaster, emergency or other demonstrable need occurs resulting in a temporary reduction or stoppage of the flow of hydrocarbons shall not unnecessarily delay or cause delay in the expeditious restoration of normal pipeline operations.

## ARTICLE VI

Nothing in this Agreement shall be considered as waiving the right of either Party to withhold consent, or to grant consent subject to such terms and conditions as it may establish consistent with the principles of uninterrupted transmission and of non-discrimination reflected in this Agreement, for the construction and operation on its territory of any Transit Pipeline construction of which commences subsequent to the entry into force of this Agreement, or to determine the route within its territory of such a Transit Pipeline.

## ARTICLE VII

The Parties may, by mutual agreement, conclude a protocol or protocols to this Agreement concerning the application of this Agreement to a specific pipeline or pipelines.

## ARTICLE VIII

The Parties may, by mutual agreement, amend this Agreement at any time.

# **ARTICLE IX**

1. Any dispute between the Parties regarding the interpretation, application or operation of this Agreement shall, so far as possible, be settled by negotiation between them.

2. Any such dispute which is not settled by negotiation shall be submitted to arbitration at the request of either Party. Unless the Parties agree on a different procedure within a period of sixty days from the date of receipt by either Party from the other of a notice through diplomatic channels requesting arbitration of the dispute, the arbitration shall take place in accordance with the following provisions. Each Party shall nominate an arbitrator within a further period of sixty days. The two arbitrators nominated by the Parties shall within a further period of sixty days appoint a third arbitrator. If either Party fails to nominate an arbitrator within the period specified, or if the third arbitrator is not appointed within the period specified, either Party may request the President of the International Court of Justice (or, if the President is a national of either Party, the member of the Court ranking next in order of precedence who is not a national of either Party) to appoint such arbitrator. The third arbitrator shall not be a national of either Party, shall act as Chairman and shall determine where the arbitration shall be held.

3. The arbitrators appointed under the preceding paragraph shall decide any dispute, including appropriate remedies, by majority. Their decision shall be binding on the Parties.

4. The costs of any arbitration shall be shared equally between the Parties.

## **ARTICLE X**

1. This Agreement is subject to ratification. Instruments of Ratification shall be exchanged at Ottawa.

2. This Agreement shall enter into force on the first day of the month following the month in which Instruments of Ratification are exchanged.[1]

3. This Agreement shall remain in force for an initial period of thirty-five years. It may be terminated at the end of the initial thirty-five year period by either Party giving written notice to the other Party, not less than ten years prior to the end of such initial period, of its intention to terminate this Agreement. If neither Party has given such notice of termination, this Agreement will thereafter continue in force automatically until ten years after either Party has given written notice to the other Party of its intention to terminate the Agreement.

IN WITNESS WHEREOF the undersigned representatives, duly authorized by their respective Governments, have signed this Agreement.

DONE in duplicate at Washington in the English and French languages, both versions being equally authentic, this twenty-eighth day of January 1977.

**FOR THE GOVERNMENT OF THE UNITED STATES OF AMERICA:**

(Signature)
Julius L. Katz

**FOR THE GOVERNMENT OF CANADA:**

(Signature)
J. H. Warren

8

# 5 U.S.C. § 558

## § 558. Imposition of sanctions; determination of applications for licenses; suspension, revocation, and expiration of licenses

**(a)** This section applies, according to the provisions thereof, to the exercise of a power or authority.

**(b)** A sanction may not be imposed or a substantive rule or order issued except within jurisdiction delegated to the agency and as authorized by law.

**(c)** When application is made for a license required by law, the agency, with due regard for the rights and privileges of all the interested parties or adversely affected persons and within a reasonable time, shall set and complete proceedings required to be conducted in accordance with sections 556 and 557 of this title or other proceedings required by law and shall make its decision. Except in cases of willfulness or those in which public health, interest, or safety requires otherwise, the withdrawal, suspension, revocation, or annulment of a license is lawful only if, before the institution of agency proceedings therefor, the licensee has been given--

    **(1)** notice by the agency in writing of the facts or conduct which may warrant the action; and

    **(2)** opportunity to demonstrate or achieve compliance with all lawful requirements.

When the licensee has made timely and sufficient application for a renewal or a new license in accordance with agency rules, a license with reference to an activity of a continuing nature does not expire until the application has been finally determined by the agency.

**CREDIT(S)**
(Pub.L. 89-554, Sept. 6, 1966, 80 Stat. 388.)

## 25 U.S.C. § 324

### § 324. Consent of certain tribes; consent of individual Indians

No grant of a right-of-way over and across any lands belonging to a tribe organized under the Act of June 18, 1934 (48 Stat. 984), as amended; the Act of May 1, 1936 (49 Stat. 1250); or the Act of June 26, 1936 (49 Stat. 1967), shall be made without the consent of the proper tribal officials. Rights-of-way over and across lands of individual Indians may be granted without the consent of the individual Indian owners if (1) the land is owned by more than one person, and the owners or owner of a majority of the interests therein consent to the grant; (2) the whereabouts of the owner of the land or an interest therein are unknown, and the owners or owner of any interests therein whose whereabouts are known, or a majority thereof, consent to the grant; (3) the heirs or devisees of a deceased owner of the land or an interest therein have not been determined, and the Secretary of the Interior finds that the grant will cause no substantial injury to the land or any owner thereof; or (4) the owners of interests in the land are so numerous that the Secretary finds it would be impracticable to obtain their consent, and also finds that the grant will cause no substantial injury to the land or any owner thereof.

**CREDIT(S)**

(Feb. 5, 1948, c. 45, § 2, 62 Stat. 18.)

## 49 U.S.C. § 60102

## § 60102. Purpose and general authority

**(a) Purpose and minimum safety standards.**--

**(1) Purpose.**--The purpose of this chapter is to provide adequate protection against risks to life and property posed by pipeline transportation and pipeline facilities by improving the regulatory and enforcement authority of the Secretary of Transportation.

**(2) Minimum safety standards.**--The Secretary shall prescribe minimum safety standards for pipeline transportation and for pipeline facilities. The standards--

**(A)** apply to any or all of the owners or operators of pipeline facilities;

**(B)** may apply to the design, installation, inspection, emergency plans and procedures, testing, construction, extension, operation, replacement, and maintenance of pipeline facilities; and

**(C)** shall include a requirement that all individuals who operate and maintain pipeline facilities shall be qualified to operate and maintain the pipeline facilities.

**(3) Qualifications of pipeline operators.**-- The qualifications applicable to an individual who operates and maintains a pipeline facility shall address the ability to recognize and react appropriately to abnormal operating conditions that may indicate a dangerous situation or a condition exceeding design limits. The operator of a pipeline

facility shall ensure that employees who operate and maintain the facility are qualified to operate and maintain the pipeline facilities.

**(b) Practicability and safety needs standards.--**

**(1) In general.**--A standard prescribed under subsection (a) shall be--

**(A)** practicable; and

**(B)** designed to meet the need for--

**(i)** gas pipeline safety, or safely transporting hazardous liquids, as appropriate; and

**(ii)** protecting the environment.

**(2) Factors for consideration.**--When prescribing any standard under this section or section 60101(b), 60103, 60108, 60109, 60110, or 60113, the Secretary shall consider--

**(A)** relevant available--

**(i)** gas pipeline safety information;

**(ii)** hazardous liquid pipeline safety information; and

**(iii)** environmental information;

**(B)** the appropriateness of the standard for the particular type of pipeline transportation or facility;

**(C)** the reasonableness of the standard;

**(D)** based on a risk assessment, the reasonably identifiable or estimated benefits expected to result from implementation or compliance with the standard;

**(E)** based on a risk assessment, the reasonably identifiable or estimated costs expected to result from implementation or compliance with the standard;

**(F)** comments and information received from the public; and

**(G)** the comments and recommendations of the Technical Pipeline Safety Standards Committee, the Technical Hazardous Liquid Pipeline Safety Standards Committee, or both, as appropriate.

**(3) Risk assessment.**--In conducting a risk assessment referred to in subparagraphs (D) and (E) of paragraph (2), the Secretary shall--

**(A)** identify the regulatory and nonregulatory options that the Secretary considered in prescribing a proposed standard;

**(B)** identify the costs and benefits associated with the proposed standard;

**(C)** include--

**(i)** an explanation of the reasons for the selection of the proposed standard in lieu of the other options identified; and

**(ii)** with respect to each of those other options, a brief explanation of the

reasons that the Secretary did not select the option; and

**(D)** identify technical data or other information upon which the risk assessment information and proposed standard is based.

**(4) Review.--**

**(A) In general.**--The Secretary shall--

**(i)** submit any risk assessment information prepared under paragraph (3) of this subsection to the Technical Pipeline Safety Standards Committee, the Technical Hazardous Liquid Pipeline Safety Standards Committee, or both, as appropriate; and

**(ii)** make that risk assessment information available to the general public.

**(B) Peer review panels.**--The committees referred to in subparagraph (A) shall serve as peer review panels to review risk assessment information prepared under this section. Not later than 90 days after receiving risk assessment information for review pursuant to subparagraph (A), each committee that receives that risk assessment information shall prepare and submit to the Secretary a report that includes--

**(i)** an evaluation of the merit of the data and methods used; and

**(ii)** any recommended options relating to that risk assessment information and the

14

associated standard that the committee determines to be appropriate.

**(C) Review by Secretary.**--Not later than 90 days after receiving a report submitted by a committee under subparagraph (B), the Secretary--

**(i)** shall review the report;

**(ii)** shall provide a written response to the committee that is the author of the report concerning all significant peer review comments and recommended alternatives contained in the report; and

**(iii)** may revise the risk assessment and the proposed standard before promulgating the final standard.

**(5) Secretarial decisionmaking.**--Except where otherwise required by statute, the Secretary shall propose or issue a standard under this chapter only upon a reasoned determination that the benefits, including safety and environmental benefits, of the intended standard justify its costs.

**(6) Exceptions from application.**--The requirements of subparagraphs (D) and (E) of paragraph (2) do not apply when--

**(A)** the standard is the product of a negotiated rulemaking, or other rulemaking including the adoption of industry standards that receives no significant adverse comment within 60 days of notice in the Federal Register;

**(B)** based on a recommendation (in which three-fourths of the members voting concur) by

the Technical Pipeline Safety Standards Committee, the Technical Hazardous Liquid Pipeline Safety Standards Committee, or both, as applicable, the Secretary waives the requirements; or

**(C)** the Secretary finds, pursuant to section 553(b)(3)(B) of title 5, United States Code, that notice and public procedure are not required.

\*    \*    \*

**CREDIT(S)**

(Pub.L. 103-272, § 1(e), July 5, 1994, 108 Stat. 1304; Pub.L. 104-304, §§ 4, 20(g), Oct. 12, 1996, 110 Stat. 3794, 3805; Pub.L. 107-355, §§ 20(a)(1), (2)(A), 23, Dec. 17, 2002, 116 Stat. 3009, 3011; Pub.L. 109-468, § 4, Dec. 29, 2006, 120 Stat. 3490; Pub.L. 112-90, §§ 4, 12, 15, 18(b), 24, Jan. 3, 2012, 125 Stat. 1906, 1913, 1915, 1916, 1919; Pub.L. 113-30, § 1, Aug. 9, 2013, 127 Stat. 510; Pub.L. 116-260, Div. R, Title I, §§ 113, 118, 121, Title II, §§ 203, 204, 206, Dec. 27, 2020, 134 Stat. 2228, 2234, 2236, 2239, 2241.)

## 49 U.S.C. § 60117(p)

## § 60117. Administrative

\*          \*          \*

**(p) Emergency order authority.**--

**(1) In general.**--If the Secretary determines that an unsafe condition or practice, or a combination of unsafe conditions and practices, constitutes or is causing an imminent hazard, the Secretary may issue an emergency order described in paragraph (3) imposing emergency restrictions, prohibitions, and safety measures on owners and operators of gas or hazardous liquid pipeline facilities without prior notice or an opportunity for a hearing, but only to the extent necessary to abate the imminent hazard.

**(2) Considerations.**--

**(A) In general.**--Before issuing an emergency order under paragraph (1), the Secretary shall consider, as appropriate, the following factors:

**(i)** The impact of the emergency order on public health and safety.

**(ii)** The impact, if any, of the emergency order on the national or regional economy or national security.

**(iii)** The impact of the emergency order on the ability of owners and operators of pipeline facilities to maintain reliability and continuity of service to customers.

**(B) Consultation.**--In considering the factors under subparagraph (A), the Secretary shall

17

consult, as the Secretary determines appropriate, with appropriate Federal agencies, State agencies, and other entities knowledgeable in pipeline safety or operations.

**(3) Written order.**--An emergency order issued by the Secretary pursuant to paragraph (1) with respect to an imminent hazard shall contain a written description of--

> **(A)** the violation, condition, or practice that constitutes or is causing the imminent hazard;

> **(B)** the entities subject to the order;

> **(C)** the restrictions, prohibitions, or safety measures imposed;

> **(D)** the standards and procedures for obtaining relief from the order;

> **(E)** how the order is tailored to abate the imminent hazard and the reasons the authorities under section 60112 and subsection (m) are insufficient to do so; and

> **(F)** how the considerations were taken into account pursuant to paragraph (2).

**(4) Opportunity for review.**--Upon receipt of a petition for review from an entity subject to, and aggrieved by, an emergency order issued under this subsection, the Secretary shall provide an opportunity for a review of the order under section 554 of title 5 to determine whether the order should remain in effect, be modified, or be terminated.

**(5) Expiration of effectiveness order.**--If a petition for review of an emergency order is filed under

paragraph (4) and an agency decision with respect to the petition is not issued on or before the last day of the 30-day period beginning on the date on which the petition is filed, the order shall cease to be effective on such day, unless the Secretary determines in writing on or before the last day of such period that the imminent hazard still exists.

**(6) Judicial review of orders.**--

**(A) In general.**--After completion of the review process described in paragraph (4), or the issuance of a written determination by the Secretary pursuant to paragraph (5), an entity subject to, and aggrieved by, an emergency order issued under this subsection may seek judicial review of the order in a district court of the United States and shall be given expedited consideration.

**(B) Limitation.**--The filing of a petition for review under subparagraph (A) shall not stay or modify the force and effect of the agency's final decision under paragraph (4), or the written determination under paragraph (5), unless stayed or modified by the Secretary.

**(7) Regulations.**--

**(A) Temporary regulations.**--Not later than 60 days after the date of enactment of the PIPES Act of 2016, the Secretary shall issue such temporary regulations as are necessary to carry out this subsection. The temporary regulations shall expire on the date of issuance of the final regulations required under subparagraph (B).

**(B) Final regulations.**--Not later than 270 days after such date of enactment, the

Secretary shall issue such regulations as are necessary to carry out this subsection. Such regulations shall ensure that the review process described in paragraph (4) contains the same procedures as subsections (d) and (g) of section 109.19 of title 49, Code of Federal Regulations, and is otherwise consistent with the review process developed under such section, to the greatest extent practicable and not inconsistent with this section.

**(8) Imminent hazard defined.**--In this subsection, the term "imminent hazard" means the existence of a condition relating to a gas or hazardous liquid pipeline facility that presents a substantial likelihood that death, serious illness, severe personal injury, or a substantial endangerment to health, property, or the environment may occur before the reasonably foreseeable completion date of a formal proceeding begun to lessen the risk of such death, illness, injury, or endangerment.

**(9) Limitation and savings clause.**--An emergency order issued under this subsection may not be construed to--

**(A)** alter, amend, or limit the Secretary's obligations under, or the applicability of, section 553 of title 5; or

**(B)** provide the authority to amend the Code of Federal Regulations.

## CREDIT(S)

(Pub.L. 103-272, § 1(e), July 5, 1994, 108 Stat. 1321; Pub.L. 103-429, § 6(77), Oct. 31, 1994, 108 Stat. 4388; Pub.L. 104-304, §§ 12, 19, Oct. 12, 1996, 110 Stat. 3802, 3804; Pub.L. 107-355, § 7, Dec. 17, 2002, 116

Stat. 2993; Pub.L. 109-468, §§ 11, 13, 17, Dec. 29, 2006, 120 Stat. 3494 to 3496; Pub.L. 112-90, § 13(a), Jan. 3, 2012, 125 Stat. 1913; Pub.L. 114-183, § 16, June 22, 2016, 130 Stat. 525; Pub.L. 116-260, Div. R, Title I, § 108(a), (b)(2), Dec. 27, 2020, 134 Stat. 2221, 2223.)

## 49 U.S.C. § 60120

**§ 60120. Enforcement**

**(a) Civil actions**

**(1) Civil actions to enforce this chapter.**--At the request of the Secretary of Transportation, the Attorney General may bring a civil action in an appropriate district court of the United States to enforce this chapter, including section 60112, or a regulation prescribed or order issued under this chapter. The court may award appropriate relief, including a temporary or permanent injunction, punitive damages, and assessment of civil penalties, considering the same factors as prescribed for the Secretary in an administrative case under section 60122. The maximum amount of civil penalties for administrative enforcement actions under section 60122 shall not apply to enforcement actions under this section.

**(2) Civil actions to require compliance with subpoenas or allow for inspections.**--At the request of the Secretary, the Attorney General may bring a civil action in a district court of the United States to require a person to comply immediately with a subpena or to allow an officer, employee, or agent authorized by the Secretary to enter the premises, and inspect the records and property, of the person to decide whether the person is complying with this chapter. The action may be brought in the judicial district in which the defendant resides, is found, or does business. The court may punish a failure to obey the order as a contempt of court.

**(b) Jury trial demand.**--In a trial for criminal contempt for violating an injunction issued under this section, the violation of which is also a violation of this chapter, the defendant may demand a jury trial. The defendant shall be tried as provided in rule 42(b) of the Federal Rules of Criminal Procedure (18 App. U.S.C.).

22

**(c) Effect on tort liability.**--This chapter does not affect the tort liability of any person.

**CREDIT(S)**

(Pub.L. 103-272, § 1(e), July 5, 1994, 108 Stat. 1323; Pub.L. 107-355, § 8(b)(3), Dec. 17, 2002, 116 Stat. 2993; Pub.L. 112-90, § 2(c), Jan. 3, 2012, 125 Stat. 1905.)

# 25 C.F.R. § 2.6 (2023)

## § 2.6 Finality of decisions.

(a) No decision, which at the time of its rendition is subject to appeal to a superior authority in the Department, shall be considered final so as to constitute Departmental action subject to judicial review under 5 U.S.C. 704, unless when an appeal is filed, the official to whom the appeal is made determines that public safety, protection of trust resources, or other public exigency requires that the decision be made effective immediately.

(b) Decisions made by officials of the Bureau of Indian Affairs shall be effective when the time for filing a notice of appeal has expired and no notice of appeal has been filed.

(c) Decisions made by the Assistant Secretary—Indian Affairs shall be final for the Department and effective immediately unless the Assistant Secretary—Indian Affairs provides otherwise in the decision.

## Credits

[54 FR 7666, Feb. 22, 1989]

<Part effective until Sept. 8, 2023.>

SOURCE: 54 FR 6480, Feb. 10, 1989, unless otherwise noted.

AUTHORITY: R.S. 463, 465; 5 U.S.C. 301, 25 U.S.C. 2, 9.

**25 C.F.R. § 169.3 (2013)**

**§ 169.3 Consent of landowners to grants of right-of-way.**

(a) No right-of-way shall be granted over and across any tribal land, nor shall any permission to survey be issued with respect to any such lands, without the prior written consent of the tribe.

(b) Except as provided in paragraph (c) of this section, no right-of-way shall be granted over and across any individually owned lands, nor shall any permission to survey be issued with respect to any such lands, without the prior written consent of the owner or owners of such lands and the approval of the Secretary.

(c) The Secretary may issue permission to survey with respect to, and he may grant rights-of-way over and across individually owned lands without the consent of the individual Indian owners when

(1) The individual owner of the land or of an interest therein is a minor or a person non compos mentis, and the Secretary finds that such grant will cause no substantial injury to the land or the owner, which cannot be adequately compensated for by monetary damages;

(2) The land is owned by more than one person, and the owners or owner of a majority of the interests therein consent to the grant;

(3) The whereabouts of the owner of the land or an interest therein are unknown, and the owners or owner of any interests therein whose whereabouts are known, or a majority thereof, consent to the grant;

(4) The heirs or devisees of a deceased owner of the land or an interest therein have not been determined, and the

25

Secretary finds that the grant will cause no substantial injury to the land or any owner thereof;

(5) The owners of interests in the land are so numerous that the Secretary finds it would be impracticable to obtain their consent, and also finds that the grant will cause no substantial injury to the land or any owner thereof.

[36 FR 14183, July 31, 1971. Redesignated at 47 FR 13327, Mar. 30, 1982]

**25 C.F.R. § 169.14 (2013)**

**§ 169.14 Deposit and disbursement of consideration and damages.**

At the time of filing an application for right-of-way, the applicant must deposit with the Secretary the total estimated consideration and damages, which shall include consideration for the right-of-way, severance damages, damages caused during the survey, and estimated damages to result from construction less any deposit previously made under §169.4. In no case shall the amount deposited as consideration for the right-of-way over any parcel be less than the amount specified in the consent covering that parcel. If in reviewing the application, the Secretary determines that the amounts deposited are inadequate to compensate the owners, the applicant shall increase the deposit to an amount determined by the Secretary to be adequate. The amounts so deposited shall be held in a "special deposit" account for distribution to or for the account of the landowners and authorized users and occupants of the land. Amounts deposited to cover damages resulting from survey and construction may be disbursed after the damages have been sustained. Amounts deposited to cover consideration for the right-of-way and severance damages shall be disbursed upon the granting of the right-of-way. Any part of the deposit which is not required for disbursement as aforesaid shall be refunded to the applicant promptly following receipt of the affidavit of completion of construction filed pursuant to §169.16.

## 25 C.F.R. § 169.19 (2013)

## § 169.19 Renewal of right-of-way grants.

On or before the expiration date of any right-of-way heretofore or hereafter granted for a limited term of years, an application may be submitted for a renewal of the grant. If the renewal involves no change in the location or status of the original right-of- way grant, the applicant may file with his application a certificate under oath setting out this fact, and the Secretary, with the consent required by §169.3, may thereupon extend the grant for a like term of years, upon the payment of consideration as set forth in §169.12. If any change in the size, type, or location of the right-of-way is involved, the application for renewal shall be treated and handled as in the case of an original application for a right-of-way.

## Required Short Appendix
## Table of Contents

**Document**                                             **Page**

Opinion and Order on Cross-Motions for
Summary Judgment (R.360)
September 7, 2022 ........................................................................ A1

Opinion and Order on Public Nuisance Claim and
Counterclaim (R.612)
November 28, 2022 ....................................................................A57

Opinion and Order on Remaining Issues (R.684)
June 16, 2023 ............................................................................A73

Final Order Clarifying Order of June 16, 2023 (R.687)
June 26, 2023 .........................................................................A125

Amended Final Judgment (R.689)
June 29, 2023 .........................................................................A128

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

BAD RIVER BAND OF THE LAKE
SUPERIOR TRIBE OF CHIPPEWA
INDIANS OF THE BAD RIVER
RESERVATION,

               Plaintiff and Counter Defendant,

    v.

ENBRIDGE ENERGY COMPANY, INC., and
ENBRIDGE ENERGY, L.P.,

               Defendants and Counter Claimants.

    v.

NAOMI TILLISON,

               Counter Defendant.

OPINION AND ORDER

19-cv-602-wmc

 

     Enbridge Energy owns and operates an oil and natural gas pipeline that extends 645 miles between Superior, Wisconsin to Sarnia, Ontario.  By virtue of various, long-term easement agreements, the pipeline was constructed in part on the Bad River Reservation in northern Wisconsin on parcels of land allotted to individual Indians, owned by non-Indians and owned in whole or in part by the Bad River Band of the Lake Superior Tribe of Chippewa Indians.  In recent years, the Bad River Band has grown concerned about the potential environmental impacts this pipeline may have on its lands, and it has consequently refused to renew Enbridge's easement on 12 parcels now owned in whole or in part by the Band.  Although the easements expired in 2013, Enbridge has refused to remove the pipeline from these 12 parcels.

**A1**

The Band filed this lawsuit, accusing Enbridge of trespass and unjust enrichment for continuing to operate across the Reservation without valid easements, as well as nuisance, ejectment, and a violation of the Band's regulatory authority.  In turn, Enbridge counterclaimed that the Band breached its contract granting an easement and its related duty of good faith and fair dealing.  Before the court now are the parties' cross motions for summary judgment.

The Band moves for summary judgment on its claims of trespass and unjust enrichment, and on its entitlement to a monetary remedy, arising out of Enbridge's continued operations of the pipeline across the 12 parcels on which its easements have expired.  The Band also moves for summary judgment on Enbridge's counterclaims for breach of contract, and further requests a permanent injunction requiring Enbridge to cease operation of the pipeline and to safely decommission and remove it.  (Dkt. #165.)[1]  In turn, Enbridge moves for summary judgment on the Band's remaining claims of nuisance, ejectment and violation of the Band's regulatory authority.

For the reasons discussed below, the court will grant the Band's motion with respect to its trespass and unjust enrichment claims, Enbridge's counterclaims and the Band's entitlement to a monetary remedy.  Nevertheless, the court must deny the Band's request for an automatic injunction, as an immediate shutdown of the pipeline would have significant public and foreign policy implications.  While inclined to grant alternative injunctive relief to the Band, requiring Enbridge to reroute its pipeline outside the

---

[1] Several interest groups filed amicus briefs in this case articulating their views on the legal questions and factual issues before the court, and on potential injunctive relief in particular.  The court has considered all of the amicus briefs.

**A2**

Reservation, the court will seek input from the parties before deciding the terms of a permanent injunction.  Finally, the court will grant Enbridge's motion with respect to the Band's state law nuisance, ejectment and regulatory authority claims, but will deny the motion as to the Band's federal nuisance claim.

OVERVIEW OF UNDISPUTED FACTS[2]

**A. Enbridge's Line 5 Pipeline**

Enbridge operates a network of pipelines and other infrastructure to transport Canadian oil and natural gas liquids to refineries in the United States and Canada, including Line 5 that is the subject of this lawsuit ("the pipeline"), which transports about 23 million gallons of crude oil and natural gas liquids daily.  In northern Wisconsin, the pipeline traverses through 12 miles of the Bad River Reservation, which was established by the Treaty with the Chippewa Tribe in 1854.  The pipeline corridor through the Reservation is approximately 60 feet wide and constitutes less than 1.9% of the entire pipeline.  At the time the pipeline was built in 1953, some parcels on the Reservation were owned by the Band and held in trust by the United States; some were owned by individual tribal members; and some were owned by non-Indians.  In 1952, the United States Department of the Interior, Bureau of Indian Affairs ("BIA"), granted Enbridge a single, 20-year easement, which covered all the parcels on the Reservation owned either by the Band or by individual Indians.  In the early 1970s, the BIA renewed that easement for another 20-year term.

