Nos. 23-2309 & 23-2467

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

BAD RIVER BAND OF THE LAKE SUPERIOR TRIBE OF CHIPPEWA INDIANS OF
THE BAD RIVER RESERVATION,
*Plaintiff-Appellee, Cross-Appellant,*

*v.*

ENBRIDGE ENERGY COMPANY, INC. AND ENBRIDGE ENERGY, L.P.,
*Defendants-Appellants, Cross-Appellees.*

ENBRIDGE ENERGY COMPANY, INC. AND ENBRIDGE ENERGY, L.P.,
*Counter-Plaintiffs, Appellants/Cross-Appellees,*

*v.*

BAD RIVER BAND OF THE LAKE SUPERIOR TRIBE OF CHIPPEWA INDIANS OF
THE BAD RIVER RESERVATION AND NAOMI TILLISON,
*Counter-Defendants, Appellees/Cross-Appellants.*

On Appeal from the United States District Court
for the Western District of Wisconsin, No. 3:19-cv-00602-wmc
The Honorable William M. Conley, District Court Judge

## BRIEF OF AMICI CURIAE AMERICAN FUEL & PETROCHEMICAL MANUFACTURERS, AMERICAN PETROLEUM INSTITUTE, AND LIQUID ENERGY PIPELINE ASSOCIATION IN SUPPORT OF ENBRIDGE AND REVERSAL

Michael B. Schon
*Counsel of Record*
Shannon Grammel
LEHOTSKY KELLER COHN LLP
200 Massachusetts Ave. NW
Washington, DC 20001
(512) 693-8350
September 18, 2023     mike@lkcfirm.com

## CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Under Federal Rule of Appellate Procedure 26.1 and Seventh Circuit Rule 26.1(a) and (b), American Fuel & Petrochemical Manufacturers ("AFPM") certifies that it is incorporated under the laws of Delaware. AFPM has no parent entity, and no publicly held corporation or similarly situated legal entity has 10% or greater ownership of AFPM. American Petroleum Institute ("API") certifies that it is incorporated under the laws of the District of Columbia. API has no parent entity, and no publicly held corporation or similarly situated legal entity has 10% or greater ownership of API. Liquid Energy Pipeline Association ("LEPA") certifies that it is incorporated under the laws of the District of Columbia. LEPA has no parent entity, and no publicly held corporation or similarly situated legal entity has 10% or greater ownership of LEPA.

/s/ Michael B. Schon
Michael B. Schon
*Counsel of Record for Amici Curiae*
*American Fuel & Petrochemical*
*Manufacturers, American Petroleum*
*Institute, and Liquid Energy Pipeline*
*Association*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ............................................................. iii

INTEREST OF AMICI CURIAE.........................................................1

ARGUMENT ...............................................................................3

    I.   Plaintiffs' Anticipatory Nuisance Claims Are Displaced
        And Preempted Because They Stand As An Obstacle To
        Achieving Federal Law's Goal Of Uniform Pipeline Safety
        Regulation. ...........................................................................3

   II.  Plaintiffs' Anticipatory Nuisance Claims Are Displaced
        And Preempted Because Congress Has Occupied The Field
        Of Pipeline Safety...................................................................10

CONCLUSION............................................................................17

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Am. Elec. Power Co. v. Connecticut,*
564 U.S. 410 (2011) .......................................................................4, 5, 15

*ANR Pipeline Co. v. Iowa State Com. Comm'n,*
828 F.2d 465 (8th Cir. 1987) ...............................................................12

*Cipollone v. Liggett Grp., Inc.,*
505 U.S. 504 (1992) .............................................................................10

*City of Milwaukee v. Illinois & Michigan,*
451 U.S. 304 (1981) ...........................................................4, 5, 10, 13, 16

*Crosby v. Nat'l Foreign Trade Council,*
530 U.S. 363 (2000) ...............................................................................3

