Nos. 23-2309, 23-2467

---

# UNITED STATES COURT OF APPEALS
# FOR THE SEVENTH CIRCUIT

———

BAD RIVER BAND OF THE LAKE SUPERIOR TRIBE OF CHIPPEWA INDIANS OF THE
BAD RIVER RESERVATION,
Plaintiff-Appellee, Cross-Appellant,

v.

ENBRIDGE ENERGY COMPANY, INC., AND ENBRIDGE ENERGY, L.P.,
Defendants-Appellants, Cross-Appellees.

———

ENBRIDGE ENERGY COMPANY, INC., AND ENBRIDGE ENERGY, L.P.,
Counter-Plaintiffs, Appellants/Cross-Appellees,

v.

BAD RIVER BAND OF THE LAKE SUPERIOR TRIBE OF CHIPPEWA INDIANS OF THE
BAD RIVER RESERVATION, and NAOMI TILLISON,
Counter-Defendants, Appellees/Cross-Appellants.

———

Appeal from the U.S. District Court for the Western District of Wisconsin,
No. 3:19-cv-602-wmc, Judge William M. Conley

———

## OPENING AND RESPONSE BRIEF FOR
## THE BAD RIVER BAND AND NAOMI TILLISON

Paul D. Clement
Matthew D. Rowen*
James Xi*
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900

* Supervised by principals of the firm who are
members of the Virginia bar

(Additional counsel on inside cover)

Riyaz A. Kanji
David A. Giampetroni
Lucy W. Braun
Ian P. Fisher
Josh C. Handelsman*
KANJI & KATZEN, P.L.L.C.
P.O. Box 3971
Ann Arbor, MI 48106
(734) 769-5400

* Supervised by principals of the firm who
are members of the Michigan bar

Erick Arnold
BAD RIVER BAND OF THE LAKE
SUPERIOR TRIBE OF CHIPPEWA INDIANS
OF THE BAD RIVER RESERVATION
72682 Maple Street
Odanah, WI 54861
(715) 682-7107

Jane G. Steadman
KANJI & KATZEN, P.L.L.C.
811 1st Avenue, Suite 630
Seattle, WA 98104
(206) 344-8100

Bruce Wallace
HOOPER HATHAWAY PRICE BEUCHE
& WALLACE
126 S. Main Street
Ann Arbor, MI 48104
(734) 662-4426

*Counsel for the Bad River Band of the Lake Superior Tribe of Chippewa Indians and Naomi Tillison, Director of the Mashkiiziibii Natural Resources Department of the Bad River Band, in her official capacity*

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 23-2309, 23-2467

Short Caption: Bad River Band of the Lake Superior Tribe of the Chippewa Indians v. Enbridge Energy Co., Inc.

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

    ☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

    Bad River Band of the Lake Superior Tribe of the Chippewa Indians and Naomi Tillison, in her official capacity

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

    Kanji & Katzen, P.L.L.C.; Hooper Hathaway Price Beuche & Wallace; Stafford Rosenbaum, LLP;

    National Wildlife Federation; Clement & Murphy, PLLC.

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

(4)    Provide information required by FRAP 26.1(b)   Organizational Victims in Criminal Cases:

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

Attorney's Signature: s/ Paul D. Clement    Date: October 11, 2023

Attorney's Printed Name: Paul D. Clement

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes ☐    No ☑

Address: 706 Duke Street, Alexandria, VA 22314

Phone Number: 202-742-8900    Fax Number:

E Mail Address: paul.clement@clementmurphy.com

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 23-2309, 23-2467

Short Caption: Bad River Band of the Lake Superior Tribe of the Chippewa Indians v. Enbridge Energy Co., Inc.

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

        [ ]   **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

    Bad River Band of the Lake Superior Tribe of the Chippewa Indians and Naomi Tillison, in her official capacity

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

    Kanji & Katzen, P.L.L.C.; Hooper Hathaway Price Beuche & Wallace; Stafford Rosenbaum, LLP;

    National Wildlife Federation; Clement & Murphy, PLLC.

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

(4)    Provide information required by FRAP 26.1(b)   Organizational Victims in Criminal Cases:

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

Attorney's Signature: s/ Matthew D. Rowen        Date: October 11, 2023

Attorney's Printed Name: Matthew D. Rowen

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).  Yes [ ]  No [✓]

Address: 706 Duke Street, Alexandria, VA  22314

Phone Number: 202-742-8900        Fax Number:

E Mail Address: matthew.rowen@clementmurphy.com

rev. 12/19 AK

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 23-2309, 23-2467

Short Caption: Bad River Band of the Lake Superior Tribe of the Chippewa Indians v. Enbridge Energy Co., Inc.

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)     The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
    Bad River Band of the Lake Superior Tribe of the Chippewa Indians and Naomi Tillison, in her official capacity

(2)     The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
    Kanji & Katzen, P.L.L.C.; Hooper Hathaway Price Beuche & Wallace; Stafford Rosenbaum, LLP;

    National Wildlife Federation; Clement & Murphy, PLLC.

(3)     If the party, amicus or intervenor is a corporation:

      i)     Identify all its parent corporations, if any; and

      ii)     list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

(4)     Provide information required by FRAP 26.1(b)   Organizational Victims in Criminal Cases:

(5)     Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

Attorney's Signature: **s/ James Xi**         Date:  October 11, 2023

Attorney's Printed Name:  James Xi

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes ☐   No ☑

Address:  706 Duke Street, Alexandria, VA  22314

Phone Number:  202-742-8900             Fax Number:

E Mail Address: james.xi@clementmurphy.com

rev. 12/19 AK

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 23-2309, 23-2467

Short Caption: Bad River Band of the Lake Superior Tribe of the Chippewa Indians v. Enbridge Energy Co., Inc.

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
    Bad River Band of the Lake Superior Tribe of the Chippewa Indians and Naomi Tillison, in her official capacity

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
    Kanji & Katzen, P.L.L.C.; Hooper Hathaway Price Beuche & Wallace; Stafford Rosenbaum, LLP;

    National Wildlife Federation; Clement & Murphy, PLLC.

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

(4)    Provide information required by FRAP 26.1(b)   Organizational Victims in Criminal Cases:

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

---

Attorney's Signature: s/ Jane G. Steadman        Date: October 11, 2023

Attorney's Printed Name: Jane G. Steadman

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes ☐    No ☑

Address: 811 1st Avenue, Suite 630, Seattle, WA 98104

Phone Number: 206-344-8100        Fax Number: 866-283-0178

E Mail Address: jsteadman@kanjikatzen.com

rev. 12/19 AK

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 23-2309, 23-2467

Short Caption: Bad River Band of the Lake Superior Tribe of the Chippewa Indians v. Enbridge Energy Co., Inc.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐ **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)     The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
Bad River Band of the Lake Superior Tribe of the Chippewa Indians and Naomi Tillison, in her official capacity

(2)     The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
Kanji & Katzen, P.L.L.C.; Hooper Hathaway Price Beuche & Wallace; Stafford Rosenbaum, LLP;

National Wildlife Federation; Clement & Murphy, PLLC.

(3)     If the party, amicus or intervenor is a corporation:

    i)     Identify all its parent corporations, if any; and

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

(4)     Provide information required by FRAP 26.1(b)   Organizational Victims in Criminal Cases:

(5)     Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

---

Attorney's Signature: s/ Lucy W. Braun          Date: October 11, 2023

Attorney's Printed Name: Lucy W. Braun

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).     Yes ☐     No ☑

Address: P.O. Box 3971, Ann Arbor, MI 48106

Phone Number: 734-769-5400          Fax Number: 734-769-2701

E Mail Address: lbraun@kanjikatzen.com

rev. 12/19 AK

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 23-2309, 23-2467

Short Caption: Bad River Band of the Lake Superior Tribe of the Chippewa Indians v. Enbridge Energy Co., Inc.

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
    Bad River Band of the Lake Superior Tribe of the Chippewa Indians and Naomi Tillison, in her official capacity

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
    Kanji & Katzen, P.L.L.C.; Hooper Hathaway Price Beuche & Wallace; Stafford Rosenbaum, LLP;

    National Wildlife Federation; Clement & Murphy, PLLC.

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

(4)    Provide information required by FRAP 26.1(b)   Organizational Victims in Criminal Cases:

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

Attorney's Signature: s/ Bruce T. Wallace      Date: October 11, 2023

Attorney's Printed Name: Bruce T. Wallace

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   Yes ☐   No ☑

Address: 126 South Main Street, Ann Arbor, MI 48104

Phone Number: 734-662-4426      Fax Number:

E Mail Address: bwallace@hooperhathaway.com

rev. 12/19 AK

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 23-2309, 23-2467

Short Caption: Bad River Band of the Lake Superior Tribe of the Chippewa Indians v. Enbridge Energy Co., Inc.

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[✓]    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

    Bad River Band of the Lake Superior Tribe of the Chippewa Indians and Naomi Tillison, in her official capacity

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

    Kanji & Katzen, P.L.L.C.; Hooper Hathaway Price Beuche & Wallace; Stafford Rosenbaum, LLP;

    National Wildlife Federation: Clement & Murphy, PLLC.

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

(4)    Provide information required by FRAP 26.1(b)   Organizational Victims in Criminal Cases:

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

---

Attorney's Signature: s/ Riyaz A. Kanji        Date: October 11, 2023

Attorney's Printed Name: Riyaz A. Kanji

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes [✓]  No [ ]

Address: PO Box 3971, Ann Arbor, Michigan 48106

Phone Number: 734-769-5400        Fax Number: 734-769-2701

E Mail Address: rkanji@kanjikatzen.com

rev. 12/19 AK

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 23-2309, 23-2467

Short Caption: Bad River Band of the Lake Superior Tribe of the Chippewa Indians v. Enbridge Energy Co., Inc.

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☑     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)     The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
     Bad River Band of the Lake Superior Tribe of the Chippewa Indians and Naomi Tillison, in her official capacity

(2)     The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
     Kanji & Katzen, P.L.L.C.; Hooper Hathaway Price Beuche & Wallace; Stafford Rosenbaum, LLP;

     National Wildlife Federation; Clement & Murphy, PLLC.

(3)     If the party, amicus or intervenor is a corporation:

     i)     Identify all its parent corporations, if any; and

     ii)     list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

(4)     Provide information required by FRAP 26.1(b)   Organizational Victims in Criminal Cases:

(5)     Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

---

Attorney's Signature: s/ David A. Giampetroni          Date: October 11, 2023

Attorney's Printed Name: David A. Giampetroni

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).     Yes ☐     No ☑

Address: PO Box 3971, Ann Arbor, Michigan  48106

Phone Number: 734-769-5400          Fax Number: 734-769-2701

E Mail Address: dgiampetroni@kanjikatzen.com

                                        rev. 12/19 AK

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 23-2309, 23-2467

Short Caption: Bad River Band of the Lake Superior Tribe of the Chippewa Indians v. Enbridge Energy Co., Inc.

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

       ✓     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

    Bad River Band of the Lake Superior Tribe of the Chippewa Indians and Naomi Tillison, in her official capacity

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

    Kanji & Katzen, P.L.L.C.; Hooper Hathaway Price Beuche & Wallace; Stafford Rosenbaum, LLP;

    National Wildlife Federation: Clement & Murphy, PLLC.

(3)    If the party, amicus or intervenor is a corporation:

    i)     Identify all its parent corporations, if any; and

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

(4)    Provide information required by FRAP 26.1(b)   Organizational Victims in Criminal Cases:

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

---

Attorney's Signature: s/ Ian P. Fisher       Date:  October 11, 2023

Attorney's Printed Name:  Ian P. Fisher

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   Yes ☐   No ✓

Address:  PO Box 3971, Ann Arbor, Michigan  48106

Phone Number: 734-769-5400         Fax Number:  734-769-2701

E Mail Address: ifisher@kanjikatzen.com

rev. 12/19 AK

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 23-2309, 23-2497

Short Caption: Bad River Band of the Lake Superior Tribe of the Chippewa Indians v. Enbridge Energy Co., Inc.

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

    ☑    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

    Bad River Band of the Lake Superior Tribe of the Chippewa Indians and Naomi Tillison, in her official capacity

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

    Kanji & Katzen, P.L.L.C.; Hooper Hathaway Price Beuche & Wallace; Stafford Rosenbaum, LLP;

    National Wildlife Federation; Clement & Murphy, PLLC.

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

(4)    Provide information required by FRAP 26.1(b)  Organizational Victims in Criminal Cases:

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

---

Attorney's Signature: s/ Josh C. Handelsman    Date:  October 11, 2023

Attorney's Printed Name:  Josh C. Handelsman

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).  Yes ☐  No ☑

Address:  PO Box 3971, Ann Arbor, Michigan  48106

Phone Number: 734-769-5400    Fax Number:  734-769-2701

E Mail Address: jhandelsman@kanjikatzen.com

# TABLE OF CONTENTS

TABLE OF AUTHORITIES......................................................................... iv

REQUEST FOR ORAL ARGUMENT ................................................. xii

GLOSSARY .............................................................................................. xiii

INTRODUCTION ...................................................................................... 1

JURISDICTIONAL STATEMENT ........................................................ 6

STATEMENT OF THE ISSUES .............................................................. 6

STATEMENT OF THE CASE .................................................................. 7

I.  Legal and Historical Background ............................................... 7

    A.  The Non-Intercourse Act and Federal Rights-of-Way
        Statutes ................................................................................. 7

    B.  The Bad River Reservation ........................................... 10

II.  Factual Background .................................................................... 14

    A.  Enbridge Obtains an Easement to Operate a Pipeline
        Through the Reservation................................................. 14

    B.  The Band Acquires Ownership in Some Allotted Parcels
        and Declines to Renew Enbridge's Easements. .......... 19

    C.  The Looming Threat at the Bad River Meander. ....... 23

III.  Procedural History .................................................................... 27

    A.  Summary Judgment......................................................... 27

    B.  Post-Trial Decisions ....................................................... 29

SUMMARY OF ARGUMENT .............................................................. 31

STANDARD OF REVIEW ................................................................. 37

ARGUMENT ....................................................................................... 38

I.    The District Court Correctly Held Enbridge Liable for
      Conscious Trespass and Unjust Enrichment. ....................................... 38

      A.    Enbridge Is Consciously Trespassing on Land Owned
            by the Band and Is Unjustly Enriched by That Trespass.
            .................................................................................................... 38

      B.    The Band Did Not Breach any Express or Implied Duty
            in the 1992 Agreement. ............................................................... 39

      C.    The Non-Intercourse Act Precludes Enbridge's Breach-
            of-Contract and Implied-Duty-of-Good-Faith Claims. ............. 50

      D.    The APA Does Not Excuse Enbridge's Trespass. ....................... 55

II.   Enbridge Is Liable for a Full Accounting of Its Wrongful Gains
      as a Result of Its Trespass. .................................................................. 60

      A.    A Restitution Award that Effectively Incentivizes
            Continued Trespassing Violates Core Principles and the
            Non-Intercourse Act. .................................................................. 60

      B.    The Restitution Award Fails to Stop Enbridge from
            Trespassing. ................................................................................ 62

III.  The District Court Erred By Refusing to Issue a Permanent
      Injunction Ordering Enbridge to Stop Trespassing
      Immediately. ........................................................................................ 73

      A.    The Non-Intercourse Act Requires Immediate Cessation
            of Enbridge's Trespass. ............................................................... 73

      B.    Basic Equitable Principles Support the Same Result. ................ 77

C.    Neither the Transit Treaty nor the Foreign Affairs
      Doctrine Precludes Injunctive Relief. ........................................... 84

IV.   The District Court Correctly Held That Continued Operation
      of the Pipeline Constitutes a Public Nuisance. ..................................... 92

      A.    The Continued Operation of the Pipeline Is a Public
            Nuisance. ........................................................................................... 92

      B.    The Pipeline Safety Act Does Not Displace the
            Nuisance Claim. ................................................................................ 93

      C.    Enbridge's Disingenuous Efforts to Blame the Band
            Fail. ...................................................................................................... 97

V.    The District Court's Remedy Fails to Abate The Nuisance. ................. 99

CONCLUSION ............................................................................................... 104

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME
      LIMITATION

CERTIFICATE OF COMPLIANCE WITH CIRCUIT RULE 30(d)

STATUTORY ADDENDUM

# TABLE OF AUTHORITIES

## Cases

*American Electric Power Company v. Connecticut,*
  564 U.S. 410 (2011) ........................................................96

*American Insurance Association  v. Garamendi,*
  539 U.S. 396 (2003) ........................................................91

*Amoco Production Company  v. Village of Gambell,*
  480 U.S. 531 (1987) ........................................................74

*Arnold v. Stevens,*
  24 Pick. 106 (Mass. 1839).................................................51

*Babbitt v. Youpee,*
  519 U.S. 234 (1997) ........................................................13

*Bankers Life & Casualty Company v. Callaway,*
  530 F.2d 625 (5th Cir. 1976) .........................................58

*Blackfeet Indian Tribe v. Montana Power Company,*
  838 F.2d 1055 (9th Cir. 1988) .......................................55

*Bucklew v. Hawkins, Ash, Baptie & Co.,*
  329 F.3d 923 (7th Cir. 2003) .........................................66

*Burnett v. Bowen,*
  830 F.2d 731 (7th Cir. 1987) .........................................94

*Cass County v. Leech Lake Band of Chippewa Indians,*
  524 U.S. 103 (1998) ........................................................12

*Chemehuevi Indian Tribe v. Jewell,*
  767 F.3d 900 (9th Cir. 2014) ....................................7, 52

*Cipollone v. Liggett Group, Inc.,*
  505 U.S. 504 (1992) ........................................................89

*City of Milwaukee v. Illinois,*
  451 U.S. 304 (1981) .......................................................................95

*City of Sherrill v. Oneida Indian Nation of New York,*
  544 U.S. 197 (2005) .......................................................................76

*County of Yakima v. Confederate Tribes and Bands of Yakima Indian
  Nation,*
  502 U.S. 251 (1992) ..................................................................12, 13

*Crosby v. National Foreign Trade Council,*
  530 U.S. 363 (2000) .......................................................................91

*Davilla v. Enable Midstream Partners L.P.,*
  913 F.3d 959 (10th Cir. 2019) ...........................................13, 75, 77

*Escondido Mutual Water Company v. La Jolla, Rincon, San Pasqual,
  Pauma, & Pala Bands of Mission Indians,*
  466 U.S. 765 (1984) .......................................................................83

*Federal Power Commission v. Tuscarora Indian Nation,*
  362 U.S. 99 (1960) ...........................................................................8

*Finite Resources, Ltd. v. DTE Methane Resources, LLC,*
  44 F.4th 680 (7th Cir. 2022) ..........................................................37

*Grace v. Corbis-Sygma,*
  487 F.3d 113 (2d Cir. 2007)............................................................66

*Herrera v. Wyoming,*
  139 S.Ct. 1686 (2019) ..............................................................35, 85

*Highmark Inc. v. Allcare Health Management Systems, Inc.,*
  572 U.S. 559 (2014) .......................................................................37

*In re de Jong,*
  588 B.R. 879 (9th Cir. B.A.P. 2018) ..............................................67

*INS v. Pangilinan,*
    486 U.S. 875 (1988) ........................................................73

*Kansas v. Nebraska,*
    574 U.S. 445 (2015) ..................................................62, 72

*Kay v. FCC,*
    525 F.3d 1277 (D.C. Cir. 2008) ....................................59

*Lac Courte Oreilles Band of Lake Superior Chippewa Indians of
    Wisconsin v. Evers,*
    46 F.4th 552 (7th Cir. 2022) .................................. passim

*Lac du Flambeau Band of Lake Superior Chippewa Indians v.
    Coughlin,*
    599 U.S. 382 (2023) ........................................................52

*Leigh v. Engle,*
    727 F.2d 113 (7th Cir. 1984) ........................................66

*Lomax v. Ortiz-Marquez,*
    140 S.Ct. 1721 (2020) ....................................................93

*Lovelace v. McKenna,*
    894 F.3d 845 (7th Cir. 2018 ..........................................81

*McGirt v. Oklahoma,*
    140 S.Ct. 2452 (2020) ..............................................62, 86

*Merrion v. Jicarilla Apache Tribe,*
    455 U.S. 130 (1982) ............................................... passim

*Metavante Corporation v. Emigrant Savings Bank,*
    619 F.3d 748 (7th Cir. 2010) ........................................37

*Metcalf Construction Company v. United States,*
    742 F.3d 984 (Fed. Cir. 2014) ..........................48, 49, 50

*Michigan v. U.S. Army Corps of Engineers*,
   667 F.3d 765 (7th Cir. 2011) ..................................................... passim

*Michigan v. United States Army Corps of Engineers*,
   758 F.3d 892 (7th Cir. 2014) ...................................................79

*Minnesota v. Mille Lacs Band of Chippewa Indians*,
   526 U.S. 172 (1999) ...................................................11, 35

*Market Street Associates Limited Partnership v. Frey*,
   941 F.2d 588 (7th Cr. 1991)...................................................49

*Morton v. Mancari*,
   417 U.S. 535 (1974) ...................................................88

*Oneida County v. Oneida Indian Nation of New York*,
   470 U.S. 226 (1985) ...................................................52, 75, 84

*Pearson v. Target Corporation*,
   968 F.3d 827 (7th Cir. 2020) ...................................................60, 63

*Pelfresne v. Village of Williams Bay*,
   865 F.2d 877 (7th Cir. 1989) ...................................................78

*Public Services Company of New Mexico v. Barboan*,
   857 F.3d 1101 (10th Cir. 2017) ...................................................13, 46, 62, 79

*Reich v. Continental Casualty Company*,
   33 F.3d 754 (7th Cir. 1994) ...................................................69

*Reich v. Great Lakes Indian Fish & Wildlife Commission*,
   4 F.3d 490 (7th Cir. 1993) ...................................................85

*San Xavier Development Authority v. Charles*,
   237 F.3d 1149 (9th Cir. 2001) ...................................................77

