Nos. 23-2309, 23-23467

In the
UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

BAD RIVER BAND OF THE LAKE SUPERIOR TRIBE OF CHIPPEWA INDIANS
OF THE BAD RIVER RESERVATION

      Plaintiff-Appellee, Cross-Appellant,

v.

ENBRIDGE ENERGY COMPANY, INC., and ENBRIDGE ENERGY, L.P.,

      Defendants-Appellants, Cross-Appellees.

ENBRIDGE ENERGY COMPANY, INC. and ENBRIDGE ENERGY, L.P.,
      Counter-Plaintiffs, Appellants/Cross-Appellees,

v.

BAD RIVER BAND OF THE LAKE SUPERIOR TRIBE OF CHIPPEWA INDIANS
OF THE BAD RIVER RESERVATION, and NAOMI TILLISON,
      Counter-Defendants, Appellees/Cross-Appellants.

Appeal from the United States District Court
Western District of Wisconsin
Honorable William M. Conley

**BRIEF OF AMICI CURIAE STATE OF MICHIGAN AND ATTORNEY
GENERAL DANA NESSEL IN SUPPORT OF THE BAD RIVER BAND AND
ITS REQUEST FOR PARTIAL AFFIRMANCE AND PARTIAL VACATURE
AND REMAND OF THE DISTRICT COURT'S JUDGMENT**

                                        Daniel P. Bock
                                        Keith D. Underkoffler
                                        Assistant Attorneys General
                                        Counsel of Record
                                        Attorneys for Amici Curiae
                                        Environment, Natural Resources, and
                                        Agriculture Division
                                        P.O. Box 30755
                                        Lansing, MI 48909
                                        (517) 335-7664

Dated: October 18, 2023

# TABLE OF CONTENTS

Page

Table of Authorities ...................................................................................... iii

Glossary ........................................................................................................... v

Statement of Interest of Amici Curiae State of Michigan and Attorney
General Dana Nessel ................................................................................. 1

Statement of Facts ........................................................................................ 2

    Enbridge's Line 5 ................................................................................. 5

    Enbridge's 2010 Line 6B oil spill ...................................................... 5

    Michigan's actions with regard to Line 5 ......................................... 6

    Recent erosion at the Bad River meander and potential harm to Lake
    Superior ............................................................................................. 10

Summary of Argument ................................................................................ 11

Argument ..................................................................................................... 12

I.    The District Court properly rejected Enbridge's Treaty-based
    arguments ......................................................................................... 12

    A.    Article IX of the 1977 Treaty does not require, or even *allow*,
        abstention. ................................................................................ 13

    B.    The 1977 Treaty expressly preserves the Band's sovereign
        authority to regulate its land and natural resources. ........................ 16

    C.    Enbridge's interpretation of the 1977 Treaty would effectively
        grant pipeline companies a license to trespass and leave
        property owners without any recourse. .................................. 18

II.    The threat of irreparable harm posed by Line 5's continued operation
    on the Bad River Reservation outweighs the asserted impacts of a
    court-ordered shutdown. ................................................................. 19

III.    The equities favor the Band in this dispute ................................... 23

    A.    The Band's decision not to renew Enbridge's easement in 2013
        was a common-sense decision based on facts not known to the
        Band in 1992 .......................................................................... 24

B.    The Band's denial of Enbridge's permit requests was both legal and equitable. ............................................................ 26

Conclusion and Relief Requested ...................................................... 28

Certificate of Compliance ................................................................. 29

Certificate of Service ......................................................................... 30

# TABLE OF AUTHORITIES

<u>Page</u>

**Cases**

*Air France v. Saks,*
    470 U.S. 392 (1985) ..................................................... 13

*Cohens v. Virginia,*
    19 U.S. 264 (1821) ...................................................... 15

*Collins v. Gerhardt,*
    211 N.W. 115 (Mich. 1926) ......................................... 1

*Cooper v. Tokyo Elec. Power Co.,*
    860 F.3d 1193 (9th Cir. 2017) .................................... 13

*Glass v. Goeckel,*
    703 N.W.2d 58 (Mich. 2005) ....................................... 1

*Kline v. Burke Construction Co.,*
    260 U.S. 226 (1922) ................................................... 15

*Medellin v. Texas,*
    552 U.S. 491 (2008) ................................................... 13

*New Orleans Pub. Serv., Inc. v. Council of New Orleans,*
    491 U.S. 350 (1989) ................................................... 15

*Portland Pipe Line Corp. v. City of S. Portland,*
    288 F. Supp. 3d 321 (D. Me. 2017) ........................... 17

*Sprint Communications, Inc. v. Jacobs,*
    571 U.S. 69 (2013) ..................................................... 15

*Texas Midstream Gas Servs., LLC v. City of Grand Prairie,*
    608 F.3d 200 (5th Cir. 2010) ...................................... 17

*Ungaro-Benages v. Dresdner Bank AG,*
    379 F.3d 1227 (11th Cir. 2004) .................................. 13

*United States v Enbridge Energy Ltd., et al.,*
    No. 1:16-cv-914 (W.D. Mich. May 23, 2017) .............. 26

*Wash. Gas Light Co. v. Prince George's County Council,*
    711 F.3d 412 (4th Cir. 2013) ...................................... 16

**Statutes**

49 U.S.C. § 60104(e).................................................................. 17

**Other Authorities**

1977 Transit Pipelines Treaty, 1977 WL 181731 ............................................... passim

1977 Transit Pipelines Treaty, 1977 WL 181731, art. IV .................................... 16, 17

1977 Transit Pipelines Treaty, 1977 WL 181731, art. IV.1 ...................................... 18

1977 Transit Pipelines Treaty, 1977 WL 181731, art. IX.1–4 ............................ 14, 16

2023 PA 119, Art. 16, Pt. 2, § 510 .............................................................. 22

## GLOSSARY

| Short Form | Description |
| --- | --- |
| BA | Filed Appendix of Plaintiff-Appellee/Cross-Appellant, Doc. 42, filed October 11, 2023 |
| EA | Filed Appendix to Brief on Appeal filed by Defendant-Appellant/Cross-Appellee, Doc. 15, filed September 11, 2023 |
| MA | Short Appendix to Amicus Brief of the State of Michigan and Attorney General Dana Nessel, filed October 18, 2023 |
| Dkt. | The District Court Docket in W.D. Wisc. Case No. 19-cv-602 |

## STATEMENT OF INTEREST OF
## AMICI CURIAE STATE OF MICHIGAN AND ATTORNEY GENERAL DANA NESSEL

Amici the State of Michigan and Dana Nessel, Attorney General of the State of Michigan, have a duty to protect and preserve the waters of the Great Lakes. This duty, known as the public trust doctrine, is enshrined in Michigan law. It provides that Michigan's navigable waters belong to the public and are held in trust for their benefit by the state government. The Michigan Supreme Court has underscored the importance of this sovereign duty:

> [U]nder longstanding principles of Michigan's common law, the state, as sovereign, has an obligation to protect and preserve the waters of the Great Lakes and the lands beneath them for the public. The state serves, in effect, as the trustee of public rights in the Great Lakes for fishing, hunting, and boating for commerce or pleasure.

*Glass v. Goeckel*, 703 N.W.2d 58, 64–65 (Mich. 2005) (cleaned up).

"The state, as sovereign, cannot relinquish this duty to preserve public rights in the Great Lakes and their natural resources." *Id.* Instead, these public rights are protected by a "high, solemn, and perpetual trust which it is the duty of the State to forever maintain." *Collins v. Gerhardt*, 211 N.W. 115, 118 (Mich. 1926).

It is this solemn duty that compels Amici to weigh in here, as they did in the District Court below. The imminent threat of a rupture of the Line 5 pipeline at the Bad River meander creates an unreasonable and substantial risk of irreparable harm to the People and natural resources of the State of Michigan. Indeed, as the District Court found, a rupture of the pipeline would cause "catastrophic environmental damage to the Bad River and Lake Superior watersheds" and "[i]f a

large oil spill occurred, it would be impossible to undo the damage with remediation efforts, an injunction or monetary penalties." (A104.)

Under these circumstances, Amici's high, solemn, and perpetual duty to preserve and protect the waters of Lake Superior for the benefit of the public necessitates action. In furtherance of that duty, Amici ask this Court to consider the interests of the People of the State of Michigan and others who will be harmed if there is a release of hydrocarbons from Line 5.

The Amici Curiae Brief of the State of Michigan and Attorney General is being filed pursuant to Federal Rule of Appellate Procedure 29(a)(2).

## STATEMENT OF FACTS

In the interest of candor to the Court, Amici are currently involved in litigation with Enbridge related to the operation of Line 5 in the Straits of Mackinac, where Line 5 crosses the bottomlands of Lake Michigan and Lake Huron between Michigan's Upper and Lower Peninsulas.

In 2019, Attorney General Dana Nessel, on behalf of the People of the State of Michigan, filed a lawsuit in Michigan state court, seeking to enjoin operation of Line 5 in the Straits of Mackinac because the pipeline in that location sits on an invalid easement, creates a public nuisance, and violates Michigan environmental law. That case was litigated in state court for over a year before Enbridge removed it to federal court. In June of 2020, after an anchor or similar object struck the pipeline, the state court entered a temporary restraining order shutting down Line

5 in the Straits for several weeks.[1]  Enbridge subsequently removed the case to the U.S. District Court for the Western District of Michigan, *Nessel v. Enbridge Energy, L.P. et al.*, No. 21-cv-01057.  The validity of that removal is presently before the U.S. Court of Appeals for the Sixth Circuit on interlocutory appeal in No. 23-1671.

In November 2020, the State of Michigan, through Michigan's Governor and the Director of the Michigan Department of Natural Resources (DNR), also issued a Notice of Revocation and Termination of Easement, which revoked Enbridge's easement under the Straits of Mackinac based on violations of the public trust doctrine and Enbridge's repeated and incurable violations of the easement's terms and conditions.  (MA01–MA35.)  The Notice set forth that Enbridge lacked a valid easement for the location of Line 5 on the bottomlands of the Straits of Mackinac (MA04–MA05), and that Enbridge's continued use of the aging and exposed pipeline in an extremely sensitive, high-traffic navigation area created an unreasonable risk of an oil spill which was inconsistent with the public trust (MA05–MA09).  Additionally, the Notice documented the State of Michigan's findings that Enbridge had repeatedly breached its obligation to exercise "due care" by failing to provide

---

[1] This was the second time in as many years that Line 5 was shut down due to anchor strikes or similar impacts, the first being a significant strike by a 12,000 pound industrial barge anchor in 2018.  MLive, *Video shows 'shocking' aftermath of Line 5 anchor strike* (May 15, 2019), https://www.mlive.com/news/grand-rapids/2019/05/video-shows-shocking-aftermath-of-line-5-anchor-strike.html; U.S. Coast Guard, *Report of Investigation into the Clyde S. Van Enfkevort (O.N. 1232691) and Erie Trader (O.N. 1238380) Anchor Strike which Damaged Subsurface Transmission Cables and Pipelines in the Straits of Mackinac Michigan on 01 April 2018*, https://www.dco.uscg.mil/Portals/9/DCO%20Documents/5p/CG-5PC/INV/docs/boards/CLYDE%20S_%20VENENKEVORT%20ROI.pdf?ver=xkMXW4Oi-Ogo3AZyMuAy3Q%3D%3D.

adequate support for Line 5 on the bottomlands (MA13–MA14), failing to properly maintain the pipeline coating (MA14–MA16), and failing to prevent excessive pipeline curvature (MA16). "[T]o provide notice to affected parties and to allow for an orderly transition to ensure Michigan's energy needs are met," the Notice directed Enbridge to cease operation of Line 5 in the Straits of Mackinac within 180 days. (MA20.)

Two additional lawsuits were filed regarding the Notice: *State of Michigan, et al. v. Enbridge Energy, L.P. et al.*, which was filed in state court, removed to the Western District of Michigan, No. 1:20-cv-01142, and voluntarily dismissed on November 30, 2021; and (2) *Enbridge Energy, L.P. et al. v. Whitmer, et al.*, which is currently pending in the U.S. District Court for the Western District of Michigan, No. 1:20-cv-01141.

The State of Michigan, along with other state entities, was also previously a defendant in the matter of *Enbridge Energy, L.P., et al. v. State of Michigan, et al.*, 957 N.W.2d 53 (Mich. App. 2020).

These matters are not the subject of this brief, but are referenced here to apprise the Court of previous and ongoing disputes between the Amici and Enbridge related to the operation of Line 5 in Michigan and to provide background on Amici's knowledge of and experience with that pipeline. This brief will offer Amici's perspective on certain arguments raised by the Band and Enbridge in their cross-appeals, and will also address the imminent threat posed by Line 5 at the Bad River meander, the grave threat of catastrophic harm that this poses to Lake Superior,

Michigan's efforts to assess the risk to the Great Lakes posed by Line 5, the potential impacts to Michigan if the pipeline is shut down, and the steps Michigan and relevant market participants have taken to ensure that Michigan is prepared for a shutdown.

**Enbridge's Line 5**

As the Court is already well aware, Line 5 is an approximately 70-year-old, 645-mile pipeline that runs from Superior, Wisconsin to Sarnia, Ontario. A stretch of the pipeline, approximately four miles in length, runs through the waters of the Great Lakes on the bottomlands of the Straits of Mackinac, between Michigan's Upper and Lower Peninsulas. Line 5 transports crude oil as well as natural gas liquids such as propane.

Since completing Line 5 in 1954, Enbridge's predecessors, and now Enbridge itself, have continued to operate it, and over time have significantly increased the quantity of products transported through it. Enbridge currently transports an average of 540,000 barrels (22,680,000 gallons) of light crude oil, synthetic light crude oil and/or natural gas liquids per day in Line 5.

**Enbridge's 2010 Line 6B oil spill**

In 2010, approximately 20,080 barrels (873,600 gallons) of crude oil were released from another Enbridge pipeline—Line 6B—into the waters of the Kalamazoo River and Talmadge Creek in Michigan. (MA38, MA41–MA43.) It took

Enbridge over 17 hours to shut down the pipeline,[2] resulting in one of the largest inland oil spills in U.S. history, which caused significant harm to Michigan's natural resources and took over seven years to clean up.  The ensuing shutdown of Line 6B lasted "several months," but according to Enbridge's own expert "there was not, you know, sizable price impacts for refined product in the Detroit/Toledo area." (MA47:3–12.)

After the Line 6B release, State of Michigan officials undertook significant analysis of the likelihood of a release from Line 5—which is of a similar age and has a similar maintenance history to Line 6B—as well as the potential impacts of such a release.  The State was particularly concerned about the potential for a release where the pipeline lies on bottomlands as deep as 270 feet below the surface of Lakes Michigan and Huron, as a release in the Great Lakes would be particularly difficult to remediate and would cause catastrophic environmental, economic, and cultural harm to Michigan's residents and to the Great Lakes and all who depend on them.

**Michigan's actions with regard to Line 5**

The State of Michigan undertook a series of actions to understand and address the risks posed by a potential release from Line 5 to the waters of the Great

---

[2] *See, e.g.*, CBC News, *Enbridge staff ignored warnings in Kalamazoo River spill* (Jun. 22, 2012), https://www.cbc.ca/news/canada/edmonton/enbridge-staff-ignored-warnings-in-kalamazoo-river-spill-1.1129398.

Lakes, to assess the impacts that a shutdown of Line 5 would cause, and to ensure

that Michigan's energy needs will be met if Line 5 is shutdown, including:

- Creating the Michigan Petroleum Pipeline Task Force in 2014, whose work culminated in the publication of the Michigan Petroleum Pipeline Task Force Report in July of 2015:  https://mipetroleumpipelines.org/document/michigan-petroleum-pipeline-task-force-report.

- Creating Michigan's Pipeline Safety Advisory Board in November of 2015: https://mipetroleumpipelines.org/document/creation-pipeline-safety-advisory-board.

- Commissioning a report titled "Alternatives Analysis for the Straits Pipelines" by Dynamic Risk Assessment Systems, which was published in October of 2017 and included, among other things, an analysis of the risks posed by Line 5's operation in the Straits of Mackinac, and of alternatives that could be employed to meet Michigan's energy needs in the event of a shutdown:  https://mipetroleumpipelines.org/document/alternatives-analysis-straits-pipeline.

- Establishing regulations to restrict vessel operation and anchor use in the Straits of Mackinac effective May 23, 2018: https://mipetroleumpipelines.org/document/dnr-establishes-restricted-anchor-and-vessel-equipment-zone-straits.

- Obtaining multiple alternatives reports from Enbridge, including:

  o A June 2018 report titled "Alternatives for replacing Enbridge's dual Line 5 pipelines crossing the Straits of Mackinac," which is available at:  https://mipetroleumpipelines.org/document/alternatives-replacing-enbridges-dual-line-5-pipelines-crossing-straits-mackinac.

  o A June 2018 report titled "Mitigating potential vessel anchor strike to Line 5 at the Straits of Mackinac," which is available at: https://mipetroleumpipelines.org/document/mitigating-potential-vessel-anchor-strike-line-5-straits-mackinac.

  o A June 2018 report regarding the integrity of the coating of the Line 5 pipelines titled "Evaluation of technologies to assess the condition of pipe coating on Line 5," which is available at: https://mipetroleumpipelines.org/document/evaluation-technologies-assess-condition-pipe-coating-line-5.

