Case Nos. 23-2309 & 23-2467

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

BAD RIVER BAND OF THE LAKE SUPERIOR TRIBE OF CHIPPEWA
INDIANS OF THE BAD RIVER RESERVATION,

*Plaintiff-Appellee/Cross-Appellant*,

v.

ENBRIDGE ENERGY COMPANY, INC., *et al.*,

*Defendants-Appellants/Cross-Appellees.*

————

ENBRIDGE ENERGY COMPANY, INC., *et al.*,

*Counter-Plaintiff, Appellants/Cross-Appellees*,

v.

BAD RIVER BAND OF THE LAKE SUPERIOR TRIBE OF CHIPPEWA
INDIANS OF THE BAD RIVER RESERVATION *et al.*,

*Counter-Defendants, Appellees/Cross-Appellants.*

On Appeal from the U.S. District Court for the Western District of Wisconsin
Hon. William M. Conley, District Judge, Case No. 3:19-cv-602-wmc

## BRIEF OF *AMICI CURIAE* 31 TRIBAL NATIONS AND
## ORGANIZATIONS IN SUPPORT OF APPELLEE/CROSS-APPELLANT
## BAD RIVER BAND OF THE LAKE SUPERIOR CHIPPEWA INDIANS
## AND PARTIAL AFFIRMANCE AND PARTIAL REVERSAL

Wesley James Furlong
    *Counsel of Record*
NATIVE AMERICAN RIGHTS FUND
745 West 4th Avenue, Suite 502
Anchorage, AK 99501
Tel. (907) 276-0680
wfurlong@narf.org

David L. Gover
Kirsten D. Gerbatsch
NATIVE AMERICAN RIGHTS FUND
250 Arapahoe Avenue
Boulder, CO 80302
Tel. (303) 447-8760

*Counsel for* Amici Curiae *31 Tribal Nations and Organizations*

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**
**(Wesley James Furlong)**

Appellate Court No.: <u>23-2309, 23-2467</u>

Short Caption: <u>Bad River Band of the Lake Superior Tribe of Chippewa Indians v. Enbridge Energy Co., Inc.</u>

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

        <u>     </u>    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):
<u>Agua Caliente Band of Cahuilla Indians, Barona Band of Mission Indians, Bay Mills Indian Community, Chippewa Cree Tribe, Confederated Tribes of the Umatilla Indian Reservation, Grand Traverse Band of Ottawa and Chippewa Indians, Jamul Indian Village of California, Keweenaw Bay Indian Community, Lac du Flambeau Band of Lake Superior Chippewa Indians, Leech Lake Band of Ojibwe, Little River Band of Ottawa Indians, Little Traverse Bay Bands of Odawa Indians, Lower Sioux Indian Community of the State of Minnesota, Muscogee (Creek) Nation, Navajo Nation, Nottawaseppi Huron Band of the Potawatomi, Oneida Nation, Pueblo of Isleta, Red Cliff Band of Lake Superior Chippewa Indians, Saginaw Chippewa Indian Tribe of Michigan, San Juan Southern Paiute Tribe, Shoshone-Bannock Tribes of the Fort Hall Reservation, St. Croix Chippewa Indians of Wisconsin, Stockbridge-Munsee Community, Suquamish Indian Tribe of the Port Madison Reservation, Viejas Band of Kumeyaay Indians, White Earth Band of Ojibwe, California Tribal Chairpersons' Association, Coalition of Large Tribes, National Congress of American Indian, and United South and Eastern Tribes Sovereignty Protection Fund, Inc.</u>

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
<u>Native American Rights Fund</u>

(3)    If the party or amicus is a corporation:
        i)       Identify all its parent corporations, if any; and
                  <u>None of the *Amici Curiae* have parent corporations.</u>

        ii)      list any publicly held company that owns 10% or more of the party's, amicus', or intervenor's stock:
                  <u>None of the *Amici Curiae* issue stock.</u>

(4)    Provide information required by FRAP 26.1(b) Organizational Victims in Criminal Cases:
<u>N/A</u>

(5)    Provide information required by FRAP 26.1 (c) 1 & 2:
<u>N/A</u>

---

Attorney's Signature: <u>*/s/ Wesley James Furlong*</u>          Date: <u>October 18, 2023</u>

Attorney's Printed Name: <u>Wesley James Furlong</u>

Please indicate if you are *counsel of record* for the above listed parties pursuant to Circuit Rule 3(d).  Yes <u> X </u>   No <u>     </u>

Address: <u>745 West 4th Avenue, Suite 502, Anchorage, AK 99501</u>

Phone Number: <u>(907) 276-0680</u>          Fax Number: <u>(907) 276-2466</u>

E Mail Address: <u>wfurlong@narf.org</u>

**CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**
(David L. Gover)

Appellate Court No.: <u>23-2309, 23-2467</u>

Short Caption: <u>Bad River Band of the Lake Superior Tribe of Chippewa Indians v. Enbridge Energy Co., Inc.</u>

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

        _____     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)     The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):
<u>Agua Caliente Band of Cahuilla Indians, Barona Band of Mission Indians, Bay Mills Indian Community, Chippewa Cree Tribe, Confederated Tribes of the Umatilla Indian Reservation, Grand Traverse Band of Ottawa and Chippewa Indians, Jamul Indian Village of California, Keweenaw Bay Indian Community, Lac du Flambeau Band of Lake Superior Chippewa Indians, Leech Lake Band of Ojibwe, Little River Band of Ottawa Indians, Little Traverse Bay Bands of Odawa Indians, Lower Sioux Indian Community of the State of Minnesota, Muscogee (Creek) Nation, Navajo Nation, Nottawaseppi Huron Band of the Potawatomi, Oneida Nation, Pueblo of Isleta, Red Cliff Band of Lake Superior Chippewa Indians, Saginaw Chippewa Indian Tribe of Michigan, San Juan Southern Paiute Tribe, Shoshone-Bannock Tribes of the Fort Hall Reservation, St. Croix Chippewa Indians of Wisconsin, Stockbridge-Munsee Community, Suquamish Indian Tribe of the Port Madison Reservation, Viejas Band of Kumeyaay Indians, White Earth Band of Ojibwe, California Tribal Chairpersons' Association, Coalition of Large Tribes, National Congress of American Indian, and United South and Eastern Tribes Sovereignty Protection Fund, Inc.</u>

(2)     The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
<u>Native American Rights Fund</u>

(3)     If the party or amicus is a corporation:
        i)        Identify all its parent corporations, if any; and
                 <u>None of the *Amici Curiae* have parent corporations.</u>

        ii)       list any publicly held company that owns 10% or more of the party's, amicus', or intervenor's stock:
                 <u>None of the *Amici Curiae* issue stock.</u>

(4)     Provide information required by FRAP 26.1(b) Organizational Victims in Criminal Cases:
        <u>N/A</u>

(5)     Provide information required by FRAP 26.1 (c) 1 & 2:
        <u>N/A</u>

---

Attorney's Signature: <u>*/s/ David L. Gover*</u>                          Date: <u>October 18, 2023</u>

Attorney's Printed Name: <u>David L. Gover</u>

Please indicate if you are *counsel of record* for the above listed parties pursuant to Circuit Rule 3(d).   Yes <u>_____</u>     No <u>  X  </u>

Address: <u>250 Arapahoe Avenue, Boulder, CO 80302</u>

Phone Number: <u>(303) 447-8760</u>                          Fax Number: <u>(303) 447-7776</u>

