Nos. 23-2309, 23-2467

UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

BAD RIVER BAND OF THE LAKE SUPERIOR TRIBE OF CHIPPEWA INDIANS
OF THE BAD RIVER RESERVATION,
*Plaintiff-Appellee/Cross-Appellant*,
v.

ENBRIDGE ENERGY COMPANY, INC. and ENBRIDGE ENERGY, L.P.,
*Defendants-Appellants/Cross-Appellees*.

ENBRIDGE ENERGY COMPANY, INC. and ENBRIDGE ENERGY, L.P.,
*Counter-Plaintiffs, Appellants/Cross-Appellees*,
v.

BAD RIVER BAND OF THE LAKE SUPERIOR TRIBE OF CHIPPEWA INDIANS
OF THE BAD RIVER RESERVATION and NAOMI TILLISON,
*Counter-Defendants, Appellees/Cross-Appellants*.

Appeal from U.S. District Court for the Western District of Wisconsin
No. 3:19-CV-602-wmc (Hon. William M. Conley)

## BRIEF OF THE UNITED STATES AS
## AMICUS CURIAE SUPPORTING PARTIAL REVERSAL

BRIAN BOYNTON
*Principal Deputy Assistant*
*Attorney General*
SHARON SWINGLE
LEWIS S. YELIN
*Attorneys*
Appellate Staff, Civil Division
U.S. Department of Justice
950 Pennsylvania Ave., NW
Washington, D.C. 20530
(202) 514-3425
lewis.yelin@usdoj.gov

TODD KIM
*Assistant Attorney General*
AMBER BLAHA
*Attorney*
Environment and Natural Resources Div.
U.S. Department of Justice
Post Office Box 7415
Washington, D.C. 20044
(202) 598-5568
amber.blaha@usdoj.gov

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .......................................................................ii

INTERESTS OF THE UNITED STATES ................................................ 1

STATEMENT OF THE ISSUES ................................................................ 9

ARGUMENT ........................................................................................... 10

I.    Enbridge is liable for trespass. ....................................... 10

    A.    Federal law requires that Enbridge obtain a right-of-way from Interior to remain on the Band's lands. ..................................................... 10

    B.    Enbridge's expired rights-of-way do not remain in effect by operation of 5 U.S.C. § 558(c). .............................. 12

    C.    The 1992 agreement cannot give Enbridge the legal right to occupy the Band's lands. ................................ 16

II.    This Court should remand the case to the district court for it to reconsider and reweigh the equities and the public interest. ............................................................... 22

III.    The district court erred in its calculation of the disgorgement of Enbridge's avoided costs. .................................... 40

IV.    The Pipeline Safety Act displaces the Band's common law nuisance claim seeking equitable relief. ................................ 47

CONCLUSION ....................................................................................... 59

CERTIFICATE OF COMPLIANCE ......................................................... 1

# TABLE OF AUTHORITIES

## Cases

*Aid for Women v. Foulston,*
441 F.3d 1101 (10th Cir. 2006)............................................32

*Altheimer & Gray v. Sioux Mfg. Corp.,*
983 F.2d 803 (7th Cir. 1993)...............................................17

*American Elec. Power Co. v. Connecticut,*
564 U.S. 410 (2011)......................................50, 51, 52, 53, 54

*Bankers Life & Cas. Co. v. Callaway,*
530 F.2d 625 (5th Cir. 1976)..............................................13

*Bennett County, S.D. v. United States,*
394 F.2d 8 (8th Cir. 1968)................................................19

*Biden v. Texas,*
597 U.S. 785, 805-806 (2022).............................................30

*Chelentis v. Luckenbach S.S. Co.,*
247 U.S. 372 (1918)....................................................33-34

*Chemehuevi Indian Tribe v. Jewell,*
767 F.3d 900 (9th Cir. 2014).........................................11, 20

*City of Sherrill, N.Y. v. Oneida Indian Nation of New York,*
544 U.S. 197 (2005)...................................................34, 35

*Davilla v. Enable Midstream Partners L.P.,*
913 F.3d 959 (10th Cir. 2019).........................12, 19, 20, 21

*eBay Inc. v. MercExchange, L.L.C.,*
547 U.S. 388 (2006)...................................................34, 35

*Fed. Power Comm'n v. Tuscarora Indian Nation,*
362 U.S. 99 (1960).........................................................19

*Geier v. American Honda Motor Co.*,
    529 U.S. 861 (2000) ...............................................................56

*Hecht Co. v. Bowles*,
    321 U.S. 321 (1944) ...............................................................37

*Janigan v. Taylor*,
    344 F.2d 781 (1st Cir. 1965) .............................................45-46

*Kamen v. Kemper Fin. Services, Inc.*,
    500 U.S. 90 (1991) .................................................................19

*Kansas v. Nebraska*,
    574 U.S. 445 (2015) .........................................................44, 45

*Kay v. F.C.C.*,
    525 F.3d 1277 (D.C. Cir. 2008) ............................................13

*Lac Courte Oreilles Band of Lake Superior Chippewa Indians of
    Wisconsin v. Evers*,
    46 F.4th 552 (7th Cir. 2022) .................................................31

*Lewis v. Lewis & Clark Marine, Inc.*,
    531 U.S. 438 (2001) .........................................................22, 33

*Liebhart v. SPX Corp.*,
    998 F.3d 772 (7th Cir. 2021) ...........................................23-24

*Medellin v. Texas*,
    552 U.S. 491 (2008) ...............................................................30

*Merrion v. Jicarilla Apache Tribe*,
    455 U.S. 130 (1982) ...............................................................31

*Metzger v. Acting Deputy Sec'y-Indian Affairs*,
    13 IBIA 314 (1985) ................................................................14

*Michigan v. U.S. Army Corps of Engineers*,
    667 F.3d 765 (7th Cir. 2011) .............................................. 53

*Mountain States Tel. & Tel. Co. v. Pueblo of Santa Ana*,
    472 U.S. 237 (1985) .......................................................... 18

*Northern Cheyenne Tribe v. Hodel*,
    851 F.2d 1152 (9th Cir. 1988) ............................................ 32

*Oneida Cnty., N.Y. v. Oneida Indian Nation of New York State*,
    470 U.S. 226 (1985) ..................................................... 40, 41

*Oneida Indian Nation of N.Y. State v. Oneida Cnty., N.Y.*,
    414 U.S. 661 (1974) .......................................................... 18

*Oneida Tribe of Indians of Wis. v. Village of Hobart, Wis.*,
    732 F.3d 837 (7th Cir. 2013) ................................................ 7

*Pearson v. Target Corp.*,
    968 F.3d 827 (7th Cir. 2020) .............................................. 46

*Porter v. Warner Holding Co.*,
    328 U.S. 395 (1946) ..................................................... 34, 35

*Randall v. Loftsgaarden*,
    478 U.S. 647 (1986) .......................................................... 45

*Shoshone Indian Tribe of Wind River Rsrv. v. United States*,
    672 F.3d 1021 (Fed. Cir. 2012) .......................................... 20

*Shoshone Tribe of Indians of Wind River Rsrv. v. United States*,
    299 U.S. 476 (1937) .......................................................... 31

*Sprietsma v. Mercury Marine, a Div. of Brunswick Corp.*,
    537 U.S. 51 (2002) ............................................................ 58

*Swinomish Indian Tribal Cmty. v. BNSF Ry. Co.*,
    951 F.3d 1142 (9th Cir. 2020) ............................................ 12

*Taggart v. Lorenzen,*
    139 S. Ct. 1795 (2019) ........................................................ 38

*United States v. Boylan,*
    265 F. 165 (2d Cir. 1920) ................................................ 35-36

*United States v. Candelaria,*
    271 U.S. 432 (1926) ............................................................ 19

*United States v. Kimbell Foods, Inc.,*
    440 U.S. 715 (1979) ............................................................ 19

*United States v. Locke,*
    529 U.S. 89 (2000) .......................................................... 57-58

*United States v. Milner,*
    583 F.3d 1174 (9th Cir. 2009) ............................................ 11

*United States v. Oakland Cannabis Buyers' Co-op.,*
    532 U.S. 483 (2001) ...................................................... 34, 37

*United States v. Osage Wind, LLC,*
    No. 14-704, 2023 WL 8813867 (N.D. Okla. Dec. 20, 2023) ................. 35

*United States v. Santa Fe Pac. Ry. Co.,*
    314 U.S. 339 (1941) ...................................................... 18, 40

*United States v. Southern Pac. Transp. Co.,*
    543 F.2d 676 (9th Cir. 1976) .............................................. 20

*Washington v. Washington State Com. Passenger
    Fishing Vessel Ass'n,*
    443 U.S. 658 (1979) ............................................................ 34

*Weinberger v. Romero-Barcelo,*
    456 U.S. 305 (1982) ....................................................... 7, 28

*Williams Elec. Games, Inc. v. Garrity,*
    366 F.3d 569 (7th Cir. 2004) .............................................. 44

*Wisconsin Winnebago Bus. Comm. v. Koberstein*,
762 F.2d 613 (7th Cir. 1985) .................................................. 17

**Statutes**

5 U.S.C. § 558(c) .............................................. 12, 13, 14, 15, 16

Indian Non-Intercourse Act, 25 U.S.C. § 177 ....................... 11, 18, 32, 37

25 U.S.C. § 81 (1988) ................................................ 17, 22

25 U.S.C. §§ 323-328 .......................................................... 4

§ 321 ............................................................ 11 17, 19

§ 323 .............................................................. 11, 19

§ 324 ............................................................. 4, 12, 13

25 U.S.C. § 415 .............................................................. 14

33 U.S.C. § 2718(a)(1) ...................................................... 57

49 U.S.C. § 106(f)(1) ....................................................... 48

Pipeline Safety Act, 49 U.S.C. § 60101 *et seq.* .......................... 3, 47

