In the

# United States Court of Appeals
## For the Seventh Circuit

––––––––––––––––––

Nos. 23-2309 and 23-2467

BAD RIVER BAND OF THE LAKE SUPERIOR TRIBE OF CHIPPEWA INDIANS OF THE BAD RIVER RESERVATION,

*Plaintiff-Appellee, Cross-Appellant,*

*v.*

ENBRIDGE ENERGY COMPANY, INC. and ENBRIDGE ENERGY, L.P.,

*Defendants-Appellants, Cross-Appellees.*

––––––––––––––––––––––––––––––––––––––––––––––––––––

ENBRIDGE ENERGY COMPANY, INC. and ENBRIDGE ENERGY, L.P.,

*Counter-Plaintiffs, Appellants/Cross-Appellees,*

*v.*

BAD RIVER BAND OF THE LAKE SUPERIOR TRIBE OF CHIPPEWA INDIANS OF THE BAD RIVER RESERVATION, and NAOMI TILLISON,

*Counter-Defendants, Appellees/Cross-Appellants.*

––––––––––––––––––

Appeals from the United States District Court for
the Western District of Wisconsin.
No. 3:19-cv-00602-wmc — **William M. Conley**, *Judge.*

––––––––––––––––––

ARGUED FEBRUARY 8, 2024 — DECIDED JULY 30, 2026

———————————

Before EASTERBROOK, SCUDDER, and ST. EVE, *Circuit Judges*.

SCUDDER, *Circuit Judge*. Enbridge Energy Company, Inc. owns and operates Line 5, a pipeline carrying oil and natural gas liquids between the United States and Canada. In northern Wisconsin, the pipeline runs under 12 miles of land within the Bad River Reservation. In 2013, Enbridge's rights-of-way across certain parcels of Reservation land expired, but the company has not removed Line 5 or altered its route.

In 2019, the Bad River Band, which holds ownership interests in these parcels, sued Enbridge in federal court for trespass. The Band also brought a federal common law claim of nuisance, pointing to the risk of Line 5 rupturing (and then spilling oil) in an area where the Bad River has rapidly eroded the land supporting the pipeline. The district court found for the Band on both claims. Based on the trespass, it awarded the Band $5,151,668 in past restitution and ordered Enbridge to remove Line 5 from the affected parcels by June 2026. To abate the nuisance, the district court ordered Enbridge to adopt a proactive plan for monitoring and responding to the risk of pipeline exposure. Both parties appealed.

Do not let this summarized retelling mask the complexity of this case, or the magnitude of the interests on both sides— all of which has the ongoing attention of both the United States and Canada given the tribal, environmental, and commercial issues at stake. In the final analysis, we agree that Enbridge is trespassing. We remand, however, to the district court to refashion the remedies it imposed for this violation.

Finally, we conclude that federal statutory law has displaced the Band's nuisance claim.

## I

### A. Legal and Historical Background

We begin with the legal and historical backdrop that gives rise to the conflict before us.

"Indian tribes are 'separate sovereigns pre-existing the Constitution.'" *Lac Courte Oreilles Band of Lake Superior Chippewa Indians of Wisc. v. Evers*, 46 F.4th 552, 555 (7th Cir. 2022) (quoting *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 56 (1978)). And they retain sovereign status to this day, even as the United States has expanded across their historical territory. See *Puerto Rico v. Sanchez Valle*, 579 U.S. 59, 70 (2016). The nature of this sovereignty is qualified, however, because tribes are "'domestic dependent nations,' subject to plenary control by Congress." *Id.* (quoting *Cherokee Nation v. Georgia*, 5 Pet. 1, 17 (1831)). This plenary authority comprehends "full power to legislate concerning … tribal property." *Winton v. Amos*, 255 U.S. 373, 391 (1921); see also *Haaland v. Brackeen*, 599 U.S. 255, 275 (2023) (affirming that Congress's "well established and broad" power to legislate "with respect to Indians" encompasses "a wide range of areas, including … property").

Over time, the federal government has taken different approaches to Indian land policy. While early "tribal relations were mostly a matter for the President's Article II treatymaking powers," *Lac Courte Oreilles Band*, 46 F.4th at 556, Congress took the helm during the "Allotment Era" beginning in the late nineteenth century, see *Davilla v. Enable Midstream Partners L.P.*, 913 F.3d 959, 963 (10th Cir. 2019); see also *County of Yakima v. Confederated Tribes and Bands of Yakima Indian Nation*,

502 U.S. 251, 253–56 (1992) (describing the history of allotment). During this period, "Congress carved reservations into allotments and assigned the land parcels to tribal members," initially permitting allottees to freely alienate the land upon receiving it. *Pub. Serv. Co. of N.M. v. Barboan*, 857 F.3d 1101, 1104 (10th Cir. 2017). When this policy led to the rapid and extensive loss of Indian lands, Congress opted for a "trust-based model" in which "the United States retained legal title of allotted parcels while Indian allottees received equitable title." *Davilla*, 913 F.3d at 963.

Allotment came to an end with the passage of the Indian Reorganization Act of 1934, ch. 576, 48 Stat. 984 (codified as amended at 25 U.S.C. §§ 5101–5144). The Act "halted further allotments," "extended indefinitely the existing periods of trust" for many allotted lands, and authorized the acquisition in trust of certain lands for tribes. *Yakima*, 502 U.S. at 255. The effects of the Allotment Era are long-enduring, however, with many reservations left a "checkerboard of tribal, individual Indian, and individual non-Indian interests." *Barboan*, 857 F.3d at 1105.

Meanwhile, Congress sought to ensure that "conduits of modern commerce … could span the continent without encumbrance." *Davilla*, 913 F.3d at 964 (cleaned up). To that end, it enacted a series of "right-of-way statutes" in the first half of the twentieth century. *Id.* In two places in the U.S. Code, Congress delegated to the Secretary of the Interior the exclusive authority to grant easements for pipeline operation over Indian lands. Congress empowered the Secretary "to grant rights-of-way for all purposes, subject to such conditions as he may prescribe, over and across any lands now or hereafter held in trust by the United States for individual Indians or In-

dian tribes." 25 U.S.C. § 323. Congress also authorized the Secretary "to grant a right-of-way in the nature of an easement for the construction, operation, and maintenance of pipe lines for the conveyance of oil and gas through any Indian reservation" limited to a term of 20 years. *Id.* § 321.

With each provision, Congress subjected the Secretary's authority to the same key limitation: "No grant of a right-of-way over and across any lands belonging to a tribe … shall be made without the consent of the proper tribal officials." *Id.* § 324. For "[r]ights-of-way over and across lands of individual Indians," the Secretary generally needs the consent of a majority of the equitable interest holders. *Id.*

### B. The Parties and Line 5

The parties to this appeal inherit this legacy of history and law.

In 1854, the United States entered a treaty with several Ojibwe (anglicized to Chippewa) tribes that "set apart" land as their permanent homes. See Treaty with the Chippewa, Chippewa-U.S., arts. 2, 11, Sept. 30, 1854, 10 Stat. 1109; see also *Lac Courte Oreilles Band*, 46 F.4th at 559–60 (describing the 1854 Treaty). This 1854 Treaty created the Bad River Reservation, which spans some 125,000 acres in northern Wisconsin and abuts Lake Superior. The Reservation is home to the plaintiffs here, the Bad River Band of the Lake Superior Tribe of Chippewa Indians. The Reservation is no exception to the checkerboarding of ownership that characterizes much post-Allotment Era Indian land. This means that the United States holds some parcels of Reservation land in trust for the Band and some for individual Indians.

Running underground through 12 miles of the Reservation is Line 5, a pipeline that transports over 20 million gallons of crude oil and natural gas liquids each day from Superior, Wisconsin to Sarnia, Ontario. Enbridge Energy Company, Inc. owns Line 5, which is part of a larger network of pipelines carrying petroleum products from Western Canada to refineries in the Midwest, Ontario, and Quebec. Line 5's path through the Reservation is approximately 60 feet wide, and the 12-mile span makes up less than 2% of the pipeline's total length of 645 miles.

Where Line 5 crosses land held by the United States for the Band or individual Indians, the right-of-way statutes dictate that Enbridge needs approved easements from the Department of the Interior to operate. See 25 U.S.C. §§ 321, 323. For some time, this requirement posed no major obstacle for Enbridge or its predecessor. In 1953, when Line 5 was first constructed, Enbridge obtained from the Bureau of Indian Affairs a single 20-year easement covering all Indian lands within the Line 5 pipeline corridor across the Reservation. When that easement expired in the 1970s, the Bureau renewed it for another 20 years.

In the early 1990s, however, negotiations to renew the easement a second time became more complicated. By then, the pipeline corridor included 13 parcels held in trust by the United States for the sole beneficial ownership of the Band. We will call these the "Tribal Parcels." But this land, spanning about 2.8 miles, did not comprise the entire pipeline corridor. Line 5 also crossed 15 parcels of allotment land—interspersed between the Tribal Parcels—held in trust by the United States for the benefit of individual Indian owners with fractional ownership shares.

With the 1970s easement set to expire in June 1993, the Bureau of Indian Affairs directed Enbridge to negotiate with the Band for its consent to a renewed easement across the 13 Tribal Parcels. See 25 U.S.C. § 324; 25 C.F.R. § 169.3(a) (1992). The Bureau also indicated that it would work with Enbridge to obtain the landowner consent necessary for the allotted lands. In June 1992, Enbridge submitted multiple easement renewal applications to the Bureau: one application listing the 13 Tribal Parcels and 15 separate applications for the plots of allotment land.