---

[2] The following facts are undisputed except where noted.  Additional, undisputed facts will be discussed as they become relevant in the opinion itself.

**A3**

**B. Negotiation of the 1993 Easements**

Because that second, 20-year easement was set to expire in June 1993, Enbridge, the Band, and the BIA began discussing potential renewal of the easement in the early 1990s. At that time, the Band was the sole owner of 13 parcels all held in trust by the United States, which accounted for approximately 2.8 miles of the length of the pipeline corridor through the Reservation, with the 60-foot-wide easement covering approximately 20.1 acres in total area. In addition, the pipeline ran across another 15 "allotment parcels" owned by individual Indians, with multiple individuals holding fractional ownership in each of those parcels, all of which were also held in trust by the United States. The Band further held a small percentage of ownership in three of the allotment parcels.

Naturally, Enbridge wanted an easement that would run for longer than 20 years. However, the BIA, which was responsible for negotiating easements on the 15 allotment parcels, notified Enbridge that it would not issue easements longer than 20 years on the allotment parcels. Still, the BIA advised that the Band could grant longer easements on its 13 wholly owned parcels were it inclined to do so. Thus, the BIA told Enbridge to negotiate directly with the Band for new easements on those 13 parcels.

In June 1992, Enbridge submitted several easement renewal applications to the BIA. The first was an application for new easements on the 13, Band-owned parcels, referred to as "Tribal Lands." (Dkt. #166-19.) That application stated the right-of-way over those parcels would be "2.8 miles" in length, and it attached a "Tribal Lands Schedule" listing all parcels by their precise township and range legal descriptions. (Tribal Lands Application (dkt. #166-20).) The second actually consisted of 15, separate applications for the

4

**A4**

allotment parcels, which also described the precise land at issue for each allotment parcel easement. (Dkt. #210-2.)

### 1. Band's wholly owned parcels

The Band and Enbridge proceeded to negotiate for an easement over the Band-owned parcels and had agreed that Enbridge would pay the Band $800,000 for a 50-year easement over the 13 Band-owned parcels by December 1992, subject to the BIA's approval. If the BIA did not approve, Enbridge had further agreed to pay the Band $450,000 for a 20-year easement. Also, in December 1992, the Bad River Tribal Council passed two resolutions providing the Band's consent and approval for a 50-year easement over its wholly-owned parcels in exchange for $800,000. Enbridge and the Band then memorialized their agreement by contract ("the 1992 Agreement"), with the two Tribal Resolutions attached as exhibits to the contract.

As required under 25 U.S.C. § 323, the Band next submitted the two Tribal Resolutions and the 1992 Agreement to the BIA for its approval, along with a cover letter from the Band's Chairman, David Moore, stating that "[t]hese documents express the terms by which the Bad River Tribe has agree to grant to Lakehead [Enbridge's predecessor] a fifty year right of way over its existing easement." (Dkt. #166-23.) In response, the BIA asked the Band to explain why a 50-year easement would be in the best interest of the Bad River community, as opposed to one again renewing the 20-year easement, *and* suggested that the Band might want to explore alternative uses for their lands in 20 years. (Dkt. #166-21.) The Band responded that it had received a good price, which it intended to invest. At that point, the BIA issued a 50-year easement expressly covering the 13, Band-

owned parcels, with the term beginning on June 3, 1993, and ending on June 2, 2043. (Dkt. #166-14.) Enbridge then paid the Band the $800,000 payment required under the parties' 1992 Agreement.

### 2. 15, separate allotment parcels

The BIA negotiated separately with Enbridge for 20-year easements over the 15 allotment parcels, including the three parcels in which the Band had a small ownership interest. In particular, Enbridge and the BIA eventually agreed that Enbridge would pay $179,000 total to the individual owners of the 15 allotment parcels for a 20-year easement, although the Band did not receive any compensation for its small interest in three of those parcels. Those easements issued in May 1993. The easements expressly stated that they were "limited as to tenure for a period not to exceed 20 (Twenty) years, beginning on June 3, 1993, and ending on June 2, 2013." They also provided as follows:

> At the termination of this Grant of Easement, Grantee shall remove all materials, equipment and associated installations within six months of termination, and agrees to restore the land to its prior condition. Such restoration may include but not be limited to filling, leveling and seeding the right-of-way area.

(Dkt. #166-15.)

### C. The Band's Acquisition of Additional Ownership Interests in Allotted Parcels

Many parcels of land on the Bad River Reservation are owned by various individual landowners because of historical allotment policies that had divided up tribal land. In 1982, Congress enacted the Indian Land Consolidation Act, 25 U.S.C. § 2202–2221, to counter past policies strongly encouraging allotment of Reservation lands to individual

6

**A6**

tribal members, and to assist tribes in acquiring full or fractional ownership on lands within their reservation generally.  Under this Act, the BIA was responsible for assisting the Band in obtaining ownership interests in land within the Bad River Reservation borders. Between 1994 and 2013, therefore, the BIA assisted the Band in acquiring ownership interests in 12 of the 15 allotment parcels in the pipeline corridor for which the BIA had issued 20-year easements in 1993.  The Band presently owns 100% of two of the parcels and more than 45% fractional ownership in the remaining 10.

### D. The Band Refuses to Renew Easements on the Allotment Parcels

In January 2013, with the 20-year easements expiring in June 2013, the BIA reminded Enbridge of the approaching end of the easements over the 15 allotment parcels. In March 2013, Enbridge submitted applications to the BIA to renew the easements on those allotment parcels for yet another 20-year period.  At the same time, Enbridge failed to submit with its applications any documents showing that the owners of the allotment parcels had *consented* to the renewal of these easements, despite the Band's consent now being necessary to renew the easements on 12 of those 15 parcels because the Band now had a full or fractional ownership in each of them.

In fairness, Enbridge had notified the Band that it *wanted* to renew these easements. Moreover, the Band requested detailed environmental, pipeline safety, and emergency response information from Enbridge pertaining to its operation of the pipeline, including records of spills and regulatory violations.  The Band was particularly concerned about these issues because a different pipeline operated by Enbridge had failed and spilled more than a million gallons of crude oil into a Michigan river in 2010, and federal investigators

7

**A7**

had concluded that Enbridge's actions were responsible for the environmental consequences of the spill. While Enbridge provided some information requested, the Band responded that the information produced was deficient.

During 2015 and 2016, the Band and Enbridge continued to discuss potential renewal of the easements on the allotment parcels, as well as operation and maintenance protocols for the pipeline going forward. However, the Band remained unconvinced that the easements should be renewed, and on January 4, 2017, the Band's governing body enacted a resolution affirming the Band's unwillingness to consent to new easements. (Dkt. #166-33.) That resolution asserted that: the lands, rivers and wetlands in the Bad River and Lake Superior watersheds were sacred to the Band; an oil spill on the Reservation "would be catastrophic" and would "nullify our long years of effort to preserve our health, subsistence, culture and ecosystems"; the Band would not renew the easements; and Band staff would take steps to initiate the pipeline's decommissioning. (*Id.*) Nonetheless, Enbridge has refused to remove the pipeline from Reservation lands, and continued to transport petroleum and natural gas liquid products across the Bad River Reservation.

When further efforts to reach an understanding failed, the Band filed this lawsuit against Enbridge in July 2019, raising trespass and unjust enrichment claims against Enbridge based on its refusal to remove the pipeline from the 12 former allotment parcels in which the Band now had full or fractional ownership, and for which the easements expired in 2013. As mentioned, the Band also raises nuisance, ejectment, and violation of regulatory authority claims against Enbridge for its operation of the pipeline on tribal trust parcels, for which Enbridge has a 50-year easement expiring in 2043. In response, Enbridge

then filed its counterclaims for breach of contract and its underlying duty of good faith and fair dealing.  Specifically, Enbridge contends that the parties' 1992 Agreement granting the 50-year easement on the Band's wholly-owned parcels, implicitly obligates it to consent to renewed easements over *all* parcels in which the Band has an ownership interest, including the 12, former allotment parcels.

OPINION

As discussed at the outset, the Band seeks partial summary judgment on its trespass and unjust enrichment claims, which relate solely to Enbridge's refusal to vacate the 12 former allotment parcels, and on Enbridge's counterclaims for breach of contract and its underlying general duty of good faith and fair dealing.  In turn, Enbridge seeks summary judgment on the Band's remaining claims for nuisance, ejectment, and violation of the Band's regulatory authority.  The court will address the Band's motion first, followed by Enbridge's motion.

## I.  The Band's Motion for Partial Summary Judgment

The Band contends that Enbridge has been trespassing on the 12 allotment parcels now owned in whole or in part by the Band since the 20-year lease with the BIA granting the easements expired in June 2013.  More specifically, because the easements were not renewed, the Band contends that Enbridge was required by the plain language in the leases to remove the pipeline within six months of expiration, and in continuing to operate the pipeline through the Bad River Reservation, has been unjustly enriched by its trespass.

**A9**

To succeed on its trespass claim, the Band must prove three elements:  (1) it has an ownership interest in the parcels; (2) Enbridge physically entered or remained, or it caused something to enter or remain, upon the property; and (3) Enbridge lacked a legal right -- express or implied -- to enter or remain.  *See Grygiel v. Monches Fish & Game Club, Inc.*, 2010 WI 93, ¶ 40, 328 Wis. 2d 436, 461, 787 N.W.2d 6, 18; Restatement (Second) of Torts § 329 (1965)).[3]  Enbridge does not challenge the Band's ability to prove the first and second elements of its trespass claims, nor could it, since the undisputed evidence establishes that the Band owns or co-owns 12 allotment parcels through which Enbridge's pipeline passes and has continued to operate despite the easements expiring in 2013. However, Enbridge argues that the Band cannot succeed on the third element of its trespass claim for three basic reasons:  (a) the Band is obligated to consent to Enbridge's pipeline running on the 12 allotment parcels for 50 years under the parties' 1992 Agreement; (b) Enbridge's easements have not actually expired because it filed timely applications for renewal of the easements; and (c) the Band's attempt to remove or interfere with Enbridge's operation of the pipeline violates federal statutory law.  The court addresses each of these arguments below.

---

[3] The parties agree that federal law applies to the Band's trespass and Enbridge's contract claims, while the court may look to state law and the Restatement (Second) of Contracts for guidance, so the court has assumed the same.  *See FutureSource LLC v. Reuters Ltd.*, 312 F.3d 281, 283 (7th Cir. 2002) ("[T]here's no discussion of choice of law issues, and so we apply the law of the forum state."); *see also Davilla v. Enable Midstream Partners*, L.P., 913 F.3d 959, 965 (10th Cir. 2019) (considering federal and state common law to resolve trespass claim brought by Indian landowners).

**A. The 1992 Agreement**

As an initial matter, Enbridge argues that the 1992 Agreement granting 50 year leases on other parcels, somehow requires the Band to consent to easements over the 12 allotment parcels under both the agreement's express terms and implied duty of good faith and fair dealing. In particular, Enbridge argues that because the so-called "objective" of the 1992 Agreement was to permit Enbridge to operate its pipeline across the Reservation for 50 years, the agreement should be interpreted as providing the Band's "advanced consent" to easements over *all* parcels in which it had or might in the future acquire an ownership interest, however small. As discussed below, however, the Band only consented under the 1992 Agreement to a 50-year easement on the 13 parcels that were, at that time, wholly owned by the Band, and nothing more.

**1. Contract language**

To determine whether the Band is obligated by the 1992 Agreement to consent to renewed easements over the 12 allotment parcels, the court begins with the language of the agreement itself. *See First Bank & Trust v. Firstar Info. Servs., Corp.*, 276 F.3d 317, 322 (7th Cir. 2001) (to determine contractual intent of the parties, court must first consider the plain language of their agreement). The consent provision of the 1992 Agreement states:

> The Secretary may grant to the Company a right of way for the construction, operation and maintenance of a pipeline for fifty (50) years within the Existing Right of Way. Said pipeline right of way shall be granted pursuant to and in accordance with the Tribal Council's Resolution Granting Pipeline Right of Way, the form of which is attached and marked Exhibit "A." The consideration and damages to be paid by the Company for

11

**A11**

> such pipeline operation and right of way and associated
> damages is the sum of Eight Hundred Thousand Dollars
> ($800,000.00), which sum shall be paid as set forth herein.

(1992 Agreement (dkt. #166-5) § 1.a.)  "Existing Right of Way" is defined in the 1992

Agreement as the portion of the land in Enbridge's "Original Rights of Way" in which the

Band had a "legal interest."  (*Id.* at 2.)  "Original Rights of Way" was defined as both tribal

land and allotment land over which Enbridge operated its pipeline on the Reservation.

(*Id.*)

Under this consent provision, the Band's consent to an easement in the 1992

Agreement was coterminous with the consent reflected in the Tribal Resolution attached

as Exhibit A to the 1992 Agreement.  *See Matthews v. Wisconsin Energy Corp. Inc.*, 534 F.3d

547, 554 (7th Cir. 2008) (where contractual provision required performance "in a manner

that is consistent with" specific referenced policies, the contract "clearly and expressly

incorporates" those policies as part of the contract); *see also* 11 Williston on Contracts

§ 30:25 (4th ed.)  ("When a writing refers to another document, that other document, or

the portion to which reference is made, becomes constructively a part of the writing, and

in that respect the two form a single instruction.").

For its part, the Tribal Resolution stated that the Band consented to an easement

that was coterminous with the easement identified in Enbridge's Tribal Lands Application

to the BIA.  The Tribal Resolution unambiguously limited the Band's consent to the lands

covered by that application:

> WHEREAS, the Lakehead Pipe Line Company [Enbridge's
> predecessor] . . . has requested consent from the Bad River
> Band . . . for a fifty (50) year right of way easement for a
> pipeline over and across any lands in which the Tribe has a

12

**A12**

legal interest within the Company's existing rights of way, all as is described more fully in the Company's Application of Right of Way dated June 10, 1992 (hereineafter "Application"); and

WHEREAS, the Tribal Council . . . has reviewed the Application and has been advised by the Tribe's attorney with respect to the Application; and

WHEREAS, the Company has offered to pay Eight Hundred Thousand Dollars ($800,000.00) in full consideration for such fifty (50) year Right of Way Easement for a pipeline;

THEREFORE BE IT RESOLVED, that the Tribal Council . . . hereby accepts the offer of the Company, consents to the Company's requests and Application, and requests the Secretary of Interior . . . to approve and grant the Application and the rights of way[.]

(1992 Tribal Resolution (dkt. #166-22).)

Enbridge's Tribal Lands Application, in turn, identified an easement for which the "[a]pproximate distance of the right-of-way will be 2.8 miles[.]" (Tribal Lands Application (dkt. #166-19).) That distance was the lineal distance of the 13 parcels within the pipeline corridor then wholly owned by the Band, in other words, *not* the allotment parcels. The "Tribal Lands Schedule," attached as part of the Tribal Lands Application, listed those same 13 parcels by their precise township and range legal descriptions, listed a cumulative length of the right-of-way of approximately 2.8 miles and identified the parcels as "Bad River Tribal Trust Indian Lands." (Tribal Lands Schedule (dkt. #166-20).)

The obvious import of these documents is that Enbridge's Tribal Lands Application was limited to the 13 Band-owned parcels, the Band's 1992 Resolution limited the Band's easement approval to the 13 parcels in the Application, and the 1992 Agreement, which was entered "pursuant to and in accordance with the" Resolution, was likewise limited to

13

**A13**

the 13 Band-owned parcels identified in the Application.  Certainly, this is how the BIA interpreted the parties' 1992 Agreement, as it issued an easement after receiving these documents that was expressly "limited to and more particular described as" the same 13 parcels covered by Enbridge's Tribal Lands Application, which were again set forth by their precise township and range legal descriptions.  (BIA Tribal Land Easement (dkt. #166-14).)  *See Bland v. Fiatallis N. Am., Inc.*, 401 F.3d 779, 783 (7th Cir. 2005) (stating federal principles of contract interpretation) ("A document should be read as a whole with all its parts given effect, and related documents must be read together.").

Despite the clarity of these documents, Enbridge argues that that 1992 Agreement also addressed the allotment parcels over which the Band later obtained an ownership interest.  But Enbridge's arguments rely on a strained and unpersuasive reading of the 1992 Agreement.  First, Enbridge argues that the terms of its Tribal Lands Application were not incorporated into the 1992 Agreement because it does not mention the Tribal Lands Application.  But this argument ignores that the 1992 Agreement *expressly* incorporates the Band's 1992 Resolution, which expressly limited its reach to the lands identified in the Tribal Lands Application.  Similarly, the cases Enbridge relies on are inapposite, as they address situations in which a contract mentioned additional terms, but unlike here, failed to attach or identify specifically the terms or documents that were incorporated.  *See Gupta v. Morgan Stanley Smith Barney, LLC*, 934 F.3d 705, 715 (7th Cir. 2019) (contract contained merger clause and did not incorporate any other terms or documents); *188 LLC v. Trinity Indus., Inc.*, 300 F.3d 730, 737 (7th Cir. 2002) (contract did not identify specifically any terms or documents that were incorporated).

14

**A14**

Second, Enbridge tries to end run the limited parcels on which the 50-year easement was actually granted by arguing that § 3 of the 1992 Agreement implicitly granted the same 50-year easement on allotment land over which the Band had no interest or a de minimis (2%) interest.  Section 3 states:

> The Tribe and the Company will do whatever they can reasonably do to ensure that all of the objectives of the Tribe and the Company, as those objectives are expressed in this Agreement, are achieved, even if it means that one or both of the parties must do something which is not expressly described herein.  One of the Company's objectives under this Agreement is to obtain from the Tribe all consents and authorizations it is possible for the Company to obtain, whether necessary or not to obtain a fifty (50) year easement for Right of Way for a pipeline over the Company's existing pipeline Right of Way in which the Tribe has an interest.

(1992 Agreement (dkt. #166-5) § 3.)  Thus, Enbridge now argues that since its "objective" under the 1992 Agreement was to obtain consent to operate its pipeline across the entire reservation for 50 years, and because the Band agreed in § 3 to provide "all consents and authorizations" necessary to achieve this objective, the Band is obligated to provide consent for Enbridge to operate across allotment parcels, even those parcels that the Band obtained an interest in *after* signing the 1992 Agreement.

However, § 3 does not expressly or implicitly impose such an obligation on the Band.  Indeed, the provision says nothing about the Band assisting Enbridge in obtaining a right-of-way across *allotment land*, let alone the entire Reservation.  If the provision was intended to address a 50-year right of way across the entire Reservation, if could have said so simply by using the term "Original Rights of Way," which the contract defined specifically as both tribal land and allotment land on the Reservation.  Instead, the

15

**A15**

provision uses "Existing Pipeline Right of Way," which is defined as the land owned by the Band at the time of the 1992 Agreement. As telling, the provision would also have expressly included additional consideration if it had imposed additional, specific obligations, such as "advance consent" to future easements. But the 1992 Agreement mentions no consideration to be paid to the Band besides the $800,000 set forth in § 1, in exchange for the 50-year easement across tribal land. To the contrary, that compensation was paid to the majority owner(s) of each allotment parcel, and then for only a 20-year easement just as the BIA directed.

Thus, contrary to Enbridge's arguments and as the Band argues, § 3 is simply a "further assurances" or "best efforts" clause that required the parties to take actions necessary to consummate the contract, even if the actions were not required specifically by the contract. *See Boyd Grp. (U.S.) Inc. v. D'Orazio*, No. 14 CV 7751, 2015 WL 3463625, at *5 (N.D. Ill. May 29, 2015) (clause requiring parties "to do such acts and things, all as the other parties may reasonably request for the purpose of carrying out the intent of this Agreement" was a further assurances clause that did not impose new or different obligations on the parties not set out elsewhere in the contract). In this regard, § 3 is akin to the contract's implied duty of good faith recognized by Wisconsin common law and discussed below, rather than a provision expanding the four corners of the contract itself beyond recognition. For example, the Band was obligated by this provision to explain persuasively to the BIA why it was requesting a 50-year easement on its then, wholly-owned parcels, as opposed to the historical and BIA-required, 20-year easement assigned to the allotment parcels. The provision required nothing more, and certainly did not

**A16**

constitute an open-ended promise for easements over an unspecified number of parcels the

Band might acquire in material part or in while sometime in the future, and that appeared

nowhere else in the Agreement or referenced documents.  To hold otherwise would be to

"read language into a contract which is not there."  *Dakota, Minnesota & E. R.R. Corp. v.*

*Wisconsin & S. R. Co.*, No. 09-CV-00516-WMC, 2010 WL 3282936, at *5 (W.D. Wis.

Aug.  19,  2010).    This  is  particularly  true  where,  as  here,  the  contract  is  between

"sophisticated parties . . . who know how to say what they mean and have an incentive to

draft their agreement carefully."  *ConFold Pac., Inc. v. Polaris Indus., Inc.*, 433 F.3d 952, 955

(7th Cir. 2006).

Third  and  finally,  Enbridge  argues  that  the  court  must  interpret  the  1992

Agreement as applying to allotment parcels, as well as Band-owned parcels, "to avoid an

absurd result," arguing that it never would have paid $800,000 for a 50-year easement on

specific tribal parcels if it knew that the Band could block renewal of easements on other

parcels after 20 years.  However, Enbridge knew full well at the time it signed the 1992

Agreement that there *was* a substantial risk its easements on the allotment parcels would

expire after 20 years, having been apprised that the BIA would *only* grant 20-year easements

on  the  allotment  parcels,  and  that  there  was  no  guarantee  these  easements  would  be

renewed, regardless of who owned them at that time.  Individual landowners did not have

to consent to renewal, so there was always the possibility that Enbridge would not be able

to operate its pipeline across the Reservation for 50 years.  That Enbridge did not chose to

pay less for a 20-year easement on the Band-owned parcels as it had for the allotment

parcels or paid more for the Band's express guarantee as to its future easements, were both

17

**A17**

its choice. Instead, Enbridge accepted the risk and paid $800,000 for a 50-year easement over the Band-owned parcels, while paying less for 20-year easements on the other parcels. Although Enbridge's gamble did not pay off, it is not absurd for the court to enforce the contract provisions to which the parties plainly agreed.

### 2. Duty of Good Faith and Fair Dealing

Enbridge next argues that even if the contract language did not require the Band to consent to easements over the allotment parcels, an implied duty of good faith and fair dealing imposed that obligation under Wisconsin common law, and the Band breached that duty by refusing to provide consent to the BIA to extend the right-of-way across the allotment parcels.[4] The Band argues in response that the implied duty of good faith does not require it to give up its sovereign power to control its territory.

Wisconsin recognizes a duty of good faith and fair dealing as being implied in every contract. *Wis. Alumni Research Found. v. Xenon Pharms., Inc.*, 591 F.3d 876, 885 n. 5 (7th

---

[4] Enbridge also says that the Band breached its applied duty of good faith and fair dealing by attempting to remove the pipeline from the parcels covered by the 50-year easement and by refusing to permit Enbridge to conduct maintenance on the pipeline. (Enbridge Opp. Br. (dkt. #207) 100–101.) However, Enbridge failed to develop any breach of contract or bad faith arguments about the 50-year easement or maintenance requests in its opposition brief; instead, it included two conclusory proposed findings of fact, apparently to support these claims. (Enbridge PFF (dkt. #209) ¶ 57) (alleging that Tribal Council is trying to terminate 1992 Agreement and remove pipeline from entire Reservation), ¶ 93 (alleging that the Band "unreasonably refused to permit Enbridge (and its contractors) to conduct maintenance on the Line where it crosses the Reservation, primarily on the purported justification that Enbridge is in trespass").) Such "perfunctory and undeveloped arguments" are waived. *M.G. Skinner & Associates Insurance Agency v. Norman-Spencer Agency*, 845 F.3d 313, 321 (7th Cir. 2017) ("Perfunctory and undeveloped arguments are waived, as are arguments unsupported by legal authority."); *Estate of Moreland v. Dieter*, 395 F.3d 747, 759 (7th Cir. 2005) (same). Further, the Band also moved for summary judgment on Enbridge's breach of contract claims, so this was the time for Enbridge to support those claims with sufficient evidence and argument to raise a genuine dispute of material fact. Having failed to do so, the Band is entitled to summary judgment on Enbridge's breach of contract and duty of good faith claims relating to the 50-year easement and maintenance disputes as well.

18

**A18**

Cir. 2010) (Wisconsin law).[5]   However, the duty of good faith requires no more from a

party then to honor the other party's rights under the contract, *id.* at 829, and precludes

parties from engaging in conduct that "denie[s] the benefit of the bargain originally

intended by the parties," *Zenith Ins. Co. v. Employers Ins. of Wausau*, 141 F.3d 300, 308 (7th

Cir. 1998), or "frustrat[es] the purpose of the agreement." *Estate of Chayka*, 47 Wis. 2d

102, 107, 176 N.W.2d 561 (Wis. 1970).   Conduct that violates the duty of good faith

may include:  "evasion of the spirit of the bargain, lack of diligence and slacking off, willful

rendering of imperfect performance, abuse of a power to specify terms, and interference

with or failure to cooperate in the other party's performance." *Foseid v. State Bank of Cross

Plains*, 197 Wis. 2d 772, 797, 541 N.W.2d 203 (Ct. App. 1995).   Thus, the similarity

between this duty and the contractual duty of both parties in § 3, quoted in full above, to

"do whatever they can reasonably do to ensure that all of the objectives of the Tribe and

Company, as those objectives are expressed in the Agreement."

Nevertheless, Enbridge argues that the Band violated the duty of good faith because

of its refusal to consent to easements over the now 12, Band-owned allotment parcels

somehow frustrates the purpose of the parties' 1992 Agreement.   However, that argument

has no more traction than that under § 3.   Certainly, Enbridge's 50-year easement over the

Band-owned tribal land is of little import unless Enbridge has permission to operate its

pipeline across the entire Reservation, and without the Band's consent to easements on the

---

[5] Some courts have found that the duty of good faith is implied under federal common law well. *E.g., Precision Pine & Timber, Inc. v. U.S.*, 596 F.3d 817, 828 (Fed. Cir. 2010) ("The duty of good faith and fair dealing is inherent in every contract, including contracts to which the federal government is a party.") (citing Restatement (Second) of Contracts § 205).