*Freightliner Corp. v. Myrick,*
514 U.S. 280 (1995) ............................................................................3, 8

*Gordon v. United Van Lines, Inc.,*
130 F.3d 282 (7th Cir. 1997) .................................................................5

*Jones v. Rath Packing Co.,*
430 U.S. 519 (1977) ...............................................................................4

*Michigan v. Enbridge Energy, Ltd. P'ship,*
571 F. Supp. 3d 851 (W.D. Mich. 2021) ...............................................15

*N. Border Pipeline Co. v. Jackson County,*
512 F. Supp. 1261 (D. Minn. 1981) ......................................................12

*N. Nat. Gas Co. v. State Corp. Comm'n of Kan.,*
372 U.S. 84 (1963) ...............................................................................16

*Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n,*
461 U.S. 190 (1983) .............................................................15

*People of State of Ill. v. Outboard Marine Corp.,*
680 F.2d 473 (7th Cir. 1982) .............................................4

*Pierce v. Visteon Corp.,*
791 F.3d 782 (7th Cir. 2015) .............................................3

*Williams Pipe Line Co. v. City of Mounds View,*
651 F. Supp. 551 (D. Minn. 1987) ....................................7

*Wisconsin Cent., Ltd. v. Shannon,*
539 F.3d 751 (7th Cir. 2008) ......................................10, 11

**Statutes, Regulations & Rules**

49 U.S.C. § 108 .....................................................................14

Pipeline Safety Act, 49 U.S.C. §§ 60101-143 .........................6, 7, 8, 11

49 U.S.C. § 60104 ..........................................................6, 8, 11

49 U.S.C. § 60117 ................................................................15

Accountable Pipeline Safety and Partnership Act of 1996, Pub. L. No. 104-304, 110 Stat. 3793 .........................................12

Natural Gas Pipeline Safety Act of 1968, Pub. L. No. 90-481, 82 Stat. 720 ........................................................................11

Natural Gas Pipeline Safety Act of 1976, Pub. L. No. 94-477, 90 Stat. 2073 (1976) .............................................................11

Pipeline Safety Act of 1979, Pub. L. No. 96-129, 93 Stat. 989 .........11

Pipeline Safety Act of 1992, Pub. L. No. 102-508, 106 Stat. 3289 ....12

Pipeline Safety Improvement Act of 2002, Pub. L. No. 107-355, 116 Stat. 2985 ................................................................13

Pipeline Safety Reauthorization Act of 1988, Pub. L. No. 100-561, 102 Stat. 2805 ..............................................................12

Protecting Our Infrastructure of Pipelines and Enhancing Safety Act of 2016, Pub. L. No. 114-183, 130 Stat 514 ................................13

49 C.F.R. Part 195 ................................................................14

Fed. R. App. P. 29 ..................................................................1

**Other Authorities**

Paul Biancardi & Lisa M. Bogardus, *From "Command and Control" to Risk Management: The Evolution of the Federal Natural Gas Pipeline Safety Program*, 16 Energy L.J. 461 (1995) ...................7

Enbridge Inc., *About Line 5*, https://perma.cc/G9HL-VBNU ...........................9

Gov't of Canada, *Government of Canada Statement on the 1977 Canada-U.S. Transit Pipelines Treaty as It Relates to Line 5 on the Bad River Band Reservation in Wisconsin* (May 16, 2023), https://perma.cc/HW58-NG6F...................................................10

*Pipeline Safety: Potential for Damage to Pipeline Facilities Caused by Earth Movement and Other Geological Hazards*, 84 Fed. Reg. 18919 (May 2, 2019) ........................................................14

*Pipeline Safety: Potential for Damage to Pipeline Facilities Caused by Flooding*, 78 Fed. Reg. 41991 (July 12, 2013) ...................................14

*Pipeline Safety: Potential for Damage to Pipeline Facilities Caused by Flooding, River Scour, and River Channel Migration*, 84 Fed. Reg. 14715 (Apr. 11, 2019) ...........................................14