*Schlueter v. Latek Capital Corporation*,
   683 F.3d 350 (7th Cir. 2012) ...................................................60

*SEC v. First City Financial Corporation,*
    890 F.2d 1215 (D.C. Cir. 1989) ...........................................................65

*Seneca Nation v. Hochul,*
    58 F.4th 664 (2d Cir. 2023) ...............................................................51

*Shoshone Indian Tribe of Wind River Reservation v. United States,*
    672 F.3d 1021 (Fed. Cir. 2012) ...........................................................8

*Sierra Club v. Franklin County Power of Illinois, LLC,*
    546 F.3d 918 (7th Cir. 2008) ..............................................................78

*Sprietsma v. Mercury Marine,*
    537 U.S. 51 (2002) ...............................................................................94

*Swinomish Indian Tribal Community v. BNSF Railway Company,*
    2022 WL 3597439 (W.D. Wash. Aug. 22, 2022)...............................84

*Swinomish Indian Tribal Community. v. BNSF Railway Company,*
    951 F.3d 1142 (9th Cir. 2020). .....................................................85, 87

*Town of Munster v. Sherwin-Williams Company,*
    27 F.3d 1268 (7th Cir. 1994) ..............................................................74

*TVA v. Hill,*
    437 U.S. 153 (1978) .............................................................................74

*United States ex rel. Santa Ana Indian Pueblo v. University of New Mexico,*
    731 F.2d 703 (10th Cir. 1984) .........................................................7, 8

*United States v. Candelaria,*
    271 U.S. 432 (1926) .............................................................................62

*United States v. Dion,*
    476 U.S. 734 (1986) .............................................................................87

*United States v. Locke,*
    529 U.S. 89 (2000) ................................................................94

*United States v. Oakland Cannabis Buyers' Cooperative,*
    532 U.S. 483 (2001) ..............................................................79

*United States v. Pend Oreille County Public Utility District No. 1,*
    135 F.3d 602 (9th Cir. 1998) ................................................83

*United States v. Santa Fe Pacific Railroad Company,*
    314 U.S. 339 (1941) ..............................................................84

*United States v. Southern Pacific Transportation Company,*
    543 F.2d 676 (9th Cir. 1976) .................................8, 53, 62

*Varity Corporation v. Howe,*
    516 U.S. 489 (1996) ..............................................................56

*Worrall v. Rhoads,*
    2 Whart. 427 (Penn. 1837) ...................................................51

## Treaties

Agreement Between the Government of the United States and
    the Government of Canada Concerning Transit Pipelines, 28
    U.S.T. 7449, 1977 WL 181731 (Jan. 28, 1977) ...................... passim

Treaty with the Chippewa, 7 Stat. 536 (July 29, 1837) ....................................11

Treaty with the Chippewa, 7 Stat. 591 (Oct. 4, 1842) ......................................11

Treaty with the Chippewa, 10 Stat. 1109 (Sept. 30, 1854)........................ 12, 47

## Statutes

Indian Land Consolidation Act of 1983, 25 U.S.C. §§2201 *et seq.*...................13

Act of July 22, 1790, Pub. L. No. 1-33 1 Stat. 137 ...............................................52

Act of Mar. 1, 1793, Pub. L. No. 2-19, 1 Stat. 329 .............................................52

Act of Mar. 3, 1799, Pub. L. No. 5-46, 1 Stat. 743 .............................................53

5 U.S.C. §558 .............................................................................................33, 55, 58

5 U.S.C. §559 .......................................................................................................56

25 U.S.C. §177 (Non-Intercourse Act) ........................................................ passim

25 U.S.C. §321 ............................................................................................. passim

25 U.S.C. §323 .........................................................................................9, 10, 55

25 U.S.C. §324 ............................................................................................. passim

25 U.S.C. §357 .....................................................................................................79

25 U.S.C. §2201 note ..........................................................................................48

28 U.S.C. §1291 .....................................................................................................6

28 U.S.C. §1331 .....................................................................................................6

28 U.S.C. §1362 .....................................................................................................6

49 U.S.C. §60104 .............................................................................................36, 96

49 U.S.C. §60117 ................................................................................................95

49 U.S.C. §60120 ......................................................................................... passim

## Regulations

25 C.F.R. §169.2 ...................................................................................................10

25 C.F.R. §169.107 ...............................................................................................10

25 C.F.R. §169.202 ...............................................................................57

25 C.F.R. §169.3 (2013)...............................................................10, 20, 57

25 C.F.R. §169.12 (2013)......................................................................57

25 C.F.R. §169.15 (1992)...................................................................... 54

25 C.F.R. §169.19 (2013)...............................................................10, 20, 57

## Other Authorities

Black's Law Dictionary (5th ed. 1979) ................................................58

Black's Law Dictionary (1st ed. 1891) ................................................51

Francis Paul Prucha, *American Indian Policy in the Formative*
   *Years: The Indian Trade and Intercourse Acts 1790-1834* (1962)......................8

Robert N. Clinton & Margaret Tobey Hotopp, *Judicial*
   *Enforcement of the Federal Restraints on Alienation of Indian*
   *Land*, 31 Me. L. Rev. 17 (1979) ........................................................51

U.S. Department of Justice, *Attorney General's Manual on the APA*
   (1947) ...............................................................................59

 William Page Keeton et al.,
   *Prosser & Keeton on Torts,* §52 (5th ed. 1984) ...............................................66

## REQUEST FOR ORAL ARGUMENT

Appellee-Cross-Appellant, the Bad River Band of the Lake Superior Tribe of Chippewa Indians of the Bad River Reservation (the "Band"), respectfully requests oral argument in this case, which raises important issues of first impression in this Circuit. Oral argument may assist the panel in addressing the questions.

## GLOSSARY

| Short Form | Description |
|---|---|
| 1854 Treaty | Treaty with the Chippewa, 10 Stat. 1109 (Sept. 30, 1854) |
| 1948 Right-of-Way Act | 25 U.S.C. §323 |
| 1992 Agreement | Agreement between Enbridge and the Band, found at BA19 of the Band's Appendix |
| Allotted Parcels | 15 parcels of land originally allotted by the United States to individual Indians |
| BA | The Band's Appendix under Circuit Rule 30(b) |
| Bureau | Bureau of Indian Affairs |
| cfs | cubic feet per second |
| ILCA | Indian Land Consolidation Act of 1983, 25 U.S.C. §§2201 *et seq.* |
| Non-Intercourse Act | 25 U.S.C. §177 |
| PHMSA | United States Pipeline and Hazardous Materials Safety Administration |
| Reservation | Bad River Reservation |
| Secretary | U.S. Secretary of the Interior |
| Third Restatement | Restatement (Third) of Restitution (2011) |
| Transit Treaty | Agreement Between the Government of the United States and the Government of Canada Concerning Transit Pipelines, 28 U.S.T. 7449, 1977 WL 181731 (Jan. 28, 1977) |
| Tribal Parcels | 13 parcels of land owned in full by the Band |

**INTRODUCTION**

This case concerns a blatant trespass and public nuisance that threaten catastrophe for the Bad River Band, the river and watershed from which the tribe takes its name, and Lake Superior. Every day, Enbridge pumps approximately 24 million gallons of crude oil and natural gas liquids through the 70-year-old Line 5 pipeline that traverses the Bad River Reservation. In 2010, another Enbridge pipeline of similar vintage ruptured in Michigan, spilling over a million gallons of oil into the Kalamazoo River, resulting in the costliest inland spill in American history. Three years after that disaster, easements allowing Enbridge to operate Line 5 across various Reservation parcels expired; when Enbridge failed to address the Band's concerns about its history of pipeline ruptures and environmental damage, the Band declined to renew those easements. The Band then enacted a formal resolution demanding that Enbridge honor its obligation to shut down and remove the pipeline—but Enbridge refused. Despite a sovereign's decree and a federal lawsuit, Enbridge carries on business as usual on the Reservation even to this day.

Enbridge knows it is trespassing. The easements expired in 2013 and specifically required it to remove the pipeline within six months after expiration. Enbridge insists that a different easement across different parcels now extends to the trespassed-upon parcels, but that easement is expressly limited to parcels not at issue here. What is more, a host of federal statutes, including the foundational Non-Intercourse Act and those governing rights-of-way on reservations, unambiguously require federal approval of any easement over tribal lands—but the government has provided no such approval here.

Yet Enbridge continues its trespass. The explanation is simple: trespassing is profitable. As the district court found, Enbridge netted more than $1.1 billion in profits from the pipeline since its trespass began (even before considering the time value of money), and has reaped an almost-$300-million windfall in cost savings simply by staying put.

The proper remedies for this ongoing and obvious trespass should have been straightforward: an order permanently enjoining Enbridge from further trespass and disgorging Enbridge's profits. That is the only way to

vindicate the Band's sovereignty, force Enbridge to find a lawful way to operate its pipeline, and deter future wrongdoing. Yet instead of ordering Enbridge to leave tribal land immediately (or at least within the six months contemplated by the easements), the court greenlighted another three *years* of trespass. And rather than requiring Enbridge to disgorge the profits its trespass enabled, the court imposed only a modest toll: just $5.1 *million* of Enbridge's $1.1-*billion* profit. The orders here effectively grant Enbridge a three-year forced easement at bargain rates over the sovereign's ongoing objection and in violation of federal law.

That would be bad enough even if the consequences of Enbridge's continued operation of the pipeline on the Reservation were not so severe. What was once a 310-foot separation between the ever-migrating Bad River and the pipeline is now 11 feet—equivalent to what was lost *in a single week* last spring. Another, similar spring will bring exposure of the pipeline and loss of the soil underneath. When that happens, the pipeline will rupture, devastating the Bad River, the internationally recognized wild rice sloughs that lie at its mouth, and Lake Superior beyond.

Based on this imminent threat of environmental devastation, the district court found Enbridge liable for public nuisance, and the company does not challenge that holding on the merits. It instead argues displacement based on the Pipeline Safety Act. But the PSA's text is clear: The statute neither affects the ability to bring tort actions nor extends to the locational issues at the heart of this suit.

The district court correctly rejected Enbridge's atextual argument. But it again fell short on remedy, allowing Enbridge to continue operating the pipeline up to the very brink, with no margin for error in executing a purge and shutdown of the pipeline before disaster strikes. One need not be overly familiar with the Kalamazoo River catastrophe, or others like it, to predict how that will end.

The district court hesitated to enforce the Band's rights promptly based on claims made by Enbridge and amici about the impact of shutting down the pipeline. But overheated assertions about convenience and consequence are a staple of litigation to enforce tribal rights. "The sky will fall," the story goes, without regard to what happens when the law is not followed. The

sky rarely falls, however, and it will not here. Enbridge's own expert testified that shutting down Line 5 will lead to a one-cent increase per gallon of gasoline in Michigan and Wisconsin and a nickel in Ontario. More fundamentally, Congress has spoken: The public interest is served by respecting, rather than relegating, tribal land rights. The Non-Intercourse Act and the rights-of-way statutes prohibit courts from forcing easements over tribal lands, whether in "law or equity." No federal appellate court has ever held otherwise, and this Court should reject Enbridge's invitation to be the first.

The Band deserved meaningful restitution and a real injunction, not three more years of trespass in the face of grave danger. Respecting tribal sovereignty can sometimes be inconvenient—and our Nation's history is littered with examples where promises yielded to expediency. But the Non-Intercourse Act and the rights-of-way statutes reflect Congress' considered view that respecting sovereignty in the face of expediency is in the public interest, even when it costs us a few pennies at the pump.

The district court got things half-right. The Court should affirm the decision holding Enbridge liable for willful trespass, unjust enrichment, and public nuisance. But it should (1) vacate the district court's trespass remedy and remand with instructions to order Enbridge to disgorge the full extent of its profits and stop trespassing immediately, and (2) vacate the district court's nuisance remedy and remand with instructions to enter relief that actually abates the nuisance.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction over the Band's federal-common-law claims under 28 U.S.C. §§1331 and 1362., It had jurisdiction over Counts I-III of Enbridge's counterclaims under 28 U.S.C. §1331, but lacked jurisdiction over Counts IV-V. The court entered final judgment on June 29, 2023, which disposed of all parties' claims. A128-29. Enbridge appealed the next day, R.690; the Band cross-appealed on July 28, R695. This Court has jurisdiction under 28 U.S.C. §1291.

## STATEMENT OF THE ISSUES

1. Whether the district court correctly held that Enbridge trespassed on the Band's land and was unjustly enriched by that trespass.

2. Whether the district court correctly calculated restitution as a fraction of Enbridge's profits and savings from its conscious trespass.

3. Whether the district court should have immediately enjoined Enbridge from further trespass.

4. Whether the district court correctly held that Enbridge's operation of its pipeline across the Reservation constitutes a public nuisance.

5. Whether the district court should have entered an order abating the nuisance.

STATEMENT OF THE CASE

## I.    Legal and Historical Background

### A.    The Non-Intercourse Act and Federal Rights-of-Way Statutes

1. The Non-Intercourse Act, 25 U.S.C. §177, is "perhaps the most significant congressional enactment regarding Indian lands." *United States ex rel. Santa Ana Indian Pueblo v. Univ. of N.M.*, 731 F.2d 703, 706 (10th Cir. 1984). "The goal of the statute is to ensure that tribal lands remain in tribal hands," *Chemehuevi Indian Tribe v. Jewell*, 767 F.3d 900, 904 (9th Cir. 2014), and "prevent the steady eating away at the Indian Country by individuals who privately acquired lands from the Indians," Francis Paul Prucha,

*American Indian Policy in the Formative Years: The Indian Trade and Intercourse Acts 1790-1834*, at 45 (1962). The Act not only "guarantees the Indian tribes' right of possession," but "imposes on the federal government a fiduciary duty to protect the lands covered by the Act." *Santa Ana*, 731 F.2d at 706.

The Act accordingly nullifies any "purchase, grant, lease, or other conveyance" of tribal land not "made by treaty or convention entered into pursuant to the Constitution," 25 U.S.C. §177, and requires "the assent of the Indian nation or tribe" to any such conveyance, *Fed. Power Comm'n v. Tuscarora Indian Nation*, 362 U.S. 99, 119 (1960). Courts have applied it well beyond purported fee conveyances, including to oil-and-gas leases approved by the Bureau contrary to federal statutory requirements, *see Shoshone Indian Tribe of Wind River Reservation v. United States*, 672 F.3d 1021, 1037 (Fed. Cir. 2012), and, of particular relevance here, to rights-of-way over Indian land not authorized by treaty or statute, *see, e.g., United States v. S. Pac. Transp. Co.*, 543 F.2d 676, 684 (9th Cir. 1976).

2. Two relevant statutes allow the federal government to grant rights-of-way for pipelines over Indian land. Under the 1948 Right-of-Way Act, the

Secretary may "grant rights-of-way for all purposes, subject to such conditions as he may prescribe, over and across any lands now or hereafter held in trust by the United States for individual Indians or Indian tribes … or any lands now or hereafter owned, subject to restrictions against alienation, by individual Indians or Indian tribes." 25 U.S.C. §323. Under 25 U.S.C. §321, the Secretary may "grant a right-of-way in the nature of an easement for the construction, operation, and maintenance of pipe lines for the conveyance of oil and gas through any Indian reservation" for a term of twenty years. Both provisions come with important limits. Under neither statute may the Secretary authorize a right-of-way "across any lands" owned or co-owned by tribes "without the consent of the proper tribal officials." *Id.* §324.

The Secretary has delegated her authority to grant rights-of-way to the Bureau. Bureau regulations specify that, "[f]or a right-of-way across tribal land, the applicant must obtain tribal consent, in the form of a tribal authorization and a written agreement with the tribe." 25 C.F.R. §169.107(a). The regulations define "tribal land" as any tract "owned by

9

one or more tribes in trust or restricted status," *id.* §169.2, and make clear

that "[i]f the tribe owns *any interest* in a tract, it is considered 'tribal land'

and the tribe's consent for rights-of-way on the tract is required under 25

U.S.C. 323 and 324," 80 Fed. Reg. 72,492, 72,497 (Nov. 19, 2015) (emphasis

added).[1]

### B.     The Bad River Reservation

1. Ojibwe (or Chippewa) tribes have occupied the Great Lakes region for

centuries. After settlers moved into the area in the 1800s, the federal

government "sought control of valuable Ojibwe lands on the shores of Lake

Superior." *Lac Courte Oreilles Band of Lake Superior Chippewa Indians of Wis.*

*v. Evers*, 46 F.4th 552, 559 (7th Cir. 2022). To that end, the United States

negotiated treaties with the Band and other Ojibwe tribes in 1837 and 1842.

While the Ojibwe understood that they were simply selling timber and

mining rights, "the treaties they signed actually transferred title to their

lands outright." *Id*. Still, the treaties preserved their right to hunt, fish, and

---

[1] The requirement of tribal consent applied in 2013 as it does today. *See* 25
C.F.R. §§169.3(a) & 169.19 (renewals) (2013).

gather in the ceded territory. *See* Treaty with the Chippewa, arts. 1, 5, July 29, 1837, 7 Stat. 536; Treaty with the Chippewa, arts. 1, 2, Oct. 4, 1842, 7 Stat. 591.

President Taylor attempted to revoke even those rights in 1850, ordering officials to remove the Ojibwe west to unceded lands in Minnesota. *See Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 179 (1999). That plan, however, "ended in disaster." *Id.* at 180. Hundreds of Ojibwe died during what came to be known as the Wisconsin Death March. That harrowing experience "intensified opposition to the removal order among the Chippewa as well as among non-Indian residents of the area." *Mille Lacs Band*, 526 U.S. at 180. As a result of that opposition, the United States "abandoned its removal policy." *Id.* at 183.

It "did not," however, "abandon its attempts to acquire more Chippewa land." *Id.* The United States negotiated a new treaty with the Ojibwe in 1854. *See id.* at 183-84 (discussing 1854 Treaty). This time, the Ojibwe demanded the government set aside lands for them as permanent reservations. *Lac Courte Oreilles Band*, 46 F.4th at 559-60. In exchange for

11

additional cessions, the United States "set apart and withh[e]ld from sale" several reservations, including the Bad River Reservation, which spans roughly 125,000 acres abutting the south shore of Lake Superior in Wisconsin and about 2,000 acres on Madeline Island. *See* Treaty with the Chippewa, art. 2, Sept. 30, 1854, 10 Stat. 1109.

2. Over time, ownership of land on the Bad River Reservation became fragmented. Beginning in the mid-nineteenth century, Washington "changed its policy of setting aside reservation lands exclusively for Indian tribes under federal supervision," *Cass Cnty. v. Leech Lake Band of Chippewa Indians*, 524 U.S. 103, 106 (1998), and undertook to break reservations apart into individual allotments. Its objectives "were simple and clear cut: to extinguish tribal sovereignty, erase reservation boundaries, and force the assimilation of Indians into society at large." *Lac Courte Oreilles Band*, 46 F.4th at 560 (quoting *Cnty. of Yakima v. Confed. Tribes and Bands of Yakima Indian Nation*, 502 U.S. 251, 254 (1992)).

Allotment "quickly proved disastrous for the Indians," including the Band, resulting in "a dramatic decline in the amount of land in Indian

hands" and fractionation that "proliferated with each succeeding generation as multiple heirs took undivided interests in allotments." *Babbitt v. Youpee*, 519 U.S. 234, 237-38 (1997). Congress ended the allotment policy in 1934. *Yakima*, 502 U.S. at 253-56. In the intervening 90 years, Congress has enacted several important statutes to remediate allotment's deleterious effects, including the Indian Land Consolidation Act of 1983, 25 U.S.C. §§2201 *et seq.*, which authorized the Secretary to acquire fractional interests in allotted parcels and place them in trust for the affected tribes. *Youpee*, 519 U.S. at 236-37. But Congress' efforts did not undo the past; its "vacillation on Indian land policy left 'a checkerboard of tribal, individual Indian, and individual non-Indian land interests' across Indian country." *Davilla v. Enable Midstream Partners L.P.*, 913 F.3d 959, 964 (10th Cir. 2019) (quoting *Pub. Serv. Co. of N.M. v. Barboan*, 857 F.3d 1101, 1105 (10th Cir. 2017)).

The Bad River Reservation is a prime example. The United States holds parcels in trust for the Band, for individual tribal members, and in some cases for a combination of both. Other parcels are held in fee by the Band or

its members, or by non-Indians pursuant to patents issued during

allotment.

Fractionation notwithstanding, the Band has fought to protect the

special character of the Reservation. R600 at 8-19; R607 at 9-13; Trial.Ex.8.

As a result of those tireless efforts, the Reservation continues to harbor

exceptionally high-quality natural resources, including innumerable

species of wildlife and plants and natural wild rice sloughs so important

and rare as to have been designated Wetlands of International Importance

under the Ramsar Convention. R268 at 9-14; R268-2 at 140.

## II.     Factual Background

### A.     Enbridge Obtains an Easement to Operate a Pipeline Through the Reservation.

Enbridge owns and operates oil-and-gas pipelines throughout Canada

and the United States. During the Termination era of the 1950s, when the

federal government allowed tribes little say in running their own affairs,

Enbridge's corporate predecessor negotiated with the Bureau for an

easement to install and operate a pipeline across roughly twelve miles of

Reservation land.

The designated pipeline corridor included Indian land parcels that the United States administered for the Band or held in trust for individual Band members, and parcels held by non-Indians in fee simple. The Bureau granted Enbridge a 20-year easement to operate its pipeline across the Indian land. That easement expired in 1973, and the Bureau renewed it for another 20-year term.

With the second easement set to expire in June 1993, Enbridge, the Band, and the Bureau discussed renewal. By that time, the pipeline corridor included thirteen parcels owned in full by the Band ("Tribal Parcels"), and fifteen parcels allotted to individual Indians ("Allotted Parcels"). The United States held both sets of parcels in trust. In June 1992, Enbridge submitted to the Bureau two separate applications for easements. One concerned a right-of-way over "Tribal Lands," BA16; it specifically listed the thirteen Tribal Parcels, BA17. The other sought a right-of-way over the fifteen Allotted Parcels; it specifically listed those fifteen parcels, BA12, including the names of the fifteen original allottees, BA16.