- A June 2018 report addressing how to detect leaks from the underwater portion of Line 5 titled "Evaluation of identified underwater technologies to enhance leak detection of the dual Line 5 pipelines," which is available at: https://mipetroleumpipelines.org/document/evaluation-identified-underwater-technologies-enhance-leak-detection-dual-line-5-pipelines.

- A June 2018 report titled "Enhancing safety and reducing potential impacts at Line 5 water crossings," which is available at: https://mipetroleumpipelines.org/document/enhancing-safety-and-reducing-potential-impacts-line-5-water-crossings.

- Commissioning an independent risk analysis report titled "Independent Risk Analysis for the Straits Pipelines," which was prepared by a team of experts at Michigan Technological University and published in September of 2018, to assess the potential risks posed by Line 5's operation in the Straits of Mackinac: https://mipetroleumpipelines.org/document/independent-risk-analysis-straits-pipelines-final-report.

- Undertaking a Statewide Energy Assessment in 2019 to evaluate and make recommendations to strengthen the resilience of Michigan's electric, natural gas, and propane delivery systems: https://www.michigan.gov/-/media/Project/Websites/mpsc/regulatory/reports/2019-09-11_SEA_Final_Report_with_Appendices.pdf?rev=77a6a88282384718aa09360f714f177f.

- Creating the Upper Peninsula Energy Task Force, which conducted a broad analysis of the energy needs of Michigan's Upper Peninsula, including its reliance on propane for heat and alternative solutions for meeting those needs in the event that Line 5 ceases operation. A copy of the Task Force's propane supply recommendations is available at: https://www.michigan.gov/egle/-/media/Project/Websites/egle/Documents/Groups/UPETF/Report-2020-04-17-Recommendations-Part1-Propane-Supply.pdf?rev=470b36456e154378924c79e58cf139af&hash=6D74E2B794B29CA41BA1F7334897164C.

- Establishing an interdepartmental Workgroup on Propane Energy Security focused on facilitating market changes to provide alternative sources of propane in anticipation of a Line 5 shutdown, and announcing in 2021 the MI Propane Security Plan, which details measures the State has taken to ensure Michigan will have a secure energy supply when Line 5 shuts down. A copy of the Plan is available at: https://www.michigan.gov/-/media/Project/Websites/mpsc/consumer/propane/MI_Propane_Security_Plan_

Overview.pdf?rev=90d4da17bbfb482a96fec64e2201b6c9.

In sum, the State of Michigan has devoted substantial resources to studying and assessing the risks to Michigan's natural resources posed by Line 5, as well as strategies for addressing those risks, detecting and mitigating the harm of a potential release, determining whether those risks are outweighed by the potential impacts of a shutdown of Line 5, and analyzing and preparing for those potential impacts. These extensive efforts have demonstrated to the State of Michigan's satisfaction that markets will ably adjust to a court-ordered shutdown of Line 5, and that Michigan is well positioned to manage any impacts that may occur. Further, these efforts have convinced the State of Michigan that any impacts associated with a shutdown of Line 5 are far outweighed by the grave risk of irreparable environmental and economic harm posed by its continued operation.

Based on this information, Amici and numerous state officials have taken action to shut down the operation of Line 5 in the Straits of Mackinac, as noted above. These actions were taken after careful consideration of the severe risks posed by Line 5's operation in the Straits of Mackinac and the potential economic and energy-related consequences of a shutdown—matters which the State of Michigan continues to actively assess and address.

**Recent erosion at the Bad River meander and potential harm to Lake Superior**

Amici's particular interest in this lawsuit stems from the evidence put forth by the Band regarding the likelihood and severity of a release of oil from Line 5 to Lake Superior.

While it requires no introduction, Lake Superior is the world's largest freshwater lake, containing more water than the other Great Lakes combined. By many measures, it is also the healthiest of the Great Lakes. It is a precious cultural and natural resource that boasts extraordinary biodiversity, contributes to the drinking water that the Great Lakes provide to roughly 40 million people, and supports industries such as fishing, tourism, and shipping. It shares hundreds of miles of shoreline with Michigan's Upper Peninsula, and the Bad River feeds into it close to the Michigan border.[3]

The record indicates that a full-bore rupture of Line 5 at the Bad River meander would result in 21,974 barrels (922,908 gallons) of oil entering the Bad River, which is located 16 miles upstream of Lake Superior. (MA50.) And as the District Court emphasized, Enbridge's own expert found that a major oil spill at the meander would lead to "tremendous dispersion in Lake Superior." (MA54:12–17.)

---

[3] *See generally, e.g.*, https://www.michigan.gov/egle/about/organization/water-resources/great-lakes-coordination/lake-superior; https://www.michiganseagrant.org/topics/great-lakes-fast-facts/lake-superior/; https://www.canr.msu.edu/news/lakes_appreciation_month_the_great_lakes_facts_and_features.

## SUMMARY OF ARGUMENT

Amici are uniquely positioned to assist the Court by offering the perspective of a fellow sovereign landowner that finds itself in a similar position to the Band with regard to Line 5. Like the Band, in the wake of Enbridge's Line 6B oil spill in 2010, the State of Michigan took action to understand and address the grave threat to natural resources posed by Line 5. In particular, Amici believe their perspective will assist the Court in addressing the Parties' arguments about the 1977 Transit Pipelines Treaty (1977 Treaty), the balancing of the potential impacts of a release of oil from Line 5 to the Bad River and Lake Superior, and the balancing of the equities in this dispute.

As to the first issue, Enbridge's arguments based on the 1977 Treaty are without merit. Neither Article II nor Article IX of the Treaty foreclose this Court or the District Court from adjudicating environmental and property law claims regarding Line 5. In fact, Article IV of the Treaty expressly preserves actions such as this.

As to the second issue, the threat of a release of oil from Line 5 far outweighs any economic impact associated with a court-ordered shutdown.

As to the third issue, Amici disagree with Enbridge's assertion that the Band has breached any duty, behaved inequitably, or contributed in any way to the ongoing public nuisance caused by Enbridge's trespass. Rather, the Band has acted as a responsible sovereign landowner and environmental permitting authority.

## ARGUMENT

## I.    The District Court properly rejected Enbridge's Treaty-based arguments.

In its principal brief, Enbridge argues that the 1977 Treaty bars "public authorities" (including the Band) from adopting measures that interfere with hydrocarbon transit, and that the authority of domestic courts to adjudicate this dispute is displaced by an international dispute-resolution process.  (Enbridge's Br. App., Doc. 13, pp. 15, 35, 39.)  Canada echoes this argument in its amicus brief, noting that it has invoked the Treaty's dispute-resolution process.  (Canada's Amicus Br., Doc. 20, pp. 6–7, 16, 21–22.)  These arguments are familiar to Amici because Enbridge and Canada have also raised them in the above-described litigation between Michigan and Enbridge.[4]

Amici are uniquely positioned to understand the Band's concerns in this matter because, like the Band, the State of Michigan is both a sovereign governmental entity and a property owner seeking to eject Line 5 from its property based on the lack of a valid easement.  And, like the Band, Amici are concerned that the interpretation of the 1977 Treaty advanced by Enbridge and Canada sweeps far too broadly.

Enbridge and Canada essentially argue that the 1977 Treaty allows Enbridge to trespass indefinitely on someone else's land—sovereign land at that—and

---

[4] This question is currently pending before the U.S. District Court for the Western District of Michigan in the matter of *Enbridge, et al. v. Whitmer, et al.*, case no. 1:20-cv-01141.  It remains undecided as of the filing of this amicus brief.

deprives the landowner of any recourse unless the United States and Canada resolve the matter through international dispute resolution. This argument is without merit, has no basis in the text of the Treaty, and is offensive to the fundamental rights of sovereign governments and property owners.

### A.     Article IX of the 1977 Treaty does not require, or even *allow*, abstention.

"The interpretation of a treaty, like the interpretation of a statute, begins with its text." *Medellin v. Texas*, 552 U.S. 491, 506 (2008) (*citing Air France v. Saks*, 470 U.S. 392, 396–97 (1985)). Nothing in the 1977 Treaty bars tort or contract actions such as this from proceeding in domestic courts.

The 1977 Treaty contains no clause expressly preempting tort claims, contract claims, or other similar actions. Nor does it contain any provision expressly stripping domestic courts of the authority to hear such claims. This is noteworthy because the Executive Branch knows how to include such provisions in international agreements when it chooses. *See, e.g.*, *Ungaro-Benages v. Dresdner Bank AG*, 379 F.3d 1227, 1234 (11th Cir. 2004) (discussing an agreement between the United States and Germany that created an international tribunal to supply "**the exclusive remedy and forum** for the resolution of, *all claims that have or may be asserted against German companies arising from the National Socialist era and World War II*" (bold text added, italics in original)); *Cooper v. Tokyo Elec. Power Co.*, 860 F.3d 1193, 1200 (9th Cir. 2017) (discussing international conventions stating that "jurisdiction . . . *shall lie only*" with certain courts) (emphasis added)).

13

The 1977 Treaty contains no such provision that would make the dispute resolution provision in Article IX the exclusive remedy for any tort claim brought by a non-party to the Treaty.  Rather, Enbridge and its amici seek to hang their collective hat on the hook of Article IX, which provides that "[a]ny dispute *between the Parties* regarding the interpretation, application, or operation of this Agreement shall, so far as possible, be settled by negotiation *between them*"; "[a]ny *such dispute* which is not settled by negotiation shall be submitted to arbitration at the request of *either Party*"; the arbitrators' decision "shall be binding *on the Parties*"; and "[t]he costs of any arbitration shall be shared equally *between the Parties*."  1977 Transit Pipelines Treaty, 1977 WL 181731, art. IX.1–4 (emphasis added).  This provision is plainly limited to disagreements between the *parties* to the Treaty—the United States and Canada.  It does not apply to or in any way limit the rights of litigants such as the Band to enforce their rights in domestic courts.  Nor does it strip away the jurisdiction of the courts to adjudicate property disputes such as this.  Compare this language to the express preemption provisions cited in the preceding paragraph, and it is clear that Enbridge and its amici have stretched the language of Article IX far beyond the breaking point.

Additionally, Article IX applies only to disputes "*regarding the interpretation, application, or operation of this Agreement . . . .*"  *Id.* (emphasis added).  The Band raises no such dispute.  Rather, the Band advances claims for trespass, ejectment, public nuisance, and unjust enrichment based on the fact that Enbridge no longer holds an easement authorizing Line 5 on the Band's land.

In fact, Enbridge's argument that the District Court was required to abstain from adjudicating this matter so that the United States and Canada could arbitrate the Band's claims runs afoul of basic abstention principles.  Federal courts "are obliged to decide cases within the scope of federal jurisdiction." *Sprint Communications, Inc. v. Jacobs*, 571 U.S. 69, 72 (2013).  This is based on "the undisputed constitutional principle that Congress, and not the Judiciary" decides which cases fall within the jurisdiction of the federal courts.  *New Orleans Pub. Serv., Inc. v. Council of New Orleans*, 491 U.S. 350, 359 (1989) (*citing Kline v. Burke Construction Co.*, 260 U.S. 226, 234 (1922)).  "Federal courts, it was early and famously said, have 'no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given.'" *Sprint*, 571 U.S. at 77 (*quoting Cohens v. Virginia*, 19 U.S. 264 (1821)).

Here, Enbridge and Canada asked the District Court to effectively rewrite the 1977 Treaty to justify disregarding this "virtually unflagging," *id.*, obligation to decide a case within the scope of its jurisdiction.  This Court should join the District Court in rejecting this request.[5]

---

[5] In its principal brief, Enbridge claims that the District Court "simply disregard[ed] the Transit Treaty."  (Enbridge's Br. App., Doc. 13, p. 35.)  Canada does the same, claiming that "[t]he district court erred by simply disregarding the transit treaty," (Canada's Amicus Br., Doc. 20, p. 16), and that "[i]n the decision below, the district court simply ignored the Treaty and Canada's rights and interests" (*id.* at 24).  This is inaccurate.  The District Court considered, and expressly rejected Enbridge's Treaty-based arguments in its September 7, 2022 Opinion and Order on the Parties' cross-motions for summary judgment.  (A42–A43.)

**B.**     **The 1977 Treaty expressly preserves the Band's sovereign authority to regulate its land and natural resources.**

In addition to relying on Article IX, Enbridge and Canada cite to Article II of the 1977 Treaty, which bars "public authorit[ies]" from adopting "measures" that interfere with hydrocarbon transit.  (Enbridge's Br. App., Doc. 13, pp. 15, 35; Canada's Amicus Br., Doc. 20, pp. 16, 21–22.)  This argument is puzzling because it does not matter if the Band's actions fall within Article II's prohibition.  Under Article IV of the Treaty, appropriate governmental authorities—including the Band—retain the authority to adopt nondiscriminatory "regulations, requirements, terms, and conditions" with respect to matters such as "environmental protection." 1977 Transit Pipelines Treaty, 1977 WL 181731, art. IV.  Importantly, this preservation of the Band's authority applies "[*n*]*otwithstanding the provisions of Article II*."  *Id.* (emphasis added).

The Band has done exactly what Article IV contemplates—it has enforced nondiscriminatory requirements, terms, and conditions in furtherance of environmental protection.  The power of governmental entities to regulate the locations of pipelines out of a concern for environmental protection is well-established.  *See Wash. Gas Light Co. v. Prince George's County Council*, 711 F.3d 412 (4th Cir. 2013) (upholding a county zoning plan that excluded pipelines from certain lands based in part on the desire to "[r]estore, protect, and enhance the environment by protecting environmentally sensitive areas, minimizing the impacts of development, and expanding recreational opportunities and trail and bikeway connections"); *Texas Midstream Gas Servs., LLC v. City of Grand Prairie*, 608 F.3d

200, 210 (5th Cir. 2010) (upholding a zoning setback for pipelines based on safety concerns); *Portland Pipe Line Corp. v. City of S. Portland*, 288 F. Supp. 3d 321, 429–30 (D. Me. 2017) ("Under their police power, states and localities retain their ability to prohibit pipelines altogether in certain locations.").[6]

Prohibiting Enbridge from continuing to operate an environmental hazard on the Band's sovereign land is precisely the type of action that the Treaty preserves. Such control over Reservation land lies at the core of the Band's sovereign power. And Enbridge cannot credibly argue that the regulations, requirements, terms, or conditions at issue here are unjust, unreasonable, or discriminatory—the Band has enforced generally applicable and nondiscriminatory laws that apply to Enbridge the same way they would apply to any trespasser.

By expressly applying "[n]otwithstanding the provisions of Article II," Article IV kicks the legs out from under Enbridge's argument that the District Court's injunction violates the foreign affairs doctrine. (Enbridge's Br. App., Doc. 13, pp. 37–40.) Enbridge argues that such relief interferes with the ability of the United States to "speak[] with one voice in all matters of foreign relations . . . ." (*Id.* at 37.) But the Executive Branch has spoken through Article IV, in which it and Canada agreed that "the appropriate governmental authorities hav[e] jurisdiction"

---

[6] These same cases defeat Enbridge's argument that the Pipeline Safety Act displaces the federal common law of public nuisance. (Enbridge's Br. App., Doc. 13, pp. 48–59.) The Pipeline Safety Act expressly does *not* preempt actions related to the siting and location of interstate oil pipelines. 49 U.S.C. § 60104(e). As these cases establish, state or county regulations that govern the *location* of an interstate oil pipeline are not "safety standards," and therefore not preempted by the Pipeline Safety Act, even if they are enacted out of a concern for environmental protection.

to regulate Transit Pipelines "in the same manner as for any other pipelines."[7]

1977 WL 181731, art. IV.1.  The Band's actions and the District Court's decision to

exercise jurisdiction over this case are in accord with the Executive Branch's

decision to include Article IV in the Treaty.  The United States has spoken with one

voice; Enbridge simply does not like what it has said.

### C.   Enbridge's interpretation of the 1977 Treaty would effectively grant pipeline companies a license to trespass and leave property owners without any recourse.

If this Court was to adopt Enbridge's flawed interpretation of the 1977

Treaty, it is unclear how any landowner (not only sovereign, but private as well)

would assert their rights against any transit pipeline company.  If a pipeline

company brazenly trespasses on someone else's land for years, as Enbridge has done

here, what recourse would that landowner have?  Ask the United States

government to negotiate on their behalf with Canada to resolve the trespass?

Enbridge's interpretation would strip away fundamental property rights from

every landowner, sovereign or private, whose land is burdened by an international

---

[7] As the Band noted in the District Court, subsequent actions by the Executive Branch reflect the same.  (*See* Dkt. 301, p. 16 (discussing the *Presidential Permit Authorizing Lakehead Pipeline Company, Limited Partnership to Operate and Maintain a Pipeline at the International Boundary Line between the United States and Canada* (Dec. 12, 1991), 869f65_5373ff87997c4b499195c3b3022b5971.pdf (filesusr.com), which conditions Enbridge's operation of an international pipeline across the U.S.–Canada border in Michigan upon, among other things, "comply[ing] with all applicable federal and State laws and regulations," complying with "any orders issued by any competent agency of the United States Government or of the State of Michigan," and "acquir[ing] such right-of-way grants, easements, permits, and other authorizations as may become necessary and appropriate").)

transit pipeline easement.  It would effectively void every easement that grants only limited rights to a pipeline company—such as by limiting the company's occupation to a term of years—and instead provide pipeline companies with a license to trespass with impunity.  This argument is not supported by the plain language of the 1977 Treaty, fundamental principles of treaty interpretation, or common sense.

## II.     The threat of irreparable harm posed by Line 5's continued operation on the Bad River Reservation outweighs the asserted impacts of a court-ordered shutdown.