E Mail Address: <u>dgover@narf.org</u>

**CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**
**(Kirsten D. Gerbatsch)**

Appellate Court No.: <u>23-2309, 23-2467</u>

Short Caption: <u>Bad River Band of the Lake Superior Tribe of Chippewa Indians v. Enbridge Energy Co., Inc.</u>

     To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

     The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

    <u>    </u>    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):
<u>Agua Caliente Band of Cahuilla Indians, Barona Band of Mission Indians, Bay Mills Indian Community, Chippewa Cree Tribe, Confederated Tribes of the Umatilla Indian Reservation, Grand Traverse Band of Ottawa and Chippewa Indians, Jamul Indian Village of California, Keweenaw Bay Indian Community, Lac du Flambeau Band of Lake Superior Chippewa Indians, Leech Lake Band of Ojibwe, Little River Band of Ottawa Indians, Little Traverse Bay Bands of Odawa Indians, Lower Sioux Indian Community of the State of Minnesota, Muscogee (Creek) Nation, Navajo Nation, Nottawaseppi Huron Band of the Potawatomi, Oneida Nation, Pueblo of Isleta, Red Cliff Band of Lake Superior Chippewa Indians, Saginaw Chippewa Indian Tribe of Michigan, San Juan Southern Paiute Tribe, Shoshone-Bannock Tribes of the Fort Hall Reservation, St. Croix Chippewa Indians of Wisconsin, Stockbridge-Munsee Community, Suquamish Indian Tribe of the Port Madison Reservation, Viejas Band of Kumeyaay Indians, White Earth Band of Ojibwe, California Tribal Chairpersons' Association, Coalition of Large Tribes, National Congress of American Indian, and United South and Eastern Tribes Sovereignty Protection Fund, Inc.</u>

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
<u>Native American Rights Fund</u>

(3)    If the party or amicus is a corporation:
        i)        Identify all its parent corporations, if any; and
                <u>None of the *Amici Curiae* have parent corporations.</u>

        ii)       list any publicly held company that owns 10% or more of the party's, amicus', or intervenor's stock:
                <u>None of the *Amici Curiae* issue stock.</u>

(4)    Provide information required by FRAP 26.1(b) Organizational Victims in Criminal Cases:
<u>N/A</u>

(5)    Provide information required by FRAP 26.1 (c) 1 & 2:
<u>N/A</u>

---

Attorney's Signature: <u>*/s/ Kirsten D. Gerbatsch*</u>           Date: <u>October 18, 2023</u>

Attorney's Printed Name: <u>Kirsten D. Gerbatsch</u>

Please indicate if you are *counsel of record* for the above listed parties pursuant to Circuit Rule 3(d).   Yes <u>    </u>   No <u> X </u>

Address: <u>250 Arapahoe Avenue, Boulder, CO 80302</u>

Phone Number: <u>(303) 447-8760</u>             Fax Number: <u>(303) 447-7776</u>

E Mail Address: <u>gerbatsch@narf.org</u>

# TABLE OF CONTENTS

TABLE OF CONTENTS .......................................................................... v

TABLE OF AUTHORITIES ................................................................. vi

INTEREST OF *AMICI CURIAE* ........................................................ 1

SUMMARY OF ARGUMENT ............................................................. 3

ARGUMENT ......................................................................................... 4

    I.    Enbridge's Actions on the Bad River Reservation Continue the Centuries-Long History of Using Trespass to Dispossess and Destroy Tribal Nations ......................................................................... 4

    II.   Right to Exclude Non-Indians from Tribal Lands is an Essential Attribute of Tribal Sovereignty ........................................... 10

    III.  Courts' Refusal to Eject Trespassers from Tribal Lands Erodes the Inherent Sovereign Authority of Tribal Nations ................................ 18

    IV.  The District Court's Inconsequential Restitution Award Incentivizes Trespassers and Undermines Tribal Nations' Sovereignty and Bargaining Power .................................................................. 24

CONCLUSION .................................................................................. 27

CERTIFICATE OF COMPLIANCE ................................................. 28

CERTIFICATE OF SERVICE .......................................................... 29

# TABLE OF AUTHORITIES

## Cases

*Arizona Public Service Co. v. Environmental Protection Agency,*
211 F.3d 1280 (D.C. Cir. 2000) .................................................................... 12

*Attorney's Process & Investigation Services, Inc. v. Sac & Fox Tribe of Mississippi in Iowa,*
609 F.3d 927 (8th Cir. 2010) .................................................................. 12, 17

*Computing Scale Co. v. Toledo Computing Scale Co.,*
279 F. 648 (7th Cir. 1921) ............................................................................ 23

*Confederated Salish & Kootenai Tribes v. Lake County Board of Commissioners,*
454 F. Supp. 3d 957 (D. Mont. 2020) ........................................................... 9

*Donovan v. Navajo Forest Products Industries,*
692 F.2d 709 (10th Cir. 1982) ............................................................... 14, 22

*Eagle Bear, Inc. v. Blackfeet Indian Nation,*
No. CV-21-88-GF-BMM, 2021 WL 5360601 (D. Mont. Nov. 17, 2021) ...... 16

*Grondal v. Mill Bay Members Association, Inc.,*
No. 2:09-CV-18-RMP, 2020 WL 4590528 (W.D. Wash. Mar. 26, 2020) ..... 22

*Grondal v. United States,*
21 F.4th 1140 (9th Cir. 2021) ........................................................................ 9

*Hall v. Tesoro High Plains Pipeline Co., LLC,*
478 F. Supp. 3d 834 (D.N.D. 2020) ............................................................. 26

*Lac Courte Oreilles Band of Lake Superior Chippewa Indians of Wisconsin v. Evers,*
46 F.4th 552 (7th Cir. 2022) ........................................................... 10, 21, 22

*Light v. United States,*
220 U.S. 523 (1911) ................................................................................ 20, 23

*Marsh v. Brooks,*
49 U.S. 223 (1850) ................................................................................. 14, 19

*Merrion v. Jicarilla Apache Tribe,*
455 U.S. 130 (1982) ............................................................................. passim

*Michigan v. Bay Mills Indian Community,*
572 U.S. 782 (2014) .............................................................................. 10, 22

*Montana v. Blackfeet Tribe of Indians*,
  471 U.S. 759 (1985) ................................................................ 10

*New Mexico v. Mescalero Apache Tribe*,
  462 U.S. 324 (1983) ................................................................ 11

*Norton v. Ute Indian Tribe of Uintah & Ouray Reservation*,
  862 F.3d 1236 (10th Cir. 2017) .............................................. 17

*Oklahoma Tax Commission v. Citizen Band of Potawatomi Indian Tribe of Oklahoma*,
  498 U.S. 505 (1991) ........................................................ 10, 11

*Oneida County v. Oneida Indian Nation of New York*,
  470 U.S. 226 (1985) .......................................................... 5, 13

*Oneida Indian Nation of New York v. Oneida County*,
   414 U.S. 661 (1974) ...................................................... 15, 16

*Ortiz-Barraza v. United States*,
  512 F.2d 1176 (9th Cir. 1975) .................................................. 6

*Owens Valley Indian Housing Authority v. Turner*,
  185 F.3d 1029 (9th Cir. 1999) ................................................ 18

*Peabody Coal Co. v. Navajo Nation*,
  75 F.3d 457 (9th Cir. 1996) .................................................... 15

*Plains Commerce Bank v. Long Family Land & Cattle Co.*,
  554 U.S. 316 (2008) ................................................. 11, 12, 21

*Public Service Company of New Mexico v. Barboan*,
  857 F.3d 1101 (10th Cir. 2017) .............................................. 21

*Quechan Tribe of Indians v. Rowe*,
  531 F.2d 408 (9th Cir. 1976) .................................................. 13