§ 60102(a)(2) ............................................................ 48

§ 60102(b)(1)(B) ..................................................... 48, 54

§ 60104(c) ............................................................... 49

§ 60106(b)(1) ............................................................ 49

§ 60108(a)(2) ............................................................ 59

§ 60112 .............................................................. 49, 54

§ 60117(m)(1) ................................................................ 48

§ 60118(b) ............................................................. 48, 59

§ 60120(a)(1) ................................................................ 49

§ 60120(c) ....................................................................... 56

§ 60121(a)(1) ........................................................... 49, 55

**Regulations**

25 C.F.R. Pt. 162 ......................................................... 14

25 C.F.R. Pt. 169 ....................................... 4, 11, 12, 17

§ 169.3 ............................................................... 13-14, 21

§ 169.7 ........................................................................... 14

§ 169.19 ......................................................................... 14

§ 169.107 ....................................................................... 21

33 C.F.R. Pt. 325, App. B, para. 7 ............................. 39

49 C.F.R. § 1.97 .......................................................... 48

49 C.F.R. Pt. 192 ......................................................... 48

49 C.F.R. Pt. 195 ......................................................... 48

§ 195.401 ....................................................................... 54

§ 195.402 ....................................................................... 59

§ 195.452 ....................................................................... 55

84 Fed. Reg. 18,919 (May 2, 2019) ............................ 55

87 Fed. Reg. 33,576 (June 2, 2022) ..........................................................55

## Other Authorities

Agreement Between the United States and Canada
    Concerning Transit Pipelines,
    28 U.S.T. 7449 (1977) ..................................... 1, 8, 23, 25, 28, 29, 30, 33

Restatement (Third) of Restitution and
    Unjust Enrichment (2011) .................................................. 40, 41, 43, 45

S. Rep. 90-733 (Nov. 7, 1967) .................................................................57

Treaty with the Chippewa,
    10 Stat. 1109 (Sept. 30, 1854) .............................................. 7, 31, 33, 37

Wisconsin Department of Natural Resources, *Enbridge Pipeline
    Projects in Wisconsin*,
    https://dnr.wisconsin.gov/topic/EIA/Enbridge.html ...........................39

## INTERESTS OF THE UNITED STATES

The United States files this brief in response to the Court's invitation "to address the effect of the Agreement Between the United States and Canada Concerning Transit Pipelines, 28 U.S.T. 7449 (1977) [("Transit Pipeline Treaty")], and any other issues that the United States believes to be material." Order (Dec. 12, 2023). This appeal, involving a company's operation of an international pipeline in trespass on tribal lands, implicates multiple, significant interests of the United States.

First, the United States has a trust relationship with the Bad River Band of the Lake Superior Tribe of Chippewa Indians of the Bad River Reservation ("Bad River Band" or "Band") and its members. An 1854 treaty between the United States and the Chippewas of Lake Superior (including the Band) established the Bad River Reservation. The United States has an obligation to honor the rights the Band secured through its treaties with the United States and an interest in its relationship with the Band. In addition, the United States holds title in trust for the Band to the parcels (or interests in parcels) of land on the Band's Reservation that are at issue in this appeal. More generally,

the United States holds fee title to over 60 million acres in trust for Indian Tribes and individual Indians, and federal law governs interests in Indian lands, including access to and use of such lands. Pursuant to statute, the Department of the Interior ("Interior") administers rights-of-way and other forms of access to Indian lands, and the Department of Justice may bring suit in federal court to enforce Indian property rights. The United States has a strong interest in the application of law to protect trust lands from trespass and to provide remedies that appropriately deter and compensate for holdover trespasses on Indian lands.

Second, as the Court's order indicates, Line 5, the pipeline at issue in this appeal, implicates an international agreement between the United States and Canada. The United States has a strong interest in complying with its obligations under that treaty as well. Accordingly, the United States also has a strong interest in ensuring that courts properly consider whether injunctive orders affecting the operation of Line 5 may risk exposing the United States to claims that it has violated its obligations under the Transit Pipeline Treaty and that seek potentially substantial monetary damages, and may affect the United

States' trade and diplomatic relations with Canada—in addition to considering the implications of the Band's treaty rights.

Third, in the Pipeline Safety Act, 49 U.S.C. § 60101 *et seq.*, Congress directed the Department of Transportation ("DOT") to adopt and enforce nationwide safety standards for pipeline transportation and facilities, including standards to prevent and mitigate potential environmental damage pipeline operators may cause. The comprehensive nature of the statute and its express preemption of state law demonstrate Congress's intent that a uniform set of safety standards govern pipeline operations. Legislation that delegates responsibility for promulgating specific standards to an expert agency displaces federal common law that might otherwise apply in a suit involving regulated conduct. The United States therefore has a significant interest in ensuring that the uniform scheme that Congress contemplated is not undermined by a court's application of federal common law, which may impose standards different from those adopted by the expert agency.

Finally, the United States has an interest in the adequacy and reliability of the Nation's energy supply.

## INTRODUCTION

Enbridge Energy Company and its subsidiaries ("Enbridge") operate Line 5, a pipeline that moves millions of gallons of crude oil and natural gas liquids each day between Superior, Wisconsin and Sarnia, Ontario. Approximately 12 miles of Line 5 crosses the Reservation of the Bad River Band in northern Wisconsin. Within the pipeline corridor on the Reservation, some parcels of land are owned by the Band, by individual members, or by the Band along with individual members, and are held in trust by the United States; the remaining lands are held in fee, either by non-Indians or Indians. Line 5 was constructed along rights-of-way originally obtained in the 1950s for construction and maintenance of an underground pipeline. Those rights-of-way were renewed at various times over the succeeding decades.

Under federal law, rights-of-way over Indian trust lands may be obtained only from Interior. *See* 25 U.S.C. §§ 323-328; 25 C.F.R. Pt. 169 (2013). Tribal consent is required for any right-of-way over tribal lands. 25 U.S.C. § 324. When Line 5 rights-of-way were again to expire, in 1993, Interior, with the consent of the Band, issued a right-of-way to Enbridge totaling 2.8 miles over parcels that were then owned entirely

by the Band and held in trust by the United States. That right-of-way was for a period of 50 years, is still in effect, and is not directly implicated in this appeal.

Also in 1993, the United States issued rights-of-way to Enbridge for a 20-year period over 15 parcels of land that originally had been allotted to tribal members and were then owned in fractional share by individual heirs of those allottees. (The Band apparently held fractional interests in three of these parcels at the time but was not involved in the negotiations.) Those rights-of-way were issued with the consent of the requisite percentage of owners and comprise about 2.33 miles of pipeline. The rights-of-way included a provision under which Enbridge agreed to "remove all materials, equipment and associated installations within six months of termination," and "to restore the land to its prior condition." BA32.

After those rights-of-way were issued, the Band obtained partial or full ownership interests in 12 of these parcels. The rights-of-way over those parcels expired in 2013. The Band, as partial or complete owner of those parcels, did not and does not consent to the renewal of the rights-of-way over them. After allowing Enbridge seven years to try to obtain

the required tribal consent and complete its applications for renewal of the rights-of-way, Interior denied Enbridge's applications in 2020. Enbridge thus lacks the rights-of-way required by federal law for its pipeline to traverse these parcels of tribal trust lands. Enbridge has been fully aware of this fact since the easements expired in 2013 but continues to operate the pipeline on those parcels.

In the meantime, the Band brought this action in 2019 seeking, inter alia, a determination that Enbridge is in trespass on the 12 parcels and seeking an injunction requiring Enbridge to cease operation and remove the pipeline on these parcels. As the district court correctly found, Enbridge is consciously trespassing on tribal land.

Devising the appropriate remedy for this trespass in this case is not a simple matter. Some measure of damages or other monetary relief is ordinarily appropriate for past trespass. And here, the Band requested a permanent injunction requiring Enbridge to cease operation of the pipeline on its lands and to safely decommission and remove it. Under principles of equity, a court considering permanent injunctive relief must evaluate whether plaintiff has shown irreparable injury, lack of a remedy at law, and that the balance of hardships and the

public interest weigh in favor of a permanent injunction. *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 311-13 (1982).

A number of equitable considerations weigh in the Band's favor. In particular, the Band's Reservation was set aside by a treaty with the United States, and the Band's sovereign, property, and treaty rights include the power to exclude or place conditions on Enbridge's continued presence on tribal lands within the Reservation. *See* Treaty with the Chippewa, 10 Stat. 1109 (Sept. 30, 1854). Federal trusteeship of the lands in question underscores that those lands are both "inalienable without federal authorization" and subject to the Band's sovereign authority. *E.g.*, *Oneida Tribe of Indians of Wis. v. Village of Hobart, Wis.*, 732 F.3d 837, 839 (7th Cir. 2013). And Congress has made clear through statutes such as the Indian Non-Intercourse Act and the Indian Right-of-Way Act that the interests of Indians in their lands may not be conveyed except as expressly authorized by Congress. Put simply, the Band's sovereign interests in these lands are protected by federal law and that fact should carry dispositive weight in most cases of trespass.

But a district court must consider all relevant equities. Here, those equities include any other relevant equities with respect to the Band, as well as the unique equities associated with the potential removal or rerouting of an active international pipeline that falls under a treaty between the United States and Canada regarding transit pipelines. *See* Transit Pipeline Treaty. The operation of that pipeline has implications for the trade and diplomatic relationship between the two countries, as well as economic and energy-supply implications.

In the view of the United States, the district court failed to adequately assess all of the public interests in crafting its injunctive relief or to adequately weigh them in light of all the circumstances and equities. Remand is appropriate for the district court to reevaluate the public interests and consider how to craft appropriate relief that takes them into account.