Enbridge and the Band proceeded to negotiate. Six months later, in December, they signed the 1992 Agreement, a contract conferring the Band's consent to a 50-year right-of-way over the Tribal Parcels in exchange for $800,000. The Band's Tribal Council, its governing body, also passed two resolutions authorizing and supporting the 1992 Agreement. In February 1993, after reviewing this documentation, the Bureau of Indian Affairs granted Enbridge a 50-year easement to operate its pipeline over the Tribal Parcels. This right-of-way will not expire until June 2, 2043, and the issues before us do not include the Tribal Parcels.

With an easement over the Tribal Parcels secured, Enbridge turned its attention to the 15 parcels of allotment land. It negotiated directly with the Bureau of Indian Affairs, which as early as spring 1992 had communicated its intention to grant only 20-year easements over these parcels. True to its word, in May 1993, the Bureau issued 20-year easements over the 15 plots of allotted land after obtaining the consent of the requisite Indian landowners. By their terms, these easements came to an end on June 2, 2013, and obligated Enbridge to re-

move the pipeline and restore the affected lands within six months of expiration.

An important development occurred between 1993 and 2013. During that period, the Band acquired ownership interests in 11 of the 15 allotted parcels by participating in a land reacquisition program made possible by the Indian Land Consolidation Act, Pub. L. No. 97-459, 96 Stat. 2515 (1983) (codified as amended at 25 U.S.C. §§ 2201–2221). In the Consolidation Act, Congress sought to "help tribes buy back lost land" after the fractionalization wrought by allotment. *Barboan*, 857 F.3d at 1106. By 2016, the Band had at least a fractional ownership interest in 12 of the formerly allotted parcels in the pipeline corridor. We will call these 12 trust parcels in which the Band has obtained some ownership interest the "Allotted Parcels."

In 2013, then, Enbridge faced a foreseeable predicament. Its 50-year easement over the Tribal Parcels continued for another 30 years, but its rights-of-way over the Allotted Parcels were set to expire in June 2013. The predicament came from the mismatch in these expiration dates: Line 5 cannot operate on the Tribal Parcels without crossing the Allotted Parcels. Accordingly, in March 2013, Enbridge submitted renewal applications to the Bureau of Indian Affairs. These applications, however, contained no documentation showing Indian landowner consent, still a statutory prerequisite for agency approval. See 25 U.S.C. § 324; 25 C.F.R. § 169.19 (2013). And, given the Band's new ownership interests, the right-of-way statutes now compelled Enbridge to obtain tribal consent to renewed easements across the Allotted Parcels. See 25 C.F.R. § 169.3(a) (2013).

These circumstances led Enbridge and the Band to enter a multi-year negotiation for tribal consent. The Band sought detailed environmental and pipeline safety information from the company, influenced by a 2010 incident in which a different Enbridge pipeline had spilled over 1 million gallons of crude oil into a tributary of the Kalamazoo River in Michigan. While Enbridge provided information in response, the parties were unable to come to an agreement. In 2017, and again in 2019, the Band's Tribal Council issued a resolution indicating it would not consent to renewed rights-of-way across the Allotted Parcels. Enbridge, however, has not removed Line 5 from the Allotted Parcels or ceased its operation in the Bad River Reservation.

This stalemate led to litigation.

### C.  The District Court Proceedings

In 2019, the Band sued Enbridge in federal court in Wisconsin. It brought claims of trespass and unjust enrichment under federal common law based on the company's continued operation of Line 5 across the 12 Allotted Parcels. The Band also brought a federal common law claim of nuisance, focusing on the risk of pipeline rupture at a bend of the Bad River known as "the meander." Enbridge responded with several counterclaims, including a breach-of-contract claim alleging that the 1992 Agreement compels the Band to consent to renewed easements over the Allotted Parcels. Outside the courtroom, Enbridge began working on a plan to reroute Line 5 around the Bad River Reservation—a lengthy and as yet incomplete process requiring both state and federal permits.

In September 2022, the district court entered summary judgment for the Band on its trespass and unjust enrichment

claims and on Enbridge's breach-of-contract counterclaim, concluding that the company has no legal right to operate across the Allotted Parcels. The case then proceeded to a bench trial on the appropriate remedies for the trespass and the merits of the Band's nuisance claim.

In June 2023, the district court awarded the Band $5,151,668 in restitution for the past trespass and unjust enrichment and, on a forward-looking basis, ordered Enbridge to continue disgorging a portion of its profits while Line 5 remains in operation over the Allotted Parcels. The district court also issued an injunction, ordering Enbridge to cease operation of Line 5 over the Allotted Parcels by June 16, 2026—in other words, in three years from the date of its decision. The district court further found that Enbridge's continued operation of Line 5 at the Bad River meander was a public nuisance and, as part of its injunctive relief, directed Enbridge to adopt a more robust monitoring and shutdown plan.

Both parties have appealed aspects of the district court's rulings. We have also received submissions from Canada and, at our invitation, the United States. While this appeal was under advisement in our court, the district court stayed the portion of its injunction ordering a June 16, 2026, shutdown of Line 5 on the Allotted Parcels.

## II

We begin with Enbridge's challenge to the district court's entry of summary judgment in favor of the Band on its trespass claim and, by the same token, on the company's breach-of-contract claim.

We review the district court's decisions by undertaking our own independent review of the facts and the law. See *Sig-*

*nal Funding, LLC v. Sugar Felsenthal Grais & Helsinger LLP*, 136 F.4th 718, 726 (7th Cir. 2025). Summary judgment is appropriate when, construing the facts and drawing all reasonable inferences in favor of Enbridge, the Band is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(a).

### A. The Law Governing the Trespass Claim

We start by clarifying the law governing the Band's trespass claim. The Supreme Court has recognized that "Indians have a federal common-law right to sue to enforce their aboriginal land rights." *Oneida County v. Oneida Indian Nation of N.Y. State*, 470 U.S. 226, 235 (1985). Neither party disputes that this cause of action extends to the Band's suit to vindicate its ownership interest in the Allotted Parcels or that federal common law supplies the rule of decision. See *id.* at 236 ("[A]bsent federal statutory guidance, the governing rule of decision would be fashioned by the federal court in the mode of the common law." (quoting *Oneida Indian Nation of N.Y. State v. Oneida County*, 414 U.S. 661, 674 (1974))); see also *United States v. Milner*, 583 F.3d 1174, 1182 (9th Cir. 2009) ("Federal common law governs an action for trespass on Indian lands.").

This leaves us to determine the content of that federal common law. We often look to general principles of tort law, as reflected in the Restatement of Torts, to inform the content of federal common law. See *Milner*, 583 F.3d at 1182 ("[Federal common law] generally comports with the Restatement of Torts …."). At times, our fellow circuits have borrowed from state tort law for trespass claims involving Indian land. See, *e.g.*, *Davilla*, 913 F.3d at 965; *Nahno-Lopez v. Houser*, 625 F.3d 1279, 1282 (10th Cir. 2010); see also *Milner*, 583 F.3d at 1182 n.6 (acknowledging that "it may be appropriate to borrow from state law for the rule of decision").

Our decision here is made easier because Wisconsin law tracks the Restatement's definition of trespass. See *Movrich v. Lobermeier*, 905 N.W.2d 807, 813 (Wis. 2018) (referencing Restatement (Second) of Torts (A.L.I. 1965) §§ 158, 160 to explain general principles of trespass under Wisconsin law); *Grygiel v. Monches Fish & Game Club, Inc.*, 787 N.W.2d 6, 18 (Wis. 2010) (similar). Both bodies of law counsel that a person is liable for trespass who enters or remains upon land in the possession of another without the possessor's consent or another legal privilege. See Restatement (Second) of Torts §§ 158, 329; *Grygiel*, 787 N.W.2d at 18.

### B. Enbridge's Trespass on the Allotted Parcels

With this law in mind, we turn to the merits of the Band's trespass claim and Enbridge's counterclaim for breach of contract. The basic facts underlying the Band's contentions are undisputed. By their terms, Enbridge's rights-of-way over the Allotted Parcels—land in which the Band owns interests—expired on June 2, 2013. The company nonetheless continues to transport crude oil and natural gas liquids through Line 5 across the Allotted Parcels.

Enbridge does not contest that the Band's fractional ownership interests in the Allotted Parcels satisfy the possession element of a federal common law trespass action. Nor does it quibble with whether Line 5's ongoing operation across the Allotted Parcels is an entry upon the land. See Restatement (Second) of Torts § 160 (recognizing that the failure to remove a structure or other thing from the land can be a trespass).

The parties' disagreement comes on only one element of the Band's trespass claim, whether Enbridge has consent or another privilege to remain on the Allotted Parcels despite the

presumptive expiration of its easements in June 2013. The company offers two bases to conclude that it may continue legally operating Line 5 over this land: the Band's consent and the protection of 5 U.S.C. § 558(c), a provision of the Administrative Procedure Act. Neither contention persuades us.

### 1. The Band's Consent

"Consent to entry onto the land is a defense to an action for trespass." *Grygiel*, 787 N.W.2d at 18 (cleaned up); see also Restatement (Second) of Torts § 158 cmt. e (recognizing that "[c]onduct which would otherwise constitute a trespass is not a trespass if it is privileged," including privilege "deriv[ing] from the consent of the possessor"). "Consent is willingness in fact for conduct to occur," Restatement (Second) of Torts § 892, and "[t]he burden of establishing the possessor's consent is upon the person who relies upon it," *id.* § 167 cmt. c; see also *Grygiel*, 787 N.W.2d at 18.

Start with the obvious. The Band has not affirmatively provided either written or verbal consent to easements permitting Enbridge to operate Line 5 across the 12 Allotted Parcels post-June 2013. Indeed, the Band's Tribal Council formally resolved in 2017 and 2019 not to renew Enbridge's interests in the land. Presumptively, then, Enbridge is trespassing.