12 Band-owned allotment parcels, Enbridge cannot obtain the permission that it needs. Still, Enbridge's argument ultimately fails for at least two reasons. First, the *only* purpose or objective shared by and express in the 1992 Agreement was to grant Enbridge an easement to operate across the then Band-owned parcels for 50 years. As discussed above with respect to § 3, the agreed upon purpose was not, as Enbridge now asserts, to permit it to operate across the *entire* Reservation for 50 years. Moreover, Enbridge *knew* of the risk that its 20-year easements contemporaneously granted by the BIA might not be renewed, and yet failed to protect itself from that risk. In the end, the duty of good faith and fair dealing cannot be used to add obligations and conditions to an agreement that go beyond the agreement reached by the parties. *Betco Corp., Ltd. v. Peacock*, No. 14-CV-193-WMC, 2016 WL 7429460, at *6 (W.D. Wis. Dec. 23, 2016), aff'd, 876 F.3d 306 (7th Cir. 2017) ("implied duty of good faith is not a license to rewrite a contract").

Second, and as importantly, the implied duty of good faith and fair dealing cannot be applied to deprive the Band of its sovereign authority over its land. Rather, the court must interpret all contracts in light of the Band's sovereign power and must construe contracts to avoid, if possible, foreclosing the exercise of sovereign authority. *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 148 (1982). A sovereign will be found to have surrendered a sovereign power by contract *only if* the surrender was explicit and unambiguous. *Bowen v. Public Agencies Opposed to Social Security Entrapment*, 477 U.S. 41, 52 (1986) (quoting *Merrion*, 455 U.S. at 148) ("[S]overeign power, even when unexercised, is an enduring presence that governs all contracts subject to the sovereign's jurisdiction, and will remain intact unless surrendered in unmistakable terms."). In this case, nothing

**A20**

in the 1992 Agreement clearly and unmistakably surrenders the Band's power to exclude Enbridge from parcels of land acquired after the agreement was signed; nor are there explicit or unmistakable terms in the 1992 Agreement by which the Band agreed to grant Enbridge a right-of-way across all parcels owned by the Band for the next 50 years.

Accordingly, on this record, the only way to find a waiver of the Band's broader sovereign power over other parcels would be to infer one under the contractual implied duty of good faith, but to do so would be contrary to law.  *See United States v. Cherokee Nation of Oklahoma*, 480 U.S. 700, 707 (1987) ("[A] waiver of sovereign authority will not be implied, but instead must be 'surrendered in unmistakable terms'") (citations omitted); *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 58–59 (1978) (waiver of sovereign powers "cannot be implied but must be unequivocally expressed") (citations omitted); *Grand Canyon Skywalk Dev. v. 'Sa' Nyu Wa Inc.*, 715 F.3d 1195, 1205 (9th Cir. 2013) (sovereign powers must be "expressly waived in unmistakable terms within the contract").  While Enbridge argues that the Band's power to exclude is not a sovereign power, and the Band simply has the same authority to exclude that belongs to any landowner, which can be limited by contract, the Supreme Court has expressly rejected the view that tribal power to exclude from its land is akin to "the power possessed by any individual landowner or any social group to attach conditions . . . to the entry by a stranger onto private land." *Merrion*, 455 U.S. at 146.  Instead, the Court explained that "a hallmark of Indian sovereignty is the power to exclude non-Indians from Indian lands" and "to control economic activity within its jurisdiction." *Id.* at 140.  Indeed, the Bad River Band's sovereign power over its lands was acknowledged in the 1854 Treat with the Chippewa,

*State of Wisconsin v. Hitchcock*, 201 U.S. 202, 214 (1906), which created a permanent reservation for the Band with permanent rights of occupancy and possession, including the power to exclude and to "place conditions on entry, on continued presence, or on reservation conduct." *Oneida Cnty., N.Y. v. Oneida Indian Nation of New York State*, 470 U.S. 226, 235 (1985).

Further, Congress recognized the extent of tribal sovereign authority in this area by making tribal consent a statutory requirement to an encumbrance on tribal land. Under the Nonintercourse Act, a transfer of any rights in tribal land to a non-Indian person or entity requires the consent of both the Secretary of the Interior and the tribe itself. *See* 25 U.S.C. § 177; *Fed. Power Comm'n v. Tuscarora Indian Nation*, 362 U.S. 99, 119 (1960). With respect to right-of-way easements across tribal lands in particular, the Secretary of the Interior has the authority to grant an easement for a pipeline through a Reservation or individual Indian allotment, 25 U.S.C. § 321, but cannot authorize a right-of-way easement across land owned or co-owned by a tribe "without the consent of the proper tribal officials." 25 U.S.C. § 324; *see also* 25 C.F.R. § 169.4.[6] Thus, in exercising its power to exclude non-Indians, the Band is acting not only as a landowner, but as a local government and sovereign. *Merrion*, 455 U.S. at 146, n.12 ("Over tribal lands, the tribe has the rights of a landowner as well as the rights of a local government, dominion as well

---

[6] Both case law and BIA regulations also recognize that these statutory requirements arise from the Band's tribal sovereignty. *See Pub. Serv. Co. of New Mexico v. Barboan*, 857 F.3d 1101, 1112 (10th Cir. 2017) (discussing § 324 and noting that, "unlike ordinary heirs inheriting interests in land, tribes are sovereign political entities possessed of sovereign authority") (citation omitted); "Rights-of-Way on Indian Land," 80 Fed. Reg. at 72,505–06 (BIA acknowledging that "[c]onsenting to rights-of-way on trust or restricted land is one of several tools . . . that animate the traditional notions of sovereignty").

**A22**

as sovereignty.").  Moreover, the Band's decision effectively to refuse additional, 30-year easements to Enbridge on allotment parcels was not just was the exercise of a sovereign power to which Enbridge was always subject, which the implied duty of good faith and fair dealing cannot waive, but to do otherwise would be effectively renewing these easements without BIA approval.

In sum, the Band did not breach the 1992 Agreement and did not violate its implied duty of good faith and fair dealing by refusing to grant Enbridge easements over the 12 allotment parcels acquired after signing the agreement; nor did the 1992 Agreement provide the Band's consent to Enbridge for continued operation of its pipeline on the allotment lands now owned by the Band beyond the express, 20-year easement approved by the BIA and long since expired.  Instead, the 1992 Agreement expressly limited the 50-year easement to the 13 Band-owned parcels identified and created no obligation as to any other parcels along the pipeline corridor.  Accordingly, Enbridge cannot rely on the 1992 Agreement as a source of consent or legal authorization to continue operating its pipeline on the allotment parcels without a valid easement.

### B. Enbridge's Efforts to Renew the Easements

Next, Enbridge argues that the Band's trespass claim fails because, regardless of the 1992 Agreement, the Administrative Procedures Act, 5 U.S.C. § 558(c), gives Enbridge the right to continue operations on the allotment parcels.  Section 558(c) states that a timely application for renewal of an easement or license form a federal agency stays expiration of an easement or license until a final decision is made, so long as the application was made "in accordance with agency rules."  *See also Pan-Atl. S. S. Corp. v. Atl. Coast Line R. Co.*, 353

U.S. 436, 439 (1957) (describing requirements of § 558(c)). Thus, Enbridge argues that because it submitted applications for renewal of its easements on the allotment parcels *before* they expired, and there is no final decision from the Interior Board of Indian Appeals on those applications, Enbridge can continue operating its pipeline without being in trespass indefinitely.

This argument fails lacks support in the evidence. While Enbridge submitted 15 written applications for renewal of the allotment parcels in March 2013, approximately three months before the easements would expire by their terms in June 2013, the BIA denied those applications in November 2020 because Enbridge had "*failed to obtain landowner consents*" (*id.* at 2) (emphasis added) with its right-of-way applications. Although Enbridge filed timely administrative appeals from the denials, which are technically still pending before the Interior Board of Indian Appeals, Enbridge's renewal applications did *not* comply with the BIA's rules for seeking renewal of easements over tribal land on their face. In particular, Enbridge asserts that there was no *regulation* at the time expressly requiring the submission of landowner consents with its applications, but the application forms submitted in 2013 identified the documents that the BIA required to be submitted with a renewal request, including "Written consent of landowner (ROW Form 94.7)." (Dkt. #258-3.)

Plus, contrary to Enbridge's assertion, the regulations at the time of submitting the renewal applications, 25 C.F.R. § 169.14 (2013), required it to deposit "the total estimated . . . consideration for the right-of-way" as "specified in the consent covering that parcel." The BIA guidance at the time likewise listed "Written consent of landowner" as a

"Required" item to be submitted with the renewal application. *See* https://iltf.org/wp-content/uploads/2016/11/BIA-Procedural-Handbook-Grant-of-Easement-for-Right-of-Way-on-Indian-Lands.pdf (last visited September 7, 2022). In light of this guidance, Enbridge had and has no plausible argument that its 2013 renewal applications complied with the BIA's rules, much less were sufficient to stay expiration of its easements under § 558(c). To hold otherwise would lead to Enbridge being permitted to operate its pipeline indefinitely on the Band's land without its consent, so long as the BIA failed to issue a final decision on the applications despite their patent invalidity.

### C. Pipeline Safety Act and Federal Preemption

Enbridge's final argument is that the Band's trespass claim is barred by the federal Pipeline Safety Act, 49 U.S.C. § 60101, *et seq.*, which establishes a comprehensive regime of safety requirements for interstate pipelines and precludes domestic authorities from regulating pipeline safety. 49 U.S.C. § 60104(c) ("A State authority may not adopt or continue in force safety standards for interstate pipeline facilities or interstate pipeline transportation.") Enbridge also cites several cases holding that state or local actions are preempted by the Act. *E.g., Olympic Pipe Line Co. v. City of Seat*tle, 437 F.3d 872 (9th Cir. 2006) (Pipeline Safety Act preempted City of Seattle from enforcing its own more stringent pipeline safety provisions); *Kinley Corp. v. Iowa Utilities Board, Utilities Division, Department of Commerce*, 999 F.2d 354 (8th Cir. 1993). Enbridge argues that because the Band is withholding its consent to renewed easements on the allotment parcels based on safety concerns, the Band's actions are preempted by the Act.

25

**A25**

The glaring problem with this argument is that while the Band's refusal to consent to easements may be based in part on safety concerns (at least environmental in nature), it is *not* based on any imposition of safety *standards*. Nor has Enbridge been able to cite *any* legal authority supporting its argument that the Pipeline Safety Act would *require* a tribe (or any other landowner for that matter) to grant or renew an easement for a pipeline across its land simply because it has concerns about the safety of doing so. *See Enbridge Energy v. Town of Lima*, No. 13-CV-187-BBC, 2013 WL 12109106, at *4 (W.D. Wis. Apr. 4, 2013) ("[B]ecause defendants' road use proposal and demands are not safety regulations, they do not come within the express preemption provision of the Pipeline Safety Act.")

For all of the reasons explained above, therefore, Enbridge has failed to undermine plaintiff's overwhelming evidence of the three elements of the Band's trespass claim or asserted any viable defense. Thus, the Band is entitled to summary judgment on its trespass claim, as well as on Enbridge's counterclaims for breach of contract and related implied duty of good faith and fair dealing.

### D. Unjust Enrichment and Restitution

The Band has also moved for summary judgment on its claim of unjust enrichment. To succeed on this claim, the Band must show that Enbridge obtained a benefit at its expense, or in violation of its legally protected rights. *See* Restatement (Third) Restitution and Unjust Enrichment § 1 ("Restatement of Restitution"); *see also See Cent. States, Se. & Sw. Areas Health & Welfare Fund v. Pathology Lab'ys of Arkansas, P.A.*, 71 F.3d 1251, 1254 (7th Cir. 1995) (federal common law on restitution and unjust enrichment "tracks the

**A26**

consensus of the states," which is summarized in the Restatement of Restitution).  The Band claims that Enbridge benefited monetarily by trespassing in violation of its legally protected rights and should be found liable for unjust enrichment, including payment of restitution.  Enbridge raises three arguments in opposition to the Band's unjust enrichment claim, but none is persuasive.

First, Enbridge argues that there is no federal cause of action for unjust enrichment, relying on a single, district court decision that found "no authority" in federal common law setting forth "the elements of an unjust enrichment claim."  *Schafer, Tr. of Wayne Penn Schafer Separate Prop. Tr. Established Oct. 5, 1982 v. Centerpoint Energy Oklahoma Gas*, No. 17-CV-365-GKF-FHM, 2018 WL 10140171, at *5 (N.D. Okla. May 21, 2018).  As far as this observation goes, it is certainly not precedential, or even persuasive.  Regardless, the Seventh Circuit has recognized unjust enrichment claims under federal common law, equating them with common law principles of restitution.  *ConFold Pac., Inc. v. Polaris Indus., Inc.*, 433 F.3d 952, 957 (7th Cir. 2006); *Cent. States*, 71 F.3d at 957.  More specifically, "A person who is unjustly enriched at the expense of another is subject to liability in restitution."  Restatement of Restitution § 1; *see also id.* § 40 ("A person who obtains a benefit by an act of trespass . . . is liable in restitution to the victim of the wrong."); *Bobak v. Fed. Exp. Corp.*, No. 97 C 7066, 1999 WL 160223, at *7 (N.D. Ill. Mar. 10, 1999) (recognizing common law theory of unjust enrichment).

Second, Enbridge argues that there are disputed issues of fact precluding summary judgment on the Band's unjust enrichment claim.  However, the only disputed issues that Enbridge discusses relate to the 1992 Agreement, and in particular whether Enbridge had

permission under that agreement to maintain its pipeline on the allotment parcels owned by the Band. As discussed above, there are no genuine factual disputes regarding the 1992 Agreement, and Enbridge had no valid basis for believing that it could maintain its pipeline on tribal land without the Band's permission and a valid easement from the BIA, leaving only a question as to the appropriate remedy.

Third, and relatedly, Enbridge argues that the Band cannot pursue an equitable remedy for unjust enrichment because it can seek fair rental value for Enbridge's trespass, which provides an adequate legal remedy. However, as discussed more in the section below, addressing a "profits-based remedy," the basis for the Band's restitution claim is that an award of fair rental value alone would *not* be an adequate remedy, and similarly that ordinary trespass damages would be inadequate to address Enbridge's actions. Enbridge has failed to refute this argument sufficiently to prevent the Band from being allowed to seek an appropriate remedy for unjust enrichment.

In sum, the Band has submitted evidence sufficient to compel a reasonable jury's finding of unjust enrichment, and Enbridge has failed to raise any legal or factual dispute that would preclude entry of summary judgment on liability as to that claim. Therefore, the Band is entitled to a finding at summary judgment that Enbridge is liable for unjust enrichment, as well as unlawful trespass.

### E.  The Band's Remedies

This brings us to the Band's motion for summary judgment on its entitlement to certain remedies. As an initial matter, Enbridge concedes that if the Band is successful on its trespass claim, the Band is entitled to fair market rental value on the expired easements

**A28**

for the 12 allotment parcels.  As noted, the Band in turn contends that the rental value of the easement would not be a sufficient damage award, and seeks a ruling that it is entitled to recover a profits-based remedy for its trespass and unjust enrichment claims.  The Band also seeks a permanent injunction requiring Enbridge to cease operation of the pipeline, to safely decommission it, and to remove it.

### 1.  Accounting and profits

The court also agrees that the Band is entitled to a profits-based remedy for Enbridge's trespass and unjust enrichment.  Specifically, the Supreme Court has recognized that an accounting for profits is available under federal common law specifically for trespass to Indian lands.  *United States v. Santa Fe Pac. R. Co.*, 314 U.S. 339, 344 (1941) (railroad that unlawfully used Indian lands was required to "account for all rents, issues and profits derived from the leasing, renting or use of the lands"); *Oneida Cnty., N.Y.*, 470 U.S. at 235–36 ("Indians have a common-law right of action for an accounting of 'all rents, issues and profits' against trespassers on their land.") (quoting *Santa Fe*, 314 U.S. at 344); *see also Davilla v. Enable Midstream Partners, L.P.*, No. CIV-15-1262-M, 2016 WL 6952356, at *3 (W.D. Okla. Nov. 28, 2016) (where pipeline found in trespass after expiration of BIA easements, Indian landowners entitled, under federal common law, "to an accounting of defendants' profits from the operation of their pipeline and recovery of the pro-rata share of those profits that is attributable to the portion of the pipeline that has been located on their property").

As explained in the Restatement on Restitution, an appropriate remedy for unjust enrichment is also "the amount of profit wrongfully obtained."  Restatement on Restitution

§ 49. Similarly, "[e]nrichment resulting from intentional trespass is not properly measured by ordinary rental value," as that remedy would leave the conscious wrongdoer "on a parity with a person who—pursing the same objectives—respects the legally protected rights of the property owner." *Id.* § 40, cmt. b. Instead, the proper remedy for willful or intentional trespass includes "consequential gains" in the form of profits that the trespasser achieved by violating the property owner's rights. *Id.  See also* Restatement (Second) of Torts § 929 ("[I]f the defendant is a willful trespasser, the owner is entitled to recover from him the value of any profits made by the entry.").

Enbridge also raises several arguments in opposition to the Band's request for a profits-based remedy, but none is persuasive. First, Enbridge contends that the Band did not plead a claim for accounting, but this is simply incorrect. Indeed, the Band sought in its complaint "an order awarding the Band damages for trespass and restitution for unjust enrichment, including for profits derived from Enbridge's unlawful transmission of petroleum products across the Band's lands." (3d Am. Cpt. (dkt. #85-1) Prayer for Relief, ¶ H).) A request for profits and restitution for unjust enrichment is the equivalent of a request for an "accounting." *See* Restatement of Restitution § 51(4) ("Restitution remedies that pursue this object [depriving a wrongdoer of profits] are often called 'disgorgement' or 'accounting'"); *Liu v. Sec. & Exch. Comm'n*, 140 S. Ct. 1936, 1942 (2020) ("depriv[ing] wrongdoers of their net profits from unlawful activity" has "gone by different names," including "restitution," "disgorgement," "accounting" and "accounting for profits"). Accordingly, the Band adequately pleaded its request for a profits-based remedy following an accounting.

30

**A30**

Second, Enbridge argues that restitution or a profits-based remedy is not appropriate for trespass cases, and that the only appropriate remedy is a rental fee or market value of the land, particularly if nothing was removed from the property. However, the only cases that Enbridge cites in support concern *innocent* trespassers. *E.g.*, *Enbridge Energy, Ltd. P'ship v. Engelking*, 2017 WI App 1, ¶ 22, 372 Wis. 2d 833, 890 N.W.2d 48 (landowner entitled to rental value of the land for duration of the trespass, where trespasser "did not act willfully or wantonly in disregard of the [landowner's] rights, but rather committed an honest mistake when they located the three additional pipelines in an area they erroneously believed, based on the language of the Right of Way Grant, was part of the conveyed right of way"); *Young v. Appalachian Power Co.*, No. CIV.A.2:07-479, 2008 WL 4571819, at *8 (S.D.W. Va. Oct. 10, 2008) ("Plaintiffs have adduced no evidence that the defendant was a "conscious wrongdoer."); *Mullins v. Equitable Prod. Co.*, No. 2:03CV00001, 2003 WL 21754819, at *1 (W.D. Va. July 29, 2003) (rental value was appropriate remedy where pipeline was built on plaintiff's property "in error").

Here, although initially an owner of an easement, Enbridge is now a conscious or willful trespasser. A "'conscious wrongdoer' is a defendant who is enriched by misconduct and who acts (a) with knowledge of the underlying wrong to the claimant, or (b) despite a known risk that the conduct in question violates the rights of the claimant." Restatement of Restitution § 51(3). For the reasons discussed above, a reasonable jury would have to find that Enbridge was enriched by trespassing on the Band's land and had no reasonable basis for believing that its presence continued to be lawful. To the contrary, Enbridge knew that: its easements had expired; and it was required by federal statute to have permission

31

**A31**

from the Band, as well as a valid easement from the BIA.  Instead, Enbridge continued operating its pipeline on the allotment parcels.  Moreover, contrary to its argument, Enbridge could neither have reasonably believed that the 1992 Agreement, nor that its incomplete renewal applications permitted Enbridge to continue operating on the allotment land owned by the Band.  Instead, on this record, a reasonable jury would have to find that Enbridge was a conscious trespasser from whom the Band can recover a profits-based remedy.  *See In re de Jong*, 793 F. App'x 659, 660 (9th Cir. 2020) (trespasser who knew lease would expire but did not vacate premises was a conscious trespasser liable for "disgorgement of all profits derived from the trespass," because "a conscious trespasser will be stripped of all gains from unauthorized interference with another's property").

Third, Enbridge argues that the Band's request for restitution, profits, or any other relief, including injunctive relief, is barred by the doctrine of laches, since the Band waited several years after Enbridge's easements expired before filing this lawsuit.[7]  Laches is an equitable doctrine that considers the inequity of permitting a claim to be enforced.  *City of Sherrill, N.Y. v. Oneida Indian Nation of New York*, 544 U.S. 197, 217 (2005) (laches is an equitable remedy that may "bar long-dormant claims for equitable relief").  To support a defense of laches, however, Enbridge would have to show (1) a lack of diligence by the

---

[7] Enbridge says in a footnote that it has "a number of other affirmative defenses" that would bar the Band's claims and that preclude summary judgment on the Band's trespass claim.  (Enbridge's Opp. Br. (dkt. #207) 143, n.84.)  However, if Enbridge wanted to raise affirmative defenses in opposition to the Band's trespass or unjust enrichment claims, summary judgment was obviously the time to do so.  By failing to develop these arguments in its opposition brief, Enbridge has waived those affirmative defenses to the Band's trespass and unjust enrichment claims.

Band, and (2) prejudice to Enbridge. *See Lingenfelter v. Keystone Consol. Indus., Inc.*, 691 F.2d 339, 340 (7th Cir. 1982). Neither have been established here.

Nevertheless, Enbridge argues that it engaged the Band in good faith negotiations before easements on the allotment parcels expired in 2013, and that the Band failed to meaningfully respond for more than two years to its offer. It further alleges that the Band never demanded that Enbridge cease operations or remove the pipeline until January 2017, when the Tribal Council passed a resolution stating that it would not renew the easements for the pipeline, and that the Band did not accuse Enbridge of trespass until it filed this lawsuit in July 2019. Enbridge also argues that it was prejudiced by the Band's delay in crying foul, because (1) it could have started working sooner on a plan to reroute the pipeline outside of the Reservation boundaries, and (2) the lapsed time has increased Enbridge's potential liability for damages to the Band.

The court is not persuaded that the doctrine of laches bars any of the Band's claims in this case. Enbridge relies on cases in which equitable principles barred the enforcement of rights that had long gone stale. For example, in *Cayuga Indian Nation of N.Y. v. Pataki*, 413 F.3d 266, 269 (2d Cir. 2005), the Cayuga Indian Nation filed suit against the State of New York, claiming that a flaw in the original transfer of its reservation land over 200 years ago violated federal law, so it was entitled to possession of the land. The Second Circuit found the claim was barred by laches because "this type of possessory land claim—seeking possession of a large swath of central New York State and the ejectment of tens of thousands of landowners—is indisputably disruptive." *Id.* at 275–277. In so holding, the Second Circuit relied on *City of Sherrill*, 544 U.S. 197, in which the Supreme Court held

**A33**

that equitable principles precluded the Oneida Indian Nation from reviving its sovereignty over land that was formerly part of its historic reservation.  The Tribe resisted payment of property taxes to the City of Sherrill on the ground that its acquisition of fee title to the parcels revived the Tribe's sovereignty over the land.  *Id.*  The Supreme Court rejected that claim, concluding that the "long lapse of time" and "dramatic changes in the character of the properties" precluded the Tribe from gaining "the disruptive remedy it now seeks."  *Id.* at 216-217.   Specifically, referring to the doctrines of laches, acquiescence and impossibility, the Court held that the "Oneidas' long delay in seeking equitable relief against New York or its local units, and developments in the city of Sherrill spanning several generations," rendered the shift in governance sought by the Tribe inequitable.  *Id.* at 221.

The equitable considerations in this case are not remotely analogous to the circumstances in *Cayuga* or *Sherrill*.  The Band's enforcement of its sovereign authority over the allotment parcels will not disrupt significant and justified expectations concerning the character of the land.  The Band's claims are also not long-dormant claims that it has sought to revive after 200 years.  Although the Band did not seek to enforce its rights over the allotment parcels until it filed suit in 2019, Enbridge had no justified expectations in continuing to operate the pipeline over the allotment parcels for years without paying compensation.  Regardless, Enbridge was well-aware that it lacked a valid easement over the parcels, and it knew or should have known that federal law required both the Band's and BIA's approval.  Lastly, Enbridge has cited no legal authority suggesting that a court

in law or equity should apply principles of laches to protect individuals who have been knowingly operating contrary to federal law.

Fourth, and finally, Enbridge argues that permitting the Band to recover a profits-based remedy would be a "windfall" to the Band because it obtained ownership of the allotment parcels "at taxpayer expense through federal programs, and for a minute fraction of the amounts it is now seeking in damages as a result of its ownership in these lands." (Enbridge Opp. Br. (dkt. #207) 120.) This argument is tone-deaf and meritless. As Enbridge is well-aware, the allotment parcels were part of the Band's original territory, and were severed as a result of the federal government's allotment policy, the purpose of which was "simple and clear cut: to extinguish tribal sovereignty, erase reservation boundaries, and force the assimilation of Indians into society at large." *Lac Courte Oreilles Band of Lake Superior Chippewa Indians of Wisconsin v. Evers*, – F.4th –, 2022 WL 3355076, at *6 (7th Cir. Aug. 15, 2022) (quoting *Cnty. of Yakima v. Confederated Tribes & Bands of Yakima Indian Nation*, 502 U.S. 251, 254 (1992)); *see also Oneida Nation v. Vill. of Hobart*, 968 F.3d 664, 670–71 (7th Cir. 2020) ("as a result of allotment, Indians drift[ed] toward complete impoverishment and lost their land") (citations omitted). The land consolidation and reorganization programs by which the Band acquired the 12 allotment parcels at issue here were intended to reverse the decimation of tribal land wrought by the government's allotment policy, and to "give tribes the opportunity to re-establish their governments and land holdings." *Oneida Nation*, 968 F.3d at 671. In light of this historical background, Enbridge's argument that the Band would receive a "windfall" by enforcing its sovereign rights over the land it has recovered is meritless.