U.S. Dep't of Transp., PHMSA, *Summary of Enforcement Actions*,
   https://perma.cc/SWK7-AN7U ......................................................................16

Bernard L. Weinstein & Terry L. Clower, Consumer Energy
   Alliance, *Enbridge Line 5 | Shutdown Impacts on Transportation
   Fuel* (2022), https://perma.cc/2BRM-KB79......................................................9

## Interest of Amici Curiae

Amici curiae are national trade associations with members engaged in, and reliant on, all aspects of the oil and natural gas industry.[1] Amici have direct and profound interests in the free flow of petroleum products through a uniformly safe interstate and international network of pipeline systems. Amici submit this brief to emphasize and defend the federal laws that displace and preempt other claims of authority to regulate interstate and international pipeline safety. These federal laws, which apply nationwide, play a critical role in maintaining effective pipeline safety standards and in preventing conflicting regulations across the various jurisdictions that pipelines traverse.

**American Fuel & Petrochemical Manufacturers** ("AFPM") is a national trade association whose membership covers most U.S. refiners and petrochemical manufacturers that receive natural gas, crude oil, and other

---

[1]     All parties have consented to the filing of this brief. No counsel for a party authored this brief in whole or in part, and no person other than amici curiae, their members, and their counsel made a monetary contribution to fund the preparation or submission of this brief. *See* Fed. R. App. P. 29(a)(4)(E).

materials via the natural gas and oil industry's midstream sector. This midstream sector includes pipelines, railroads, vessels, tankers, and trucks. AFPM's members supply products that meet daily needs in homes and businesses, contribute to fulfilling America's fuel and petrochemical needs, strengthen economic and national security, and support nearly three million jobs.

**American Petroleum Institute** ("API") represents all segments of America's natural gas and oil industry, which supports more than 11 million U.S. jobs and is backed by a growing grassroots movement of millions of Americans. API's nearly 600 members produce, process, and distribute the majority of the Nation's energy, and participate in API Energy Excellence, which is accelerating environmental and safety progress by fostering new technologies and transparent reporting.

**Liquid Energy Pipeline Association** ("LEPA") promotes responsible policies, safety excellence, and public support for liquids pipelines. LEPA represents pipelines transporting 97 percent of all reported hazardous liquids barrel miles, extending over 225,000 in total length. LEPA's diverse

membership includes large and small pipelines carrying crude oil, refined petroleum products, natural gas liquids, and other energy liquids.

## ARGUMENT

## I. Plaintiffs' Anticipatory Nuisance Claims Are Displaced And Preempted Because They Stand As An Obstacle To Achieving Federal Law's Goal Of Uniform Pipeline Safety Regulation.

Plaintiff's anticipatory nuisance claims are preempted because they would frustrate Congress's intent to provide for a system of pipeline safety standards that apply uniformly across the country.

It is well established that a common-law cause of action is preempted where it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Freightliner Corp. v. Myrick*, 514 U.S. 280, 287 (1995) (internal quotation marks and citation omitted); *cf. Pierce v. Visteon Corp.*, 791 F.3d 782, 787 (7th Cir. 2015) ("Common-law doctrines yield to statutes." (citation omitted)). The determination whether the common law poses an impediment to the achievement of federal objectives is "informed by examining the federal statute as a whole and identifying its purpose and intended effects." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S.

3

363, 373 (2000). Federal statutory law can displace both state and federal common law. *See Am. Elec. Power Co. v. Connecticut*, 564 U.S. 410, 423-24 (2011) (holding that Clean Air Act displaces federal common-law cause of action for nuisance); *City of Milwaukee v. Illinois & Michigan*, 451 U.S. 304, 317 (1981) (holding that Clean Water Act displaces federal common-law cause of action for nuisance).