*Tribal Parcels.* Because the Band owned the thirteen Tribal Parcels, Enbridge needed the Band's consent for an easement over them. *See* 25 U.S.C. §324. In December 1992, the Band's Tribal Council enacted a resolution stating its consent to a 50-year easement "over and across any lands in which the Tribe has a legal interest within the Company's existing rights of way"—i.e., the thirteen Tribal Parcels—in exchange for $800,000. BA18.

The parties memorialized their agreement in a written contract ("1992 Agreement"). The 1992 Agreement explicitly distinguished the Tribal Parcels and the Allotted Parcels. It noted that, in 1953, the Company acquired "Original Rights of Way" "over and across lands within and/or about the Bad River Reservation in Wisconsin, … including lands in which the Tribe had a legal interest *and* including lands generally known as allotted lands …, for a period of twenty (20) years." BA19 (emphasis added). It thus specified that the "Original Rights of Way" included not only the thirteen Tribal Parcels, but also the fifteen Allotted Parcels. BA19.

16

The 1992 Agreement then specified that both "[1] *that portion* of the Original Rights of Way *in which the Tribe now has a legal interest* and [2] any other land through which such pipeline was constructed which is subject to rights of way of the Company *in which the Tribe now has a legal interest* are hereinafter collectively referred to as the 'Existing Rights of Way.'" BA19. The Band further agreed that the "Secretary may grant to [Enbridge] a right of way for the construction, operation and maintenance of a pipeline for fifty (50) years *within the Existing Right of Way*," and that "[s]aid pipeline right of way shall be granted pursuant to and in accordance with the Tribal Council's Resolution Granting Pipeline Right of Way." BA20.

The Band submitted the tribal resolution and the Agreement to the Bureau for approval. SA25. The Bureau verified that "[t]he documentation consists of a resolution and Agreement between the [Band] and [Enbridge]" that pertained to "the proposed Grant of Easement for Right-of-way to [Enbridge] over *13 parcels of tribal trust lands*." BA25 (emphasis added). In March 1993, the Bureau issued the 50-year easement for those thirteen parcels. BA27-28. The easement states that it "is limited to" the

thirteen parcels, and specifically lists each of the thirteen parcels by its Bureau tract number and its precise legal description. BA27; BA30.

*Allotted Parcels.* At the same time, Enbridge and the Bureau began negotiating a separate easement over the fifteen Allotted Parcels. *See* R170-16 at 6-13. Because Enbridge and the Bureau were unaware at the time that the Band held fractional interests in three of the Allotted Parcels, the Band took no part in these negotiations. The Bureau granted 20-year easements for each of the fifteen Allotted Parcels a few months later. *See* BA31-36. The grants identified each of the parcels by tract number, specifying ownership status (they were all individual-owned) and their precise legal descriptions. They further stated that the easements are "limited as to tenure for a period not to exceed 20 (Twenty) years, beginning on June 3, 1993, and ending on June 2, 2013," and provided that "[a]t the termination of this Grant of Easement, Grantee shall remove all materials, equipment and associated installations *within six months* of termination, and agrees to restore the land to its prior condition." BA32 (emphasis added). "Such restoration may

include but not be limited to filling, leveling and seeding the right-of-way area." BA32.

B.     **The Band Acquires Ownership in Some Allotted Parcels and Declines to Renew Enbridge's Easements.**

1. After 1993, the Band acquired ownership in twelve of the fifteen Allotted Parcels pursuant to ILCA's consolidation provisions. A7. These twelve Allotted Parcels give rise to the Band's trespass claim.[2] They are separate from the thirteen Tribal Parcels for which the Band granted 50-year easements:



     🟥 **20-Year Parcels**          🟦 **50-Year Parcels**

---

[2] The Bureau tract numbers for the twelve parcels are: 430-3B23, 430-R49, 430-3H46, 430-S13, 430-3H318, 430-3H08, 430-E33, 430-3H322, 430-E532, 430-R146, 430-E266, 430-R154. R123 at 21-22 n.11.

R168 at 10.

2. In January 2013, the Bureau reminded Enbridge "that the Easements with Bad River Tribe expire June of 2013." BA46. Enbridge submitted renewal applications for the Allotted Parcels two months later. Because the Band now had ownership interests in most of the Allotted Parcels, federal law required Enbridge to obtain the Band's consent to easement renewals for those parcels. *See* 25 U.S.C. §324; 25 C.F.R. §§169.3(a), 169.19 (2013). Enbridge was well aware of this, acknowledging internally that the Band's "Tribal Council will need to approve the agreements." BA49; BA52. Enbridge obtained neither the Band's consent nor a renewed easement, *see* SA26-39, but nevertheless continued to operate the pipeline.

The Band had every reason to hesitate about an easement renewal in 2013. Just a few years earlier, another Enbridge pipeline ruptured, releasing more than a million gallons of crude oil into a tributary of the Kalamazoo River. *See* BA130-52. Federal investigators determined that the rupture and resulting damage were "made possible by pervasive organizational failures at Enbridge." BA133. Pipeline ruptures devastated other rivers, including

the Yellowstone, in the years leading up to 2013. *See* R484-12 at I-6. The Band accordingly requested detailed environmental and safety information from Enbridge so that it could "better identify the possible environmental effects this pipeline will have on the lands and the people of the Bad River Tribe." R170-29 at 2.

Enbridge provided only limited material in response.[3] *See* R170-30; R170-31. Thus, in January 2017, the Tribal Council issued a resolution opposing a new easement. The resolution noted that "our life is rooted in a connection to the natural world, the source of our health and wellness for the past, present, and future generations making our relationship with the natural world sacred." BA37. It explained that "the natural waters found in" the Bad River and Lake Superior "give life to plants and animals, and from these we are blessed with food and medicine, and the natural

---

[3] Indeed, as the Band subsequently learned, Enbridge withheld its knowledge of the growing threat presented by the pipeline's operation at the Bad River meander, a risk it started tracking as early as 2013. (Trial.Ex.457.)

groundwater and springs found in these places continue to … bless[] [the Band] with drinking water." BA37.

The Band noted that "pipelines of similar setting have broken and caused extensive environmental damages," and that "a crude oil spill" at the Bad River "would be catastrophic to the health and economy" of the community and "would impact coastal wetlands and wild rice beds, and traditional fishing areas." BA37. The Tribal Council thus declared that "it shall not renew its interests in the rights of way," and directed tribal staff to "send notice to [Enbridge] and federal agencies and take all action permitted under the law for Line 5 removal project development on Bad River lands and watershed." BA38.

Despite the Band's decision, Enbridge continued to operate its pipeline—all while recognizing internally that the easements "are expired and the Band has the ability to hold Enbridge in trespass and likely require removal of the pipeline." BA60; *see also* BA58-59; BA62.

It took Enbridge still another three years to apply for a pipeline re-route. BA76:25-BA77:3. In doing so, it proposed a path that crosses numerous

rivers and streams, while hugging the Reservation's borders. The district

court found that this path has "little realistic prospect" of being approved

within five years (if ever), A123, given the concerns of multiple federal

agencies and key stakeholders that the proposed route would cause serious

environmental harm to the Reservation and watershed, A94.

### C.    The Looming Threat at the Bad River Meander.

Enbridge's trespass is compounded by the looming threat of rupture at a

meander immediately upstream from where the pipeline crosses under the

Bad River. There, the river is carving away the banks and soils that cover

the pipeline. A79-80; A85. Sixty years ago, 310 feet of bank separated the

river from the pipeline. R268 at ES-1. That protection is now almost entirely

gone:



R268-1 at 64; *see also* R276 at 11.

By the time of trial in October 2022, only 26-27 feet of riverbank remained between the river and the pipeline. A80. Moderate flooding in April and May 2023 led to substantial additional loss. As the district court found, "there presently exist four locations at which less than 15 feet of bank remains"; at one location, "only 11 feet of bank remains." A85 (citing BA90).



BA95.

The pace of loss this past spring was staggering. As the district court found, "in one week … 10.5 to 11.5 feet was lost [at one location], nearly the same amount as still exists." A85. Three to four feet of bank disappeared in a single 24-hour period at two different junctures. BA95. And, as the district court observed, this erosion "has taken place in conjunction with flood levels that are significant, but far from record flows for this stretch of the Bad River." A87.





A86.

Similar erosion next spring would expose the pipeline to the river's full

force. A46-47; A79; A104-05. When that occurs, the river will erode the soil

on which the pipeline rests, and a portion of the pipeline will end up

suspended in the air, while still holding the full weight of the oil within it.

A78-79; A105. Once the unsupported stretch exceeds its "critical span

length," the pipeline will rupture, causing up to 21,974 barrels (or 922,908

gallons) of oil to spill into the Bad River and Lake Superior. A59-60 & n.2.

As the district court found, a release of oil at the meander will be

"catastrophic," A59; A104, devastating resources of exceptionally high

quality and sensitivity in the Bad River, the Kakagon-Bad River Sloughs,

and Lake Superior. R268-2 at 118, 161; BA78-87; *see* BA88 (Enbridge expert

animation simulating oil spreading in Lake Superior). In turn, this will

destroy the Band's fisheries, wild rice harvest, and very way of life. A76-77;

A104.

## III.    Procedural History

### A.    Summary Judgment

The district court granted summary judgment for the Band on its

trespass and unjust enrichment claims and rejected Enbridge's breach-of-

contract counterclaim. The court held that Enbridge failed to obtain the consent it needed from the Band to operate its pipeline over the Allotted Parcels. A10. Because "Enbridge had no valid basis for believing that it could maintain its pipeline on tribal land without the Band's permission and a valid easement from the BIA," the only question was "the appropriate remedy." A28.

The court held that the Band was "entitled to a profits-based remedy for Enbridge's trespass and unjust enrichment." A29. Restitution was "appropriate and necessary," the court explained, "to address the violation of the Band's sovereign rights and to take away what otherwise would be a strong incentive for Enbridge to act in the future exactly as it did here." A35. The court deferred judgment on the appropriate amount until after trial.

As for the Band's request for a permanent injunction, the court held that the Non-Intercourse Act did not automatically entitle the Band to an injunction, and so proceeded to weigh the equities. A37-39. The court concluded that monetary damages would be insufficient, the harm to the

Band irreparable, and that the balance of hardships "weighs heavily in the Band's favor." A40. Nevertheless, the court concluded that material disputes existed regarding the public interest factor given claims about the economic impact of a pipeline shutdown. A43; BA3-4.

Finally, the court rejected Enbridge's request for summary judgment on the Band's nuisance claim. A47.

### B.    Post-Trial Decisions

The court held a six-day trial on the Band's nuisance claim and remedies. On the trespass remedy, the court found that Enbridge made more than $1.1 billion (before accounting for present value) from the pipeline since 2013. A118. But instead of ordering Enbridge to disgorge the wrongful gains the trespass enabled, the court concluded that Enbridge should pay only a tiny fraction: it discounted the $1.1 billion to reflect the 0.36% of the 642-mile pipeline's length accounted for by the twelve trespass parcels. A117; *see also* BA2-3. The court then further reduced that figure to reflect the Band's portion of ownership of the twelve parcels. A117-18. This led to an award of $4,410,969 (after adjusting for present value) for June

2013 to June 2022. A119. The court then ordered Enbridge to continue

disgorging profits in the future based on the same formula. A119-20.

As an alternative measure of disgorgement, the Band sought the

windfall Enbridge reaped by delaying any re-routing or other transitional

efforts necessary to avoid trespassing on the twelve parcels. Using the most

conservative measure of Enbridge's wrongful gain—the financial benefit

the company derived by deferring action on the re-route path it ultimately

(and unilaterally) chose to pursue—the court found that Enbridge saved

nearly $300 million from its inaction. But the court expressed concern that

awarding that amount would be "disproportionate," and inexplicably

discounted those savings—which are specific to the Reservation—by again

comparing the disputed parcels' relationship to overall pipeline length.

A120-21.

Although the Band presented its two theories as alternatives, the court

then added the two together, for a total of $5,151,668.

As to injunctive relief, the court agreed that the Band is "entitled to

permanent injunctive relief on its trespass claim under a fair reading of the

current law applicable to its sovereign rights." A122. The court rejected

Enbridge's request for an additional five years to remove its pipeline:

"Enbridge has now had 10 years since losing its rights of way … to move

its bypass forward," and "the court cannot countenance an indefinite

delay." A123. Nevertheless, the court granted Enbridge what in its own

words "would amount to a 3-year forced easement," giving Enbridge until

June 2026 to continue operating the pipeline on the Reservation. A123.

Finally, the court agreed that Enbridge's operation of the pipeline on the

Reservation constitutes a public nuisance, as "the current conditions at the

meander create a real and unreasonable risk of [pipeline rupture] occurring

such that equitable relief is warranted." A75. As a remedy, however, the

court largely adopted Enbridge's insufficiently protective shutdown and

purge plan. A108-10.

## SUMMARY OF ARGUMENT

**I.** The district court correctly held Enbridge liable for conscious trespass

and unjust enrichment. Enbridge is currently operating its pipeline over

Reservation land owned by the Band. Enbridge's 20-year easements

expired in 2013 and expressly require Enbridge to "remove all materials, equipment and associated installations" and "restore the land to its prior condition" within six months of expiration. The Band declined to consent to new easements, and the Bureau has not approved them. Yet Enbridge continues to operate its pipeline on Band property. That is the definition of an unlawful, willful trespass.

Nothing in the parties' 1992 Agreement suggests otherwise. That agreement dealt only with parcels in which the Band *then* had an interest. The Band's trespass claim, however, is not about *those* parcels; Enbridge is trespassing on parcels in which the Band only obtained an interest *later*.

The implied duty of good faith and fair dealing does not save Enbridge either. "[A] hallmark of Indian sovereignty is the power to exclude non-Indians from Indian lands," and sovereign powers may not be surrendered by implication; only "terms which admit of no other reasonable interpretation" may be held to effectuate one. *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 141, 148 (1982). That bedrock principle forecloses Enbridge's effort to impose an implied duty, which fails in any event

because Enbridge seeks to rewrite rather than enforce the bargain previously struck by the parties.

The Non-Intercourse Act further precludes Enbridge's effort to evade responsibility for its trespass. Consistent with the clear text, courts have long held that the Act prohibits easements over Indian land without federal authorization. Thus, even if the Band *had* agreed in 1992 to grant Enbridge a 50-year easement over the Allotted Parcels, that would have had "no validity in law or equity" unless the federal government authorized it. 25 U.S.C. §177. But the federal government never did so, and instead blessed only a 20-year easement.

Finally, 5 U.S.C. §558(c) does not save Enbridge. It does not trump the Non-Intercourse Act or other more specific and earlier-enacted provisions governing the conveyances of Indian land—as its neighboring provision, §559, makes clear. Moreover, §558(c) applies only when the licensee has made a "*sufficient*" application for a renewal "in accordance with agency rules," but Enbridge's 2013 renewal applications fell far short of the mark.

33

**II.** Enbridge is liable for a full accounting of its wrongful gains as a result of its trespass. The district court's disgorgement remedy utterly fails to eliminate the economic incentive for Enbridge to continue trespassing. The court found not only that Enbridge's trespass enabled it to make more than $1.1 billion in net profit from the pipeline since it began trespassing in 2013, but that Enbridge's decision to forego a re-route in 2013 saved Enbridge $300 million. Yet it awarded a remedy of *just a quarter of a percent* of the gains that Enbridge realized. Under the trifling trespass toll the court issued, the economically rational choice is for Enbridge to continue trespassing. That is not valid restitution.

**III.** The district court should have ordered Enbridge to stop trespassing *immediately*, rather than three years hence. The court's decree grants Enbridge a three-year "forced easement" to trespass on Indian land, and thus constitutes a forbidden "conveyance" of Indian land under the Non-Intercourse Act, as no federal treaty or statute authorizes it. Indeed, 25 U.S.C. §§321-324 make clear that specific federal authorization (and tribal consent) is required for *any* right-of-way, and for oil-and-gas-pipeline

conveyances in particular. Congress has struck a deliberate balance that the district court was bound to follow, especially since traditional equitable principles compel the same result.

The Transit Treaty does not suggest otherwise. That treaty *says nothing about Indian tribes or Indian lands*. No evidence suggests that the United States even perceived a conflict with the 1854 Treaty that guaranteed the Band's sovereign right to exclude non-Indians from its lands. That should be the end of the matter, as "[t]here must be 'clear evidence that Congress actually considered the conflict between its intended action on the one hand and Indian treaty rights on the other, and chose to resolve that conflict by abrogating the treaty.'" *Herrera v. Wyoming*, 139 S.Ct. 1686, 1698 (2019) (quoting *Mille Lacs Band*, 526 U.S. at 202-03). Moreover, even if the Transit Treaty applies, Article IV—which Enbridge studiously ignores— preserves rather than defeats the Band's action. As for the "foreign affairs doctrine," *Garamendi* and *Crosby* stand only for the notion that states may not pursue their own contrary foreign policies; they do not remotely

suggest that a state or tribe cannot enforce its clear rights under a contract

or easement simply because doing so inconveniences a foreign sovereign.

**IV.** The district court correctly held that continued operation of the

pipeline on the Reservation constitutes a public nuisance. Enbridge does

not contest that conclusion or the factual findings underpinning it. It

argues instead that the Pipeline Safety Act displaces nuisance law entirely.

But, in reality, the PSA *preserves* common-law tort claims: "This chapter

does not affect the tort liability of any person." 49 U.S.C. §60120(c).

Moreover, the PSA explicitly "does not authorize the Secretary of

Transportation to prescribe the location or routing of a pipeline facility," *id.*

§60104(e), instead preserving that issue for other governments—and the

continued operation of the pipeline in the immediate vicinity of a

migrating and flood-prone river is the very nub of the nuisance claim here.

Those express carve-outs from the federal regulatory scheme eviscerate

Enbridge's pleas for displacement or field preemption.

**V.** While the district court correctly found Enbridge liable for public

nuisance, it once again fell short on the remedy, subjecting the Band to a far

36

greater risk of a pipeline rupture during the next flooding season than a reasonable person would incur. The district court's own factual findings make plain that its Enbridge-inspired decree, which will allow Enbridge to continue operating the pipeline up to the very brink of disaster, will render it impossible for Enbridge to then act in timely fashion to stave off a catastrophic rupture that will devastate the Bad River watershed and surrounding environs.

## STANDARD OF REVIEW

Following a bench trial, this Court reviews legal issues de novo and findings of fact for clear error. *Metavante Corp. v. Emigrant Savings Bank*, 619 F.3d 748, 758-59 (7th Cir. 2010). Summary judgment rulings are reviewed de novo. *Finite Res., Ltd. v. DTE Methane Res., LLC*, 44 F.4th 680, 683 (7th Cir. 2022). Decisions regarding the contours of injunctive relief are reviewed for abuse of discretion. "A district court … necessarily abuse[s] its discretion if it base[s] its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence." *Highmark Inc. v. Allcare Health Mgmt. Sys., Inc.*, 572 U.S. 559, 563 n.2 (2014).

37

**ARGUMENT**

## I.     The District Court Correctly Held Enbridge Liable for Conscious Trespass and Unjust Enrichment.

### A.     Enbridge Is Consciously Trespassing on Land Owned by the Band and Is Unjustly Enriched by That Trespass.

The district court correctly held Enbridge liable for an ongoing conscious trespass. "A trespass may be committed by the continued presence on the land of a structure, chattel, or other thing which the actor or his predecessor in legal interest has placed on the land … with the consent of the person then in possession of the land, if the actor fails to remove it after the consent has been effectively terminated." Restatement (Second) of Torts §160 (1965); *see also id*. §158 & cmt. i (trespass can occur "by … propelling … a thing either on or beneath the surface of the land").

These provisions describe this case to a T. Enbridge is currently operating its pipeline over Reservation land owned by the Band. While the Bureau approved 20-year easements in 1993, those easements—which expressly require Enbridge to "remove all materials, equipment and associated installations" and "restore the land to its prior condition" within six months of its expiration—expired over a decade ago. BA32. The Band

38

declined to consent to new easements, and the Bureau has not approved

them. Thus, Enbridge's own easements obligated it to vacate the premises

long ago, yet it continues to operate its pipeline on Band property and to

transmit oil and natural gas liquids through it, all without the Band's

consent. That is as straightforward as trespass claims get. *See Burns Philp*

*Food, Inc. v. Cavalea Cont'l Freight, Inc.*, 135 F.3d 526, 529 (7th Cir. 1998).

> **B.**     **The Band Did Not Breach any Express or Implied Duty in the 1992 Agreement.**

1. Nothing in the 1992 Agreement suggests that the parties agreed to a

50-year easement over the Allotted Parcels. On the contrary, the text

confirms that Enbridge paid $800,000 for a 50-year easement over thirteen

separate Tribal Parcels—nothing more.

The Agreement both references allotted lands and makes clear the

easement governs only land in which the Band had an interest in 1992. The

second paragraph defines the phrase "Original Rights of Way" (acquired in

1953) as "*including lands in which the Tribe had a legal interest and including*

*lands generally known as allotted lands*." BA19 (emphasis added). The fourth

paragraph then defines "*Existing* Rights of Way" as the subset of those

Original Rights of Way "in which the Tribe *now* has a legal interest," i.e., as of 1992:

> Whereas, *that portion* of the Original Rights of Way *in which the Tribe now has a legal interest* and any other land through which such pipeline was constructed which is subject to rights of way of the Company *in which the Tribe now has a legal interest* are hereinafter collectively referred to as the "Existing Rights of Way."

BA19 (emphases added). By specifying that "Existing Rights of Way" include *only* "that portion" of the "Original Rights of Way in which the Tribe now has a legal interest" (i.e., the Tribal Parcels), the Agreement plainly excludes "lands generally known as allotted lands" (i.e., the Allotted Parcels) in which the Band then had *no* known legal interest. Nothing in the Agreement discusses a 50-year easement over those Allotted Parcels, in which the Band had no then-current interest.