A number of Enbridge's supporting amici predict grave economic consequences if Line 5 is forced to shut down, as Enbridge itself did in the District Court and has in its litigation with Amici in other courts.  But the State of Michigan has devoted substantial resources to studying these issues over the course of several years and strongly believes that the grim prognostications of Enbridge and its amici are exaggerated.  Based on that in-depth analysis, the State concluded that the public interest would be served by shutting down Line 5, which is why it ordered that the pipeline be shut down within 180 days.  Enbridge's concerns over the price of petrochemicals pale in comparison to the devastating environmental impacts that would be caused by a release from Line 5.

The threat of a release at the Bad River meander is all too real.  Erosion of the riverbank threatens the integrity of Line 5 and presents another high-risk location, like the Straits of Mackinac, where a release of oil could cause irreparable harm to the Great Lakes.

19

As set forth above, given the 2010 Line 6B oil spill and impacts to Line 5 in the Straits, the State of Michigan has undertaken significant analysis of the risks of a release of oil from Line 5 to the waters of the Great Lakes, and of the potential impacts of a shutdown of Line 5. *See supra* at 6–9. As the actions that Amici and numerous state officials have taken against Line 5's continued operation in the Straits of Mackinac demonstrate, Amici agree with the Band that the potential harm of a shutdown has been exaggerated by Enbridge (and its supporting amici) and does not outweigh the imminent harm posed by Line 5. *Id.*

The possibility of a Line 5 shutdown is not new or unexpected. Enbridge's easements on the allotted parcels expired *10 years ago*—in 2013. The District Court found that Enbridge has been in willful trespass for the past decade, and even before that, it "knew full well at the time it signed the 1992 Agreement that there *was* a substantial risk that its easements on the allotment parcels would expire after 20 years." (A17; *see also* A31.) Further, the shutdown of Line 5 was a prominent campaign issue in Michigan's 2018 election. The State's Notice of Revocation and Termination directed Enbridge to cease operation of Line 5 in the Straits of Mackinac by May of 2021, and the Attorney General's lawsuit first sought an injunction to that effect in 2019.

Against this backdrop, Enbridge's contention that a "sudden, unplanned" shutdown would create "economic havoc" is misplaced. (*See* A99.) There is nothing "sudden" here. The possibility that Enbridge would be ordered to shut down Line 5

20

is one that it, interested stakeholders, and market participants have anticipated for years.

Amici agree with the Band's conclusion that markets will adjust to a shutdown. The weeks-long, court-ordered shutdown of Line 5 after the 2020 anchor strikes in the Straits of Mackinac did not have dire economic consequences. Nor did the shutdown after Line 5 was struck by a 12,000 pound anchor in 2018. And, as noted above, Enbridge's own expert testified that the 2010 shutdown of Line 6B in Michigan lasted for "several months" and did not have "sizable price impacts for refined product in the Detroit/Toledo area." (MA47:3–12.) That same expert further testified "[a]nd that's consistent with my analysis here regarding a Line 5 shutdown." (*Id.*)

Based on the State of Michigan's above-described research and analysis, as well as the State's own expertise and experience with its energy needs, systems, and resilience (including prior shutdowns of Line 5 and Line 6B), Amici anticipate that the relevant markets can and will reasonably adapt to a court-ordered shutdown of Line 5. Indeed, the markets have already begun to do so.[8]

The State of Michigan has taken extensive steps in recent years to ensure that Michigan is well positioned to maintain energy security in the event of a shutdown. This includes successful and ongoing efforts, illustrated by the MI

---

[8] *See, e.g.*, MLive, *Some Michigan propane suppliers switching to rail cars in anticipation of Line 5 closure* (Mar. 12, 2021), https://www.mlive.com/public-interest/2021/03/some-michigan-propane-suppliers-switching-to-rail-cars-in-anticipation-of-line-5-closure.html.

Propane Security Plan, to strengthen Michigan's propane resilience and optionality through measures such as diversifying its wholesale propane supply, expanding propane-related transportation solutions, and creating new tools to help Michigan families and businesses lower their energy intensity and transition to more affordable options.[9]  And as recent legislation and investments reflect, energy security and optionality remain top and active priorities for the State.[10]

---

[9] The MI Propane Security Plan, linked above, provides a summary of some such steps.  For a sampling of specific examples, *see, e.g.*, LPGas Magazine, *NGL Supply Wholesale flows propane at new Michigan terminal* (May 4, 2022), https://www.lpgasmagazine.com/ngl-supply-wholesale-flows-propane-at-new-michigan-terminal/; The Sault News, *New rail system in Kincheloe to increase propane delivery in EUP* (Mar. 15, 2021), https://www.sooeveningnews.com/story/news/2021/03/15/new-rail-system-kincheloe-increase-propane-delivery/4698833001/; LPGas Magazine, *Crestwood acquires storage, terminal assets from Plains* (May 12, 2020), https://www.lpgasmagazine.com/crestwood-acquires-storage-terminal-assets-from-plains/; NGL Supply Co. Ltd., *NGL Supply Buys Plains' Kincheloe, Michigan Propane Rail Terminal* (Nov. 3, 2019), https://nglsupply.com/ngl-supply-buys-plains-kincheloe-mich-propane-rail-terminal/; Michigan Public Service Commission, *MPSC approves settlement agreement allowing $155M rate increase for Consumers Energy electric customers* (Jan. 19, 2023) (detailing terms of settlement, including initiation of a pilot program for electrifying residential use of propane and other unregulated fuels), https://www.michigan.gov/mpsc/commission/news-releases/2023/01/19/mpsc-approves-settlement-agreement-allowing-rate-increase-for-consumers-energy-electric-customers.

[10] *See, e.g.*, 2023 PA 119, Art. 16, Pt. 2, § 510 (appropriating $8 million in funds available through September 2027 to "support efforts to ensure the adequacy of supply and affordability of pricing for residential and commercial consumers in this state who rely on propane as a primary energy source or as part of their preparedness and continuity plans," such as "develop[ing] and expand[ing] the storage capacity of wholesale and retail propane suppliers for transport and distribution through rail or other means"); Press Release, Executive Office of the Governor, *Gov. Whitmer Signs Bipartisan Bills to Expand Clean Energy, Create Jobs, and Lower Energy Costs* (July 27, 2023) (summarizing recent legislation and budgetary allocations to foster clean-energy growth and help low-income households lower energy costs), https://www.michigan.gov/whitmer/news/press-

The November 2020 Notice of Termination and Revocation issued by the State of Michigan, its Governor, and its DNR Director ordered Enbridge to shut down Line 5 in the Straits of Mackinac within 180 days (*i.e.*, six months) of that Notice, which the State of Michigan believed was sufficient to "to provide notice to affected parties and to allow for an orderly transition to ensure Michigan's energy needs are met." (MA20.) While Enbridge has refused to comply with this directive, and litigation over the continued operation of Line 5 in the Straits is ongoing, the State of Michigan remains ready and able to manage any impacts associated with a court-ordered shutdown.

Meanwhile, Amici remain deeply concerned about the very real and existential threat of a release of oil into the Great Lakes. Simply put, if erosion at the Bad River meander causes Line 5 to rupture, the resulting contamination will be catastrophic. This imminent threat of irreparable harm far outweighs the risk of impacts associated with a shutdown of Line 5.

## III. The equities favor the Band in this dispute.

Throughout its principal brief, Enbridge accuses the Band of inequitable behavior regarding two issues: (1) the Band's decision not to renew Enbridge's easement over the 12 "Allotted Parcels" in 2013 (Enbridge's Br. App., Doc. 13, pp. 16–29); and (2) the Band's decision not to issue environmental permits to Enbridge to install erosion control measures at the Bad River meander, which

releases/2023/07/27/whitmer-signs-bipartisan-bills-to-expand-clean-energy-create-jobs-and-lower-energy-costs.

Enbridge claims makes the Band "responsib[le] for the nuisance" (*id.* at 61).  Again, Amici are uniquely positioned to understand this facet of the dispute because the State of Michigan is both a sovereign landowning entity that must base its decisions as a landowner on concerns for the public's natural resources, and an entity with environmental permitting authority.

### A.  The Band's decision not to renew Enbridge's easement in 2013 was a common-sense decision based on facts not known to the Band in 1992.

In sections I.A.–C. of its opening brief, Enbridge argues that the Band breached various duties by agreeing to certain easement renewals in 1992, but not renewing other easements which expired in 2013.  (Enbridge's Br. App., Doc. 13, pp. 17–29.)

Amici will not belabor the contract law arguments, which have been ably made by the Band and were correctly decided by the District Court.  Rather, Amici offer the Court the perspective of a sovereign landowner and regulatory authority well-positioned to understand how the public's knowledge of the dangers posed by Line 5 evolved from 1992 to 2013.  Viewed through this lens, Amici believe the Band's decision not to renew the easements over the Allotted Parcels to be not only equitable but eminently reasonable.

In 1992, the grave threat to water resources posed by Line 5 was not on anyone's radar.  It was not until the 2010 release of oil from Enbridge's Line 6B, described on pages 6–7, that regulators fully understood the risks created by Enbridge's poor pipeline management.  That spill has been described as "an

awakening" which brought awareness to the threat posed by Line 5 and led to increased oversight by state and federal regulators.[11]  As set forth above, the environmental concerns posed by a release from Enbridge's aging pipelines suddenly became very real after the 2010 oil spill, and it is not surprising that landowners and regulatory agencies such as the Band responded by taking actions that were not anticipated two decades earlier.  *See supra* at 5–8.

The Band's decision not to renew Enbridge's easements over the Allotted Parcels in 2013 was not a breach of any duty, nor was it an inequitable act.  Rather, the circumstances changed when Enbridge caused one of the largest inland oil spills in the history of the United States.  Like any prudent landowner and regulator, when the facts changed, the Band's course of action changed to address those facts.

And yet one could read Enbridge's principal brief and not know that the Band had a very good reason for reassessing its willingness to have one of Enbridge's pipelines on its property.  Enbridge's brief is rife with outrage over what it frames as the Band's "repudiation" of its contractual obligations (Enbridge's Br. App., Doc. 13, pp. 9–10), breach of various duties including good faith and fair dealing (*id.* at 17–29), and accusations of the Band's "wrongful acts" which, Enbridge believes, were simply ignored by the District Court (*id.* at 46–47).

But all the Band did was elect not to renew a contract when it expired pursuant to its own terms (terms which Enbridge negotiated and agreed to).  Amici

---

[11] *See* MLive, *10 years ago, Kalamazoo River oil spill was 'an awakening' in pipeline debate* (Jan. 19, 2021), https://www.mlive.com/news/kalamazoo/2020/07/10-years-ago-kalamazoo-river-oil-spill-was-an-awakening-in-pipeline-debate.html.

believe that this decision by the Band was motivated by the clear environmental threat posed by Line 5 at the Bad River meander, and informed by the fact that, only three years prior, Enbridge propagated a major environmental catastrophe which was *still being cleaned up*[12] when the easements to the Allotted Parcels expired in 2013.  And what was Enbridge's response to the easements' expiration? As the District Court held, it was to "commit conscious and willful trespass . . . making an appropriate remedy necessary to address the violation of the Band's sovereign rights and to take away what otherwise would be a strong incentive for Enbridge to act in the future as it has here."  (A111.)

### B.  The Band's denial of Enbridge's permit requests was both legal and equitable.

Enbridge raises another equity-based argument in response to the Band's public nuisance claim, stating that "the Band's failure to permit Enbridge to remediate erosion at the Meander—and its corresponding responsibility for the nuisance—should have weighed against any injunctive relief."  (Enbridge's Br. App., Doc. 13, p. 61.)  Again, Amici believe they are well positioned to offer their perspective to the Court because the State of Michigan, like the Band, is a sovereign entity with environmental permitting authority, and Attorney General Dana Nessel represents Michigan's environmental permitting agency, the Michigan Department

---

[12] Enforcement action against Enbridge by the federal government was resolved in 2017 by entry of a consent decree.  Consent Decree, *United States v Enbridge Energy Ltd., et al.*, No. 1:16-cv-914 (W.D. Mich. May 23, 2017), https://www.epa.gov/sites/default/files/2017-06/documents/enbridge_consent_decree.pdf.

of Environment, Great Lakes, and Energy.  From the perspective of an
environmental regulator, Enbridge's argument on this point is without merit.

As a preliminary matter, as the District Court held, Enbridge is engaged in
"conscious and willful trespass" on the Band's land.  (A111.)  The Band, as a
landowner, is under no obligation to *assist* Enbridge in *exacerbating* the trespass so
that it can continue for longer than it otherwise could.

Further, from an environmental permitting standpoint, it is axiomatic that a
permit applicant must *own* the land on which they seek a permit or, at a minimum,
have the *permission* of the owner to construct the proposed project.  This is true in
Michigan, and it is true for federal agencies.[13]

The State of Michigan is very familiar with shoreline erosion measures.  In
fact, the past several years have seen historically high water levels on the Great
Lakes, which led to a drastic increase in the number of erosion protection permits
reviewed and processed by state regulators.[14]  If one was to apply to Michigan or the
U.S. Army Corps of Engineers for an erosion control permit without owning the
subject property, and without having the property owner's permission for the

---

[13] *See* U.S. Army Corps of Engineers and Michigan Department of Environment,
Great Lakes, and Energy, *Joint Permit Application Instructions*,
https://www.michigan.gov/egle/-
/media/Project/Websites/egle/Documents/Programs/WRD/Wetlands/JPA-
Instructions.pdf?rev=ff9e63d491d449fe918c1155cae35374&hash=14F4B3C473844B
28A4213417129A1DF7 (providing, at page 1, that "[a]uthorizations are required
from the property owner . . . when the applicant is not the owner").

[14] *See* Michigan Radio, *With water levels rising, EGLE expedites shoreline protection
permits to prevent damage* (Oct. 30, 2019),
https://www.michiganradio.org/environment-science/2019-10-30/with-water-levels-
rising-egle-expedites-shoreline-protection-permits-to-prevent-damage.

proposed project, the application would be rejected immediately.  It would not even be processed for review on the merits.

Enbridge's position—that it has the right to undertake construction projects on other people's land, without permission, and indeed over the objection of the landowner—is without merit.

## CONCLUSION AND RELIEF REQUESTED

Amici respectfully request that this Court reject the arguments advanced by Enbridge and its supporting amici, affirm the District Court's decision that the Band is entitled to injunctive relief, and award relief in accordance with the Band's request for relief in its brief on appeal.

Respectfully submitted,

/s/ *Daniel P. Bock*
Daniel P. Bock
Keith D. Underkoffler
Assistant Attorneys General
Counsel of Record
Attorney for Amici Curiae
Environment, Natural Resources, and
Agriculture Division
P.O. Box 30755
Lansing, MI 48909
(517) 335-7664
bockd@michigan.gov
underkofflerk@michigan.gov

Dated:  October 18, 2023

## CERTIFICATE OF COMPLIANCE

Certificate of Compliance with Type-Volume Limit,
Typeface Requirements, and Type Style Requirements

1.      This amicus brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 29(a)(5) and Circuit Rule 29 because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), this amicus brief contains no more than 7,000 words.  This document contains 6,299 words.

2.      This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) and Circuit Rule 32(b) because this document has been prepared in a proportionally spaced typeface using Word 2013 in 12-point Century Schoolbook.

Respectfully submitted,

/s/ *Daniel P. Bock*
Daniel P. Bock
Keith D. Underkoffler
Assistant Attorneys General
Counsel of Record
Attorney for Amici Curiae
Environment, Natural Resources, and
Agriculture Division
P.O. Box 30755
Lansing, MI 48909
(517) 335-7664
bockd@michigan.gov
underkofflerd@michigan.gov

## CERTIFICATE OF SERVICE

I certify that on October 18, 2023, the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record (designated below).

Respectfully submitted,

/s/ *Daniel P. Bock*
Daniel P. Bock
Keith D. Underkoffler
Assistant Attorneys General
Counsel of Record
Attorney for Amici Curiae
Environment, Natural Resources, and
Agriculture Division
P.O. Box 30755
Lansing, MI 48909
(517) 335-7664
bockd@michigan.gov
underkofflerd@michigan.gov

LF:  Enbridge – Bad River Amicus USCA7 (AG)/AG #2023-0386249-B/Amicus Brief 2023-10-18

**TABLE OF CONTENTS TO SHORT APPENDIX TO BRIEF OF AMICI CURIAE STATE OF MICHIGAN AND ATTORNEY GENERAL DANA NESSEL**

| Document | Page |
|---|---|
| November 13, 2020 Notice of Revocation and Termination of Easement | MA01 |
| Excerpt of Plaintiff's Expert Witness Disclosures, Appendix D to WWE Report, District Court Docket No. 484-7 | MA36 |
| Excerpt of Plaintiff's Expert Witness Disclosures, Appendix I to WWE Report, District Court Docket No. 484-12 | MA39 |
| Excerpt of Transcript of Fifth Day of Court Trial, Held October 28, 2022, District Court Docket No. 610 | MA44 |
| Excerpt of Expert Witness Report of Matthew Horn, District Court Docket No. 478 | MA48 |
| Excerpt of Transcript of First Day of Court Trial, Held October 24, 2022, District Court Docket No. 606 | MA51 |

# NOVEMBER 13, 2020 NOTICE OF REVOCATION AND TERMINATION OF EASEMENT

STATE OF MICHIGAN

OFFICE OF THE GOVERNOR

DEPARTMENT OF NATURAL RESOURCES

## NOTICE OF REVOCATION AND TERMINATION OF EASEMENT

## INTRODUCTION

Through Governor Gretchen Whitmer and the Department of Natural Resources, the State of Michigan hereby provides formal notice to Enbridge (as defined below) that the State is revoking and terminating the 1953 Easement. The 1953 Easement authorized Lakehead Pipe Line Company, Inc., and its successors, to operate dual pipelines in the Straits of Mackinac to transport petroleum and other products. As more fully described below, the Easement is being revoked for violation of the public trust doctrine, and is being terminated based on Enbridge's longstanding, persistent, and incurable violations of the Easement's conditions and standard of due care. The revocation and termination each take legal effect 180 days after the date of this Notice to provide notice to affected parties and to allow for an orderly transition to ensure Michigan's energy needs are met. Enbridge must cease operation of the Straits Pipelines 180 days after the date of this Notice.