*Santa Clara Pueblo v. Martinez*,
  436 U.S. 49 (1978) .......................................................... 10, 21

*Seneca Nation v. Hochul*,
  58 F.4th 664 (2d Cir. 2023) .................................................... 9

*Soaring Eagle Casino & Resort v. National Labor Relations Board*,
  791 F.3d 648 (6th Cir. 2015) .................................................. 6

*Swinomish Indian Tribal Community v. BNSF Railway Co.*,
  951 F.3d 1142 (9th Cir. 2020) ............................................. 9, 12

*Swinomish Indian Tribal Community v. BNSF Railway Co.*,
  No. C15-0543RSL, ___ F. Supp. 3d ___, 2023 WL 2646470 (W.D. Wash. Mar. 27, 2023) ...................................................................... 19

*United States v. Bundy*,
No. 2:12-cv-0804-LDF-GWF, 2013 WL 3463610 (D. Nev. July 9, 2013).... 20

*United States v. Cooley*,
141 S. Ct. 1638 (2021) ...................................................................... 10, 12, 21

*United States v. Hubbard*,
No. C18-1035-LTS, 2019 WL 1768164 (N.D. Iowa Apr. 22, 2019) ............. 20

*United States v. Kahre*,
No. 2:10-CV-1198-KJD-LRL, 2012 WL 2675453 (D. Nev. July 5, 2012) ... 20

*United States v. Milner*,
583 F.3d 1174 (9th Cir. 2009) ............................................................. 13, 19

*United States v. Nogueira*,
403 F.2d 816 (9th Cir. 1968) ...................................................................... 20

*United States v. Pend Oreille Public Utility District No. 1*,
28 F.3d 1544 (9th Cir. 1994) ...................................................................... 14

*United States v. Sioux Nation of Indians*,
448 U.S. 371 (1980) ................................................................................. 7, 8

*United States v. Sweeney*,
821 F.3d 893 (7th Cir. 2016) ...................................................................... 13

*United States v. Torlaw Realty, Inc.*,
483 F. Supp. 2d 967 (C.D. Cal. 2007) ........................................................ 22

*United States v. Winans*,
198 U.S. 371 (1905) ...................................................................................... 6

*Ute Indian Tribe of Uintah & Ouray Reservation v. Utah*,
790 F.3d 1000 (10th Cir. 2015) ................................................................... 19

*Water Wheel Campground Recreation Area, Inc. v. LaRance*,
642 F.3d 802 (9th Cir. 2011) ..............................................................passim

*Wilson v. Omaha Indian Tribe*,
442 U.S. 653 (1979) ...................................................................................... 4

*Window Rock Unified School District v. Reeves*,
861 F.3d 894 (9th Cir. 2017) ........................................................................ 5

*Worcester v. Georgia*,
31 U.S. 515 (1832) ...................................................................................... 11

## Treaties and Statutes

25 U.S.C. § 177 ................................................................................. 5, 22

1790 Nonintercourse Act, 1 Stat. 137 (1790) ..................................... 4

1793 Nonintercourse Act, 1 Stat. 329 (1793) ..................................... 4

Treaty of Fort Laramie,15 Stat. 635 (1868) ....................................... 7

Treaty with the Chippewa Indians of Saginaw, 11 Stat. 633 (1855) ................ 6

Treaty with the Chippewa Indians of Saginaw, 14 Stat. 657 (1864) ................ 6

Treaty with the Navajo, 15 Stat. 667 (1868) ....................................... 5

## Rules

88 Fed. Reg. 2112 (Jan. 12, 2023) .................................................... 2

Fed. R. App. P. 29(a)(2) ................................................................ 1

Fed. R. App. P. 29(a)(4)(E) ............................................................ 1

## Other Authorities

COHEN'S HANDBOOK OF FEDERAL INDIAN LAW
   (Nell Jessup Newton ed. 2012 & supp. 2023) ................................... 4, 5, 8, 15

FELIX S. COHEN, HANDBOOK OF FEDERAL INDIAN LAW (1941) ................ 4, 6, 14

Restatement (Second) of Torts (2009) ............................................... 19

Sherally Munshi, *Dispossession: An American Property Law Tradition*,
   110 GEO. L.J. 1021 (2022) .......................................................... 9

## Online Resources

ICT Staff, *Drug Cartels and Illegal Pot Farms: Yurok Battle for Ancestral Lands*, INDIAN COUNTRY TODAY, Aug. 11, 2016,
   https://ictnews.org/archive/drug-cartels-and-illegal-pot-farms-yurok-battle-for-ancestral-lands ........................................................ 9

Mike Hughlett & Brooks Johnson, *Enbridge Deal-Making Over Line 3 Divides Ojibwe Bands in Minnesota*, STARTRIBUNE, Mar. 1, 2021,
   https://www.startribune.com/enbridge-deal-making-over-line-3-divides-ojibwe-bands-in-minnesota/600028769/ ........................................ 25

Nicole Smith, *Lac Courte Oreilles and Enbridge Reach Historic Agreement*, SAWYER COUNTY RECORD, Oct. 17, 2017,
https://www.apg-wi.com/sawyer_county_record/news/
local/lac-courte-oreilles-and-enbridge-reach-historic-
agreement/article_b38d8d5a-b344-11e7-b803-2b3f6e53e8be.html .......... 24

## INTEREST OF *AMICI CURIAE*[1]

*Amici Curiae* Agua Caliente Band of Cahuilla Indians, Barona Band of
Mission Indians, Bay Mills Indian Community, Chippewa Cree Tribe,
Confederated Tribes of the Umatilla Indian Reservation, Grand Traverse
Band of Ottawa and Chippewa Indians, Jamul Indian Village of California,
Keweenaw Bay Indian Community, Lac du Flambeau Band of Lake Superior
Chippewa Indians, Leech Lake Band of Ojibwe, Little River Band of Ottawa
Indians, Little Traverse Bay Bands of Odawa Indians, Lower Sioux Indian
Community of the State of Minnesota, Muscogee (Creek) Nation, Navajo
Nation, Nottawaseppi Huron Band of the Potawatomi, Oneida Nation, Pueblo
of Isleta, Red Cliff Band of Lake Superior Chippewa Indians, Saginaw
Chippewa Indian Tribe of Michigan, San Juan Southern Paiute Tribe,
Shoshone-Bannock Tribes of the Fort Hall Reservation, St. Croix Chippewa
Indians of Wisconsin, Stockbridge-Munsee Community, Suquamish Indian
Tribe of the Port Madison Reservation, Viejas Band of Kumeyaay Indians,
and White Earth Band of Ojibwe (collectively, "Tribal Nation *Amici*") are

---

[1] This brief is filed without leave of the Court because the Parties have
consented to its filing. Fed. R. App. P. 29(a)(2). *Amici Curiae* certify that none
of the Parties' counsel authored this brief in whole or in part or contributed
money that was intended to fund preparing or submitting this brief, and no
person—other than *Amici Curiae*, their members, or their counsel—
contributed money that was intended to fund preparing or submitting this
brief. Fed. R. App. P. 29(a)(4)(E).

federally recognized, sovereign Tribal Nations. *See* 88 Fed. Reg. 2112 (Jan. 12, 2023). *Amici Curiae* California Tribal Chairpersons' Association, Coalition of Large Tribes, National Congress of American Indian, and United South and Eastern Tribes Sovereignty Protection Fund, Inc., (collectively, "Tribal Organization *Amici*") are national and regional Tribal organizations dedicated to the defense and advancement of Tribal sovereignty and the protection of Tribal lands.