The intricacy of the equitable factors associated with injunctive relief in this unique case make it all the more important that the court's monetary award adequately serves the goals of restitution. The district court's extreme discounting of Enbridge's avoided costs—assessing only 0.25 percent of the amount—was not justified and should be revisited

on remand. And the total restitution award of roughly $5 million for a nearly ten-year trespass—while in the same period Enbridge earned well over $1 billion in net profit from Line 5—should be reconsidered along with other issues on remand.

Finally, in the Pipeline Safety Act, Congress directed DOT to issue regulations addressing pipeline safety, including standards to avoid environmental harms of the sort at issue in the Band's common law nuisance claim. The Pipeline Safety Act displaces this claim, and the district court erred in entertaining it.

## STATEMENT OF THE ISSUES

The United States will address the following issues in this brief:

1. Whether the district court correctly determined that Enbridge is trespassing on the Band's lands;

2. Whether the district court's weighing of the equities failed to consider important public interests associated with the Transit Pipeline Treaty, or to adequately weigh the public interests and the equities generally;

3. Whether the district court erroneously reduced the portion of the restitution award associated with Enbridge's avoided costs; and

4. Whether the district court erroneously concluded that the Pipeline Safety Act does not displace the Band's common law nuisance claim.

## ARGUMENT

## I. Enbridge is liable for trespass.

The district court correctly held that Enbridge is in trespass on the 12 parcels at issue in this suit, which are owned in whole or in part by the Band and held in trust by the United States. Enbridge's rights-of-way for these parcels expired in 2013. Since Enbridge has not obtained renewed rights-of-way, it lacks any legal right to remain on those lands and thus is in trespass. And the district court correctly rejected Enbridge's arguments that the Administrative Procedure Act or the 1992 agreement authorizes it to remain on these lands.

### A. Federal law requires that Enbridge obtain a right-of-way from Interior to remain on the Band's lands.

The Band's trespass claim is governed by federal common law, which may borrow from state law to the extent it comports with federal

policy. *See United States v. Milner*, 583 F.3d 1174, 1182 (9th Cir. 2009).

The district court relied on Wisconsin law and the Restatement

(Second) of Torts to define the elements of trespass, and the only

disputed element was whether "Enbridge lacked a legal right—express

or implied—to remain." A10.

Federal law provides the exclusive mechanism by which Enbridge

may obtain a "legal right" to remain on tribal lands: a right-of-way

issued by the Secretary of the Interior. *See* 25 U.S.C. §§ 321, 323; 25

C.F.R. Pt. 169 (2013). The Indian Non-Intercourse Act, 25 U.S.C. § 177,

broadly prohibits the conveyance of any interest in tribal lands absent

congressional consent. *See Chemehuevi Indian Tribe v. Jewell*, 767 F.3d

900, 904 (9th Cir. 2014). In the Indian Right-of-Way Act and 25 U.S.C.

§ 321, Congress provided consent for pipeline rights-of-way and gave

the Secretary of the Interior sole authority to grant access to or use of

Indian trust lands. *See* 25 U.S.C. § 323 (Secretary is "empowered to

grant rights-of-way for all purposes, subject to such conditions as he

may prescribe, over and across any lands now or hereafter held in trust

by the United States for individual Indians or Indian tribes,

communities, bands, or nations."). The statute requires tribal consent

for rights-of-way over a Tribe's lands. 25 U.S.C. § 324; *see also*

*Swinomish Indian Tribal Cmty. v. BNSF Ry. Co.,* 951 F.3d 1142, 1147

(9th Cir. 2020). Interior has promulgated regulations governing the

process of issuing rights-of-way on tribal lands, and has updated these

regulations several times, most recently in 2015. 25 C.F.R. Pt. 169.

Enbridge must follow the requirements of the Indian Right-of-Way

Act and implementing regulations to obtain a legal right to keep its

pipeline on the Band's land—it must secure a right-of-way from

Interior. *See Davilla v. Enable Midstream Partners L.P.*, 913 F.3d 959,

967 (10th Cir. 2019). It is undisputed that Enbridge has not done so; it

thus lacks the legal right to remain on the Band's lands.

### B. Enbridge's expired rights-of-way do not remain in effect by operation of 5 U.S.C. § 558(c).

Enbridge asserts that its long-expired rights-of-way remain in

effect by operation of 5 U.S.C. § 558(c). Enbridge Opening Brief (Enb.

Op. Br.) 29. The district court correctly rejected this argument. Section

558(c) instructs agencies to "set and complete proceedings" and "make

its decision" on license proceedings "within a reasonable time." 5 U.S.C.

§ 558(c). It provides:

> When the licensee has made timely and sufficient
> application for a renewal or a new license in accordance with
> agency rules, a license with reference to an activity of a
> continuing nature does not expire until the application has
> been finally determined by the agency.

*Id.* Section 558(c) thus protects the interests of license holders when a

timely and sufficient renewal application has been submitted but not

acted on due to agency delay. *See, e.g.*, *Kay v. F.C.C.*, 525 F.3d 1277,

1279 (D.C. Cir. 2008) ("[Section 558(c)] prevents the unfairness that

would result if agency delay caused a licensee to lose a license despite

having filed a timely renewal application."); *Bankers Life & Cas. Co. v.*

*Callaway*, 530 F.2d 625, 634 (5th Cir. 1976) ("[T]he kind of case that

[§ 558(c)] was meant to cover was that in which time exigencies within

the agency prevent it from passing on a renewal application.").

Although Enbridge's administrative appeal of the denial of its

right-of-way application remains pending, Enbridge cannot benefit from

Section 558(c). Enbridge's right-of-way application was not sufficient, as

it was missing critical elements. No right-of-way could be issued

without proof of tribal consent and the payment of compensation, and

Enbridge provided neither. *See* 25 U.S.C. § 324; 25 C.F.R. § 169.3

(2013)[1] (requiring "the prior written consent of the tribe"); *id.* § 169.19 (renewal application requires "the consent required by § 169.3"). Nor is this a situation where the agency is the cause of the delay; to the contrary, Enbridge has repeatedly sought more time to pursue the required consents and complete its applications, and it objected to any imposition of deadlines on that process. SA27-29 (describing history of applications); SA38-39 (describing Bureau of Indian Affairs official's conclusion that "the amount of time allowed to [Enbridge] to obtain landowner consents has been more than reasonable in our judgment").

Enbridge suggests there is an implied distinction between an application's procedural requirements and its "substantive adequacy," and that only the former matters for triggering Section 558(c).[2] Enb.

_____

[1] Enbridge's right-of-way applications were filed in March 2013, and are governed by the regulation in effect at that time. *See* 25 C.F.R. § 169.7(b) (2024).

[2] Enbridge points to a 1985 decision of the Interior Board of Indian Appeals ("IBIA"), *Metzger v. Acting Deputy Sec'y-Indian Affairs*, 13 IBIA 314 (1985), in support of its argument that landowner consent is not required for an application to be deemed "sufficient" under Section 558(c). But that case concerned grazing leases, which are governed by a different statute, regulations, and application process from that governing pipeline rights-of-way. *See* 25 U.S.C. § 415; 25 C.F.R. Pt. 162. The decision thus has no bearing on what constitutes a sufficient application for a right-of-way renewal. In any event, none of the parties

Op. Br. 30. Even if that were true, Enbridge did not meet the procedural requirements: the application form states that the "Required Supporting Documents" include "Written consent of landowner (ROW Form 94-7)" as well as the "Deposit of estimated damages or compensation." BA45. Consistent with this understanding, Interior's November 5, 2020 denial of Enbridge's applications explained that the applications "remain incomplete." BA39; *see also* SA28 (describing February 19, 2020 communication from Interior to Enbridge stating that the applications remained incomplete). There is also no dispute that Enbridge's application is substantively inadequate, as Interior could not issue a right-of-way renewal without written tribal consent. However denominated, Enbridge's application was deficient.

Section 558(c) does not authorize a right-of-way applicant to submit an inadequate renewal application and then claim that its expired rights-of-way must remain in place while it pursues the tribal consents required by law or while it administratively appeals the agency's denial of the incomplete application. The district court

in *Metzger* appear to have disputed that the lessor's applications were "sufficient," and the IBIA thus did not address that issue.

correctly found that Enbridge's rights-of-way are not extended by operation of 5 U.S.C. § 558(c).

### C. The 1992 agreement cannot give Enbridge the legal right to occupy the Band's lands.

In defending against the Band's trespass claim, Enbridge asserts that a 1992 agreement expressly or impliedly gives Enbridge the legal right to occupy the Band's lands. Enb. Op. Br. 18-19. In that 1992 agreement, the Band memorialized its consent and approval for a 50-year easement on parcels that the Band owned and that are not the subject of the Band's trespass claim. SA1-6. Enbridge relies on Wisconsin law to find an implied duty of good faith and fair dealing in that agreement, and Enbridge asserts that the Band expressly committed to do whatever it can reasonably do to ensure that Enbridge's objectives are met, including actions beyond the scope of the agreement itself. Enb. Op. Br. 19-20.