The company resists this conclusion, directing our attention further back in time to the 1992 Agreement in which the Band provided Enbridge a 50-year easement over the Tribal Parcels. Enbridge contends that this same 1992 Agreement obligates the Band to consent to renewed rights-of-way over the Allotted Parcels. As the company sees it, the Band's failure to agree to such easements constitutes a breach of the Band's ex-

press and implied contractual commitments and, without this breach, Enbridge would have the consent it needs to defeat the Band's trespass claim. See Restatement (Second) of Torts § 892A(1) ("One who effectively consents to conduct of another intended to invade his interests cannot recover in an action of tort for the conduct or for harm resulting from it.").

We therefore proceed to the 1992 Agreement, with another preliminary comment on choice of law. The parties again agree that "federal law" governs Enbridge's contract claim, but we see some ambiguity in this term. On the one hand, this likely refers to federal common law, which often controls when the United States—a sovereign like the Band—is a contracting party. See, *e.g.*, *United States v. Segal*, 938 F.3d 898, 904 n.3 (7th Cir. 2019). On the other hand, we do not readily apply federal common law whenever contracting parties invoke it. See *Downey v. State Farm Fire & Cas. Co.*, 266 F.3d 675, 680–81 (7th Cir. 2001) (surveying recognized grounds for applying federal common law to contracts). And Enbridge and the Band seem to agree that we can also look to Wisconsin law, perhaps recognizing that state law may supply the content of federal common law. See *Empire Healthchoice Assurance, Inc. v. McVeigh*, 547 U.S. 677, 690–92 (2006). Here again, though, we see no daylight between federal contract principles and Wisconsin law that would alter our analysis. See *First Bank & Trust v. Firstar Info. Servs., Corp.*, 276 F.3d 317, 322 (7th Cir. 2001) (canvassing principles of contract interpretation under Wisconsin law). Nor do the parties devote time to identifying differences in or disputing the relevant contracting principles.

Under either view of the governing law, our task is to ascertain whether the 1992 Agreement, by its terms, obligates the Band to consent to renewed easements for rights-of-way

permitting Line 5's operation across the Allotted Parcels. See 11 Richard A. Lord, Williston on Contracts § 32:2 (4th ed. 1999) ("[T]he cardinal principle of contract interpretation is that the intention of the parties must prevail …. [These intentions] are first and foremost[] determined by the language used in their agreement."); *First Bank*, 276 F.3d at 322 ("When interpreting an agreement [under Wisconsin law], the court's objective is to ascertain the true intentions of the parties as expressed by the contractual language." (cleaned up)).

Although a difficult question, we do not read the 1992 Agreement to reflect such a commitment by the Band. The contract's provisions address a straightforward exchange of Enbridge's funds for the Band's consent over the 13 Tribal Parcels, not the Allotted Parcels. Specifically, in Section 1, the Band agreed that:

> The Secretary [of the Interior] may grant to the Company a right of way for the construction, operation and maintenance of a pipeline for fifty (50) years within the Existing Right of Way. Said pipeline right of way shall be granted pursuant to and in accordance with the Tribal Council's Resolution Granting Pipeline Right of Way, the form of which is attached and marked Exhibit "A." The consideration and damages to be paid by the Company for such pipeline operation and right of way and associated damages is the sum of Eight Hundred Thousand Dollars ($800,000.00), which sum shall be paid as set forth herein.

Other portions of the 1992 Agreement shed light upon the meaning of this provision. The Agreement defines the "Exist-

ing Rights of Way" as "that portion of the Original Rights of Way in which the Tribe now"—meaning as of December 1992—"has a legal interest." The contract also defines "Original Rights of Way" to encompass both the tribal and "allotted lands" over which the pipeline was originally constructed in 1953. Putting these pieces together, the 1992 Agreement acknowledges the varied ownership of the swath of parcels running under the pipeline. But it then limits the Band's consent to a right-of-way over only that subset in which it had a known legal interest in 1992—the Tribal Parcels.

The Tribal Council's Resolution, attached to the 1992 Agreement as Exhibit A, reinforces this understanding. See Williston on Contracts § 30:25 (recognizing that "the parties to a contract may incorporate terms by reference to a separate, noncontemporaneous document"). The Resolution, dated just two days before the execution of the 1992 Agreement, describes how Enbridge had requested consent:

> [F]or a fifty (50) year right of way easement for a pipeline over and across any lands in which the Tribe has a legal interest within the Company's existing rights of way, all as is described more fully in the Company's Application for Right of Way dated June 10, 1992.

The Tribal Council then resolved to "consent[] to the Company's requests and Application," asking the Secretary of the Interior "to approve and grant the Application and the rights of way." Following the thread, Enbridge's Tribal Lands Application, dated June 10, 1992, attached a "Tribal Land Schedule" listing and precisely describing the 13 Tribal Parcels.

Considering these documents together, we agree with the district court's assessment that the Band's consent reflected in the 1992 Agreement began and ended with easements over the Tribal Parcels. Read this way, the Agreement obligates the Band to provide the consent needed under 25 U.S.C. § 324 for Enbridge to obtain an approved right-of-way over only specific, identified parcels of land. This the Band has done, and this easement over the Tribal Parcels continues in place through 2043.

Enbridge urges a different interpretation, focusing on language in Section 3 of the 1992 Agreement that commits the parties to action beyond the four corners of the contract:

> The Tribe and the Company will do whatever they can reasonably do to ensure that all of the objectives of the Tribe and the Company, as those objectives are expressed in this Agreement, are achieved, even if it means that one or both of the parties must do something which is not expressly described herein. One of the Company's objectives under this Agreement is to obtain from the Tribe all consents and authorizations it is possible for the Company to obtain, whether necessary or not to obtain a fifty (50) year easement for Right of Way for a pipeline over the Company's existing pipeline Right of Way in which the Tribe has an interest.

Enbridge seizes on this language to insist that its "objectives" included securing Line 5's uninterrupted operation for 50 years across the Reservation as a whole or, at a minimum, across the Tribal Parcels. Even more, Enbridge reads the last sentence to commit the Band to providing any consent or au-

thorization it might possibly give the company, whether related to the Tribal Parcels or other land in which the tribe holds an interest. Enbridge, in short, sees Section 3 as requiring the Band to approve easements over later-acquired parcels in the pipeline corridor to avoid thwarting these objectives.

No doubt the language in Section 3 is broad. But we do not think it sweeps as far as Enbridge presents. Recall that our task is to discern what the parties intended at the time of contracting. We are therefore reluctant to read the set of promises embodied in Section 3 as limitless.

Beginning with the final sentence of Section 3, which Enbridge highlights, we do not see this as a promise from the Band to confer upon Enbridge any consent or authorization within its power during the life of the 1992 Agreement. Such an interpretation would produce the absurd result of committing the Band to provide an unspecified set of consents, potentially sweeping far beyond the scope of the contract. See *BKCAP, LLC v. CAPTEC Franchise Tr. 2000-1*, 572 F.3d 353, 359–60 (7th Cir. 2009) (declining to rely on the plain language of the contract if doing so would be absurd). It is far more plausible to see the "consents and authorizations" language within Section 3 as limited by the language coming after the comma that ties these approvals to the "existing Pipeline Right of Way in which the Tribe has an interest," or said another way, the Tribal Parcels.

Considering Section 3 overall, we also doubt that the provision encompasses a promise from the Band to consent to rights-of-way over any parcel in the pipeline corridor it might acquire in the future. We read the 1992 Agreement as a whole, see Restatement (Second) of Contracts § 202(2) (A.L.I. 1981),

and the precise focus of its other provisions on the Tribal Parcels advises against reading Section 3 to indirectly impose obligations on the Band that stretch beyond that land. Remember, too, that at the time of contracting, Enbridge was a sophisticated commercial party negotiating an important contract. The company was also well aware that the Tribal Parcels did not span the entire portion of Line 5 on the Reservation. If it intended Section 3 to secure the Band's consent over future acquisitions in the pipeline corridor, Enbridge could have insisted on more explicit language and provided consideration for such a promise.

And clear language matters here, as we heed the Supreme Court's instruction to proceed with caution before reading a contract to restrict a tribe's sovereign control over its own territory. See *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 148 (1982) ("Without regard to its source, sovereign power, even when unexercised, is an enduring presence that governs all contracts subject to the sovereign's jurisdiction, and will remain intact unless surrendered in unmistakable terms."). The Court has long endorsed "the canon of construction" that "an ambiguous term of a grant or contract" will not "be construed as a conveyance or surrender of sovereign power." *United States v. Winstar Corp.*, 518 U.S. 839, 876 (1996) (plurality opinion) (collecting cases). "The application of the [canon] thus turns on whether enforcement of the contractual obligation alleged would block the exercise of a sovereign power of the Government." *Id.* at 879 (plurality opinion).

Tribal sovereignty is deeply tied to control over land. See *Okla. Tax Comm'n v. Citizen Band Potawatomi Indian Tribe of Okla.*, 498 U.S. 505, 509 (1991) ("Indian tribes … exercise inherent sovereign authority over their members and

territories."); *Cohen's Handbook of Federal Indian Law* § 18.01 (Nell Jessup Newton & Kevin K. Washburn, eds., 2024) ("Land forms the basis for social, cultural, religious, political, and economic life for American Indian nations."). Indeed, "a hallmark of Indian sovereignty is the power to exclude non-Indians from Indian lands." *Merrion*, 445 U.S. at 141; see also *Cohen's Handbook* § 5.01[2][d] ("Because the exclusionary power is a fundamental sovereign attribute intimately tied to a tribe's ability to protect the integrity and order of its territory and the welfare of its members, it is an internal matter over which the tribes retain sovereignty."). "Tribes possess inherent sovereign authority to determine who may enter the reservation; to define the conditions upon which they may enter; to prescribe rules of conduct; and to expel those who enter the reservation without proper authority." *Swinomish Indian Tribal Community v. BNSF Ry. Co.*, 951 F.3d 1142, 1153 (9th Cir. 2020) (cleaned up).