**A35**

Accordingly, the court is persuaded that restitution or a profits-based remedy is appropriate and necessary in this case, *both* to address the violation of the Band's sovereign rights and to take away what otherwise would be a strong incentive for Enbridge to act in the future exactly as it did here. If Enbridge was required to pay only what it would have paid the Band for an easement, the court would essentially be granting Enbridge a de facto condemnation power, and excusing it from complying with the bargaining and easement process for Indian lands established by federal law. *Cf. Pearson v. Target Corp.*, 968 F.3d 827, 831 (7th Cir. 2020) ("We base our decision here on long-established principles of equity. It has long been axiomatic 'that no person shall profit by his own wrong.'"); *Williams Elecs. Games, Inc. v. Garrity*, 366 F.3d 569, 576 (7th Cir. 2004) ("[O]ne way to deter [an intentional tort] is to make it worthless to the tortfeasor by stripping away all his gain, since if his gain exceeded the victim's loss a damages remedy would leave the tortfeasor with a profit from his act."). For all of these reasons, the court will grant summary judgment to the Band on its request for a profits-based remedy.

The Band did not request a specific amount of monetary relief in its motion for summary judgment, and neither side addressed how a profits-based remedy should be calculated in this case. Accordingly, the court will direct the parties to submit supplemental briefing on how the court should determine the amount of profits-based relief to which the Band is entitled, including the ordering of a third-party accounting, and whether the ultimate question as to a final dollar amount should be resolved by the court or a jury.

36

**A36**

### 2. Permanent injunction

Finally, the Band argues that if the court finds Enbridge in trespass, it should issue a permanent injunction prohibiting the further flow of crude oil and natural gas across the relevant parcels and requiring the safe removal of Line 5 from the 12 allotment parcels owned by the Band. However, a finding of liability on a defendant's part does not automatically give rise to an entitlement to injunctive relief, even if the defendant's actions clearly violate federal law. *Liebhart v. SPX Corp.*, 998 F.3d 772, 779 (7th Cir. 2021). To the contrary, an injunction issues "only as necessary to protect against otherwise irremediable harm." *LAJIM, LLC v. Gen Elec. Co.*, 917 F.3d 933, 944 (7th Cir. 2019); *see also United States v. Bethlehem Steel Corp.*, 38 F.3d 862, 867 (7th Cir. 1994) ("Ordinarily, a court is obligated to conduct an equitable balancing of harms before awarding injunctive relief, even under an environmental statute which specifically authorizes such relief.")

Nonetheless, the Band argues that this court should not weigh the equities in deciding whether to enjoin Enbridge permanently from using the pipeline in its Tribal lands, because an injunction is mandatory under the circumstances here. In particular, the Band says that permitting Enbridge to operate in trespass would violate the Nonintercourse Act, which requires tribal consent to any conveyance of a right on Indian land. 25 U.S.C. § 177 ("No purchase, grant, lease, or other conveyance of lands, or of any title or claim thereto, from any Indian nation or tribe of Indians, shall be of any validity in law or equity, unless the same be made by treaty or convention entered into pursuant to the Constitution.")

37

**A37**

In so arguing, the Band relies on *Tennessee Valley Authority v. Hill*, 437 U.S. 153 (1978), a case that analyzed a different statute and statutory scheme under the Endangered Species Act. *Id.* at 171. The Court held that the Endangered Species Act required the district court to enjoin completion of a dam where it was undisputed further construction would cause the complete elimination of an endangered species. *Id.* Under these circumstances, an injunction was the only means of ensuring compliance with the Endangered Species Act. *Id.* at 194. However, the Band cites no cases applying *Hill* to a trespass or unjust enrichment claim, nor any case applying *Hill* to prevent a violation of the Nonintercourse Act. Nor has the Band cited any case in which a court disregarded traditional equitable principles and issued an automatic injunction to prevent a Nonintercourse Act violation.

Instead, the Supreme Court noted that "the Nonintercourse Act does not address directly the problem of restoring unlawfully conveyed land to the Indians," *Oneida Cnty.*, 470 U.S. at 239, and recognized that "equitable considerations" might limit the relief available to Indians seeking to enforce their property rights. *Id.* at 253, n.27. In rejecting an Indian tribe's request for injunctive relief for equitable reasons, the Supreme Court also explained that "[t]he substantive questions whether the plaintiff has any right or the defendant has any duty, and if so what it is, are very different questions from the remedial questions whether this remedy or that is preferred, and what the measure of the remedy is." *City of Sherrill*, 544 U.S. at 213 (citing *Oneida Indian Nation of New York State v. Cnty. of Oneida, N.Y.*, 199 F.R.D. 61, 90 (N.D.N.Y. 2000) ("[T]here is a sharp distinction between the existence of a federal common law right to Indian homelands and how to

vindicate that right.")); *see also Yankton Sioux Tribe v. United States*, 272 U.S. 351, 357 (1926) (recognizing the impracticability of returning to Indian control land that generations earlier passed into numerous private hands).

Although this case is distinguishable from the *City of Sherrill* and other cases involving land that has been held by non-Indians for decades, or even centuries, there are still equitable considerations that affect the Band's injunction request.  *See City of Sherrill*, 544 U.S. at 219 (recognizing that certain requests for injunctive relief may be "impractical").  In particular, there are concerns raised by Enbridge and several amici about the impact on foreign relations, consumers, refineries, regional economies, and international energy supply, resulting from an immediate shutdown of the Line 5 pipeline. Under the circumstances, therefore, the court will follow the Supreme Court's guidance that in choosing between various methods of enforcing Congress's policy choices, discretion be exercised as to "whether a particular means of enforcing the statute should be chosen over another permissible means." *United States v. Oakland Cannabis Buyers' Co-op.*, 532 U.S. 483, 497–98 (2001).

Applying this principle, the court concludes that the Band is entitled to a remedy for Enbridge's trespass and unjust enrichment, particularly in light of Congress's clear statement in the Nonintercourse Act, but that the court is *not* required to issue a permanent injunction that would eject Enbridge immediately from the allotment parcels without considering the relevant equities.  *See Davilla v. Enable Midstream Partners L.P.*, 913 F.3d 959, 973 (10th Cir. 2019) (holding that district court erred by ordering defendant to remove pipeline "on the basis of liability alone").

**A39**

Generally, in determining whether to enjoin a continuing trespass permanently, a federal district court must consider whether: (1) an injunction is necessary to prevent irreparable harm; (2) remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) the balance of hardships between the plaintiff and defendant; and (4) the public interest would not be disserved by a permanent injunction. *Liebhart*, 998 F.3d at 779 (quoting *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).) Here, the Band has submitted ample evidence to show that an injunction is necessary to prevent irreparable harm, and that remedies available at law, such as monetary damages, would be inadequate compensation. Indeed, "[a]s a general rule, interference with the enjoyment or possession of land is considered 'irreparable' since land is viewed as a unique commodity for which monetary compensation is an inadequate substitute." *Pelfresne v. Vill. of Williams Bay*, 865 F.2d 877, 883 (7th Cir. 1989). This is particularly true here, where the harm of a continuing trespass would dispossess the Band of its *sovereign* right to control its own land. *See Merrion*, 455 U.S. at 141 ("power to exclude non-Indians from Indian lands" is "a hallmark of Indian sovereignty"). For the same reason, interference with the Band's sovereignty cannot be adequately remedied with monetary damages.

As for the third factor, the court agrees the balance of hardship between the parties weighs heavily in the Band's favor since Enbridge's conduct was willful. *See Sierra Club v. Franklin Cnty. Power of Illinois, LLC*, 546 F.3d 918, 935 (7th Cir. 2008) ("[I]t is an accepted equitable principle that a court does not have to balance the equities in a case where the

40

**A40**

defendant's conduct has been willful.") (citation omitted).  However, genuine disputes of material fact exist regarding the fourth factor:  the public interest.

Certainly, the Band persuasively argues that the public interest is served by protecting the Band's treaty rights, sovereignty and rights of self-government, as well as advancing Congress's policy choices as articulated in the Nonintercourse Act's prohibition on unconsented conveyances of Tribal land.  Enbridge does not counter any of the Band's arguments in that regard, but it raises several other, valid and significant public interest concerns.  In particular, Enbridge, and several amici, argue that an immediate shutdown of the Line 5 pipeline would have widespread economic consequences.  Both sides have submitted expert opinions from oil industry economists and experts in the logistics of shipping crude oil and natural gas liquids, who provide varying opinions regarding the impact of shutting down the pipeline, as well as whether there are viable mechanisms for replacing the energy products currently conveyed by Line 5.  Indeed, the Band concedes, as it must, that genuine factual disputes exist regarding Enbridge's economic arguments and the impact that decommissioning the pipeline would have on energy supply and local economies.  (Band's Reply Br. (dkt. #256) 88.)

Further, there is little question that an immediate shutdown of the pipeline would have significant public policy implications on the trade relationship between the United States and Canada.  As the Band concedes, Line 5 falls under a treaty between the two nations regarding pipeline transit:  1977 Transit Pipeline Treaty (Agreement Between the Government of the United States and the Government of Canada Concerning Transit Pipelines, Jan. 28, 1977, 28 U.S.T. 7449, 1977 WL 181731 ("Transit Treaty").  A

41

**A41**

provision of the Transit Treaty prohibits any "public authority" of either nation from "institut[ing] any measures" that would impede the flow of oil in certain cross-border pipelines, including Line 5.  *See* Transit Treaty, Art. II.  Disputes about the pipeline must, according to the treaty, be subject to international arbitration, a procedure that Canada recently requested with respect to Line 5.  (Statement by Canadian Minister (dkt. #357-2).)  The Canadian Minister of Foreign Affairs, Melanie Joly, recently issued a statement expressing concern about a shutdown of the pipeline on the Bad River Reservation, and supporting a proposal by Enbridge to relocate that segment of Line 5 outside and around the Reservation.  (*Id.*)  Indeed, Enbridge goes so far as to argue that Canada's request for international arbitration precludes this court from issuing any injunctive relief or, at the very least, requires this court to stay the Band's request for an injunction.

Even so, the court is not persuaded that it must stay resolution of the parties' ongoing dispute, given that:  there is no indication the Band will be involved in any arbitration between the United States and Canada; and the Band's property rights are themselves recognized in a federal treaty -- the 1854 Treaty between the United States and the Chippewa; and again, a court cannot find that Congress abrogated Indian treaty rights absent unambiguous language to that effect.  *Cook v. United States*, 288 U.S. 102, 120 (1933) ("A treaty will not be deemed to have been abrogated or modified by a later statute, unless such purpose on the part of Congress has been clearly expressed."); *see also United States v. Dion*, 476 U.S. 734, 739–40 (1986) ("What is essential is clear evidence that Congress actually considered the conflict between its intended action on the one hand and Indian treaty rights on the other, and chose to resolve that conflict by abrogating the

treaty."). There is no such abrogation language in the 1977 Transit Treaty, as the Transit Treaty does not mention Indian treaties or treaty rights at all, let alone the 1854 Treaty with the Chippewa.

Regardless, it is possible to craft injunctive relief that would not interfere with the Transit Treaty or Canada's concerns about the economic impact of an immediate shutdown. Enbridge has represented to this court that it is working on a reroute of the pipeline, which would take Line 5 completely outside of the Bad River Reservation, and should take only six years to complete. (Enbridge Opp. Br. (dkt. #207) 148.) Thus, if Enbridge has been working diligently on the reroute plan, it should be able to complete that reroute within five years. Thus, the court is inclined to issue an injunction that: (1) requires Enbridge to complete a reroute of the pipeline outside the Bad River Reservation within five years; (2) requires Enbridge to pay the Band a fee for the easement in the interim; and (3) would subject Enbridge to a doubling of that fee if the reroute is not completed within five years. Such an injunction would balance the equities between the Band's sovereign interests, broader economic concerns, and foreign relations.

However, the court will not issue any permanent injunctive relief without further input from the parties. Specifically, the court will hold a status conference with the parties at which the parties should be prepared to provide input on: (1) Enbridge's likelihood of completing the reroute within five years; (2) how to determine the appropriate measure of past and future rent and damages to the Band; and (3) what issues, if any, must be resolved by a jury or this court. After the court receives the parties' input on these issues, it will determine the type of trial necessary to resolve this case.

43

**A43**

## II. Enbridge's Motion for Summary Judgment

In addition to its trespass and unjust enrichment claims addressed above, the Band claims that the pipeline is a public nuisance under state and federal common law due to the risk of a rupture near the Bad River, which could have devastating environmental impacts to the Band's Reservation Lands. The Band also asserts its own regulatory authority under federal common law to assess the pipeline's safety and to eject the pipeline from the Bad River Reservation. Enbridge moves for partial summary judgment on these remaining counts in the Band's third amended complaint: count 1 (federal nuisance); count 2 (state law nuisance); count 4 (ejectment); and count 5 (Band regulatory authority). The court will briefly address Enbridge's arguments as to count 2, count 4, and count 5, before considering Enbridge's arguments regarding the Band's federal nuisance claims in count 1.

### A. State law nuisance

Enbridge argues that the Band is not within the class of eligible plaintiffs who may bring a public nuisance action under Wisconsin law. Specifically, Wis. Stat. § 823.01 provides that "[a]ny person, county, city, village or town may maintain an action to recover damages or to abate a public nuisance[.]" Enbridge argues that because the statute does not list tribes, and because the term "person" is not typically construed to include tribes, *see Will v. Michigan Dep't of State Police*, 491 U.S. 58, 64 (1989), the Band lacks standing to sue under that particular statute. The Band fails to address this argument in its opposition brief; instead, it argues general standing to bring suit under Article III of the United States Constitution. (Band's Opp. Br. (dkt. #282) 28–29.) However, the Band's Article III standing is not in dispute. Enbridge is only challenging the Band's eligibility to maintain

44

**A44**

a public nuisance action under Wisconsin law.  *See Tucker v. U.S. Dep't of Com.*, 958 F.2d 1411, 1416 (7th Cir. 1992) (whether plaintiff is "within the class of persons who have been given a right to litigate the violation" is "[an]other sense[] of standing besides the Article III sense").  By failing to respond to Enbridge's argument, the Band has effectively conceded that it does not fall within the class of persons who may bring a public nuisance claim under Wisconsin law, at least for purposes of summary judgment in this case.  *See Cincinnati Ins. Co. v. Eastern Atlantic Ins. Co.*, 260 F.3d 742, 747 (7th Cir. 2001) (failure to respond to nonfrivolous argument in opposition brief "acquiesces" to the argument, and "[t]hat acquiescence operates as a waiver").

### B.  Ejectment

The court agrees with Enbridge that the Band's ejectment claim (count 4) is duplicative of the Band's trespass claim.  In fact, the Band acknowledges the ejectment claim is based on its holding "valid and lawful ownership interest in twelve [allotment] parcels[, and] Enbridge's maintenance and operation of the pipeline on those parcels constitute[ing] the wrongful use and possession of them," which "operates to withhold rightful possession from the Band."  (Band's Opp. Br. (dkt. #282) 26 (citing 3d Am. Compl. (dkt. #85-1) ¶¶ 160–61, 163).)  Of course, these are the *same* basic allegations that support the Band's trespass claim; plus, the Band seeks the same remedy -- ejectment -- for both claims.  As discussed above, the court is not going to order immediate ejectment of Enbridge from Reservation land because of larger public policy concerns, but will consider input from the parties in crafting an appropriate equitable remedy in this case.  Because it is entirely duplicative and adds nothing further to the court's equitable analysis, therefore,

45

**A45**

the court will dismiss the Band's ejectment claim. *See Brooks Jay Transportation, Inc. v. FedEx Ground Package Sys., Inc.*, No. 17-CV-084-WMC, 2017 WL 5136014, at *3 (W.D. Wis. Nov. 3, 2017) (dismissing duplicative breach of contract claims that were based on same allegations and sought same remedy); Borzych v. Frank, No. 06-C-475-C, 2006 WL 3254497, at *8 (W.D. Wis. Nov. 9, 2006) (dismissing duplicative claim that was "simply a repackaging" of another claim).

## C. The Band's regulatory authority

The court will also dismiss the Band's regulatory authority claim (count 5) in light of the Band's concession that the claim is not yet ripe. (Band's Opp. Br. (dkt. #282) 27.) While the Band also requests that the court hold this claim in abeyance "unless and until a live controversy develops" (*id.* at 28) the court has no such authority. *See Med. Assur. Co. v. Hellman*, 610 F.3d 371, 375 (7th Cir. 2010) (district court erred by staying unripe claim, and stating that the "proper disposition . . . would have been to dismiss"). Accordingly, the court will dismiss the regulatory authority claim without prejudice for lack of subject matter jurisdiction.

## D. Federal nuisance claim

This leaves the Band's federal common law nuisance claim (count 1). The Band alleges that, as a result of bank erosion, high river flows, and local geomorphology, the Bad River is encroaching on and will soon reach the Line 5 pipeline to the east of where it is presently buried. When this happens, the Band has offered evidence that the river will strip the pipeline of its supporting soils, exposing it to currents and other stresses that,

46

**A46**

according to the Band, the pipeline was never designed to withstand, leading to a high risk of pipeline rupture. Moreover, there is no reasonable dispute that a rupture would cause significant environmental damage to the Bad River and its surrounding natural resources, including wild rice beds and fisheries on which the Band depends.  Accordingly, the Band argues that Enbridge's continued operation of the pipeline in the face of such a rupture presents a grave risk of harm in violation of the federal common law of public nuisance, and it asks the court for declaratory and injunctive relief at summary judgment enjoining Enbridge from further use of Line 5 for the transmission of crude oil and natural gas liquids across the Reservation.  The Band also seeks an injunction requiring Enbridge to remove the pipeline from the Reservation in a prompt and safe manner, and for such other relief as the court deems just under the circumstances.

On the other hand, Enbridge argues that *it* is entitled to summary judgment on the Band's federal nuisance claim fails because:  (1) Congressional regulation under the Pipeline Safety Act, 49 U.S.C. § 60101, *et seq.* has displaced the federal common law on which the Band's claim rests; and (2) the Band cannot prove the elements of a public nuisance claim.  Since the outcome of the two arguments dictates the disposition of both parties' motions for summary judgment as to count 1, the court addresses each argument below.

### 1.  Displacement by the Pipeline Safety Act

The doctrine of displacement rests on the premise that federal common law is subject to the paramount authority of Congress.  *Michigan v. U.S. Army Corps of Engineers*, 667 F.3d 765, 777 (7th Cir. 2011) ("Asian Carp I"); *see also Am. Elec. Power Co. v.*

47

**A47**

*Connecticut*, 564 U.S. 410, 423–24 (2011) ("[I]t is primarily the office of Congress, not the federal courts, to prescribe national policy in areas of special federal interest.")  The important question for displacement analysis is "whether Congress has provided a sufficient legislative solution" to the particular nuisance at issue to warrant a conclusion that the legislation "has occupied the field to the exclusion of federal common law." *Asian Carp I*, 667 F.3d at 777.  Said another way, the question "is simply whether the statute 'speak[s] directly to [the] question' at issue."  *Id.* at 2537 (quoting *Mobil Oil Corp. v. Higginbotham*, 436 U.S. 618, 625 (1978).)[8]

Enbridge points out that the very purpose of the Pipeline Safety Act is to protect against risks of damage posed by interstate pipelines.  *See* 49 U.S.C. § 60102(a)(1) (purpose of Act is to "provide adequate protection against risks to life and property posed by pipeline transportation and pipeline facilities by improving the regulatory and enforcement authority of the Secretary of Transportation").  Moreover, to achieve this purpose, Congress instructed the Department of Transportation to "prescribe minimum safety standards for pipeline transportation and for pipeline facilities." *Id.* § 60102(a)(2).  In addition, the Act contains an express preemption provision that preempts at least all *state* laws and regulations purporting to impose additional safety requirements on interstate

---

[8] Enbridge argued in its opening brief that the Band's federal common law nuisance claim was "preempted" by the Pipeline Safety Act.  (Enbridge Br. (dkt. #231) 11–17.)  After the Band argued that federal statutory law does not *preempt* federal common law, Enbridge limited its argument about the Band's federal claims to a "displacement theory" in its reply brief.  (Enbridge Reply Br. (dkt. #323) 8–9.)

pipeline operations: "A State authority may not adopt or continue in force safety standards for interstate pipeline facilities or interstate pipeline transportation." *Id.* § 60104(c).[9]

The court is unpersuaded by Enbridge's argument for several reasons. First, Enbridge's argument relies primarily on cases concluding that different statutes -- not the Pipeline Safety Act -- preempt certain types of federal common law claims. For example, Enbridge discusses *City of Milwaukee v. Illinois & Michigan*, 451 U.S. 304, 317 (1981), in which the Supreme Court held that a federal common law action to abate a nuisance caused by a city's discharges of sewage effluent into Lake Michigan was displaced by the Clean Water Act, because under that Act, "[e]very point source discharge is prohibited unless covered by a permit [which the city had], which directly subjects the discharger to the administrative apparatus established by Congress to achieve its goals." *Id.* at 318 (footnote and emphasis omitted). In particular, the Court explained that the permits at issue incorporated "the specific effluent limitations established by [the] EPA" under the Act, and there was "no question that the problem of effluent limitations has been thoroughly addressed through the administrative scheme established by Congress." *Id.* at 319–20. Thus, the Court found "no basis for a federal court to impose more stringent limitations than those imposed under the regulatory regime by reference to federal common law." *Id.* Similarly, in *Am. Elec. Power Co.*, the Supreme Court found a public nuisance claim displaced by the Clean Air Act because the plaintiffs were "ask[ing] for a decree setting

---

[9] In reply, Enbridge also concedes both that the Band's actions do not constitute safety standards under *state law* that would fall under the Act's express preemption provision, this Federal Act does not *preempt* federal common law. However, it argues that because the Band's public nuisance claim is based on safety concerns, the Pipeline Safety Act *displaces* the Band's nuisance claim.

carbon-dioxide emissions for each defendant[,]" which was something Congress had addressed already in the Act.  564 U.S. at 415.  Specifically, that Act already provided "a means to seek limits on emissions of carbon dioxide from domestic powerplants" on the same terms as sought by the plaintiffs' public nuisance claim.  *Id.* at 425.

In this instance, however, the Band is not seeking an injunction that would impose safety regulations addressed already by the Pipeline Safety Act or federal regulation. Rather, the Band seeks a solution to the threat posed by the alleged imminent exposure of the pipeline at the Bad River meander.  Enbridge identifies no provision of the Act that provides a legislative solution to that issue, such as how close a river can come to exposing a pipeline or what to do when a pipeline faces an imminent threat of exposure to a river. It is not sufficient that the Pipeline Safety Act addresses pipeline safety generally, that federal regulations prescribe *some* standards governing pipeline construction and operation, or even that the Department of Transportation could order a pipeline to be shut down. *See Native Vill. of Kivalina v. ExxonMobil Corp.*, 696 F.3d 849, 856 (9th Cir. 2012) ("The existence of laws generally applicable to the question is not sufficient; the applicability of displacement is an issue-specific inquiry.") *(citing Asian Carp I*, 667 F.3d at 777).  Under *City of Milwaukee* and *Am. Elec. Power*, the question for displacement is whether the statute has provided a "sufficient legislative solution" to the particular nuisance at issue.  *Asian Carp I*, 667 F.3d at 777.  Because the Pipeline Safety Act does not address the particular situation at issue, the Band's claim is not displaced.

Second, Enbridge cites some decisions by other federal circuit courts of appeals addressing the Pipeline Safety Act in particular, but each involved state laws or regulations

regarding interstate pipeline safety that violated the *express preemption provision* of the Act discussed above.  *E.g.*, *Olympic Pipe Line Co. v. City of Seattle*, 437 F.3d 872 (9th Cir. 2006) (Pipeline Safety Act preempted the City of Seattle from enforcing its own more stringent pipeline safety provisions); and *ANR Pipeline Co. v. Iowa State Commerce Comm'n*, 828 F.2d 465 (8th Cir. 1987) (Iowa law imposing safety standards for pipelines preempted by the Act).  Here, again, the Band is not seeking to impose specific pipeline safety standards on Enbridge, so its nuisance claim is not barred by the Act's express preemption provision as Enbridge itself conceded.  49 U.S.C. § 60104(c) (preempting only state law "*safety standards for interstate pipeline facilities or interstate pipeline transportation*") (emphasis added).

Third, the Pipeline Safety Act contains a savings clause that expressly preserves tort claims.  That clause states that the Act "does not affect the tort liability of any person." 49 U.S.C. § 60120(c); *see also* 49 U.S.C. § 60121(d) ("This section does not restrict a right to relief that a person . . . may have under another law or at common law.").  Relying on this savings clause provision in particular, other district courts have rejected the argument that federal common law tort claims against pipeline operators were barred by the Pipeline Safety Act.  *E.g., Cheverez v. Plains All Am. Pipeline, LP*, No. CV15-4113 PSG (JEMX), 2016 WL 4771883, at *5 (C.D. Cal. Mar. 4, 2016); *Am. Energy Corp. v. Texas E. Transmission, LP*, 701 F. Supp. 2d 921, 925, 927 (S.D. Ohio 2010) (holding that claim seeking injunctive relief against pipeline company that would require it to "develop and implement a mitigation plan to protect its pipelines" not preempted by Pipeline Safety Act).

There is no dispute that the Band's nuisance claim is a common law tort action.  *See* Restatement (Second) of Torts § 821B (identifying elements of the tort of public nuisance).

Nonetheless, Enbridge argues that the savings clause in § 60120(c) was only intended to preserve tort claims for *money damages*, not claims for injunctive relief. In other words, Enbridge suggests that the Band could sue for money damages in the event the pipeline ruptured and caused harm to the Band's land, but cannot sue to *prevent* damage from occurring in the first place. Not only is this language contradicted by Congress' adoption of the generic word "relief," rather than "money damages," in the savings clause, but Enbridge cites no legal authority suggesting that the savings clause is so limited. Moreover, injunctive relief is typically an available remedy against someone found liable in tort for nuisance, assuming a plaintiff demonstrates the likelihood of irreparable harm. *See LAJIM,* 917 F.3d at 944 ("[O]nce a court finds a defendant liable for creating a risk of imminent and substantial danger, it will usually be the case that injunctive relief is warranted.") (citing *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 545 (1987) ("Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable. . . . [T]herefore, the balance of harms will usually favor the issuance of an injunction to protect the environment."); *see also Cheverez*, No. CV15-4113 PSG (JEMX), 2016 WL 4771883, at *5. Of course, as discussed above, an injunction is not automatic, and courts must consider the traditional equitable factors. But the mere fact that the Band has requested injunctive relief because of safety concerns does not mean that its nuisance claim is displaced by the Pipeline Safety Act.