In fact, when Congress enacts federal regulatory and enforcement mechanisms to address the exact concerns that otherwise would be pursued under federal common law, as it has here, courts presume preemption. Courts faced with an apparent conflict between federal common law and a federal regulatory scheme "'start with the assumption' that it is for Congress, not federal courts, to articulate the appropriate standards to be applied as a matter of federal law." *City of Milwaukee*, 451 U.S. at 317 (quoting *Jones v. Rath Packing Co.*, 430 U.S. 519, 525 (1977)). They apply, in other words, a "'presumption in favor of preemption of federal common law' . . . whenever Congress has legislated on a subject." *People of State of Ill. v. Outboard Marine Corp.*, 680 F.2d 473, 480 (7th Cir. 1982) (citation omitted). As the Supreme

Court has explained, "[l]egislative displacement of federal common law does not require the 'same sort of evidence of a clear and manifest [congressional] purpose' demanded for preemption of state law." *Am. Elec. Power*, 564 U.S. at 423 (second alteration in original; quoting *City of Milwaukee*, 451 U.S. at 317).

A major reason for this is that when *federal* common law butts up against *federal* statutory law, concerns about "'[d]ue regard for the presuppositions of our embracing federal system . . . as a promoter of democracy' do[] not enter the calculus." *Id.* (citation omitted). Instead, countervailing concerns arise with respect to judicial "formulation of appropriate federal standards . . . through application of often vague and indeterminate nuisance concepts and maxims of equity jurisprudence." *City of Milwaukee*, 451 U.S. at 317; *cf. Gordon v. United Van Lines, Inc.*, 130 F.3d 282, 287 (7th Cir. 1997) ("When Congress has spoken this carefully to the subject of remedies, it would exceed the proper role of the court for us to read in additional or different remedies." (citation omitted)).

Here, Congress has made clear its intent that pipeline safety standards apply uniformly across the United States. Congress enacted the Pipeline Safety Act (the "Act"), 49 U.S.C. §§ 60101-143, to establish a uniform, nationwide system of "protection against risks to life and property posed by pipeline transportation and pipeline facilities." *Id.* § 60102(a)(1). The Act achieves that uniformity by displacing every state's authority to regulate interstate pipelines. *Id.* § 60104(c). It provides that states "may not adopt or continue in force safety standards for interstate pipeline facilities or interstate pipeline transportation." *Id.* Such locality-specific safety standards are prohibited regardless whether they are consistent with federally promulgated safety standards. In this way, the Act ensures that the same, federally promulgated pipeline safety standards apply uniformly throughout all states and localities.

The Act reflects Congress's determination that a uniform national system of interstate pipeline regulation is the best way to protect human health, safety, and the environment. If the Act did not guarantee uniformity, interstate pipelines would be subject to a patchwork of inconsistent, overlapping,

and conflicting state and local regulations. It would be near impossible for pipelines traversing multiple states and localities to comply with all of these inconsistent regulations. *See* Paul Biancardi & Lisa M. Bogardus, *From "Command and Control" to Risk Management: The Evolution of the Federal Natural Gas Pipeline Safety Program*, 16 Energy L.J. 461, 488 (1995) (explaining that preemption protects transporters and others "from the impossible burden of complying with inconsistent state and local requirements"). And their inevitably futile efforts to do so would jeopardize pipeline safety rather than protect it. Interstate "pipelines run through [many] states, and presumably through small and large plots of land belonging to vast numbers of persons. Were each of these landowners entitled to demand compliance with their own safety standards, the clear Congressional goal of a national standard for . . . pipeline safety would be thwarted." *Williams Pipe Line Co. v. City of Mounds View*, 651 F. Supp. 551, 569 (D. Minn. 1987).