Further confirming the point, the Agreement goes on: "The Secretary may grant to the Company a right of way for the construction, operation and maintenance of a pipeline for fifty (50) years *within the Existing Right of Way*. Said pipeline right of way shall be granted *pursuant to and in accordance with the Tribal Council's Resolution* Granting Pipeline Right of

Way[.]" BA20 (emphases added). And, as noted above, the Tribal Council

Resolution limited the Band's consent to the thirteen parcels identified in

Enbridge's Tribal Lands Application. *See supra* 16.

The 1992 Agreement is clear: The 50-year easement applies to parcels of

land "in which the Tribe *now* has a legal interest," i.e., the Tribal Parcels—

and not in subsequently acquired allotted lands.

2. Enbridge ignores all this, pointing instead to a separate provision

requiring the parties to "do whatever they can reasonably do to ensure that

all the objectives of the Tribe and the Company, as those objectives are

expressed in this Agreement, are achieved, even if it means that one or both

of the parties must do something which is not expressly described herein."

Enbridge.Br.19. According to Enbridge, its "prime objective was to obtain

the Band's consent to Line 5's uninterrupted operation on the Reservation

as a whole—not just the parcels then owned by the Band." Enbridge.Br.22.

Enbridge then insists that the Band breached its responsibility to "do

whatever [it] can reasonably do" to ensure that Enbridge achieves its

objectives by acquiring distinct parcels subject to a 20-year easement and not agreeing to extend those separate easements. Enbridge.Br.22.

That argument is wrong for multiple reasons. First, the provision makes its touchstone the objectives "*expressed in the agreement*," and the 1992 Agreement applies only to lands "in which the Tribe *now* has a legal interest," i.e., as of 1992. BA19 (emphasis added). It does not authorize Enbridge to privilege its current hopes that the Agreement would convey an easement over the "Reservation as a whole," or that the Band would voluntarily extend the easements over subsequently acquired allotted parcels for no additional compensation, over the agreement's text.

Enbridge notes that the agreement also says that "[o]ne of the Company's objectives under this Agreement is to obtain from the Tribe all consents and authorizations it is possible for the Company to obtain, whether necessary or not to obtain a fifty (50) year easement for Right of Way for a pipeline over the Company's existing pipeline Right of Way in which the Tribe has an interest." Enbridge.Br.23 (emphases omitted). But

that statement is again limited to the "existing" right of way, i.e., the parcels "in which the Tribe *has* an interest," not later-acquired parcels.

If the point of the 1992 Agreement really were to provide Enbridge with a 50-year easement over future parcels that the Band might acquire or over the "Reservation as a whole," as Enbridge insists, it could easily have said so. After all, in identifying the "Original Rights of Way," the agreement references *both* the "lands in which the Tribe had a legal interest *and* including lands generally known as allotted lands." BA19 (emphasis added). The agreement contains not a whit of textual evidence that the $800,000 payment was to cover any future acquired interest in "allotted lands." It instead says the opposite, repeatedly limiting its reach to lands in which the Band "*now*" has an interest.

Perhaps recognizing that problem, Enbridge changes gears, insisting that even if the point of the Agreement was to provide Enbridge with an easement over only the "then Band-owned parcels for 50 years," the Band thwarted that objective by "depriving Enbridge of the ability to operate the pipeline for the remaining decades within the fifty-year easement."

Enbridge.Br.24 (emphases omitted). But as the district court correctly

recognized, that puts the cart before the horse. It would be one thing for the

Band to hinder the Agreement by, say, interfering with the approval

process for the Tribal Parcels at the Bureau or belatedly asserting that the

Bureau could not approve a 50-year easement over the thirteen Tribal

Parcels. A16-17. Had the Band done so (which it did not), it may well have

violated its obligation to "do whatever [it] can reasonably do" to ensure

that Enbridge got the benefit of its bargain: an easement to operate its

pipeline for fifty years over the Tribal Parcels. A16-17. But it is entirely a

different thing for the Band to assert its sovereign rights *over entirely*

*separate parcels that are not subject to the Agreement at all*. A17.

Enbridge knew from the beginning that obtaining a 50-year easement

over the thirteen Tribal Parcels did not secure a 50-year easement over the

entire Reservation. It understood that the 20-year easements over the

Allotted Parcels obligated it to reach a renewal agreement with the owners

of record in 2013 or else vacate the premises within six months. *See supra*

18-19. There was always a risk that some of those landowners would

decline to renew—and whether Enbridge could take full advantage of its permission on the Tribal Parcels until 2043 has always been contingent on whether it could persuade the owners of the dozens of other parcels along the corridor to renew in 2013. The Band did nothing to undermine the bargain the parties struck. The "objective" of the 1992 Agreement was to provide Enbridge with permission to operate its pipeline over thirteen specific Tribal Parcels until 2043—and Enbridge got exactly what it paid for.

3. With no support in the text, Enbridge invokes the implied duty of good faith. That effort fails at the threshold. "[A] hallmark of Indian sovereignty is the power to exclude non-Indians from Indian lands," and tribes cannot be deemed to have surrendered a sovereign power by implication; only "terms which admit of no other reasonable interpretation" will suffice. *Merrion*, 455 U.S. at 141, 148. That foundational principle forecloses Enbridge's effort to impose an implied duty.

Enbridge tries to distinguish "the power of a sovereign to exclude from its sovereign territory" and the "power to … consent to an easement,"

Enbridge.Br.26, but no authority supports that hair-splitting distinction.

The power to exclude "necessarily includes the lesser power to place

conditions on entry," both of which involve the Band's "sovereign power."

*Merrion*, 455 U.S. at 144-45. And Enbridge's suggestion that the "power to

… consent to an easement" is not a sovereign power because it is

"conferred by statute," Enbridge.Br.26, makes no sense. To be sure,

"federal statutes have long protected tribal rights against intrusion by third

parties," including by prohibiting "trespasses on Indian lands." Felix S.

Cohen, *Cohen's Handbook of Federal Indian Law*, §15.08 (2023) (collecting

statutes). But that does not make the "power to exclude non-Indians from

Indian lands" any less a sovereign power. *Merrion*, 455 U.S. at 141.[4]

Enbridge's contention that granting an easement "does not diminish a

tribe's sovereign authority," Enbridge.Br.28, only reflects Enbridge's stilted

view of tribal history and sovereignty. "[T]hat the tribe chooses not to

exercise its power" to exclude "when it initially grants a non-Indian entry

---

[4] The Bureau agrees. *See* 80 Fed. Reg. at 72,505-06, 72,509; *see also Barboan*,
857 F.3d at 1112.

46

onto the reservation does not permanently divest the tribe of its authority to" exercise that power. *Merrion*, 455 U.S. at 145. But *divesting* a tribe of its right to exclude (especially in the wake of events including the disastrous Kalamazoo River spill) *does* diminish its sovereign authority—which is why tribes may not surrender that authority by implication.

Enbridge's other arguments make even less sense. Enbridge likens the Band's trespass claim to that of "a private landowner." Enbridge.Br.26. But the Band is not a "private landowner"—it is a sovereign government, and its land is held in trust by the United States on a treaty-guaranteed reservation. *See* 1854 Treaty, art. 2. Conflating a tribe's power to exclude with that of an "individual landowner" again ignores reality and "denigrates Indian sovereignty." *Merrion*, 455 U.S. at 146.

Enbridge asserts that "[t]he Band did not merely refuse consent," but "first acquir[ed] land in which the Band held no interest." Enbridge.Br.27. But the Band's reacquisition of Reservation land only reinforces that the Band is acting as a sovereign; after all, the Band acquired the parcels at issue pursuant to ILCA, which Congress enacted to "consolidate fractional

47

interests in a manner that enhances tribal sovereignty," 25 U.S.C. §2201 note. Finally, Enbridge's assertion that "the sovereign power does not apply" when the sovereign enters into a contract, Enbridge.Br.27, flies in the face of black-letter law, under which "sovereign power … governs all contracts subject to the sovereign's jurisdiction, and will remain intact unless surrendered in unmistakable terms." *Merrion*, 455 U.S. at 148.

In all events, even if the implied duty were relevant, Enbridge's implied-duty argument fails on its own terms. The implied duty exists to "honor[] the reasonable expectations created by the autonomous expressions of the contracting parties," not to "expand a party's contractual duties beyond those in the express contract." *Metcalf Constr. Co. v. United States*, 742 F.3d 984, 994 (Fed. Cir. 2014) (federal common law).[5] Thus, the "implied duty of good faith and fair dealing is limited by the original bargain": "[A]n act will not be found to violate the duty (which is implicit in the contract) if such a finding would be at odds with the terms of the original bargain,

---

[5] *See* A10 n.3 ("The parties agree that federal law applies to … Enbridge's contract claims."); Enbridge.Br.18 n.2 (same).

whether by altering the contract's discernable allocation of risks and benefits or by conflicting with a contract provision." *Id.* Applying those principles, the district court correctly found no breach of the implied duty. "[B]locking renewal of Enbridge's twenty-year easements on the Allotted Parcels," Enbridge.Br.20, bears no connection to any specific promise in the 1992 Agreement. That agreement granted Enbridge a 50-year easement over thirteen specific parcels of tribal land—nothing more. *See supra* 16-18. That is exactly what Enbridge received.

If Enbridge wanted the 1992 Agreement to cover later-acquired parcels, it could have bargained for such protection. The implied duty of good faith does not give Enbridge a do-over. It applies to circumstances "that could not have been contemplated at the time of drafting, and which therefore [were] not resolved explicitly by the parties." *Mkt. St. Assocs. v. Frey*, 941 F.2d 588, 595 (7th Cr. 1991). But by 1992, ILCA had been in effect for nearly a decade, and the Band had been acquiring interests in allotted parcels under it throughout the Reservation. Indeed, Enbridge admitted below that "Enbridge knew it needed to obtain the Band's cooperation and consent *in*

*advance* for future BIA easement renewal(s) over the Allotted Parcels." R207

at 13.[6] Using the implied duty of good faith to preclude the Band from

asserting its right to exclude would thus alter "the contract's discernable

allocation of risks and benefits," *Metcalf*, 742 F.3d at 991, by transforming

(without any additional consideration) a 50-year easement over thirteen

specific parcels into one over every parcel that the Band might acquire in

the future.

### C.  The Non-Intercourse Act Precludes Enbridge's Breach-of-Contract and Implied-Duty-of-Good-Faith Claims.

1. The Non-Intercourse Act provides that "[n]o purchase, grant, lease, or

other conveyance of lands, or of any title or claim thereto, from any Indian

nation or tribe of Indians, shall be of any validity in law or equity, unless

the same be made by treaty or convention entered into pursuant to the

Constitution." 25 U.S.C. §177. It speaks in broad terms. "[T]he statute

generally covers any sort of conveyance or alienation of an interest in real

---

[6] Accordingly, this case is nothing like the Restatement illustration
Enbridge cites (at 21), which involves an action that was neither
"contemplated" by the parties nor "justified."

property." Robert N. Clinton & Margaret Tobey Hotopp, *Judicial Enforcement of the Federal Restraints on Alienation of Indian Land*, 31 Me. L. Rev. 17, 69 (1979) (collecting cases). That (obviously) includes easements over Indian lands. The word "conveyance" means an "instrument … by which some estate or interest in lands is transferred from one person to another," Black's Law Dictionary 273 (1st ed. 1891), and an "easement" is "a permanent interest in another's land," *id.* at 405. Granting an easement is thus a "conveyance of lands"—as numerous contemporaneous decisions confirm. *See, e.g.*, *Worrall v. Rhoads*, 2 Whart. 427, 428 (Penn. 1837); *Arnold v. Stevens*, 24 Pick. 106, 109 (Mass. 1839). In short, "any easement over Indian land require[s] the consent of the United States." *Seneca Nation v. Hochul*, 58 F.4th 664, 667 (2d Cir. 2023).

Context reinforces that conclusion. The phrase "other conveyance of lands" follows a list of more specific verbs, including "purchase," "grant," and "lease." Congress intended "other conveyance of lands" to serve as catchall to sweep in all sorts of interests in land, in any form. *See Lac du Flambeau Band of Lake Superior Chippewa Indians v. Coughlin*, 599 U.S. 382,

388-89 (2023). The phrase "other conveyance of lands" also precedes the phrase "or of any title or claim thereto," further confirming that it is not limited to transactions that convey title, but extends to any interest in land, including easements. *See Chemehuevi*, 767 F.3d at 906.

History also reinforces this reading. The initial version of the statute prohibited just the "*sale* of lands made by … any nation or tribe of Indians." Act of July 22, 1790, Pub. L. No. 1-33, §4, 1 Stat. 137, 138 (emphasis added). Congress recognized, however, that "the conflict between whites and Indians that marked American Indian relations" at the time was caused not just by "private purchase[s]," but by other encroachments as well, including the "running of roads through Indian Country." Prucha, *supra*, at 139, 144-46. Congress thus updated the statute to make it "stronger" and "more detailed," *Oneida Cnty. v. Oneida Indian Nation of N.Y.*, 470 U.S. 226, 232 (1985), expanding it to include any "purchase *or grant* of lands, *or of any title or claim thereto*," Act of Mar. 1, 1793, Pub. L. No. 2-19, §8, 1 Stat. 329, 330 (emphases added), and then again to include any "purchase, grant, lease, *or*

*other conveyance of lands*, or of any title or claim thereto," Act of Mar. 3, 1799, Pub. L. No. 5-46, §12, 1 Stat. 743, 746 (emphasis added).

All of this explains why courts have long held that the Act prohibits easements over Indian land in the absence of federal authorization. Particularly relevant is *Southern Pacific Transportation Co.*, in which the Ninth Circuit invalidated a *nearly-100-year-old* "right-of-way across the reservation." 543 F.2d at 681. The court explained that "an easement is an interest in land which can be conveyed by an Indian tribe only 'by treaty or convention entered into pursuant to the Constitution.'" *Id.* at 697 (quoting 25 U.S.C. §177). Because the easement "purport[ed] to convey a claim to Indian lands from an Indian tribe" absent federal authorization, it was "invalid under [the Non-Intercourse Act]." *Id.* at 684.

2. The Non-Intercourse Act likewise plainly forecloses Enbridge's attempt to use the 1992 Agreement to excuse its trespass. Even if the Band somehow implicitly agreed in 1992 to grant Enbridge a 50-year easement over the Allotted Parcels (it did not), that grant would have "no validity in law or equity" absent federal authorization. 25 U.S.C. §177. And the federal

government never authorized a 50-year easement over the Allotted Parcels,

only a 20-year easement. Indeed, Enbridge acknowledges that "[t]he BIA

issued an easement through 2043 over *the Tribal Parcels* and easements

*through June 3, 2013, over the Allotted Parcels*." Enbridge.Br.8 (emphases

added).

 The record confirms as much. Federal law in 1992 required (as it does

today) that the easement instrument "shall incorporate all conditions or

restrictions set out in the consents obtained" from the tribe. 25 C.F.R.

§169.15 (1992). The Bureau's "Grant of Easement" for the twelve Allotted

Parcels relevant here all confirm that the easement "is limited as to tenure

for a period not to exceed 20 (Twenty) years, beginning on June 3, 1993, and

ending on June 2, 2013." BA32. By contrast, the Bureau's "Grant of

Easement" for the 50-year right-of-way specifically states that the easement

"is limited to" the thirteen Tribal Parcels—none of which is the subject of

the Band's trespass claim. BA27; BA30. Likewise, contemporaneous letters

confirm that the Bureau understood that the Band's request "to grant a

pipeline easement for fifty years" pertained only to a "Right-of-way to

[Enbridge] over *13 parcels of tribal trust land*." BA25 (emphasis added).
Nothing in the record suggests that the Bureau approved a 50-year
easement for any of the separate Allotted Parcels. Thus, even if the 1992
Agreement could somehow be read (explicitly or implicitly) to "give
Enbridge" the "right" to operate its pipeline over the Allotted Parcels until
2043, Enbridge.Br.17, it has "no validity in law or equity," 25 U.S.C. §177,
full stop.[7]

### D.     The APA Does Not Excuse Enbridge's Trespass.

Enbridge argues that 5 U.S.C. §558(c) allows it to operate its pipeline
across the Reservation despite the expiration of its easements because the
Bureau has not definitely rejected its application to extend the expired 20-
year easements. Enbridge.Br.29-32. Enbridge is wrong on multiple levels.

---

[7] In fact, had the Bureau approved a 50-year easement for any Allotted
Parcel in 1993, it would have issued the easement under 25 U.S.C. §323, as
it did with the thirteen Tribal Parcels. *See* BA27. But the Bureau instead
chose to issue the easements for the Allotted Parcels under §321, *see* BA31,
which explicitly provides that "the rights herein granted *shall not extend
beyond a period of twenty years*," 25 U.S.C. §321 (emphasis added); *see, e.g.,
Blackfeet Indian Tribe v. Mont. Power Co.*, 838 F.2d 1055, 1056 (9th Cir. 1988)
(§321 "authoriz[es] the Secretary to grant rights-of-way as easements … for
a period no longer than twenty years").

First, §558(c) is a generic provision that cannot trump the specific and earlier-enacted provisions of the Non-Intercourse Act and 1948 Right-of-Way Act that apply in the sensitive context of conveyances of Indian land. *See Varity Corp. v. Howe*, 516 U.S. 489, 511 (1996). Indeed, §558's neighboring provision—which Enbridge fails to mention—makes clear that "[t]his subchapter," which includes §558, "do[es] not limit or repeal additional requirements imposed by statute or otherwise recognized by law." 5 U.S.C. §559.

Second, by its plain terms, §558(c) applies only when the licensee has made a "*sufficient*" application for a renewal "in accordance with agency rules." But Enbridge's 2013 applications are the opposite of "sufficient," as they flout key Bureau requirements. The relevant rule in 2013 authorized the Secretary to renew a right-of-way only if the tribe consented in writing and only after the applicant paid the negotiated compensation to the tribe: "If the renewal involves no change in the location or status of the original right-of-way grant, the applicant may file with his application a certificate under oath setting out this fact, and the Secretary, *with the consent required*

*by §169.3*, may thereupon extend the grant for a like term of years, *upon the payment of consideration as set forth in §169.12*." 25 C.F.R. §169.19 (2013) (emphases added). "[T]he consent required by §169.3" includes "the prior written consent of the tribe." *Id.* & *id.* §169.3 (2013). And the "consideration as set forth in §169.12" is the monetary compensation that the parties agree to after "negotiations for a … renewal." *Id.* §169.12 (2013).[8] The renewal application form Enbridge used thus lists "Written consent of landowners (ROW Form 94-7)" as well as "Deposit of estimated … compensation (See 169.4 and 169.14)" as two of the "REQUIRED SUPPORTING DOCUMENTS" that applicants must file alongside their renewal application. BA45.

Enbridge did not satisfy those requirements. As the Bureau explained in rejecting Enbridge's renewal request in 2020: "Consent of the landowners is required before a ROW can be granted." BA39. "To date, the requisite landowner consent(s) have not been provided. *The applications have now been pending with the agency for more than seven years and remain incomplete*."

---

[8] The currently-in-force rules state likewise. *See* 25 C.F.R. §169.202.

BA39 (emphasis added). An "incomplete" application is not the kind of "timely and sufficient application" that triggers §558(c). After all, tribal consent is the sine qua non of a sufficient application, and what is incomplete is *in*sufficient by definition. *See* Black's Law Dictionary 1285 (5th ed. 1979) ("sufficient" means "[a]dequate," "enough," and "that which may be necessary to accomplish an object").

Enbridge does not dispute that the Bureau's rules prohibit it from renewing its easements absent Band consent, or that it failed to obtain that consent. Yet it insists that its renewal applications were "sufficient" because (it says) landowner consents are a "substantive," not a "procedural," requirement for renewal. Enbridge.Br.30. The statute draws no such distinction. Where an applicant's failure to satisfy an "agency rule[]" precludes the agency from renewing a license, the application is not "sufficient," regardless of whether one characterizes the relevant rule as "procedural" or "substantive." 5 U.S.C. §558(c); *see Bankers Life & Cas. Co. v. Callaway*, 530 F.2d 625, 634 (5th Cir. 1976) (finding application insufficient because "a substantive problem arose with [it]"). Regardless, the Bureau

plainly viewed the deficiencies in the applications as "procedural." The Bureau's application forms treat landowner consent as one of the "REQUIRED SUPPORTING DOCUMENTS," and the Bureau explained that Enbridge's failure to submit that supporting document rendered its applications "incomplete." BA39, BA45.

At bottom, Enbridge's argument makes nonsense of §558(c). The point of the provision is to avoid unfairly punishing a diligent applicant for *agency* delay in processing a renewal application. *See Kay v. FCC*, 525 F.3d 1277, 1279 (D.C. Cir. 2008); U.S. Dep't of Justice, *Att'y Gen.'s Manual on the APA* 91-92 (1947). The delay here had nothing to do with the agency, but everything to do with Enbridge's submission of an "incomplete" application that remained so "for more than seven years." BA39. Section 558(c) cannot save Enbridge from liability for its trespass.

II.    **Enbridge Is Liable for a Full Accounting of Its Wrongful Gains as a Result of Its Trespass.**

A.    **A Restitution Award that Effectively Incentivizes Continued Trespassing Violates Core Principles and the Non-Intercourse Act.**

Restitution reflects the foundational principle that "no person shall profit by his own wrong." *Pearson v. Target Corp.*, 968 F.3d 827, 831 (7th Cir. 2020). The goal is to "strip the defendant of a wrongful gain." Third Restatement §51 cmt. a. By depriving a wrongdoer of its profits, restitution deters similar misconduct.