## BACKGROUND

On April 23, 1953, the Conservation Commission of the State of Michigan granted an easement entitled "Straits of Mackinac Pipe Line Easement Conservation Commission of the State of Michigan to Lakehead Pipe Line Company, Inc." ("1953 Easement" or "Easement"), a copy of which is attached as Exhibit 1.

The Easement was issued by the Conservation Commission under the authority of 1953 PA 10 and in consideration of a one-time payment of $2,450.00 by the Grantee to the Grantor.

Subject to its terms and conditions, the Easement granted Lakehead Pipe Line Company, Inc., the Grantee, and its successors and assigns, the right "to construct, lay, maintain, use and operate" two 20-inch diameter pipelines for the purpose of transporting petroleum and other products "over, through, under, and upon" specifically described public trust bottomlands owned by the State of Michigan in the Straits of Mackinac.

The two pipelines subject to the Easement ("Straits Pipelines" or "Pipelines") were completed in 1953 and thereafter have been operated by the Grantee and its successors.

The Grantee's current successors, Enbridge Energy, Limited Partnership, Enbridge Energy Company, Inc., and Enbridge Energy Partners, L.P. (collectively "Enbridge"), operate the Straits Pipelines as part of the Enbridge Line 5 pipeline that

extends from Superior, Wisconsin and across Michigan, to Sarnia, Ontario. Line 5, including the Straits Pipelines, currently transports an average of 540,000 barrels or 22,680,000 gallons of crude oil and/or natural gas liquids per day.

The Governor is the chief executive officer of the State of Michigan. The Department of Natural Resources ("DNR") is the successor to the Conservation Commission, Grantor of the 1953 Easement.

On June 27, 2019, Governor Gretchen Whitmer directed the DNR to undertake a comprehensive review of Enbridge's compliance with the 1953 Easement. The DNR submitted several requests to Enbridge to provide documents and information pertaining to its compliance with the Easement. Beginning in February 2020 and ending in June 2020, Enbridge provided some documents in response to these requests.[1]

This Notice is based on review of the records recently submitted by Enbridge, other documents in the public domain, and the legal and factual grounds specified below.

## I.   REVOCATION OF EASEMENT PURSUANT TO THE PUBLIC TRUST DOCTRINE

The State of Michigan, in both its sovereign and proprietary capacities, is revoking the Easement pursuant to the public trust doctrine.

### A.      The Public Trust Doctrine

In *Glass v Goeckel,* 473 Mich 667, 678-679 (2005), the Michigan Supreme Court held that the state, as sovereign, is obligated to protect and preserve the waters of, and lands beneath, the Great Lakes. "The state serves, in effect, as the *trustee of public rights* in the Great Lakes for fishing, hunting, and boating for commerce or pleasure." *Id*. at 679 (emphasis added).[2]

---

[1] Among other things, the DNR included a request for records confirming that Enbridge systematically has undertaken efforts (inspections, investigations, assessments and evaluations) to comply with the Easement from its issuance in 1953 to the present. In response, Enbridge produced few contemporaneous records and little evidence that it conducted a pipeline inspection and maintenance program from 1953 to the late 1990s or early 2000s – i.e., during most of the Easement's existence.

[2] The Michigan Legislature has recognized the public trust doctrine in various state statutes. For example, Part 17 of the Natural Resources and Environmental Protection Act ("NREPA"), the Michigan Environmental Protection Act, grants broad standing to any person to file an action in circuit court "against any person for the protection of the air, water, and other natural resources and the *public trust in these resources* from pollution, impairment, or destruction." MCL 324.1701(1) (emphasis added). In Part 301 of NREPA, Inland Lakes and Streams, the Department of Environment, Great Lakes, and Energy is prohibited from issuing a permit for a proposed project or activity if it will "adversely affect the public trust,"

These public rights are protected by a "*high*, *solemn* and *perpetual* trust, which it is the duty of the state to forever maintain." *Collins v Gerhardt*, 237 Mich 38, 49 (1926) (emphasis added). As the Michigan Supreme Court long ago explained, "[t]he state is sovereign of the navigable waters within its boundaries, bound, however, in trust, to do nothing in hindrance of the public right of navigation, hunting and fishing." *Nedtweg v Wallace*, 237 Mich 14, 20 (1926).

Both the United States Supreme Court and the Michigan Supreme Court have held that the public trust doctrine strictly limits the circumstances under which a state may convey property interests in public trust resources. In *Illinois Central Railroad Co v Illinois*, 146 US 387, 455-456 (1892), the United States Supreme Court identified only two exceptions under which such a conveyance is permissible:

> The trust with which they are held, therefore, is governmental, and cannot be alienated, except in those instances mentioned, of parcels used in the improvement of the interest thus held, or when parcels can be disposed of without detriment to the public interest in the lands and waters remaining.

The Court held that because neither of those conditions was satisfied by a state statute purporting to grant submerged lands along the Chicago lakefront to a private company, a subsequent state statute revoking that grant and restoring public rights was valid and enforceable. *Id.* at 460.

In *Obrecht v National Gypsum Co*, 361 Mich 399, 412 (1960), the Michigan Supreme Court declared that "[l]ong ago we committed ourselves . . . to the universally accepted rules of such trusteeship as announced by the Supreme Court in *Illinois Central*," including *Illinois Central*'s delineation of the limited conditions under which public trust resources may be conveyed:

> [N]o part of the beds of the Great Lakes, belonging to Michigan and not coming within the purview of previous legislation . . . can be alienated or otherwise devoted to private use *in the absence of due finding of one of two exceptional reasons for such alienation or devotion to non-public use*. One exception exists where the State has, *in due recorded form*, determined that a given parcel of such submerged land may and should be conveyed 'in the improvement of the interest thus held' (referring to the public trust). The other is present where the State has, *in similar form*, determined that such disposition may be made 'without detriment to the public interest in the lands and waters remaining.'

---

which includes consideration of uses of lakes and streams for "*recreation, fish and wildlife, aesthetics, local government, agriculture, commerce, and industry*." MCL 324.30106 (emphasis added). And, as noted in footnote 3 below, Part 325 of NREPA, Great Lakes Submerged Lands, includes "*hunting, fishing, swimming, pleasure boating, or navigation*" as public uses. MCL 324.32502 (emphasis added); see also, e.g., MCL 324.32503 & .32505.

*Obrecht,* 361 Mich at 412-413, quoting *Illinois Central*, 146 US at 455-456 (emphasis added). The Michigan Legislature has incorporated and codified that common-law standard and "due finding" requirement into Part 325 (Great Lakes Submerged Lands) of the Natural Resources and Environmental Protection Act, MCL 324.32501 *et seq.*[3]

## B.     The 1953 Easement Violated the Public Trust and Was Void From its Inception

The 1953 Easement violated the public trust doctrine from its inception because the State never made a finding that the Easement: (1) would improve navigation or another public trust interest; or (2) could be conveyed without impairment of the public trust. The Easement itself contains no such findings, and there is no contemporaneous document in which the State determined that the proposed Easement met either of the two exceptions. In fact, there is no indication whatsoever that the Conservation Commission determined that the conveyance of the Easement and the operation of the Straits Pipelines would improve public rights in navigation, fishing, or other uses protected by the public trust. Moreover, there is no evidence that the Commission determined that the Pipelines' operation could not adversely affect those rights.[4]

Also, contemporaneous approval of the construction of what is now Enbridge's Line 5 in Michigan by the Michigan Public Service Commission ("PSC") lacked any such public trust findings and determinations.[5]

Finally, the enactment of 1953 PA 10, the statute authorizing issuance of the Easement, does not evidence a finding that either of the public trust limitations would

---

[3] See, e.g., MCL 324.32502 (conveyance of property interests in submerged lands allowed "whenever it is determined by the department that the private or public use of those lands and waters will not substantially affect the public use of those lands and waters for hunting, fishing, swimming, pleasure boating, or navigation or that the public trust in the state will not be impaired by those agreements for use, sales, lease, or other disposition"); MCL 324.32503(1) (requiring a "finding that the public trust in the waters will not be impaired or substantially affected" in order to "enter into agreements pertaining to waters over and the filling in of submerged patented lands, or to lease or deed unpatented lands"); MCL 324.32505(2) (requiring a "finding that the public trust will not be impaired or substantially injured" in order to "allow, by lease or agreement, the filling in of patented and unpatented submerged lands and allow permanent improvements and structures").

[4] The 1953 Easement lacks any mention of the two required findings and merely states the following: "*WHEREAS, the Conservation Commission is of the opinion that the proposed pipe line system will be of benefit to all of the people of the State of Michigan and in furtherance of the public welfare*" and "*WHEREAS, the Conservation Commission duly considered the application of Grantee and at its meeting held on the 13th day of February, A.D. 1953, approved the conveyance of an easement.*"

[5] PSC Opinion and Order for the 1953 Line 5 pipeline (March 31, 1953), https://www.michigan.gov/documents/deq/Appendix_A.3_493982_7.pdf.

be satisfied by the Straits Pipelines. That legislation merely authorized the Conservation Commission to grant easements for pipelines, electric lines and telegraph lines on certain state lands and lake bottomlands, subject to terms and conditions determined by the Commission. The statute did not find or determine that the 1953 Easement, as subsequently granted, would either benefit public trust uses or not impair such uses of the Great Lakes and the bottomlands.

In the absence of either of the due findings required under the public trust doctrine, the 1953 Easement was void from its inception.

## C.    Current and Continued Use of the Straits Pipelines Violates the Public Trust

As noted above, public rights in navigable waters "are protected by a *high, solemn*, and *perpetual* trust, which it is the duty of the state to forever maintain." *Collins,* 237 Mich at 49 (emphasis added). The State did not surrender its trust authority and concurrent responsibilities when it granted the 1953 Easement to Enbridge's predecessor. "The state, as sovereign, cannot relinquish [its] duty to preserve public rights in the Great Lakes and their natural resources." *Glass*, 473 Mich at 679. A state's conveyance of property rights "to private parties leaves intact public rights in the lake and its submerged land. . . . Under the public trust doctrine, the sovereign never had the power to eliminate those rights, *so any subsequent conveyances . . . remain subject to those public rights*." *Id*. at 679-681 (emphasis added).

Under Michigan law, all conveyances of bottomlands and other public trust resources are encumbered by the public trust. *Nedtweg,* 237 Mich at 17. When the State conveys a property interest in Great Lakes bottomlands, "it necessarily conveys such property *subject to the public trust." Glass*, 473 Mich at 679. Even if initially valid, the 1953 Easement remains subject to the public trust and the State's continuing duty to protect the Great Lakes public trust resources. Indeed, the Easement itself broadly reserved the State's rights. 1953 Easement, Paragraph M ("All rights not specifically conveyed herein are reserved to the State of Michigan.").

As the United States Supreme Court held in *Illinois Central,* a grant of property rights in public trust resources "is necessarily revocable, and the exercise of the trust by which the property was held by the state can be resumed at any time." 146 US at 455. In that case, the State of Illinois subsequently determined that it should rescind its prior grant of lake bottomlands to a private entity and the Court upheld that action.

Recent events have made clear that continued operation of the Straits Pipelines cannot be reconciled with the State's duty to protect public trust uses of the Lakes from potential impairment or destruction. As outlined below, transporting millions of gallons of petroleum products each day through two 67-year old pipelines that lie exposed in the Straits below uniquely vulnerable and busy shipping lanes presents an extraordinary, unreasonable threat to public rights because of the very

real risk of further anchor strikes and other external impacts to the Pipelines, the inherent risks of pipeline operations, and the foreseeable, catastrophic effects if an oil spill occurs at the Straits.

The Straits Pipelines are located where multiple lanes of heavy shipping activity converge and are oriented north-south, perpendicular to the direction of most commercial vessel traffic. Also, despite near-shore sections of the Straits Pipelines (those in waters less than 65 feet deep) being laid in trenches and covered with soil, most of each Pipeline was placed and remains on or above the State-owned lakebed, exposed in open water and with no covering shielding it from anchor strikes or other physical hazards.

In October 2017, Dynamic Risk Assessment Systems, Inc. ("Dynamic Risk"), an independent consulting firm working under a contract with the State of Michigan, issued the final report of its Alternatives Analysis for the Straits Pipelines ("Dynamic Risk Report") that included, among other things, an analysis of the risks associated with continued operation of the existing Pipelines. Dynamic Risk determined that the dominant threat of a rupture to the Pipelines is the inadvertent deployment of anchors from ships traveling through the Straits. The Report noted that inadvertent anchor strikes are known in the industry to be the principal threat to offshore pipelines. They are both "increas[ing] in frequency" and "not influenced by mitigation measures."[6]

According to the Dynamic Risk Report, the risk of a pipeline-anchor incident depends largely on four "vulnerability factors": (1) size of the pipeline; (2) water depth (relative to anchor chain length); (3) pipeline protection (depth of burial, use of armoring material); and (4) number and size distribution of ship crossings per unit of time. Dynamic Risk found that the Straits Pipelines score high on all four of these factors.[7]

Recent events confirm that the threat of damage to the Straits Pipelines from anchor strikes or impacts from other external objects is very real. In April 2018, a commercial tug and barge vessel inadvertently dropped and dragged an anchor across the lakebed at the Straits. The anchor severed or dragged several electric transmission cables located on the bottom of the Straits near the Pipelines. The anchor actually struck and dented the Pipelines at three locations, though neither Pipeline ruptured. Fortunately, those strikes to the Pipelines happened to occur at locations where the Pipelines rest on the lakebed rather than other areas where they are suspended above it and are particularly vulnerable to anchor hooking.

The 2018 anchor strike was not an isolated event. Most recently, in June 2020, Enbridge disclosed that both the east and west legs of the Straits Pipelines had been

---

[6] Dynamic Risk Report, p. 2-35, https://mipetroleumpipelines.com/document/alternatives-analysis-straits-pipeline-final-report.
[7] *Id.*, pp. 2-36, 2-42 to -43.

hit by external objects, apparently cables or anchors deployed from vessels operating near the Pipelines, most likely in 2019. Those impacts damaged pipeline coatings and, at one location on the east Pipeline, severely damaged a pipeline support structure previously installed by Enbridge. Tellingly, none of the measures implemented by Enbridge since the April 2018 incident to mitigate the risk of anchor strikes was sufficient to prevent or even contemporaneously detect the recently disclosed impacts to the Pipelines. And while the specific cause(s) of the impacts has not yet been determined, Enbridge's own reports on these events conclude that four of the five vessels potentially responsible for the impacts were operated by Enbridge's own contractors.[8]

According to Dynamic Risk, even apart from their unique vulnerability to anchor strikes, operation of the Straits Pipelines presents inherent risks of environmental harm. Dynamic Risk sought to identify what it classified as the "Principal Threats," i.e., "Threats for which an evaluation of susceptibility attributes indicates *a significant vulnerability*, and that have the potential to provide the most significant contributions to overall failure probability."[9] The threats considered included "incorrect operations," which were described as follows:

> The threats to transmission pipeline integrity from incorrect operations include, but are not necessarily limited to accidental over-pressurization, exercising inadequate or improper corrosion control measures, and improperly maintaining, repairing, or calibrating piping, fittings, or equipment.[10]

Dynamic Risk concluded that notwithstanding the various operational and procedural changes Enbridge adopted after the Marshall, Michigan Line 6B failure, "incorrect operations" remain a Principal Threat for the Straits Pipelines.[11]

The Straits of Mackinac are at the heart of the Great Lakes, a unique ecosystem of enormous public importance. As noted in "Independent Risk Analysis for the Straits Pipelines," Michigan Technological University (September 2018), a report commissioned by the State and carried out by a multi-disciplinary team of experts ("Michigan Tech Report"):

> The Straits of Mackinac hydraulically link Lakes Michigan and Huron. . . and are wide and deep enough . . . to permit the same average water level in both water bodies, technically making them two lobes of a single large lake. The combined Michigan–Huron system forms the largest lake in the world by surface area and the fourth largest by volume, containing nearly 8% of the world's surface freshwater. The Straits of

---

[8] Enbridge Report, Investigation of Disturbances to Line 5 in the Straits of Mackinac Discovered in May and June of 2020 (Updated August 21, 2020), p. 8.
[9] Dynamic Risk Report, p. 2-11 (emphasis added).
[10] *Id.*, p. 2-37.
[11] *Id.*, p. 2-47.