*Amici Curiae* have strong interests in defending the inherent sovereign authority of Tribal Nations to exclude non-Indians from, condition non-Indians' entry upon, and expel non-Indian trespassers from Tribal lands. This authority is a fundamental attribute of inherent Tribal sovereignty. Tribal Nations across the United States, including many of the Tribal Nation *Amici* and Tribal Organization *Amici*'s members, routinely experience third-party trespass, including by pipeline and energy companies. These trespasses give rise to significant issues and threaten the inherent sovereignty, political integrity, territorial management, and economic security of Tribal Nations.

*Amici Curiae* submit this brief in support of Appellee/Cross-Appellant Bad River Band of the Lake Superior Tribe of Chippewa Indians of the Bad River Reservation ("Bad River Band" or "the Band").

## SUMMARY OF ARGUMENT

In its opening brief, Appellants/Cross-Appellees Enbridge Energy Company, Inc., and Enbridge Energy L.P. (together, "Enbridge") claim that "tribal sovereignty is not at issue" in this case. Doc. 15, at 41. Nothing could be further from the truth. "[A] hallmark of Indian sovereignty is the power to exclude non-Indians from Indian lands[.]" *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 141 (1982). When a non-Indian trespasses on Tribal lands, Tribal Nations suffer injuries far greater than those suffered by ordinary landowners. Trespass on Tribal lands threatens the political integrity of Tribal Nations and their ability to exercise their inherent sovereign powers of self-government and territorial management. Trespass has been used to dispossess and destroy Tribal Nations for centuries. This history informs the severity of the injuries Tribal Nations suffer from trespass today and the need for courts to order and enforce meaningful remedies.

When a Tribal Nation establishes that a non-Indian is trespassing on Tribal land, the appropriate remedy is immediate ejectment. Any monetary relief must meaningfully ensure that trespassers do not profit from their trespass and actually deter future trespassers. The District Court's refusal to grant immediate injunctive relief expelling Enbridge from the Bad River Reservation and its meaningless restitution award undermine the Bad River

Band's inherent sovereignty by forcing the Band to accept a continuing trespass on its lands.

## ARGUMENT

I.   **Enbridge's Actions on the Bad River Reservation Continue the Centuries-Long History of Using Trespass to Dispossess and Destroy Tribal Nations**

Since the very earliest days of the United States, trespass on Tribal lands has been a pervasive issue that has defined Federal Indian policy. *See* FELIX S. COHEN, HANDBOOK OF FEDERAL INDIAN LAW xii (1941) [hereinafter COHEN] ("The protection of Indian land against trespass was one of the first responsibilities assumed by the Federal Government."). Beginning in 1790, Congress attempted to address White settlers' unlawful entry onto and occupation of Tribal lands by enacting six Nonintercourse Acts, which prohibited unpermitted trade with Tribal Nations, as well as entry onto and the use or occupation of Tribal lands and territories. *See* COHEN'S HANDBOOK OF FEDERAL INDIAN LAW § 1.03[2], at 34-8 (Nell Jessup Newton ed. 2012 & supp. 2023) [hereinafter COHEN'S HANDBOOK]. Due to "recurring trespass upon and illegal occupancy of Indian territory, a major purpose of these Acts as they developed was to protect the rights of Indians and their properties." *Wilson v. Omaha Indian Tribe*, 442 U.S. 653, 664 (1979). For example, the 1793 Nonintercourse Act, 1 Stat. 329 (1793), "subject[ed] individuals who settle[d] on Indian lands to fine and imprisonment, and g[ave] the President

4

discretionary authority to remove illegal settlers from the Indians' land[s]." *Oneida Cnty. v. Oneida Indian Nation of N.Y.*, 470 U.S. 226, 238 (1985) (footnote omitted). The provisions of the 1790 Nonintercourse Act that prohibited the acquisition of Tribal lands, *see* 1 Stat. 137, 138 § 4 (1790), are still in effect today and regularly litigated. *See* COHEN'S HANDBOOK, *supra* § 1.03[2], at 35 n.84 (internal citations omitted); 25 U.S.C. § 177.

Beginning in the early 1800s, however, "[t]he rapid growth of the [United States] created a demand for territorial expansion and new pressure to extinguish Indian title." COHEN'S HANDBOOK, *supra* § 1.03[3], at 38. As the United States expanded westward, it sought to "mak[e] a vast area available for white settlement[.]" *Id.* § 1.03[4][a], at 41. To achieve this, the United States negotiated treaties with Tribal Nations, in which Tribal Nations ceded—sometimes willingly but often by force or coercion—most of their territory to the United States. *Id.* § 1.03[1], at 26. As a result, Tribal Nations were confined to reservations, just fractions the size of their traditional territory. *Id.* § 1.03[6][a], at 60.

In many of these treaties, Tribal Nations explicitly reserved their inherent authority to exclude non-Indians from their reservations. *See, e.g.*, *Window Rock Unified Sch. Dist. v. Reeves*, 861 F.3d 894, 904 (9th Cir. 2017) (discussing Treaty with the Navajo, 15 Stat. 667 (1868)) ("The 1868 treaty that established the Navajo Reservation makes clear that the Navajo Nation

5

has the right to exclude nonmembers from the land [at issue.]"); *Soaring Eagle Casino & Resort v. Nat'l Lab. Rels. Bd.*, 791 F.3d 648, 651 (6th Cir. 2015) (discussing Treaty with the Chippewa Indians of Saginaw, 11 Stat. 633 (1855); Treaty with the Chippewa Indians of Saginaw, 14 Stat. 657 (1864)) ("It is undisputed that the Treaties preserved the Tribe's right to exclude non-Indians from living in the territory." (citation omitted)). While many treaties include similar provisions, as discussed *infra* Section II, the power to exclude is "intrinsic in the sovereignty of an Indian tribe[.]" *Ortiz-Barraza v. United States*, 512 F.2d 1176, 1179 (9th Cir. 1975). The power to exclude is therefore not limited only to those Tribal Nations that entered into treaties specifically reserving this right. *See Soaring Eagle*, 791 F.3d at 663 ("These retained powers inherent to tribal sovereignty are not limited to just those powers explicitly recognized in the treaties[.]"); *cf. United States v. Winans*, 198 U.S. 371, 381 (1905) ("[T]he treaty was not a grant of rights to the Indians, but a grant of right from them,[ ]a reservation of those not granted.").

These treaties often obligated the United States to protect Tribal lands from White settlement. This "was an important *quid pro quo* in the process of treaty-making by which the United States acquired a vast public domain." COHEN, *supra* at xii. Notwithstanding its explicit treaty obligations, the United States often reneged on these promises by condoning trespass on

6

Tribal lands. The United States' theft of the Black Hills provides one egregious example.

In 1868, the Sioux Nation and the United States entered into the Fort Laramie Treaty, in "which the United States pledged that the Great Sioux Reservation, including the Black Hills, would be 'set apart for the absolute and undisturbed use and occupation of the Indians herein named.'" *United States v. Sioux Nation of Indians*, 448 U.S. 371, 374 (1980) (quoting Treaty of Fort Laramie, art. II, 15 Stat. 635, 636 (1868)). In executing the treaty, "[t]he United States 'solemnly agreed' that no unauthorized persons 'shall ever be permitted to pass over, settle upon, or reside in this territory.'" *Id*. at 374 (quoting 15 Stat. at 636) (brackets omitted). In 1874, however, the discovery of gold in the Black Hills kicked off "an intense popular demand for the 'opening' of the Hills for settlement. The only obstacle to 'progress' was the Fort Laramie Treaty that reserved occupancy of the Hills to the Sioux [Nation]." *Id*. 377 (internal footnote omitted).