The United States expresses no opinion about the interpretation of the 1992 agreement under Wisconsin law. But even if Enbridge's assertions about the meaning of the 1992 agreement are accepted as true, the agreement cannot grant Enbridge a legal right or interest in tribal lands and thus cannot defeat the Band's federal-common-law

trespass claim. As described above, federal law provides the exclusive means by which Enbridge can obtain the right to occupy the Band's lands—a right-of-way issued by Interior. *See* 25 U.S.C. § 321; 25 C.F.R. Pt. 169. A contract with the Band, to which Interior is not a party, does not suffice.[3] The district court correctly concluded that reading the agreement to prohibit the Band from withholding consent "would be effectively renewing these easements without [Bureau of Indian Affairs ("BIA")] approval." A23. Indeed, it was unnecessary for the district court—and is unnecessary for this Court—to evaluate whether the 1992 agreement provided the Band's consent to the rights-of-way at issue here under various contract or common-law theories. As a matter of

---

[3] Any contract concerning Indian lands would have needed to be approved by the Secretary of the Interior. *See* 25 U.S.C. § 81 (1988) (prohibiting and rendering void agreements with Indian Tribes "in consideration of services for said Indians relative to their lands" absent Secretarial approval); *Altheimer & Gray v. Sioux Mfg. Corp.*, 983 F.2d 803, 805-08 (7th Cir. 1993) (stating that the statute "requires contracts concerning Indian lands to be approved by the Secretary of the Interior" and governs "transactions relative to Indian land for which Congress has not passed a specific statute" (quoting *Wisconsin Winnebago Bus. Comm. v. Koberstein*, 762 F.2d 613, 619 (7th Cir. 1985))). Although the 1992 agreement was submitted to Interior with the documents for the 50-year right-of-way, there is no evidence that Interior approved the 1992 agreement or understood it to have any effect beyond the wholly owned parcels subject to the 50-year easement.

17

law, the 1992 agreement cannot grant Enbridge the legal right to occupy the Band's lands.

Since the earliest years of our Nation, federal law has required the consent of the United States to actions conferring an interest in Indian lands. This requirement was first codified in 1790 in the Indian Non-Intercourse Act:

> [n]o purchase, grant, lease, or other conveyance of lands, or of any title or claim thereto, from any Indian nation or tribe of Indians, shall be of any validity in law or equity, unless the same be made by treaty or convention entered into pursuant to the Constitution.

25 U.S.C. § 177. The Indian Non-Intercourse Act strictly prohibits the disposition of Indian lands and interests, including easements and rights-of-way, without federal authorization. 25 U.S.C. § 177; *see, e.g.*, *Mountain States Tel. & Tel. Co. v. Pueblo of Santa Ana*, 472 U.S. 237, 247 (1985) (stating that conveyance of right-of-way over tribal land without federal consent would have been invalid under Non-Intercourse Act); *Oneida Indian Nation of N.Y. State v. Oneida Cnty., N.Y.*, 414 U.S. 661, 678 (1974) ("[T]he extinguishment of Indian title required the consent of the United States."); *United States v. Santa Fe Pac. Ry. Co.*, 314 U.S. 339, 348 (1941). A Tribe may not dispose of trust land, or any

interests in that land, except as permitted by federal law. *E.g.*, *Fed. Power Comm'n v. Tuscarora Indian Nation*, 362 U.S. 99, 119 (1960); *United States v. Candelaria*, 271 U.S. 432, 563 (1926); *Bennett County, S.D. v. United States,* 394 F.2d 8, 11 (8th Cir. 1968).

Congress has provided a mechanism for obtaining federal approval for a pipeline to traverse tribal lands—a right-of-way issued by Interior. *See* 25 U.S.C. §§ 321, 323; *supra* pp. 11-12. It is undisputed that Enbridge has not obtained new rights-of-way. Without this federal permission, the Band's alleged consent or agreement to provide future consent to the rights-of-way in the 1992 agreement has no legal force.

State common-law principles that could support Enbridge's contract claim are not incorporated into federal common law unless they are consistent with federal law and would not "frustrate specific objectives of the federal programs." *Kamen v. Kemper Fin. Services, Inc.*, 500 U.S. 90, 98 (1991) (quoting *United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 728 (1979)). Federal law, embodied in the Indian Non-Intercourse Act and the Indian Right-of-Way Act, prohibits the alienation of Indian lands without congressional consent, including by contracts or other agreements. *See, e.g.*, *Davilla*, 913 F.3d at 966-67;

*Chemehuevi Indian Tribe*, 767 F.3d at 904 (collecting cases); *Shoshone Indian Tribe of Wind River Rsrv. v. United States*, 672 F.3d 1021, 1038 (Fed. Cir. 2012) (holding that leases of Indian land that did not comply with statutory requirements are void); *United States v. Southern Pac. Transp. Co.*, 543 F.2d 676, 697 (9th Cir. 1976) (holding that agreements between Tribe and railway company purporting to convey a right-of-way are invalid). Even if state common-law principles are incorporated into federal common law in some other respects, the application of those principles to find tribal consent in the 1992 agreement would contravene both the letter and the purpose of federal statutes.

The Tenth Circuit recently rejected a similar argument that an Indian landowner's consent (even if such were present here) could defeat a trespass action against a pipeline. *Davilla*, 913 F.3d at 966-67. Landowner consent could not establish the right to remain on the land because "[w]hen it comes to maintaining a pipeline over Indian allotted land ... Congress has dictated the prerequisites of a right to enter by statute." *Id.* at 967. As a result, a pipeline company "has no legal right" to occupy Indian land "unless and until it secures a right-of-way for that purpose from the Secretary of the Interior." *Id.* The same reasoning

applies here. Any legal right to remain on the Band's lands must be in the form of an Interior-issued right-of-way, not a contract with the Band. To find otherwise would "frustrate federal Indian land policy, effectively robbing Indian [Tribes] and the government of meaningful control over alienation." *Id.* at 967-68.

Enbridge glosses over the requirement to obtain the rights-of-way, asserting that nothing "stands in the way of BIA approval other than the Band's unlawful refusal to consent." Enb. Op. Br. 25. But Enbridge has no right to occupy the Band's lands until it actually obtains the rights-of-way from Interior. This is not just a rubber stamp. Interior must make its own determination that any proffered written consent of the Band meets the statutory and regulatory criteria. *See, e.g.*, 25 C.F.R. § 169.3 (2013); 25 C.F.R. § 169.107 (2013). Here, however, Enbridge agreed that it did not have the Band's consent and sought more time to negotiate with the Band. *E.g.*, SA31 (Interior decision noting there "is no dispute that [Enbridge] has not obtained the necessary landowner consents in this case" and that Enbridge asserted instead that "various circumstances hindered its obtaining of consents"). Nor has Enbridge made any argument to Interior that any

alleged consent (or agreement to provide future consent) drawn from the 1992 agreement would satisfy the requirements of the Indian Right-of-Way Act and regulations.[4] Enbridge has only advanced this argument in this litigation. As a result, that issue was not properly before Interior, and its denial of the rights-of-way application cannot be overturned by the IBIA on that basis.

The 1992 agreement cannot provide Enbridge with the legal right to occupy the Band's lands and thus cannot defeat the Band's trespass claim.

## II. This Court should remand the case to the district court for it to reconsider and reweigh the equities and the public interest.

**A.** Although the district court properly held that Enbridge is trespassing on the Band's lands, A26, the remedy the district court ordered requires reconsideration. *See Lewis v. Lewis & Clark Marine, Inc.*, 531 U.S. 438, 445 (2001) ("[T]he distinction between rights and

---

[4] If Enbridge had presented this argument to Interior, the Department might have considered factors such as whether Enbridge's assertions about the agreement providing the Band's consent or agreement to provide future consent for rights-of-way on parcels not identified in the agreement are consistent with the Indian Right-of-Way Act and 25 U.S.C. § 81 as well as the Department's trust responsibilities to the Band.

remedies is fundamental."). In determining the proper injunctive relief in this unique case, the court should fully consider the Band's treaty and sovereign rights in its lands—rights that the United States is obligated to respect. The court should also fully consider the possible consequences of an order requiring the shutdown of the pipeline, including its effect on the United States' obligations under the Transit Pipeline Treaty and the United States' diplomatic and commercial relationship with Canada. As explained below, the district court failed to fully consider all of the relevant public interests.

In its September 2022 decision, the district court granted summary judgment to the Band on its trespass claim, but it denied the Band's request for an injunction requiring Enbridge to immediately shut down Line 5. A2-3. As the district court noted, in deciding whether to enter a permanent injunction, a district court must consider whether "(1) an injunction is necessary to prevent irreparable harm; (2) remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) the balance of hardships [favors] the plaintiff [or] defendant; and (4) the public interest would not be disserved by a permanent injunction." A40 (citing *Liebhart v. SPX*

*Corp.*, 998 F.3d 772, 779 (7th Cir. 2021)). The court concluded that Enbridge's continuing interference with the Band's possession of land is an irreparable harm and that damages would not be an adequate remedy for that harm. *Id.* It also concluded that the balance of hardships between the parties themselves "weighs heavily" in favor of the Band because Enbridge's trespass is willful. *Id.* But the court determined that "genuine disputes of material fact exist regarding the fourth factor: the public interest." A41.

The district court recognized, on the one hand, that the "public interest" is "certainly" served by "protecting the Band's treaty rights, sovereignty and self-government, [and] advancing Congress's policy choices in the Nonintercourse Act's prohibition on unconsented conveyances of Tribal land." A41. But, the court continued, Enbridge had raised other "valid and significant public interest concerns." *Id.* The court noted that there were varying expert opinions on the viability of mechanisms for replacing the energy products currently carried by Line 5 and "genuine factual disputes" regarding "the impact that decommissioning the pipeline would have on energy supply and local economies." *Id.* And the court found "little question that an immediate

shutdown of the pipeline would have significant public policy implications on the trade relationship between the United States and Canada." *Id.* In particular, the court noted that Article II of the Transit Pipeline Treaty prohibits any "'public authority'" from "'institut[ing] any measures' that would impede the flow of oil" through Line 5. A42 (quoting Transit Pipeline Treaty Art. II). It also observed that Canada had recently invoked the dispute resolution provision of the treaty with respect to Line 5's operation on the Reservation. *Id.*; *see* Transit Pipeline Treaty Art. IX.