By virtue of the 1854 Treaty, the Band exercises its sovereign power over the Bad River Reservation—a point of emphasis for the United States in its *amicus* submission. See Brief of the United States as Amicus Curiae Supporting Partial Reversal at 31 ("[The Band's sovereign land rights] stem from the Band's treaty with the United States and include a treaty right of occupancy on the Reservation with all its beneficial incidents, including the power to exclude others from the Band's lands." (cleaned up)); see also 1854 Treaty, arts. 2, 11 (conferring the Band permanent occupancy rights). The Band's sovereign authority extends to the Allotted Parcels, in which the Band acquired ownership under the auspices of a federal program designed to restore tribal sovereignty in the post-Allotment Era. See *Barboan*, 857 F.3d at 1106 (discussing federal efforts to assist tribes with repurchasing land); Indian

Land Consolidation Act Amendments of 2000, Pub. L. No. 106-462, § 102 note (describing a goal of the Indian land reacquisition program as "consolidat[ing] fractional interests in a manner that enhances tribal sovereignty").

All of this leaves us unwilling to accept Enbridge's claim that the Band intended in the 1992 Agreement to restrict its sovereign authority to exclude the company from later-acquired parcels in the Line 5 pipeline corridor. To grant Enbridge the relief it seeks—a declaration that the Band must consent to easements over the Allotted Parcels—we would need to mandate that the Tribal Council take an affirmative act affecting the terms upon which the company may remain on the Reservation. See *Winstar*, 518 U.S. at 879 (instructing us to look at "the effect of a contract's enforcement"). Such a judicial directive would strike at the heart of tribal sovereignty. We cannot read Section 3 of the 1992 Agreement to bind the Band's current governing body in this way without clear, even unmistakable, contractual language. The language in Section 3 is not clear enough to cross this high threshold.

Enbridge disagrees, telling us that the Band's power to grant or deny an easement over the Allotted Parcels is not an exercise of sovereign authority, but instead the act of a private landowner. But this perspective "confuse[s] the Tribe's role as commercial partner with its role as sovereign." *Merrion*, 455 U.S. 145–46 & n.12 ("Over tribal lands, the tribe has the rights of a landowner as well as the rights of a local government, dominion as well as sovereignty." (quoting F. Cohen, *Handbook of Federal Indian Law* 439 (1942)) (cleaned up)). Indeed, we view the tribal consent requirement codified in 25 U.S.C. § 324 as recognizing tribal sovereign power to dictate the terms

upon which non-tribal entities can enter tribal land. See Rights-of-Way on Indian Land, 80 Fed. Reg. 72,492, 72,505–06 (Nov. 19, 2015) ("Consenting to rights-of-way on trust or restricted land is one of several tools, including entering into leases, that animate the traditional notions of sovereignty …." (cleaned up)). Given all this, we decline to read the contract to impliedly restrict the Band's power to deny Enbridge rights-of-way over the Allotted Parcels.

A similar analysis resolves Enbridge's claim that the Band's refusal to approve renewed easements on the Allotted Parcels breaches the implied duty of good faith and fair dealing. We recognize that "[e]very contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement." Restatement (Second) of Contracts § 205; see also *Betco Corp., Ltd. v. Peacock*, 876 F.3d 306, 310 (7th Cir. 2017) (describing Wisconsin law). This includes contracts involving a sovereign entity. Cf. *Metcalf Const. Co., Inc. v. United States*, 742 F.3d 984, 991 (Fed. Cir. 2014) (recognizing the implied duty applies to contracts with the United States).

The implied duty requires each party to honor the spirit of an agreement by performing consistently with the other's "justified expectations." Restatement (Second) of Contracts § 205 cmt. a; see also *Betco*, 876 F.3d at 310 ("A party may breach its implied duty of good faith when it follows the letter but not the spirit of an agreement …." (cleaned up)). While it may hold parties to actions beyond those named expressly in the contract, "[t]he implied duty of good faith and fair dealing is limited by the original bargain: it prevents a party's acts or omissions that … are inconsistent with the contract's purpose and deprive the other party of the contemplated value." *Metcalf*, 742 F.3d at 991.

With the Supreme Court's direction in *Merrion* in mind, we are hesitant to apply the implied duty of good faith and fair dealing imposed by the 1992 Agreement so expansively as to hinder the Band's sovereign power over the Allotted Parcels. It is, after all, an implied duty, and we are looking for a clear surrender of sovereign authority within the plain language of the 1992 Agreement.

Beyond this concern, we are not convinced that the Band's actions conflict with Enbridge's justified expectations from the 1992 Agreement. See *Betco*, 876 F.3d at 310 ("We look to what the parties expected from the arrangement ...."). Enbridge pursued the Band's consent to a 50-year easement over the Tribal Parcels, aware that the Bureau of Indian Affairs intended to give only 20-year easements over the allotted lands in the pipeline corridor. Moreover, in 1992, the Band could not have promised that the then-fractionalized owners of the Allotted Parcels would consent to renewed easements in 2013. So Enbridge bargained for a longer easement over the Tribal Parcels, knowing it would face mismatched easement expiration dates in 2013. Put another way, the company's contemplated value from the 1992 Agreement was securing an easement for 50 years across the Tribal Parcels, subject to the known risk that the owners of the Allotted Parcels—whoever they were—might not consent to renewals in 2013, thereby forcing Enbridge into the situation it now faces.

To read the implied duty so broadly as to compel the Band's consent to renewed easements across the Allotted Parcels would eliminate the risk of these differing expiration dates, conferring a windfall on Enbridge that it could not have reasonably expected in December 1992. See *Metcalf*, 742 F.3d at 991 ("[A]n act will not be found to violate the duty ... if

such a finding would … alter[] the contract's discernible allocation of risks …."). In 1992, Enbridge secured its easement across the Tribal Parcels, and it expected to negotiate in 2013 with the owners of the Allotted Parcels. As a new owner of the Allotted Parcels, the Band did in fact negotiate with the company, cognizant of a 2010 oil spill involving another Enbridge pipeline in Michigan. The Band then chose not to renew, a risk that Enbridge always faced when it signed the 1992 Agreement. We therefore see Enbridge as having gotten what it bargained for.

One final observation merits mention. Recall that a valid right-of-way across the Allotted Parcels requires both the consent of the Band and the approval of the Secretary of the Interior. See 25 U.S.C. §§ 321, 323, 324; see also *Davilla*, 913 F.3d at 967 (remarking that an oil pipeline has no legal right to keep its structure on allotted trust land "unless and until it secures a right-of-way for that purpose from the Secretary of the Interior"). Enbridge has neither. Although the company submitted applications to renew its expiring rights-of-way in March 2013, the Bureau of Indian Affairs has rejected those applications at two levels of administrative review, citing the lack of requisite consent from Indian landowners. While the Department of the Interior has yet to issue a final decision on the 2013 renewal applications, Enbridge provides no reason to think it will approve them absent the Band's consent. This reinforces our conclusion that the company is in trespass.

### 2.  Section 558(c) of the Administrative Procedure Act

Enbridge next claims a legal privilege to continue operating Line 5 across the Allotted Parcels based on a provision within the Administrative Procedure Act addressing the expiration of agency-given licenses, like rights-of-way. See 5

U.S.C. § 551(8) (defining "license" under the APA to broadly include "an agency permit … or other form of permission"). Section 558(c) provides that "[w]hen the licensee has made timely and sufficient application for a renewal or a new license in accordance with agency rules, a license with reference to an activity of a continuing nature does not expire until the application has been finally determined by the agency." *Id.* § 558(c). Because its March 2013 renewal applications remain pending with the Department of the Interior, Enbridge insists that its prior easements across the Allotted Parcels—issued in 1993—remain in effect by operation of this provision.

But § 558(c) is a misfit for Enbridge's argument. Only a "sufficient application … in accordance with agency rules" triggers the statutory protection. Under the regulations governing Enbridge's March 2013 applications, the Bureau of Indian Affairs cannot renew a right-of-way across land held in trust for a tribe "without the prior written consent of the tribe." 25 C.F.R. § 169.3(a) (2013); see also 25 C.F.R. § 169.19 (2013) (making this consent a precondition of a renewal grant). Enbridge's renewal applications did not—and do not—contain any manifestation of tribal consent, and this non-compliance with the regulatory requirement has prompted the Bureau to deny the applications at two levels of administrative review. So Enbridge's renewal applications fall short of § 558(c)'s express requirement that they be "sufficient." See Black's Law Dictionary (5th ed. 1979) (defining "sufficient" as "[a]dequate," "enough," and "that which may be necessary to accomplish an object").

It may well be true, as Enbridge insists, that in 2013 the Bureau of Indian Affairs permitted applicants seeking to re-

new rights-of-way to submit Indian landowner consent after the filing of an initial application. We fail to see how this latitude renders Enbridge's applications, which continue to lack the necessary component of the Band's consent, "sufficient" without deviating from the provision's natural meaning. See *Kay v. F.C.C.*, 525 F.3d 1277, 1279 (D.C. Cir. 2008) (Kavanaugh, J.) (interpreting § 558(c) and emphasizing that "courts have no authority to rewrite the plain text of a statute").

Stepping back, we are unwilling to read this general provision of the APA to upset the careful statutory regime that Congress has established regarding rights-of-way over Indian land. In the main, § 558(c) guards against the loss of a license when an agency fails to process a renewal application that is otherwise properly submitted and complete. See *Bankers Life & Cas. Co. v. Callaway*, 530 F.2d 625, 634 (5th Cir. 1976) ("[T]he kind of case that the statute was meant to cover was that in which time exigencies within the agency prevent it from passing on a [renewal] application …."); *Kay*, 525 F.3d at 1279 ("Section 558(c) prevents the unfairness that would result if agency delay caused a licensee to lose a license despite having filed a timely renewal application."). The provision does not rewrite the requirements needed for any given license. This is especially true given that 5 U.S.C. § 559, a neighboring provision of the APA, specifies that "[t]his subchapter," which includes § 558(c), "do[es] not limit or repeal additional requirements imposed by statute or otherwise recognized by law."