### 2. Merits of the Band's nuisance claim

Enbridge also contends that the Band cannot establish the necessary elements of a

public nuisance action.  The Band's nuisance claim has three elements: (1) unreasonable interference with public rights, health, safety or welfare; (2) if not presently occurring, interreference must be imminent or certain to occur; and (3) the defendant must have caused the nuisance.  *Michigan v. U.S. Army Corps of Eng'rs*, 758 F.3d 892, 900 (7th Cir. 2014) (Asian Carp II).  Enbridge does not and cannot deny that a pipeline rupture on the Bad River Reservation would cause significant and negative environmental consequences. Instead, Enbridge argues that the Band's nuisance claim fails because it cannot show that a rupture is sufficiently "imminent," and because the Band has rejected Enbridge's numerous offers to mitigate the risk of rupture by either lowering the pipeline or taking other remedial measures that would address the threat.

"Imminence," for purposes of public nuisance law, considers whether the alleged harm is "sufficiently close to occurring" such that the court "should order the defendants to take some new action that will be effective to abate the public nuisance." *Asian Carp I*, 667 F.3d at 781–82.  As the Seventh Circuit has explained:

> There is no meaningful legal difference for purposes of the ultimate resolution of a public nuisance claim between a threatened nuisance that is "imminent" and one that is "immediate," "significant," "real," an "unreasonable risk," or anything similar. The job of a court considering the merits of a public nuisance claim is simply to determine whether the activity complained of is a nuisance and, if so, whether it is sufficiently close to occurring that equitable relief is necessary to prevent it from happening.

*Id.* at 782.

In this instance, there are genuine disputes of material fact regarding whether the threat of rupture is "imminent," as well as the adequacy of Enbridge's proposed abatement

53

**A53**

measures.  In particular, the parties have submitted differing expert opinions regarding the

likely timing of pipeline exposure, with the Band's experts opining that the pipeline will be

exposed to the Bad River within 2 to 5 years, though it could be significantly less time, and

that such exposure would likely lead to pipeline damage and release of oil into the Bad

River watershed.  (WWE Rep. (dkt. #269) 17).  Not surprisingly, Enbridge's experts

disagree with the Band's assessments and argue that, in any event, 2 to 5 years does not

qualify as "imminent."  The Band's experts have also evaluated Enbridge's mitigation

proposals and explain why the proposals would be ineffective, as well as require a further,

unwanted expansion of Enbridge's easements on Reservation land.  Enbridge's experts

again disagree.  The court cannot resolve these disputes at summary judgment.  Certainly,

the mere possibility of a rupture occurring would not be sufficient to sustain a nuisance

claim.  Ultimately, though, whether a pipeline rupture is sufficiently imminent to sustain

a public nuisance claim depends on whether the risk is "unreasonable," and "granter than

a reasonable [person] would incur." *Asian Carp I*, 667 F.3d at 781 (citation omitted).  The

factual disputes regarding this issue must be resolved at a trial.  Accordingly, Enbridge's

motion for summary judgment on the Band's public nuisance claim must be denied.

For public policy reasons explained above, however, the court would not grant an

immediate injunction requiring Enbridge to remove Line 5 from the Band's lands, even if

the Band succeeded in proving its nuisance claim.  Instead, the court will consider requiring

Enbridge to work with the Band to create an effective mitigation plan that could be

implemented on the pipeline while Enbridge completes its reroute.  The court will direct

the Band to explain whether it wishes to continue pursuing its nuisance claim in light of the court's conclusions.

ORDER

IT IS ORDERED that:

1) Plaintiff Bad River Band of the Lake Superior Tribe of Chippewa Indians of the Bad River Reservation's motion for partial summary judgment (dkt. #165) is GRANTED IN PART and DENIED IN PART as set forth above.

2) Defendants Enbridge Energy Company, Inc., and Enbridge Energy, L.P.'s motion for partial summary judgment (dkt. #230) is GRANTED IN PART AND DENIED IN PART as set forth above.

3) The various motions for leave to file amicus briefs (dkt. ##213, 235, 239, 294, 340) are GRANTED.

4) Plaintiff's motion for leave to file supplemental authority (dkt. #353) is GRANTED.

5) Defendants' motion for leave to file supplemental brief (dkt. #357) is GRANTED.

6) The court will hold a video conference on Friday, September 9, at 2 p.m., at which time the parties should be prepared to discuss: (1) whether Enbridge can complete a reroute of the pipeline within five years or less; (2) how the appropriate measure of past and future rent and damages to the Band should be determined; (3) what issues, if any, must be resolved by a jury, and what issues may be resolved by the court; and (4) whether the Band wishes to continue pursuing its federal common law public nuisance claim for injunctive relief.

7) The parties' deadline for *all* final pretrial submissions, including exhibit lists and deposition designations, is extended by one week, to September 16, 2022. Objections are due by September 30, 2022.

**A55**

8) The parties' motion for clarification (dkt. #359) is DENIED as moot.

Entered this 7th day of September, 2022.

BY THE COURT:

/s/

_____

WILLIAM M. CONLEY
District Judge

56

**A56**

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

BAD RIVER BAND OF THE LAKE
SUPERIOR TRIBE OF CHIPPEWA
INDIANS OF THE BAD RIVER
RESERVATION,

               Plaintiff and
               Counter Defendant,

    v.

ENBRIDGE ENERGY COMPANY, INC., and
ENBRIDGE ENERGY, L.P.,

               Defendants and
               Counter Claimants,

    v.

NAOMI TILLISON,

               Counter Defendant.

OPINION AND ORDER
(Public Nuisance Claim and
Counterclaims)

19-cv-602-wmc

---

Concerned about a potential failure of Enbridge Energy's Line 5 crude oil and liquid natural gas pipeline running through the Reservation of the Bad River Band of the Lake Superior Tribe of Chippewa Indians in northern Wisconsin, the Band brought this suit seeking to enjoin its continued operation under federal common law claims of public nuisance and trespass. At summary judgment, this court concluded that Enbridge had trespassed by operating the pipeline on expired rights-of-way on 12 parcels owned in whole or in part by the Band and dismissed Enbridge's breach of contract counterclaims, but denied either side summary judgment on the Band's public nuisance claim. (Dkt. #360.) After reviewing relevant expert reports, deposition designations and other voluminous, additional written submissions by the parties, the court held a trial to the bench on the Band's public nuisance claim and Enbridge's remaining counterclaims on October 24, 25

and 26, 2022.[1]  Before issuing a final decision on the Band's public nuisance claim, the court will direct the parties to meet and confer on specific issues and submit a proposal to the court, as set forth below.  However, the court will deny Enbridge's request for declaratory and injunctive relief on its counterclaims.

OPINION

I.    **The Band's Nuisance Claim**

Under federal common law, a public nuisance is a substantial and unreasonable interference with a right common to the general public.  Restatement (Second) of Torts § 821B.  Where, as in this case, the nuisance is not presently occurring, a plaintiff must generally prove that the substantial and unreasonable interference "is imminent" or "certain to occur." *Michigan v. U.S. Army Corps of Eng'rs*, 758 F.3d 892, 900 (7th Cir. 2014) (*Asian Carp II*).  The Seventh Circuit has advised that this concept of "imminence" does not have a precise definition.  Rather, there is "no meaningful legal difference" between "imminent" and such arguable synonyms as "immediate," "significant," "real," "unreasonable," or "greater than a reasonable [person] would incur." *Michigan v. U.S. Army Corps of Engineers*, 667 F.3d 765, 781–82 (7th Cir. 2011) ("*Asian Carp I*").  Thus, the ultimate question is whether a grave, irreparable harm is "sufficiently close to occurring" that the court "should order the defendants to take some new action that will be effective to abate the public nuisance." *Id*.

---

[1] At the end of this first phase of trial, the court went on to hear evidence for remedies as to Enbridge's ongoing trespass of the Band's territory, which will be the subject of a separate Opinion and Order.

Both parties presented evidence at trial establishing that the greatest known risk of a pipeline rupture is currently located at or near the meander where Line 5 crosses the Bad River:



(Fig 1: Line 5 crossing Bad River meander (Def's Demonstrative Ex. 4).)

Not only is there an actual risk of a significant rupture, but the negative impact in this area on the Bad River watershed and even Lake Superior itself could be catastrophic. Thus, the court finds that a rupture of Line 5 at the meander would be a substantial and unreasonable interference with the Band's and the public's rights. Indeed, the nearest, existing shutoff valves of Line 5 on either side of that meander are approximately 14 miles apart. Even if those shutoff valves were activated in time to prevent *any* release of additional crude oil and liquid natural gas ("NGL"), a failure of the line would likely not prevent the roughly 20,000 gallons of crude oil and NGL constantly contained in that stretch of pipe from being released into the Bad River, absent sufficient time to purge it

**A59**

into a fleet of trucks before the pipe failed. [2]

Still, although there are various reasons why Line 5 seems likely to fail the meander at some point, the Band has yet to prove its right to an immediate entry of injunctive relief, and particularly its right to an injunction immediately stopping the operation of Line 5 altogether. *First*, whether a rupture of Line 5 is "imminent" or "certain to occur" remains open to reasonable debate, as illustrated by much of the evidence at trial. There are actually three, separate ways that the pipeline might fail at the meander:



(Fig 2: Potential pipeline failure at Bad River meander (PEX. 70, at 4).)

The least likely, identified as "channelization" on Figure 2 above, is that one of the

---

[2] Enbridge offered substantial evidence of shut off and purge protocols, as well as possible mediation efforts in the event of a spill, but there remains at least some risk of a much larger spill than 20,000 gallons because the shut down and purge protocols take time to complete. While Enbridge claims to be much better prepared now, one need look no further to appreciate the potential damage than the spill of over one million gallons into the Kalamazoo River in 2010, after the failure of another of Enbridge's pipelines, which was similarly built in the 1950s.

current flood channels through the meander's toe could become sufficiently worn that the pipe is exposed, and eventually the area below the pipe is scoured by a perpendicular current, creating a free standing, unsupported span of pipe subject to failure by metal fatigue and vibrations.[3]  The parties presented conflicting evidence as to how far that span would have to be:  plaintiff's experts suggested that the pipe would lose its ability to "flex" without causing permanent damage and a catastrophic failure at approximately 60 feet, while Enbridge's protocol claims no substantial risk until an unsupported span reaches 90 to 100 feet.  The next (and only slightly more likely) risk, identified as "scour" on Figure 2, is a similar, perpendicular scouring event at the bottom of the river bed, in which pipe now buried under the riverbed sufficiently exposed to erosion to create a substantial, unsupported span and perpendicular current.  Finally, as the court found at trial following the close of evidence on the Band's public nuisance claim, the third possibility -- horizontal erosion at the meander's river bank closest to the pipeline (identified as "historical bank erosion" on Figure 2) -- poses the greatest current risk of rupture of Line 5 within the Reservation.

Even at this location, however, there still remains approximately 26 or 27 feet of riverbank between the Bad River shoreline and Line 5 at its nearest point, a distance that, although alarmingly significant given annual average erosion, has remained stable for three straight years as a result of below average flooding and the serendipitous formation of a

---

[3] Under a perpendicular "channel scouring" scenario, the possibility of vibrations stressing the pipe becomes more concerning, but then the metal failure risk caused by the free span is reduced by support of the water below the pipe.

small gathering of fallen trees directly upstream.



(Fig 3: View across meander (WWE Rep. (dkt. #268-1, 27).)  In their reports and at trial, the parties' experts offered differing opinions regarding the probable annual rate of future horizontal erosion, what flood events could affect that rate, and whether Enbridge's current shutdown and purge protocols are sufficient to prevent a major, crude oil spill.  Similarly, the experts offered conflicting evidence and differing opinions regarding the efficacy of remediation projects proposed by Enbridge to slow the rate of erosion at the meander.

Under current conditions, therefore, the court has yet to find that the Band has established that a public nuisance is imminent at the meander.  This is mainly because a worst-case flooding scenario -- consisting of *more* than the so-called 1-in-500-year flood that last occurred in 2016, *or* more likely, a series of major floods -- capable of causing sufficient

6

**A62**

horizontal erosion for the Bad River to *approach* the pipe at the meander, is still unlikely to then scour suddenly and immediately an additional span of 65 to 100 feet of unsupported pipe necessary to raise legitimate, imminent concerns about its structural integrity. Thus, the risk of a catastrophic failure of the pipeline at the meander remains thankfully at least a year away. Given heightened monitoring, so, too, it remains likely that Enbridge would be able to recognize the risk of an imminent failure in time to shut down the current 14-mile stretch of vulnerable pipeline between shutoff valves *and* to purge its contents, so that more dubious, large-scale containment and recovery efforts would not be necessary.

A *second*, ongoing question is whether *Enbridge's* actions or inaction might cause a failure of Line 5 within the Reservation. *See*, *Asian Carp II*, 758 F.3d at 900. Defendant must be responsible for *causing* an unreasonable interference with a public right to be held liable. By itself, Enbridge's operation of a pipeline carrying crude oil and NGL is not a public nuisance. The Band obviously recognizes this, as its claim has boiled down to an assertion that the public nuisance here is the *threat* of a rupture at the meander, and more specifically that Enbridge has failed to take reasonable steps to address that threat.[4]

However, the evidence presented to the court at trial established that Enbridge *has* made, and continues to make, efforts to prevent a rupture of Line 5 at the meander, and thus, to abate a potential public nuisance, including: (1) implementing a more robust and timely shutdown and purge plan at the meander, with additional, real time video

---

[4] The concept of "reasonableness," and the reasonableness of a defendant's actions in particular, is discussed repeatedly in the Restatement (Second) of Torts' chapters on nuisance liability. *Eg.*, § 838 (defendant may be liable if he "fails to exercise reasonable care to prevent the nuisance"); § 839(c) (defendant may be liable if "he has failed after a reasonable opportunity to take reasonable steps to abate the condition").

monitoring and spacing of additional warning monuments at that location; (2) to install emergency flow restricting device shutoff valves (EFRDs) to reduce the exposed stretch from 14 to 5 miles and the risk of a crude oil spill to as little as 6,000 gallons; (3) speeding up the purging of even that amount before the pipeline fails at the meander; (4) proposing various remediation plans to slow erosion at the meander, including rip rap and tree revetment projects; and (5) purchasing all necessary easements, designing a reroute, acquiring pipe, and pursuing the required permits to relocate Line 5 outside the Band's territorial limits (though not its watershed).[5]

---

[5] The unrebutted testimony at trial was that Enbridge now holds 100% of the necessary easements from landowners to reroute Line 5 around the entire Bad River Reservation, if barely so at its southwest and southeast corners and well within the Bad River watershed. Enbridge has also stockpiled some $80 million in necessary materials to begin installation of this reroute. However, none of the environmental permitting is in place to begin construction, which will likely take a few years to obtain from state and federal officials under a best-case scenario and could be denied entirely under a worst case given environmental and political opposition, including, as is its right, by the Bad River Band itself.

8

**A64**



(Fig 5: Proposed reroute (PEX 11).

For its part, the Band presented evidence and argument that Enbridge's current processes are inadequate, and its remediation proposals are unlikely to go forward because they are environmentally unreasonable and will ultimately be ineffective. The Band also objects that Enbridge's proposed abatement projects would result in a continuing trespass on the Band's lands. In particular, Enbridge's rip rap and tree revetment proposals would require a significant portion of work and placement of revetment material on parcel 430-S13, a parcel on which Line 5 already runs, but on which Enbridge no longer has a valid easement and on which the Band possesses a 50.79% interest. Despite the Band's objections, however, these efforts by Enbridge *are* relevant to whether it has caused a

9

**A65**

substantial, unreasonable and imminent interference with public rights.  *See Asian Carp II*, 758 F.3d at 904 (efforts by Corps to address threat of invasion by Asian carp were relevant to analysis of public nuisance, including in particular, the Corps' "diligent efforts to find the solution best suited to accommodating the competing concerns").

*Third*, in balancing the relevant equities, the court finds that the Band's failure to engage meaningfully with Enbridge in addressing the risk of further erosion at the meander and developing acceptable shutoff and purge protocols, including the installation of new EFRDs closer to the meander, is relevant to the nuisance analysis, as well as the appropriateness of immediate injunctive relief.  In considering the balance of harms, *Asian Carp I*, for example, the Seventh Circuit, faulted the plaintiffs for having "adopted a rather insouciant attitude" about the potential costs of their proposal, as well as for "scoffing at the defendants' concerns about the costs of relief . . . when they apparently feel no obligation to contribute to the costs of averting this crisis."  667 F.3d at 794.  Similarly, in this case, the Band has downplayed the potential for significant economic impacts of its preferred solution (a shutdown of Line 5), while rejecting opportunities to collaborate with Enbridge on potential remediation plans at the meander.

Indeed, some of the remediation plans, including rip rap, have been used to successfully address similar erosion problems on the Bad River, and on other waterways throughout the country, and the proposed, additional EFRDs could significantly reduce the environmental impacts of a spill at the meander.  Rather than confer with Enbridge on these proposals, the Band has to date taken the position that the *only* other solution to prevent an imminent rupture from occurring at the meander besides a permanent

10

**A66**

shutdown would be to adopt a shutoff and purge of the pipeline as soon as it is within 20 feet of the river, despite the evidence at trial showing that no more than erosion of 6 or 7 feet at the river's shoreline is likely to occur by next spring, and worst case scenario is unlikely to approach, much less result, in immediate scouring of some 60 to 100 feet below the pipe sufficient to threaten its integrity. Nevertheless, the Band's alternate injunction would effectively require an automatic, permanent shutdown of Line 5 without any possibility of remediation at the meander.

Before adopting such draconian injunctive remedies, therefore, the court must consider what alternative steps, however imperfect (particularly in the longer run), would reduce the risk of an oil spill in the near term, while also preserving operation of Line 5 for those areas of the United States and Canada that currently depend upon it. In doing so, the court readily acknowledges that the Band's National Resource Department ("MNRD") has already considered these alternatives and provided reasons for refusing to permit them. However, on each occasion, the MNRD appears to have failed to weigh the flaws in those alternatives against the risks of a possible pipeline failure at the meander, which could obviously result in a far greater environmental disaster than anything proposed by Enbridge as remediation. In fact, while *none* of Enbridge's proposals provide permanent solutions to a possible failure at the meander (short of a complete reroute), each at least appears to forestall that risk at *relatively* limited costs to the Band's natural resources as compared to a catastrophic pipe failure or a massive reroute still within the Band's watershed.



Fig 4: Enbridge's most recent rip rap remediation proposal at meander (DEX 1264, at 3).

For all of these reasons, the Band has not yet shown that its specific shutdown and purge plan, much less an immediate shutdown of Line 5, is the best or even a reasonable way to prevent a catastrophic rupture of Line 5 in the near term after balancing all the interests of the Band and the public. *See Asian Carp II*, 758 F.3d at 905–06 (concluding that plaintiffs' request for specific solution to stop invasion of Asian carp did not satisfy requirements for obtaining equitable relief because there were "a host of competing concerns" that the Corps had to consider in adopting a particular plan). Even so, the court has concerns about whether EFRDs, rip rap, or some other remediation

12

**A68**

plan could be in place before the next, serious flooding event that will surely cause further, substantial erosion at the meander and increasingly threaten the pipe's integrity. The court also remains concerned that Enbridge's current shutoff and purge plan is not sufficiently conservative, given the catastrophic damage a rupture might cause, both to be Bad River watershed and conceivably Lake Superior. Accordingly, before the court enters a final decision on the Band's public nuisance claim, it will direct the parties to meet and confer regarding: (1) the installation of EFRDs on Line 5 on the Reservation; (2) an appropriate shutdown and purge protocol should conditions worsen at the meander; and (3) other reasonable remediation projects that could inhibit further erosion at the meander. If they still cannot agree on a reasonable plan, each should submit their own last, best offer on the shutoff and purge protocols, and the court will consider whether it is appropriate to issue an injunction requiring Enbridge to adopt a plan.

## II.     Enbridge's Counterclaims and Request for Injunctive Relief

During the public nuisance phase of trial, the parties also presented evidence relevant to Enbridge's remaining counterclaims IV and V for declaratory and injunctive relief, both of which allege that the Band and Naomi Tillison, the director of MNRD, have unreasonably and unlawfully denied Enbridge access to Line 5 to conduct operations, inspections and maintenance. (Counterclaims IV & V (dkt. #146) 71–78.) Both before and during trial, the court directed Enbridge to point to legal authority that would permit the court to order the declaratory and injunctive relief Enbridge requests -- specifically, an order requiring the Band and Tillison to permit Enbridge access to tribal lands to perform specific maintenance tasks or to facilitate remediation at the meander. Enbridge has now

**A69**

filed a brief (dkt. #589), arguing that the Clean Water Act, the Transit Pipelines Treaty[6] and the All Writs Act, 28 U.S.C. § 1651, provide the court with authority to require the Band and MNRD to comply with all applicable federal law. However, the court is not persuaded by any of Enbridge's arguments.

To begin, Enbridge argues that the court can enjoin the Band because the denials of Enbridge's proposed meander projects exceed the scope of its Clean Water Act authority. Specifically, Enbridge argues that the Band used "false water quality pretexts" in unfairly reviewing and denying Enbridge projects. (Dkt. #589, at 5.) Unlike the cases cited by Enbridge (dkt. #589, at 4), however, Enbridge did *not* bring a claim in this case challenging a particular permit denial as improper under the Clean Water Act. Certainly, the MNRD's consideration of Enbridge's remediation proposals is relevant to the balance of equities and the nuisance analysis as just discussed above, but the evidence at trial did *not* establish that MNRD's denials of Enbridge's proposals exceeded the Band's Clean Water Act authority. Rather, Director Tillison's testimony and underlying documents supporting the Band's denial of Enbridge's various proposals provided detailed reasons why both believed that Enbridge's proposals would threaten water quality in the Bad River watershed.

Next, Enbridge argues that the court should issue an injunction requiring the Band to comply with the Transit Treaty, which prohibits public authorities from "institut[ing] any measures . . . which would have the effect of impeding, diverting, redirecting or interfering with in any way the transmission of hydrocarbons in transit." 1977 Transit

---

[6] *Agreement between the Government of Canada and the Government of the United States of America Concerning Transit Pipelines*, Jan. 28, 1977, 28 U.S.T. 7449, 1977 WL 181731 ("Transit Treaty").

Treaty, 1977 WL 181731, art. II, IV.  Again, however, Enbridge did not bring a counterclaim alleging that the Band had violated the Transit Treaty, nor could it since Enbridge is not a party to the Transit Treaty, and nothing in the Treaty suggests that a private entity could bring a cause of action to enforce it or even that it may be enforced in federal court.  Instead, the signatory countries may bring claims under the Transit Treaty pursuant to a specific arbitration process, as Canada has done with respect to Line 5.  Moreover, the evidence at trial did not establish any violation of the Transit Treaty, which specifically states that, "notwithstanding the provisions of Article II," international pipelines "shall be subject to regulations by the appropriate governmental authorities having jurisdiction over such Transit Pipeline" with respect to matters of "environmental protection."  1977 Transit Treaty art. IV (emphasis added).  Thus, the Band has not violated the Transit Treaty by rejecting Enbridge's remediation proposals based on environmental and water quality concerns.

Finally, the All Writs Act, 28 U.S.C. § 1651, does not give this court authority to enjoin the Band as Enbridge requests.  The All Writs Act allows federal courts to "issue all writs necessary or appropriate in aid of their respective jurisdictions," 28 U.S.C. § 1651(a), but it does not create a cause of action or provide a source of subject matter jurisdiction.  *United States v. Denedo*, 556 U.S. 904, 914 (2009).  Rather, before invoking its authority under the All Writs Act, the court would need to conclude that Enbridge was entitled to injunctive relief on its counterclaims under some tenable legal theory.  Despite repeated opportunities to do so, Enbridge has still failed to identify such a theory, except by asserting the court's vague authority to "operationalize" the Clean Water Act and Transit Treaty.

15

**A71**

However, as discussed, Enbridge has failed to establish that it is entitled to relief for any violation of the Clean Water Act, the Transit Treaty or on any other legal claim.

In sum, the court has and will continue to consider the Band's request for injunctive relief to abate a public nuisance under the procedure set forth below, but will not enter injunctive relief against the Band on Enbridge's counterclaims.

## ORDER

IT IS ORDERED that:

1. By December 17, 2022, the parties shall meet and confer regarding: (1) the installation of EFRDs on Line 5 on the Reservation; (2) an appropriate shutdown and purge protocol should conditions worsen at the meander; and (3) other reasonable remediation projects that could inhibit further erosion at Line 5.

2. By December 24, 2022, the parties shall submit a joint proposal to the court regarding an appropriate shutoff and purge plan for the meander, *or* if they cannot agree on a joint proposal, each should submit their own last, best offer on a shutoff and purge protocol.

3. Enbridge's request for declaratory and injunctive relief on its counterclaims IV and V is DENIED.

Entered this 28th day of November, 2022.

BY THE COURT:

/s/

_____

WILLIAM M. CONLEY
District Judge

16

**A72**

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

BAD RIVER BAND OF THE LAKE
SUPERIOR TRIBE OF CHIPPEWA
INDIANS OF THE BAD RIVER
RESERVATION,

                                                    OPINION AND ORDER

              Plaintiff and
              Counter Defendant,
    v.                                                19-cv-602-wmc

ENBRIDGE ENERGY COMPANY, INC., and
ENBRIDGE ENERGY, L.P.,

              Defendants and
              Counter Claimants,
    v.

NAOMI TILLISON,

              Counter Defendant.

---

The Bad River Band of the Lake Superior Tribe of Chippewa Indians brought this

action against Enbridge Energy to enjoin the continued operation of Enbridge's Line 5

crude oil and natural gas liquids ("NGLs") pipeline through the Bad River Reservation in

Northern Wisconsin based on the risk of its failure constituting a public nuisance.  The

Band also seeks damages and injunctive relief for Enbridge's continuing to operate Line 5

in trespass on portions of the Reservation for which certain, longstanding rights of way

have now expired.  At summary judgment, the court:  decided that Enbridge was in trespass

and unjustly enriched by operating the pipeline on 12 land parcels owned in whole or in

part by the Band for which the rights of way had expired; and dismissed Enbridge's

counterclaims for breach of contract.  (Dkt. #360.)  However, the court concluded that

there were genuine disputes of material fact relating to the Band's public nuisance claim

and request for injunctive relief, leaving four, primary factual disputes to be decided at trial: (1) whether Enbridge's operation of Line 5 on the Reservation constitutes a public nuisance at its crossing of a meander on the Bad River, where the greatest risk of a pipe failure currently exists within the Band's tribal territory; (2) if so, what form of injunctive relief, if any, should be imposed to abate that nuisance and address Enbridge's trespass; (3) what additional remedies, if any, should be imposed on Enbridge based on the court's findings as to liability; and (4) whether Enbridge was entitled to any relief on its remaining counterclaims.