Allowing Plaintiff's claims, which seek to use tort remedies to impose safety standards above and beyond those required by the Act, would

frustrate the Act's aim of achieving uniformity in pipeline safety.[2] The antic-

ipatory nature of Plaintiff's claims lays bare their regulatory aim. Plaintiff

seeks not to remedy some harm that has already occurred. Rather, Plaintiff

seeks to have a court impose preventative pipeline safety standards—be-

yond those that have been federally promulgated—to keep a harm from hap-

pening. Were a court to do so, it would effectively be "adopt[ing] . . . safety

standards for interstate pipeline facilities or interstate pipeline transporta-

tion" that are not uniform across the country, in direct contravention of the

Act. 49 U.S.C. § 60104(c). Congress meant to prevent such one-off, locality-

specific safety standards with the Act, and imposing them via tort law would

"stand[] as an obstacle to the accomplishment and execution of the full pur-

poses and objectives of Congress." *Freightliner*, 514 U.S. at 287 (internal quo-

tation marks and citation omitted).

The importance of uniformity in pipeline safety is heightened by the

significant consequences of the types of remedies sought through claims like

---

[2]   For the reasons explained in Enbridge's brief (at 57-59), the Act's saving
clause does not permit Plaintiff's claims.

Plaintiff's. Shutting down Line 5, even for a brief period, would be incredibly disruptive. Refineries depend on oil supply from pipelines, including Line 5, through which up to 540,000 barrels of crude oil and natural gas liquids pass daily.[3] Consumers depend on Line 5, too. The products Line 5 transports "heat homes and businesses, fuel vehicles, and power industry."[4] If Line 5 shuts down indefinitely—due to the standards imposed in response to a federal common-law claim regarding a single locality that encompasses a minuscule fraction of the pipeline's overall mileage—"families and businesses across the Midwest will spend at least $23.7 billion more on gasoline and diesel over the following five years due to the resulting loss of production at area refineries."[5] As the Government of Canada recently put it, the "energy security of both Canada and the United States would be directly

---

[3] *See* Enbridge Inc., *About Line 5*, https://perma.cc/G9HL-VBNU.

[4] *Id.*

[5] Bernard L. Weinstein & Terry L. Clower, Consumer Energy Alliance, *Enbridge Line 5 | Shutdown Impacts on Transportation Fuel* 3 (2022), https://perma.cc/2BRM-KB79.

impacted" were the continued operation of Line 5 disrupted by a court-ordered, tort-law remedy.[6]

## II.     Plaintiffs' Anticipatory Nuisance Claims Are Displaced And Preempted Because Congress Has Occupied The Field Of Pipeline Safety.

Plaintiff's anticipatory nuisance claims are also preempted because Congress has entirely occupied the field of pipeline safety. Field preemption "occurs 'if federal law so thoroughly occupies a legislative field as to make reasonable the inference that Congress left no room for the States to supplement it.'" *Wisconsin Cent., Ltd. v. Shannon*, 539 F.3d 751, 762 (7th Cir. 2008) (quoting *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 516 (1992)). Federal common law may likewise be displaced by federal statute where Congress "has occupied the field," including "through the establishment of a comprehensive regulatory program supervised by an expert administrative agency." *City of Milwaukee*, 451 U.S. at 317. That is precisely the case when it comes to pipeline safety.

---

[6]     Gov't of Canada, *Government of Canada Statement on the 1977 Canada-U.S. Transit Pipelines Treaty as It Relates to Line 5 on the Bad River Band Reservation in Wisconsin* (May 16, 2023), https://perma.cc/HW58-NG6F.

"The long history of pervasive congressional regulation over the [pipe-line] industry is undeniable." *Shannon*, 539 F.3d at 762 (looking to "pervasive congressional regulation over the railway industry" in finding field preemption). The first statute regulating pipeline safety was the Natural Gas Pipeline Safety Act of 1968, Pub. L. No. 90-481, 82 Stat. 720. The stated purpose of this law was to "authorize the Secretary of Transportation to prescribe safety standards for the transportation of natural and other gas by pipeline." *Id.* at 720. Congress amended the Natural Gas Pipeline Safety Act in 1976 to add additional safety requirements, Pub. L. No. 94-477, 90 Stat. 2073 (1976). And it brought liquid pipelines within the purview of its regulatory scheme with the Pipeline Safety Act of 1979, Pub. L. No. 96-129, 93 Stat. 989.