Accordingly, a "defendant who takes something (and not because of an innocent mistake, either) that belongs to the plaintiff must give it back *together with any profit from the unlawful appropriation* even if that profit exceeded what the plaintiff would have earned had his property not been taken." *Schlueter v. Latek Cap. Corp.*, 683 F.3d 350, 354 (7th Cir. 2012) (emphasis added). Any "lesser liability would provide an inadequate incentive to lawful behavior." Third Restatement §3 cmt. c. "If A anticipates (accurately) that unauthorized interference with B's entitlement may yield profits exceeding any damages B could prove, A has a dangerous incentive

60

to take without asking—since the nonconsensual transaction promises to be more profitable than the forgone negotiation with B." *Id.* Worse, if "a conscious wrongdoer were able to make profitable, unauthorized use of the claimant's property, then pay only the objective value of the assets taken or the harm inflicted, the anomalous result would be to legitimate a kind of private eminent domain (in favor of a wrongdoer) and to subject the claimant to a forced exchange." *Id.* That dynamic is particularly acute when it comes to an easement, which is a voluntary agreement to traverse someone else's property. If a party can trespass involuntarily rather than traverse with permission, and pay only an approximation of the market value for the permission (if that), then the incentives to respect property rights and negotiate voluntary easements disappear.

That would be problematic enough in an ordinary case. But it is especially intolerable in a case that involves the de facto condemnation of tribal land for private use. The Non-Intercourse Act prohibits not just agreements between tribes and third parties that convey Indian land without authorization via treaty or statute; it equally prohibits judicial

orders that have the same effect. After all, courts may not "order relief

inconsistent" with the "express terms" of "federal law." *Kansas v. Nebraska*,

574 U.S. 445, 456 (2015). Just as "courts have no proper role in the

adjustment of reservation borders," *McGirt v. Oklahoma*, 140 S.Ct. 2452,

2462 (2020), they have no authority to issue any "judgment or decree which

operates directly or indirectly to transfer the lands from the Indians,"

*United States v. Candelaria*, 271 U.S. 432, 443 (1926). That is why courts have

held that tribal land is "beyond the reach of condemnation." *Barboan*, 857

F.3d at 1111-12. And it is why courts have declined to recognize an

"implicit license" to operate a railroad across Indian land. *S. Pac.*, 543 F.2d

at 698-99. A restitution award so trifling that it has the effect of extending

an easement over the Band's objection while incentivizing future trespasses

on Indian land would thus contravene the Non-Intercourse Act as well as

basic restitution principles.

### B.     The Restitution Award Fails to Stop Enbridge from Trespassing.

The district court's disgorgement remedy should have eliminated the

economic incentive for Enbridge to trespass. It utterly fails in that objective.

Indeed, it imposes only a modest toll that allows Enbridge to continue to trespass to this day.

*Pipeline profits.* Determining the appropriate amount of disgorgement requires assessing the amount of Enbridge's gain enabled by the trespass. Here, Enbridge profited immensely by trespassing on tribal land. The district court found that Enbridge's trespass enabled more than $1.1 billion in net profits from the pipeline since Enbridge began trespassing in 2013. That was the proper amount of the disgorgement remedy.[9] After all, "no person shall profit by his own wrong." *Pearson*, 968 F.3d at 831. Any "lesser liability would provide an inadequate incentive to lawful behavior." Third Restatement §3 cmt. c.

---

[9] For its ultimate recovery, the Band sought only an amount proportional to the Band's ownership interest in the parcels at issue, which on average was 69.455% during the first nine years of trespass. A121. The Band therefore does not contest the district court's decision to reduce the profits award on that basis, only the decision to prorate the award based on the fraction of the pipeline in trespass. For simplicity's sake, the Band uses the full disgorgement amounts as shorthand in this briefing, while understanding that any recovery will be adjusted accordingly.

The district court declined to enforce those principles, reasoning that because the Allotted Parcels constitute only 0.36% of the 642-mile pipeline, only 0.36% of Enbridge's profits were "attributable to the 12 parcels at issue." A117; *see also* BA2-3. The district court did not disagree that Enbridge's trespass was, and continues to be, absolutely necessary to the functioning of the entire pipeline (and thus all of Enbridge's profits). Without permission or a costly re-route or other transition, Enbridge would have been unable to generate any of its $1.1 billion in profits. Awarding only a trivial percentage of those profits, through a formula that treats the segments where Enbridge has long willfully trespassed no differently from segments where Enbridge possesses valid easements, violates first principles and loses sight of the objective of restitution: to deter wrongful conduct by "eliminat[ing] profit from wrongdoing." Third Restatement §51(4)-(5).

To the extent the district court's decision reflected concerns about causation, they were misplaced. While courts may only order disgorgement of gains that are "causally related to the wrongdoing," *SEC*

64

*v. First City Fin. Corp.*, 890 F.2d 1215, 1231 (D.C. Cir. 1989), Enbridge's

profits are directly attributable to its trespass under any theory of

causation. But for that trespass, Enbridge would not have made a cent from

its pipeline. Every gallon that passes through the pipeline necessarily

trespassed tribal land. The causal link is as direct as it gets.

To be sure, saying that a "profit is directly attributable to the underlying

wrong … does not mean that the defendant's wrong is the exclusive or

even the predominant source of the defendant's profit." Third Restatement

§51 cmt. f. And with a conveyance like a pipeline, a lawful right to operate

each segment is a necessary ingredient (i.e., but-for cause) of profitable

operation. But determining whether a "defendant's profit is properly

attributable to the defendant's wrong" or to the defendant's legitimate

activity is not a question of *causation*. *Id.* It is one of *apportionment*, i.e.,

deciding how much of a defendant's profit should be attributed to its

wrong, "as distinguished from other causes." William Page Keeton et al.,

*Prosser & Keeton on Torts* §52, at 345 (5th ed. 1984). And to the extent the

district court's decision reflects apportionment concerns, the court simply

misunderstood the relevant principles. The "burden is on the defendants …
to show which profits are attributable to their own investments" rather
than their wrongdoing. *Leigh v. Engle*, 727 F.2d 113, 138 (7th Cir. 1984)
(ERISA context); *see also Bucklew v. Hawkins, Ash, Baptie & Co.*, 329 F.3d 923,
932-33 (7th Cir. 2003) (same in copyright context); Third Restatement §51
cmt. *i* (same generally). When a defendant merely shows that "damages are
at some unascertainable amount below an upper limit and when the
uncertainty arises from the defendant's wrong, the upper limit will be
taken as the proper amount." *Grace v. Corbis-Sygma*, 487 F.3d 113, 119 (2d
Cir. 2007). By resolving uncertainty in victims' favor, that rule "avoid[s] the
potential for a wrongdoer to 'profit by his wrongdoing at the expense of his
victim.'" *Id.*

Enbridge has not come close to meeting its burden of showing with any
certainty that its profits are attributable to anything other than its trespass,
or why it makes sense for the restitution award to treat miles of ongoing
trespass no differently from segments where Enbridge operates lawfully.
While less than 1% of the pipeline trespassed on tribal land, 100% of the

petroleum products from which Enbridge's profits are derived trespassed

through it. Enbridge's "wrongful trespass affected and enabled" *all* of its

Line 5 business—so "the entire benefit" that Enbridge "gained is

attributable to the wrongful trespass." *In re de Jong*, 588 B.R. 879, 893 n.11

(9th Cir. B.A.P. 2018) (reversing decision to apportion profits), *aff'd*, 793

F.App'x 659 (9th Cir. 2020).

Regardless, the district court's decision ignores that any apportionment

methodology must still serve restitution's goals—i.e., deterring wrongful

conduct by stripping a wrongdoer of the profits of wrongdoing. *See* Third

Restatement §51(4). And there is zero question that an apportionment

methodology that turns on the length of pipeline and treats trespassing

segments and lawful segments the same will almost always fail that acid

test. Under the district court's reasoning, a company operating a lengthy

pipeline that trespasses on tribal land will almost always be on the hook for

only a tiny portion of its profits. Worse still, that portion will not account

for the sovereign nature of the Band or the reality that the Band's land,

unlike most of the property traversed by Enbridge's pipeline, is not subject

to involuntary condemnation. The district court's apportionment methodology thus inherently undervalues the Tribe's land and sovereignty to the benefit of an admitted trespasser. That it will fail to deter Enbridge and others going forward is certain. If Enbridge can make $1.1 *billion* from operating the pipeline in trespass for over a decade, why would it change its behavior based on a $5.1 *million* restitution award? The latter sum amounts to little more than a toll, leaving Enbridge—and every other company disinclined to follow the law—with the incentive to disregard the sovereign decisions and property rights of tribes, including the Band.

Moreover, it is particularly problematic to let Enbridge retain nearly all the profits it has earned since the district court's September 2022 summary judgment decision, which adjudicated Enbridge to be in conscious trespass and held that only (the court's conception of) the public interest, not Enbridge's interests, justified allowing the pipeline to continue to operate. A40-41. Under that logic, an adjudicated trespasser should derive no ongoing profits by operating in purported service of the public interest over the Band's sovereign objection. Yet Enbridge has earned more than

$130 million from Line 5 *since being adjudicated a trespasser*, and $40 million since the district court issued its final order in June 2023—sums that dwarf the amount Enbridge has been ordered to pay for over a decade of trespass. The court's award is restitution in name only.

*Avoided costs.* At the very least, the court should have ordered Enbridge to disgorge the $300-million windfall it received by delaying a transition away from trespass, as measured by the costs associated with its preferred (and least-expensive) path to re-route its pipeline around the Reservation.

As the district court correctly recognized, Enbridge's unlawful gains include expenses it avoided or deferred because of its trespass. A120. After all, a defendant's wrongful gains include "the unjust avoidance of a loss." *Reich v. Cont'l Cas. Co.*, 33 F.3d 754, 756-57 (7th Cir. 1994); *see also* 1 Dan B. Dobbs, *Law of Remedies* §4.5(3), at 640 (2d ed. 1993) ("*Dobbs on Remedies*") ("The savings can be seen as a form of income."). Here, re-routing the pipeline around the specific segment at issue in 2013 would have cost Enbridge roughly $500 million at minimum. A120. Enbridge avoided paying that substantial segment-specific amount *for over a decade* by

69

trespassing instead, which benefited Enbridge by freeing that money for other uses in the meantime. The court calculated that benefit (in the form of time value of money) at almost $300 million. A121.[10]

The court then discounted that amount based on the Band's average share in the parcels at issue (69.455%), which brought the total down to roughly $206 million. A121. The Band does not contest that proportional reduction. But that should have been the end of it. Instead, the court inexplicably discounted that segment-specific figure based on the overall pipeline length, resulting in $740,699—less than a quarter of one percent of Enbridge's avoided costs.

While the district court's decision to pro-rate Enbridge's overall pipeline profits was at least explicable (though unjustified), its decision to pro-rate Enbridge's avoided costs that have to do *only with the segment in trespass*, not the rest of the pipeline, is simply incoherent. No recognized principle of restitution—not causation, not apportionment, not even equity writ large—

---

[10] This calculation is conservative, as it is based on the cost of the shortest, least expensive re-route path that Enbridge could have proposed. R583 at PDF23.

justifies it. As to causation, there is no dispute: But for Enbridge's trespass across the Allotted Parcels, Enbridge would have been forced to re-route its pipeline around those parcels in 2013 or reconfigure its system more broadly (incurring additional costs in the process). There are no complicated apportionment questions either; the $500 million in avoided spending is entirely attributable to the segment at issue. Nor do any recognized principles of equity justify the district court's decision. The court worried that awarding the full $300 million (as adjusted for ownership interest) "would result in disgorgement disproportionate to Enbridge's trespass on a few parcels." A121. But that amount was directly tied to what Enbridge saved by not re-routing *around the specific parcels at issue*. Enbridge could not have earned profits from Line 5 without either trespassing on the Band's land or completing a re-route. Under those circumstances, there is nothing remotely inequitable or disproportionate about forcing Enbridge to disgorge its savings from deferring those necessary costs by over a decade while continuing to trespass (and thereby netting over a billion dollars during that same decade).

What *is* disproportionate, though, is ordering Enbridge to disgorge *just a quarter of a percent* of gains that it realized *only* because of its wrongdoing. To be sure, courts sometimes exercise their discretion to award less than full gains. *See, e.g.*, *Kansas*, 574 U.S. at 465. But doing so is appropriate only when the smaller remedy would nevertheless be sufficient to serve restitution's goal of deterring wrongdoing by eliminating its profits. *Id.* at 465-66. Here, the district court made zero effort to explain why requiring Enbridge to disgorge a tiny fraction of its avoided costs would suffice to discourage future trespass. Nor could it: If Enbridge can reap (at a minimum) a $300 million benefit from delaying a transition away from trespass for more than a decade, it is impossible to see how requiring Enbridge to disgorge only $5.1 million of that benefit (less than 2% of its gain) would change its behavior or the behavior of any other knowing trespasser on tribal land.

Under the trifling trespass toll that the district court issued, the economically rational choice is for Enbridge to continue trespassing. The district court's award wholly fails to satisfy the purposes of restitution.

**III.    The District Court Erred By Refusing to Issue a Permanent Injunction Ordering Enbridge to Stop Trespassing Immediately.**

**A.    The Non-Intercourse Act Requires Immediate Cessation of Enbridge's Trespass.**

1. While courts have discretion to shape equitable relief, it is a longstanding maxim that a court of equity cannot "create a remedy in violation of law." *INS v. Pangilinan*, 486 U.S. 875, 883 (1988). Here, the law declares that no "conveyance" of Indian land shall have "any validity in law or equity" unless made in accordance with a federal treaty or statute. 25 U.S.C. §177. Yet the district court's injunction grants Enbridge a three-year "forced easement" to trespass on Indian land (in exchange for less than 0.36% of its profits). That is a "conveyance" of Indian land under the Non-Intercourse Act. *See supra* 50-53. And no federal treaty or statute authorizes it. To the contrary, the relevant statutes strictly prohibit the grant of rights-of-way over Indian land "without the consent of the proper tribal officials." 25 U.S.C. §324; *see supra* 9-10. When, as here, a trespasser expresses its intent to continue trespassing in the absence of an injunction, the Non-Intercourse Act affirmatively demands an injunction ordering the trespasser to cease and desist.

To be sure, "a federal judge sitting as chancellor is not mechanically obligated to grant an injunction for every violation of law." *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 542 (1987). But "Congress may intervene and guide or control the exercise of the courts' discretion." *Town of Munster v. Sherwin-Williams Co.*, 27 F.3d 1268, 1271 (7th Cir. 1994). And "Congress has spoken in the plainest of words," *TVA v. Hill*, 437 U.S. 153, 194 (1978), when it comes to conveyances of Indian land: "*No* purchase, grant, lease, or other conveyance" of Indian lands "shall be of *any validity* in law or equity" unless made in accordance with a federal treaty or statute. 25 U.S.C. §177 (emphasis added). Congress has spoken with equal plainness when it comes to rights-of-ways over Indian land: "*No* grant of a right-of-way over and across any lands belonging to a tribe … shall be made without the consent of the proper tribal officials." *Id.* §324 (emphasis added).

These statutes admit of no exception: The sovereign rights of tribes in protecting the remaining integrity of their land bases cannot be balanced away or subordinated to a singular court's conception of the public interest. And it is not as if Congress was unaware of countervailing

74

considerations, including the Nation's need for energy. Congress passed 25
U.S.C. §321 at the turn of the twentieth century to help ensure that
"modern necessities" such as "train tracks, telegraph wires, and other
conduits of modern commerce" could "span the continent without
encumbrance" as the American people headed west. *Davilla*, 913 F.3d at
964. It passed the 1948 Right-of-Way Act amidst the post-war infrastructure
boom and its attendant massive expansions in pipeline infrastructure
(including the construction of Line 5). Nevertheless, at both junctures
Congress explicitly required tribal consent (and federal approval) for
easements across tribal lands. Congress struck a deliberate balance that the
district court was bound to follow.

2. The district court resisted that conclusion, emphasizing *Oneida
County*'s dictum that "the Nonintercourse Act does not address directly the
problem of restoring unlawfully conveyed land to the Indians," 470 U.S. at
239. A38. That is a non-sequitur. The Band is not seeking to redress an
unlawful conveyance of its land. It seeks a remedy *to prevent* such a
conveyance *by the court*. Whatever the Non-Intercourse Act may say about a

court's ability to redress an unlawful conveyance of tribal lands, it directly and explicitly forbids a court from *accomplishing* such a conveyance, be it "in law *or equity*." 25 U.S.C. §177 (emphasis added). Yet that is exactly what the district court did with its three-year "forced easement." A123.

Nothing in *City of Sherrill v. Oneida Indian Nation of New York*, 544 U.S. 197 (2005), is to the contrary. There, the Oneida sought to prohibit a city from taxing land the tribe had recently purchased after having been absent from the region for two centuries. *Id.* at 211-12. The Court held that laches barred that request, *id.* at 221, but in doing so it emphasized the long period in which the "embers of sovereignty" had grown cold, *id.* at 214. This case could not be more different. "Nothing akin to the Oneida's wholesale abandonment of their reservations occurred here[.]" *Lac Courtes Oreilles Band*, 46 F.4th at 562. The Allotted Parcels are on land clearly understood as part of the Reservation. The easements themselves recognized as much and expressly contemplated the need for Enbridge to vacate within six months of expiration. If *City of Sherrill* had involved a 20-

year cessation of taxing authority with an express condition that taxes
could resume upon expiration, the tribe would have prevailed.

Finally, Enbridge notes that the Tenth Circuit in *Davilla* ordered the
district court to address the traditional injunction factors in a trespass
action. Enbridge.Br.40. But the Tenth Circuit did not sanction disregard of
the Non-Intercourse Act's clear commands. The *Davilla* plaintiffs were
individual Indians, 913 F.3d at 962, whose interests are not protected by the
Act, *see San Xavier Dev. Auth. v. Charles*, 237 F.3d 1149, 1151 (9th Cir. 2001).

### B.    Basic Equitable Principles Support the Same Result.

1. Remarkably, Enbridge argues that the district court did not apply the
four-factor injunction test in determining a trespass remedy.
Enbridge.Br.40-43. Reality differs: The district court determined that an
injunction is necessary to prevent irreparable harm and that monetary
damages are inadequate to compensate the Band for its injury. A40. That
was obviously correct. "As a general rule, interference with the enjoyment
or possession of land is considered 'irreparable' since land is viewed as a
unique commodity for which monetary compensation is an inadequate

substitute." *Pelfresne v. Vill. of Williams Bay*, 865 F.2d 877, 883 (7th Cir. 1989). And "[w]hen the defendant by words or conduct expressly or impliedly threatens repeated future trespasses, the injunction will go." *Dobbs on Remedies* §5.10(3), at 809. It is hard to imagine a clearer case of future trespasses than when, as here, the trespasser refuses to leave.

The court likewise agreed that "the balance of hardship between the parties weighs heavily in the Band's favor." A40. That too was spot-on. The easements terminated in 2013 and treated six months as the reasonable interval for Enbridge to vacate. Enbridge thus had every reason to start its transition planning over a decade ago, and certainly has no equitable claim to needing longer to vacate the premises than the six-month period it expressly agreed to. In short, the equities clearly favor the Band, and courts do not even need "to balance the equities in a case where the defendant's conduct has been willful." *Sierra Club v. Franklin Cnty. Power of Ill., LLC*, 546 F.3d 918, 935 (7th Cir. 2008).

Relying on the public interest prong of the injunction test, the district court nonetheless issued an injunction giving Enbridge a transition period

*six times longer* than the easements provide, based on concerns about the energy markets. A95. But in determining whether the public interest is served by an injunction, "a court sitting in equity cannot ignore the judgment of Congress, deliberately expressed in legislation." *United States v. Oakland Cannabis Buyers' Coop.*, 532 U.S. 483, 497 (2001). Here, the Non-Intercourse Act reflects Congress' judgment that unlawful conveyances of Indian land disserve the public interest. Indeed, while Congress has since modified federal law to allow lands owned by *individual* Indians to be condemned for public benefit, 25 U.S.C. §357, it has kept *tribal* lands (including allotted lands in which a tribe has regained an interest) "beyond the reach of condemnation," regardless of economic benefit, *Barboan*, 857 F.3d at 1104, 1111-12. "When Congress passes a statute, it weighs the competing public interests that would be served." *Michigan v. U.S. Army Corps of Eng'rs*, 758 F.3d 892, 901 (7th Cir. 2014). The district court was not at liberty to let its own views about the public interest usurp those of Congress.

2. The overheated arguments made by Enbridge and its amici about market impacts cannot and do not alter that conclusion. Enbridge's own expert determined that, in the event of a shutdown, gas prices would increase by less than a penny per gallon in Michigan and Wisconsin, and only a nickel in Ontario. BA69-71. Enbridge (and the district court) simply ignore(d) this. They also ignore the fact that, when Enbridge shut down Line 6B after the Kalamazoo River disaster, there was no impact on gas prices. R610 at 116:3-15.

The district court asserted that the Band has told a "rosy story" of how existing infrastructure will enable the market to offset nearly all the crude oil conveyed by Line 5 within months. A95-97. However, the court's findings to the contrary are not just clearly erroneous, but utterly bewildering. The court found it "wildly optimistic" to expect that capacity on Line 78 (another Enbridge pipeline serving the same refineries) will be filled if Line 5 is shut down. A96. But the Band was not alone in making that prediction; that was also the opinion *of Enbridge's own expert*. BA77:11-20. The court separately described the Band's account as hinging on

reversing another Enbridge pipeline (Line 9) to get oil to the Quebec

refineries, A95, but that is an argument *the Band has never made*, because it is

nonsensical; Line 9 is one means by which those refineries *currently* get oil.

R388-2 at 25-26. Finally, the court described the Band's narrative as

including moving oil by rail and truck out of Superior, Wisconsin, A95-97,

but that idea comes from a scenario presented in the report of an *Enbridge*

expert, which a Band expert rightly described as a "straw man argument"

and "not a scenario that would be seriously considered," BA73. Delaying

vindication of the Band's rights for years based on clearly erroneous factual

findings and the rejection of strawmen not only defies Congress' clear

judgment and trivializes the Band's sovereignty, but represents a serious

abuse of discretion. *See Lovelace v. McKenna*, 894 F.3d 845, 849 (7th Cir.