Mackinac serve as a hub for recreation, tourism, commercial shipping, as well as commercial, sport and subsistence [including tribal] fishing . . . .[12]

An oil spill at the Straits threatens a wide range of highly valuable resources:

The waters and shoreline areas of Lake Michigan and Lake Huron including areas surrounding and adjacent to the Straits of Mackinac contain abundant natural resources, including fish, wildlife, beaches, coastal sand dunes, coastal wetlands, marshes, limestone cobble shorelines, and aquatic and terrestrial plants, many of which are of considerable ecological and economic value. These areas include stretches of diverse and undisturbed Great Lakes shorelines that provide habitat for many plant and animal species.[13]

Among other complicating factors, water currents in the Straits are unusually strong, complex, and variable:

Water currents in the Straits of Mackinac can reach up to 1 [meter per second] and can also reverse direction every 2-3 days flowing either easterly into Lake Huron or westerly towards Lake Michigan. . . . Flow volumes through the Straits can reach 80,000 [cubic meters per second] and thus play essential roles in navigation and shipping in this region, the transport of nutrients, sediments and contaminants between Lakes Michigan and Huron, and also the ecology and biodiversity of this region.[14]

Consequently, oil spilled into the Straits could be transported into either Lake, and depending upon the season and weather conditions, could impact up to hundreds of miles of Great Lakes shoreline.[15]

Crude oil contains toxic compounds that would cause both short- and long-term harm to biota, habitat, and ecological food webs.[16] Numerous species of fish, especially in their early life stages, as well as their spawning habitats and their supporting food chains, are also at risk from an oil spill.[17] Viewed as a whole, the ecological impacts would be both widespread and persistent.[18]

---

[12] Michigan Tech Report, p. 26, https://mipetroleumpipelines.com/files/document/pdf/Straits_Independent_Risk_Analysis_Final.pdf.

[13] *Id.,* p. 165.

[14] *Id.,* p. 56.

[15] *Id.,* pp. 68-69.

[16] *Id.,* pp. 166-169, 176, 181-185.

[17] *Id.,* pp. 192-199.

[18] *Id.,* pp. 213-214.

And "[b]ecause of the unique and complex environment of the Great Lakes and the Straits area," it is uncertain how effectively and at what cost the affected resources could be restored.[19] The Michigan Tech Report also estimated several types of economic and natural resource damages that would likely result from a worst-case oil spill from the Straits Pipelines.[20] Among other findings, the Report estimated large damages to recreational fishing, recreational boating, commercial fishing, and commercial navigation,[21] all activities within the rights subject to the public trust.

The Great Lakes and the Straits of Mackinac also have special ecological, cultural and economic significance for the tribes of Michigan, including, but not limited to, the tribes that retain reserved hunting, fishing and gathering rights in the lands and waters ceded to the United States under the 1836 Treaty of Washington.[22] An oil spill or release from the Straits Pipelines would have severe, adverse impacts for tribal communities. The tribes have fundamental interests in the preservation of clean water, fish and habitat at the Straits. Many tribal members rely on treaty-protected rights of commercial and subsistence fishing in the Straits and other Great Lakes waters that could be impacted by an oil spill or release.

Enbridge's operation of the Straits Pipelines presents a substantial, inherent and unreasonable risk of an oil spill and such a spill would have grave ecological and economic consequences, severely impairing public rights in the Great Lakes and their public trust resources. While Enbridge has proposed to replace the existing Pipelines with a new pipeline to be constructed in a tunnel beneath the lakebed, that project is likely years away from completion at best. For all these reasons, the Governor and the Director of the Department of Natural Resources find that Enbridge's use of the Straits Pipelines is contrary to and in violation of the public trust.

### D. The December 19, 2018 Third Agreement Between the State of Michigan and Enbridge Does Not Preclude Revocation of the 1953 Easement

On December 19, 2018, the then Governor of Michigan, the then Director of the DNR, the then Director of the Department of Environmental Quality, and representatives of Enbridge signed a document entitled "Third Agreement Between the State of Michigan, Michigan Department of Environmental Quality, and Michigan Department of Natural Resources and Enbridge Energy, Limited Partnership, Enbridge Energy Company, Inc., and Enbridge Energy Partners, L.P." ("Third Agreement") relating to the Straits Pipelines. The Third Agreement provided

---

[19] *Id.,* pp. 261-263.

[20] *Id.,* pp. 272-318.

[21] *Id.,* pp. 285-294.

[22] Those tribes are the Bay Mills Indian Community, the Grand Traverse Band of Ottawa and Chippewa Indians, the Little River Band of Ottawa Indians, the Little Traverse Bay Bands of Odawa Indians, and the Sault Ste. Marie Tribe of Chippewa Indians. The exercise of those rights in the Great Lakes is covered by the 2000 Consent Decree in *United States v Michigan* to which the State of Michigan is a party.

that, subject to specified conditions, Enbridge could continue to operate the existing Straits Pipelines pending completion of a tunnel beneath the Straits and of a Straits Line 5 Replacement Segment to be constructed and operated within the proposed tunnel.

Specifically, Article 4.1 of the Third Agreement states:

4.1    The State agrees that Enbridge may continue to operate the Dual Pipelines, which allow for the functional use of the current Line 5 in Michigan, until the Tunnel is completed, and the Straits Line 5 Replacement segment is placed in service within the Tunnel, subject to Enbridge's continued compliance with all of the following:

(a)    The Second Agreement;

(b)    The Tunnel Agreement;

(c)    This Third Agreement;

(d)    *The 1953 Easement; and*

(e)    *All other applicable laws,* including those listed in Section V of the Second Agreement. (Emphasis added.)

Notwithstanding the Third Agreement, the 1953 Easement is subject to revocation under the public trust doctrine, and the Third Agreement's stated conditional right to continue to operate the Straits Pipelines does not preclude that revocation, for at least two reasons. First, as detailed below in Section II of this Notice, Enbridge incurably has violated and continues to violate the 1953 Easement. Second, as set forth above, the public trust doctrine is among the laws that apply to the existing Straits Pipelines and Enbridge's continued operation of the Pipelines violates the public trust.

Section 4.2 of the Third Agreement states in part:

4.2    Provided that Enbridge complies with Section 4.1 above, the State agrees that:

                        ***

(c)    The replacement of the Dual Pipelines with the Straits Line 5 Replacement Segment in the Tunnel is expected to eliminate the risk of a potential release from Line 5 at the Straits.

(d)    In entering into this Third Agreement, and thereby authorizing the Dual Pipelines to continue to operate until such time that the Straits Line 5 Replacement Segment is placed into service within the Tunnel, the State has acted in accordance with and in furtherance of the public's interest in the protection of waters,

waterways, or bottomlands held in public trust by the State of Michigan.

The language of Section 4.2 quoted above does not and cannot preclude the revocation of the 1953 Easement under the public trust doctrine for at least the following reasons. To begin, it is expressly conditioned on Enbridge's compliance with Section 4.1; as discussed, Enbridge is not, and has not been, in compliance with that provision. Furthermore, nothing in Section 4.2 provides a "due finding" that Enbridge's continued use of public trust bottomlands and waters to operate the existing Straits Pipelines would either enhance the public trust or not impair the public trust uses of waters and lands at the Straits. Section 4.2(d) does not itself supply it. Nor does the related assertion in Section 4.2(c) that the eventual replacement of the existing Pipelines with a new pipeline in the proposed tunnel is expected to eliminate the risk of a potential release from Line 5 at the Straits. It simply does not follow from that assertion that continuing to operate the existing Pipelines until they are replaced would somehow enhance the public trust or not impair it. And nothing else in the Third Agreement suggests, let alone embodies, a finding that continued operation of the Pipelines now, before a tunnel is completed, mitigates the risk of releases from them. Nor, for that matter, could the requisite due finding have been made when the Third Agreement was signed in December 2018, given the substantial, inherent and unreasonable risk of grave harm presented by the continued operation of the Straits Pipelines. See Section I.C, *supra*.

Finally, even if the Third Agreement contained a lawful finding by the State officials who signed it in 2018 that Enbridge's continued operation of the Straits Pipelines is consistent with the public trust—which it did not—any such finding is not permanently binding on the State and those former State officials' successors, who retain a solemn, perpetual and irrevocable duty to protect the public trust. Accordingly, the Third Agreement does not preclude the revocation of the 1953 Easement for the reasons stated in this Notice.

## II.   TERMINATION OF EASEMENT FOR VIOLATION AND BREACH BY ENBRIDGE

### A.   Easement Terms and Conditions

#### 1.   Standard of Due Care

Paragraph A of the 1953 Easement provides: "Grantee [originally Lakehead Pipe Line Company, Inc., now Enbridge] in its exercise of rights under this easement, including its designing, constructing, testing, operating, maintaining, and, in the event of termination of this easement, its abandoning of said pipe lines, shall follow the usual, necessary and proper procedures for the type of operation involved, and *at all times shall exercise the due care of a reasonably prudent person* for the safety and welfare of all persons and of all public and private property . . . ." (Emphasis added.)

The standard of due care under the Easement is that of a reasonably prudent person. The Merriam-Webster Dictionary's definition of "prudence" includes "skill and good judgment in the use of resources" and "caution or circumspection as to danger or risk."[23]

## 2.    Compliance Obligations

Paragraph A of the Easement further states: "Grantee shall comply with the following minimum specifications, conditions and requirements, unless compliance therewith is waived or the specifications or conditions modified in writing by Grantor . . . ."

Among other requirements, the Easement includes specific conditions obligating the Grantee to: (1) maintain a maximum span or length of unsupported pipe not to exceed 75 feet; (2) protect all pipe with a specified coating and wrap; and (3) maintain a minimum curvature of any section of pipe of not less than 2,050 feet radius.[24]

## 3.    Easement Termination

Paragraph C.(1) of the Easement provides that the Easement may be terminated by Grantor "[i]f, after being notified in writing by Grantor of any specified breach of the terms and conditions of this easement, Grantee shall fail to correct said breach within ninety (90) days, or, having commenced remedial action within such ninety (90) day period, such later time as it is reasonably possible for the Grantee to correct said breach by appropriate action and the exercise of due diligence in the correction thereof . . . ."

The stated timeframes for correcting a breach of the Easement presume that the identified breach or violation is "correctable." As more fully explained below, Enbridge has failed for decades to meet its compliance and due-care obligations under the Easement, and it remains in violation of those obligations. There is nothing Enbridge can do to change its past behavior and callous disregard for its duties under the Easement, and its breaches of the Easement's terms and conditions cannot be corrected or otherwise cured.

## B.    Enbridge Has Violated Conditions of the Easement and the Easement's Standard of Due Care

Enbridge has breached or violated the standard of due care and its obligations to comply with the conditions of the Easement in several fundamental and incurable ways.

---

[23] https://www.merriam-webster.com/dictionary/prudence.
[24] 1953 Easement, Paragraphs A.(10), (9), and (4).

### 1.     Unsupported Pipeline Spans or Lengths

Paragraph A.(10) of the Easement requires that each Pipeline must be physically supported (i.e., either rest on the lakebed or be supported by some other structure/device) at least every 75 feet. This prohibition of unsupported pipeline "spans" longer than 75 feet serves to protect the structural integrity of the Pipelines from stresses and vibrations that may be caused by the strong currents surrounding the Pipelines. Those same currents can erode the lakebed on which portions of the Pipelines rest, creating excessive spans.

For virtually the entire time the Easement has been in place, Enbridge has ignored the 75' span requirement.[25] Documents provided by Enbridge confirm that since at least 1963 and continuing through 2012, Enbridge has known that multiple unsupported pipe spans have exceeded 75 feet but has failed to take remedial action to address the non-compliant spans:

- 1963: 17 spans detected – action taken on 0 spans
- 1972: 7 spans detected – action taken on 0 spans
- 1975: 13 spans detected – action taken on 3 spans
- 1982: 7 spans detected – action taken on 0 spans
- 1987: 7 spans detected – action taken on 7 spans
- 1992: 17 spans detected – action taken on 6 spans (4 spans exceeded 200': 216'; 221'; 292'; 359')
- 1997: 45 spans detected – action taken on 0 spans (4 spans exceeded 200': 278'; 311'; 286'; 421')
- 2001: 50 spans detected – action taken on 8 spans
- 2003: 62 spans detected – action taken on 16 spans
- 2004: 75 spans detected – action taken on 16 spans
- 2005: 40 spans detected – action taken on 14 spans
- 2006: 64 spans detected – action taken on 12 spans
- 2007: 64 spans detected – action taken on 0 spans
- 2010: 62 spans detected – action taken on 7 spans
- 2012: 33 spans detected – action taken on 17 spans[26]

Spreadsheet data on pipe spans for Calendar Years 2005 through 2012 provided by Enbridge further confirm that Enbridge failed to take timely corrective action to address span lengths known to exceed 75 feet for significant periods of time,

---

[25] In correspondence to then Attorney General Bill Schuette and then DEQ Director Dan Wyant, dated June 27, 2014, Enbridge refers to a Span Management Program employed by the company *since construction of the dual pipelines* in the Straits of Mackinac. Despite this reference, Enbridge failed to produce any such document(s) or proof of the program's existence and later, through legal counsel, acknowledged that *"Enbridge is not aware of a single document that fits this description."* Correspondence from William Hassler to Steven Chester, dated May 8, 2020.

[26] Summary Information and Tables provided by Enbridge Counsel, June 22, 2020; and June 27, 2014 Correspondence to Bill Schuette and Dan Wyant.

including data indicating delays of up to 3 to 5 years to repair 17 noncompliant spans, 7 years to repair 11 noncompliant spans, and 9 years to repair 17 noncompliant spans.[27]

Several documents submitted by Enbridge suggest that at some point in time the company chose to ignore the Easement's 75' span requirement and replace it with a 140' requirement for taking corrective action on unsupported pipe spans. These include a 2003 Onyx ROV Report that indicates Onyx detected 61 pipe spans exceeding 75' and yet only 17 spans exceeding 140' were repaired, leaving 44 pipe spans exceeding 75' unrepaired. Two other documents referring to a 140' span length are the 2004 Kenny Report and the 2016 Kiefner and Associates Report.[28]

Enbridge has failed to produce any records or evidence that the 75' span length requirement of the Easement was ever waived or modified in writing by the State of Michigan. Enbridge's apparent unilateral adoption of a 140' pipe span criterion in lieu of the 75' Easement condition was itself a violation of the Easement. For virtually the entire life of the Easement, Enbridge disregarded its obligation to comply with the 75' pipe span requirement, and even failed to take corrective action when pipe spans exceeded 200' in length (e.g., see above, unsupported spans of 216' to 421' in length).

For decades, Enbridge violated and neglected its obligations under Paragraph A.(10) of the Easement, and its concomitant duties to inspect, timely repair, and disclose exceedances of pipe spans to the State of Michigan. In doing so, Enbridge exhibited an astonishing lack of candor and indifference to its due-care obligations under the Easement.

## 2.    Pipeline Coatings

Paragraph A.(9) of the Easement requires Enbridge to maintain a multi-layer coating on the Pipelines. This protective coating is intended to prevent the steel from being exposed to environmental factors that could cause corrosion or other physical damage.

Since at least 2003, and continuing until 2014, Enbridge was on notice that heavy biota (i.e., mussels) accumulation on the Straits Pipelines made it impossible to do a detailed analysis of the integrity of the coating/wrap for the Pipelines over much of their length. Despite these repeated warnings, and notwithstanding its affirmative obligation under the Easement to ensure the integrity of the pipeline coating/wrap, documents submitted by Enbridge show it made little to no effort to undertake a more detailed study of the condition of the pipeline coating/wrap until 2016-2017 – a gap of approximately 13-14 years from notice to response.

---

[27] Recent Enbridge Document Submittals; June 27, 2014 Correspondence to Bill Schuette and Dan Wyant; and November 19, 2014 Correspondence to Bill Schuette and Dan Wyant.
[28] Onyx Inspection Survey Report (2003); JP Kenney Survey of Spans Report (2004); and Kiefner and Associates Report (October 12, 2016).

The 2003 Onyx ROV Report stated that "[t]he focus of this inspection was to positively identify existing conditions, which could potentially compromise the safety of the line. Examples of these conditions could include *exposed* or unsupported *areas of pipe, severely degraded or missing coating*, or damage caused by impact. . . . The exposed portion of the pipeline is heavily covered in zebra mussel growth, *making a detailed analysis* of the coating and actual pipe condition *impossible*." (Emphasis added.)[29]

The very same notice and warning were repeated in the 2004 Onyx ROV Report, the 2005 Onyx ROV Report, the 2007 Veolia ROV Report, the 2011 Veolia ROV Report, and the 2012 Veolia ROV Report.

In 2014, Ballard Marine Construction completed an ROV and diver inspection of the Straits Pipelines which stated that *"a few instance* [sic] *of a small amount of coating delamination was observed."*[30] Several years later, in a 2016 Inspection Report dated January 3, 2017, Ballard Marine once again found *"a few instances of a small amount of coating delamination"* and stated this information was similar to past findings including data obtained during the 2014 inspection.[31]

Despite such notice/warnings, Enbridge did not undertake a thorough investigation of the pipeline coating/wrap until it implemented a May 2017 Biota Work Plan required under a federal Consent Decree arising out of the Marshall, Michigan Line 6B failure. At last, after repeated warnings from Onyx (2003, 2004, and 2005) and Veolia (2007, 2011, and 2012), Enbridge committed to evaluating the effect of the biota (mussels) that covered much of the Straits Pipelines.