Pursuant to its treaty obligations, the United States found itself "in the position of having to threaten military force, and occasionally use it, to prevent prospectors and settlers from trespassing on lands reserved to the Indians." *Id*. Eventually, the United States "decided to abandon the Nation's treaty obligation to preserve the integrity of the Sioux [Nation's] territory." *Id*. at 378. In 1875, President Ulysses S. Grant ordered the United States

Army to "make no further resistance to the occupation of the Black Hills by miners[.]" *Id.*

With the withdrawal of the Army's enforcement of the Treaty of Fort Laramie, White settlers invaded the Black Hills. *Id.* The United States used this as a pretext to take the Black Hills from the Sioux Nation. In 1876, faced with explicit threats of military violence and forced starvation, the Sioux Nation 'agreed' to 'cede' the Black Hills to the United States, notwithstanding that the 'agreement' was not properly ratified under the terms of the Treaty of Fort Laramie. *Id.* at 381-82. Congress nevertheless ratified the 'agreement' in 1877, "abrogating the earlier Fort Laramie Treaty[.]" *Id.* at 382. In the words of the United States Supreme Court, "[t]he passage of the 1877 Act legitimized the settlers' invasion of the Black Hills[.]" *Id.* at 383. Many other Tribal Nations, including the Bad River Band and many of the Tribal Nation *Amici* and Tribal Organization *Amici*'s members, have their own harrowing histories of dispossession. *See, e.g.*, Doc. 38, at 10-14 (discussing the Bad River Band's history).

After more than a century of devastating policies, like the Allotment Era described in the Bad River Band's brief, *see* Doc 38, at 12-13, which sought to destroy and assimilate Tribal Nations, in the mid-twentieth century the Federal government began, for the first time, to promote a policy of Tribal self-determination. *See* COHEN'S HANDBOOK, *supra* § 1.07, at 93-108.

Contemporary examples of trespass on Tribal lands nevertheless remain commonplace. For example, in Northern California, drug cartels trespass on Tribal lands to establish massive, illegal marijuana-growing operations. *See, e.g.*, ICT Staff, *Drug Cartels and Illegal Pot Farms: Yurok Battle for Ancestral Lands*, INDIAN COUNTRY TODAY, Aug. 11, 2016,

https://ictnews.org/archive/drug-cartels-and-illegal-pot-farms-yurok-battle-for-ancestral-lands.[2] Enbridge and other trespassers would attempt to frame their actions as simply business or property disputes. Courts, however, must view such "conscious and willful trespass[es,]" Doc. 15, at A111, in context of the history that they perpetuate: the use of American property law to retroactively justify the illegal seizure of Tribal lands. *See* Sherally Munshi, *Dispossession: An American Property Law Tradition*, 110 GEO. L.J. 1021, 1049 (2022) (discussing "the retrospective conferral of legal ownership to illegal squatters[]").

The District Court's refusal to hold Enbridge accountable for its actions by refusing to order the immediate removal of Line 5 and awarding the Bad River Band inconsequential monetary relief signals to large corporations that

---

[2] *See also Swinomish Indian Tribal Cmty. v. BNSF Ry. Co.*, 951 F.3d 1142 (9th Cir. 2020); *Grondal v. United States*, 21 F.4th 1140 (9th Cir. 2021); *Seneca Nation v. Hochul*, 58 F.4th 664 (2d Cir. 2023); *Confederated Salish & Kootenai Tribes v. Lake Cnty. Bd. of Comm'rs*, 454 F. Supp. 3d 957 (D. Mont. 2020).

they can willfully trespass on Tribal lands so long as they pay nominal monetary awards to remain on the land. Courts cannot condone these illegal actions and their resulting assaults on Tribal sovereignty.

## II.     Right to Exclude Non-Indians from Tribal Lands is an Essential Attribute of Tribal Sovereignty

Tribal Nations "are 'separate sovereigns pre-existing the Constitution,' and as such they 'exercise inherent sovereign authority[.]'" *Lac Courte Oreilles Band of Lake Superior Chippewa Indians of Wis. v. Evers*, 46 F.4th 552, 555 (7th Cir. 2022) (quoting *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 56 (1978) (first); *Okla. Tax Comm'n v. Citizen Band of Potawatomi Indian Tribe of Okla.*, 498 U.S. 505, 509 (1991) (second)). While the extent of Tribal Nations' inherent sovereign authority has been somewhat limited "[d]ue to their incorporation into the United States," *United States v. Cooley*, 141 S. Ct. 1638, 1642 (2021), they still retain the aspects of their inherent sovereign authority that have not been explicitly diminished by Congress. *See Lac Courte Oreilles*, 46 F.4th at 555 (quoting *Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 764 (1985) ("So, too, have the tribes 'retained' that inherent sovereignty 'even after the formation of the United States.'"); *see also Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 788 (2014). One aspect of inherent sovereign authority Tribal Nations have retained is their

power to exclude non-Indians from, condition their entry upon, and remove them from Tribal lands.

The Supreme Court has explicitly acknowledged that "a hallmark of Indian sovereignty is the power to exclude non-Indians from Indian lands[.]" *Merrion*, 455 U.S. at 141. This power "necessarily includes the lesser power to place conditions on entry, on continued presence, [and] on reservation conduct." *Id.* at 144; *see also New Mexico v. Mescalero Apache Tribe*, 462 U.S. 324, 333 (1983). *Merrion* articulates a foundational principle of Tribal sovereignty and a cornerstone of Federal Indian law, which rests on nearly 200 years of Supreme Court precedent. For example, in *Worcester v. Georgia*, the Supreme Court held that "the citizens of Georgia have no right to enter" the Cherokee Nation's territory, except "with the assent of the Cherokee themselves, or in conformity with treaties, and with the acts of congress." 31 U.S. 515, 561 (1832).

Over the past two centuries, the Supreme Court has repeatedly affirmed Tribal Nations' inherent sovereign authority to exclude non-Indians from and condition their entry upon Tribal lands. *See, e.g.*, *Citizen Band*, 498 U.S. at 509 ("Indian tribes . . . exercise inherent sovereign authority over their . . . territories."); *Plains Com. Bank v. Long Family Land & Cattle Co.*, 554 U.S. 316, 334 (2008) ("By virtue of their incorporation into the United States, the tribe's sovereign interests are now confined to managing tribal

11

land," among other interests.). Indeed, most recently, in *United States v. Cooley*, the Supreme Court observed that while Tribal Nations have lost some aspects of their inherent sovereign authority, they may still "exclude others from entering tribal land." 141 S. Ct. at 1642 (citing *Plains Com.*, 554 U.S. at 327-28).

Federal courts of appeals have also consistently affirmed Tribal Nations' inherent sovereign authority to exclude non-Indians from and condition their entry upon Tribal lands. The United States Court of Appeals for the Tenth Circuit, for example, has recognized the Supreme Court's "repeated confirmation of tribes' right to exclude nonmembers for tribal lands[.]" *Norton v. Ute Indian Tribe of Uintah & Ouray Res.*, 862 F.3d 1236, 1245 (10th Cir. 2017). Likewise, the United States Court of Appeals for the Ninth Circuit has repeatedly held that "Indian tribes have the right to exclude non-Indians and non-tribal members from their lands, and the commensurate right to grant admission to, or use of, their lands on such terms as they see fit to impose." *Swinomish*, 951 F.3d at 1153; *see also Attorney's Process & Investigation Servs., Inc. v. Sac & Fox Tribe of Miss. in Iowa*, 609 F.3d 927, 940 (8th Cir. 2010); *Ariz. Pub. Serv. Co. v. Envtl. Prot. Agency*, 211 F.3d 1280, 229 (D.C. Cir. 2000).