At that earlier stage, the district court thought it would be "possible to craft injunctive relief that would not interfere with the Transit Pipeline Treaty or Canada's concerns about the economic impact of an immediate shutdown." A43. The court contemplated an injunction that would "(1) require[] Enbridge to complete a reroute of the pipeline outside the Bad River Reservation within five years; (2) require[] Enbridge to pay the Band a fee for the easement in the interim; and [that] (3) would subject Enbridge to a doubling of that fee if the reroute is not completed within five years." *Id.* In the court's view, "[s]uch an injunction would balance the equities between the Band's

sovereign interests, broader economic concerns, and foreign relations."
*Id.* The court directed the parties to provide further input on the
likelihood that Enbridge could complete the rerouting within five years
and on the proper measure of rent and damages to the Band, among
other issues. *Id.*

The district court's subsequent June 2023 order directed Enbridge
to shut down Line 5 within three years. But in adopting that remedy,
the court did not specifically consider or failed to fully address the
equitable and public-interest considerations it had previously identified.
On the one hand, the court considered the Band's sovereignty in
determining that the Band was entitled to permanent injunctive relief,
but it did not specifically consider or failed to fully address the Band's
sovereign interests or the public interest in the United States'
relationship with the Band, whose land had been trespassed upon for
ten years.

On the other hand, the district court also did not consider what it
had described as the "significant public policy implications," A41, that a
shutdown order would have on the United States' trade and diplomatic
relationship with and treaty obligations to Canada or address in any

detail the consequences for energy supply in the United States and Canada. The court noted that Enbridge had obtained easements for all necessary rights-of-way for rerouting the pipeline, hired a general contractor and drafted construction schedules, spent $86 million on materials, and applied for the necessary state and federal permits. A93-94. But it observed that the Band and others, including some federal government agencies, had raised environmental concerns about Enbridge's pending permit applications for the rerouting. A94. "Considering all the evidence," the district court was skeptical that Enbridge would be able to complete a rerouting of Line 5 within the five-year period the court had previously contemplated, much less the three-year period it ultimately adopted. A123.

The district court concluded that even if Enbridge failed to replace Line 5 in that period, "the three years will at least give the public and other affected market players time to adjust to a permanent closure of Line 5." A123. But the court did not resolve the parties' disputes about the effects of the closure of the pipeline. It also did not specifically address whether its order could be considered a breach of the Transit Pipeline Treaty, or the public interest in avoiding a dispute with

Canada under the treaty. *Cf.* A111 (observing that "the Band's use of limited trespass following 60 years of lawful use of those parcels seems particularly ill-suited to resolve what are much larger public policy issues … [including the] international relations between the United States and Canada"). And the court also did not specifically address the public interests in the United States' diplomatic and trade relationship with Canada, including regarding impacts on supplies in Canada.

"In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Romero-Barcelo*, 456 U.S. at 312. The district court incompletely addressed that important consideration by failing to consider the possibility that an arbitral panel could find that its order is inconsistent with the United States' international obligations. The district court failed to consider that possibility even though Enbridge had argued that an ordered shutdown of Line 5 before rerouting is completed would put the United States in violation of its obligations under the Transit Pipeline Treaty, *see* R.655: 21-23, 35-36, and despite the court's earlier recognition that Canada had invoked the Transit Pipeline Treaty's dispute-resolution process and that there was

"little question" that a shutdown order would implicate "significant" foreign relations interests, *see* A41.

Canada's amicus brief filed in this Court contends that the district court's shutdown order is inconsistent with the requirements of the Transit Pipeline Treaty. Amicus Brief of the Government of Canada 8. Canada further asserts that a shutdown of Line 5 would have a "devastating impact" on parts of the Canadian economy if an alternative pipeline is not in operation at the time of the shutdown. *Id.* And, as noted above, *see supra* p. 25, Canada has invoked the treaty's dispute resolution provisions to address those contentions. Under the treaty, if diplomatic negotiations do not resolve the dispute, a party may seek arbitration. Transit Pipeline Treaty Art. IX(2). The arbitration panel has the authority to decide the dispute, "including appropriate remedies." *Id.* Art. IX(3). Thus, if Line 5 were shut down before a replacement pipeline is put into operation—and that shutdown were to lead to the sort of economic harm Canada describes—it is possible that the United States could be subject to arbitration in which it could have exposure for significant damages if the arbitration panel found the United States liable for breaching its treaty obligations.

The United States has a manifest interest in complying with its treaty obligations with all sovereigns—including both foreign nations and Indian Tribes—and in avoiding potential monetary liability if it is found to have breached its obligations.[5] There is also a public interest in avoiding a dispute with Canada over whether a shutdown order would violate the Transit Pipeline Treaty and in recognizing the importance of the broader diplomatic and trade relationship with Canada. *Cf. Biden v. Texas*, 597 U.S. 785, 805-806 (2022). In crafting the appropriate remedy, the district court should fully consider those important public interests.

---

[5] The parties dispute whether Article II of the Transit Pipeline Treaty is self-executing and so enforceable as domestic law. *Compare* Enb. Op. Br. 12, *with* Band River Band Opening Brief ("Band Br.") 86; *see Medellin v. Texas*, 552 U.S. 491, 505 n.2 (2008) ("What we mean by 'self-executing' is that the treaty has automatic domestic effect as federal law upon ratification."). In the view of the United States, Article II's prohibition is self-executing under traditional canons of treaty construction: it is mandatory, precise, and needs no legislation to make it operative. *See Medellin*, 552 U.S. at 505-06. However, this Court need not resolve that issue to hold that the district court erred by failing to consider the public interest in the United States' compliance with its treaty obligations (to the extent applicable) and in avoiding a dispute with Canada on that issue and potential monetary liability in the event a shutdown order were found to be a treaty breach. The public interest in complying with international obligations and avoiding a dispute over compliance and possibly significant damages exists whether or not Article II is self-executing as domestic law.

At the same time, the district court should fully consider the ongoing harm to the Band's sovereignty, treaty rights, and property rights from allowing Enbridge's trespass, which the Band has already suffered for ten years, to continue into the future—as well as the resulting implications for the relationship between the United States and the Band. Protecting the Band's sovereign land rights is itself a public interest of great importance. Those rights stem from the Band's treaty with the United States and include a "treaty right of occupancy" on the Reservation "with all its beneficial incidents," including the "power to exclude" others from the Band's lands.[6] *See* Treaty with the Chippewa, 10 Stat. 1109, Arts. 2, 11; *Merrion v. Jicarilla Apache Tribe,* 455 U.S. 130, 141, 144 (1982); *Shoshone Tribe of Indians of Wind River Rsrv. v. United States*, 299 U.S. 476, 496 (1937). Although the district court acknowledged the Band's sovereign interests to some extent in

_____

[6] In the 1854 Treaty with the Chippewa (which includes the Bad River Band), the United States agreed to "set apart and withhold from sale" the Band's Reservation "for the use of the Chippewas of Lake Superior." 10 Stat. 1109, Art. 2. Article 11 of the treaty established that the Reservation would be a permanent home for the Tribes, assuring that they "shall not be required to remove from the homes hereby set apart for them." *Id.*, Art. 11; *see also Lac Courte Oreilles Band of Lake Superior Chippewa Indians of Wisconsin v. Evers*, 46 F.4th 552, 560 (7th Cir. 2022) (describing treaty provisions).

determining that some form of injunctive relief was appropriate, A40-42, it did not specifically consider those interests in crafting the permanent injunction that it ultimately entered, A121-123.

On remand, the district court should consider both types of treaty-based public interests, and the implications for the United States' relationship with each of the sovereigns with which it has entered into a treaty. The court should then craft an order taking those interests into account and considering the equities of the parties in that light. *See Northern Cheyenne Tribe v. Hodel*, 851 F.2d 1152, 1157 (9th Cir. 1988) ("In deciding whether to issue an injunction in which public interest is affected, a district court must expressly consider the public interest on the record."); *see also Aid for Women v. Foulston*, 441 F.3d 1101, 1121 (10th Cir. 2006) ("[W]e conclude that failure to engage in a more explicit analysis of the public interest is an abuse of discretion.").

**B.** The Bad River Band has argued (Band Br. 73) that any remedy other than the immediate ejectment of Line 5 from the Band's lands would violate the Non-Intercourse Act, 25 U.S.C. § 177, which prohibits the conveyance of Indian lands except as authorized by the United States. The Band also argues (Band Br. 34, 84-88) that any injunctive

relief that does not order Enbridge's immediate expulsion is inconsistent with the 1854 Treaty with the Chippewa and that the Transit Pipeline Treaty does not alter that conclusion, as it is later in time and does not unambiguously address the Band's treaty rights. *See* Band Br. 85-86 (discussing canon that courts will not conclude that Congress abrogated Indian treaty rights absent unambiguous language having that effect).

Although the district court of course must take the statute and treaty into account in fashioning equitable relief, neither the Non-Intercourse Act nor the Treaty with the Chippewa prevents the district court from considering other equitable factors relevant to the Band's request for injunctive relief in the unique and weighty circumstances of this case, including the diplomatic and trade considerations discussed above. *See supra* pp. 28-31.

The Supreme Court has long recognized that "'[t]he distinction between rights and remedies is fundamental. A right is a well founded or acknowledged claim; a remedy is the means employed to enforce a right or redress an injury.'" *Lewis*, 531 U.S. at 445 (alteration in original) (quoting *Chelentis v. Luckenbach S.S. Co.*, 247 U.S. 372, 384

(1918)); *see also, e.g., eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 392 (2006) ("[T]he creation of a right is distinct from the provision of remedies for violations of that right."). "[W]hen district courts are properly acting as courts of equity, they have discretion" in fashioning injunctive relief, "unless a statute clearly provides otherwise." *United States v. Oakland Cannabis Buyers' Co-op.*, 532 U.S. 483, 496 (2001); *see also, e.g., Porter v. Warner Holding Co.*, 328 U.S. 395, 398 (1946). The Supreme Court has applied those principles in suits brought by Tribes seeking equitable relief. It has stated, for example, that "standards of federal Indian law and federal equity practice" apply at the remedy phase in cases involving a Tribe's cession of land to the State in violation of the Non-Intercourse Act, *City of Sherrill, N.Y. v. Oneida Indian Nation of New York*, 544 U.S. 197, 198 (2005), and it has also considered equitable factors in the enforcement of tribal treaty rights, *e.g., Washington v. Washington State Com. Passenger Fishing Vessel Ass'n*, 443 U.S. 658, 685-88 (1979) (applying equitable principles to implement treaty fishing rights).