Enbridge identifies no processing issue preventing the Bureau from passing on its 2013 renewal applications. Instead, the applications' deficiency stems from the company's failure to satisfy a condition precedent—tribal consent—that is Enbridge's responsibility to obtain and outside the agency's

control. In these circumstances, we do not read § 558(c) to grant the company a substantive property interest in the form of extended easements across Indian land. To do so would ignore the role of tribal consent embedded in the right-of-way statutes and accompanying regulations. See 25 U.S.C. § 324; 25 C.F.R. § 169.3 (2013).

## III

So far we have agreed with the district court that Enbridge has been trespassing on the Allotted Parcels since June 2013. Following a bench trial, the district court awarded the Band two remedies for this trespass: (a) $5 million in past restitution, as well as a restitutionary amount for any ongoing trespass, and (b) a permanent injunction. We now consider the parties' challenges to each award.

### A. The Restitution Award

First comes restitution, a remedy measured by "the defendant's gain" rather than "the plaintiff's loss." *Schlueter v. Latek*, 683 F.3d 350, 353 (7th Cir. 2012). The district court awarded the Band $5,151,668—a measure of Enbridge's profits—as a remedy for the company's past trespass on the 12 Allotted Parcels. It also determined an amount of profits that Enbridge must continue disgorging to the Band so long as Line 5 remains in trespass. See *Liu v. Sec. and Exch. Comm'n*, 591 U.S. 71, 79 (2020) (observing that a profits-based remedy may go by different names, including restitution and disgorgement).

Enbridge altogether rejects restitution as a proper remedy for trespass. Stated differently, the company disagrees with any profits- or gains-based calculation, instead contending that damages should be limited to the rental value of the Al-

lotted Parcels. For its part, the Band objects to the district court's method of calculating the restitutionary amount.

The availability of restitution as a remedy for trespass is a legal question that we review independent of the district court's analysis. We review the district court's restitution calculation for abuse of discretion and any embedded findings of fact for clear error. See *Domanus v. Lewicki*, 742 F.3d 290, 303 (7th Cir. 2014); *Int'l Prod. Specialists, Inc. v. Schwing Am., Inc.*, 580 F.3d 587, 598 (7th Cir. 2009).

As an overarching legal matter, we agree with the Band that restitution is an appropriate remedy for Enbridge's intentional trespass. See Restatement (Second) of Torts § 163 ("The intention which is required to make the actor liable [for trespass] is an intention to enter upon the particular piece of land in question …."). We have recognized the availability of restitution "in any intentional-tort case in which the tortfeasor has made a profit that exceeds the victim's damages." *Williams Elecs. Games, Inc. v. Garrity*, 366 F.3d 569, 576 (7th Cir. 2004). Our view is not an outlier. See Restatement (Second) of Torts § 929, cmt. c ("[I]f the defendant is a willful trespasser, the owner is entitled to recover from him the value of any profits made by the entry."); Restatement (Third) of Restitution and Unjust Enrichment § 40 (A.L.I. 2011) ("A person who obtains a benefit by an act of trespass … is liable in restitution to the victim of the wrong.").

Further, the Supreme Court has suggested that profits-based relief may be appropriate in actions for trespass to Indian lands. See *Oneida County*, 470 U.S. at 235–36 (recognizing its prior holding that "Indians have a common-law right of action for an accounting of 'all rents, issues and profits' against trespassers on their lands" (quoting *United States v.*

*Santa Fe Pac. R. Co.*, 314 U.S. 339, 344 (1941))); see also *Sripetch v. Sec. and Exch. Comm'n*, 608 U.S. ----, 146 S. Ct. 1403, 1411 (2026) (discussing with approval cases awarding restitution for trespass).

We pause to underscore a position we do not see Enbridge taking. The company does not suggest that we should measure the trespass award based on the amount a private pipeline company would pay when exercising the United States' delegated eminent domain power over state-owned lands. See, *e.g., PennEast Pipeline Co. v. New Jersey*, 594 U.S. 482 (2021). Enbridge urges only that restitution is unavailable as a remedy for trespass, an argument that our precedent forecloses.

The question then becomes how to calculate the restitution award. At a high level, restitution seeks to strip wrongdoers of the gain derived from their unlawful activity. See *Liu*, 591 U.S. at 79; see also *Pearson v. Target Corp.*, 968 F.3d 827, 831 (7th Cir. 2020) ("It has long been axiomatic that no person shall profit by his own wrong." (cleaned up)). We have recognized, however, that "there is no single way to measure" the defendant's gain, as "the measurement is context dependent." *Epic Sys. Corp. v. Tata Consultancy Servs., Ltd.*, 980 F.3d 1117, 1130 (7th Cir. 2020). Some details on the district court's approach to the award in this case therefore become necessary.

The district court awarded $5,151,668 to the Band based on Enbridge's trespass across the Allotted Parcels. For the sake of completeness, we recognize that the district court also granted the Band summary judgment on a separate claim that Enbridge was unjustly enriched by the same conduct. It appears that the monetary remedy covers both the trespass and the unjust enrichment claims, and neither party takes issue

with this combined approach. Our analysis similarly applies to the remedy as to both claims.

The $5 million award is the product of two separate calculations. On one approach, the district court sought to measure Enbridge's total profits from Line 5 attributable to the 12 Allotted Parcels, rather than the pipeline as a whole. To arrive at this calculation, the district court began with Enbridge's after-tax net income allocable to Line 5 for the relevant time period, which came out to over $1.1 billion. It then discounted that amount by 0.0036 to reflect that the 12 Allotted Parcels—together 2.33 miles in length—ran 0.36% of the pipeline's overall 642-mile length. The district court further reduced this number to reflect the Band's average weighted ownership share in the parcels each year (ranging from 58.4% to 76.7% between 2013 and 2022). The resulting award, converted to net present value in June 2023, was $4,410,969. On a going-forward basis, the district court also ordered Enbridge to pay profits to the Band according to this formula for each quarter that Line 5 continues to traverse the Allotted Parcels in trespass.

The district court further and separately determined that Enbridge's trespass liability should include an additional component, measured by the economic benefit to the company of delaying construction to reroute a portion of Line 5 around the Allotted Parcels. The district court and the parties refer to this amount as "avoided costs," but we see significant imprecision in this term. Specifically, we do not understand "avoided costs" to reflect the anticipated cost to reroute Line 5. Indeed, such an award would be inappropriate because, in the end, Enbridge will not avoid the design, material, construction, and many other costs necessary to complete the re-

route. Instead, this second component of the overall restitutionary award seeks to capture the amount of benefit that Enbridge realized from its ability to put its capital to other profitable uses rather than spending it on the reroute—put simply, this is a time value of money calculation based on deferred, not avoided, costs.

For this analysis, the district court accepted as a starting point the Band's expert's estimation of the economic benefit of the delayed reroute construction at $296,234,750. The district court then applied the same reductions it did to arrive at Enbridge's wrongful profits from Line 5—multiplying the nearly $300 million estimate by the percentage of the pipeline's overall miles in trespass (0.36%) and the Band's average ownership share in the Allotted Parcels. As a result, the district court ordered Enbridge to disgorge $740,699 in deferred costs. So the total trespass award was $4,410,969 + $740,699, equaling $5,151,668.

Although cognizant of the deference we owe the district court's calculations, we conclude that the district court's award computation included errors on two fronts and therefore was an abuse of discretion.

At the threshold, we view the district court as having likely double-counted by giving the Band a measure of both Enbridge's overall profits attributable to Line 5's trespass and the company's economic benefit from deferring the expense necessary to reroute Line 5. On an individual basis, we see no error with employing either measure of restitution. "[T]he profit that the defendant obtained from the wrongful act" often forms an award in restitution. *ConFold Pac., Inc. v. Polaris Indus., Inc.*, 433 F.3d 952, 957 (7th Cir. 2006); see also Restatement (Third) of Restitution and Unjust Enrichment § 51(4)

("[T]he unjust enrichment of a conscious wrongdoer … is the net profit attributable to the underlying wrong."). And it stands to reason that any value generated through unlawfully delaying necessary expenditures can make up a portion of a defendant's wrongful gain. Cf. *Reich v. Cont'l Cas. Co.*, 33 F.3d 754, 756 (7th Cir. 1994) (recognizing that restitution may encompass "the unjust avoidance of a loss").

As an accounting matter, however, profit measures a company's revenue less its expenses. From the perspective of measuring net income, then, the delayed outlay of cost translates into a corresponding increase in profit—whether by reducing costs through the relevant period or committing assets to alternative, revenue-generating purposes. It is not clear from the district court's decision why its first calculation of Enbridge's overall profits from the miles of Line 5 in trespass would not already account for its subsequent determination of the economic benefit to the company of the deferred reroute. Cf. *Motorola Sols., Inc. v. Hytera Commc'ns Corp. Ltd.*, 108 F.4th 458, 491–92 (7th Cir. 2024) (agreeing, in the calculation of an unjust enrichment award for the theft of trade secrets, that the defendant's avoided research and development costs should be subtracted from its profits "to avoid double-counting"); Restatement (Third) of Restitution and Unjust Enrichment § 51 cmt. e (describing profit as measurable in the form of "the avoidance of an otherwise necessary expenditure" or "net income").