After reviewing relevant expert reports, deposition designations and other voluminous, additional written submissions by the parties, the court held a six-day bench trial in October 2022 on these remaining issues. Shortly after the trial, the court issued an opinion and order: (1) denying Enbridge's request for declaratory and injunctive relief on its remaining counterclaims; and (2) directing the parties to meet and confer on specific issues relating to the Band's public nuisance claim, including attempting to agree on a shutoff and purge plan for Line 5 at the Bad River meander. (Dkt. #612.) The parties submitted alternative shutoff and purge proposals and more recently, provided an update regarding conditions at the Bad River meander as of May 2023. Specifically, as to the latter, the Band filed an Emergency Motion for Injunctive Relief (dkt. #628), indicating that recent erosion during spring flooding at the Bad River meander was so substantial that the threat of a Line 5 rupture is significantly greater than it was at the time of trial, and if it was not before, is now at risk of an "imminent," catastrophic rupture, requiring an immediate shutdown. After giving Enbridge a few days to marshal a response, the court

held an in-person, evidentiary hearing on May 18, 2023, to address the changing conditions at the meander.

Having reviewed the parties' shutoff and purge plans, as well as the additional evidence and arguments provided by the parties in writing and at the May 18 hearing, the court renders the following opinion and order on the remaining issues before it.  As explained in this opinion, the court concludes that a rupture of Line 5 at the Bad River meander would unquestionably be a public nuisance, and that the current conditions at the meander create a real and unreasonable risk of that nuisance occurring such that equitable relief is warranted.  However, the current threat of rupture is still not so imminent that an immediate shutdown of the pipeline is necessary to prevent the nuisance.  This is particularly true when viewed in light of larger public interests in avoiding a precipitous shutdown of Line 5, the Band's own refusal to allow any remediation efforts at the meander to delay, if not avoid, a rupture and materially reduce its environmental impact, and the likelihood that a shutdown will spark at least temporary shortages and increased prices for refined gas, propane and butane in the Upper Midwest and Eastern Canada, creating hardships, especially for the poor and other economically challenged households.

Nevertheless, given the environmental risks, the court will order Enbridge to adopt a more conservative shutdown and purge plan as discussed in detail below.  In addition, with respect to the Band's trespass claim, the court will award $5,151,668 to the Band in profits-based damages for Enbridge's past trespass.  Going forward, the court will also order Enbridge to continue paying the Band, according to the formula set forth below, for each quarter that Line 5 operates in trespass on the 12 allotment parcels.  Finally, the court will

**A75**

enjoin Enbridge to remove its pipeline within three years from any parcel within the Band's

tribal territory on which it lacks a valid right of way and to provide reasonable remediation

at those sites.

FACTS[1]

**A. Overview**

Enbridge operates a network of pipelines and other infrastructure known as the

"Lakehead system," which transports light crude oil and NGLs originating in Western

Canada to refineries in the United States and Eastern Canada.  The specific pipeline that

is the subject of this lawsuit, Line 5, is part of the Lakehead system and transports about

23 million gallons of crude oil and NGLs *daily* over some 450 miles originating in Superior,

Wisconsin and terminating in Sarnia, Ontario.  In Northern Wisconsin, 12 miles of Line

5 runs underground through the Bad River Reservation, including through 12 allotment

parcels on which Enbridge's rights of way expired in June 2013.

The Band's identity and way of life is rooted in reliance on and stewardship for their

land, and Band members have become increasingly concerned that Line 5, which is now

some 70 years old, will rupture and cause catastrophic environmental degradation to their

lands and waters, particularly to the Bad River and potentially Lake Superior watersheds,

concerns shared by a number of other individuals, businesses and entities dependent on

---

[1] The court provided a detailed, factual background of this case in its summary judgment opinion
(dkt. #360), as well as its most recent posttrial decision (dkt. #619).  This relatively brief summary
of the facts includes further findings established at trial and the subsequent evidentiary hearing in
May, although additional facts relevant to the remaining issues are set out in the court's opinion
below where most pertinent to its analysis.

those same resources for enjoyment and commerce.[2]  (Dkt. #599 (10/24/22 AM Trial Tr.)
64–126 (Band witnesses).)   Indeed, the Band has designated the Bad River itself as an
"outstanding tribal resource water," which is the highest category of waters on the
Reservation and subject to the most protection under the Band's "antidegradation policy,"
as approved by the Environmental Protection Agency.  (Dkt. #600 (10/25/22 AM Trial
Tr.) 16 (Naomi Tillison).)   The EPA has also delegated to the Band the authority to
administer federal and tribal water quality standards and certifications consistent with the
Clean Water Act and applicable regulations.  (*Id.* at 12–13 (Tillison).)

    As noted, the area of most concern on the Reservation is where Line 5 runs
underground through a specific "meander" on the Bad River.  As this court explained in its
most recent opinion, the evidence presented by both sides at trial confirms that:  (1) the
greatest known risk of a pipeline rupture on tribal lands is at that meander; and (2) an
uncontrolled rupture at that location could result in significant environmental damage to
the Bad River and Lake Superior watersheds, which is located only 16 miles downstream
of the meander.  (Dkt. #612, at 3.; dkt. #606 (10/24/22 PM Trial Tr.) 94 (Ian Paton);
(WWE Rep. (dkt. #268) 27).)

---

[2] Among others, this concern is shared by *amicus* State of Michigan, who is suing independently in
federal court in the Western District of Michigan to shut down Line 5 at its much longer crossing
under the Straights of Mackinac.  (Dkt. #665.)



(WWE Rep. (dkt. #268) 29, Fig. ES-2, *Bad River Meander Overview Map*.)

### B. Conditions and Monitoring at the Meander

#### 1. Conditions at the time of trial

Presently, Line 5 pipe at the meander is currently unexposed and completely underground. There are also no known, current problems with the structural integrity of the pipeline at that point, nor reason to believe that exposure of the pipeline to the surface of the meander, by itself, would cause the pipeline to fail. (Dkt. #606 (10/24/22 PM Trial Tr.) 12, 14 (Jonathan Jones).) Rather, the pipeline would likely rupture only when the land beneath the pipeline at the meander's neck is scoured away by the river's perpendicular current during flooding, then suspended in the air after the water's retreat,

so that inadequate land or water support exists for a "critical aerial span of approximately 100 feet. This is because, at that aerial span or more, the pipe has the potential to bend, become damaged and fail, although the pipeline would not reach this critical span until it was no longer supported by retreating floodwaters. (Dkt. #606 (10/24/22 PM Trial Tr.) 51–52 (Mark Weesner).)[3] Thus, a pipeline rupture at the meander is most likely to occur if the riverbank continues to erode towards Line 5, exposes a segment of that pipe, and is scoured under the pipe unabated to critical aerial span.

As both sides' experts testified at trial, the pipeline could be exposed in a single, significant flooding event, and in particular, an unsupported span of 65 feet or greater can quickly become more than 100 feet, especially after flood conditions. (Dkt. #606 (10/24/22 PM Trial Tr.) 62, 80 (Mark Weesner); dkt. #608 (10/26/22 PM Trial Tr.) 17–18 (Hamish Weatherly); *see also* WWE Report, dkt. #268-2, at 12 ("[I]t is foreseeable that a substantial length of pipeline could be exposed in a single high flow event, or over the course of several high flow events occurring within a short period of time.").) Plus, the likelihood that the riverbank will erode, resulting in exposure and unsupported spanning at the meander due to natural, horizontal erosion near the pipeline at the meander's riverbank, increases every year. (Dkt. #606 (10/24/22 PM Trial Tr.) 19 (Jonathan Jones)).

---

[3] The critical aerial span of 100 feet is based on American Society of Mechanical Engineers (ASME) Table B31.4, which provides industry-standard calculations that govern the allowable span permitted for an exposed pipeline, and which has been incorporated into regulations promulgated by the Pipeline and Hazardous Materials Safety Administration, 49 C.F.R. 195.3(c)(3). (Dkt. #601 (10/26/22 AM Trial Tr.) 139, 165 (Deb Tetteh-Wayoe); dkt. #606 (10/24/22 PM Trial Tr.) 72 (Mark Weesner).) While still supported by floodwater, the allowable span may be as much as 265 feet.

At the time of trial, there remained approximately 26 or 27 feet of riverbank between the Bad River shoreline and Line 5 at its nearest point at the meander, a distance that had remained stable for three, straight years as a result of below average flow rates and the natural accumulation of logs, vegetation and sand on the upstream riverbank at the meander.  (Dkt. #599 (10/24/22 AM Trial Tr.) 133–137) (Jonathan Jones); dkt. #606 (10/24/22 PM Trial Tr.) 20–22 (Jonathan Jones).)  Nevertheless, both sides' expert reports and testimony at trial agree that Line 5 exposure from bank erosion was likely to occur within three to five years, and the Band's experts opined that the pipe could become materially exposed in a single or multiple flooding events, depending on its size, beginning with any cubic feet per second ("cfs") flow rate above 3,000.  (Dkt. #606 (10/24/22 PM Trial Tr.) 11, 21, 25 (Jonathan Jones); dkt. #608 (10/26/22 PM Trial Tr.) 12 (Hamish Weatherly).)  Illustrative of that risk is evidence only recently provided to the court, indicating that three flooding events between March and May of this year, ranging up to approximately 13,900 to 10,400 cfs, reduced the closest point of Line 5 to the meander's riverbank by more than half, to only 11 feet.

### 2.  Enbridge's current "Meander Monitoring and Shutdown Plan"

Both the Band and Enbridge have cameras set up at that meander to monitor erosion and flood conditions, and Enbridge has had a specific "Meander Monitoring and Shutdown Plan" in place since June 2021.  (Dkt. #600 (10/25/22 AM Trial Tr.) 65 (Naomi Tillison) (discussing cameras); Trial Exh. 70 (dkt. #616-1) (Enbridge's 2021 plan).)  Under the 2021 plan, Enbridge is required to monitor the meander using multiple methods, including aerial patrol, drone inspection, remote cameras, and U.S. Geological Survey

gauges and precipitation forecasts. The frequency at which remote cameras at the meander are reviewed by an Enbridge pipeline integrity engineer depends on the flow conditions on the river: less than 4,000 cfs (weekly review); between 4,000 to 10,500 cfs (daily review); and greater than 10,500 cfs (reviewed every 3 hours initially, "but increasing in frequency to near-continuously if the bank nearest the pipeline demonstrates significant erosion progressing toward the pipeline").

Enbridge uses flag markers and "monuments," which are posts stuck in the ground with assigned letters and numbers, that have been configured in a grid on both Enbridge's and the Band's property at the meander. At the time of trial, the monuments had been placed at various intervals between 25 feet to 5 feet away from the pipeline, with the row of monuments located 5 feet from the pipeline being referred to as "backline monuments" as pictured below.



(Dft.'s Dem. Exh. 33, at 2.) After the October 2022 trial, Enbridge installed several

additional rows of monuments at the meander, resulting in 10 rows of lettered monuments spaced 20 feet from the adjacent lettered monument.  (Duncan Decl. (dkt. #654) Fig. 3.) These monuments are designed to be tall enough to be visible to the cameras even during a so-called "500-year flood" event.  (*Id.* at 4; Dkt. #601 (10/26/22 AM Trial Tr.) 134–135.)

The monuments are monitored using remote cameras to measure whether erosion has moved further towards the pipeline and could create an unsupported aerial span beneath it.  Enbridge's current monitoring and shutdown plan contains calculations as to the length of unsupported span that could be created based on the loss of certain combinations of monuments, and in particular whether a 90-foot-long unsupported span is possible.  A monument is to be deemed "lost" under Enbridge's monitoring and shutdown plan if the cameras cannot see the monument, whether it has fallen into the river due to erosion of the ground beneath it or it is actually in place but covered by flood waters.

Monument-loss events trigger different response actions under Enbridge's plan.  The loss of a single, backline monument indicates the *possibility* of a maximum span of less than 90 feet.  (Trial Exh. 70 (dkt. #616-1) 4–5.)  In this scenario, Enbridge would take measures, such as increasing to "near continuous" monitoring (through weather forecasts, river flow readings, remote cameras and drone flights) to determine whether any affirmatively remedial action or preventive purge-and-shutdown of the pipeline would be prudent.  (*Id.*) If multiple, backline monuments were lost, Enbridge would interpret that loss under the plan as indicating the potential existence of a span greater than 90 feet.  In such an event, Enbridge would take additional steps, including initiating a purge "if feasible," to remove

petroleum products from the segment at risk within 40–50 hours,[4] and once a purge had been completed, temporarily shutting down Line 5 -- or more accurately, shutting-in that segment of Line 5 -- using valves on either end of the Reservation.  (*Id.* at 5, 10 ("The launching of the pigs and injecting nitrogen will take approximately 45 hours to complete."); dkt. #601 (10/26/22 AM Trial Tr.) 141–43 (Deb Tetteh-Wayoe) (testifying that if multiple backline monuments are lost, Enbridge would "execute a shutdown," even if the pipeline was still buried).)  Enbridge's existing plan also contains a restart procedure that would occur after flood waters receded, and after Enbridge's "Pipeline Integrity Engineering Department" conducted an assessment to determine whether the pipeline may be safely restarted.  (Trial Exh. 70 (dkt. #616-1) 9.)

### 3.  Spring 2023 conditions at the meander

As previously mentioned, the pace of riverbank erosion at the Bad River meander significantly quickened during the spring of 2023 as compared to the previous, three years

---

[4] At trial, the parties disputed whether a complete purge of oil and natural gas for this segment of Line 5 could be accomplished in that short amount of time, although mainly because of the amount of nitrogen gas and heavy equipment needed to be obtained on short notice.  Enbridge's own witnesses testified that it could take several days to obtain and mobilize the equipment and materials needed to conduct a purge of the pipeline.  (Dkt. #601 (10/26/22 AM Trial Tr.) 3–4) (Deb Tetteh-Wayoe) (testifying that "three to five days maybe of prep work" needed to start the actual purge process).)  However, Enbridge represents without contradiction that in light of the recent loss of riverbank due to flooding, it has taken further steps to be assured of acquiring sufficient gas and the necessary equipment to accomplish a purge on short notice.  Even so, the court cannot help but find that those efforts may be more difficult to achieve in practice, particular when likely to be occurring during challenging weather conditions.

due to high levels of snow melt and precipitation.[5]  Between April 13 and May 1, 2023, there were three separate, significant flood events on the Bad River: on April 13, the river peaked at 13,800 cfs (less than a 10-year flood event); on April 21, it peaked at 10,400 cfs (less than a 5-year flood event); and on May 1, it peaked at 10,800 cfs (less than a 5-year flood event).

Both sides provided an update on the conditions at the meander as a result of these floods at the injunction hearing held on May 18, 2023.  Line 5 is still buried under approximately 6.5 feet of soil at the meander neck and remains supported under the soil as well.  However, the flooding caused significant erosion on the riverbank at and near the meander, with 3 to 4 feet of riverbank being lost in a 40-to-50-hour period, just south of the meander.  In addition, at least 6 monuments were dislodged at the meander, likely due to erosion, while other monuments were lost or pushed over from floodwater or debris in the river, as depicted in the following illustration:

---

[5]  After unusually low, annual snowfalls for a number of years, far Northern Wisconsin and the Upper Peninsula of Michigan experienced near record amounts of snow last winter, which appears to be consistent with wider ranges of extreme conditions resulting from climate change more generally.



(Duncan Decl. (dkt. #654) 7, Fig. 1) (depicting the standing, lost and toppled monuments as of May 16, 2023).

As a result of the erosion, therefore, the riverbank has moved closer to the pipeline's location.  For example, at the M3 monument, 34 feet of bank existed between the pipeline and river before flows increasing in the second week of April.  Now only 12.5 feet remain.  (Paton Decl. (dkt. #632) ¶ 5.)  Thus, in one week (between April 29 and May 5), 10.5 to 11.5 feet of bank was lost there, nearly the same amount as still exists.  (*Id.*)  In fact, there presently exist four locations at which less than 15 feet of bank remains between the Bad River and Line 5 (*id.* ¶ 4), and at the E series of monuments, only 11 feet of bank remains.  (*Id.*)  The following images from one of Enbridge's cameras shows the significant bank loss at the D, M3, E and F monument series between April 10 and May 5, 2023.





**A86**

(Paton Decl. (dkt. #632) 9, Fig. 4.)  Finally, the following schematic illustrates current

bank distances at the meander as of May 9, 2023.



(Duncan Decl. (dkt. #654) 9, Fig. 2.)

The recent erosion and monument loss at the meander has taken place in

conjunction with flood levels that are significant, but far from record flows for this stretch

of the Bad River.  (Paton Decl. (dkt. #632) ¶ 14.c.)  And although there has been no

further significant erosion since May 9, 2023, the conditions at the site, including undercut

banks with exposed roots, indicate that more bank erosion will continue, particularly if

major rain events continue into early summer followed by so-called "sloughing."  (*Id.* ¶¶ 9,

14.)  Moreover, both sides' experts testified at the May 18 hearing that the Bad River is a

"flashy" river, meaning that it can surge quickly.  (Dkt. #670 (5/18/23 Tr.) 92 (Paton),

214 (Duncan).)  Indeed, the Bad River historically has had a series of floods that peak

during short periods of time, similar to what happened at the meander this spring, and

those peaks can occur throughout the summer and into the fall. (*Id.* at 92–94.)

Generally, the actual erosion of the riverbank does not occur while floodwaters are peaking, but instead after the flood waters recede below the top of the bank. However, the amount of time it takes for a flood to recede varies, depending on the level of the peak and other conditions. (*Id.* at 131–33) (Paton). For example, the three floods this spring took between 70 hours to 5 days to recede, while some historic floods have receded below the level of the pipe within 40 hours. (*Id.* at 96.) Moreover, once erosion uncovers the pipe, it could result in flood waters "piping" (horizontal erosion along, rather than under, the pipeline) that could increase the rate at which the pipeline becomes unsupported once perpendicular scouring begins. (*Id.* at 114.)

During the floods this spring, Enbridge provided updates on conditions at the meander to both the Band and the Pipeline and Hazardous Materials Safety Administration ("PHMSA"). As of the time of the May 18 hearing, PHMSA had not required Enbridge to take additional actions to prevent erosion at the meander. However, in response to the flooding, Enbridge has taken preparatory activities in case a shutdown or purge is required under its monitoring and shutdown plan, including: staging purge "pigs" and other equipment at its Superior terminal; placing Enbridge's purge contractors and vendors, including nitrogen vendors, on "standby status"; and staging matting and other equipment in Ashland to be able to prep valve site access if needed. (Teitelbaum Decl. (dkt. #643) ¶ 4.) Even so, Enbridge has not purchased nitrogen yet, meaning that it would still take approximately three days before it could execute a purge of the pipeline. (Dkt. #670 (5/18/23 Tr.) 57–58 (Teitelbaum).)

**C. Enbridge's Proposed Remediation Projects and the Band's Response**

At trial, Enbridge presented evidence of its remediation proposals to the Band over the last few years to limit erosion and prevent a rupture of Line 5 at the meander. For example, Enbridge proposed: (1) a rock riprap project, which would involve depositing vast quantities of boulders and gravel in the Bad River on the meander's upstream bank, using either helicopters or heavy equipment; and (2) a tree revetment project, which would involve depositing larges trees by helicopter or other means upstream at the meander to mimic a naturally-occurring tree revetment already located just upriver from the meander. Enbridge has also proposed installation of emergency flow restriction devices ("EFRDs"), which would more than halve the potential volume of oil or NGLs that could spill due to a rupture of Line 5 on the Reservation. The following graphic shows the locations of the current, manual shut off valves outside the Reservation, as well as new, more advanced EFRD locations proposed by Enbridge for installation and remote control as early as this summer.



(Dft.'s Dem. Exh. 6.)

In contrast, despite highlighting how much worse the conditions at the meander have become, by the time of trial and again May, the Band has refused to approve *any* of Enbridge's remediation and prevention proposals, much less proposed even one project of its own to prevent or at least slow further erosion at the meander; nor has it asked any of its experts from Wright Water Engineers ("WWE") to provide recommendations on riverbank protection projects, other than offering suggestions and criticisms of Enbridge's proposals.  (Dkt. #600 (10/25/22 AM Trial Tr.) 87 (Naomi Tillison); dkt. #599 (10/24/22 AM Trial Tr.) 129) (Jonathan Jones).)

Nevertheless, both sides' experts further testified at trial that Enbridge's remediation proposals would provide protection to the riverbank at the meander, and likely would stop (or in the case of the Band's experts, at least slow) further erosion at the meander, if only on a temporary basis.  (Dkt. #599 (10/24/22 AM Trial Tr.) 141–42

(Jonathan Jones); dkt. #608 (10/26/22 PM Trial Tr.) 29, 31–36 (Hamish Weatherly).)

Further, they both testified rock riprap in particular can be very effective in limiting erosion

and has been installed successfully in several areas on the Reservation without significant

environmental damage, including on the Bad River itself.  (*Id.* at 142, 145, 151–53, 157)

(Jonathan Jones).)  In fairness, the Band's experts also raised concerns with the structural

integrity and feasibility of Enbridge's various proposals (*id.* at 142; dkt. #268 (WWE

Expert Rep.) 48–52; dkt. #268-3 (WWE Rep. part 4), as well as some environmental

concerns, although none would even remotely approach those that will occur should a span

of pipeline fail at or near its crossing at the meander.  (Dkt. #606 (10/24/22 PM Trial Tr.)

5, 27–28, 39) (Jonathan Jones).)

Because the Band has been granted Clean Water Act permitting authority for all of

its lands by the EPA (including for parcels outright owned by Enbridge) and because the

Band owns some of the property adjacent to the Bad River (including roughly 50% of the

meander riverbank most likely to erode and reach the pipeline (Trial Ex. 1449)), Enbridge

is unable to perform *any* remediation project at the meander without the Band's advanced

approval and issuance of a permit.  To date, however, the Band has generally placed

Enbridge's applications to perform remediation work at the meander "under

consideration," in what can only be described as slow walking possible remediation.

In response to this glaring lack of progress, Naomi Tillison, the director of the

Band's Mashkiiziibii Natural Resources Department (MNRD), explained at trial that the

Band rejected some of Enbridge's past proposals only after conducting a thorough review

and analysis, applying the rigorous procedures mandated by the Band's Water Quality

Certification and Water Quality Review Code, Wetlands and Watercourse Protection Ordinance, and administrative procedures.  (Dkt. #600 (10/25/22 AM Trial Tr.) 20–21.) After rejecting some of Enbridge's proposals, MNRD staff members also drafted documents describing the bases for the Band's decisions, including that: the proposals were "unfeasible from an engineering perspective"; would cause "significant environmental damage" to a sensitive area, including erosion and disturbance to the habitat of the threatened wood turtle; and ultimately would require further trespass on the Band's lands.  (*Id.* at 28–29, 34, 41–44, 47–49.)  Further, the Band has determined that the proposals were not acceptable because Enbridge could avoid these risks by either: (1) decommissioning the pipeline outright within the Reservation boundaries; or (2) implementing enhanced monitoring and a robust protocol for a permanent shutdown and purge of the pipeline, with clearly defined, predetermined triggers.  (*Id.* at 49.)

Tellingly, at the May 18 hearing, the Band's counsel represented that it was close to reaching a compromise on yet another proposed temporary erosion prevention plan for the meander.  Specifically, in response to the recent flooding and erosion at the meander, Enbridge proposed the installation of sandbags at the meander as an alternative erosion prevention project, which purportedly could also be installed as soon as permits are approved by the Band and Army Corps of Engineers.  Similar to Enbridge's earlier, rejected riprap proposal, this proposal consists of large sandbags (as opposed to riprap) being filled with sand and lowered into place by helicopter along the upstream riverbank of the Bad

River.  Enbridge submitted this proposed sandbag project to the Band on May 9, 2023.[6]

Although the Band's experts and Director Tillison expressed concerns at the May 18 hearing about the design of the plan, including the proposed vertical stacking of sandbags and instability, the Band had placed the proposal on an expedited timeline (reducing it from approximately seven months to two weeks).  (Dkt. #670 (5/18/23 Tr.) 119–25 (Paton); 141–145, 157 (Tillison).)  Tillison also stated at the hearing that she anticipated recommending approval of the sandbag project.

At post-hearing meetings, however, Tillison raised concerns about the project's compliance with the Band's antidegradation standards, and the Band's Natural Resources Department later recommended that Enbridge's proposed project be denied.  On June 7, 2023, the Tribal Council passed a resolution denying the sandbag project.  (Dkt. #681.)  In a moment of candor, that resolution rejected the project not only based on environmental concerns, but also based on Line 5's ongoing trespass on some land parcels now owned outright or at least partially by the Band.  (Dkt. #682-2.)

### D. Enbridge's Proposed Reroute of Line 5

To address its ongoing trespass and the Band's refusal to renegotiate lapsed rights of way, Enbridge has also proposed a reroute of Line 5 around the Bad River Reservation, following a 41-mile path along the external boundaries of the Reservation.  (Dkt. #611 (10/31/22 PM Trial Tr.) 5 (Julie Molina).)  At the time of trial, Enbridge had:  obtained

---

[6] Enbridge also recently proposed a new tree revetment project that is still being considered by the Band's National Resources Department.

easements for all of the necessary rights-of-way for the project; hired a general contractor for the project; drafted construction schedules; and spent $86 million purchasing materials for the project.  (*Id.* at 6–8.)  Enbridge also has applied for, though not yet obtained, permits needed for the project from the Wisconsin Department of Natural Resources and Army Corps of Engineers.  (*Id.* at 10.)

Unsurprisingly, the Band, affected landowners along the reroute, various governmental bodies, and numerous environmental groups oppose it.  The Band and others point out that the rerouted pipeline would remain within the Bad River watershed, damage numerous wetlands and cross several bodies of water protected by the Clean Water Act. Thus, in response to Enbridge's permit applications, the Band, several other tribes, the Great Lakes Indian Fish & Wildlife Commission, National Park Service and the Environmental Protection Agency have raised formal concerns with the reroute's impact on wetlands and waterbodies, aquatic resources, water quality, tribal resources and climate change.  (*Id.* at 64–72 (Jessica Strand) (discussing the Band's concerns with Enbridge's reroute plan).)