Congress's intent to occupy the field of pipeline safety is underscored by the fact that much of its regulation of pipeline safety has been found to have a preemptive effect—ensuring the uniformity of pipeline safety regulation throughout the nation. For example, the Act has expressly preempted all state-imposed "safety standards for interstate pipeline facilities or interstate pipeline transportation" for decades. 49 U.S.C. § 60104(c). And courts

11

have long recognized that the pervasive federal regulation of natural gas pipeline safety "preempt[s] state regulation of safety issues with respect to interstate pipeline facilities." *ANR Pipeline Co. v. Iowa State Com. Comm'n*, 828 F.2d 465, 469 (8th Cir. 1987). As those courts have explained, "there is no room for any state regulation be it consistent with, or more or less stringent than the federal legislation." *Id.* (quoting *N. Border Pipeline Co. v. Jackson County*, 512 F. Supp. 1261, 1265 (D. Minn. 1981)).

Through subsequent enactments, Congress further strengthened the role of federal regulators, underscoring Congress's view that pipeline safety should be strictly set and enforced via federal regulatory programs. *See* Pipeline Safety Reauthorization Act of 1988, Pub. L. No. 100-561, 102 Stat. 2805 (bringing carbon dioxide pipelines within the scope of Congress's regulatory framework); Pipeline Safety Act of 1992, Pub. L. No. 102-508, 106 Stat. 3289 (seeking to "to increase the safety to humans and the environment from the transportation by pipeline of natural gas and hazardous liquids"); Accountable Pipeline Safety and Partnership Act of 1996, Pub. L. No. 104-304, 110 Stat. 3793 (seeking to "reduce risk to public safety and the environment

associated with pipeline transportation of natural gas and hazardous liquids"); Pipeline Safety Improvement Act of 2002, Pub. L. No. 107-355, 116 Stat. 2985 (seeking to "enhance the security and safety of pipelines"). More recently, Congress enacted the Protecting Our Infrastructure of Pipelines and Enhancing Safety Act of 2016, Pub. L. No. 114-183, 130 Stat 514. This law enhanced the authority of the Pipeline and Hazardous Materials Safety Administration ("PHMSA") to quickly address imminent pipeline safety hazards and established a new, exclusive emergency-order authority. *Id.* § 16, 130 Stat. at 525-26.

If Congress's pervasive and exclusive regulation of pipeline safety weren't enough to manifest Congress's clear intent to occupy the field of pipeline safety, Congress has also vested authority for "supervis[ing]" pipeline safety in "an expert administrative agency." *City of Milwaukee*, 451 U.S. at 317. Congress has specifically directed PHMSA to "assign[] and maint[ain] . . . safety as the highest priority, recognizing the clear intent, encouragement, and dedication of Congress to the furtherance of the highest degree of safety in pipeline transportation and hazardous materials

transportation." 49 U.S.C. § 108(b). In carrying out its mission, PHMSA has promulgated pipeline safety regulations that govern all facets of interstate pipeline operations, including design, specifications, operation, and maintenance to ensure safety. *See, e.g.*, 49 C.F.R. Part 195. And PHMSA is active in specifically monitoring and preventing the risks of flooding and erosion—the very same hazards Plaintiff asks the courts to prevent in this case.[7]

Of particular importance, Congress has given PHMSA alone the "exclusive jurisdiction to issue an emergency order requiring pipeline closure