2018).[11]

---

[11] The court also found that while portable transloaders could be used to unload railcars of propane, they would take "as much as four to six months to even acquire." A99. That might explain why a six-*month* transition period would be useful, but not a three-*year* one.

3. Enbridge claims that the court erred in granting an injunction at all—even one according it a three-year forced easement. By Enbridge's account, *no* amount of delay can be expected to reduce the impact of a Line 5 shutdown, because so long as Enbridge holds out the possibility of a re-route, market players will not invest in alternatives. Enbridge.Br.46. The irony of that argument is that it means a delayed injunction does not serve market interests any better than an immediate one, in which case there is again no warrant to delay vindication of the Band's rights—unless, that is, a court is willing to impose an indefinite and patently illegal forced easement on the Band.

That Enbridge challenges the exceedingly lenient injunction, but accepts the "restitution" award as a reasonable cost of doing business , speaks volumes about the inadequacy of the latter and underscores that what Enbridge really seeks is a  forced easement in perpetuity.[12] But it is

_____

[12] Enbridge does not dispute the district court's finding that there is "little realistic prospect" of Enbridge completing this re-route within five years, if ever, A123, in light of concerns raised by federal agencies, the Band, and other stakeholders about the environmental impact of Enbridge's proposed re-reroute path, A94.

fundamental that "no one should be permitted to take land of another merely because he is willing to pay a market price for it." *Dobbs on Remedies* §5.10(4), at 816. That would amount to the power of eminent domain—and such power cannot be exercised without violating the Band's sovereignty and the unequivocal prohibitions of the Non-Intercourse Act.

Enbridge's cases do not indicate otherwise. While the Ninth Circuit affirmed a delayed injunction in *United States v. Pend Oreille County Public Utility District No. 1*, 135 F.3d 602, 614-15 (9th Cir. 1998), that case arose under the Federal Power Act, which expressly allows FERC to authorize the use of tribal lands for hydroelectric power projects *without tribal consent*. *See Escondido Mut. Water Co. v. La Jolla, Rincon, San Pasqual, Pauma, & Pala Bands of Mission Indians*, 466 U.S. 765, 787 & n.30 (1984). Here, by contrast, the Band's consent is required under both the Non-Intercourse Act and the rights-of-way acts—which is why the relevant agency (the Bureau) has already rejected Enbridge's application to continue using Band lands. *See* SA26-39.

Nor do Enbridge's citations suggest that a court "may award money damages for a trespass on tribal lands without issuing injunctive relief." Enbridge.Br.42-43. In *Oneida County*, the tribe raised only a claim for damages. 470 U.S. at 229. In *United States v. Santa Fe Pacific Railroad Co.*, the utility quitclaimed the land at issue back to the United States, mooting the issue of injunctive relief. 314 U.S. 339, 359-60 (1941). And in *Swinomish Indian Tribal Community v. BNSF Railway Co.*, the trespassing railroad company—in sharp contrast to Enbridge—*ceased violating its easement during the litigation*, mooting the claim for injunctive relief. 2022 WL 3597439, at *6, *11 (W.D. Wash. Aug. 22, 2022). These cases simply establish that a court may award monetary relief to a tribe seeking it, not that it may award such relief in lieu of an injunction.

## C.     Neither the Transit Treaty nor the Foreign Affairs Doctrine Precludes Injunctive Relief.

1. Enbridge spills significant ink discussing the Transit Treaty, but it ignores the more specific and earlier-in-time treaty that controls here: the 1854 Treaty, in which the United States guaranteed the Band the right not

just to live on the Bad River Reservation, but to exercise sovereign authority over it. A42-43.

Given the "retain[ed] … sovereignty" of the "Indian tribes," *Reich v. Great Lakes Indian Fish & Wildlife Comm'n*, 4 F.3d 490, 493 (7th Cir. 1993), courts "will not hold that Congress abrogated Indian treaty rights absent unambiguous language to that effect," *Swinomish Indian Tribal Cmty. v. BNSF Ry. Co.*, 951 F.3d 1142, 1160 (9th Cir. 2020). "There must be 'clear evidence that Congress actually considered the conflict between its intended action on the one hand and Indian treaty rights on the other, and chose to resolve that conflict by abrogating the treaty.'" *Herrera*, 139 S.Ct. at 1698 (quoting *Mille Lacs Band*, 526 U.S. at 202-03). That bedrock principle precludes Enbridge's (and Canada's) argument that the Transit Treaty guarantees Enbridge a right to operate its pipeline in trespass on the Band's land indefinitely. The Transit Treaty says nothing about Indian tribes or Indian lands. No evidence suggests that the United States even perceived a conflict between its agreement with Canada on the one hand and the 1854

Treaty with the Band on the other—let alone resolved it by making a clear choice to abrogate rights under the latter.

That should be the end of the matter. Indeed, even if there *were* evidence that the United States thought it was abrogating tribal rights in the Transit Treaty—which neither Enbridge nor its amici claim—that still would not help Enbridge. That is because the authority to impair Indian treaty rights "belongs to Congress alone," *McGirt*, 140 S.Ct. at 2462, and "[a] treaty is … not a legislative act," *Lac Courte Oreilles Band*, 46 F.4th at 565. And because "*only* Congress" may "take actions that lessen tribal sovereignty," *id.* at 557, neither the President, nor the Senate, nor the two together can make or ratify a treaty that operates of its own force to override tribal rights.

Enbridge and Canada seek to evade this conclusion by arguing that the Transit Treaty is self-executing. *See* Enbridge.Br.33.n.7; Canada.Br.12.n.13. But that is irrelevant to whether the Treaty is endowed with both the authority and the clarity to abrogate the Band's rights (it is not). And in any event, the Treaty is not self-executing. The argument to the contrary is based on a single, conclusory statement by a single State Department

official buried in an appendix to a Senate Committee Report. Whatever one thinks about legislative history generally, that argument surely takes its use to new lows, as making a treaty self-executing requires the agreement of the President and two-thirds of the Senate, not a statement by single official.

What is more, it is not just the 1854 Treaty that Enbridge must circumvent; Enbridge (again) ignores the federal rights-of-way statutes governing Indian lands. *See supra* 9-10. Those statutes plainly require Enbridge to obtain the Band's consent for pipeline easements over tribal land. *See* 25 U.S.C. §§321-324. The "Indian Right of Way Act applies to a 'very specific situation': the issuance of right-of-way easements that permit third parties to use a tribe's trust land, consistent with the conditions of that agreement." *Swinomish*, 951 F.3d at 1159. The Transit Treaty, on the other hand, applies more broadly. That alone precludes Enbridge's sweeping reading of the treaty; even outside the Indian treaty context, "a specific statute will not be controlled or nullified by a general one,

regardless of the priority of the enactment." *Morton v. Mancari*, 417 U.S. 535, 550-51 (1974).

2. Even if the Transit Treaty applied here, it would not help Enbridge. Enbridge contends that, under Article II of the Transit Treaty, U.S. courts can *never* enjoin a transit pipeline from Canada "in any way"—no matter how blatant a trespass or other violation. Enbridge.Br.32-34. That is a breathtaking claim: If Enbridge were right, then *any* effort to enforce the property rights of private parties, municipalities, tribes, or states would be verboten—even when, as here, it rested on the plain terms of a freely negotiated easement. That theory would convert a state's or tribe's understandable effort to resist a re-routing through state parkland or sacred tribal land into a breach of the United States' treaty obligations.

Only the clearest of text could support such a sweeping diminution of state and tribal power. But the text of the Transit Treaty confirms exactly the opposite: The United States and Canada made no such agreement.

To be sure, Article II provides that "[n]o public authority in the territory of either Party shall institute any measures … which are intended to, or

which would have the effect of, impeding, diverting, redirecting or interfering with in any way the transmission of hydrocarbons in transit." 28 U.S.T. 7449, art. II, cl. 1, 1977 WL 181731 (Jan. 28, 1977). But Article IV—which Enbridge simply ignores—confirms the limitations of that provision. "Notwithstanding the provisions of Article II," Article IV provides that "a Transit Pipeline shall be subject to regulations by the appropriate governmental authorities … *in the same manner* as for any other pipelines … subject to the authority of such governmental authorities[,] with respect to such matters as … [p]ipeline safety[,] … operation standards[, and] environmental protection." 28 U.S.T. 7449, art. IV, cl. 1 (emphasis added).

This unequivocal language confirms the Band's right to seek, and the district court's power to order, relief in this litigation. After all, "state regulation can be as effectively exerted through an award of damages as through some form of preventive relief." *Cipollone v. Liggett Grp. Inc.*, 505 U.S. 504, 521 (1992) (brackets omitted). And the Band seeks through this suit to enforce a right to exclude that "is a hallmark of Indian sovereignty," *Merrion*, 455 U.S. at 141, and to protect the Bad River watershed and Lake

Superior from environmental devastation—aims that square with the

illustrative list of acceptable regulatory purposes under Article IV.[13]

 As a last-ditch effort, Enbridge asserts that Article V "prohibits public

authorities from permanently shutting down transit pipelines."

Enbridge.Br.34-35. But Article V speaks  of temporary shutdowns *because it*

*only addresses situations calling for them*: "In the event of an actual or

threatened natural disaster, an operating emergency, or other

demonstrable need temporarily to reduce or stop … the normal operation

of a Transit Pipeline, the flow of hydrocarbons through such Transit

Pipeline may be temporarily reduced or stopped[.]" 28 U.S.T. 7449, art. V.

Language in a distinct article addressing a distinct situation does not

diminish the force of Article IV.[14]

---

[13] Neither Enbridge nor Canada argues that the injunction disfavors Line 5 because it is a transit pipeline. Nor could they; it imposes "requirements, terms and conditions" in a nondiscriminatory fashion to redress Enbridge's tortious trespass—all in keeping with Article IV's second clause. *See* 28 U.S.T. 7449, art. IV, cl. 11.

[14] The Treaty also provides no support for Canada's argument that the courts must short-circuit any domestic litigation touching on transit pipelines.  Article IX only governs the resolution of disputes between the

90

3. Finally, enjoining the operation of the pipeline does not violate the "foreign affairs doctrine." *Contra* Enbridge.Br.37-40; Trade.Unions.Br.4-12. Under that "doctrine," "*state* law must give way" to "federal executive authority" where "there is evidence of clear conflict between the policies adopted by the two." *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 421 (2003) (emphasis added); *accord Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 375-76 (2000).

Nothing in *Garamendi* or *Crosby* suggests that a state or tribe cannot enforce its clear rights under a contract or easement simply because doing so inconveniences a foreign sovereign. Likewise, neither Enbridge nor its amici cites any case holding that the "foreign affairs doctrine" displaces *federal courts*' authority to vindicate promises the *United States* has made to Indian tribes, which are sovereigns themselves. Nor have they cited evidence that the United States has disavowed its commitment to

---

United States and Canada. The Treaty contains no directive to the courts to stay or divert litigation by tribes or any other entity to enforce their rights, and that is fatal to Canada's claim. *See GE Energy Power Conversion France SAS, Corp. v. Outokumpu Stainless USA, LLC*, 140 S.Ct. 1637, 1645 (2020).

enforcement of the Band's sovereign rights. It goes without saying that

while Canada is vociferous in its belief that a conflict exists between the

Band's rights and the Transit Treaty and that the Band's rights must give

way, Canada does not speak for the United States.

## IV.   The District Court Correctly Held That Continued Operation of the Pipeline Constitutes a Public Nuisance.

### A.   The Continued Operation of the Pipeline Is a Public Nuisance.

"A public nuisance is defined as a substantial and unreasonable

interference with a right common to the general public." *Michigan v. U.S.*

*Army Corps of Eng'rs*, 667 F.3d 765, 771 (7th Cir. 2011). The district court

found that a pipeline rupture at the meander not only "would

unquestionably be a substantial and unreasonable interference with the

Band's and the public's rights" but "is now 'sufficiently close to occurring'

such that Enbridge must take new actions to abate the nuisance." A104.

Enbridge disputes neither nuisance liability nor the court's underlying

factual findings. That should be the end of the matter.

Enbridge nonetheless argues that the PSA displaces the Band's claim

and that the Band is responsible for Enbridge's nuisance in all events.

Enbridge is wrong on both counts.

### B.     The Pipeline Safety Act Does Not Displace the Nuisance Claim.

The PSA expressly *preserves* common-law tort claims: "This chapter does

not affect the tort liability of any person." 49 U.S.C. §60120(c). That clause

alone defeats Enbridge's displacement theory.

Despite (or perhaps because of) that clear text, Enbridge tries to rewrite

the statute. In Enbridge's telling, the phrase "tort liability" in §60120(c)

refers only to "pecuniary obligation[s]," not "nonpecuniary remedies like

… injunctions." Enbridge.Br.57 (emphasis omitted). But §60120(c) draws no

such distinction; it preserves all "tort liability," no matter the remedy. And

courts "may not narrow a provision's reach by inserting words Congress

chose to omit." *Lomax v. Ortiz-Marquez*, 140 S.Ct. 1721, 1725 (2020). Doing

so here would be especially inappropriate given that Congress *did*

distinguish between "pecuniary obligation[s]" and nonpecuniary remedies

elsewhere in the statute. *Compare* 49 U.S.C. §60120(a)(1) (authorizing courts

to "award appropriate relief, including a temporary or permanent injunction, punitive damages, and assessment of civil penalties" in enforcement actions brought by the Attorney General), *with id.* §60121(a)(1) (authorizing courts to award only "injunction[s]" in private-party suits). "The fact that Congress knows how to withdraw a particular remedy and has not expressly done so is some indication of congressional intent to preserve that remedy." *Burnett v. Bowen*, 830 F.2d 731, 737 (7th Cir. 1987). 1987).

Nothing in *Sprietsma v. Mercury Marine*, 537 U.S. 51 (2002), or *United States v. Locke*, 529 U.S. 89 (2000), undermines that conclusion. *Contra* Enbridge.Br.57-59. The plaintiff in *Sprietsma* sought only damages; so, while the Court interpreted the phrase "liability at common law" to encompass damages, it did not address whether that phrase *excludes* injunctive relief. 537 U.S. at 54. Similarly, *Locke* simply assessed whether a state *regulation* fell within a savings clause, not whether the clause was limited to damages claims. 529 U.S. at 97-98.

94

Enbridge's argument also flies in the face of this Court's decision in *Michigan v. U.S. Army Corps of Engineers*. Enbridge asserts that "[t]he PSA's delegation of authority over pipeline safety … to an expert agency" suffices to establish displacement. Enbridge.Br.16. But *Michigan* rejected the notion that "all Congress must do to displace federal law is … delegate a particular problem to an executive agency." 667 F.3d at 777. And the provision Enbridge highlights merely authorizes the Secretary to issue emergency orders redressing pipeline hazards "without prior notice or an opportunity for a hearing." 49 U.S.C. §60117(p)(1). That is hardly redundant of an action to enjoin a public nuisance in federal court.

This case is therefore far afield from those Enbridge invokes (at 50-51). *City of Milwaukee v. Illinois*, 451 U.S. 304 (1981 ), involved a nuisance claim seeking to impose specific effluent limitations on pollutant discharges. The Court held that the Clean Water Act displaced that claim—not because the Act broadly regulates water pollution, but because it subjects the defendants to "specific effluent limitations," leaving no room "for a federal court to impose more stringent limitations [under] federal common law."

*Id.* at 319-20. Similarly, in *American Electric Power Co. v. Connecticut*, 564 U.S. 410 (2011), the Court found that the Clean Air Act displaced a nuisance claim against power generators seeking "a decree setting carbon-dioxide emissions for each defendant" because the statute provided "a means to seek limits on emissions of carbon dioxide from domestic powerplants" *on precisely the same terms* as sought by the plaintiffs' nuisance claim, leaving "no room for a parallel track." *Id.* at 425.

No comparable redundancy exists here. Nothing in the PSA "speaks directly to the … nuisance about which the [Band is] complaining." *Michigan*, 667 F.3d at 780. It says nothing about the permissible distance between a pipeline and a flood-prone river, or the appropriate relief in such circumstances.[15] To the contrary, the PSA explicitly "does not authorize the Secretary of Transportation to prescribe the location or routing of a pipeline facility," 49 U.S.C. §60104(e), leaving that to other governments—

---

[15] The district court stated that Enbridge's shutdown plan was approved by PHMSA, A110, but it was confused. Enbridge developed three shutdown plans during this litigation and has never suggested that they were subject to PHMSA approval. *E.g.*, R447 at 25 ("[T]his proposed plan is not necessary to 'comply with PHMSA's regulatory guidance.'").

and the continued operation of Enbridge's  pipeline in the immediate

vicinity of the Bad River is the very nub of the Band's claim.

As this Court has made clear, "that Congress has not been mute on the

subject" is insufficient; "Congress must have spoken to the particular

question at issue" and "provided a sufficient legislative solution" in terms

that leave no room for common-law adjudication. *Michigan*, 667 F.3d at 777-

78. Congress has not done so here, instead choosing to preserve tort claims

and withhold federal authority over the location of pipelines. Those carve-

outs from the federal regulatory scheme eviscerate Enbridge's

displacement argument.

## C.    Enbridge's Disingenuous Efforts to Blame the Band Fail.

Enbridge argues that relief from the nuisance should have been

precluded because the Band declined to authorize Enbridge to install

massive armoring projects to alter the Bad River's course. But each of

Enbridge's proposals through trial would have *extended* Enbridge's trespass

by armoring the banks of a parcel directly adjacent to the meander and

held in trust for the Band and individual citizens, and many would have

97

required substantial, destructive access with heavy equipment across roadless Band and individual-Indian-owned parcels. A65; BA153-55; (R268-3 at 183-84; R601 at 72:8-74:6; R606 at 39:11-40:21). Moreover, the district court recognized that the Band's rejections of Enbridge's project proposals, which would involve the discharge of thousands of cubic yards (roughly the volume of 500 dump trucks) of material into the Bad River and adjacent water resources, constituted a lawful exercise of the Band's authority under the Clean Water Act.[16] A70. Enbridge cites no case holding that a party engaged in a nuisance has an entitlement to trespass (more) on another's land, and to override the lawful exercise of regulatory authority, to attempt its preferred method of abating  the nuisance. This case should not be the first.[17]

---

[16] The Band regulates water quality on the Reservation pursuant to its inherent authority and an express delegation by Congress under the Clean Water Act. *See* 81 Fed. Reg. 30,183 (2016); BA128-29.

[17] Enbridge's argument is particularly galling since the district court improperly held the Band's refusal to acquiesce in Enbridge's "remedy"-cum-trespass *against the Band* in its equitable decisionmaking. A106-07; *contra* Enbridge.Br.60-61.

**V.    The District Court's Remedy Fails to Abate The Nuisance.**

While the district court correctly determined that Enbridge can no longer be allowed to operate Line 5 unrestrained given the looming threat of a catastrophic spill, it failed to order action "that will be effective to abate the public nuisance." *Michigan*, 667 F.3d at 781. The court adopted a plan, largely based on an Enbridge submission, that calls for the pipeline to be purged and then shut down when two criteria are satisfied in tandem: river flows must be at least 10,500 cfs (or there must be a forecasted flow of 15,000 cfs); and the river erodes to within 5 feet of the pipeline at 2 separate locations at least 20 feet apart. A110. That decree fails to guard against the risk of a catastrophic rupture, and thus is an abuse of discretion, for two independent (but closely related) reasons.

First, based on *the district court's own factual findings*, the plan allows Enbridge to operate the pipeline right up to the brink of disaster, such that it will be all but impossible for Enbridge to prevent a catastrophic rupture once it finally does move to shut down the pipeline. The amount of bank remaining between the river and pipeline at the closest point (11 feet) is

now equivalent to the amount of bank lost in a single week last spring. A85.

The court found that it would take Enbridge 40 hours to purge the pipeline

of oil, and that "preparatory work required … to even begin a 40-hour

purge can itself take three to five days." A105. The river is at a point, in

other words, where barely enough time might exist for Enbridge to purge

the pipeline and shut it down before pipeline exposure next spring. And, as

the court recognized, that "does not account for inevitable delays that

could occur due to weather conditions, supply and equipment problems

and human error." A105.

Yet far from requiring the pipeline to shut down during the next

flooding season, the court embraced a plan that will allow for erosion to

continue until only 5 feet of bank remain—barely more than that lost *in a*

*single day* at two locations last spring. BA95. The court never explained how

the 5-foot threshold can be squared with its findings on purge timing and

rate of bank loss. In its November 2022 order, when 26-27 feet remained,

the court expressed skepticism that the flooding event(s) necessary to erode

that amount of bank would also scour enough soil to leave the pipeline

unsupported for a stretch exceeding its critical span length. A62-63. By its

June 2023 decision, however, with only 11 feet remaining, those doubts had

disappeared. "Even if the court assumes that Enbridge would activate its

shutdown and purge plan as soon as two backline [5-foot] monuments are

lost, the river could peak and recede more quickly than it did this spring,

resulting in 'sloughing' that exposes Line 5 to an unsupported span close to

60 or 100 feet before Enbridge is able to complete its preparatory work,

much less complete the actual purge." A105.[18] That finding is consistent

with testimony from Enbridge's own expert that "a single flood could

result in both an initial pipeline exposure and free span of greater than 90

feet if the bank started at five feet from the pipeline," R608 at 17:7-18:4, and

considerable evidence of pipelines being exposed to river forces and

rupturing in a single flood. *See, e.g.*, R484-12 at I-2-I-6, I-12; R608 at 18:21-23.