Pursuant to the Biota Work Plan, Enbridge would also investigate so-called "holidays" (i.e., gaps exposing bare metal) in the external pipeline coating. In March 2017, in response to questions raised by the Michigan Pipeline Safety Advisory Board, Enbridge publicly represented to the Board, whose members included State agency representatives, that no gaps existed on the Pipelines and there was no need for any repairs.[32] Yet in August 2017, Enbridge informed State officials that there were three small areas of bare metal exposed, and later was forced to acknowledge both that it had known of these coating gaps since 2014 and that some were apparently caused by Enbridge during the installation of pipe supports.[33] Subsequent inspections showed dozens more areas of coating damage.[34]

---

[29] 2003 Onyx Inspection Report, pp. 1 and 8.
[30] 2014 Ballard Report, p. 9 (emphasis added).
[31] 2017 Ballard Report, p. 9 (emphasis added).
[32] https://www.mlive.com/news/2017/03/enbridge_line_5_delamination.html.
[33] https://www.freep.com/story/news/local/michigan/2017/10/27/enbridge-straits-pipeline-coating-michigan/807452001/.
[34] https://www.freep.com/story/news/local/michigan/2017/11/14/enbridge-discloses-dozens-more-gaps-straits-mackinac-pipelines-protective-coating/863490001/.

Enbridge's course of conduct, by failing to undertake a detailed examination of the condition of the pipeline coating/wrap despite being on notice of the need to do so for 13-14 years, delaying disclosure to the State of several areas of bare metal for three years after initially denying such conditions existed, and only belatedly undertaking further inspections and repairs when demanded by the State, evidences a pattern of indifference to, and violation of, the conditions of Paragraph A.(9) of the Easement and its obligation to exercise due care.

### 3.     Pipeline Curvature

Paragraph A.(4) of the Easement includes a condition that "[t]he minimum curvature of any section of pipe shall be no less than two thousand and fifty (2,050) feet radius." This condition relating to pipeline curvature limits stresses placed on the Pipelines.

The DNR requested documents and information relating in any way to Enbridge's efforts to ensure compliance with this condition, and Enbridge provided several GEOPIG Geometry Inspection Reports beginning in 2005.[35] The GEOPIG Reports do not refer to the pipe's radius curvature but rather record the diameter bend of the pipe. A diameter bend of 1230D feet is equivalent to a minimum curvature of 2,050 feet radius.

Any diameter bend between 0D and 1230D would violate the Easement standard. The GEOPIG Reports, however, only provide data on bends less than 100D. Even with this limitation, the GEOPIG Reports identify 20 to 25 exceedances of the Easement's minimum pipe curvature requirement.[36] To the best of the DNR's knowledge, Enbridge has never documented to the State that it took any measures to ensure compliance with this Easement condition when the Pipelines were installed, or reported these exceedances to the State when Enbridge learned of them. Nor are there any records or evidence that the 2,050 feet radius standard of the Easement was ever waived or modified in writing by the State of Michigan.

Enbridge ignored the pipeline curvature mandate of Paragraph A.(4) of the Easement, perhaps from the very beginning with installation of the Straits Pipelines. Noncompliance with the curvature condition continues today and remains uncorrected. This is contrary to the standard of due care imposed by the Easement and represents an ongoing, incurable violation of one of the Easement's fundamental terms and conditions.

### 4.     Unreasonable Risks of Continued Operation of the Straits Pipelines

As discussed in Section I.C above, the continued operation of the Straits Pipelines cannot be reconciled with the State's duty to protect the public trust

---

[35] Enbridge Energy Limited Partnership, GEOPIG Geometry Inspection Reports (2005, 2016, 2018, and 2019).

[36] *Id.*

resources of the Great Lakes from the risk of additional anchor strikes or other external impacts to the Pipelines, the inherent risks of pipeline operations, and the foreseeable, catastrophic effects of an oil spill in the Straits. These very same risks and concerns are contrary to and incompatible with Enbridge's obligation under the 1953 Easement to exercise the due care of a reasonably prudent person.

The threat of damage to the Straits Pipelines from anchor strikes and impacts by other external objects remains a clear and present danger. In its Report, Dynamic Risk identified anchor strikes as a "Principal Threat" to the Pipelines, and emphasized that these events are "increas[ing] in frequency" and "not influenced by mitigation measures."[37] As discussed in Section I.C above, in April 2018, a commercial tug and barge vessel inadvertently dropped and dragged an anchor which struck and dented the Straits Pipelines at three locations. But this is not the most recent occurrence of a potential anchor strike causing damage to the Straits Pipelines.

As also discussed in Section I.C above, sometime in 2019, the east and west legs of the Pipelines were hit by external objects (cables or anchors) deployed from vessels operating near the Pipelines. The impacts resulted in severe damage to a pipeline support structure previously installed by Enbridge. The company did not discover the substantial damage done to the support structure until June 2020, and **none** of the detection, mitigation and protective measures employed by Enbridge since the April 2018 incident were effective in preventing or even timely detecting the 2019 impacts and the damage to the Pipelines. Moreover, as discussed above, according to information provided by Enbridge, four of the five vessels that were potentially responsible for the damage disclosed in 2020 were operated by Enbridge contractors.

In the face of the documented and recently demonstrated vulnerability of the Straits Pipelines to external impacts from anchors and other objects, and the complete failure of safety systems intended to mitigate such impacts, as well as the inherent threats to pipeline integrity from incorrect operations and procedural errors, Enbridge's continued operation of the Straits Pipelines is contrary to and incompatible with its affirmative duty under the Easement to "exercise the due care of a reasonably prudent person for the safety and welfare of all persons and of all private and public property." Under these circumstances, continued operation of the Straits Pipelines presents a substantial, inherent and unacceptable risk of a catastrophic oil spill with grave ecological and economic consequences. *Accord* Michigan Tech Report, discussed *supra*, Section I.C.

## C.    The December 19, 2018 Third Agreement Between Enbridge and the State of Michigan Does Not Preclude Termination of the 1953 Easement

As noted in Section I.D above, the continued operation of the existing Straits Pipelines under the terms of the Third Agreement is expressly conditioned upon

---

[37] Dynamic Risk Report, pp. 2-35, 2-42 to -43.

Enbridge's compliance with the 1953 Easement. And, as outlined above, Enbridge incurably has violated and continues to violate the Easement.

Section 4.2 of the Agreement addresses compliance with certain terms and conditions of the Easement discussed in this Notice:

> 4.2    Provided that Enbridge complies with Section 4.1 above, the State agrees that:
>
> ***
>
> (b)    Enbridge's compliance with *Article 5* below demonstrates compliance *with the specified conditions* of the 1953 Easement.
>
> ***
>
> (e)    *Based on currently available information*, the State is not aware of any violation of the 1953 Easement that would not be addressed and cured by compliance with Section 4.1 and Article 5 of this Agreement. (Emphasis added.)

These provisions do not preclude termination of the Easement pursuant to this Notice for at least the following reasons. First, as noted above, Section 4.2 is conditioned on Enbridge's compliance with Section 4.1 of the Third Agreement, and Enbridge is not, and has not been, in compliance with that provision. Second, neither Section 4.2 nor Article 5 addresses in any way two of the terms and conditions of the Easement that form the basis of this Notice of Termination: the obligation to exercise due care and the condition on pipeline curvature in Paragraph A.(4). Third, the statement in Section 4.2(e)—that the State is not aware of any violation of the 1953 Easement that would not be addressed and cured by compliance with Article 5— expressly provided that it was "based on currently available information," i.e., information considered as of December 2018. Here, as noted above, beginning in 2019, the State undertook a systematic investigation and review of Enbridge's compliance with the Easement. It was through that subsequent review that the State has now identified the full scope of repeated past and continuing violations of the Easement that form the grounds for this Notice of Termination.

Article 5 of the Third Agreement, which is referenced in Section 4.2, addresses two of the Easement conditions at issue here: Paragraph A.(9) concerning pipeline coatings (addressed in Section 5.2 of the Third Agreement) and Paragraph A.(10) concerning unsupported pipe spans (addressed in Section 5.3 of the Third Agreement). But the language of Sections 5.2 and 5.3 is limited and qualified in two important ways. First, as in Section 4.2(e), the statements in these provisions of Article 5 regarding compliance with the Easement are expressly qualified by reference to "currently available information":

> The State agrees, *based upon currently available information*, that Enbridge's compliance with the requirements under this Section 5.2

satisfies the requirements of Paragraph A (9) of the 1953 Easement. (Section 5.2(d) (emphasis added).)

***

The State agrees, *based upon currently available information,* that Enbridge's compliance with the requirements under this Section 5.3 satisfies the requirements of Paragraph A (10) of the 1953 Easement. (Section 5.3(d) (emphasis added).)

Again, as noted above, the full scope of violations of Paragraphs A.(9) and A.(10) of the Easement discussed in this Notice were identified through the State's recent review of Easement compliance. Moreover, the terms of Sections 5.2 and 5.3 were focused solely on actions to be taken prospectively regarding then current or potential future issues with pipeline coatings and unsupported pipe spans. They do not consider or address the longstanding pattern of Enbridge's violations of Paragraphs A.(9) and A.(10). Accordingly, the Third Agreement does not preclude the termination of the Easement for the reasons stated in this Notice.

## Conclusion

By this Notice, the State of Michigan is formally notifying Enbridge that the State is revoking and terminating the 1953 Easement. The Easement is being revoked for violation of the public trust doctrine, and is being terminated based on Enbridge's longstanding, persistent, and incurable violations of the Easement's conditions and standard of due care.

ACCORDINGLY, the State of Michigan, for the legal and factual reasons stated herein:

A. Revokes the 1953 Easement, effective 180 days after the date of this Notice to provide notice to affected parties and to allow for an orderly transition to ensure Michigan's energy needs are met.

B. Terminates the 1953 Easement, effective 180 days after the date of this Notice to provide notice to affected parties and to allow for an orderly transition to ensure Michigan's energy needs are met.

C. Requires Enbridge to cease operation of the Straits Pipelines 180 days after the date of this Notice.

D. Requires Enbridge to permanently decommission the Straits Pipelines in accordance with applicable law and plans approved by the State of Michigan.

_Gretchen Whitmer_ _[signature]_

Gretchen Whitmer
Governor

Date: 11/13/20

_[signature]_

Daniel Eichinger
Director, Department of
Natural Resources

Date: 11/13/20

# **Exhibit 1**

# 1953 Easement

STRAITS OF MACKINAC PIPE LINE EASEMENT

CONSERVATION COMMISSION OF THE STATE OF MICHIGAN

TO

LAKEHEAD PIPE LINE COMPANY, INC.

THIS EASEMENT, executed this twenty-third day of April, A. D. 1953, by the State of Michigan by the Conservation Commission, by Wayland Osgood, Deputy Director, acting under and pursuant to a resolution adopted by the Conservation Commission at its meeting held on February 13, 1953, and by virtue of the authority conferred by Act No. 10, P. A. 1953, hereinafter referred to as Grantor, to Lakehead Pipe Line Company, Inc., a Delaware corporation, of 510 22nd Avenue East, Superior, Wisconsin, hereinafter referred to as Grantee,

W I T N E S S E T H:

WHEREAS, application has been made by Grantee for an easement authorizing it to construct, lay and maintain pipe lines over, through, under and upon certain lake bottom lands belonging to the State of Michigan, and under the jurisdiction of the Department of Conservation, located in the Straits of Mackinac, Michigan, for the purpose of transporting petroleum and other products; and

WHEREAS, the Conservation Commission is of the opinion that the proposed pipe line system will be of benefit to all of the people of the State of Michigan and in furtherance of the public welfare; and

WHEREAS, the Conservation Commission duly considered the application of Grantee and at its meeting held on the 13th day of February, A. D. 1953, approved the conveyance of an easement.

-1-

124

NOW, THEREFORE, for and in consideration of the sum of Two Thousand Four Hundred Fifty Dollars ($2,450.00), the receipt of which is hereby acknowledged, and for and in consideration of the undertakings of Grantee and subject to the terms and conditions set forth herein, Grantor hereby conveys and quit claims, without warranty express or implied, to Grantee an easement to construct, lay, maintain, use and operate two (2) pipe lines, one to be located within each of the two parcels of bottom lands hereinafter described, and each to consist of twenty inch (20") O D pipe, together with anchors and other necessary appurtenances and fixtures, for the purpose of transporting any material or substance which can be conveyed through a pipe line, over, through, under and upon the portion of the bottom lands of the Straits of Mackinac in the State of Michigan, together with the right to enter upon said bottom lands, described as follows:

All bottom lands of the Straits of Mackinac, in the State of Michigan, lying within an area of fifty (50) feet on each side of the following two center lines:

(1) Easterly Center Line: Beginning at a point on the northerly shore line of the Straits of Mackinac on a bearing of South twenty-four degrees, no minutes and thirty-six seconds East (S 24° 00' 36" E) and distant one thousand seven hundred and twelve and eight-tenths feet (1,712.8') from United States Lake Survey Triangulation Station "Green" (United States Lake Survey, Latitude 45° 50' 00", Longitude 84° 44' 58"), said point of beginning being the intersection of the center line of a twenty inch (20") pipe line and the said northerly shore line; thence, on a bearing of South fourteen degrees thirty-seven minutes and fourteen seconds West (S 14° 37' 14" W) a distance of nineteen thousand one hundred and forty-six and no tenths feet (19,146.0') to a point on the southerly shore line of the Straits of Mackinac which point is the intersection of the said center line of the twenty inch (20") pipe line and the said southerly shore line; and is distant seven hundred and seventy-four and seven tenths feet (774.7') and on a bearing of South thirty-six degrees, eighteen minutes and forty-five seconds West (S 36° 18' 45" W) from United States Lake Survey Triangulation Station "A. Mackinac West Base" (United States

125

Lake Survey, Latitude 45° 47' 14", Longitude 84° 46' 22").

(2) _Westerly Center Line_: Beginning at a point on the northerly shore line of the Straits of Mackinac on a bearing of South forty-nine degrees, twenty-five minutes and forty-seven seconds East (S 49° 25' 47" E) and distant two thousand six hundred and thirty-four and nine tenths feet (2,634.9') from United States Triangulation Station "Green" (United States Lake Survey, Latitude 45° 50' 00", Longitude 84° 44' 58") said point of beginning being the intersection of the center line of a twenty inch (20") pipe line and the said northerly shore line; thence on a bearing of South fourteen degrees, thirty-seven minutes and fourteen seconds West (S 14° 37' 14" W), a distance of nineteen thousand four hundred and sixty-five and no tenths feet (19,465.0') to a point on the southerly shore line of the Straits of Mackinac which point is the intersection of the said center line of the twenty inch (20") pipe line and the said southerly shore line and is distant one thousand no hundred and thirty-six and four tenths feet (1,036.4') on a bearing of South sixty-three degrees, twenty minutes and fifty-four seconds East (S 63° 20' 54" E) from United States Lake Survey Triangulation Station "A. Mackinac West Base" (United States Lake Survey, Latitude 45° 47' 14", Longitude 84° 46' 22").

TO HAVE AND TO HOLD the said easement unto said Grantee, its successors and assigns, subject to the terms and conditions herein set forth, until terminated as hereinafter provided.

This easement is granted subject to the following terms and conditions:

A. Grantee in its exercise of rights under this easement, including its designing, constructing, testing, operating, maintaining, and, in the event of the termination of this easement, its abandoning of said pipe lines, shall follow the usual, necessary and proper procedures for the type of operation involved, and at all times shall exercise the due care of a reasonably prudent person for the safety and welfare

-3-

126

of all persons and of all public and private property,
shall comply with all laws of the State of Michigan and
of the Federal Government, unless Grantee shall be con-
testing the same in good faith by appropriate proceedings,
and, in addition, Grantee shall comply with the following
minimum specifications, conditions and requirements, unless
compliance therewith is waived or the specifications or
conditions modified in writing by Grantor:

   (1)  All pipe line laid in water up to fifty
   (50) feet in depth shall be laid in a ditch
   with not less than fifteen (15) feet of cover.
   The cover shall taper off to zero (0) feet at
   an approximate depth of sixty-five (65) feet.
   Should it be discovered that the bottom material
   is hard rock, the ditch may be of lesser depth,
   but still deep enough to protect the pipe lines
   against ice and anchor damage.

   (2)  Minimum testing specifications of the twenty
   inch (20") OD pipe lines shall be not less than
   the following:

   Shop Test-----------1,700 pounds per square inch gauge
   Assembly Test-------1,500 pounds per square inch gauge
   Installation Test--1,200 pounds per square inch gauge
   Operating Pressure-  600 pounds per square inch gauge

   (3)  All welded joints shall be tested by X-Ray.

-4-



(4)  The minimum curvature of any section of pipe shall be no less than two thousand and fifty (2,050) feet radius.

(5)  Automatic gas-operated shut-off valves shall be installed and maintained on the north end of each line.

(6)  Automatic check valves shall be installed and maintained on the south end of each line.

(7)  The empty pipe shall have a negative buoyancy of thirty (30) or more pounds per linear foot.

(8)  Cathodic protection shall be installed to prevent deterioration of pipe.

(9)  All pipe shall be protected by asphalt primer coat, by inner wrap and outer wrap composed of glass fiber fabric material and one inch by four inch (1" x 4") slats, prior to installation.

(10)  The maximum span or length of pipe unsupported shall not exceed seventy-five (75) feet.

(11)  The pipe weight shall not be less than one hundred sixty (160) pounds per linear foot.

(12)  The maximum carbon content of the steel, from which the pipe is manufactured, shall not be in excess of .247 per cent.

-5-



(13)  In locations where fill is used, the top·of the fill shall be no less than fifty (50) feet wide.

(14)  In respect to other specifications, the line shall be constructed in conformance with the detailed plans and specifications heretofore filed by Grantee with Lands Division, Department of Conservation of the State of Michigan.