Tribal Nations' inherent sovereign authority to exclude non-Indians from and condition their entry upon Tribal lands necessarily includes the

authority "to expel those who enter their reservation without proper authority." *Quechan Tribe of Indians v. Rowe*, 531 F.2d 408, 411 (9th Cir. 1976). When a Tribal Nation grants a non-Indian the right to enter its Tribal land, "the tribe agrees not to exercise its ultimate power to oust the non-Indian as long as the non-Indian complies with the initial conditions of entry." *Merrion*, 455 U.S. at 144. Of course, if the non-Indian fails to adhere to these conditions, the Tribal Nation retains the absolute right and authority to expel that non-Indian. *See Water Wheel Campground Recreation Area, Inc. v. LaRance*, 642 F.3d 802, 811 (9th Cir. 2011) (Tribal Nation has power to expel non-Indians "who were trespassers on the tribe's land and had violated the conditions of their entry[]"); *Merrion*, 455 U.S. at 144-45.

Tribal Nations can pursue various avenues to expel non-Indians from Tribal lands. For example, Tribal Nations possess federal common law causes of action to protect their interests in Tribal lands. *See Oneida Cnty.*, 470 U.S. at 233-36 (recognizing that Tribal Nations "have a federal common-law right to sue to enforce their aboriginal land rights[]" (footnote omitted)).[3] Indeed, as

---

[3] The federal common law trespass cause of action "generally comports with the Restatement of Torts[.]" *United States v. Milner*, 583 F.3d 1174, 1182 (9th Cir. 2009) (citing *United States v. Pend Oreille Pub. Util. Dist. No. 1*, 28 F.3d 1544, 1549 n.8 (9th Cir. 1994); *Oneida Cnty.*, 470 U.S. at 235-36). Moreover, this Court has stated that when considering federal common law trespass claims, "[t]he Restatement approach to trespass is a good starting point." *United States v. Sweeney*, 821 F.3d 893, 899 (7th Cir. 2016).

the Ninth Circuit has noted, "[t]he Supreme Court has recognized a variety of federal common law causes of action to protect Indian lands from trespass, *including actions for ejectment*[.]" *Pend Oreille*, 28 F.3d at 1549 n.8 (citations omitted, emphasis added)). For over a century-and-a-half, the Supreme Court has recognized Tribal Nations' unquestionable right to seek the ejectment of trespassers on Tribal lands. *See Marsh v. Brooks*, 49 U.S. 223, 232 (1850) ("That an action of ejectment could be maintained on an Indian right to occupancy and use, is not open to question."). Separately, Tribal Nations possess inherent sovereign authority to bring, adjudicate, and enforce their own trespass claims, based on Tribal law, in Tribal courts. *See, e.g.*, *LaRance*, 642 F.3d at 814. Tribal Nations may also request the United States, in its capacity as trustee, to bring suit to eject trespassers. *See* COHEN'S HANDBOOK, *supra* § 15.08[2], at 1047 ("Tribal ownership rights may be enforced . . . by the federal government acting through the Department of Justice on behalf of the tribe.").

Enbridge asserts that in granting it a right-of-way and now seeking its ejectment, the Bad River Band "is acting in its proprietary capacity, not its governmental or sovereign capacity." Doc. 15, at 27. Enbridge is fundamentally incorrect. The inherent sovereign authority to exclude non-Indians from Tribal lands is "essential to a tribe's exercise of self-government and territorial management." *Donovan v. Navajo Forest Prods. Indus.*, 692

14

F.2d 709, 712 (10th Cir. 1982); *see also LaRance*, 642 F.3d at 814 (non-Indians' trespass on Tribal land "interfered directly with the tribe's inherent powers to exclude and manage its own lands[]"). Accordingly, in exercising their inherent sovereign authority to exclude non-Indians from, condition their entry upon, or expel them from Tribal lands, Tribal Nations do not act as ordinary landowners, but as sovereigns.

In *Merrion*, the Supreme Court observed that Tribal Nations' power to exclude non-Indians from Tribal lands is not "merely the power possessed by any individual or any social group[,]" but is, instead, "a sovereign power." 455 U.S. at 146. Indeed, the Court criticized the dissent (and petitioners) for "confus[ing] the Tribe's role as a commercial partner with its role as a sovereign." *Id.* at 145. The Court explained that "[o]ver tribal lands, the tribe has the rights of a landowner as well as the rights of a local government, dominion as well as sovereignty." *Id.* at 146 n.12 (quoting COHEN, *supra* at 143) (emphasis omitted); *see Peabody Coal Co. v. Navajo Nation*, 75 F.3d 457, 464 (9th Cir. 1996) ("[A]n Indian tribe can occupy both the position as landowner and sovereign[.]").

The federal common law causes of action Tribal Nations possess to protect their interest in Tribal lands underscore the fact that Tribal Nations are not ordinary landowners. In *Oneida Indian Nation of New York v. Oneida County*, the Supreme Court explained that Tribal Nations possess federal

common law causes of action because their claims are "based in part on their aboriginal right of occupancy" and can arise "from treaties guaranteeing their possessory right[s.]" 414 U.S. 661, 677 (1974). Ordinary landowners do not possess these rights. Accordingly, when Tribal Nations assert their authority to expel trespassers from Tribal lands, they are not simply exercising their rights as landowners, but also their authority as sovereign governments.

Trespass on Tribal lands threatens not only Tribal Nations' rights and interests in their land as landowners, but their sovereignty, political integrity, and self-government. *Water Wheel Campground Recreation Area, Inc. v. LaRance* illustrates these threats well. In 1975, Water Wheel Campground Recreation Area, Inc., ("Water Wheel") signed a thirty-two-year lease with Colorado River Indian Tribes ("CRIT") to operate a resort on Tribal land within CRIT's reservation. 642 F.3d at 805. When the lease expired in 2007, Water Wheel and its non-Indian owner refused to vacate, continued to operate the resort, and stopped making payments to CRIT. *Id.*[4]

---

[4] Enbridge's trespass is similar to other examples in Indian Country. For example, the Blackfeet Nation is currently locked in a years-long effort to eject a campground operator located on Tribal land within its reservation after the Bureau of Indian Affairs canceled its lease for not paying rent. This litigation is ongoing. *See Eagle Bear, Inc. v. Blackfeet Indian Nation*, No. CV-21-88-GF-BMM, 2021 WL 5360601, at *7 (D. Mont. Nov. 17, 2021) ("Eagle Bear continue[d] to operate the KOA campground on the Blackfeet Nation's tribal land despite the lease agreement with the Blackfeet Nation apparently having been canceled by the BIA in 2008.").

CRIT filed a lawsuit in Tribal court for eviction, unpaid rent, and damages. *Id*. The Tribal court ruled for CRIT on all claims, and the Tribal appellate court affirmed. *Id*. at 805-06. Unsatisfied, Water Wheel and its owner sought to enjoin their eviction in federal district court. *Id*. at 807. Instead, the district court affirmed CRIT's authority to evict the non-Indian squatter. *See id*.

On appeal, the Ninth Circuit affirmed CRIT's authority to evict Water Wheel, holding that "through its sovereign authority over tribal land, the CRIT ha[s] power to exclude Water Wheel and [its non-Indian owner], who were trespassers on the tribe's land and violated the conditions of their entry." *Id*. at 811. The court concluded that CRIT possessed authority to eject them because the trespass "occurred on tribal land, [and] the activity interfered directly with the tribe's inherent powers to exclude and manage its own lands[.]" *Id*. at 814.