As discussed above, *see supra* p. 31, the Band's land rights, both as a property owner and a sovereign, include the right to exclude others.

But a violation of that right does not require immediate ejectment in all circumstances without consideration of the traditional equitable factors. Neither the act nor the Treaty with the Chippewa prescribes specific remedies for violations of the rights they create, nor do they express an intent to restrict the court's equitable discretion in remedying such violations. *See Porter*, 328 U.S. at 398 ("Unless a statute in so many words, or by a necessary and inescapable inference, restricts the court's jurisdiction in equity, the full scope of that jurisdiction is to be recognized and applied."); *see also eBay*, 547 U.S. at 391 ("[A] major departure from the long tradition of equity practice should not be lightly implied.").

In most cases of trespass on Indian lands, the consideration of equitable factors should nonetheless result in immediate ejectment as the appropriate remedy. *See, e.g.*, *United States v. Osage Wind, LLC*, No. 14-704, 2023 WL 8813867 (N.D. Okla. Dec. 20, 2023); *cf. City of Sherrill*, 544 U.S. at 210 n.3 (discussing without disagreement a court decree "restoring … to possession" Indians ejected by a court order, where Indians had previously remained on the land despite conveyances (quoting *United States v. Boylan*, 265 F. 165, 173-74 (2d

Cir. 1920)). But in an extraordinary case such as this, where a transboundary pipeline governed by a treaty with a foreign government and the United States' relationship with that government are at issue, equitable considerations can and should inform a court's determination about whether certain injunctive relief should be deferred for reasons of public interest. The Non-Intercourse Act, the Treaty with the Chippewa, and sovereign tribal rights must of course also inform that consideration, but none prevents a district court from crafting a remedy based on relevant factors governing equitable relief, including comprehensive consideration of the public interests.[7]

Remand is appropriate to allow the district court to conduct a more complete analysis of the public interests here and in particular to consider the possible effects of an equitable remedy on the United States' international obligations under the Transit Pipeline Treaty (as applicable), the Band's sovereign rights, the effects of a shutdown of the

_____

[7] This is not to suggest that a court order allowing Enbridge to trespass perpetually would be justifiable. At some point, an order permitting continued trespass would be in substantial tension with the Non-Intercourse Act and Indian Right-of-Way Act, as well as the Band's treaty rights. Such an order may also be an abuse of discretion under traditional equitable standards.

Line 5 pipeline, and all other equitable considerations relevant to the crafting of appropriate injunctive relief.

**C.** We do not suggest how the district court's consideration of these issues should proceed or come out. Nor do we suggest that the district court's order should countenance Enbridge's original trespass on the Band's lands or excuse its continuance. That would compromise the public interest in protecting the Band's sovereignty, tip the balance of hardships strongly against the Band, and be in substantial tension with federal law. *E.g.*, 25 U.S.C. § 177; Treaty with the Chippewa, 10 Stat. 1109. "The essence of equity jurisdiction has been the power of the Chancellor to do equity and to mould each decree to the necessities of the particular case. Flexibility rather than rigidity has distinguished it." *Oakland Cannabis Buyers' Co-op.*, 532 U.S. at 496 (quoting *Hecht Co. v. Bowles*, 321 U.S. 321, 329 (1944)). Enbridge is in trespass on the Band's lands, has been for many years, and agreed when it initially acquired the easements that expired in 2013 to remove all equipment and installations within six months of the easements' termination. BA32. That trespass in turn has led to this suit and to the issues related to the Transit Pipeline Treaty and the United States'

relationship with Canada. Enbridge, as the former holder of rights-of-way on the parcels at issue here owes a duty to the Band and to the United States to end its trespass and resolve the issues the trespass has created.

The district court possesses broad discretion to compel Enbridge to remedy the injuries it has caused at the soonest possible date, consistent with the public interest. The court may enter orders directing Enbridge to take specific actions needed to reroute the pipeline by specific dates, violations of which may be addressed through suitable sanctions, both to "coerce the defendant into compliance" and to "compensate the complainant for losses stemming from the defendant's noncompliance."[8] *Taggart v. Lorenzen*, 139 S. Ct. 1795, 1801 (2019) (quotation marks omitted).

_____

[8] The proposed reroute requires both state and federal authorizations. Enbridge has submitted a Water Resources Application for Project Permits to the Wisconsin Department of Natural Resources ("WDNR") and U.S. Army Corps of Engineers ("Corps") for the proposed relocation project. The Corps is considering Enbridge's application for discharges of dredged or fill material into waters of the United States under Section 404 of the Clean Water Act ("CWA"), and for work under a navigable water of the United States under the Rivers and Harbors Act. This review also includes compliance with the National Environmental Policy Act ("NEPA"), National Historic Preservation Act, and Endangered Species Act. The Corps is preparing a draft combined

Nor is the district court's remedial authority limited by Enbridge's current rerouting proposal. It can order Enbridge to assess and submit possible alternatives to Enbridge's current proposal that are consistent with the public interest and that might result in quicker termination of Enbridge's trespass, even if Enbridge would find the alternatives less desirable from a business perspective than its current rerouting proposal (or the status quo). Under the circumstances, the court may require Enbridge to take all appropriate steps to undertake or facilitate any feasible alternatives to routing Line 5 across tribal land and

---

decision document, which includes a draft NEPA Environmental Assessment, CWA section 404(b)(1) analysis, and public interest review to inform a decision to issue or deny a permit to Enbridge. *See* 33 C.F.R. Pt. 325, App. B., para. 7. The Corps anticipates that the draft combined decision document will be published later this spring for public comment.

Wisconsin authorities are considering an application for a wetland fill permit and will review any requests for certification associated with federal permits under Section 401 of the CWA, among other things. In December 2021, the WDNR released a draft Environmental Impact Statement on the project and reports receiving more than 32,000 public comments on the draft. *See* https://dnr.wisconsin.gov/topic/EIA/Enbridge.html (last visited Apr. 8, 2024).

These review processes have required Enbridge to submit supplemental information in support of its applications, and they may require Enbridge to do so in the future. They may also require Enbridge to consider modifications to the project or propose alternative projects to comply with applicable laws.

appropriately anticipate that the Band will work cooperatively with Enbridge and other stakeholders, as well as regulators, to address issues that may arise in the interim. And under any order declining to order immediate ejectment of Enbridge from the Band's lands, the district court properly may order appropriate compensation for the Band for Enbridge's use of the land, which may take into account the benefit Enbridge receives from its unlawful encroachment. *See Oneida Cnty., N.Y. v. Oneida Indian Nation of New York State*, 470 U.S. 226, 235-36 (1985) ("Indians have a common-law right of action for an accounting of 'all rents, issues and profits' against trespassers on their land." (quoting *Santa Fe Pac. R. Co.*, 314 U.S. at 344)); Restatement (Third) of Restitution and Unjust Enrichment § 51(4) (2011) ("Restatement") ("[T]he unjust enrichment of a conscious wrongdoer … is the net profit attributable to the underlying wrong.").

## III. The district court erred in its calculation of the disgorgement of Enbridge's avoided costs.

The district court properly sought to require a suitable disgorgement of net profits from Enbridge associated with its trespass but erred in its calculation of that remedy. In particular, the court erroneously applied various "discount" factors to Enbridge's avoided

costs, resulting in an amount that is only 0.25 percent of those costs and leaves Enbridge with nearly all of the financial benefit from its delay of a reroute. And the court's total award of $5 million in restitution—compared with over a billion dollars in profits associated with Line 5 in the relevant time period—fails to meet restitution's goals of addressing unjust enrichment and deterring similar conduct. The Court should vacate and remand the district court's restitution award for recalculation in light of these principles.

The district court appropriately awarded the Band a profits-based remedy because Enbridge is a willful trespasser that should pay "net profit attributable to the underlying wrong." Restatement § 51(4); *see also Oneida Cnty.*, 470 U.S. at 235-36. The proper remedy for willful or intentional trespass includes "consequential gains" in the form of profits that the trespasser achieved by violating the property owner's rights. Restatement § 51(4)-(5). This can include "the avoidance of an otherwise necessary expenditure." *Id.* § 51 Cmt. e. Disgorgement of these profits and gains should ensure that the intentional trespasser does not profit from its conduct and deter similar actions in the future.

The district court's award had two components: net profits and avoided costs. For net profits, the court limited the Band's award to a percentage-based recovery of Enbridge's adjusted net income minus depreciation attributable to Line 5. A117-19. The district court calculated that Enbridge made more than $1.1 billion net income (before accounting for present value) attributable to Line 5 between 2013 and 2022. A117-118. Because Enbridge trespassed on 2.33 miles of the Band's lands, the court divided 2.33 by Line 5's total length (642 miles) to reach a 0.36 percent multiplier to apply to Line 5's adjusted net income. A117. The court further reduced that number to account for the Band's weighted average share of fractionated interests in the 2.33 miles of allotted parcels, which ranged from 58 to 76 percent. A117-18. This resulted in $3.03 million, which the court converted to present-day value, resulting in an award of $4.41 million in disgorged profits from 2013 through the second quarter of 2022. A119.

For avoided costs, the court focused on the value of effectively delaying a reroute estimated to cost $500 million. A120. The Band provided expert testimony estimating that the net present value of Enbridge's economic benefit of delaying the reroute was $296 million.