On this record, we conclude that the district court abused its discretion in applying both total profits and the value of delayed costs as measures of restitution. It needed to pick one or the other. Or, if we are mistaken in our view of the double counting, the district court needed to provide a more com-

plete or compelling justification for adopting both approaches. See *In re Stericycle Sec. Litig.*, 35 F.4th 555, 559 (7th Cir. 2022) (observing that the failure to explain part of a fee award can be an abuse of discretion).

Another component of the district court's $5 million restitution calculation gives us pause. Specifically, we believe the district court should have refrained from discounting Enbridge's nearly $300 million estimated economic benefit from deferring the reroute by the percentage of Line 5's overall miles in trespass. This concern warrants attention in the event the district court chooses on remand to calculate a new restitution award based on the value of Enbridge's delayed costs.

In calculating a profits- or gains-based remedy, our case law recognizes a role for apportioning "a wrongdoer's profits between those produced by his or her own legitimate efforts and those arguably resulting from his or her wrong." *Leigh v. Engle*, 727 F.2d 113, 138 (7th Cir. 1984); see also *Sheldon v. Metro-Goldwyn Pictures Corp.*, 106 F.2d 45, 49 (2d Cir. 1939), aff'd, 309 U.S. 390 (1940). Apportionment involves estimation. See *Leigh*, 727 F.2d at 138; Restatement (Third) of Restitution and Unjust Enrichment § 51 cmt. e ("[T]he question of what is properly attributable tends to escape specification by objective rules."). And we have offered two principles to guide this estimation: the burden is on defendants to show which profits are clean of their wrongdoing and, separately, doubts should be resolved in favor of the plaintiff. See *Leigh*, 727 F.2d at 138.

Although the district court could have more clearly held Enbridge to this burden, we do not conclude that its miles-based method of apportioning the net profits attributable to the trespass was an abuse of discretion. On the facts facing the

district court—a trespass that made up less than half a percent of the overall pipeline—it was within the bounds of reason to approximate the wrongful portion of Enbridge's profit from Line 5 in this way.

We cannot say the same for the district court's similar discounting of Enbridge's economic benefit from reroute cost deferral, however. The nearly $300 million estimate measured only the company's gain from delaying the costly construction of a new portion of Line 5 that would bypass the Allotted Parcels. It is difficult to see how any portion of this economic benefit is not attributable to the ongoing trespass or, at the least, how the percentage length of the pipeline in trespass was a pertinent and logical metric for discounting the award.

On this front, the district court stated only that the award might be "disproportionate to Enbridge's trespass on a few parcels." No doubt $300 million is a substantial amount, but this observation does not explain the resulting method of calculation, especially given the need to resolve doubts in favor of the Band. See *Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc.*, 772 F.2d 505, 518 (9th Cir. 1985) ("The difficulty in this case is that the district court has not provided us with any reasoned explanation of … its apportionment."). This concern also runs afoul of restitution's emphasis on the defendant's gain—rather than the plaintiff's loss. See Restatement (Third) of Restitution and Unjust Enrichment § 3 cmt. c (recognizing that unjust enrichment may exceed the plaintiff's measurable injury).

In light of these two errors, we vacate the district court's restitution award and remand for calculation of a new amount. Ultimately, we leave the appropriate measure of Enbridge's wrongful gain—whether by overall profits or the

economic benefit of delayed costs—to the district court's sound discretion within the bounds identified in our opinion. In fashioning a new award, the district court should account for the significant passage of time between its original award and today. On remand the district court has the latitude to consider the totality of the circumstances in arriving at a new award, including the ongoing nature of the trespass, any appropriate amount of interest owed for non-payment to date of restitution, and the parties' respective courses of conduct regarding the reroute of Line 5.

And whatever the final method of calculating Enbridge's wrongful gain, the district court should provide a more complete explanation of its choice, including any apportionment or discounting it finds warranted. As a court of review, we need to understand why the final amount is adequate—why, as a matter of law, it reasonably meets the objectives of restitution in these complex circumstances. See *Travelers Cas. & Sur. Co. of America, Inc. v. Northwestern Mut. Life Ins. Co.*, 480 F.3d 499, 501–02 (7th Cir. 2007) ("[M]aking the wrongdoer's wrongful conduct worthless to him is a good method of deterring such conduct ….").

### B. The Permanent Injunction

We turn next to the permanent injunction, which orders Enbridge to cease operating Line 5 across the Allotted Parcels and to arrange reasonable remediation at those sites by June 16, 2026. The district court has stayed this relief pending our resolution of this appeal. The parties both mount challenges to this injunction. The Band objects to its three-year delayed effect—the district court gave Enbridge until June 2026 to cease operations—while Enbridge questions the appropriate-

ness of injunctive relief resulting in the shutdown of Line 5 on any timeline.

To warrant injunctive relief, "[a] plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). An injunction is a flexible remedy, and we afford "great deference" to a district court's judgment on whether to issue or deny an injunction. *Liebhart v. SPX Corp.*, 998 F.3d 772, 779 (7th Cir. 2021). Ultimately, "[w]e evaluate both the district court's grant of injunctive relief and the scope of that relief for abuse of discretion." *Fields v. Smith*, 653 F.3d 550, 554 (7th Cir. 2011).

The first three of these factors need not detain us. "As a general rule, interference with the enjoyment or possession of land is considered 'irreparable' since land is viewed as a unique commodity for which monetary compensation is an inadequate substitute." *Pelfresne v. Vill. of Williams Bay*, 865 F.2d 877, 883 (7th Cir. 1989). This general rule applies with extra force here given that the Band's control over the Allotted Parcels implicates its sovereign power. See *Ute Indian Tribe of the Uintah and Ouray Rsrv. v. Utah*, 790 F.3d 1000, 1005 (10th Cir. 2015) ("The Tenth Circuit has repeatedly stated that an invasion of tribal sovereignty can constitute irreparable injury." (cleaned up)). Further, the equities favor the Band given that Enbridge's trespass has been intentional.

As the district court's thorough opinions recognized, however, shaping injunctive relief that protected the public inter-

est was no easy task. "In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982). In this case, however, the public consequences of any choice the district court made were substantial, and they cut in different directions.

Several considerations weighed in favor of ordering the company to remove Line 5 from the Allotted Parcels without delay. By the time of the district court's June 2023 decision, the Band had endured Enbridge's intentional trespass for a decade on land that the United States has guaranteed by treaty to "set apart" as the Band's permanent homeland. See 1854 Treaty, arts. 2, 11. There is a manifest public interest in protecting these sovereign land rights. And, accepting our invitation to share its views on the questions before us, the United States—much like the district court—emphasizes that honoring the nation's commitments in the 1854 Treaty, and thereby protecting our government's sovereign-to-sovereign relationship with the Band, serves the public interest. See Brief of the United States at 30–31.

Of course, we also presume that Congress considers the public interest when it enacts a statute. See *United States v. Oakland Cannabis Buyers' Co-op.*, 532 U.S. 483, 497 (2001). The relevant statutory scheme manifests a clear policy of protecting Indian land, especially from nonconsensual conveyances. Foremost, the Indian Nonintercourse Act generally prohibits transactions in tribal lands without congressional approval. See 25 U.S.C. § 177; *Chemehuevi Indian Tribe v. Jewell*, 767 F.3d 900, 904 (9th Cir. 2014) (collecting cases interpreting § 177). "The obvious purpose of that statute is to prevent unfair, im-

provident or improper disposition by Indians of lands owned or possessed by them to other parties," *Fed. Power Comm'n v. Tuscarora Indian Nation*, 362 U.S. 99, 119 (1960), or said differently, "to ensure that tribal lands remain in tribal hands," *Chemehuevi Indian Tribe*, 767 F.3d at 904. And, in the pipeline context, Congress has made its approval to rights-of-way crossing tribal lands conditional upon tribal consent. See 25 U.S.C. § 324. All of this leads us to agree with the district court that an interminable trespass over the Allotted Parcels would be significantly at odds with the public interest.

The Band urges us to take this analysis a step further, contending that the Nonintercourse Act limited the discretion that the district court enjoyed in fashioning equitable relief. The Act provides that "[n]o purchase, grant, lease, or other conveyance of lands, or of any title or claim thereto, from any Indian nation or tribe of Indians, shall be of any validity in law or equity, unless the same be made by treaty or convention entered into pursuant to the Constitution." 25 U.S.C. § 177. As the Band sees it, any injunctive relief permitting Line 5 to operate beyond the six-month remediation period contemplated in the 1993 rights-of-way amounts to a judicially imposed easement, violating § 177 because Congress has conditioned its approval of such easements upon tribal consent.

We cannot agree that the Nonintercourse Act so restricts the "wide latitude" of the district court in its equitable analysis. *Fed. Trade Comm'n v. Day Pacer LLC*, 125 F.4th 791, 813 (7th Cir. 2025). As a baseline principle, we will not lightly imply "a major departure from the long tradition of equity practice," and we do not see § 177 as indicating that Congress "intended such a departure." *eBay*, 547 U.S. at 391–92. Although the provision contains a broad prohibition on the "conveyance of

lands … in equity," we cabin this general statutory text in light of the specific terms that came before it. See Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 199 (2012) ("Where general words follow an enumeration of two or more things, they apply only to … things of the same general kind of class specifically mentioned ….").

The terms "purchase," "grant," and "lease" within § 177 all connote the transfer of a valid and recognized property interest in land. We see a meaningful difference between the delayed enforcement of an injunction and the types of formal, more customary transfers that the Act prohibits without Congress's approval. In keeping with our interpretation, the only case the Band identifies applying § 177 of the Nonintercourse Act to restrict a court's equitable discretion involves an action for quiet title, a remedy that resolves competing claims of title. See *United States v. Candelaria*, 271 U.S. 432, 443 (1926); see also Samuel Bray, *A System of Equitable Remedies*, 63 UCLA L. Rev. 530, 558 (2016) (describing quiet title). The delayed start to an injunction is merely a concession to equity, not the legal transfer of a property interest—in short, it is not a "conveyance" within the meaning of the statute.