### E. Economic Consequences of Line 5 Shutdown

At trial, both parties offered a number of expert opinions and underlying evidence regarding the likely impact of the loss of Line 5 in delivering Western Canadian NGLs and crude oil in the upper Midwest of the United States and Eastern Canada.  Supplementing information at summary judgment, both sides' experts acknowledge that the loss of Line 5, even with time for planning its closing, will have near-term economic impacts on consumers, particularly with respect to the delivery of propane during heating season

(generally between the months of October and March) in Michigan and Ontario. Even so, the Band's experts opine that both oil and NGL markets will reach new equilibriums with substantial alacrity within a year to eighteen months. While the court agrees that the markets for oil and NGLs will reach new equilibriums within that timeframe, the likelihood of substantial, ongoing supply issues and price spikes appear much higher than the Band and its amici suggest, especially if the stoppages are only temporary and discourage the necessary capital investment to reroute delivery of Western Canada light crude oil and natural gas to the Upper Midwest and Eastern Canada.

As for impacts on the crude oil supply, the Band and its experts tell a particularly rosy story with respect to the industry's ability to find alternative routes for the quick, safe and efficient transport of some 450,000 barrels a day of crude oil from Western Canada now traveling on Line 5 by use of other pipelines in Enbridge's system along with truck, train and shipping lanes. In particular, using 2019 annualized figures, the Band's experts and attorneys purport to show by extrapolation of a report and testimony of a single Enbridge expert, Neil Earnest, that the near-term, shortfall in crude oil would be largely made up by immediately diverting crude oil down from Superior Wisconsin, on Lines 6, 14, 61 and 64, then through to Michigan using 100,000 barrels of excess capacity on Line 78. In addition, the Band suggests that another 100,000 barrels or more could be moved in a relatively short period by "reactivation of existing rail facilities" and truck transport from Superior, Wisconsin, to Toledo, Ohio and Ontario, and even use of available tankers on the St. Lawrence Seaway to Quebec. As to an additional gap in supplies to two, other Quebec refineries, the Band posits a "re-reversal" of Line 9 to supply crude oil from east to

**A95**

west.  With these gaps filled, the Band argues that only a gap of 86,000 barrels of crude oil per day will exist for any sustained period, something the market could accommodate with cents on the dollar increases in the price of gas.

The following graphics show Enbridge's Lakehead System and the various pipelines to which the Band refers.



(Dft.'s Dem. Exh. 39.)

Even ignoring the supply and demand variables independent of Line 5's shutdown, which are extremely difficult to predict in the sometimes volatile, global market for oil, there are substantial reasons to question the viability of the Band's solution to a Line 5 shutdown.  Specifically, several assumptions appear wildly optimistic in this scenario, beginning with the fact that uncontradicted testimony at trial indicated that Lines 6, 14, 61 and 65 are already at capacity and appear likely to bottleneck even before the planned

use of excess capacity on Line 78. Moreover, utilizing rail and truck transport from Superior would require both improved onboarding and offboarding oil transfer facilities and expensive rail cars, at a cost of tens of millions (if not hundreds of millions) of dollars, with similar costs for trucks and related transfer facilities. This scenario also unreasonably downplays market adjustments that would be required by numerous, downstream entities accustomed to easy delivery of light crude and natural gas that would be affected by a shutdown, including commodity traders, terminal developers and operators, midstream consumers and associated pipeline companies. Thus, while the court assumes the markets will eventually adjust to Enbridge's reduced role in the delivery of Western Canadian crude oil by rerouting and looking elsewhere for transport, refining and even sourcing of crude oil, it finds the Band's assurances of an easy adjustment much less credible, just as it remains skeptical of Enbridge's rosy scenarios for identifying the right moment for purging and shutting down Line 5 in the midst of flooding, much less remediating a major oil spill.

As for NGLs, even the Band concedes that a loss of the current 80,000 barrels running daily through Line 5 would be difficult to make up, particularly given the current location of fractionator facilities in Sarnia, Detroit and Toledo, as well as points further east in Canada.

## Enbridge System Overview



2

(Dft.'s Dem. Exh. 39.)  Again, however, the Band's experts suggest that with use of rail and trucks for alternative transport to Maryville, Michigan, and by trucks to Eastern Canada via the St. Lawrence Seaway, any shortfalls in NGLs would be limited in duration (roughly 12 to 18 months), and that average costs would be only a few cents more on the dollar for consumers in need of propane and butane for heating.

Of course, Enbridge's experts, both internal and external, as well as their downstream fractionators and consumers, do not share this confidence.  As to natural gas in particular, Enbridge's experts are especially skeptical of the alternative routes offered by the Band's experts.  Further, credible testimony was provided by operators of the Enbridge System that feeder lines from Superior, Wisconsin, whether on Line 6, 14 and 61, or Lines 64 and 55, lack excess capacity and will bottleneck near Chicago, making any expansion of NGLs running through Line 78 dubious at best, particularly in the short term.  These experts also question whether current facilities exist for offloading NGLs at Superior to

railroad cars or trucks, and suggest that temporary transloaders could not make up the difference; nor could or would larger, permanent transloaders be built to process larger volumes faster if there was a possibility that Line 5 may come back into operation. Indeed, while appropriate portable transloaders might be set up more quickly, their processing speed is slower and may take as much as four to six months to even acquire. There was also evidence that there are simply not enough truck drivers and properly outfitted trucks currently available and capable of safely transporting natural gas, and that to the extent current railcars capable of carrying NGLs fall short, as seems more likely than not, each new, properly equipped tanker car would cost roughly $300,000 apiece.

Finally, in response to the Band's emergency motion considered at the May 18, 2023 evidentiary hearing for an *immediate* shutdown of Line 5, Enbridge offered additional, persuasive evidence as to the economic havoc that such a sudden, unplanned and temporary shut down of the line would cause the markets for both crude oil and natural gas, especially for the current refractory facilities producing propane in the Detroit and Toledo area should the shutoff continue into traditional heating months in Michigan and Ontario. In short, the Band minimizes any long-term impact of Line 5's temporary shutdown on all but Enbridge, who after all, is in trespass, but the evidence suggests increased economic volatility in the markets for light crude, NGLs and propane/butane in the Upper Midwest and Eastern Canada.

### F. The Parties' Posttrial Monitoring and Shutdown Proposals

In its November 28, 2022 posttrial opinion, the court ordered the Band and Enbridge to "meet and confer regarding: (1) the installation of additional emergency flow

restriction devices (EFRDs) on Line 5 on the Reservation; (2) an appropriate shutdown and purge protocol should conditions worsen at the meander; and (3) other reasonable remediation projects that could inhibit further erosion at Line 5." (Dkt. #612, at 16.) The parties responded by notifying the court that they held two, meet-and-confer sessions that included Band representatives, Enbridge's internal subject matter experts and the Band's outside subject matter experts on the topics specified by the court, and made "substantial progress" on the topic of EFRDs and "anticipate that they will continue to make good-faith efforts toward accomplishing expeditious EFRD installation on the Reservation." (Dkt. #614, at 2.) At the May 18, 2023 hearing, Director Tillison further elaborated that the parties had met approximately 8 times since December to discuss potential revetment and erosion prevention at the meander, including modifications shared by WWE that might be incorporated into Enbridge's most recent tree revetment proposal of May 15. (Dkt. #670 at 165–68, 170–72.) However, as has been the case for years, the parties were unable to reach agreement on any revetment or shutdown and purge protocol. Instead, each side submitted its own proposed protocol for the court's consideration.

### 1. The Band's post-trial proposal

The Band's December 2022 protocol would require the shutdown and purge of Line 5 on the Bad River Reservation when either of two independent triggers are met: (1) the Bad River flows at the USGS gage upstream of the Bad River meander reach 33,000 cfs, which is a "200-year flood" event; or (2) the river advances to within 15 feet of the pipeline, which is tied to the amount of erosion that could occur at the meander during a "500-year event," such as the flood that occurred in July 2016. (Dkt. #617, at 3.) The Band's

**A100**

proposal would also require that Enbridge: (1) the install four, additional monuments to facilitate identification of the 15-foot threshold along the length of the meander neck; (2) purge the pipeline in conjunction with a shutdown; and (3) take preparatory steps to shorten the time needed to accomplish a purge.  (*Id.* at 3–4.)    The Band's proposal would allow for a restart of the pipeline when Enbridge can confirm that there is no risk to pipeline integrity; and if:  (1) more than 15 feet of bank remains after severe flows have subsided; or (2) less than 15 feet of bank remains during seasonal conditions that present lower risks. (*Id.* at 4.)  Finally, to ensure that the pipeline is not restarted imprudently or prematurely, the Band's proposal provides that any restart be done either with the concurrence of the Band or the approval of the court.  (*Id.*)

### 2.  Enbridge's post-trial proposal

As with its current protocols, Enbridge's December 2022 proposed plan is based on protecting against the threat of a critical aerial span.  However, the new plan differs from its current plan in four aspects: (1) reconfiguring the monument grid to accommodate more conservative monument loss scenarios; (2) adding a "purge readiness" action, which would require Enbridge to stage purging materials and equipment into readiness to reduce the lead time necessary to begin the actual purge; (3) revising purge-and-shutdown procedures by: (a) reconfinguring the backline monuments for an even, 20-foot spacing between each backline monument and reducing the monument loss requirement, lowering the purge-and-shutdown trigger based on evidence of a possible unsupported 60-foot aerial span, rather than 90-foot; and (b) adding a high-flow element, meaning that a shutdown does

**A101**

not occur unless the Bad River's flow reaches at least 20,000 cfs; and (4) adding a purge-and-shutdown trigger in the event the line is restarted after being shutdown.  (Dkt. #616-2.)

OPINION

I.      **The Band's Nuisance Claim**

Under federal common law, a public nuisance is a substantial and unreasonable interference with a right common to the general public.  Restatement (Second) of Torts § 821B.  "A court may grant equitable relief to abate a public nuisance that is occurring or to stop a threatened nuisance from arising."  *Michigan v. U.S. Army Corps of Engineers*, 667 F.3d 765, 781 (7th Cir. 2011).  Where, as in this case, the alleged nuisance is not presently occurring, a plaintiff must generally prove that: (1) the activity or circumstances complained of would be a substantial and unreasonable interference with a public right; and (2) the activity is "imminent."  *Id.*

As discussed in the court's previous posttrial opinion, the Band established at trial that a rupture of Line 5 at the Bad River meander before a successful purge could be completed would cause significant environmental damage to the Bad River watershed and Lake Superior.  In fact, if Line 5 were not purged in time, a rupture at the meander could result in a release of as much as 20,000 barrels (840,000 gallons) or more of crude oil, as well as additional NGLs, into the Bad River. (Dkt. #608 (10/26/22 PM Trial Tr.) 65, 85–86 (Trent Wetmore).)  Such a discharge would unquestionably be a substantial and unreasonable interference with the Band's and the public's rights.

**A102**

As it was at trial, the more complicated question remains whether the Band has shown that this substantial, irreparable harm is "imminent." At the May 18 hearing and in previous opinions in this case, the court focused on that term, evaluating whether the evidence and conditions at the Bad River meander showed that a rupture of Line 5 was likely to occur in the near future, such that an immediate shutdown of the pipeline (or some other form of injunctive relief) was warranted. However, for purposes of establishing a threat of public nuisance, "imminent" does not necessarily mean that the harm will certainly occur within a specific timeframe. Instead, the Seventh Circuit has explained that "[t]here is no meaningful legal difference for purposes of the ultimate resolution of a public nuisance claim between a threatened nuisance that is 'imminent' and one that is 'immediate,' 'significant,' 'real,' an 'unreasonable risk,' or anything similar." *Asian Carp I*, 667 F.3d at 782. *Cf. Price v. U.S. Navy*, 39 F.3d 1011, 1019 (9th Cir. 1994) ("A finding of 'imminency' does not require a showing that actual harm will occur immediately so long as the risk of threatened harm is present."). Thus, the central question in evaluating the merits of the Band's claim for relief under public nuisance doctrine is "whether the harm that the [plaintiffs] have described is sufficiently close to occurring that the courts should order the defendants to take some new action that will be effective to abate the public nuisance." *Id.* at 781.

Of course, in evaluating whether there is a threat of "imminent" harm, courts must also consider "the magnitude of the potential harm," including whether the risk of harm will increase as time goes on and whether the harm could be eliminated after it occurs. *Id.* at 785–86 ("The fact that it would be impossible to un-ring the bell in this case is another

**A103**

reason to be more open to a conclusion that the threat is real."); *see also Van De Sande v. Van De Sande*, 431 F.3d 567, 570 (7th Cir. 2005) ("The gravity of a risk involves not only the probability of harm, but also the magnitude of the harm if the probability materializes."). The Seventh Circuit further counsels that the "nature of the threat" is relevant to the imminence analysis, and "ecological harm suggests that a broader perspective on the problem might be necessary." *Asian Carp I*, 667 F.3d at 785.

Under these standards, and in light of additional erosion occurring this spring, the court finds that a Line 5 rupture at the meander is now "sufficiently close to occurring" such that Enbridge must take new actions to abate the nuisance. First, the nature of the potential harm—catastrophic environmental damage to the Bad River and Lake Superior watersheds—is a significant factor. If a large oil spill occurred, it would be impossible to undo the damage with remediation efforts, an injunction or monetary penalties.

Second, evidence presented at trial, and particularly at the May 18, 2023, posttrial hearing, establishes that the Bad River itself can be unpredictable, despite Enbridge's arguments to the contrary. Historical and recent data show that it is a "flashy" river, prone to seasonal flooding that may peak and recede quickly. A dramatic example is the 2016 floods, during which the flow of the Bad River increased from approximately 600 cfs to a peak flow of 40,000 cfs in only 14 hours. Thus, sometimes seasonal flooding causes little to no bank erosion, while at other times the rise and fall of floodwaters can cause dramatic erosion within a few days. In light of the unpredictability of the Bad River and recent events, the court is simply no longer comfortable relying on Enbridge or its experts' attempts to quantify the likelihood of a risk of an exposure or pipeline rupture at the

meander.  For example, in April 2022, Enbridge's expert opined that there was a less than one percent chance of the pipeline being exposed within a year.  (Weatherly Rep. (dkt. #276) 5.)  Now, one year later, he quantifies that risk at five to ten percent.  (Weatherly Decl. (dkt. #642, ¶ 8.)  These latest percentages are hardly comforting in light of Weatherly's and other experts' testimony at trial that the pipeline could be exposed in a single, significant flooding event; and in particular, that an unsupported span of 65 feet or greater may quickly become more than 100 feet, depending on the conditions at the time.

Third, the court is not convinced that Enbridge's current monitoring and shutdown protocol is sufficiently conservative, when considering that the preparatory work required for Enbridge to even begin a 40-hour purge can itself take three to five days.  Even if the court assumes that Enbridge would activate its shutdown and purge plan as soon as two backline monuments are lost, the river could peak and recede more quickly than it did this spring, resulting in "sloughing" that exposes Line 5 to an unsupported span close to 60 or even 100 feet before Enbridge is able to complete its preparatory work, much less complete the actual purge.  The court is particularly concerned that Enbridge's plan does not account for inevitable delays that could occur due to weather conditions, supply and equipment problems and human error.

For these reasons, and other evidence in the record regarding the environmental devastation that would result from a pipeline rupture and the recent, precarious conditions at the meander, the court concludes that if riverbank erosion continues at the meander, a substantial and unreasonable interference with a public right is imminent, if not certain to

occur, at least if Enbridge fails to make prompt, extraordinary efforts to prevent a Line 5 rupture before a purge can be effectuated.

The next question is what form of injunctive relief is now necessary to abate this nuisance. In determining whether to impose permanent injunctive relief, the court generally must consider whether: (1) an injunction is necessary to prevent irreparable harm; (2) remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) the balance of hardships between the plaintiff and defendant; and (4) the public interest would not be disserved by a permanent injunction. *Liebhart v. SPX Corp.*, 998 F.3d 772, 779 (7th Cir. 2021). Of course, "once a court finds a defendant liable for creating a risk of imminent and substantial danger, it will usually be the case that injunctive relief is warranted." *LAJIM, LLC v. Gen Elec. Co.*, 917 F.3d 933, 944 (7th Cir. 2019) (citing *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 545 (1987) ("Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable. . . . [T]herefore, the balance of harms will usually favor the issuance of an injunction to protect the environment.").

As discussed, the court has already concluded that some form of injunctive relief has become necessary to prevent irreparable harm and that monetary damages would be inadequate. The balance of hardships and public interest are more complicated by the Band's own failure to engage sooner and in good faith with Enbridge on a potential remediation plan at the meander. In particular, the court has expressed frustration at the Band's refusal to authorize Enbridge to install state-of-the-art EFRDs within the Reservation, which would more than halve any potential oil or NGLs discharged at the

**A106**

meander,[7] or engage meaningfully in collaborative discussions with Enbridge on the most feasible bank stabilization project that the Band would accept. *See Asian Carp I*, 667 F.3d at 794 (reasonableness of the parties' efforts are relevant to the nuisance analysis, as well as the appropriateness of immediate injunctive relief). Also relevant to equities are the significant economic and public policy implications that would arise from a shutdown of Line 5 as already outlined above.[8]

However, these concerns can be mitigated somewhat by issuing an injunction that does not necessarily require an immediate, indefinite or permanent shutdown of Line 5. Instead, the court concludes that a more robust and specific monitoring, shutdown and purge protocol, if successfully implemented, would significantly reduce the threat of an imminent oil or NGL spill in the near term. While these protocols may yet require a shutdown of Line 5 even this year given the erosion that has already occurred at the meander this spring, such a shutdown may only be necessary temporarily, until seasonal conditions have again stabilized. In this way, at least Enbridge might continue operations of the pipeline during the more stable months of the year, allowing a sufficient period of

---

[7] As noted, the parties' recent filings and testimony at the May 18, 2023 hearing suggest that no progress is likely to be made in this regard, or in shoring up the bank at the Bad River meander, at least in part because the Band's principal goal is to close Line 5, not allow it to limp along for the benefit of Enbridge's bottom line. Moreover, because Indian Tribes are exempt from providing judicial review of approval or denial of Clean Water Act permits, 40 C.F.R. § 123.30, Enbridge appears to have no judicial or administrative recourse to challenge the Band's permit denials. At most, Enbridge could potentially appeal to the EPA to withdraw the Band's permitting authority, though the court acknowledges that such a request would likely be unsuccessful.

[8] As discussed elsewhere, Enbridge's individual hardship carries less weight in light of its status as an ongoing trespasser on some of the Band's allotted parcels.

**A107**

time for markets to adjust without shortages or extreme price swings, for and Line 5 to be successfully decommissioned on the Reservation with fewer significant market disruptions.

After reviewing the parties' post-trial shutdown and purge proposals, the court concludes that Enbridge's December 2022 monitoring and shutdown plan is a reasonable and effective method to abate the public nuisance at the meander, with some relatively minor modifications. Enbridge's proposal was developed by its pipeline integrity and safety engineers, who have extensive experience in developing such plans and include an operational document, along with a detailed declaration from a company pipeline engineer involved in its creation. (Dkt. #615; dkt. #616-2.) Of particular import to the court, and in contrast to its current plan, the December 2022 plan requires Enbridge to take specific steps to prepare for a shutdown and purge, including actually obtaining nitrogen and mobilizing crews and equipment, in response to any meaningful increase in threatening conditions at the meander. Hopefully, these preparatory activities will reduce the time it will take Enbridge to start a purge of the pipeline, if and when necessary.

Consistent with the existing December 2022 plan, the court's modifications relate to the flow levels necessary to trigger certain actions by Enbridge. In particular, the plan as written requires flow levels of 17,000 cfs or higher, as well as monument loss, to trigger purge preparedness or a purge itself. The court notes that those flow levels are significantly higher than the three, peak flows during flooding this spring, which resulted in substantial, additional erosion at the meander. In addition, at levels over 8,000 or even 6,000 cfs, it will be increasingly difficult to discern what is happening to the bank, or pipeline, as the flood waters would then obscure any view of the neck of the meander, as well as and the

**A108**

pipeline's condition. For these reasons, the court has reduced the flow thresholds of Enbridge's plan. The court's modifications are highlighted in blue in the tables below.

**Table 1** Enbridge is to monitor the meander using multiple methods (page 4)

| Method | Frequency |
|---|---|
| Site ground inspections | Annually |
| Aerial patrol | Intervals not exceeding 3 weeks, but no less than 26 times per year |
| Drone inspection | As triggered by flood events |
| Remote cameras* | Real-time plus historical screen captures |
| USGS gauges | Real-time at Odanah (~6 miles from meander) performed by Geohazard Consultant |
| Precipitation forecasts (NOAA and National Weather Service) | Daily |

**Table 2** PI Engineering Representative is to review images from the remote cameras installed at the meander per the following frequency (page 4)

| Flow Condition | Frequency of Image Review |
|---|---|
| <4000 cfs | Weekly |
| 4000 cfs –10,500 cfs | Daily |
| >10,500 cfs OR Flood warning issued by NWS | Every 3 hours initially but increasing in frequency to near-continuously if the bank nearest the pipeline demonstrates significant erosion progressing toward the pipeline |
| Recession to <4000 cfs | Every 3 hours for two weeks after the flow conditions have receded to <4000 cfs |

**Table 3** Scenario 1: Purge Preparedness, including movement of nitrogen, personnel and equipment on site (page 6)

| Scenario | Event |
|---|---|
| Monument Loss | Loss of 2 adjacent monuments 10 feet from pipeline, OR |
| | Loss of the 10' and 15' monuments in the same line in a 48-hour period, OR |
| | Loss of the 10' and 5' monuments in the same line in a 48-hour period |
| | AND |
| Flow | Actual flow event ≥ 10,500 cfs OR |
| | Forecasted flow event ≥ 15,000 cfs |

**A109**

**Table 4** Scenario 2: Purge and Temporary Shutdown (page 6)

| Scenario | Event |
|---|---|
| Monument Loss | Loss of 2 adjacent backline monuments (60 feet between standing monuments) |
| | Loss of 2 nonadjacent backline monuments in a 48-hour period |
| AND | |
| Flow | Actual flow event $\geq$ 10,500 cfs  OR |
| | Forecasted flow event $\geq$ 15,000 cfs |

In requiring Enbridge to implement its December 2022 plan with those modifications, the court acknowledges that the current plan has been approved by the Pipeline and Hazardous Materials Safety Administration ("PHMSA"), and that PHMSA is aware of the current conditions at the meander. The court also acknowledges that PHMSA might require Enbridge to take additional action to prevent erosion or a rupture of Line 5 at the meander, including shutting down the pipeline, though it has not yet done so. As the court explained at summary judgment, however, PHMSA's authority to manage pipeline safety does not displace this court's authority to resolve the Band's federal public nuisance claim; nor does it deprive the court of authority to enter injunctive relief necessary to abate a public nuisance. (*See* dkt. #360, at 49–52.) Accordingly, Enbridge will be directed to adopt and implement the December 2022 monitoring and shutdown plan in full, *including* the court's modifications set forth above, within 21 days.

## II. Remedy for Trespass

This brings the court full circle to what has always been the driver of this lawsuit: the Band's determination to close Line 5's 645 miles of pipe permanently, based on relatively few parcels within its control for which long-standing rights of way have expired,

**A110**

*versus* Enbridge's desire to get the remaining life out of the now 70-year-old pipe on Line 5. Of course, the use of trespass on a few parcels to drive the effective closure of all Line 5 has always been about a tail wagging a much larger dog. Said less colloquially, the Band's use of limited trespasses following 60 years of lawful use of those parcels seems particularly ill-suited to resolve what are much larger public policy issues as to the appropriate life of oil and gas pipelines that involve not only the sovereign rights of the Band, but the rights of multiple states and international relations between the United States and Canada. Nevertheless, as the court concluded at summary judgment, Enbridge has and continues to commit conscious and willful trespass by operating Line 5 on the Band's 12, former-allotment parcels for which 20-year rights of way expired in June 2013, making an appropriate remedy necessary to address the violation of the Band's sovereign rights and to take away what otherwise would be a strong incentive for Enbridge to act in the future exactly as it has here. (Dkt. #360, at 31, 36.) Left for trial was the amount of damages to which the Band is entitled, and the question whether shutting down the operation of Line 5 is appropriate to remedy Enbridge's ongoing trespass on the 12 parcels.

The evidence presented at trial on these issues was obviously impacted by the court's pretrial rulings that: (1) an immediate, permanent shutdown of Line 5 would not be equitable given the impacts outlined above; (2) Enbridge's trespass could not continue indefinitely; and (3) the Band was not entitled to an award of all of Enbridge's profits earned during the period of trespass by operation of the pipeline as a whole. (Dkt. #512, at 2–3.) Thus, the court stated that it would determine an appropriate remedy based on evidence regarding economic consequences of a Line 5 closure, Enbridge's proposed reroute

A111

of Line 5, and the pro-rata share of Enbridge's profits from the operation of the pipeline during the relevant time period to the extent reasonably attributable to the 12, former-allotment parcels on which Enbridge's rights of way had expired.  (*Id.* (citing *Davilla v. Enable Midstream Partners, L.P.*, No. CIV-15-1262-M, 2016 WL 6952356, at *3 (W.D. Okla. Nov. 28, 2016) (where pipeline found in trespass after expiration of BIA easements, Indian landowners entitled under federal common law "to an accounting of defendants' profits from the operation of their pipeline that is attributable to the portion of the pipeline that has been located on their property").)  Accordingly, the court will first address a monetary award before turning to the question of injunctive relief.

### A. Profits-based Award

An appropriate profits-based award must account for the net profit attributable to Enbridge's intentional trespass.  *See* Restatement on Restitution § 51(4).  Profit includes "any form of use value, proceeds, or consequently gains that is identifiable and measurable and not unduly remote."  *Id.* § 51(5)(a).  The Band has the initial burden of producing evidence "permitting at least a reasonable approximation of the amount of [Enbridge's] wrongful gain," while any "residual risk of uncertainty in calculating net profit" falls on Enbridge.  *Id.* § 51(5)(d) (appropriate remedy for unjust enrichment is "amount of profit wrongfully obtained").

In determining the appropriate award, there are three factors that must be resolved by the court: (1) the relevant time period for the calculation; (2) Enbridge's net profits for Line 5; (3) the amount of those net profits attributable to Enbridge's trespass on lands

**A112**

owned by the Band; and (4) whether Enbridge's profits should be further disgorged based on cost savings resulting from its delay in rerouting the pipeline sooner.