---

[7]     *See, e.g., Pipeline Safety: Potential for Damage to Pipeline Facilities Caused by Earth Movement and Other Geological Hazards*, 84 Fed. Reg. 18919, 18920 (May 2, 2019) (listing several actions "[p]ipeline operators should consider taking . . . to ensure pipeline safety"); *Pipeline Safety: Potential for Damage to Pipeline Facilities Caused by Flooding, River Scour, and River Channel Migration*, 84 Fed. Reg. 14715, 14716 (Apr. 11, 2019) ("[S]evere flooding, river scour, and river channel migration may create unusual operating conditions that can adversely affect the safe operation of a pipeline, and may require corrective action. . . . If an operator determines outside force damage (e.g., earth movement, floods) is a threat to the pipeline, the operator must take steps to minimize the probability of damage and the consequences of a release under [existing] regulations."); *Pipeline Safety: Potential for Damage to Pipeline Facilities Caused by Flooding*, 78 Fed. Reg. 41991, 41991 (July 12, 2013) ("Severe flooding is the kind of unusual operating condition that can adversely affect the safe operation of a pipeline and require corrective action under [applicable regulations].").

'when an unsafe condition or practice, or a combination of unsafe conditions and practices, constitutes or is causing an imminent hazard.'" *Michigan v. Enbridge Energy, Ltd. P'ship*, 571 F. Supp. 3d 851, 860 (W.D. Mich. 2021) (quoting 49 U.S.C. § 60117(p)). Congress's decision to give exclusive authority to address pipeline emergencies to a single expert federal agency underscores Congress's intent to occupy the field of pipeline safety regulation to achieve national uniformity in all facets of addressing pipeline safety. *See Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 207 (1983) (looking to a federal agency's "exclusive jurisdiction" in finding field preemption). When it comes to regulating pipeline safety, PHMSA, as a pipeline safety expert, "is surely better equipped to do the job than individual district judges issuing ad hoc, case-by-case injunctions." *Am. Elec. Power*, 564 U.S. at 428.

PHMSA maintains an active role in ensuring that interstate pipelines remain safe and subject to uniform, non-overlapping standards. From 2018 through 2022, PHMSA initiated 1,108 enforcement actions against pipeline

operators.[8] Of those actions, 352 resulted in notices of probable violation, and 16 resulted in corrective action orders, typically in "urgent situations arising out of an accident, spill, or other significant, immediate, or imminent safety or environmental concern."[9] Allowing courts like the one below to selectively disrupt PHMSA's ongoing role in monitoring and ensuring pipeline safety under the guise of tort law would "invalidly invade the federal agency's exclusive domain." *N. Nat. Gas Co. v. State Corp. Comm'n of Kan.*, 372 U.S. 84, 92 (1963). It would upset Congress's intentionally uniform pipeline safety scheme—and would pose a threat to safety, health, and the environment.

In sum, Congress has pervasively, consistently, and comprehensively regulated in the field of interstate pipeline safety. "The establishment of such a self-consciously comprehensive program by Congress . . . strongly suggests that there is no room for courts to attempt to improve on that program with federal common law." *City of Milwaukee*, 451 U.S. at 319 (citation

---

[8]  U.S. Dep't of Transp., PHMSA, *Summary of Enforcement Actions*, https://perma.cc/SWK7-AN7U.

[9]  *Id.*

omitted). Plaintiff's common-law anticipatory nuisance claims are therefore

preempted.

## CONCLUSION

The Court should reverse the district court's judgment.

Respectfully submitted,

/s/ Michael B. Schon
Michael B. Schon
    *Counsel of Record*
Shannon Grammel
LEHOTSKY KELLER COHN LLP
200 Massachusetts Ave. NW
Washington, DC 20001
(512) 693-8350
mike@lkcfirm.com

*Counsel for Amici Curiae*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of 7th Cir. R. 29 because it contains 2,990 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionately spaced typeface using Microsoft Word Palatino Linotype 14-point font.

Date: September 18, 2022

*/s/ Michael B. Schon*
Michael B. Schon

### CERTIFICATE OF SERVICE

I hereby certify that on September 18, 2023, I electronically filed the fore-going with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the appellate CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

Date: September 18, 2022

*/s/ Michael B. Schon*
Michael B. Schon