    <u>Second</u>, the court's order allows Enbridge to continue pumping oil,

no matter what amount of bank remains (or even if the pipeline is

---

[18] The Court found that the pipeline would likely rupture at a "critical
aerial span of approximately 100 feet." A78-80.

unsupported), unless river flows are at least 10,500 cfs (or a 15,000 cfs event is forecasted). A108, A110. The district court's blessing of this flow requirement runs directly counter to its own finding that significant erosion takes place at flows substantially below 10,500 cfs. "Generally, the actual erosion of the riverbank does not occur while floodwaters are peaking, but instead after the flood waters recede below the top of the bank." A88.[19] While floodwaters carve away and soften the soil, the pressure of the water can prevent bank sloughing or collapse until the waters subside. A87-88. Events last spring place these realities in dramatic relief, as large swaths of bank were lost at flows lower than 10,500 cfs. *Id.*; BA95, 103; R660 at 3 (3-4 feet lost at two locations in 24 hours at 6,500 cfs and below); BA98 (large block with tree collapsed at 4,000 cfs); BA92, BA100 (21.5 feet lost between April 5 and May 5 when flows reached 10,500 cfs on just 5 days). And this is not a unique pattern. *E.g.*, BA103 (5 feet lost in one week in April 2020 with peak flow less than 8,000 cfs).

---

[19] The Bad River overtops banks at the meander at approximately 6,000 cfs. R268-3 at 177.

Neither the distance nor the flow thresholds imposed by the district court can be reconciled, then, with its factual findings regarding the nature and rate of bank loss and pipeline exposure. Far from erring on the side of caution given the irreparable damage that a pipeline rupture would cause, the district court entered an order that fails in its most basic task and subjects the Band (and all concerned with the Bad River watershed and Lake Superior) to a far greater risk of a pipeline rupture during the next flooding season "than a reasonable man would incur." *Michigan*, 667 F.3d at 781. The court's adoption of Enbridge's shutdown plan (as slightly modified) instead of a purge and shutdown prior to the commencement of the spring flooding season constitutes a grave abuse of discretion that could lead to catastrophic consequences. It cannot stand.

## CONCLUSION

The Court should affirm the decision holding Enbridge liable for

conscious trespass and public nuisance. It should vacate the trespass

remedy and instruct the district court to order Enbridge to cease its

trespass and disgorge its profits. And it should vacate the nuisance remedy

and instruct the district court to abate the nuisance.

Dated: October 11, 2023

Respectfully Submitted,

Paul D. Clement

Matthew D. Rowen*

James Xi*

CLEMENT & MURPHY, PLLC

706 Duke Street

Alexandria, VA 22314

(202) 742-8900

* Supervised by principals of the firm
who are members of the Virginia bar


Erick Arnold

BAD RIVER BAND OF THE LAKE

SUPERIOR TRIBE OF CHIPPEWA INDIANS

OF THE BAD RIVER RESERVATION

72682 Maple Street

Odanah, WI 54861

(715) 682-7107

s/Riyaz A. Kanji

Riyaz A. Kanji

David A. Giampetroni

Lucy W. Braun

Ian P. Fisher

Josh C. Handelsman*

KANJI & KATZEN, P.L.L.C.

P.O. Box 3971

Ann Arbor, MI 48106

(734) 769-5400

* Supervised by principals of the firm who
are members of the Michigan bar


Jane G. Steadman

KANJI & KATZEN, P.L.L.C.

811 1st Avenue, Suite 630

Seattle, WA 98104

(206) 344-8100


Bruce Wallace

HOOPER HATHAWAY PRICE BEUCHE

& WALLACE

126 S. Main Street

Ann Arbor, MI 48104

(734) 662-4426

105

# CERTIFICATE OF COMPLIANCE
## WITH TYPE-VOLUME LIMITATION

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B), Circuit Rule 32(c), and this Court's Order granting the Band's motion to file an oversize brief, ECF 36, because the brief contains 18,976 words, excluding the parts of the brief exempted from the word count by Fed. R. App. P. 32(f).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because the Brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Palatino Linotype font.

October 11, 2023

s/Riyaz A. Kanji
Riyaz A. Kanji

## CERTIFICATE OF COMPLIANCE WITH CIRCUIT RULE 30(d)

Pursuant to Circuit Rule 30(d), counsel certifies that all materials

required by Circuit Rule 30(a) and (b) are included in the appendix bound

with Enbridge's brief and the separate appendix filed with this brief. *See*

Circuit Rule 30(c).


October 11, 2023


s/Riyaz A. Kanji
Riyaz A. Kanji

# Statutory Addendum

# Table of Contents

*Treaty with the Chippewa, 10 Stat. 1109 (Sept. 30, 1854)* .......................................1

*Agreement Between the Government of the United States and the Government of Canada Concerning Transit Pipelines, 28 U.S.T. 7449, 1997 WL 181731 (Jan. 28, 1977)* ....................................................................................................6

*5 U.S.C. §558* ..........................................................................................................11

*5 U.S.C. §559* ..........................................................................................................12

*25 U.S.C. §177* ........................................................................................................13

*25 U.S.C. §321* ........................................................................................................14

*25 U.S.C. §323* ........................................................................................................16

*25 U.S.C. §324* ........................................................................................................17

*49 U.S.C. §60104* ....................................................................................................18

*49 U.S.C. §60117(p)* ...............................................................................................19

*49 U.S.C. §60120* ....................................................................................................22

*49 U.S.C. §60121* ....................................................................................................23

*25 C.F.R. §169.3 (2013)* ..........................................................................................25

*25 C.F.R. §169.12 (2013)* ........................................................................................26

*25 C.F.R. §169.19 (2013)* ........................................................................................27

*25 C.F.R. §169.15 (1992)* ........................................................................................28

## Treaty with the Chippewa, 10 Stat. 1109 (Sept. 30, 1854)

Articles of a treaty made and concluded at La Pointe, in the State of Wisconsin, between Henry C. Gilbert and David B. Herriman, commissioners on the part of the United States, and the Chippewa Indians of Lake Superior and the Mississippi, by their chiefs and head-men.

## ARTICLE 1

The Chippewas of Lake Superior hereby cede to the United States all the lands heretofore owned by them in common with the Chippewas of the Mississippi, lying east of the following boundary-line, to wit: Beginning at a point, where the east branch of Snake River crosses the southern boundary-line of the Chippewa country, running thence up the said branch to its source, thence nearly north, in a straight line, to the mouth of East Savannah River, thence up the St. Louis River to the mouth of East Swan River, thence up the East Swan River to its source, thence in a straight line to the most westerly bend of Vermillion River, and thence down the Vermillion River to its mouth.

The Chippewas of the Mississippi hereby assent and agree to the foregoing cession, and consent that the whole amount of the consideration money for the country ceded above, shall be paid to the Chippewas of Lake Superior, and in consideration thereof the Chippewas of Lake Superior hereby relinquish to the Chippewas of the Mississippi, all their interest in and claim to the lands heretofore owned by them in common, lying west of the above boundary-line.

## ARTICLE 2

The United States agree to set apart and withhold from sale, for the use of the Chippewas of Lake superior, the following described tracts of land, viz:

1st. For the L'Anse and Vieux De Sert bands, all the unsold lands in the following townships in the State of Michigan: Township fifty-one north range thirty-three west; township fifty-one north range thirty-two west; the east half of township fifty north range thirty-three west; the west half of township fifty north range thirty-two west, and all of township fifty-one north range thirty-one west, lying west of Huron Bay.

2d. For the La Pointe band, and such other Indians as may see fit to settle with them, a tract of land bounded as follows: Beginning on the south shore of Lake Superior, a few miles west of Montreal River, at the mouth of a creek called by the Indians Ke-che-se-be-we-she, running thence south to a line drawn east and west through the centre of township forty-seven north, thence west to the west line of said township, thence south to the southeast corner of township forty-six north, range thirty-two west, thence west the width of two townships, thence north the width of two townships, thence west one mile, thence north to the lake shore, and thence along the lake shore, crossing Shag-waw-me-

quon Point, to the place of beginning. Also two hundred acres on the northern extremity of Madeline Island, for a fishing ground.

3d. For the other Wisconsin bands, a tract of land lying about Lac De Flambeau, and another tract on Lac Court Orielles, each equal in extent to three townships, the boundaries of which shall be hereafter agreed upon or fixed under the direction of the President.

4th. For the Fond Du Lac bands, a tract of land bounded as follows: Beginning at an island in the St. Louis River, above Knife Portage, called by the Indians Paw-paw-sco-me-me-tig, running thence west to the boundary-line heretofore described, thence north along said boundary-line to the mouth of Savannah River, thence down the St. Louis River to the place of beginning. And if said tract shall contain less than one hundred thousand acres, a strip of land shall be added on the south side thereof, large enough to equal such deficiency.

5th. For the Grand Portage band, a tract of land bounded as follows: Beginning at a rock a little east of the eastern extremity of Grand Portage Bay, running thence along the lake shore to the mouth of a small stream called by the Indians Maw-ske-gwaw-caw-maw-se-be, or Cranberry Marsh River, thence up said stream, across the point to Pigeon River, thence down Pigeon River to a point opposite the starting-point, and thence across to the place of beginning.

6th. The Ontonagon band and that subdivision of the La Pointe band of which Buffalo is chief, may each select, on or near the lake shore, four sections of land, under the direction of the President, the boundaries of which shall be defined hereafter. And being desirous to provide for some of his connections who have rendered his people important services, it is agreed that the chief Buffalo may select one section of land, at such place in the ceded territory as he may see fit, which shall be reserved for that purpose, and conveyed by the United States to such person or persons as he may direct.

7th. Each head of a family, or single person over twenty-one years of age at the present time of the mixed bloods, belonging to the Chippewas of Lake Superior, shall be entitled to eighty acres of land, to be selected by them under the direction of the President, and which shall be secured to them by patent in the usual form.

## ARTICLE 3

The United States will define the boundaries of the reserved tracts, whenever it may be necessary, by actual survey, and the President may, from time to time, at his discretion, cause the whole to be surveyed, and may assign to each head of a family or single person over twenty-one years of age, eighty acres of land for his or their separate use; and he may, at his discretion, as fast as the occupants become capable of transacting their own affairs, issue patents therefor to such occupants, with such restrictions of the power of

alienation as he may see fit to impose. And he may also, at his discretion, make rules and regulations, respecting the disposition of the lands in case of the death of the head of a family, or single person occupying the same, or in case of its abandonment by them. And he may also assign other lands in exchange for mineral lands, if any such are found in the tracts herein set apart. And he may also make such changes in the boundaries of such reserved tracts or otherwise, as shall be necessary to prevent interference with any vested rights. All necessary roads, highways, and railroads, the lines of which may run through any of the reserved tracts, shall have the right of way through the same, compensation being made therefor as in other cases.

## ARTICLE 4

In consideration of and payment for the country hereby ceded, the United States agree to pay to the Chippewas of Lake Superior, annually, for the term of twenty years, the following sums, to wit: five thousand dollars in coin; eight thousand dollars in goods, household furniture and cooking utensils; three thousand dollars in agricultural implements and cattle, carpenter's and other tools and building materials, and three thousand dollars for moral and educational purposes, of which last sum, three hundred dollars per annum shall be paid to the Grand Portage band, to enable them to maintain a school at their village. The United States will also pay the further sum of ninety thousand dollars, as the chiefs in open council may direct, to enable them to meet their present just engagements. Also the further sum of six thousand dollars, in agricultural implements, household furniture, and cooking utensils, to be distributed at the next annuity payment, among the mixed bloods of said nation. The United States will also furnish two hundred guns, one hundred rifles, five hundred beaver-traps, three hundred dollars' worth of ammunition, and one thousand dollars' worth of ready-made clothing, to be distributed among the young men of the nation, at the next annuity payment.

## ARTICLE 5

The United States will also furnish a blacksmith and assistant, with the usual amount of stock, during the continuance of the annuity payments, and as much longer as the President may think proper, at each of the points herein set apart for the residence of the Indians, the same to be in lieu of all the employees to which the Chippewas of Lake Superior may be entitled under previous existing treaties.

## ARTICLE 6

The annuities of the Indians shall not be taken to pay the debts of individuals, but satisfaction for depredations committed by them shall be made by them in such manner as the President may direct.

## ARTICLE 7

No spirituous liquors shall be made, sold, or used on any of the lands herein set apart for the residence of the Indians, and the sale of the same shall be prohibited in the Territory hereby ceded, until otherwise ordered by the President.

## ARTICLE 8

It is agreed, between the Chippewas of Lake Superior and the Chippewas of the Mississippi, that the former shall be entitled to two-thirds, and the latter to one-third, of all benefits to be derived from former treaties existing prior to the year 1847.

## ARTICLE 9

The United States agree that an examination shall be made, and all sums that may be found equitably due to the Indians, for arrearages of annuity or other thing, under the provisions of former treaties, shall be paid as the chiefs may direct.

## ARTICLE 10

All missionaries, and teachers, and other persons of full age, residing in the territory hereby ceded, or upon any of the reservations hereby made by authority of law, shall be allowed to enter the land occupied by them at the minimum price whenever the surveys shall be completed to the amount of one quarter-section each.

## ARTICLE 11

All annuity payments to the Chippewas of Lake Superior, shall hereafter be made at L'Anse, La Pointe, Grand Portage, and on the St. Louis River; and the Indians shall not be required to remove from the homes hereby set apart for them. And such of them as reside in the territory hereby ceded, shall have the right to hunt and fish therein, until otherwise ordered by the President.

## ARTICLE 12

In consideration of the poverty of the Bois Forte Indians who are parties to this treaty, they having never received any annuity payments, and of the great extent of that part of the ceded country owned exclusively by them, the following additional stipulations are made for their benefit. The United States will pay the sum of ten thousand dollars, as their chiefs in open council may direct, to enable them to meet their present just engagements. Also the further sum of ten thousand dollars, in five equal annual payments, in blankets, cloth, nets, guns, ammunition, and such other articles of necessity as they may require.

They shall have the right to select their reservation at any time hereafter, under the direction of the President; and the same may be equal in extent, in proportion to their numbers, to those allowed the other bands, and be subject to the same provisions.

They shall be allowed a blacksmith, and the usual smithshop supplies, and also two persons to instruct them in farming, whenever in the opinion of the President it shall be proper, and for such length of time as he shall direct.

It is understood that all Indians who are parties to this treaty, except the Chippewas of the Mississippi, shall hereafter be known as the Chippewas of Lake Superior. Provided, That the stipulation by which the Chippewas of Lake Superior relinquishing their right to land west of the boundary-line shall not apply to the Bois Forte band who are parties to this treaty.

## ARTICLE 13

This treaty shall be obligatory on the contracting parties, as soon as the same shall be ratified by the President and Senate of the United States.

In testimony whereof, the said Henry C. Gilbert, and the said David B. Herriman, commissioners as aforesaid, and the undersigned chiefs and headmen of the Chippewas of Lake Superior and the Mississippi, have hereunto set their hands and seals, at the place aforesaid, this thirtieth day of September, one thousand eight hundred and fifty-four.

…

**Agreement Between the Government of the United States and the Government of Canada Concerning Transit Pipelines, 28 U.S.T. 7449, 1997 WL 181731 (Jan. 28, 1977)**

The Government of the United States of America and the Government of Canada,

Believing that pipelines can be an efficient, economical and safe means of transporting hydrocarbons from producing areas to consumers, in both the United States and Canada;

Noting the number of hydrocarbon pipelines which now connect the United States and Canada and the important service which they render in transporting hydrocarbons to consumers in both countries; and

Convinced that measures to ensure the uninterrupted transmission by pipeline through the territory of one Party of hydrocarbons not originating in the territory of that Party, for delivery to the territory of the other Party, are the proper subject of an agreement between the two Governments;

Have agreed as follows:

## <u>ARTICLE I</u>

For the purpose of this Agreement:

(a) "Transit Pipeline" means a pipeline or any part thereof, including pipe, valves and other appurtenances attached to pipe, compressor or pumping units, metering stations, regulator stations, delivery stations, loading and unloading facilities, storage facilities, tanks, fabricated assemblies, reservoirs, racks, and all real and personal property and works connected therewith, used for the transmission of hydrocarbons in transit. "Transit Pipeline" shall not include any portion of a pipeline system not used for the transmission of hydrocarbons in transit.

(b) "Hydrocarbons" means any chemical compounds composed primarily of carbon and hydrogen which are recovered from a natural reservoir in a solid, semi-solid, liquid or gaseous state, including crude oil, natural gas, natural gas liquids and bitumen, and their derivative products resulting from their production, processing or refining. In addition, "hydrocarbons" includes coal and feedstocks derived from crude oil, natural gas, natural gas liquids or coal used for the production of petro-chemicals.

(c) "Hydrocarbons in transit" means hydrocarbons transmitted in a "Transit Pipeline" located within the territory of one Party, which hydrocarbons do not originate in the territory of that Party, for delivery to, or for storage before delivery to, the territory of the other Party.

## ARTICLE II

1. No public authority in the territory of either Party shall institute any measures, other than those provided for in Article V, which are intended to, or which would have the effect of, impeding, diverting, redirecting or interfering with in any way the transmission of hydrocarbons in transit.

2. The provisions of paragraph 1 of this Article apply:

(a) In the case of Transit Pipelines carrying exclusively hydrocarbons in transit, to such volumes as may be transmitted to the Party of destination in the Transit Pipeline;

(b) In the case of Transit Pipelines in operation at the time of entry into force of this Agreement not carrying exclusively hydrocarbons in transit, to the average daily volume of hydrocarbons in transit transmitted to the Party of destination during the 12 month period immediately prior to the imposition of any measures described in paragraph 1;

(c) In the case of Transit Pipelines which come into operation subsequent to the entry into force of this Agreement not carrying exclusively hydrocarbons in transit, to such volumes of hydrocarbons in transit as may be authorized by the appropriate regulatory bodies; or

(d) To such other volumes of hydrocarbons in transit as may be agreed upon subsequently by the Parties.

3. Each Party undertakes to facilitate the expeditious issuance of such permits, licenses, or other authorizations as may be required from time to time for the import into, or export from, its territory through a Transit Pipeline of hydrocarbons in transit.

## ARTICLE III

1. No public authority in the territory of either Party shall impose any fee, duty, tax or other monetary charge, either directly or indirectly, on or for the use of any Transit Pipeline unless such fee, duty, tax or other monetary charge would also be applicable to or for the use of similar pipelines located within the jurisdiction of that public authority.

2. No public authority in the territory of either Party shall impose upon hydrocarbons in transit any import, export or transit fee, duty, tax or other monetary charge. This paragraph shall not preclude the inclusion of hydrocarbon throughput as a factor in the calculation of taxes referred to in paragraph 1.

## ARTICLE IV

1. Notwithstanding the provisions of Article II and paragraph 2 of Article III, a Transit Pipeline and the transmission of hydrocarbons through a Transit Pipeline shall be subject to regulations by the appropriate governmental authorities having jurisdiction over such Transit Pipeline in the same manner as for any other pipelines or the transmission of hydrocarbons by pipeline subject to the authority of such governmental authorities with respect to such matters as the following:

  a. Pipeline safety and technical pipeline construction and operation standards;

  b. environmental protection;

  c. rates, tolls, tariffs and financial regulations relating to pipelines;

  d. reporting requirements, statistical and financial information concerning pipeline operations and information concerning valuation of pipeline properties.

2. All regulations, requirements, terms and conditions imposed under paragraph 1 shall be just and reasonable, and shall always, under substantially similar circumstances with respect to all hydrocarbons transmitted in similar pipelines, other than intra-provincial and intra-state pipelines, be applied equally to all persons and in the same manner.

## ARTICLE V

1. In the event of an actual or threatened natural disaster, an operating emergency, or other demonstrable need temporarily to reduce or stop for safety or technical reasons the normal operation of a Transit Pipeline, the flow of hydrocarbons through such Transit Pipeline may be temporarily reduced or stopped in the interest of sound pipeline management and operational efficiency by or with the approval of the appropriate regulatory authorities of the Party in whose territory such disaster, emergency or other demonstrable need occurs.

2. Whenever a temporary reduction of the flow of hydrocarbons through a Transit Pipeline occurs as provided in paragraph 1:

  (a) In the case of a Transit Pipeline carrying exclusively hydrocarbons in transit, the Party for whose territory such hydrocarbons are intended shall be entitled to receive the total amount of the reduced flow of hydrocarbons,

  (b) In the case of a Transit Pipeline not carrying exclusively hydrocarbons in transit, each Party shall be entitled to receive downstream of the point of interruption a proportion of the reduced flow of hydrocarbons equal to the proportion of its net inputs to the total inputs to the Transit Pipeline made upstream of the point of interruption. If the two Parties are able collectively to make inputs to the Transit Pipeline upstream of the point of interruption, for delivery downstream of the point of interruption, of a volume of hydrocarbons which exceeds the temporarily reduced

8

capacity of such Transit Pipeline, each Party shall be entitled to transmit through such Transit Pipeline a proportion of the total reduced capacity equal to its authorized share of the flow of hydrocarbons through such Transit Pipeline prior to the reduction. If no share has been authorized, specified or agreed upon pursuant to Article II, paragraph 2, the share of the Parties in the reduced flow of hydrocarbons shall be in proportion to the share of each Party's net inputs to the total flow of hydrocarbons through such Transit Pipeline during the 30 day period immediately preceding the reduction.

3. The Party in whose territory the disaster, emergency or other demonstrable need occurs resulting in a temporary reduction or stoppage of the flow of hydrocarbons shall not unnecessarily delay or cause delay in the expeditious restoration of normal pipeline operations.

## **ARTICLE VI**

Nothing in this Agreement shall be considered as waiving the right of either Party to withhold consent, or to grant consent subject to such terms and conditions as it may establish consistent with the principles of uninterrupted transmission and of non-discrimination reflected in this Agreement, for the construction and operation on its territory of any Transit Pipeline construction of which commences subsequent to the entry into force of this Agreement, or to determine the route within its territory of such a Transit Pipeline.

## **ARTICLE VII**

The Parties may, by mutual agreement, conclude a protocol or protocols to this Agreement concerning the application of this Agreement to a specific pipeline or pipelines.

## **ARTICLE VIII**

The Parties may, by mutual agreement, amend this Agreement at any time.

## **ARTICLE IX**

1. Any dispute between the Parties regarding the interpretation, application or operation of this Agreement shall, so far as possible, be settled by negotiation between them.