B.   Grantee shall give timely notice to the Grantor in writing:

(1)  Of the time and place for the commencement of construction over, through, under or upon the bottom lands covered by this easement, said notice to be given at least five (5) days in advance thereof;

(2)  Of compliance with any and all requirements of the United States Coast Guard for marking the location of said pipe lines;

(3)  Of the filling of said pipe lines with oil or any other substance being transported commerially;

(4) · Of any breaks or leaks discovered by Grantee in said pipe lines, said notice to be given by telephone promptly upon discovery and thereafter confirmed by registered mail;

MA28

(5) Of the completion of any repairs of said pipe lines, and time of testing thereof, said notice to be given in sufficient time to permit Grantor's authorized representatives to be present at the inspection and testing of the pipe lines after said repairs; and

(6) Of any plan or intention of Grantee to abandon said pipe lines, said notice to be given at least sixty (60) days prior to commencement of abandonment operations.

C. The easement herein conveyed may be terminated by Grantor:

(1) If, after being notified in writing by Grantor of any specified breach of the terms and conditions of this easement, Grantee shall fail to correct said breach within ninety (90) days, or, having commenced remedial action within such ninety (90) day period, such later time as it is reasonably possible for the Grantee to correct said breach by appropriate action and the exercise of due diligence in the correction thereof; or

(2)  If Grantee fails to start construction of
the pipe lines authorized herein within two years
from date of execution of this instrument; or

(3)  If Grantee fails for any consecutive three-
year period to make substantial use of said pipe
lines commercially and also fails to maintain said
pipe lines during said period in such condition as
to be available to commercial use within thirty
(30) days.

D.  Construction of the pipe lines contemplated by this
instrument shall not be commenced until all necessary authori-
zation and assent of the Corps of Engineers, United States
Army, so far as concerns the public rights of navigation,
shall have been obtained.

E.  In the event of any relocation, replacement, major repair,
or abandonment of either of the pipe lines authorized by this
easement, Grantee shall obtain Grantor's written approval of
procedures, methods and materials to be followed or used prior
to commencement thereof.

F.  The maximum operating pressure of either of said pipe lines
shall not exceed six hundred (600) pounds per square inch
gauge.

If there is a break or leak or an apparent break or leak in either of said pipe lines, or if Grantor notifies Grantee that it has good and sufficient evidence that there is or may be a break or leak therein, Grantee shall immediately and completely shut down the pipe line involved and said pipe line shall not be placed in operation until Grantee has conducted a shut-in two (2) hour pressure test of six hundred (600) pounds per square inch gauge showing that no substance is escaping from a break or leak in said pipe line.

G. If oil or other substance escapes from a break or leak in the said pipe lines, Grantee shall immediately take all usual, necessary and proper measures to eliminate any oil or other substance which may escape.

H. In the event the easement herein conveyed is terminated with respect to either or both of said pipe lines, or if any part or portion of a pipe line is abandoned, Grantee shall take all of the usual, necessary and proper abandonment procedures as required and approved by Grantor. Said abandonment operations shall be completed to the satisfaction of Grantor within one year after any abandonment of any part or portion of a pipe line; or in event of termination of this easement, within one year thereafter. After the expiration of one year following the termination of this easement, Grantee

MA31

132

shall at the option of Grantor quit claim to the State of Michigan
all of its right, title and interest in or to any pipe line, appurte-
nances or fixtures remaining over, through, under or upon the bottom
lands covered by this easement. Abandonment procedures as used
herein include all operations that may be reasonably necessary to
protect life and property from subsequent injury.

I. Grantee shall permit Grantor to inspect at reasonable times
and places its records of oil or any other substance being trans-
ported in said pipe lines and shall, on request, submit to
Grantor inspection reports covering the automatic shut-off and
check valves and metering stations used in connection with the
Straits of Mackinac crossing.

J. (1) Grantee shall indemnify and hold harmless the State of
Michigan from all damage or losses caused to property (including
property belonging to or held in trust by the State of Michigan),
or persons due to or arising out of the operations or actions of
Grantee, its employees, servants and agents hereunder. Grantee
shall place in effect prior to the construction of the pipe lines
authorized by this easement and shall maintain in full force and
effect during the life of this easement, and until Grantor has
approved completion of abandonment operations, a Comprehensive
Bodily Injury and Property Damage Liability policy, bond or surety,
in form and substance acceptable to Grantor in the sum of at least
One Million Dollars ($1,000,000.00), covering the liability herein
imposed upon Grantee.

-10-

133

(2)  Grantee, prior to commencing construction of
the pipe lines authorized by this easement, shall
provide the State of Michigan with a surety bond
in the penal sum of One Hundred Thousand Dollars
($100,000.00) in form and substance acceptable to
Grantor, and surety or sureties approved by Grantor,
to well, truly and faithfully perform the terms,
conditions and requirements of this easement.  Said
bond shall be maintained in full force and effect
during the life of this easement and until Grantor
has approved completion of Grantee's abandonment
operations.  Said bond shall not be reduced in amount
except with the written consent of Grantor.

K.  Grantee shall within sixty (60) days thereafter notify
Grantor in writing of any assignment of this easement.

L.  The terms and conditions of this easement shall be bind-
ing upon and inure to the benefit of the respective successors
and assigns of Grantor and Grantee.

M.  All rights not specifically conveyed herein are reserved
to the State of Michigan.

134

N. Grantee shall not improvise, construct or maintain ship-to-shore or ship-to-pipe line loading or unloading facilities over, through, under or upon any of the bottom lands herein described for the purpose of removing material from or injecting material into said pipe lines.

O. Grantor shall have the right at all reasonable times and places to inspect the pipe lines, appurtenances and fixtures authorized by this easement.

P. It shall not be a breach of the terms and conditions of this easement if for operating or maintenance reasons Grantee shall make use of only one of said pipe lines at a time.

Q. Where provision is made herein that Grantee shall obtain the authorization, approval or consent of Grantor, Grantor agrees that it will not unreasonably withhold the same.

IN WITNESS WHEREOF, the State of Michigan by the Conservation Commission, by Wayland Osgood, Deputy Director, acting pursuant to authority specifically conferred upon him, has caused this instrument to be executed this twenty-third day of April, A.D. 1953.

Signed, Sealed and Delivered in the Presence of:

STATE OF MICHIGAN
BY THE CONSERVATION COMMISSION

/s/ Jane Bower
Jane Bower

By /s/ Wayland Osgood
Wayland Osgood, Deputy Director,
pursuant to resolutions of the
Conservation Commission dated
February 13, 1953 and July 10,
1951

/s/ Elizabeth Soule
Elizabeth Soule

STATE OF MICHIGAN )
                    )     ss.
COUNTY OF INGHAM )

On this twenty-third day of April, A.D. 1953, before me, a
Notary Public, in and for said county, personally appeared Wayland Osgood,
Deputy Director, known by me to be the person who executed the within
instrument and who, being duly sworn, deposes and says that he is the duly
appointed deputy director of the Conservation Commission and that he
executed the within easement under authority specifically conferred upon
him by law and by the Conservation Commission at its meetings held on
February 13, 1953 and July 10, 1951, and who acknowledged the same to be
his free act and deed and the free act and deed of the State of Michigan
by the Conservation Commission, in whose behalf he acts.

                                   /s/ C. R. Humphrys
                               C. R. Humphrys, Notary Public, Ingham County, Michigan
                               My Commission expires September 20, 1954

Examined and approved 4/23/53
as to legal form and effect:


 /s/ R. Glen Dunn
Assistant Attorney General

# EXCERPT OF PLAINTIFF'S EXPERT WITNESS DISCLOSURES, APPENDIX D TO WWE REPORT, DISTRICT COURT DOCKET NO. 484-7

Case: 3:19-cv-00602-wmc   Document #: 484-7   Filed: 10/04/22   Page 1 of 57
Case: 23-2309      Document: 48      Filed: 10/18/2023      Pages: 91
Engineering Evaluation of the Bad River Meander Adjacent to Enbridge Line 5 and Other Water Resources Issues

# Appendix D: Implications of Pipeline Failure and Discharge into the Bad River

Appendix D: Implications of Pipeline Failure and Discharge of Oil into the Bad River

| Spill | Background Details | Notable Environmental Consequences | Approximate Release Volume (bbl) | Approximate Release Duration (hrs) | Approximate River Flow Rate (cfs) | Oil Type | Approximate Distance Travelled (mi) |
|---|---|---|---|---|---|---|---|
| Enbridge Pipeline Spill, Marshall, Michigan, 2010 | On Sunday, July 25, 2010, Enbridge's 30-inch-diameter pipeline (Line 6B) ruptured in a wetland in Marshall, Michigan. The rupture occurred while Enbridge was completing a planned shutdown and was not addressed for over 17 hours. The oil saturated the surrounding wetlands and flowed into Talmadge Creek and the Kalamazoo River (National Transportation Safety Board, 2012). Some of the heavy oil sank to the bottom and created ongoing problems with heavily oiled sediment in the channel bottom. | Over 5,000 acres of channel and overbanks, including backwaters, impoundments, tributary mouths, and forested, shrub and/or emergent wetland were affected (USEPA, 2016). During the initial spill and flooding, 2,588 acres of wetlands were oiled (USFWS, 2015). Some oiled vegetation was cut and removed, much of it with an aquatic harvesting machine (USEPA, 2016). Woody material in and overhanging the creek and river that was coated in oil was also removed during cleanup, which decreased available fish habitat (USEPA, 2016). Disturbed areas have been slow to recover, and surveys conducted in 2016 and 2017 noted that riparian vegetation and in-stream habitat were still in the recovery process. Recovery timeframes published in the 2015 Final Damage Assessment and Restoration Plan/Environmental Assessment (USFWS, 2015) estimated a further recovery time of three to seven years was necessary in emergent wetlands and a further recovery time of five to 50 years was necessary in forested wetlands, depending on the extent to which trees were cut and soil was removed. Initial wildlife cleanup efforts found many animals impacted by oil. Fifty-two birds were found dead or died while in rehab facilities, and 144 birds were captured, cleaned, and released. Forty mammals, including muskrat, raccoons, and beavers, were found dead and 23 mammals were cleaned and rehabilitated. One hundred and six reptiles were found dead or died during rehabilitation, with 3,800 turtles and 11 snakes cleaned and released. Seventy-three amphibians were also cleaned and released (USEPA, 2016). Forty-two fish were found dead immediately following the spill, although given the size of the impacted area, this was not considered a significant number (USFWS, 2015). Fish surveys conducted in 2010 following the spill indicated a decrease in smallmouth bass density in the Kalamazoo River and a decrease in overall fish abundance and diversity in Talmadge Creek. A USGS pathological assessment also showed significant adverse changes in bioindicators of fish found within the spill region (USFWS, 2015). | 20,080 (National Transportation Safety Board, 2012) | 17 (National Transportation Safety Board, 2012) | 1,800 (USGS gage Kalamazoo River at Marshall, MI) | Heavy Bituminous Crude oil (National Transportation Safety Board, 2012) | 38 (USFWS, 2015) |
| Pine River Spill, Canada, 2000 | On August 1, 2000, a section of the buried Pembina Pipeline burst near Chetwynd, British Columbia, and released 250,000 gallons of light sour crude oil onto land and into the Pine River (Lee et al., 2015). Surveys conducted five years after the spill found that oil remained in some bottom substrates of the river (Goldberg, 2006 in David Bustard and Associates, 2011). As a result of persistent hydrocarbon and PAH contamination, the town of Chetwynd shut down its drinking water plant as a precautionary measure and chose to drill new drinking water wells (Canada Attorney General Press Release, 2000). | Oil recovery occurred for approximately two months and involved the use of containment booms, sorbent pad, skimming and pumping, soil removal, and vegetation cleanup and removal (Armstrong 2000; Lee et al., 2015). Over 1,600 dead fish, including whitefish, sculpins, arctic grayling, rainbow trout, bull trout, and burbot were collected along a 30-mile length of river. Based on the number of fish observed, 15,000–27,900 fish were estimated to have been killed (Alpine Environmental and EBA Engineering, 2001 in Lee et al., 2015). Snorkel surveys found that fish populations were lower following the spill compared to data from 1993, but by 2005 fish populations had recovered to 1993 levels (Goldberg, 2011 in Lee et al., 2015). Spilled oil also impacted benthic macroinvertebrates. Immediately after the spill, de Pennart et al. (2015) observed depletion of all trophic classes at sites downstream of the spill location. Populations were reduced up to 120 kilometers downstream of the spill site. A year later, benthic populations had mostly recovered in downstream sites, although some recovery was still occurring. Efforts to remove the spilled oil created environmental damages of their own. Alteration of the river's physical features hurt aquatic organisms and decreased bank stability. An oxbow channel and back channel were cut off, which removed an important area for fish food. In addition, logjams and riparian vegetation were removed, decreasing fish habitat and creating bank instability. Large machinery was also allowed into the river during cleanup, causing additional physical damage to the ecosystem (Lee et al., 2015). | 5,950 (Lee et al., 2015) | No information | 5,700 (Galagan & Fontenault, 2013) | Light sour crude oil (Lee et al., 2015) | 50 (Lee et al., 2015) |

Wright Water Engineers, Inc.

MA38

# EXCERPT OF PLAINTIFF'S EXPERT WITNESS DISCLOSURES, APPENDIX I TO WWE REPORT, DISTRICT COURT DOCKET NO. 484-12

Case: 3:19-cv-00602-wmc   Document #: 484-12   Filed: 10/04/22   Page 1 of 18
Case: 23-2309      Document: 48      Filed: 10/18/2023      Pages: 91
Engineering Evaluation of the Bad River Meander Adjacent to Enbridge Line 5 and Other Water Resources Issues

# Appendix I: Exposed Pipelines: Case Studies on Impacts of River Channel Migration and Bank and Overflow Channel Scour on Existing Pipelines and Other Infrastructure

Case: 3:19-cv-00602-wmc   Document #: 484-12   Filed: 10/04/22   Page 12 of 18
Case: 23-2309      Document: 48      Filed: 10/18/2023      Pages: 91

Appendix I: Exposed Pipelines: Exposed Pipelines: Case Studies on Impacts of River Channel Migration and Bank and Overflow
Channel Scour on Existing Pipelines and Other Infrastructure

Other examples of bridges being threatened by channel migration, river scour, and erosion include: the Interstate 64 bridge between Indiana and Illinois where the Wabash River's currents scoured the bank and caused erosion around the bridge piers (Associated Press, 2013); the Highway 537 bridge in Shreveport, Louisiana, which in addition to the road discussed in Section I.3.1, is threatened by the Red River (Shreveport Times Staff Reports, 2021); and the Tex Wash bridge on Interstate 10 in Riverside County, California that collapsed likely due to channel migration during a desert flood event (Kelman and Rumer, 2015)

## I.3   REPRESENTATIVE WWE PROJECTS RELATING TO CHANNEL EROSION AND MIGRATION THAT THREATEN INFRASTRUCTURE

Wright Water Engineers (WWE) has worked on many projects where stream and river erosion, migration, and scour have threatened or impacted infrastructure. A few representative examples include: Caulks Creek in St Louis, Missouri where Strecker Road was being undermined by the creek erosion; stream channels at the Keystone ski area in Colorado that were threatening to cause a landslide; and many projects for Town of Vail, Colorado, City of Springfield, Missouri, Coors Brewery, and Xcel Energy where creek and drainageway erosion was threatening infrastructure. Other examples are provided in the resumes in Appendix A. In WWE's experience, migrating waterways can be a significant hazard to existing infrastructure and should be addressed promptly. In each of these cases, site-specific analysis of environmental conditions, accessibility, and property owner considerations were factored into determining the most appropriate actions. WWE notes that remediation options that worked in one location would not have been appropriate nor feasible in all locations.

## I.4   OTHER RELEVANT CASE STUDIES OF PIPELINE SPILLS NOT CAUSED BY EROSION

These case studies, although not specifically caused by pipeline exposure due to bank erosion or scour, provide additional examples of spills into rivers and the extent of contamination that can occur.

### I.4.1  Asher Creek, Missouri, 1979

On August 24, 1979, nearly 400,000 gallons (9,500 barrels) of domestic crude oil spilled from a burst pipeline in southwestern Missouri into Asher Creek. Despite containment strategies, oil was able to disperse through riffles and coat the stream substrate, and an oil sheen persisted on the stream for 453 days after the spill (Crunkilton and Duchrow, 1990).

### I.4.2  Wetlands, Talmadge Creek, and Kalamazoo River, Marshall, Michigan, 2010

The rupture of Enbridge's Line 6B in Michigan constituted a major environmental disaster. The National Transportation Safety Board analyzed this spill in detail in the after-action report entitled *Enbridge Incorporated Hazardous Liquid Pipeline Rupture and Release, Marshall, Michigan, July 25, 2010. Pipeline Accident Report NTSB/PAR-12/01* (2012).