Alternatively, the Ninth Circuit held that CRIT had the authority to evict Water Wheel and its non-Indian owner because their continued trespass on Tribal lands threatened CRIT's political integrity and economic security. *Id*. 819.[5] The Ninth Circuit found that the non-Indian's "unlawful occupancy

---

[5] Both the United States Court of Appeals for the Eighth Circuit and the Tenth Circuit have likewise held that non-Indians' trespass on Tribal land has the potential to threaten Tribal Nations' political integrity. *See, e.g.*, *Norton*, 862 F.3d at 1246; *Attorney's Process*, 609 F.3d at 940.

and use of tribal land . . . deprived the CRIT of its power to regulate its own land," as well as "its right to manage and control an asset capable of producing significant income." *Id*. The court noted that "[i]f tribes lacked authority to evict holdover tenants and their agents, tribes would be discouraged from entering into financially beneficial leases with nonmembers for fear of losing control over their land." *Id*.

While *LaRance* concerns a Tribal Nation's ability to exercise civil adjudicatory and regulatory jurisdiction over a non-Indian located on Tribal land, the Ninth Circuit's discussion of the Tribal Nation's inherent authority to exclude non-Indians and the threat trespass poses to Tribal sovereignty is nonetheless germane to this case. The authority to exclude non-Indians from, condition their entry upon, and expel those who trespass from Tribal lands forms a core aspect of Tribal sovereignty. Accordingly, non-Indians' trespass on Tribal lands directly threatens Tribal Nations' political integrity, self-government, territorial management, and economic security.

## III. Courts' Refusal to Eject Trespassers from Tribal Lands Erodes the Inherent Sovereign Authority of Tribal Nations

Tribal Nations have the absolute right as sovereign governments to seek a non-Indian's removal from Tribal lands. *See Owens Valley Indian Hous. Auth. v. Turner*, 185 F.3d 1029, 1032 (9th Cir. 1999), *vacated as moot* 201 F.3d 444 (9th Cir. 1999) (Tribal Nations have the "right to bring

ejectment actions to remedy violations of the right of occupancy." (citations omitted)); *Marsh*, 49 U.S. at 232. When a Tribal Nation grants a non-Indian the right to occupy or enter Tribal land, it "agrees not to exercise its ultimate power to oust the non-Indian as long as the non-Indian complies with the initial conditions of entry." *Merrion*, 455 U.S. at 144. The non-Indian commits trespass when they "violate[] those conditions or restrictions." *Swinomish Indian Tribal Cmty. v. BNSF Ry. Co.*, No. C15-0543RSL, ___ F. Supp. 3d ___, 2023 WL 2646470, at *5 (W.D. Wash. Mar. 27, 2023) (citation omitted). Likewise, "a person is liable for trespass 'if he . . . fails to remove from the land a thing which he is under a duty to remove.'" *Milner*, 583 F.3d at 1182 (quoting Restatement (Second) of Torts § 156 (2009)) (bracket and ellipses omitted).

Monetary relief cannot adequately remedy the harm caused by a non-Indian's trespass on Tribal. A non-Indian's trespass on Tribal land does not simply cause economic harm to the Tribal Nation; instead, it threatens the political integrity of the Tribal Nation, including its exercise of self-government and territorial management. *See LaRance*, 642 F.3d at 814; *cf. Ute Indian Tribe of Uintah & Ouray Res. v. Utah*, 790 F.3d 1000, 1005 (10th Cir. 2015) ("'[A]n invasion of tribal sovereignty can constitute irreparable injury.'" (citation omitted)). As such, the trespass must be enjoined. This is consistent with how courts remedy trespass on federal lands.

Federal courts "[r]outinely" order trespassers removed from federal lands. *United States v. Kahre*, No. 2:10-CV-1198-KJD-LRL, 2012 WL 2675453, at *4 (D. Nev. July 5, 2012) (citation omitted); *see also United States v. Hubbard*, No. C18-1035-LTS, 2019 WL 1768164, at *6 (N.D. Iowa Apr. 22, 2019) (collecting cases). Indeed, courts routinely suggest that the United States is entitled to an injunction removing trespassers *as a matter of law* when it has proven trespass. *See, e.g.*, *United States v. Bundy*, No. 2:12-cv-0804-LDF-GWF, 2013 WL 3463610, at *3 (D. Nev. July 9, 2013) ("Moreover, the United States is entitled to injunctive relief as a matter of law once trespass on federal lands is proven." (citation omitted)); *United States v. Nogueira*, 403 F.2d 816, 825 (9th Cir. 1968) ("The district court may not deny the United States injunctive relief or damages if trespass upon the public lands is sown." (citation omitted)). The Supreme Court has explained that enjoining trespass is proper because courts cannot force the Federal government to accept a continuing trespass on its land. *See Light v. United States*, 220 U.S. 523, 537 (1911) ("The courts cannot compel [Congress] to set aside the lands for settlement, or to suffer them to be used for agricultural or grazing purposes[.]") According to the Supreme Court, "[t]hese are rights incident to proprietorship, to say nothing of the power of the United States as a sovereign over the property belonging to it." *Id.*

20

If courts cannot compel the United States to suffer a continuing trespass on its land because of it its status as a sovereign, courts, likewise, cannot compel Tribal Nations to suffer the same harm.[6] Tribal Nations "are 'separate sovereigns pre-existing the Constitution[.]'" *Lac Courte Oreilles*, 46 F.4th at 555 (quoting *Martinez*, 436 U.S. at 56). While the scope and nature of Tribal Nations' inherent sovereignty has been somewhat circumscribed over the past two-hundred-and-fifty-years, *see id.*, their core sovereign authority to exclude non-Indians from and manage Tribal lands has not been diminished. *See Cooley*, 141 S. Ct. at 1642 (citing *Plains Com.*, 554 U.S. at 327-28).

The District Court has fundamentally undermined a core aspect of the Bad River Band's inherent sovereignty by failing to require the immediate removal of Line 5. By allowing Enbridge to continue trespassing on the Bad River Reservation and operating Line 5 for three more years, the court has sanctioned the *de facto* condemnation of Tribal land, *but see Pub. Serv. Co. of N.M. v. Barboan*, 857 F.3d 1101, 1104 (10th Cir. 2017) ("[F]ederal law does not permit condemnation of tribal land[.]"), and undermined the Bad River Band's inherent sovereign authority of "self-government and territorial

---

[6] Enbridge is trespassing on federal, *as well as* Tribal, land. The land upon which Line 5 runs through the Bad River Reservation is owned by the United States and held in trust for the benefit of the Bad River Band. *See* Doc. 38, at 47.

21

management." *Donovan*, 692 F.2d at 712; *LaRance*, 642 F.3d at 819. The District Court's decision is grossly out of step with the Bad River Band's status as a sovereign and courts' limited role in Indian affairs and policy.

Only Congress—*not* the courts—can limit the nature or extent of Tribal sovereignty. *Accord Bay Mills*, 572 U.S. at 800 ("[I]t is fundamentally Congress's job, not ours, to determine whether or how to limit tribal immunity. The special brand of sovereignty the tribes retain—both its nature and its extent—rests in the hands of Congress."); *Lac Courte Oreilles*, 46 F.4th at 557 ("Recall, though, that only *Congress* . . . may act to diminish tribal sovereignty." (citation omitted, emphasis in original)). Moreover, Congress has explicitly prohibited the use and occupation of Tribal land without permission. *See* 25 U.S.C. § 177. By refusing to issue immediate injunctive relief, the District Court has undermined the Bad River Band's inherent sovereignty, interfered with Congress's powers over Indian affairs, and condoned Enbridge's continued violation of federal law. *Cf. Grondal v. Mill Bay Members Ass'n, Inc.*, No. 2:09-CV-18-RMP, 2020 WL 4590528, at *3 (W.D. Wash. Mar. 26, 2020) ("The Court will become an instrument of injustice if it delays a resolution of this matter any longer[.]"). These results cannot stand, as they are beyond the authority of any court to impose.