A121. Enbridge objected that this analysis was speculative but provided no alternative calculation of avoided costs. *Id.* Nonetheless, the district court, citing only a concern that using the Band's calculation "would result in disgorgement disproportionate to Enbridge's trespass on a few parcels," applied the two discount factors used in its net profits calculation: (1) 0.36 percent based on the percent of the total pipeline length in trespass; and (2) the Band's average ownership interest. The court ordered disgorgement of $740,699 for avoided costs. A121.

The district court erred in discounting the award for Enbridge's avoided costs in this way. Restitution should make a wrongdoer liable for "the net increase in [its] assets …, to the extent that this increase is attributable to the underlying wrong." Restatement § 51 Cmt. e. The increase of Enbridge's profits due to delaying the reroute is attributable to the apparent need as a realistic matter to construct a pipeline around the entire Reservation to terminate Enbridge's conscious and willful trespass on the 12 parcels at issue within the Reservation. Unlike net profits, which are based on product in the pipeline that must also traverse the other miles of pipe outside the Reservation and thus at least arguably can be attributable per mile, the costs avoided by

delaying relocation are not distributed across the entire line. Those costs should not be discounted by reference to such unrelated segments of pipeline. The discount applied by the district court almost entirely fails to "eliminate profit from wrongdoing," a primary object of restitution. *Id.* § 51(4); *see also Williams Elec. Games, Inc. v. Garrity*, 366 F.3d 569, 576 (7th Cir. 2004) ("[O]ne way to deter [deliberate torts] is to make it worthless to the tortfeasor by stripping away all his gain."). A discount to that extent is different, for example, than if the court had discounted the avoided costs by the percentage of the pipeline length crossing the 12 parcels on which Enbridge is in trespass as compared to the total length of the pipeline on the Reservation (as opposed to the entirety of Line 5).

Courts have discretion in calculating disgorgement, and something less than full disgorgement may be appropriate when the court concludes that it will nonetheless "convey[] an effective message to the breaching party that it must work hard to meet its future obligations." *Kansas v. Nebraska*, 574 U.S. 445, 465 (2015); *see also* Restatement § 51 Cmt. f (disgorgement calculation considers whether "there would be an incentive to [wrongdoing] if the defendant were

permitted to retain the profits realized in such a transaction"). But the district court made no such findings here and did not otherwise identify factors that might support a particular amount or reduction of an award as a matter of equity. The court instead discounted the award of avoided costs with little explanation. A121; *cf. Kansas*, 574 U.S. at 466 (upholding award where Special Master "took into account the appropriate considerations—weighing Nebraska's incentives, past behavior, and more recent compliance efforts—in determining the kind of signal necessary to prevent another breach"). This was error.

The award of only $740,699 for avoided costs for a ten-year trespass by Line 5 does not meet the goals of disgorgement. Enbridge retains 99.75 percent of the costs it avoided by delaying a reroute, and thus it has not been deprived of any substantial portion of its ill-gotten gains. And by discounting this component of the restitution award to a mere 0.25 percent of the actual avoided costs, the district court's award does not deter similar conduct in the future—if anything, it encourages a trespasser to delay relocation.[9]

---

[9] Enbridge asserts that an award of $300 million would be a "windfall" and makes various equitable arguments in support of the district court's avoided-costs award. Enbridge Answering Brief 28-29. But to

Nor does the restitution award as a whole meet the goals of restitution: Enbridge is required to pay $5 million for its nearly ten-year trespass, while in the same period it reaped $1.1 billion net profit from Line 5 including $296 million in avoided costs by not promptly pursuing a reroute. The total restitution award constitutes 0.47 percent of Enbridge's profits and avoided costs attributable to Line 5 as a whole, a paltry amount that permits Enbridge to profit handsomely from its trespass. *Cf. Pearson v. Target Corp.*, 968 F.3d 827, 832-32 (7th Cir. 2020) ("[I]t has long been axiomatic that no person shall profit by his own wrong." (quotation marks and citation omitted)). It also sends a troublesome message to others who may want to trespass on Indian lands that they may retain a substantial amount of their profits that are appropriately attributable to the trespass.

---

serve the goal of avoiding unjust enrichment, it is "more appropriate to give the [injured] party the benefit even of windfalls than to let the fraudulent party keep them." *Randall v. Loftsgaarden*, 478 U.S. 647, 663 (1986) (quoting *Janigan v. Taylor*, 344 F.2d 781, 786 (1st Cir. 1965)). There is no evidence that the district court considered the other equitable factors in its decision, but they could be considered, as appropriate, on remand.

The district court's calculation of the restitution award was in error. Remand is appropriate to allow the court to recalculate this award.

## IV. The Pipeline Safety Act displaces the Band's common law nuisance claim seeking equitable relief.

The district court erred in entertaining the Band's federal common law nuisance claim because the Pipeline Safety Act, 49 U.S.C. § 60101 *et seq.*, displaces any common law authority the court had to issue injunctive relief to prevent or remediate alleged environmental harms. The Band's nuisance claim asserts that due to erosion, high river flows, and local geomorphology, the operation of Line 5 around the Bad River Meander is creating a risk that Line 5 will rupture. A46. The district court sought to reduce that risk by invoking federal common law to order Enbridge to adopt a monitoring and shutdown plan. But the Pipeline Safety Act vests authority in DOT to establish standards to address environmental risks and damage caused by pipeline operators, and it creates enforcement mechanisms to require operators to mitigate the risks and harms they cause. The comprehensive nature of the statute displaces the courts' authority to address the same risks by injunction through common law public nuisance claims. A court's

consideration of such claims asserted outside the statutory framework would invite the adoption of different standards by different courts, even for the same pipeline, and would undermine Congress's purpose to establish uniform regulation and enforcement of safety and environmental matters related to pipelines.

**A.** The Pipeline Safety Act directs DOT to "prescribe minimum safety standards for pipeline transportation and for pipeline facilities."[10] 49 U.S.C. § 60102(a)(2). Those standards must be "designed to meet the need" for "safety" and for "protecting the environment." *Id.* § 60102(b)(1)(B). The statute gives DOT authority to enforce its safety standards by issuing orders "directing compliance." *Id.* § 60118(b). DOT, moreover, is authorized to address pipeline risks even in the absence of a regulatory violation. For example, if DOT determines that "a pipeline facility has a condition that poses a pipeline integrity risk to public safety, property, or the environment," it may issue a "safety order"

---

[10] The Administrator of the Pipeline and Hazardous Materials Safety Administration (PHMSA) carries out the Secretary of Transportation's responsibilities under the Pipeline Safety Act. *See* 49 U.S.C. § 106(f)(1); 49 C.F.R. § 1.97(a). PHMSA has implemented the statutory mandate by promulgating a comprehensive set of pipeline safety regulations. *See, e.g.*, 49 C.F.R. Pts. 192, 195.

requiring the operator to take action to remedy the condition. *Id.* § 60117(m)(1). And in more serious situations where DOT determines that operation of a pipeline is "hazardous to life, property, or the environment," it may issue a "corrective action" order requiring a pipeline shutdown or other action. *Id.* § 60112.

The Pipeline Safety Act includes several features aimed at ensuring uniform, nationwide regulation of interstate pipelines. The statute expressly preempts States from enacting "safety standards for interstate pipeline facilities or interstate pipeline transportation." 49 U.S.C. § 60104(c). And while DOT may enter into agreements allowing States to participate in the oversight of pipelines, it may not "delegate the enforcement of safety standards for interstate pipeline facilities." *Id.* § 60106(b)(1). The statute authorizes the Department of Justice to seek judicial enforcement of the Pipeline Safety Act or DOT's regulations and orders. *Id.* § 60120(a)(1). And the Act creates a private right of action for injunctive relief for violating DOT regulations, but a private party may bring suit only after notice is given to DOT, and such an action is foreclosed if DOT undertakes administrative proceedings or if the Department of Justice commences its own suit. *Id.* § 60121(a)(1).

Because "it is primarily the office of Congress, not the federal courts, to prescribe national policy in areas of special federal interest," the "test for whether congressional legislation excludes the declaration of federal common law is simply whether the statute speak[s] directly to [the] question at issue." *American Elec. Power Co. v. Connecticut*, 564 U.S. 410, 423-24 (2011) (quotation marks omitted; alteration in original). In *American Electric Power Co.*, the Supreme Court concluded that the Clean Air Act displaced a federal common law nuisance claim targeting carbon dioxide emissions because the statute required the Environmental Protection Agency ("EPA") to identify and establish performance standards for carbon dioxide emitters, and the statute "provides multiple avenues for enforcement," including actions by EPA or state agencies acting under authority delegated by EPA, criminal actions against violators, and private enforcement if EPA or state agencies do not act. *Id.* at 424-25; *see id.* at 426-29.

Here, the Band's nuisance claim alleges that Enbridge's operation of Line 5 near the Bad River Meander creates significant environmental risk. A46-47. That risk comes within the Pipeline Safety Act's comprehensive framework for pipeline safety regulation, which includes

protection of the environment. First, because "[l]egislative displacement of federal common law does not require the same sort of evidence of a clear and manifest [congressional] purpose demanded for preemption of state law," *American Elec. Power Co.*, 564 U.S. at 423 (quotation marks omitted; alteration in original), the statute's express preemption of the States' authority to enact safety standards for interstate pipelines is itself evidence that Congress intended to create a comprehensive, uniform approach to pipeline safety issues and so has displaced district courts' authority to enter injunctive relief concerning pipeline safety through the adjudication of federal common law claims.