In the end, we agree that the interests enshrined in the Indian Nonintercourse Act weigh in favor of an injunction. The same is true for the United States' commitments to the Band in the 1854 Treaty. But these considerations do not constrict the district court's discretion to craft injunctive relief that accounts for conflicting public interests.

And, indeed, the district court identified serious public consequences that counseled against an immediate and unyielding order causing Line 5 to shut down altogether. There can be no doubt that the pipeline is a significant piece of in-

frastructure that impacts the economy and energy supply of both the United States and Canada. More specifically, we find no clear error in the district court's fact-finding that the loss of Line 5's supply of crude oil and natural gas liquids would have detrimental economic impacts on consumers, and that an immediate shutdown would increase volatility in the markets for light crude oil, natural gas liquids, and propane/butane in the Upper Midwest and Eastern Canada.

Beyond this economic impact, Line 5's operation implicates the United States' diplomatic and trade relationship with our neighbor to the north. The parties agree that Line 5 falls within the scope of a 1977 treaty between the United States and Canada. See Agreement Between the Government of the United States and the Government of Canada Concerning Transit Pipelines, Can.-U.S., Jan. 28, 1977, 28 U.S.T. 7449. And, of course, under the Supremacy Clause of our Constitution, "all Treaties made, or which shall be made, under the Authority of the United States" are "the supreme Law of the Land." U.S. CONST. art. VI, cl. 2.

Article II of this Transit Treaty broadly prohibits any "public authority" in either nation from "institut[ing] any measures … which are intended to, or which would have the effect of, impeding, diverting, redirecting, or interfering with in any way the transmission of hydrocarbons" along a pipeline like Line 5. Nowhere in its briefing does the Band suggest that the district court was not a "public authority." By the Transit Treaty's terms, then, an injunction impacting Line 5's ongoing operation and throughput risked placing the United States in breach of its agreement with Canada. Indeed, Canada itself expressed concerns on this front by initiating the Treaty's dispute resolution process regarding Line 5. See

Transit Treaty, art. IX. Based on recent filings in the district court, we understand that the two nations are now engaged in the negotiations that the Transit Treaty requires before formal arbitration. See Statement of Interest of the United States 11, Dkt. No. 738.

The parties dispute how the Transit Treaty should impact injunctive relief here. For its part, the Band points us to Article IV, which explicitly limits Article II's broad language, to indicate that pipelines covered by the Treaty "shall be subject" to certain "regulations," including on "such matters as" pipeline safety and environmental protection. This limitation, the Band contends, preserves the district court's ability to shut down Line 5 on the Allotted Parcels without breaching the Transit Treaty.

But we do not read Article IV this way. The term "regulations" does not naturally include a judicial order, especially one enforcing a common law trespass as opposed to the violation of a right created by statute or administrative rule making. The carve-outs in Article IV add to this impression, as they all contemplate generally applicable lawmaking such as safety standards, financial regulations, and regulatory reporting requirements. Finally, it seems unlikely that Article IV would permit the district court to issue any injunction shutting down Line 5 given the broad language of Article II protecting the flow of hydrocarbons from any potential disruption.

Enbridge on the other hand seems to suggest that the Transit Treaty broadly precludes injunctive relief to remedy the company's trespass. Here, too, we cannot agree. And, unlike the district court, we now have the benefit of submissions from both signatories.

"It is … well settled that the United States' interpretation of a treaty 'is entitled to great weight.'" *Medellín v. Texas*, 552 U.S. 491, 513 (2008) (quoting *Sumitomo Shoji America, Inc. v. Avagliano*, 457 U.S. 176, 184–85 (1982)). In its submission to us, the United States has taken care not to opine directly on what injunctive relief for the trespass would violate its obligations under the Transit Treaty. But it has made two points clear. First, the United States is concerned that an injunction leading to Line 5's shutdown would breach the Transit Treaty and damage our relationship with Canada—risks that it urges should weigh in the district court's equitable analysis. See Brief of the United States at 28–30. At the same time, the United States has taken the position that the district court should use its equitable authority to bring about an end to the trespass. *Id.* at 36 n.7 & 37. Reading between the lines, then, the United States does not interpret the Transit Treaty to foreclose injunctive relief in all forms here. These considerations also refute Enbridge's suggestion that an injunction is inherently inconsistent with the United States' foreign policy.

For its part, Canada has taken the position that the judicially imposed three-year shutdown deadline risks placing the United States in breach of its binding international commitments. See Amicus Brief of the Government of Canada in Partial Support of Enbridge at 18. But Canada has also conceded that injunctive relief permitting Enbridge to reroute Line 5 around the Reservation would honor the goals of the Transit Treaty. See *id.* at 19 n.18. We decline to read the Transit Treaty more stringently than the two signatories. It is the deleterious impact on our relationship with our trade partner that we seek to avoid, and it seems a well-tailored injunction can avoid this public consequence.

***

So where does all of this leave us? We conclude, as the district court did, that injunctive relief in some form is allowed and warranted. Enbridge's trespass cannot continue unchecked across the Band's sovereign land. To decide otherwise would be substantially in tension with the 1854 Treaty and the statutory scheme governing rights-of-way on tribal lands. But it weighs heavily with us that an injunctive order halting Line 5's operation without an alternative in place risks violating the Transit Treaty, sparking international fallout with Canada, and inflicting harmful effects on energy consumers.

We therefore hold that any injunction—crafted so it does not disserve the public interest—must permit Enbridge a reasonable opportunity to complete its proposed reroute of Line 5 around the Reservation. While we do not see the imposition of a shutdown deadline as inherently incompatible with this guardrail—indeed, a deadline injects accountability into an otherwise open-ended prospect—the district court acknowledged its skepticism that Enbridge could complete a reroute in the three years it allowed. On balance, the three-year deadline strikes us as too aggressive, and we conclude the district court exceeded its discretion by imposing it.

But this conclusion does not take us very far. We are mindful of the timing of our decision, recognizing that the facts on the ground have not stood still since oral argument. Indeed, Enbridge recently represented to our court that it has made significant progress in obtaining the state and federal permits necessary for the proposed reroute, although we understand certain proceedings remain ongoing. We thus cannot opine today on the precise terms of injunctive relief that will permit

Enbridge a realistic prospect of rerouting Line 5 around the Allotted Parcels, while permitting the company no latitude beyond that parameter. We remand to allow the district court to fashion the necessary relief, cognizant too of its greater familiarity with the parties and its adept handling of this entire litigation to date.

Make no mistake: Enbridge must remove the pipeline from the Allotted Parcels. The grace period we direct the district court to afford Enbridge is the product of the broader public context in which the pipeline operates, and it does not reflect our approval of the company's behavior. We urge the district court to adopt measures that build oversight and accountability into the injunctive relief, whether reporting requirements or monetary sanctions, to ensure that the company completes this reroute as soon as possible.

## IV

That brings us to the final issue—the Band's federal common law claim of public nuisance.

Here, too, complexity abounds, and we begin with some additional background. The Band's concern focuses on a point of land, which the parties call "the meander," where a curve of the Bad River is tightening around Line 5's currently underground path. At the meander, the Bad River continues to wear away the riverbank, bringing its current closer and closer to the buried pipeline. The Band contends that this erosion risks the exposure and subsequent rupture of the pipeline. A rupture at the meander in turn threatens great environmental harm if oil and natural gas liquid were to pour into the Bad River and Lake Superior watersheds. The Band asserts that Enbridge's continued operation of the pipeline in

the face of this danger creates an unreasonable interference with a right common to the general public, in violation of the federal common law of public nuisance. See *Michigan v. U.S. Army Corps of Eng'rs*, 667 F.3d 765, 771–72, 780–81 (7th Cir. 2011) (*Asian Carp I*) (discussing the elements of a federal common law nuisance claim).

After the spring 2023 flooding season rapidly shrank the riverbank between the Bad River and Line 5, the district court agreed with the Band and found that a rupture at the meander was imminent enough to render the ongoing operation of the pipeline a public nuisance and to merit injunctive relief. See *id.* at 782 (discussing the requirement that the harm of a threatened nuisance be "sufficiently close to occurring that equitable relief is necessary to prevent it from happening"). After considering submissions by both parties, the district court adopted and modified Enbridge's proposed monitoring and shutdown protocol. This plan requires the company to take preparatory steps for safely shutting down and purging the pipeline if specified triggering events, like high water levels, suggest conditions at the meander are particularly perilous.

Enbridge does not challenge the district court's finding of nuisance liability on its merits, instead contending that the Pipeline Safety Act, 49 U.S.C. § 60101 *et seq.*, has displaced the Band's federal common law nuisance claim as a matter of law. We agree.

### A. Displacement by the Pipeline Safety Act

The Supreme Court has recognized a federal common law of public nuisance, largely to govern "suits brought by one State to abate pollution emanating from another State." *Am.*

*Elec. Power Co., Inc. v. Connecticut*, 564 U.S. 410, 421 (2011). But even in this context, caution remains the watchword for the development of this judge-made federal law. Considerations of separation of powers counsel that "it is primarily for … Congress, not the federal courts, to prescribe national policy in areas of special federal interest." *Id.* at 423–24. Federal common law serves only as a "necessary expedient" that courts resort to "in the absence of an applicable Act of Congress." *City of Milwaukee v. Illinois and Michigan*, 451 U.S. 304, 314 (1981) (*Milwaukee II*) (cleaned up).