**1. Relevant timeframe for disgorgement**

Enbridge has been trespassing on the Band's 12 former-allotment parcels since 2013 when its right-of-way easements expired. However, the parties engaged in subsequent, off-and-on negotiations for possible renewal of those easements on new terms until January 2017, when the Tribal Council passed a resolution stating definitively that it would *not* renew easements for the pipeline. Even then, the Band did not formally accuse Enbridge of trespass by its continued operation of Line 5 until filing this lawsuit in July 2019. In light of the Band's delay in asserting its rights, Enbridge argues that the Band's award for profits-based relief should be limited by: (1) the applicable statute of limitations; and (2) the equitable defenses of estoppel and laches. With respect to the statute of limitations, Enbridge argues that Wisconsin's three-year statute of limitations for intentional torts, Wis. Stat. § 893.57, applies to the Band's trespass claim. However, that claim is brought under federal common law, and the Supreme Court has held that it would be "inconsistent with federal policy" to apply a state limitations period to a federal common-law action brought by an Indian tribe to enforce property rights. *Oneida County, N.Y. v. Oneida Indian Nation of N.Y.*, 470 U.S. 226, 241 (1985). Therefore, the Band's damages claim is not limited by Wisconsin's statute of limitations.

As for equitable considerations, this court already concluded at summary judgment that neither the Band's trespass claim nor request for equitable relief was barred by the doctrine of laches or any other equitable doctrine. (SJ Op. (dkt. #360) 33 ("The court is

not persuaded that the doctrines of laches bars any of the Band's claims in this case.").)
However, the court left open the question whether the Band's *damages* might be limited by
equitable considerations and permitted the parties to present evidence at trial on that
question.

At trial, Enbridge presented no evidence that would support an equitable estoppel
defense against the Band, such as a specific "misrepresentation" by the Band on which
Enbridge relied.  *See Olson v. Bemis Co.*, 800 F.3d 296, 306 (7th Cir. 2015).  However,
Enbridge's laches defense has more traction.  To succeed on a laches defense, Enbridge
must show: (1) a lack of diligence by the Band; and (2) prejudice to Enbridge.  *Lingenfelter
v. Keystone Consol. Indus., Inc.*, 691 F.2d 339, 340 (7th Cir. 1982).

The evidence at trial established that Enbridge was aware in 2013 that its easements
had expired and that, instead of renewing them, the Band had requested detailed
environmental, pipeline safety and emergency response information from Enbridge about
its pipelines generally, including records of spills and regulatory violations.  The Band also
questioned Enbridge about its pipeline operations and maintenance protocols.  On the
other hand, after the easements expired on the 12 former-allotment parcels, the Band
communicated with Enbridge about potentially renewing the easements and did not state
affirmatively that it would not renew the easements under any circumstances until the
Council issued its January 2017 Resolution.

Ultimately, the court concludes that this evidence does not excuse Enbridge's
intentional trespass.  Enbridge knew that it was operating its pipeline on expired easements,
contrary to federal law.  Enbridge also knew that it lacked valid easements over the parcels,

**A114**

and it claims to have been in active negotiations for their renewal.  Plus, Enbridge knew or should have known that federal law required both the Band's and BIA's approval for continued use of the pipeline on those properties.  Thus, Enbridge had no justified expectations in continuing to operate the pipeline over the allotment parcels without paying compensation, and it was not prejudiced by the Band's failure to enforce its rights until it passed the 2017 Resolution or filed this lawsuit.[9]

### 2. Enbridge's net profits from Line 5

The next task is to calculate Enbridge's net profits from Line 5 during the relevant time period.  Not surprisingly, Enbridge does not maintain a profit-and-loss statement for Line 5 specifically; instead, it tracks profits and losses on Enbridge's Lakehead Pipeline System as a whole.  Accordingly, the court finds that Enbridge's FERC Form 6, which is filed on a quarterly and annual basis with the Federal Energy Regulatory Commission, is the best evidence of Enbridge's actual profits for the Lakehead System, as the form identifies Enbridge's pre-tax income, tax rates, and depreciation for the Lakehead System.[10]  Thus, the court starts with the information on Form 6 as a baseline for calculating Enbridge's profits on Line 5.

At trial, however, the Band presented evidence showing that 70 to 80 percent of the

---

[9] Even if the court had found some sort of equitable "repose" while the parties negotiated possible renewals of these easements, it would never have amounted to the Band relinquishing its rights to challenge Enbridge's ongoing trespass.  For the years when the rights of way expired between 2013 and January 2017, the appropriate amount of damages would at minimum be the rental value of the properties identified in the expert reports of Ed Steigerwaldt.  (Dkt. ##502–513.)

[10] Enbridge's expert calculated after-tax income using tax rates supplied by Enbridge, but the court agrees with the Band's expert that the tax rates in the FERC Form 6 are the best evidence of the profits and tax rates paid by Enbridge.  (Leistra-Jones Rep. (dkt. #573) 17.)

ongoing depreciation for the Lakehead System listed on Form 6 is *not* associated in any way with Line 5, which had been fully depreciated some time ago. Rather, most depreciation still being claimed by Enbridge is attributable to more recent capital projects on other lines in its Lakehead System. (Dkt. #602 (10/27/22 AM Trial Tr.) 109–112 (Olive); Dkt. #609 (10/27/22 PM Trial Tr.) 7 (Leistra-Jones).) Moreover, Enbridge submitted no contrary evidence suggesting that anything beyond 20 to 25 percent of its depreciation for the Lakehead System between 2013 and 2022 could be attributable to Line 5. Thus, the court will only subtract 22 percent of the depreciation total from Enbridge's after-tax income to determine net income for the Lakehead System, resulting in the following calculations:

| Year | Lakehead System after-tax net income | Depreciation on Form 6 | 22% of Depreciation | Total after-tax income, minus 22% depreciation for Lakehead System |
|---|---|---|---|---|
| 2013 (June—Dec) | 188,630,110 | 110,071,474 | 24,215,724 | 164,414,386 |
| 2014 | 644,239,337 | 246,636,627 | 54,260,058 | 589,979,279 |
| 2015 | 812,212,070 | 308,196,933 | 67,803,325 | 744,408,745 |
| 2016 | 1,001,729,167 | 403,064,509 | 88,674,192 | 913,054,975 |
| 2017 | 918,867,866 | 414,465,861 | 91,182,489 | 827,685,377 |
| 2018 | 993,123,225 | 424,847,756 | 93,466,506 | 899,656,719 |
| 2019 | 1,080,284,126 | 426,317,501 | 93,789,850 | 986,494,276 |
| 2020 | 1,007,956,581 | 431,749,637 | 94,984,920 | 912,971,661 |
| 2021 | 1,221,885,391 | 469,090,949 | 103,200,009 | 1,118,685,382 |

A116

| 2022 Q1–Q2 | 716,896,904 | 288,666,628 | 63,506,658 | 653,390,246 |
| Total | 8,585,824,777 | 3,523,107,875 | 775,083,732 | 7,810,795,045 |

To determine the net income from the Lakehead System attributable to Line 5, the parties propose using a "barrel-miles" analysis, which is the barrels of petroleum product transported via the pipeline times the number of miles the barrels traveled on Line 5 for each year. That amount, which is reflected by the "allocation factor" for light crude ("LGT") and NGLs in the table below[11] is multiplied by the after-tax net income (minus 22% depreciation) from the Lakehead System to determine the after-tax net income attributable to Line 5. The amount of the Line 5 after-tax net income attributable to the 12 parcels at issue is then calculated by multiplying the total Line 5 after-tax net income by 0.0036, which reflects that the 12 parcels (2.33 miles) were, on average, 0.36 percent of Line 5's 642 miles during the relevant years. That figure is then multiplied by the Band's average weighted ownership share in the 12 parcels for each year,[12] to determine the total amount owed to the Band in net income for Line 5:

| Year | Allocation Factor (%) | | Line 5 after-tax net income minus 22% depreciation | | | Pro-rata income for 2.33 miles of Line 5 (0.36%) | Band Weighted Average Share of 12 Parcels (%) | Band's Share of Line 5 Income |
|---|---|---|---|---|---|---|---|---|
| | LGT | NGL | LGT | NGL | Total | | | |
| 2013 | 18.8 | 3.3 | 30,909,905 | 5,425,675 | 36,335,580 | 130,808 | 58.412 | 76,408 |
| 2014 | 17.7 | 3.1 | 104,426,332 | 12,325,684 | 116,752,016 | 420,307 | 58.727 | 246,834 |

[11] (Olive Rep. (Dkt. #577) 19–21.)
[12] (Dfts.' Trial Exh. 1456 (shows Band's percentage of ownership in each parcel each year).)

A117

| 2015 | 15.0 | 2.8 | 111,661,312 | 20,843,444 | 132,504,756 | 477,017 | 58.727 | 280,138 |
| 2016 | 13.3 | 2.6 | 121,436,312 | 23,739,429 | 145,175,741 | 522,633 | 59.938 | 313,256 |
| 2017 | 12.4 | 2.4 | 102,632,987 | 19,864,449 | 122,497,436 | 440,991 | 76.302 | 336,485 |
| 2018 | 12.3 | 2.3 | 110,657,776 | 20,692,105 | 131,349,881 | 472,860 | 76.336 | 360,962 |
| 2019 | 12.7 | 2.3 | 125,284,773 | 22,689,368 | 147,974,141 | 532,707 | 76.336 | 406,647 |
| 2020 | 10.9 | 2.2 | 99,513,911 | 20,085,377 | 119,599,288 | 430,557 | 76.717 | 330,310 |
| 2021 | 11.8 | 2.0 | 132,004,875 | 22,373,708 | 154,378,583 | 555,763 | 76.721 | 426,387 |
| 2022 Q1–Q2 | 12.1 | 1.9 | 79,060,220 | 12,414,415 | 91,474,635 | 329,308 | 76.721 | 252,648 |
| Total | -- | -- | -- | -- | 1,119,042,057 | | -- | **3,030,075** |

As reflected above, therefore, the Band's total share of Line 5 income from January 2013 to the second quarter of 2022 is $3,030,075, although that amount must still be converted to net present value.  Enbridge's expert proposed using a 30-year treasury rate to reflect the Band's "time value of money."  However, the purpose of this remedy is *disgorgement* of the benefit to Enbridge derived from its wrongdoing, not the value to the Band had it been awarded Enbridge's profits sooner.  Thus, the court agrees with the Band's expert, Leistra-Jones, that the weighted average cost of capital, listed on Enbridge's FERC Form 6, is far and away the more appropriate measure of the present value of net income owed to the Band.  Indeed, Enbridge's own expert agreed that the weighted average cost of capital can serve as an estimate for the time value of money of a corporation.  (Dkt. #602 (10/27/22 AM Train Tr.) 122 (Olive).)  In particular, Leistra-Jones used the weighted average cost of capital to determine the appropriate discount rates for converting the net

**A118**

income to present value.  (Leistra-Jones Rep. (dkt. #573) 63, Table D-3.)  Applying those

discount rates to the numbers above results in the following net profits owed to the Band

through the second quarter of 2022:

| Year | Band's Share of Line 5 Income | Discount Factor | Band's Share of Line 5 Income Present Day Value (2022) |
|---|---|---|---|
| 2013 (June—Dec) | 76,408 | 2.172 | 165,958 |
| 2014 | 246,834 | 2.006 | 495,149 |
| 2015 | 280,138 | 1.863 | 521,897 |
| 2016 | 313,256 | 1.709 | 535,355 |
| 2017 | 336,485 | 1.578 | 530,973 |
| 2018 | 360,962 | 1.434 | 517,620 |
| 2019 | 406,647 | 1.309 | 532,301 |
| 2020 | 330,310 | 1.185 | 391,417 |
| 2021 | 426,387 | 1.079 | 460,072 |
| 2022 Q1–Q2 | 252,648 | 1.030 | 260,227 |
| Total | 3,030,075 | -- | **4,410,969** |

Based on the above calculations, Enbridge must disgorge $4,410,969 to the Band

to account for past-profits attributed to its operation of Line 5 on the 12 allotment parcels

for January 2013 through the second quarter of 2022.  In addition, Enbridge must continue

to disgorge profits to the Band on a yearly basis until Line 5 is removed from the 12

allotment parcels under the same formula set forth above.  Specifically, Enbridge must:  (1)

# A119

calculate after-tax income (based on FERC Form 6 tax rates) for the Lakehead System, minus 22 percent of the depreciation taken for the Lakehead System; (2) multiply that amount by the appropriate allocation factors for Line 5; (3) calculate the pro-rate amount attributable to the 2.33 miles of Line 5 running on the allotment parcels; (4) divide that amount by the Band's percentage of ownership in the 2.33 miles; and (5) convert the total amount to net present value using Enbridge's weighted average cost of capital.

The Band further argues that additional profits should be disgorged by Enbridge based on the value of effectively delaying a reroute, estimated to cost $500 million. Enbridge argues that cost-avoidance is an improper measure of profits, but the court disagrees. In evaluating a defendant's unjust enrichment that should be disgorged to a plaintiff, "there is no single way to measure the benefit conferred on a defendant." *Epic Sys. Corp. v. Tata Consultancy Servs. Ltd.*, 980 F.3d 1117, 1130 (7th Cir. 2020). "The important considerations are that a judge or jury calculates the benefit to the defendant— not the loss to the plaintiff—and that this calculation is done with reasonable certainty." *Id.* If the benefit to the defendant can be calculated with reasonable certainty, "'negative unjust enrichment,' consisting of the unjust avoidance of a loss," can be an appropriate measure of a defendant's unjust enrichment. *Reich v. Cont'l Cas. Co.*, 33 F.3d 754, 756 (7th Cir. 1994); *see also* Restatement (Third) of Restitution and Unjust Enrichment § 51 (2011) ("Profit includes *any form* of use value, proceeds, or consequential gains (§ 53) that is identifiable and measurable and not unduly remote.") (emphasis added).

Specifically, the Band contends that Enbridge realized an economic benefit by unjustly delaying the construction costs associated with a reroute and decommissioning of

the pipeline on the Reservation.  The Band's expert, Leistra-Jones, estimated Enbridge's economic benefit of delaying construction on the pipeline segment as $296,234,750, in net present value terms as of October 24, 2022, using an assumed in-service date of December 31, 2025, and Enbridge's internal documents estimating the costs of reroute and decommission of the pipeline.  (Leistra-Jones Rep. (dkt. #573) 26.)  Enbridge adduced no contrary evidence to show that Leistra-Jones' numbers or calculations were too high or low, but it does object to his calculations on the grounds that Leistra-Jones is not a construction cost estimator and that his analysis is wholly speculative.

Even though Enbridge did a poor job of presenting contrary evidence, the court is concerned that Leistra-Jones' cost-avoidance calculations for a reroute of Line 5 on the Reservation would result in disgorgement disproportionate to Enbridge's trespass on a few parcels.  Accordingly, the court will instead require Enbridge to disgorge $740,699 to account for its ongoing cost-avoidance as to those parcels, calculated by multiplying the Band's average ownership interest of 69.455 percent in the 12 parcels by .36 percent (2.33/642 miles) of the $296,234,750 savings figure proposed by Leistra-Jones.

Finally, there is a question whether the court can or should increase Enbridge's disgorgement for each year that Enbridge remains in trespass on the Band's land.  Although the court carefully considered such relief, the court was unable to find legal authority permitting the court to impose such a penalty as a form of equitable relief.  To the contrary, equitable, profits-focused remedies are not intended to be penalties.  *Liu v. Sec. & Exch. Comm'n*, 140 S. Ct. 1936, 1944, 1949 (2020); *see also* Restatement (Third) of Restitution and Unjust Enrichment § 51(5) (purpose of restitution as "eliminat[ing] profit from the

**A121**

wrongdoing while avoiding, so far as possible, the imposition of a penalty"). Accordingly, because the court is acting in equity, it will not impose escalating penalties on Enbridge.

### 3. Injunctive relief for trespass

Finally, the Band requests that the court enter a permanent injunction that would prohibit the further transport of crude oil and natural gas on Line 5 through the 12 parcels owned by the Band. Specifically, the Band has requested that the court require Enbridge to cease use of Line 5 across the relevant parcels within a set time frame to allow oil and natural gas markets to adjust to decommissioning of Line 5. One problem is that the parties have wildly different estimates as to how long that time frame should be.

As the court explained at summary judgment, trial and again in this opinion, there are equitable and practical considerations that affect the scope and timing of the Band's injunction request. In particular, as laid out above, the two sides presented conflicting expert testimony from oil industry economists and experts in the logistics of shipping crude oil and NGLs, who provided varying opinions regarding the impact of shutting down Line 5, as well as whether there are viable mechanisms for replacing the energy products currently conveyed by the pipeline.

That being said, the court concludes that the Band is ultimately entitled to permanent injunctive relief on its trespass claim under a fair reading of the current law applicable to its sovereign rights. Plus, Enbridge has presented no legal authority supporting its position that the court could permit it to trespass indefinitely on the Band's land. Nor has Enbridge cited any legal authority suggesting that the court could effectively force a renewal of expired easements despite the Band's sovereignty, by permitting

Enbridge to pay a fee or profits while continuing to operate its pipeline.  Similarly, although equitable concerns may displace tribal sovereignty in extraordinary situations, such as where the Tribe is asserting rights over land from which it was displaced hundreds of years ago, as in *City of Sherrill, N.Y. v. Oneida Indian Nation of New York,* 544 U.S. 197, 217 (2005), and *Cayuga Indian Nation of N.Y. v. Pataki*, 413 F.3d 266, 269 (2d Cir. 2005), this case does not present such extraordinary circumstances.  Instead, the Band has never abandoned its rights to the parcels at issue, and Enbridge has always operated the pipeline under rights of way issued by the BIA on behalf of the Band, other than for the 10 years after its easement rights on the 12 parcels had expired.

As discussed above, the court has been and still is wary of permanently shutting down the pipeline without providing adequate time for market adjustments, and hopefully, even for Enbridge to complete a proposed reroute of Line 5, which Enbridge represents would likely take 5 years for permitting and a turnkey bypass to be put in place.  Frankly, absent extraordinary efforts by Enbridge and intervention by federal officials, even this appears to be optimistic given the organized opposition to it, including by the Band.  However, Enbridge has now had 10 years since losing its rights of way, including four years of litigating, to move its bypass forward.  Considering all the evidence, the court cannot countenance an indefinite delay or even justify what would amount to a five-year forced easement with little realistic prospect of a reroute proceeding even then.  Nevertheless, the court will give Enbridge an additional three years to complete a reroute.  If Enbridge fails to do so, the three years will at least give the public and other affected market players time to adjust to a permanent closure of Line 5.  It will also give Enbridge sufficient time to

**A123**

appeal this court's injunctive order or make new law.  At the expiration of three years from the date of this order, therefore, Enbridge must have decommissioned Line 5 on the 12 affected parcels, as well as arranged removal of any sidelined pipe and remediation of area.

ORDER

IT IS ORDERED that:

1.  Defendants Enbridge Energy Company, Inc. and Enbridge Energy, L.P. shall adopt and implement its December 2022 monitoring and shutdown plan in full, including the court's modifications set forth in this order, within 21 days of the date of this order.

2.  Defendants shall disgorge $5,151,668 to plaintiff Bad River Band of the Lake Superior Tribe of Chippewa Indians for defendants' past trespass on the Band's 12, former allotment parcels.

3.  Defendants shall continue disgorging profits to the Band on a quarterly basis according to the formular set forth in this opinion so long as Line 5 operates in trespass of the 12, former allotment parcels.

4.  Defendants are ENJOINED to cease operation of Line 5 on any parcel within the Band's tribal territory on which defendants lack a valid right of way and to arrange reasonable remediation at those sites within three years of the date of this order.

5.  The parties may have until Friday, June 23, 2023, to seek any clarification of this order in writing, at which time the court will proceed to enter final judgment, or if necessary, schedule a brief telephonic hearing to address any remaining concerns.

Entered this 16th day of June, 2023.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge

**A124**

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

BAD RIVER BAND OF THE LAKE
SUPERIOR TRIBE OF CHIPPEWA
INDIANS OF THE BAD RIVER
RESERVATION,                                                          ORDER

                Plaintiff and
                Counter Defendant,

     v.                                                              19-cv-602-wmc

ENBRIDGE ENERGY COMPANY, INC., and
ENBRIDGE ENERGY, L.P.,

                Defendants and
                Counter Claimants,
     v.

NAOMI TILLISON,

                Counter Defendant.

---

Defendant Enbridge Energy has filed a request for clarification of the court's June 16, 2023, post-trial order (dkt. #684), awarding monetary and injunctive relief against Enbridge and in favor of plaintiff Bad River Band of the Lake Superior Tribe of Chippewa Indians. Enbridge raises five points for clarification.

First, Enbridge asks whether the deadlines for completion of certain actions identified in the June 16 order run from the date of the order or the date the court enters final judgment. As stated in the order, all deadlines run from the date of the court's order.

Second, Enbridge seeks confirmation that it can continue to operate Line 5 in the normal course of business for three years from the date of judgment on the parcels for which it lacks a valid right of way. Enbridge's understanding is generally accurate, to the extent that the parcels were part of this lawsuit and Enbridge complies with the court's

order requiring ongoing disgorgement of a portion of its profits to the Band for its continued trespass on those parcels. However, as just noted, operation of Line 5 on those parcels must cease on June 16, 2026.

Third, Enbridge notes that the court's citation to NPDES permitting regulations was inaccurate, because Enbridge's projects fall under Section 401 of the Clean Water Act, not 401. Enbridge is correct that the NPDES regulations do not apply here, and the court's point was only that Enbridge has no judicial or administrative recourse to challenge the Band's permit denials. As Enbridge states in its motion, its only apparent recourse to challenge the Band's permit denials is reapplication. (Dkt. #686, at 2.)

Fourth, Enbridge raises its outstanding motion for a protective order, in which it requested that its June 2021 monitoring and shutdown plan and the parties' December 2022 court-ordered proposals remain sealed. (Dkt. #619.) For security reasons, that motion will be granted.

Fifth and finally, Enbridge challenges the court's conclusion that it lacked legal authority to permit Enbridge to trespass indefinitely on the Band's land. Enbridge argues that it presented legal authority that would permit the court to delay an injunction until it completed a reroute of Line 5. However, as the court has explained, the cases on which Enbridge relies are distinguishable because they involved situations in which (a) the trespass would be temporary or (b) the plaintiff was not injured by the trespass. In contrast, there are significant reasons to question when, and even if, a reroute will ever be operational in this case. Under these circumstances, therefore, the court declines to permit an indefinite, intentional trespass on the Band's sovereign territory.

**A126**

ORDER

IT IS ORDERED that:

1. Defendants request for clarification of this court's June 16, 2023 Order (dkt. #684) is GRANTED as set forth above and final judgment shall be entered PERMANENTLY ENJOINING defendants as follows:

    a. The Defendants Enbridge Energy Company, Inc. and Enbridge Energy, L.P. SHALL ADOPT AND IMPLEMENT its December 2022 monitoring and shutdown plan in full, incorporating the court's modifications set forth in its June 16, 2023 order, on or before Wednesday, July 5, 2023.

    b. Defendants OWE $5,151,668 to plaintiff Bad River Band of the Lake Superior Tribe of Chippewa Indians for defendants' past trespass on the Band's 12, former allotment parcels.

    c. Defendants SHALL CONTINUE DISGORGING profits to the Band on a quarterly basis according to the formula set forth in this opinion so long as Line 5 operates in trespass of the 12, former allotment parcels.

    d. Defendants SHALL CEASE OPERATION of Line 5 on any parcel within the Band's tribal territory on which defendants lack a valid right of way on or before June 16, 2026, and thereafter arrange prompt, reasonable remediation at those sites.

2. Enbridge's motion for a protective order (dkt. #619) is GRANTED.

3. The clerk of court is DIRECTED to enter final judgment in this case although jurisdiction is retained for purposes of enforcement of its permanent injunction.

Entered this 26th day of June, 2023.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge

**A127**

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

BAD RIVER BAND OF THE LAKE
SUPERIOR TRIBE OF CHIPPEWA
INDIANS OF THE BAD RIVER
RESERVATION,                                                          Case No.  19-cv-602-wmc

      Plaintiff and Counter-Defendant,

  v.

ENBRIDGE ENERGY COMPANY, INC.,
and ENBRIDGE ENERGY, L.P.,

      Defendants and Counter-Claimants,

  v.

NAOMI TILLISON,

      Counter-Defendant.

---

## AMENDED FINAL JUDGMENT IN A CIVIL CASE

---

IT IS ORDERED AND ADJUDGED that judgment is entered in favor of plaintiff Bad River Band of the Lake Superior Tribe of Chippewa Indians of the Bad River Reservation ("the Band") on: its trespass, unjust enrichment, and federal public nuisance claims; defendants' counterclaims for breach of contract and breach of a duty of good faith and fair dealing; and defendants' counterclaims for declaratory and injunctive relief against the Band and counter-defendant Naomi Tillison.

IT IS FURTHER ORDERED AND ADJUDGED that judgment is entered in favor of defendants Enbridge Energy Company, Inc., and Enbridge Energy, L.P., and against the

**A128**

Judgment in a Civil Case                                                    Page 2

Band on the Band's Wisconsin public nuisance claim, its regulatory authority claim, and

its ejectment claim.

IT IS FURTHER ORDERED AND ADJUDGED that judgment is entered

permanently enjoining defendants Enbridge Energy Company, Inc., and Enbridge Energy,

L.P. as follows:

1. Defendants shall adopt and implement their December 2022 monitoring and
   shutdown plan in full, incorporating the court's modifications set forth in its
   June 16, 2023 order, on or before Wednesday, July 5, 2023.

2. Defendants shall disgorge $5,151,668 to the Band for defendants' past
   trespass on the Band's 12, former allotment parcels in which the Band has
   full or fractional ownership.

3. Defendants shall continue disgorging profits to the Band on a quarterly basis
   according to the formula set forth in the court's June 16, 2023 order so long
   as Line 5 operates in trespass of the 12, former allotment parcels.

4. Defendants shall cease operation of Line 5 on any parcel within the Band's
   tribal territory on which defendants lack a valid right of way on or before
   June 16, 2026, and thereafter arrange prompt, reasonable remediation at
   those sites.

Approved as to form this 29th day of June, 2023.

William M. Conley
District Judge

Joel Turner
Clerk of Court

June 29, 2023
Date

**A129**

**CERTIFICATE OF SERVICE**

I certify that on September 11, 2023, I caused a true and correct copy of the foregoing brief and short appendix to be served via the Court's ECF system upon all counsel of record. I also certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ Alice E. Loughran
Alice E. Loughran
STEPTOE & JOHNSON LLP
(202) 429-6202