2. Any such dispute which is not settled by negotiation shall be submitted to arbitration at the request of either Party. Unless the Parties agree on a different procedure within a period of sixty days from the date of receipt by either Party from the other of a notice through diplomatic channels requesting arbitration of the dispute, the arbitration shall take place in accordance with the following provisions. Each Party shall nominate an arbitrator within a further period of sixty days. The two arbitrators nominated by the Parties shall within a further period of sixty days appoint a third arbitrator. If either Party

fails to nominate an arbitrator within the period specified, or if the third arbitrator is not appointed within the period specified, either Party may request the President of the International Court of Justice (or, if the President is a national of either Party, the member of the Court ranking next in order of precedence who is not a national of either Party) to appoint such arbitrator. The third arbitrator shall not be a national of either Party, shall act as Chairman and shall determine where the arbitration shall be held.

3. The arbitrators appointed under the preceding paragraph shall decide any dispute, including appropriate remedies, by majority. Their decision shall be binding on the Parties.

4. The costs of any arbitration shall be shared equally between the Parties.

## **ARTICLE X**

1. This Agreement is subject to ratification. Instruments of Ratification shall be exchanged at Ottawa.

2. This Agreement shall enter into force on the first day of the month following the month in which Instruments of Ratification are exchanged.

3. This Agreement shall remain in force for an initial period of thirty-five years. It may be terminated at the end of the initial thirty-five year period by either Party giving written notice to the other Party, not less than ten years prior to the end of such initial period, of its intention to terminate this Agreement. If neither Party has given such notice of termination, this Agreement will thereafter continue in force automatically until ten years after either Party has given written notice to the other Party of its intention to terminate the Agreement.

IN WITNESS WHEREOF the undersigned representatives, duly authorized by their respective Governments, have signed this Agreement.

DONE in duplicate at Washington in the English and French languages, both versions being equally authentic, this twenty-eighth day of January 1977.

**FOR THE GOVERNMENT OF THE UNITED STATES OF AMERICA:**

(Signature)

Julius L. Katz

**FOR THE GOVERNMENT OF CANADA:**

(Signature)

J. H. Warren

**5 U.S.C. §558**

§558. Imposition of sanctions; determination of applications for licenses; suspension, revocation, and expiration of licenses

    **(a)** This section applies, according to the provisions thereof, to the exercise of a power or authority.

    **(b)** A sanction may not be imposed or a substantive rule or order issued except within jurisdiction delegated to the agency and as authorized by law.

    **(c)** When application is made for a license required by law, the agency, with due regard for the rights and privileges of all the interested parties or adversely affected persons and within a reasonable time, shall set and complete proceedings required to be conducted in accordance with sections 556 and 557 of this title or other proceedings required by law and shall make its decision. Except in cases of willfulness or those in which public health, interest, or safety requires otherwise, the withdrawal, suspension, revocation, or annulment of a license is lawful only if, before the institution of agency proceedings therefor, the licensee has been given--

        **(1)** notice by the agency in writing of the facts or conduct which may warrant the action; and

        **(2)** opportunity to demonstrate or achieve compliance with all lawful requirements.

When the licensee has made timely and sufficient application for a renewal or a new license in accordance with agency rules, a license with reference to an activity of a continuing nature does not expire until the application has been finally determined by the agency.

## 5 U.S.C. §559

§559. Effect on other laws; effect of subsequent statute

This subchapter, chapter 7, and sections 1305, 3105, 3344, 4301(2)(E), 5372, and 7521 of this title, and the provisions of section 5335(a)(B) of this title that relate to administrative law judges, do not limit or repeal additional requirements imposed by statute or otherwise recognized by law. Except as otherwise required by law, requirements or privileges relating to evidence or procedure apply equally to agencies and persons. Each agency is granted the authority necessary to comply with the requirements of this subchapter through the issuance of rules or otherwise. Subsequent statute may not be held to supersede or modify this subchapter, chapter 7, sections 1305, 3105, 3344, 4301(2)(E), 5372, or 7521 of this title, or the provisions of section 5335(a)(B) of this title that relate to administrative law judges, except to the extent that it does so expressly.

**25 U.S.C. §177**

§177. Purchases or grants of lands from Indians

No purchase, grant, lease, or other conveyance of lands, or of any title or claim thereto, from any Indian nation or tribe of Indians, shall be of any validity in law or equity, unless the same be made by treaty or convention entered into pursuant to the Constitution. Every person who, not being employed under the authority of the United States, attempts to negotiate such treaty or convention, directly or indirectly, or to treat with any such nation or tribe of Indians for the title or purchase of any lands by them held or claimed, is liable to a penalty of $1,000. The agent of any State who may be present at any treaty held with Indians under the authority of the United States, in the presence and with the approbation of the commissioner of the United States appointed to hold the same, may, however, propose to, and adjust with, the Indians the compensation to be made for their claim to lands within such State, which shall be extinguished by treaty.

**25 U.S.C. §321**

§321. Rights-of-way for pipe lines

The Secretary of the Interior is authorized and empowered to grant a right-of-way in the nature of an easement for the construction, operation, and maintenance of pipe lines for the conveyance of oil and gas through any Indian reservation, through any lands held by an Indian tribe or nation in the former Indian Territory, through any lands reserved for an Indian agency or Indian school, or for other purpose in connection with the Indian Service, or through any lands which have been allotted in severalty to any individual Indian under any law or treaty, but which have not been conveyed to the allottee with full power of alienation upon the terms and conditions herein expressed. Before title to rights of way applied for hereunder shall vest, maps of definite location shall be filed with and approved by the Secretary of the Interior: *Provided*, That before such approval the Secretary of the Interior may, under such rules and regulations as he may prescribe, grant temporary permits revocable in his discretion for the construction of such lines: *Provided*, That the construction of lateral lines from the main pipe line establishing connection with oil and gas wells on the individual allotments of citizens may be constructed without securing authority from the Secretary of the Interior and without filing maps of definite location, when the consent of the allottee upon whose lands oil or gas wells may be located and of all other allottees through whose lands said lateral pipe lines may pass has been obtained by the pipe-line company: *Provided further*, That in case it is desired to run a pipe line under the line of any railroad, and satisfactory arrangements cannot be made with the railroad company, then the question shall be referred to the Secretary of the Interior, who shall prescribe the terms and conditions under which the pipe-line company shall be permitted to lay its lines under said railroad. The compensation to be paid the tribes in their tribal capacity and the individual allottees for such right of way through their lands shall be determined in such manner as the Secretary of the Interior may direct, and shall be subject to his final approval. And where such lines are not subject to State or Territorial taxation the company or owner of the line shall pay to the Secretary of the Interior, for the use and benefit of the Indians, such annual tax as he may designate, not exceeding $5 for each ten miles of line so constructed and maintained under such rules and regulations as said Secretary may prescribe. But nothing herein contained shall be so construed as to exempt the owners of such lines from the payment of any tax that may be lawfully assessed against them by either State, Territorial, or municipal authority. And incorporated cities and towns into and through which such pipe lines may be constructed shall have the power to regulate the manner of construction therein, and nothing herein contained shall be so construed as to deny the right of municipal taxation in such towns and cities, and nothing herein shall authorize the use of such right of way except for pipe line, and then only so far as may be necessary for its construction, maintenance, and care: *Provided*, That the rights herein granted shall not extend beyond a period of twenty years: *Provided further*, That the Secretary of the Interior, at the expiration of said twenty years, may extend the right to maintain any pipe

line constructed under this section for another period not to exceed twenty years from the expiration of the first right, upon such terms and conditions as he may deem proper. The right to alter, amend, or repeal this section is expressly reserved.

**25 U.S.C. §323**

§323. Rights-of-way for all purposes across any Indian lands

The Secretary of the Interior be, and he is empowered to grant rights-of-way for all purposes, subject to such conditions as he may prescribe, over and across any lands now or hereafter held in trust by the United States for individual Indians or Indian tribes, communities, bands, or nations, or any lands now or hereafter owned, subject to restrictions against alienation, by individual Indians or Indian tribes, communities, bands, or nations, including the lands belonging to the Pueblo Indians in New Mexico, and any other lands heretofore or hereafter acquired or set aside for the use and benefit of the Indians.

**25 U.S.C. §324**

§324. Consent of certain tribes; consent of individual Indians

No grant of a right-of-way over and across any lands belonging to a tribe organized under the Act of June 18, 1934 (48 Stat. 984), as amended; the Act of May 1, 1936 (49 Stat. 1250); or the Act of June 26, 1936 (49 Stat. 1967), shall be made without the consent of the proper tribal officials. Rights-of-way over and across lands of individual Indians may be granted without the consent of the individual Indian owners if (1) the land is owned by more than one person, and the owners or owner of a majority of the interests therein consent to the grant; (2) the whereabouts of the owner of the land or an interest therein are unknown, and the owners or owner of any interests therein whose whereabouts are known, or a majority thereof, consent to the grant; (3) the heirs or devisees of a deceased owner of the land or an interest therein have not been determined, and the Secretary of the Interior finds that the grant will cause no substantial injury to the land or any owner thereof; or (4) the owners of interests in the land are so numerous that the Secretary finds it would be impracticable to obtain their consent, and also finds that the grant will cause no substantial injury to the land or any owner thereof.

**49 U.S.C. §60104**

§60104. Requirements and limitations

(a) **Opportunity to present views.**--The Secretary of Transportation shall give an interested person an opportunity to make oral and written presentations of information, views, and arguments when prescribing a standard under this chapter.

(b) **Nonapplication.**--A design, installation, construction, initial inspection, or initial testing standard does not apply to a pipeline facility existing when the standard is adopted.

(c) **Preemption.**--A State authority that has submitted a current certification under section 60105(a) of this title may adopt additional or more stringent safety standards for intrastate pipeline facilities and intrastate pipeline transportation only if those standards are compatible with the minimum standards prescribed under this chapter. A State authority may not adopt or continue in force safety standards for interstate pipeline facilities or interstate pipeline transportation. Notwithstanding the preceding sentence, a State authority may enforce a requirement of a one-call notification program of the State if the program meets the requirements for one-call notification programs under this chapter or chapter 61.

(d) **Consultation.**--

(1) When continuity of gas service is affected by prescribing a standard or waiving compliance with standards under this chapter, the Secretary of Transportation shall consult with and advise the Federal Energy Regulatory Commission or a State authority having jurisdiction over the affected gas pipeline facility before prescribing the standard or waiving compliance. The Secretary shall delay the effective date of the standard or waiver until the Commission or State authority has a reasonable opportunity to grant an authorization it considers necessary.

(2) In a proceeding under section 3 or 7 of the Natural Gas Act (15 U.S.C. 717b or 717f), each applicant for authority to import natural gas or to establish, construct, operate, or extend a gas pipeline facility subject to an applicable safety standard shall certify that it will design, install, inspect, test, construct, operate, replace, and maintain a gas pipeline facility under those standards and plans for inspection and maintenance under section 60108 of this title. The certification is binding on the Secretary of Energy and the Commission except when an appropriate enforcement agency has given timely written notice to the Commission that the applicant has violated a standard prescribed under this chapter.

(e) **Location and routing of facilities.**--This chapter does not authorize the Secretary of Transportation to prescribe the location or routing of a pipeline facility.

**49 U.S.C. §60117(p)**

§60117. Administrative

**(p) Emergency order authority.**--

    **(1) In general.**--If the Secretary determines that an unsafe condition or practice, or a combination of unsafe conditions and practices, constitutes or is causing an imminent hazard, the Secretary may issue an emergency order described in paragraph (3) imposing emergency restrictions, prohibitions, and safety measures on owners and operators of gas or hazardous liquid pipeline facilities without prior notice or an opportunity for a hearing, but only to the extent necessary to abate the imminent hazard.

    **(2) Considerations.**--

        **(A) In general.**--Before issuing an emergency order under paragraph (1), the Secretary shall consider, as appropriate, the following factors:

            **(i)** The impact of the emergency order on public health and safety.

            **(ii)** The impact, if any, of the emergency order on the national or regional economy or national security.

            **(iii)** The impact of the emergency order on the ability of owners and operators of pipeline facilities to maintain reliability and continuity of service to customers.

        **(B) Consultation.**--In considering the factors under subparagraph (A), the Secretary shall consult, as the Secretary determines appropriate, with appropriate Federal agencies, State agencies, and other entities knowledgeable in pipeline safety or operations.

    **(3) Written order.**--An emergency order issued by the Secretary pursuant to paragraph (1) with respect to an imminent hazard shall contain a written description of--

        **(A)** the violation, condition, or practice that constitutes or is causing the imminent hazard;

        **(B)** the entities subject to the order;

        **(C)** the restrictions, prohibitions, or safety measures imposed;

        **(D)** the standards and procedures for obtaining relief from the order;

**(E)** how the order is tailored to abate the imminent hazard and the reasons the authorities under section 60112 and subsection (m) are insufficient to do so; and

**(F)** how the considerations were taken into account pursuant to paragraph (2).

**(4) Opportunity for review.**--Upon receipt of a petition for review from an entity subject to, and aggrieved by, an emergency order issued under this subsection, the Secretary shall provide an opportunity for a review of the order under section 554 of title 5 to determine whether the order should remain in effect, be modified, or be terminated.

**(5) Expiration of effectiveness order.**--If a petition for review of an emergency order is filed under paragraph (4) and an agency decision with respect to the petition is not issued on or before the last day of the 30-day period beginning on the date on which the petition is filed, the order shall cease to be effective on such day, unless the Secretary determines in writing on or before the last day of such period that the imminent hazard still exists.

**(6) Judicial review of orders.**--

**(A) In general.**--After completion of the review process described in paragraph (4), or the issuance of a written determination by the Secretary pursuant to paragraph (5), an entity subject to, and aggrieved by, an emergency order issued under this subsection may seek judicial review of the order in a district court of the United States and shall be given expedited consideration.

**(B) Limitation.**--The filing of a petition for review under subparagraph (A) shall not stay or modify the force and effect of the agency's final decision under paragraph (4), or the written determination under paragraph (5), unless stayed or modified by the Secretary.

**(7) Regulations.**--

**(A) Temporary regulations.**--Not later than 60 days after the date of enactment of the PIPES Act of 2016, the Secretary shall issue such temporary regulations as are necessary to carry out this subsection. The temporary regulations shall expire on the date of issuance of the final regulations required under subparagraph (B).

**(B) Final regulations.**--Not later than 270 days after such date of enactment, the Secretary shall issue such regulations as are necessary to carry out this subsection. Such regulations shall ensure that the review process described in paragraph (4) contains the same procedures as subsections (d) and (g) of section 109.19 of title 49, Code of Federal Regulations, and is otherwise

20

consistent with the review process developed under such section, to the greatest extent practicable and not inconsistent with this section.

**(8) Imminent hazard defined.**--In this subsection, the term "imminent hazard" means the existence of a condition relating to a gas or hazardous liquid pipeline facility that presents a substantial likelihood that death, serious illness, severe personal injury, or a substantial endangerment to health, property, or the environment may occur before the reasonably foreseeable completion date of a formal proceeding begun to lessen the risk of such death, illness, injury, or endangerment.

**(9) Limitation and savings clause.**--An emergency order issued under this subsection may not be construed to--

    **(A)** alter, amend, or limit the Secretary's obligations under, or the applicability of, section 553 of title 5; or

    **(B)** provide the authority to amend the Code of Federal Regulations.

**49 U.S.C. §60120**

§60120. Enforcement

 **(a) Civil actions**

  **(1) Civil actions to enforce this chapter.**--At the request of the Secretary of Transportation, the Attorney General may bring a civil action in an appropriate district court of the United States to enforce this chapter, including section 60112, or a regulation prescribed or order issued under this chapter. The court may award appropriate relief, including a temporary or permanent injunction, punitive damages, and assessment of civil penalties, considering the same factors as prescribed for the Secretary in an administrative case under section 60122. The maximum amount of civil penalties for administrative enforcement actions under section 60122 shall not apply to enforcement actions under this section.

  **(2) Civil actions to require compliance with subpoenas or allow for inspections.**--At the request of the Secretary, the Attorney General may bring a civil action in a district court of the United States to require a person to comply immediately with a subpena or to allow an officer, employee, or agent authorized by the Secretary to enter the premises, and inspect the records and property, of the person to decide whether the person is complying with this chapter. The action may be brought in the judicial district in which the defendant resides, is found, or does business. The court may punish a failure to obey the order as a contempt of court.

 **(b) Jury trial demand.**--In a trial for criminal contempt for violating an injunction issued under this section, the violation of which is also a violation of this chapter, the defendant may demand a jury trial. The defendant shall be tried as provided in rule 42(b) of the Federal Rules of Criminal Procedure (18 App. U.S.C.).

 **(c) Effect on tort liability.**--This chapter does not affect the tort liability of any person.

**49 U.S.C. §60121**

§60121. Actions by private persons

**(a) General authority.—**

**(1)** A person may bring a civil action in an appropriate district court of the United States for an injunction against another person (including the United States Government and other governmental authorities to the extent permitted under the 11th amendment to the Constitution) for a violation of this chapter or a regulation prescribed or order issued under this chapter. However, the person--

**(A)** may bring the action only after 60 days after the person has given notice of the violation to the Secretary of Transportation or to the appropriate State authority (when the violation is alleged to have occurred in a State certified under section 60105 of this title) and to the person alleged to have committed the violation;

**(B)** may not bring the action if the Secretary or authority has begun and diligently is pursuing an administrative proceeding for the violation; and

**(C)** may not bring the action if the Attorney General of the United States, or the chief law enforcement officer of a State, has begun and diligently is pursuing a judicial proceeding for the violation.

**(2)** The Secretary shall prescribe the way in which notice is given under this subsection.

**(3)** The Secretary, with the approval of the Attorney General, or the Attorney General may intervene in an action under paragraph (1) of this subsection.

**(b) Costs and fees.**--The court may award costs, reasonable expert witness fees, and a reasonable attorney's fee to a prevailing plaintiff in a civil action under this section. The court may award costs to a prevailing defendant when the action is unreasonable, frivolous, or meritless. In this subsection, a reasonable attorney's fee is a fee--

**(1)** based on the actual time spent and the reasonable expenses of the attorney for legal services provided to a person under this section; and

**(2)** computed at the rate prevailing for providing similar services for actions brought in the court awarding the fee.

**(c) State violations as violations of this chapter.**--In this section, a violation of a safety standard or practice of a State is deemed to be a violation of this chapter or a regulation prescribed or order issued under this chapter only to the extent the standard

or practice is not more stringent than a comparable minimum safety standard prescribed under this chapter.

**(d) Additional remedies.**--A remedy under this section is in addition to any other remedies provided by law. This section does not restrict a right to relief that a person or a class of persons may have under another law or at common law.

## 25 C.F.R. §169.3 (2013)

§169.3 Consent of landowners to grants of right-of-way.

(a) No right-of-way shall be granted over and across any tribal land, nor shall any permission to survey be issued with respect to any such lands, without the prior written consent of the tribe.

(b) Except as provided in paragraph (c) of this section, no right-of-way shall be granted over and across any individually owned lands, nor shall any permission to survey be issued with respect to any such lands, without the prior written consent of the owner or owners of such lands and the approval of the Secretary.

(c) The Secretary may issue permission to survey with respect to, and he may grant rights-of-way over and across individually owned lands without the consent of the individual Indian owners when

(1) The individual owner of the land or of an interest therein is a minor or a person non compos mentis, and the Secretary finds that such grant will cause no substantial injury to the land or the owner, which cannot be adequately compensated for by monetary damages;

(2) The land is owned by more than one person, and the owners or owner of a majority of the interests therein consent to the grant;

(3) The whereabouts of the owner of the land or an interest therein are unknown, and the owners or owner of any interests therein whose whereabouts are known, or a majority thereof, consent to the grant;

(4) The heirs or devisees of a deceased owner of the land or an interest therein have not been determined, and the Secretary finds that the grant will cause no substantial injury to the land or any owner thereof;

(5) The owners of interests in the land are so numerous that the Secretary finds it would be impracticable to obtain their consent, and also finds that the grant will cause no substantial injury to the land or any owner thereof.

**25 C.F.R. §169.12 (2013)**

§169.12 Consideration for right-of-way grants.

Except when waived in writing by the landowners or their representatives as defined in §169.3 and approved by the Secretary, the consideration for any right-of-way granted or renewed under this part 169 shall be not less than but not limited to the fair market value of the rights granted, plus severance damages, if any, to the remaining estate. The Secretary shall obtain and advise the landowners of the appraisal information to assist them (the landowner or landowners) in negotiations for a right-of-way or renewal.

**25 C.F.R. §169.19 (2013)**

§169.19 Renewal of right-of-way grants.

On or before the expiration date of any right-of-way heretofore or here- after granted for a limited term of years, an application may be submitted for a renewal of the grant. If the renewal involves no change in the location or status of the original right-of-way grant, the applicant may file with his application a certificate under oath setting out this fact, and the Secretary, with the consent required by §169.3, may thereupon extend the grant for a like term of years, upon the payment of consideration as set forth in §169.12. If any change in the size, type, or location of the right-of-way is in- volved, the application for renewal shall be treated and handled as in the case of an original application for a right- of-way.

**25 C.F.R. §169.15 (1992)**

§169.15 Action on application.

Upon satisfactory compliance with the regulations in this part 169, the Secretary is authorized to grant the right-of-way by issuance of a conveyance instrument in the form approved by the Secretary. Such instrument shall incorporate all conditions or restrictions set out in the consents obtained pursuant to § 169.3. A copy of such instrument shall be promptly delivered to the applicant and thereafter the applicant may proceed with the construction work. Maps of definite location may be attached to and incorporated into the conveyance document by reference. In the discretion of the Secretary, one conveyance document may be issued covering all of the tracts of land traversed by the right-of-way, or separate conveyances may be made covering one or several tracts included in the application. A duplicate original copy of the conveyance instrument, permanent and reproducible maps, a copy of the application and stipulations, together with any other pertinent documents shall be transmitted by the Secretary to the office of record for land documents affecting the land covered by the right-of-way, where they will be recorded and filed.