Case: 3:19-cv-00602-wmc   Document #: 484-12   Filed: 10/04/22   Page 13 of 18
Case: 23-2309      Document: 48      Filed: 10/18/2023   Pages: 91

Appendix I: Exposed Pipelines: Exposed Pipelines: Case Studies on Impacts of River Channel Migration and Bank and Overflow Channel Scour on Existing Pipelines and Other Infrastructure

*On Sunday, July 25, 2010, at 5:58 p.m., eastern daylight time, a segment of a 30-inch-diameter pipeline (Line 6B), owned and operated by Enbridge Incorporated (Enbridge) ruptured in a wetland in Marshall, Michigan. The rupture occurred during the last stages of a planned shutdown and was not discovered or addressed for over 17 hours. During the time lapse, Enbridge twice pumped additional oil (81 percent of the total release) into Line 6B during two startups; the total release was estimated to be 843,444 gallons of crude oil. The oil saturated the surrounding wetlands and flowed into the Talmadge Creek and the Kalamazoo River. Local residents self-evacuated from their houses, and the environment was negatively affected. Cleanup efforts continue as of [2012], with continuing costs exceeding $767 million. About 320 people reported symptoms consistent with crude oil exposure. No fatalities were reported.*

*The National Transportation Safety Board (NTSB) determines that the probable cause of the pipeline rupture was corrosion fatigue cracks that grew and coalesced from crack and corrosion defects under disbonded polyethylene tape coating, producing a substantial crude oil release that went undetected by the control center for over 17 hours. The rupture and prolonged release were made possible by pervasive organizational failures at Enbridge Incorporated (Enbridge) that included the following:*

- *Deficient integrity management procedures, which allowed well-documented crack defects in corroded areas to propagate until the pipeline failed.*

- *Inadequate training of control center personnel, which allowed the rupture to remain undetected for 17 hours and through two startups of the pipeline.*

- *Insufficient public awareness and education, which allowed the release to continue for nearly 14 hours after the first notification of an odor to local emergency response agencies.*

- *Contributing to the accident was the Pipeline and Hazardous Materials Safety Administration's (PHMSA) weak regulation for assessing and repairing crack indications, as well as PHMSA's ineffective oversight of pipeline integrity management programs, control center procedures, and public awareness.*

Prior to the oil spill, regions of the Kalamazoo watershed received rain for multiple days, resulting in increased streamflow (USGS, 2010). Ceresco, three miles west of Marshall, and Albion, 10 miles east, received 5.70 and 5.65 inches of precipitation between July 22 and July 25, respectively. This precipitation caused a flood with an annual exceedance probability of 4% (25-year flood; USGS, 2010). The maximum discharge on July 25, 2010 was close to 1,800 cubic feet per second (USGS gage 04103500, Kalamazoo River at Marshall, MI). Over 5,000 acres of

Case: 3:19-cv-00602-wmc   Document #: 484-12   Filed: 10/04/22   Page 14 of 18
Case: 23-2309   Document: 48   Filed: 10/18/2023   Pages: 91

Appendix I: Exposed Pipelines: Exposed Pipelines: Case Studies on Impacts of River Channel Migration and Bank and Overflow
Channel Scour on Existing Pipelines and Other Infrastructure

channel and overbanks, including backwaters, impoundments, tributary mouths, and forested, shrub and/or emergent wetland were affected (USEPA, 2016). During the initial spill and flooding, 2,588 acres of wetlands were oiled (USFWS, 2015). High flows in Talmadge Creek and the Kalamazoo River also transported the oil for approximately 38 miles (USFWS, 2015). The rupture of Line 6B provides an example of how flood conditions can exacerbate the effects of an oil spill by increasing transportation of contaminants.

### I.4.3  John Heinz National Wildlife Refuge, Pennsylvania, 2000

On February 5, 2000, over 191,000 gallons (4,500 barrels) of light crude oil leaked from a cracked subsurface pipe below the John Heinz National Wildlife Refuge in Tinicum Township, Pennsylvania (Bell, 2005). The spill went undetected by Sunoco for three days and was discovered by a visitor to the wildlife refuge. Investigators attribute the spill to a defective pipeline joint, inadequate pipeline maintenance, and inadequate leak detection measures (USEPA, 2005). Ice limited the flow of oil, but 1.6 acres of the refuge, including the freshwater impoundment and wetland shoreline, were directly affected by oil. Sunoco, the company responsible for the pipeline, paid $865,000 for wetland restoration efforts, which included removing dredge spoil from the area and planting native vegetation in an effort to aid restoration (USFWS, 2009).

### I.4.4  Pine River, Canada, 2000

On August 1, 2000, a section of the buried Pembina Pipeline burst near Chetwynd, British Columbia, and released 250,000 gallons (6,000 barrels) of light sour crude oil onto land and into the Pine River. Surveys conducted five years after the spill found that oil remained in some bottom substrates of the river (Goldberg, 2006 in David Bustard and Associates, 2011). As a result of persistent hydrocarbon and polycyclic aromatic hydrocarbon (PAH) contamination, the town of Chetwynd shut down its drinking water plant as a precautionary measure and chose to drill new drinking water wells (Canada Attorney General Press Release, 2000).

## I.5  CONCLUSIONS ON CASE STUDIES

The above case studies serve as examples of the type of incidents that can occur due to geomorphological processes at river sites. River channel migration, scour, and erosion have been shown to affect many types of infrastructure, including pipelines, roadways and associated bridges, railways and associated bridges, buried utilities, and commercial and residential buildings. In addition to the case studies presented above, WWE has experience with river channel migration, scour, and erosion affecting the types of infrastructure listed.

Amongst the incidents described herein, there is no single pattern for the conditions that led to exposure or failure. While some cases were unexpected, other sites were being carefully monitored yet a pipeline exposure and spill still occurred. Some cases were caused by a single large flood event, while others were attributed to gradual changes in the river over the course of the pipeline's lifetime. Exposure due to scour, erosion, and channel migration is a real risk that has already affected many pipelines.

# EXCERPT OF TRANSCRIPT OF FIFTH DAY OF COURT TRIAL, HELD OCTOBER 28, 2022, DISTRICT COURT DOCKET NO. 610

UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

BAD RIVER BAND OF THE LAKE
SUPERIOR TRIBE OF CHIPPEWA
INDIANS OF THE BAD RIVER
RESERVATION,

        Plaintiffs and Counter Defendant    Case No. 19-CV-602-WMC

-vs-

ENBRIDGE ENERGY COMPANY, INC.,        Madison, Wisconsin
and ENBRIDGE ENERGY, L.P.,        October 28th, 2022
                1:26 p.m. - 5:12 p.m.

        Defendants and Counter Claimants,

-vs-

NAOMI TILLISON

        Counter Defendant.

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

STENOGRAPHIC TRANSCRIPT OF FIFTH DAY OF COURT TRIAL
HELD BEFORE THE HONORABLE WILLIAM M. CONLEY
(*Afternoon Session*.)

APPEARANCES:

For the Plaintiffs:
        Kanji & Katzen, PLLC
        BY:  CLAIRE R. NEWMAN,
           JANE STEADMAN
        811 1st Avenue, Suite 630
        Seattle, Washington 98104

        Kanji & Katzen, PLLC
        BY:  RIYAZ A. KANJI,
           CHRISTOPHER T. MILLER
           JOSHUA C. HANDELSMAN
           IAN P. FISHER
        303 Detroit Street, Suite 400
        Ann Arbor, MI 48104

            PHILIP C. HARRELSON, RMR, CRR
          United States District Court Reporter
             Madison, Wisconsin 53703
               1-608-261-5708
                \*\*\*

APPEARANCES (Continued):

        Stafford Rosenbaum LLP
        BY:  DOUGLAS M. POLAND
            DAVID P. HOLLANDER
        222 West Washington Avenue, Suite 900
        Madison, Wisconsin 53701

        Hooper Hathaway, PC
        BY:  BRUCE T. WALLACE
        126 South Main Street
        Ann Arbor, Michigan 48104
        Stafford Rosenbaum LLP

        Bad River Band of the Lake Superior Tribe of
        Chippewa Indians of the Bad River Reservation
        BY:  ERICK ARNOLD
        72682 Maple Street
        Odanah, Wisconsin 54861

Also Appearing:   CHRISTIAN TIEDEMANN, IT Specialist, Prolumina

        For the Defendants:
        Venable, LLP
        BY:  JUSTIN NEMEROFF,
           MICHAEL DAVIS,
           DAVID L. FEINBERG
           CHRISTOPHER RICIGLIANO
           VICTORIA GLOVER
        600 Mass. Av., NW. NW.
        Washington, DC 20001

Also Appearing:   JANA GIBSON, Litigation & Trial Specialist

## W I T N E S S   I N D E X

| PLAINTIFF'S WITNESSES | EXAMINATION | PAGES |
|---|---|---|
| TRENT WETMORE | Direct by Mr. Miller | 7 |
| (**Via Video.**) | Cross by Mr. Nemeroff | 40 |
| | Redirect by Mr. Miller | 51 |

| DEFENDANTS' WITNESSES | EXAMINATION | PAGES |
|---|---|---|
| MARLON SAMUEL | Direct by Ms. Feinberg | 56 |
| | Cross by Mr. Kanji | 79 |
| NEIL EARNEST | Cross by Mr. Kanji | 87 |
| | Redirect by Mr. Davis | 110 |
| | Recross by Mr. Kanji | 129 |

1     different -- different answer, absent certainty about the timing

2     of the closure -- permanent closure.

3          THE COURT:  And what happened with respect to the failure of

4     the Enbridge line in 2010?  How long was that shutdown after its

5     breach?

6          THE WITNESS:  Oh, the Marshall incident we're talking about?

7          THE COURT:  Yeah.

8          THE WITNESS:  It was down for -- if memory serves -- for

9     several months, at least, and I don't remember -- there was not,

10    you know, sizable price impacts for refined product in the

11    Detroit/Toledo area.  And that's consistent with my analysis here

12    regarding a Line 5 shutdown.

13         I would point out that the Marshall incident took place

14    on -- well, it was 6B at the time -- now it was 78 -- which

15    doesn't ship NGLs.

16         THE COURT:  Right.  Understood.  Yeah, the impacts were

17    different.

18         THE WITNESS:  Yeah.

19         THE COURT:  But nevertheless felt in the market.

20         THE WITNESS:  Yeah.  Again, it was a crude-oiling impact.

21    Line 5 is crude and propane.  And the solutions for propane are

22    skim.  It's going to be -- it's going to be chaos if Line 5

23    closes in the propane markets; to a lesser degree, the butane

24    markets.

25         THE COURT:  Next question, Counsel.

# EXCERPT OF EXPERT WITNESS REPORT OF MATTHEW HORN, DISTRICT COURT DOCKET NO. 478



# REBUTTAL REPORT - ENBRIDGE LINE 5

**Dr. Matthew Horn**



20-P-209100
FINAL
April 8, 2022

rpsgroup.com

WWE models only two hypothetical large volume releases from the Line 5 Bad River crossing, at two different high river flow rates, all assuming no effort was made to respond to or mitigate the spill in any way (discussed further in Section 3.3). In terms of the types of scenarios that are representative of potential exposures, several important considerations are missing from WWE's analysis. For ease of comparison to RPS' modeling, Table 1 is provided below to highlight the specific scenarios included in each group's modeling efforts (Technical Appendix p. 22; WWE, 2022 p. ES-14).

**Table 1: Scenarios modeled by RPS (Technical Appendix Table 2-2) and similar scenarios modeled by WWE**

| RPS Scenario | Response Mitigation | Volume | River flow rate | WWE Scenario | Response Mitigation | Volume | River flow rate |
|---|---|---|---|---|---|---|---|
| 1 | Unmitigated | FBR (21,974 bbl) | High (~2,119 cfs) | 1 | Unmitigated | 20,000 bbl | 2,000 cfs |
| 2 | Unmitigated | FBR (21,974 bbl) | Average (~614 cfs) | Not Considered | | | |
| 3 | Unmitigated | FBR (21,974 bbl) | Low Flow, Ice (~198 cfs) | Not Considered | | | |
| 4 | Unmitigated | FBR (21,974 bbl) | Flood – July 2016 (~31,900 cfs) | 2 | Unmitigated | 20,000 bbl | 5,000 cfs |
| 5 | Unmitigated | HARV (1,911 bbl) | High (~2,119 cfs) | 3 | Unmitigated | 2,000 bbl | 2,000 cfs |
| 6 | Unmitigated | HARV (1,911 bbl) | Average (~614 cfs) | Not Considered | | | |
| 7 | Unmitigated | HARV (1,911 bbl) | Low Flow, Ice (~198 cfs) | Not Considered | | | |
| 8 | Unmitigated | HARV (1,911 bbl) | Flood – July 2016 (~31,900 cfs) | 4 | Unmitigated | 2,000 bbl | 5,000 cfs |
| 9 | Mitigated | HARV (1,911 bbl) | Average (~614 cfs) | Not Considered | | | |
| 10 | Mitigated | RARV (334 bbl) | Average (~614 cfs) | Not Considered | | | |
| 11 | Mitigated | On-land HARV (1,911 bbl; 1,824 reaches Bad River) | Average (~614 cfs) | Not Considered | | | |
| 12 | Mitigated | On-land FBR (20,906 bbl; 13,147 reaches Bad River) | Average (~614 cfs) | Not Considered | | | |

WWE's two spill volumes (20,000 bbl and 2,000 bbl) were roughly equivalent in size to the full-bore rupture (FBR) and historical average release volume (HARV) spills evaluated by RPS. One of WWE's river flow rates (2,000 cubic feet per second [cfs]) was roughly equivalent to the high river flow conditions evaluated by RPS,

MA50

# EXCERPT OF TRANSCRIPT OF FIRST DAY OF COURT TRIAL, HELD OCTOBER 24, 2022, DISTRICT COURT DOCKET NO. 606

UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

BAD RIVER BAND OF THE LAKE
SUPERIOR TRIBE OF CHIPPEWA
INDIANS OF THE BAD RIVER
RESERVATION,

       Plaintiffs and Counter Defendant   Casee No. 19-CV-602-WMC
-vs-

ENBRIDGE ENERGY COMPANY, INC.,        Madison, Wisconsin
and ENBRIDGE ENERGY, L.P.,          October 24th, 2022
                              1:30 p.m. - 5:39 p.m.

       Defendants and Counter Claimants,

-vs-

NAOMI TILLISON

    Counter Defendant

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * *
      STENOGRAPHIC TRANSCRIPT OF FIRST DAY OF COURT TRIAL
        HELD BEFORE THE HONORABLE WILLIAM M. CONLEY
              (*Afternoon Session.*)

APPEARANCES:

For the Plaintiffs:
        Kanji & Katzen, PLLC
        BY:  CLAIRE R. NEWMAN,
           JANE STEADMAN
        811 1st Avenue, Suite 630
        Seattle, Washington 98104

        Kanji & Katzen, PLLC
        BY:  RIYAZ A. KANJI,
           CHRISTOPHER T. MILLER
           JOSHUA C. HANDELSMAN
           IAN P. FISHER
         303 Detroit Street, Suite 400
        Ann Arbor, MI 48104

             PHILIP C. HARRELSON, RMR, CRR
          United States District Court Reporter
             Madison, Wisconsin 53703
                1-608-261-5708

APPEARANCES (Continued):

         Stafford Rosenbaum LLP
         BY:  DOUGLAS M. POLAND
              DAVID P. HOLLANDER
         222 West Washington Avenue, Suite 900
         Madison, Wisconsin 53701

         Hooper Hathaway, PC
         BY:  BRUCE T. WALLACE
         126 South Main Street
         Ann Arbor, Michigan 48104
         Stafford Rosenbaum LLP

         Bad River Band of the Lake Superior Tribe of
         Chippewa Indians of the Bad River Reservation
         BY:  ERICK ARNOLD
         72682 Maple Street
         Odanah, Wisconsin 54861

Also Appearing:   CHRISTIAN TIEDEMANN, IT Specialist, Prolumina

For the Defendants:
         Venable, LLP
         BY:  JUSTIN NEMEROFF,
              MICHAEL DAVIS,
              DAVID L. FEINBERG,
              CHIRSTOPHER RICIGLIANO,
              VICTORIA GLOVER
         600 Mass. Av., NW. NW.
         Washington, DC 20001

Also Appearing:   JANA GIBSON, Litigation & Trial Specialist

                              ***

                  **W I T N E S S   I N D E X**

PLAINTIFF'S WITNESSES         EXAMINATION               PAGES

JONATHAN JONES                Cross by Mr. Davis          3
                             Redirect by Mr. Kanji      17

MARK WEESNER                  Cross by Mr. Nemeroff      45
                             Redirect by Mr. Miller     70

IAN PATON                     Cross by Mr. Feinberg      81
                             Redirect by Mr. Kanji      97
                             Recross by Mr. Feinberg   116

```
 1            THE WITNESS:  Yeah, I mean, I think my model could be used
 2      to derive a thickness, but we just --
 3            THE COURT:  That's something that you did?
 4            THE WITNESS:  Yeah.
 5            THE COURT:  Understood.
 6  BY MR. DAVIS:
 7      Q    And when oil reaches the shoreline, it continues to
 8      evaporate; correct?
 9            THE COURT:  Have you ever been near an oil spill?
10            MR. DAVIS:  I'm sorry, sir?
11            THE COURT:  I just don't know what this is about.  I don't
12      know what point you think you're making.  If there's a major oil
13      spill, there's going to be tremendous dispersion in Lake
14      Superior.  Your own expert says so.  And even with evaporation,
15      it's going to do substantial damage to the shoreline that it
16      reaches.  I just don't know what you think this cross is
17      accomplishing.
18            MR. DAVIS:  I'm just trying to simply show, Your Honor,
19      that --
20            THE COURT:  I understand.  I agree that there are disputes
21      about exactly what model would be used, but neither model
22      suggests that there wouldn't be substantial impacts.
23            MR. DAVIS:  Well, Your Honor, I'd be happy if they would
24      stipulate on --
25            THE COURT:  Why don't you just finish your questions.
```

MA54