To be sure, courts can grant other forms of relief when a non-Indian is found to have consciously and willfully trespassed on Tribal lands. *See United*

*States v. Torlaw Realty, Inc.*, 483 F. Supp. 2d 967, 973 (C.D. Cal. 2007)

("Remedies for trespass on Indian land under federal common law include:

ejectment and damages; accounting; and damages." (internal citations

omitted)). But the ability to grant *additional* relief does not mean that courts

can sidestep their obligation to remedy the trespass in the first place. *See*

*Computing Scale Co. v. Toledo Computing Scale Co.*, 279 F. 648, 671 (7th Cir.

1921) (stating, where "the defendant has committed repeated trespasses, and

that the defendant, unless enjoined, will continue . . . , the decree of

permanent injunction is the only adequate remedy[]"); *cf. Light*, 220 U.S. at

537 ("Even a private owner would be entitled to protection against wilful [sic]

trespass[.]"). Tribal Nations may request relief short of ejectment, but that

does not undermine their absolute right to an injunction.

Every Tribal Nation is a distinct, independent sovereign and, thus, can

pursue the types of relief it individually determines is appropriate for its

own, specific circumstances. That some Tribal Nations seek relief other than

ejectment does not mean that ejectment should not be the default remedy,

nor that other Tribal Nations do not have the absolute right to seek and

obtain that relief.

**IV.  The District Court's Inconsequential Restitution Award Incentivizes Trespassers and Undermines Tribal Nations' Sovereignty and Bargaining Power**

When Tribal Nations are entitled to monetary relief for a conscious and willful trespass, the amount must adequately reflect the profit the trespassers wrongfully gained while illegally using Tribal land and deter future trespasses. As the Bad River Band has argued, the District Court's $5.1 million restitution award allows Enbridge to keep nearly one hundred percent of the profit it wrongfully gained from its conscious and willful trespass and provides no deterrent to other wrongdoers, or Enbridge itself. *See, e.g.*, Doc. 38, at 64.

The District Court's meaningless restitution award will have disastrous and far-reaching consequences for Tribal Nations across the Country. In recent decades, Tribal Nations have been able to negotiate agreements for rights-of-ways, easements, and leases for amounts that reflect the unique status of Tribal Nations and Tribal lands. For example, in 2017, Enbridge itself renewed a twenty-five-year right-of-way with Lac Courte Oreilles Band of Lake Superior Chippewa Indians ("Lac Courte Oreilles Band") across 3.5 miles of the Lac Courte Oreilles Band's reservation. *See* Nicole Smith, *Lac Courte Oreilles and Enbridge Reach Historic Agreement*, SAWYER COUNTY RECORD, Oct. 17, 2017, https://www.apg-wi.com/sawyer_county_record/news/local/lac-courte-oreilles-and-enbridge-reach-historic-

agreement/article_b38d8d5a-b344-11e7-b803-2b3f6e53e8be.html. Pursuant to
their agreement, Enbridge will pay the Lac Courte Oreilles Band at least $60
million. *Id.*; *see also* Mike Hughlett & Brooks Johnson, *Enbridge Deal-
Making Over Line 3 Divides Ojibwe Bands in Minnesota*, STARTRIBUNE, Mar.
1, 2021, https://www.startribune.com/enbridge-deal-making-over-line-3-
divides-ojibwe-bands-in-minnesota/600028769/ (discussing agreements
between Enbridge and the Lac Courte Oreilles Band and other Tribal
Nations). The inequity of the District Court's restitution award is
underscored by the fact that the cost of willfully trespassing on Tribal lands
for over a decade is only a fraction of what Enbridge has agreed to pay other
Tribal Nations who have voluntarily chosen to enter into rights-of-way
agreements.[7]

The District Court's paltry restitution award signals to large
corporations that the financial cost of consciously and willfully trespassing on
Tribal lands is significantly less than the cost of following the law, by either
leaving Tribal land upon the expiration of the right-of-way or by acquiring a

---

[7] To be clear, simply granting the Bad River Band monetary relief in an
amount similar to what Enbridge paid for a voluntary right-of-way would still
be inequitable, as that amount would pale in comparison to the profit
Enbridge has gained from its trespass on the Bad River Reservation. *Amici
Curiae* compare the negligible amount of the District Court's monetary relief
to the value of Enbridge's voluntary right-of-way agreement only to further
illustrate how unconscionably small the District Court's restitution award is.

new easement or right-of-way. If the award is left to stand, corporations will be financially incentivized to continuously trespass on Tribal land at the expense of Tribal sovereignty, while simply paying nominal restitution awards as 'the cost of doing business.'

The District Court's award also undercuts the bargaining power Tribal Nations possess when negotiating rights-of-ways, easements, or leases on Tribal land, and when negotiating with trespassers to seek non-litigation-based remedies. *Cf. Hall v. Tesoro High Plains Pipeline Co., LLC*, 478 F. Supp. 3d 834, 837 (D.N.D. 2020) (describing settlement between pipeline company and Tribal Nation of $53.8 million for trespass on Tribal land). If the court-ordered remedy for trespass is a forced right-of-way or easement at a bargain rate, Tribal Nations will be "discouraged from entering into financially beneficial leases with nonmembers for fear of losing control over tribal land." *LaRance*, 642 F.3d at 819.

Moreover, the negligible amount of monetary relief granted by the District Court discourages Tribal Nations from bringing lawsuits to eject trespassers. Even if the Tribal Nation succeeds in ejecting the trespasser, considering the high cost and length of litigation, such a small award may not even cover the cost of vindicating their rights. Instead of deterring *wrongdoers*, the District Court's restitution award deters *Tribal Nations* from vindicating and defending their sovereign rights and interests.

26

Adequate monetary relief is necessary to ensure that trespassers do not profit from their illegal trespass on Tribal lands and to deter future trespassers from threatening the inherent sovereign interests of Tribal Nations.

## CONCLUSION

For the foregoing reasons, the Court should affirm the District Court's holding that Enbridge is liable for conscious and willful trespass and vacate the District Court's remedies and direct the District Court to order Enbridge to cease its trespass and disgorge its profits.

RESPECTFULLY SUBMITTED this 18th day of October, 2023.

*/s/ Wesley James Furlong*
Wesley James Furlong
   *Counsel of Record*
David L. Gover
Kirsten D. Gerbatsch
NATIVE AMERICAN RIGHTS FUND

*Counsel for* Amici Curiae *31 Tribal Nations and Organizations*

## CERTIFICATE OF COMPLIANCE

1.      This document complies with the type-volume limit of Circuit Rule 29 because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), this document contains 6,129 words.

2.      This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and Circuit Rule 32(b), and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document was prepared in a proportionally spaced typeface using Microsoft Word in 13-point Century Schoolbook font.

*/s/ Wesley James Furlong*
Wesley James Furlong
NATIVE AMERICAN RIGHTS FUND

## CERTIFICATE OF SERVICE

I hereby certify that on this 18th day of October, 2023, I electronically filed this document with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit using the appellate CM/ECF. I certify that all participants in the case are registered CM/ECF users.

*/s/ Wesley James Furlong*
Wesley James Furlong
NATIVE AMERICAN RIGHTS FUND