Second, as with the Clean Air Act in *American Electric Power Co.*, the Pipeline Safety Act's assignment of regulatory and enforcement authority to DOT and its provision of public and private judicial enforcement of DOT standards make clear that Congress intended DOT alone to establish the standards governing pipeline safety and to provide for enforcement of those standards to the exclusion of others. That conclusion is reinforced by the statute's conditioning of the private right of action on prior notice to DOT and its foreclosure of the private right if DOT begins administrative proceedings or asks the Department

of Justice to bring suit. *See American Elec. Power Co.*, 564 U.S. at 425 (noting that the "reach of remedial provisions is important to determination whether [a] statute displaces federal common law"). The statute "provides a means to seek limits" on the operation of pipelines in an environmentally hazardous manner—"the same relief the plaintiffs seek by invoking federal common law." *Id.* at 425. Thus, this statutory scheme makes clear that Congress did not intend for courts to exercise federal common law authority to develop and apply their own standards for evaluating the safety of pipelines, which could lead to inconsistent outcomes. There is "no room for a parallel track." *Id.*

**B.** The district court held that the Pipeline Safety Act does not displace its federal common law authority to entertain the Band's nuisance claim and to issue appropriate injunctive relief because the statute does not specify such things as "how close a river can come to exposing a pipeline or what to do when a pipeline faces an imminent threat of exposure to a river." A50. Similarly, the Band argues that a statute will displace federal common law only where the statute addresses the precise relief the plaintiff seeks, such as a decree setting carbon dioxide emission levels, where the plaintiffs could have sought

those limits within the scheme established by the Clean Air Act. Band Br. 95-96. Here, the Band argues, nothing in the Pipeline Safety Act directly addresses the nuisance the Band asserts because the statute does not address things like the permissible proximity of a pipeline to a river. Band Br. 96.

The focus of the district court's holding and the Band's argument is misplaced. The question for displacement analysis is not whether Congress addressed a problem with the same specificity as the claims raised in a common-law suit. While it is not enough for a statute to "touch[] on the issue at hand," where Congress enacts a "comprehensive regulatory program supervised by an expert administrative agency"— that is, where Congress has "required [an] agency to establish a single standard to deal with the problem"—common law claims seeking to remedy the same problem are displaced. *Michigan v. U.S. Army Corps of Engineers*, 667 F.3d 765, 778-80 (7th Cir. 2011) (quotation marks and citations omitted). "The critical point is that Congress delegated to [the agency] the decision whether and how to regulate [the activity]; the delegation is what displaces federal common law." *American Elec. Power Co.*, 564 U.S. at 426.

The Pipeline Safety Act unambiguously addresses environmental safety concerns, delegates to DOT the responsibility for prescribing the applicable standards, and provides a mechanism for enforcing the standards DOT adopts. *See, e.g.*, 49 U.S.C. § 60102(b)(1)(B) (directing DOT to prescribe pipeline safety standards "designed to meet the need for … protecting the environment"); *id.* § 60112 (authorizing DOT to require corrective action when operation of a pipeline is determined to be hazardous to the environment). That is sufficient to displace courts' authority to remedy the same harm under the common law. *See American Elec. Power Co.*, 564 U.S. at 425 (rejecting argument that "federal common law is not displaced until [the agency] actually exercises its regulatory authority").

In any event, DOT has in fact issued regulations that aim to address the general areas of concern at issue here. For example, one regulation requires a pipeline operator to correct any conditions that "could adversely affect the safe operation of its pipeline system" and prohibits the operation of a pipeline when a condition "presents an immediate hazard to persons or property." 49 C.F.R. § 195.401. A separate regulation requires pipeline operators to adopt comprehensive

integrity management programs for pipelines, like Line 5, that could affect "high consequence areas." *Id.* § 195.452. And another regulation requires a pipeline operator to assess pipeline integrity based on consideration of risk conditions, including "[l]ocal environmental factors that could affect the pipeline (e.g., seismicity … subsidence, climatic)" and "geo-technical hazards." *Id.* § 195.452(e)(1)(vii)-(viii); *see also* 87 Fed. Reg. 33,576 (June 2, 2022) (PHMSA guidance on application of these regulations with respect to geological hazards, including "severe flooding, river scour, and river channel migration"); 84 Fed. Reg. 18,919 (May 2, 2019) (PHMSA guidance on application of these regulations with respect to erosion from waterways).

The Band could have brought suit under the statute's private right of action provision seeking an injunction against Enbridge's operation of Line 5 in an environmentally hazardous manner, in violation of those regulations, if it met the prerequisites to suit. 49 U.S.C. § 60121(a)(1). Because the comprehensive regulatory scheme established by the statute addresses the environmental harm the Band identifies in its public nuisance claim, the district court's common law

authority to adjudicate the Band's claim for injunctive relief is displaced.

Finally, the Band argues that the Pipeline Safety Act's saving clause preserving tort liability demonstrates Congress's intent not to displace its federal common law nuisance claim. Band Br. 93-94. The provision states that the statute "does not affect the tort liability of any person." 49 U.S.C. § 60120(c). In the Band's view, the saving clause permits it to seek equitable relief to remedy a nuisance. *See* Band Br. 93-94. But under that interpretation, the statute would preserve the district courts' authority to enter injunctive relief for any claim that could be characterized as a tort, regardless of whether such relief would impinge on DOT's exclusive role in establishing pipeline safety standards. That interpretation is mistaken. It would not make sense to understand the saving clause to implicitly preserve injunctive remedial authority that the statute otherwise would displace or preempt. *See Geier v. American Honda Motor Co.*, 529 U.S. 861, 862 (2000) ("[T]his court has repeatedly declined to give broad effect to saving clauses where doing so would upset the careful regulatory scheme established by federal law.").

Instead, the saving clause is best construed as permitting only actions for damages. The provision speaks to "tort liability" and does not address the relief that a court properly may award when it determines that an individual is liable in tort for a harm caused by some action that is governed by the Pipeline Safety Act. The legislative history suggests that Congress had a more limited purpose in mind: "to assure that compliance with standards issued under the act, per se, does not create a statutorily inspired presumption of due care in tort liability suits." S. Rep. 90-733, at 11 (Nov. 7, 1967). That is consistent with the Supreme Court's construction of similar saving clauses in statutes creating comprehensive regulatory schemes that preserve laws or standards governing "liability." For example, the Oil Pollution Act of 1990, a "comprehensive federal regulatory scheme governing oil tankers," contains a saving clause preserving States' authority to impose "'additional liability or requirements with respect'" to oil spills. *United States v. Locke*, 529 U.S. 89, 94, 104 (2000) (quoting 33 U.S.C. § 2718(a)(1)). The Court explained that "[t]he evident purpose of the saving clause[] is to preserve state laws which, rather than imposing substantive regulation of a vessel's primary conduct, establish liability

rules and financial requirements relating to oil spills." *Id.* at 105; *see also, e.g.*, *Sprietsma v. Mercury Marine, a Div. of Brunswick Corp.*, 537 U.S. 51, 64 (2002).

Had Congress intended to preserve the courts' authority to enter injunctive relief under common law standards that could be different from those established under the Pipeline Safety Act's comprehensive statutory scheme, it would not have done so in such a roundabout manner.

Although the Pipeline Safety Act displaces the district court's authority to issue the equitable relief sought by the Band with respect to its nuisance claim, the United States fully recognizes the Band's legitimate concerns underlying that claim. The erosion situation at the Bad River Meander unquestionably presents serious risks, and the Band is a sovereign nation with a compelling interest in ensuring the preservation of the environmental resources on which it relies (an interest which the United States shares). DOT has inspected Line 5 near the Meander and continues to closely monitor the pipeline's safety while remaining in communication with the Band and Enbridge. DOT regulations require pipeline operators to "prepare and follow … written

procedures for conducting normal operations and maintenance activities and handling abnormal operations and emergencies." 49 C.F.R. § 195.402(a). Enbridge's written procedures include a monitoring and shutdown plan for the Bad River Meander, and Enbridge has incorporated the revisions ordered by the district court into that plan. Enbridge is thus required to comply with those procedures even if this Court reverses the district court's judgment with respect to the Band's nuisance claim. And DOT is prepared to ensure Enbridge's compliance with those procedures or to impose more stringent requirements if needed to ensure an adequate level of safety. *See* 49 U.S.C. § 60118(b); *id.* § 60108(a)(2).

## CONCLUSION

For the foregoing reasons, this Court should affirm the district court's grant of summary judgment to the Band on liability on its trespass claim. It should reverse the portions of the district court's judgment ordering injunctive relief and calculating restitution and remand for further consideration of the appropriate relief. Finally, the Court should reverse the district court's orders granting the Band

judgment on its common law nuisance claim and denying summary

judgment to Enbridge on that claim.

Respectfully submitted,

/s/ *Lewis S. Yelin*

BRIAN BOYNTON
*Principal Deputy Assistant*
*Attorney General*

SHARON SWINGLE
LEWIS S. YELIN
*Attorneys*
Appellate Staff, Civil Division
U.S. Department of Justice
950 Pennsylvania Ave., NW
Washington, D.C. 20530
(202) 514-3425
lewis.yelin@usdoj.gov

/s/ *Amber Blaha*

TODD KIM
*Assistant Attorney General*

AMBER BLAHA
*Attorney*
Environment and Natural Resources Div.
U.S. Department of Justice
Post Office Box 7415
Washington, D.C. 20044
(202) 598-5568
amber.blaha@usdoj.gov

April 8, 2024

## CERTIFICATE OF COMPLIANCE

In accordance with Fed. R. App. P. 32(g)(1), I certify that the foregoing brief complies with the type size and typeface requirements of Fed. R. App. P. 32(a)(5), (6), and Cir. R. 32(b). This brief contains 12,086 words, excluding portions of the brief exempted by Fed. R. App. P. 32(f), as recorded by the word count of the Microsoft Word processing system used to prepare the brief. A motion for leave to file an overlength brief has been filed with the Court.

s/ Amber Blaha
Counsel for the United States