This is where the doctrine of displacement comes into play. "[W]hen Congress addresses a question previously governed by a decision rested on federal common law the need for such an unusual exercise of lawmaking by federal courts disappears." *Id*. at 314; see also *Asian Carp I*, 667 F.3d at 777 ("The doctrine of displacement rests on the premise that federal common law is subject to the paramount authority of Congress."). Because we presume that Congress—not courts—should set the standards governing national issues, "[l]egislative displacement of federal common law does not require the same sort of evidence of a clear and manifest congressional purpose demanded for preemption of state law." *Am. Elec. Power*, 564 U.S. at 423 (cleaned up). "The test for whether congressional legislation excludes the declaration of federal common law is simply whether the statute speaks directly to the question at issue." *Id.* at 424 (cleaned up).

That standard requires careful examination of the Pipeline Safety Act. At a high level, the Act seeks to "provide adequate protection against risks to life and property posed by pipeline transportation and pipeline facilities." 49 U.S.C. § 60102(a)(1). To achieve this purpose, Congress endowed the Secretary of

Transportation with an extensive toolkit to address aspects of pipeline safety. See *Asian Carp I*, 667 F.3d at 777 (observing that "Congress's decision to assign a particular problem to an executive agency … may be evidence of displacement").

Some of these tools work to safeguard against pipeline accidents in the long run. For example, the Secretary must "prescribe minimum safety standards for pipeline transportation and for pipeline facilities" that account for "protecting the environment." 49 U.S.C. § 60102(a)(2) & (b)(1)(B)(ii). The Secretary, or the Pipeline and Hazardous Materials Safety Administration acting on his behalf, must also "inspect and require appropriate testing of" pipeline facilities subject to the Act. *Id.* § 60108(b); see also *id.* § 108(f)(1) (authorizing PHMSA to carry out the Secretary's duties under the Act). The Secretary must set the frequency of those inspections on a case-by-case basis, after considering factors such as the "climatic, geologic, and seismic characteristics (including soil characteristics) and conditions of the area in which the pipeline facility is located." *Id.* § 60108(b)(1). Additionally, the Act establishes integrity management programs for pipelines in unusually sensitive areas, including "areas where a pipeline rupture would likely cause permanent or long-term environmental damage." *Id.* § 60109(b).

Congress has also empowered the Secretary to respond to local, dangerous conditions as the situation calls for it. See *id.* § 60102(h) (directing the Secretary to set requirements for pipeline operators to report, within five days, hazardous pipeline conditions). Specifically, if the Secretary decides that the operation of a given pipeline carrying petroleum products "is or would be hazardous to life, property, or the environment," he must "order the operator of the facility to take nec-

essary corrective action, including suspended or restricted use of the facility." See *id.* § 60112(a)(1) & (d)(1). In assessing whether pipeline operation is hazardous, the Secretary must consider relevant "aspects of the area in which the pipeline facility is located" and its proximity to "environmentally sensitive areas." *Id.* § 60112(b)(3)–(4); see also *id.* § 60117(m) (giving the Secretary authority to issue safety orders based on similar analysis). If the hazard becomes "imminent," the Secretary may issue an emergency order "imposing restrictions, prohibitions, and safety measures … without prior notice or an opportunity for a hearing." *Id.* § 60117(p)(1); see also *id.* § 60117(p)(8) (defining "imminent hazard" as "the existence of a condition relating to a gas or hazardous liquid pipeline facility that presents a substantial likelihood that … a substantial endangerment to health, property, or the environment may occur" before the likely completion of formal proceedings).

These provisions speak directly to the risk of Line 5's rupture due to erosion at the Bad River meander. If the Secretary, or really PHMSA, determines that Enbridge's operation of Line 5 is a danger to the environment based on area conditions, the agency may temporarily shut down the pipeline or order the company to take a wide range of other safety actions. See *id.* § 60112(d)(1), 60117(m), & 60117(p). In short, the Act tasks a specialized agency with monitoring and responding to the exact kind of risk at the core of the Band's public nuisance claim. We see no gap for federal common law to fill. Indeed, the United States has confirmed what the Act already made clear: the situation at the meander is the type of potential hazard that PHMSA subjects to close and ongoing supervision. See Brief of the United States at 58 ("[The Department of Transportation] has inspected Line 5 near the Meander and

continues to closely monitor the pipeline's safety while remaining in communication with the Band and Enbridge."); see also *id.* at 59 ("And DOT is prepared to … impose more stringent requirements if needed to ensure an adequate level of safety.").

Although the Band protests that nothing in the Act prescribes specific standards for a safe distance between a pipeline and a flood-prone river, "Congress selects different regulatory regimes to address different problems." *Am. Elec. Power*, 564 U.S. at 426. This includes opting for case-by-case agency decision-making. See *Milwaukee II*, 451 U.S. at 324. It makes good sense that Congress established flexible, situation-specific oversight for conditions that the Band acknowledges are inherently local. The Act need not spell out every "aspect[] of the area in which the pipeline is located" that may render its operation hazardous. 49 U.S.C. § 60112(b)(3); see also *Milwaukee II*, 451 U.S. at 324 ("Demanding specific regulations of general applicability before concluding that Congress has addressed the problem to the exclusion of federal common law asks the wrong question."). "The critical point" is that Congress delegated to the Secretary the decision "whether and how to regulate" the developing situation at the meander. *Am. Elec. Power*, 564 U.S. at 426 (finding displacement of federal common law claim based on carbon dioxide emissions due to federal regulation addressing "pollutants"). The Band's desire for more stringent regulation—or other agency intervention—does not alter the conclusion that Congress has determined the federal solution to the problem raised here.

Finally, we observe that the Pipeline Safety Act "provides multiple avenues for enforcement." *Id.* at 425. The Secretary

may issue orders directing compliance with the Act, impose civil penalties, and request the Attorney General to initiate civil actions to enforce the Act. See 49 U.S.C. § 60118(b), 60122(a), & 60120(a). The Act establishes criminal liability for certain knowing and willful violations. See *id.* § 60123. Congress also created a right of action permitting private persons to seek injunctive relief for violations of the Act, so long as the Secretary or Attorney General has not already initiated an agency or judicial proceeding against the violator. See *id.* § 60121(a). As we see it, Congress has given the safety regime under the Act real teeth, leaving no need to supplement with federal common law.

## B.  The Pipeline Safety Act's Saving Clause

A saving clause within the Pipeline Safety Act makes the displacement question difficult, however. The clause tells us that "[t]his chapter," which covers the whole Act, "does not affect the tort liability of any person." 49 U.S.C. § 60120(c). By its terms, we could read "tort liability" to cover federal common law torts and, more specifically, the Band's public nuisance claim seeking injunctive relief. On this view, which the Band embraces, the saving clause suggests that the Pipeline Safety Act does not affect Enbridge's liability under the federal common law of nuisance, meaning that the Act and federal common law both offer sources of authority for imposing safety requirements on pipelines.

But we see this analysis as missing a crucial point: we are operating in the field of federal common law. Our default assumption is that Congress should establish "appropriate federal standards," not courts doing so "through the application of often vague and indeterminate nuisance concepts and maxims of equity jurisprudence." *Milwaukee II*, 451 U.S. at 317.

This is especially true given Congress's careful and complete crafting of a regulatory regime, headed by a specialized agency, to address pipeline safety. See *id.* at 317–19. Our task, then, is to interpret the saving clause's text, against the backdrop of the Pipeline Safety Act's express grant of regulatory authority to the Secretary and our presumption against federal common law.

With this in mind, we conclude that "tort liability" in the saving clause does not encompass the Band's federal common law public nuisance action. See *Milwaukee II*, 451 U.S. at 329 (deeming it an "unlikely assumption" that "common law" in the citizen-suit provision of a federal environmental statute "includes the limited *federal* common law as opposed to the more routine state common law"). Top of mind is the precise relief sought by the Band. Tort actions for damages "necessarily perform an important remedial role in compensating accident victims," and may thereby coexist more easily with Congress's comprehensive regulatory regime. *Sprietsma v. Mercury Marine*, 537 U.S. 51, 64 (2002). But the district court imposed an injunction with all the earmarks of a regulatory order. Put simply, it duplicates the type of action that PHMSA may elect to take when, in its judgment, Line 5's operation at the meander poses a sufficient hazard. On balance, we do not believe that Congress intended to save a federal common law action for relief that reaches into the scope of the regulatory core competency that it otherwise codified in the Act. Cf. *Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 870 (2000) ("[T]his Court has repeatedly declined to give broad effect to saving clauses where doing so would upset the careful regulatory scheme established by federal law." (cleaned up)). Considering the Act as a whole, the Band's capacious reading of the saving clause stretches too far.

Indeed, it is "altogether fitting" that Congress "designated an expert agency," here PHMSA, to serve as the primary regulator of the erosion risks at the meander. *Am. Elec. Power*, 564 U.S. at 428. Given the technical complexity of managing this environmental risk, the agency is "surely better equipped to do the job than individual district judges issuing ad hoc, case-by-case injunctions." *Id.* This is particularly true given the marked Executive Branch interest, codified in the Transit Treaty, in ensuring the undisrupted flow of hydrocarbons through Line 5. An agency, acting with greater agility, scientific knowledge, and technical expertise, is better positioned than a federal court to manage the regulatory tradeoffs needed to maintain environmental safety and to protect the national interest in energy. We see no role for the equitable power of the courts to improve on Congress's chosen pipeline safety monitor. Cf. *Asian Carp I*, 667 F.3d at 797 ("[T]he practical effect of agency actions might add up to displace as a matter of fact any role that equity might otherwise play.").

## V

For these reasons, we AFFIRM the district court's award of summary judgment for the Band on its trespass and unjust enrichment claims and on Enbridge's breach-of-contract counterclaim. We also AFFIRM the availability of restitution and a permanent injunction as remedies for the trespass claim. We VACATE, however, the restitution award and injunctive relief that the district court imposed and REMAND for further proceedings consistent with this opinion. Finally, we REVERSE the district court's judgment for the Band on its public nuisance claim and VACATE the resulting injunction.